UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

——------------------------------------------------x

DEVI NAMPIAPARAMPIL,

<em>Plaintiff,</em>

–against–

THE NEW YORK CITY CAMPAIGN FINANCE

BOARD, et. al.,

<em>Defendants</em>

**PLAINTIFF'S
RESPONSE TO THE
DEFENDANTS'
MOTION TO DISMISS
THE COMPLAINT**

No. 23 Civ. 6391 (ER)

Devi Nampiaparampil

Pro Se (Unrepresented) Litigant, The Plaintiff

Metropolis Pain Medicine PLLC

111 John Street Suite 2509

New York, NY 10038

Cell: 312-523-5935

Email: devichechi@gmail.com

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION                                              p3

FACTS                                                    p3

FACTUAL DISPUTES                                          p5

    RESPONSE TO POINT 1                              p7

        THIS ACTION IS NOT CLAIM-PRECLUDED BY
        MY PRIOR ACTION IN NEW YORK COUNTY
        SUPREME COURT

    RESPONSE TO POINT 2                              p24

        MY $1983 CLAIMS OF RETALIATION ARE VIABLE
        AS A MATTER OF LAW

    RESPONSE TO POINT 3                              p29

        THE DEFENDANTS HAVE THE CAPACITY
        TO BE SUED

CONCLUSION                                               p29

## INTRODUCTION

This case is not a partisan attack on a City Agency from a disgruntled candidate; nor is it an assault on campaign finance reform. It is definitely not about whether an elected official should be addressed by his name or his title, as it might first appear. We live in a free society where people express their choices through their votes. In 2021, the Defendants deprived me and the public of that choice by "canceling" me on a whim– perhaps not even for what I personally said or did– but because they disapproved of the political party that gave me an opportunity to share my ideas and to further contribute to this city. This "cancel culture" ideology has no place in a democratic government. Moreover, the United States is governed by a system of checks-and-balances. For voters in New York City, arguably the most influential city in the world, to have a government Agency be at the mercy of a small group of unelected bureaucrats, unrestricted by internal or external controls, is unimaginable.

## FACTS

I, the Plaintiff, Devi Nampiaparampil, am an Associate Professor at NYU Grossman School of Medicine with a private practice in downtown Manhattan where I perform interventional pain (spinal) procedures, joint injections, and nerve blocks.  I completed all my specialty and subspecialty training through Harvard Medical School, where I was ranked by my professors (now peers) as among the top 5% of alumni from my residency program. I also have a masters degree from Columbia University Graduate School of Journalism and have appeared on-air in over 500 national and international news segments for Fox News, CNN, MSNBC, CNBC, and Fox 5 NY where I am currently an on-air medical contributor. I ran as the Republican nominee for New York City Public Advocate in the 2021 general election. (Compl. ¶¶ 3, 10, 24-28).

Defendant New York City (NYC) Campaign Finance Board (CFB) is an independent agency that administers the Campaign Finance Program created by the NYC Campaign Finance Act in 1988. (NYC Admin. Code $$ 3-701-719; NYC Charter $$1051-57). The CFB employed the individual defendants. The CFB says it promotes fair elections through various programs including (1) a citywide "Voter Guide" (the "Guide") and (2) the Matching Funds Program (*Id* ¶ 30).

The CFB has described the Guide as a "critical" resource that "helps NYC voters make informed choices at the polls." (*Id* ¶ 31). There are numerous restrictions on candidate statements, including that statements may not "refer to any opposing candidate by name." Candidate statements that violate the requirements outlined in the CFB Board Rules "as determined by the Board in its sole discretion," will not be included in the Guide (RCNY $$16-02(b)(i)(E), 16-02(b)(ii)(G)  .

I prepared a Guide profile that included my photo, background, platform, and my name as it appeared on the 2021 general election ballot and as I am recognized in the community. The Defendants excluded my timely submitted print and online Voter Guide profile from public view because I referred to my opponent by name (Compl., ¶¶ 56, 58). The offensive statement can be seen in Exhibit B, p26/ 31:

"Mismanagement, backwards laws and bureaucracy have pitted employees against employers, tenants against landlords, parents against teachers, patients against nursing homes & healthcare providers against hospitals: New Yorker against New Yorker, a survival of the fittest. The Public Advocate can publish the city's data. Jumaane Williams has failed. With transparency, private citizens will solve our city's problems. When our city was infected with COVID, I treated patients. When we needed answers, I contributed to medical research. When we had an economic crisis, I created jobs. Unlike Jumaane Williams, I will fulfill the Public Advocate's mandate."

Defendant Duhalde, who served as the former Deputy Director of the Democratic Socialists of America, and whose household had previously donated to Jumaane Williams' prior campaign, reviewed my video voter guide script and informed me that I could be sued for "mentioning the candidate's wife" and describing her as a "lobbyist." This was a term her employer had used. Because a government official had threatened a lawsuit, I revised my script (Id., ¶ 71, 72). Nevertheless, unlike the other candidates, my video was posted in a manner that made it undiscoverable. It likely lacked the search tags that the CFB had applied to the other candidates' videos ((Id., ¶ 74). In advance of a CFB-sponsored television debate about the job [opportunity] of Public Advocate, the Defendants asked me twice to email them with my "race [and] gender" for a government-issued press release. The information was purportedly for voters with disabilities to decide who to elect for the job position. The CFB had already excluded my background and campaign platform from its print and online Guide. My statements about race, gender and bodily measurements could be construed as my stance both as a candidate and as an employer, which they were not. Nevertheless, I felt I must disclose this information so the Defendants wouldn't exclude me from the televised debate.

On September 29, 2021, when I learned of my exclusion from the Guide, I sought a temporary restraining order asking for my information to be added either as an insert or a postcard. The CFB moved forward with its mailing, distributing the Guide to over 5 million households. The mailing resulted in a drop of my campaign's fundraising from approximately $80,000 the week before its release to approximately $1000 the week after its release. I never applied for matching funds during the campaign; nor did I ever receive them. My campaign exited the election on November 2, 2021 with zero violations and zero penalties (Id., ¶86). Our back-up documentation error rate was 0.00% (Id., ¶92). I received 23.4% of the vote (over 254,000 votes) (Id., ¶84). After the election, the CFB informed me that I was subject to post-election penalties for over-the-limit

contributions. It prohibited me from donating to any "other campaigns." After the election, the CFB recommended I close my bank account so I could cease filing disclosures (Id., ¶88). I closed the bank account on January 11, 2022.

In August 2022, I filed an order-to-show-cause in the TRO Court to pursue my case. The Court declined to sign. The decision was entered on the docket (Id., ¶¶89, 90). The "Draft Audit Report" issued to my campaign shortly afterwards listed dozens and dozens of minor infractions for a dormant campaign that had ended a year prior (Id., 93). The violations are exceedingly technical. For example, one supposed campaign finance violation (that can be penalized at $10,000 per violation) is for us having purchased balloons for a fundraiser and not separating out the base cost of the balloons from the associated fees in the C-smart web program. It did not matter that we entered the total cost of the balloons, submitted the receipt, and submitted the associated bank statement. Another violation was for a missing $8.96 receipt from Duane Reade, even though we reported the expense. The time I spent responding to these purported violations is time I was unable to treat new or existing patients.

In the same time frame, I proceeded pro se in a case for Negligence in NYS Supreme Court and in the audit investigation because the Defendants led me to believe that I would receive penalties for over-contributions if I retained counsel after my campaign was out of money. Ultimately, I lost the Negligence case.
If not for the CFB's ongoing and escalating civil rights violations, particularly the Challenged Rule and its spending restrictions, I would run for office again. As the Plaintiff, I bring this action under 42 U.S.C. § 1983 and New York law, alleging that the Defendants New York City (NYC) Campaign Finance Board (CFB), David Duhalde, Hannah Egerton, Amy Loprest, Bethany Perskie, Frederick Schaffer, Matthew Sollars, and Jaclyn Williams ("the Defendants") acting both individually and together violated my civil rights under the U.S. and N.Y. Constitutions before, during, and after the 2021 general election, in which I was the Republican Party's nominee for NYC Public Advocate, a citywide position.

## FACTUAL DISPUTES
### (Including new facts to counter statements)

*Matching Funds "Program Participant"*
The Defendants state that I was a Matching Funds "program participant," a misleading term. Before I could be listed on the CFB's website as an official candidate, and before I could collect any contributions through the CFB's NYCVotes credit card platform, my campaign had to register with the CFB. This meant the campaign had to choose whether to remain eligible to apply for matching funds at any time in the future or whether to forfeit that opportunity altogether. The campaign chose to remain eligible to receive matching

funds. I signed a certification form, thereby expressing a *desire* to someday apply for 8:1 matching contributions from taxpayers through the CFB's Matching Funds program [Ex N, p11-13/16]. My campaign never completed or submitted the application forms for matching funds and we never received any matching funds. The only money my campaign committee, "Dr. Devi For NYC" ever asked for, or received, came through small dollar donations. We never received any public funds.

Of note, I was running for Mayor when I filled out the CFB's certification form. [Ex. N,  p4/16]. When the Republican Party substituted me for the Public Advocate position, the CFB deleted my information from public view and prevented people from donating to my campaign noting an issue with the office sought. According to its own records (obtained through a FOIL), it terminated my candidacy and participation in the program when I didn't appear on the final ballot (Ex. (marked)).

*Misrepresentations*

The Defendants' current interpretation and characterization of the crucial representations they made to me during their mandated training sessions (Compl., ¶54) is not exactly correct.

The  CFB informed me that it would judge the value of a service, not solely by its price tag to the campaign, but by its fair market value. In its judicial opinion, "To Volunteer or Not to Volunteer," the CFB assessed the fair market value of a political consultant's "volunteer" work at $250,000 and concluded that the campaign had to pay him the money. Essentially, the CFB determined that people could not volunteer valuable professional services to campaigns. The campaign needed to have fundraised the money to afford those costly services. As it was explained to me, lawyers could not work pro bono on a campaign, for example, (unless their legal advice was deemed worthless). The policy is explained to some extent in a NYT article (Ex. O, last 3 paragraphs) and in the CFB's own publication (Ex. P, last 2 paragraphs).A variety of similar examples were given to the trainees during these mandatory training sessions, including one about John Catsimatidis, the founder of Gristedes, who allegedly unknowingly received a food and beverage discount from a vendor servicing his Mayoral campaign fundraisers. According to the employees leading the training session, the CFB issued violations and penalties based on the amount of the discount.

For this reason, my mother and I believed we could not speak to lawyers, accountants, or political consultants to help us set up the campaign infrastructure, or to even get a second opinion on the CFB's legal advice. By September 2021, my campaign had finally fundraised enough for us to speak to a lawyer. The lawyer offered me a discount, which I refused, because I thought he and I would both be fined and I might end up in jail. I wrote this to him (Ex. Q).

In CFB v. Gerson et al.,a case I found more recently, the CFB prosecuted Alan Gerson, who had not received matching funds, for over-contributions related to a legal dispute (Gerson v. NYC CFB 2019 Slip Op 03268). In 2019, ten years after Gerson's election campaign, the Appellate Court ruled:

*"The court erred in upholding the Board's finding that petitioner Gerson's contribution of more than $30,912 to his campaign exceeded the $2500 limit on expenditures… [Gerson's expenditures] are covered by the exemption for expenditures made for the purpose of "bringing" or "responding" to a "proceeding" or "claim" before a court." (Administrative Code §3-706[4][a]; 52 RCNY 1-08[d][4][i][A]... We find the denial of matching funds and the penalties imposed… grossly disproportionate to any offenses committed by [Gerson and his campaign] (see generally Matter of Pell v Board of Educ. of Union Free School Distr. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 233-234 [1974])."*

The CFB persisted in its application of this policy as late as November 29, 2022 when I had a virtual session regarding my audit. My mother had previously volunteered as the Treasurer in 2021, regularly submitting financial documents to the CFB and answering its Statement Reviews. Upon learning that my mother had expertise in this area, Donna Ross, the auditor, told me that my mother could not be a volunteer. My mother should have been paid $30,000. Since the campaign no longer had any funds by the time of the audit, and since it had already closed its bank account, there was nothing we could do to rectify this "error." Moreover, if my mother had written a check to herself before I closed the bank account, I would probably have put $30,000 into the account to cover the expense. Otherwise, my personal credit would be damaged. Then she would have to return the money to me, and as the officers of the campaign, we would both personally be charged up to $100,000 in penalties by the CFB. (CFB v. Gerson et al. OATH Index 2421/14 (2015)). The Judge ruled in the CFB's favor, "The Act authorizes petitioner to impose civil penalties of up to $10,000 for each violation. Admin. Code 3-711(1). In addition, petitioner may impose a civil penalty of up to three times the amount of excess expenditures."

To this day, I cannot tell whether I was misled by the CFB's misrepresentations OR whether I correctly understood and interpreted the CFB's guidance about its informal policies. In either case, the CFB's policy interfered with our freedom of assembly (to organize a campaign) and our freedom of speech. Lawyers and accountants could not speak freely to us. We could not listen; nor could we speak freely to them. The value of the speech would be assessed by the government and subject to its contribution limits.

## RESPONSE TO POINT 1: THIS ACTION IS NOT CLAIM-PRECLUDED

I concede that I commenced two actions in New York State Supreme Court against the NYC Campaign Finance Board. I commenced the first one on **September 29, 2021** as an Order to Show Cause (OSC)/ Temporary Restraining Order (TRO) on the print voter guide until my profile could be included for the

voters ("the TRO Court"). The second action was commenced on **October 20, 2022,** approximately one year after the print Guide's publication, for Negligence, Libel and other claims "the Negligence case."

(1) <u>The Negligence case was not adjudicated on the merits.</u> Here, the Defendants argued a) that I had failed to state a claim and b) that the Court lacked jurisdiction. The Judge dismissed the case opining it was time-barred. In Exhibit M p4-5, (with the conclusion boldfaced by me), the Judge opined:

*"General Municipal Law §50-i (1) provides that no action shall be prosecuted or maintained against a city entity for personal injury, wrongful death, or damage to property resulting from the city's negligence "unless (a) a notice of claim shall have been made," "(b) at least thirty days have elapsed since the service of such notice," and "(c) the action or special proceeding shall be commenced within one year and ninety days after the event upon which the claim is based." (General Municipal Law §50-i.) §50-e of the same law requires that plaintiffs must serve notice on the city within 90 days after the claim arises.  (General Municipal Law §50-e.) Here, plaintiffs have not complied with these provisions. First,* **Nampiaparampil and Metropolis did not serve the CFB with a notice of claim within 90 days***… Second, plaintiffs have failed to comply with §50-i(1)(c), which is also why the Court must deny platinifs' cross motion to rectify the failure to serve notice §50-e(5), entitled "application for leave to serve a late notice," provides "upon application, the court… may extend the time to serve a notice of claim" but such extension "shall not exceed the time limited for the commencement of the action by claimant." (GML §50-e[5].) Where a plaintiff moves to rectify the failure to provide notice after the 1-year-and-90-day period for an action in which the statute applies, the court is without authority to grant it…. **As such the Court is powerless to grant an extension for a notice of claim… [F]or these reasons alone, plaintiffs' causes of action are dismissed."**

Because the Judge viewed the Notice of Claim/ Statute of Limitations as a fatal flaw to the case, she dismissed it. She wrote that the Notice of Claim and the Statute of Limitations issues were the <u>only</u> reasons the causes of action were dismissed.

(1a) <u>I contend I could have corrected the pleading deficiencies with an Amended Complaint to address the merits.</u> The Defendants state that the Court found that the CFB did not have a "special duty" to me, so I could not plead Negligence effectively, and that I had not adequately pleaded Libel. First, the CFB extended itself by providing legal advice to me during the training sessions and at various other times during the campaign. The CFB liaisons voluntarily assumed a special duty. Moreover, because I did not understand the legal definition of "Actual Malice," I did not plead Libel effectively. However, after I received the Judge's feedback, I understood what needed to be done. As seen on p2-3 of Plaintiff's Exhibit M, the Judge reviewed all of the Defendant's exhibits, but only a couple of mine. There is a gap between 18 and 104. She likely did not see the purpose if the claims were <u>time-barred.</u> Many of the pleading requirements were met in my

Affidavit and in my Exhibits, which I could have extracted for an Amended Complaint. Even Defendant Perskie commented on this in Exhibit K, p3/ 20:

*"Plaintiffs make numerous claims allegedly bolstered by voluminous exhibits which seek to prove the factual claims alleged in the Complaint, as well as additional factual claims asserted for the first time in the Plaintiffs' Affidavit. However, The Plaintiffs' Affidavit and accompanying exhibits fail to comply with the timing requirements of CPLR 2214(b)... Defendant reserves its right to seek relief from this Court striking such submissions from the record... [T]he Complaint's facts are not in dispute at this time, and insofar as the exhibits purport to establish new facts or legal theories, they are immaterial to the sufficiency of the Complaint. Plaintiffs cannot use their opposition to Defendant's Motion to Dismiss as a backdoor to amending their Complaint absent leave from the Court."*

Whether I stated the relevant facts in the Complaint or the Affidavit, the courts liberally construe pleadings prepared by pro se litigants and hold them "to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007).

The Court can consider affidavits submitted by a pro se Plaintiff to remedy any defects in the complaint (Rushaid v Picter & Cie, 28 NY3d 316, 327 [2016]); Chanko v. American Broadcasting Cos., Inc. 27 NY3d 46, 52 [2016]. "Whether the complaint will later survive a motion for summary judgment, or whether the plaintiff will ultimately be able to prove its claims, of course, plays no part in the determination of a prediscovery CPLR 3211 motion to dismiss" (Shaya B. Pac., LLC v Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, 38 AD3d 34, 38 [2006].

    (1b) <u>If the decision were on the merits, my company could have re-filed in Westchester County with an attorney, had I been aware of the Defendants' misrepresentations.</u> There were two plaintiffs: me and Metropolis Pain Medicine PLLC "Metropolis" d/b/a Devi Nampiaparampil, MD, which I solely own. The Judge dismissed the case for both of us and did not differentiate between us in her dismissal statements. She denied me the ability to legally represent my Metropolis (Ex. M, p3) likely based on Reilly Design v. Houraney, 40 A.D. 3d 592, which held, "[L]ike a corporation or a voluntary association, the LLC may only be represented by an attorney and not by one of its members who is not an attorney admitted to practice in the state of New York." This decision is supported by Limited Liability Companies: Tax and Business Law, ch 5, ¶ 5.05 [1][e]. Yet, if the case was decided on the merits and dismissed with prejudice, as the Defendants now argue, that necessitates believing that Judge Negligence also barred Metropolis from ever having attorney representation to litigate its claims– whether it was in the brief before her, in a future Amended Complaint before her, or in a future refiling in another jurisdiction. If she already concluded that I lacked the authority to initiate or litigate a case for Metropolis in the first place, and therefore the PLLC had insufficient counsel,

why would she restrain Metropolis in this manner? The Judge did not comment on the corporation's attorney representation, or lack thereof because the whole case appeared to be time-barred.

The Court did not believe it had the power to hear the case due to the date on the Notice of Claim, which led to the accompanying determination that the case was initiated after the Statute of Limitations had passed. The Court also determined it did not have jurisdiction over one of the Plaintiffs, Metropolis. Therefore, the case was never dismissed on the merits for Metropolis or for me. Res judicata should not apply.

Although the Judge provided constructive criticism of my Complaint, the language suggests this was for my edification, not for the purposes of adjudicating the case on the merits. She wrote, "**Given the importance of the allegations to plaintiffs**, the Court will address the merits of each cause of action below…" (Ex M., p5) and then commented on some, but not all, of my causes of action in her Judgment. Moreover, she never addressed the First Amendment issue, which the Defendants now argue I had a chance to fairly litigate and bring to a conclusion.

(2) Constitutional claims are not hostage to Notice of Claim statutes. Although my Negligence, Libel,and Disparagement of a Commercial Entity ("Devi Nampiaparampil, M.D.") causes of action appeared to be time-barred based on the City's statutes, I could move forward under Title 42 U.S.C. §1983. The City used a 1 year 90 day limit. The federal government employs a 3 year limit to these types of personal injury cases. In Wilson v. Garcia, the Supreme Court ruled:

*"Congress would not have characterized $1983 as providing a cause of action analogous to state remedies for wrongs committed by public officials. It was the very ineffectiveness of state remedies that led Congress to enact the Civil Rights Acts in the first place. Congress therefore intended that the remedy provided in §1983 be independently enforceable whether or not it duplicates a parallel state remedy (Monroe v. Pape, 365 U.S. 173)… It is most unlikely that the period of limitations applicable to such [personal injury] claims ever was, or ever would be, fixed in a way that would discriminate against federal claims, or be inconsistent with federal law in any respect… The Court of Appeals correctly applied the 3-year statute of limitations governing actions "for an injury to the person or reputation of any person.""* (Wilson v. Garcia, 280 U.S. 471). The New York courts followed, "1983 is independently enforceable whether or not it duplicates a parallel state remedy" (South Salina, 68 N.Y.2d at 489, 503 N.E.2d at 71, 510 N)

(3) First Amendment claims are specifically exempt from New York City's Notice of Claims requirements.

This is a First Amendment case. It is uncontested that the CFB erased my Voter Guide profile from this "critical" resource because of my noncompliance with the Board Rule. The CFB admitted to this in our

prior state case. In her Opposition Brief, Defendant Perskie wrote, "The deadline to submit a voter guide profile for the 2021 general election was August 2, 2021. Nampiaparampil timely submitted a voter guide profile that referred to an opposing candidate by name. On August 4, 2021, a CFB liaison notified Nampiaparampil that the profile text she had submitted for the voter guide did not comply with the requirements and to email a corrected version by August 5, 2021… Because Nampiaparampil did not submit a legally compliant voter guide profile, no profile for Nampiaparampil was included in the print voter guide." See Opp. Br., 2022 WL 19570753.

In Kassapian v. City of New York, an administrative law judge spoke to the press about pressures she endured to find more civil defendants guilty and to issue greater penalties in order to increase the City's revenues. The Defendants moved to dismiss based on the Notice of Claim, and the Plaintiff moved to amend her complaint to include First Amendment retaliation. The case was dismissed but the decision was overturned (boldfaced added by me).

*"The Supreme Court improvidently exercised its discretion in denying the plaintiff's cross motion pursuant to CPLR 3025(b) for leave to amend the complaint to assert an alternative First Amendment retaliation cause of action pursuant to 42 USC §1983, for which a notice of claim is not required (see Felder v. Casey, 487 US 131, 153 [1988]; Blake v. City of New York 148 AD 3d 1101, 1005 [2017]). Given the state constitutional causes of action included in the original complaint, the defendants would not be prejudiced or surprised by the assertion of a First Amendment cause of action… As with unlawful retaliation claims under the NYCHRL, in the First Amendment context, a plaintiff "need only show that the retaliatory conduct in question "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." (Kassapian v. City of NY 155 AD 3d 851.*

The Defendants' behavior, which I described in detail in numerous fora, all related to restrictions on my freedom of speech, freedom of assembly, and freedom to redress my grievances, and now, retaliation for my protected activities. In Defendant Perskie's November 15, 2022  Memorandum of Law in the Negligence case, she wrote,[1] "[Campaign-related] events… are a foundational and routine component of any candidacy for public office… CFB staff instructed Nampiaparampil that wages for employees, including… security personnel, were a…campaign expenditure." We both agreed. "Plaintiffs imply that Nampiaparampil was subjected to an increased risk of physical harm due to her participation in certain campaign-related events and activities, which she… would not have attended alone, if not for the guidance she received from CFB staff regarding the laws governing campaign expenditures… Plaintiffs obliquely claim that the training and advice provided by CFB staff, or possibly the campaign finance statutes themselves, caused these harms…The extraordinary actions allegedly taken by third parties during various campaign events were entirely

---

[1] I have re-ordered these sentences

unforeseeable and constitute a superseding cause of Plaintiffs' alleged injuries." As a layperson, it hadn't occurred to me that the statutes could be considered unconstitutional until after I read Perskie's Memo. Her Memo belied the Defendants' true motive behind contribution limits for those candidates who had not received, or even applied for matching funds, but who had expressed a desire to apply in the future. Those non-recipient candidates, typically challengers to the government like me, would have to choose between their own personal safety– in terms of potential political violence– or campaign finance violations and penalties if they spent their own money hiring security to participate (in Perskie's words) in "foundational and routine component[s] of any candidacy."

(4) <u>Tort claims can also proceed in New York even if filed after 1 year and 90 days, as long as the Statute of Limitations is tolled and there is a good reason the Notice of Claim is being filed late.</u> This is up to the Judge's discretion.

(a) <u>The Statute of Limitations can be tolled for continuous wrongs causing ongoing harm.</u> But not for the  CFB's ongoing civil rights' violations and misconduct, particularly the Challenged Rule, and their harassment in the form of financial disclosures and an audit, I would run for office again. I concede that I referred to the Draft Audit Report in the Negligence case (Ex. L, p5-7/11). I also referred to eleven (11) proceedings brought against my campaign and my mother, which I had to defend **by myself** in OATH Court on the same day my mother was having parts of her stomach, small intestine, pancreas, liver, and greater omentum removed. I was her proxy and the only person allowed near her (because of COVID restrictions at Memorial Sloan Kettering Cancer Center) but I had to leave my mother by herself  out of respect for patients' families in the O.R. Waiting Area. I could not participate in a hearing there.  Because I needed to win these cases to defend my medical license, I couldn't even skip it. Miraculously, over the course of the next few months, I won all of the cases [Ex. R]. What the Defendants neglected to mention is that I brought up the CFB's behavior in a <u>Sur-Reply,</u> which was never read by the Judge (Exhibit R). I wrote:

*"After going to court pro se and successfully getting all 11 Summons DISMISSED after a period of 6 months, I tried to find out what the CFB's exact involvement was in these accusations against my mother and me. After all, if I had been found guilty– of either the illegal postings or even of retaining an attorney and thereby making an over-the-limit contribution, a campaign finance violation– I would have had to explain all these illegal activities to the NYS Board of Medicine. I would have risked losing my medical license and potentially destroying my entire medical career over approximately $1000 worth of tickets for campaign signs that we never posted."*

Defendant Perskie's response [Exhibit R]  read in part, ""The CPLR does not provide for sur-reply papers, however denominated… Materials presented in violation of this Rule will not be read." Accordingly, Defendant New York City Campaign Finance Board respectfully requests that the Court disregard the

Sur-Reply in its entirety." The Court complied. The Court never adjudicated these matters. Nor did she address the misrepresentation about proceeding without counsel.

Although two OATH Court clerks told me that the CFB had participated in the proceedings against my mother and the campaign, I could not know for sure until recently. Although the CFB has been unable to produce any documents in response to my FOIL, the Department of Sanitation (DSNY) did. The CFB collaborated with the DSNY to retaliate against my mother. She and my campaign were prosecuted for putting up signs, in the days *after* the election (when there would be no point), in deserted and dangerous areas that are not near a subway and not near people who would see them. In fact, the areas were vandalized with graffiti with signs about "snitches" and "cop killers" and the City allegedly found my photo, phone number, and address in the midst of all of this, putting me and my practice at risk, and decided to issue these summonses against my campaign (Exhibit S).There were no 311 calls or other complaints, about these illegal signs. We received the summonses after my campaign was out of money, so the campaign could not pay. If I paid on behalf of the campaign, or if I hired an attorney to represent us, even if we won, we would receive violations and penalties. I had no idea if it was for each and every sign, which would amount to over $111,000 ($10,000 per violation plus the original $1000 in tickets). After all, the CFB prosecuted others in OATH Court demanding  hundreds of thousands of dollars for purported over-contributions on legal proceedings and parking tickets (Campaign Finance Board v. Gerson et al. OATH Index No. 2421/ 14 (Sept. 8, 2015)).

This is also significant because, if the Judge had been aware of the ongoing and continuous wrongs that I was routinely subjected to, she might have extended the statute of limitations based on the most recent wrong. The continuous wrong doctrine "serves to toll the running of a period of limitations to the date of the commission of the last wrongful act" and "may only be predicated on continuing, unlawful acts and not on the continuing effects of earlier unlawful conduct… The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs." (Henry v. Bank of Am., 147 AD 3d 599, 601 (1st Dept. 2017). The doctrine "is usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act." (Selkirk v. State, 249 AD 2d 818, 819, 671 NYS 2d 824 [3d Dept. 1998]).

I filed my case within 1 year of the Hagler hearing and within 1 year of discovering the false statement added to my name in the Guide. I attempted to submit a Claim nunc pro tunc, dating back to the time of the *TRO hearing*. I believed the hearing served as Notice for the CFB to investigate. I was confused by the Claim form, and I believed based on the CFB's representations, that I was not allowed to ask any professionals about it. Even though every date in my Complaint and in my Affidavits fell within the 1 year 90 day statute of limitations, I wrote "March 9, 2021" on the Claim form. (March 9, 2021 is the first time I felt the CFB was

negligent in its duties). I thought I had to delineate the first instance of harm, not the last. If I had listed the most recent date of harm, the Notice of Claim would have been timely filed and the entire case could have fallen within the Statute of Limitations. This is something I could have explained in a hearing or corrected with an Amended Complaint and Motion, but we did not have an oral argument; nor was I allowed to amend my complaint.

This is a situation that could have been rectified by an attorney. Although I am pro se now, I was prepared to hire an attorney at that time. What prevented me from doing so were the prior threats and misrepresentations by the Defendants about campaign finance violations. This itself would have tolled the time for filing the Notice of Claim (Contento v. Cortland Memorial Hosp., 237 AD 2d 725). The poor presentation of my case, my "failure to state a claim" was in part due to the Defendants' misrepresentations about whether I could hire an attorney, an ongoing violation of both my rights to free speech and my right to due process at the time. The Judge did not comment on this– again, because she was not adjudicating this case on the merits.

The misrepresentations continued to matter because I had proceeded through so many courts pro se. Rather than allow me to engage an attorney for OATH Court who might have freed me from the shackles of this psychological prison, the City encouraged me to represent my mother and "Dr. Devi For NYC," myself even though I was not a named Defendant (Exhibit U). I was stressed about my mother's health; meanwhile, my business lost a fortune while I prepared for the 11 cases.

(b) The Judge may have tolled the Statute of Limitations because this case falls within the public interest (423 S. Salina St. v City of Syracuse, 68 NY2d 493; Mills v County of Monroe, 59 NY2d 307, 312 [1983]; *855 Sager v County of Sullivan, 145 AD3d 1175, 1177 [2016]).

 "Core political speech" is the primary object of First Amendment protection." McConnell v. Fed Election Comm'n, 540 U.S. 93, 264 (2003). The CFB's Rules have been used to interfere with not only candidates' speech but with the public's ability to organize around candidates' platforms who they agree with. In NYC, candidates are unable to freely articulate their political platforms. Instead, there is a uniformity in the platforms because they are either censored or rewritten in order to conform with CFB employees' political views.

© The Court could have tolled the time for the Notice of Claim for the litigation. Because of the delays in scanning and uploading items to the file, I did not know that Judge Hagler had made a decision already– before we submitted our affidavits. I thought the case was ongoing.

(5) <u>Dismissal on a Motion to Dismiss generally does not have a res judicata effect.</u> A decision based on a motion to dismiss is not claim preclusive against later actions. Vista Points, LLC v. Waterfront Resorts, Inc. 2019 N.Y. Slip Op. 33878 (N.Y. Sup. Ct. 2019) ("a dismissal for failure to state a cause of action is generally not on the merits and will not be given res judicata effect."). (when a motion to dismiss is predicated on a claim of failure to state a cause of action, the plaintiff must be afforded an opportunity to seek leave to replead within the prescriptions of CPLR 3211 (e)." Varo Inc. v. Alvis PLC, 261AD2d 262, 267 (1st Dep't 1999). Thus, "a dismissal for failure to state a cause of action is not on the merits and, thus, will not be given res judicata effect." Pereira v. St. Joseph's Cemetery, 78 AD3d 1141, 1142 (2d Dep't 2010).

In summary, although federal claims could have been heard in state courts, and although my case could have been adjudicated in NY State Supreme Court, I had no obligation to file a Motion for Reconsideration or fight an appeal– trying to represent Metropolis, no less. After the Court dismissed the case, I became free to file in federal court, particularly since this experience convinced me I would run for office again but not for the CFB's Rule and behavior.

(6) Where "plaintiffs alleged continuing misconduct by defendants… res judicata is inapplicable." Perez v Danbury Hosp., 347 F3d 419, 426 (2d Cir. 2003). The Challenged Rules and practices remain in effect and constitute an ongoing injury. (Patane v. Nestle Waters N. Am., Inc., 314 F Supp. 3d 375, 384 (D. Conn. 2018). "Sensibly enough, res judicata does not apply if the wrong suffered by the plaintiff is of a recurrent or ongoing nature… This rule applies to a defendant's continuing course of conduct, even if related to conduct complained of in an earlier action." Davis v. Halpern, 813 F 2d 37, 40 (2d Cir. 1987). Courts have also declined to apply res judicata where the second action asserts claims that a statute violates the Constitution (Whole Woman's Health v. Hellerstedt, 579 U.S. 582 (2016) rejecting the idea of "treating every statutory enactment as a single transaction which a given party would only be able to challenge one time."

(7) <u>Res judicata does not apply because the present action seeks different relief than the prior action.</u> "[U]nder New York law, the form of relief being sought is an element of the litigant's claim." Leather v. Eyck 180F 3d 420, 425 (2d Cir. 1999).

(8) <u>Even if res judicata were applicable, the Court should not bar the claims because it would be</u> <u>"fundamentally unfair."</u> (UBS Sec LLC v Highland Cap Mgmt, LP, 927 NYS 2d 59, 75 (1st Dept 2011). I did not have a "full and fair opportunity" to litigate the case. Minnich v. Gargana, 2001 WL 1111513, at *6 (SDNY Sept. 20, 2001).

(9) <u>If the Court finds this Complaint insufficient to escape res judicata, I respectfully ask to amend my Complaint to also include other parties within my zone of interest, who experienced third-party retaliation</u> (Thompson v. North American Stainless LP, 562 U.S. 170 (2011)), which held, "Thompson [the plaintiff] is not an accidental victim of the retaliation– collateral damage, so to speak, of the employer's unlawful act. To the contrary, injuring him was the employer's means of harming Relgado. Hurting him was teh unlawful act by which the employer punished her. In those circumstances, we think Thompson well within the zone of interested sought to be protected by Title VII. He is a person aggrieved with standing to sue."

(i.) The Defendants retaliated against <u>my mother</u> with the OATH Court proceedings (Exhibit V: Affidavit from Mary Nampiaparampil).

(ii) The Defendants retaliated against the Republican slate with a new posting I first saw on January 8, 2024– after I became pro se– and before the NYS GOP Convention where 2024 candidates are selected to run for office. My attorneys at HSG conveyed my interest in running for office again, in my original Complaint submitted to this Court. The Defendants responded by posting a *2022* Voter Guide on their website (Exhibit W: 2022 Online Voter Guide).

Ballotpedia and the Board of Elections both post certified election results from the candidates who appeared on the ballot or were written in [Ex. X]. Their candidate rosters and the CFB's slate do not match. For example, in the 2022 U.S. Senate race, the CFB lists the "Candidates on the Ballot" as Charles Schumer and Diane Sare. Where is Joe Pinion's name? He was the Republican candidate who obtained 42.7% of the vote. The Defendants canceled him. For the 5 million eligible NYC voters, in addition to other members of the public, he did not even exist.

Because NYC has so many registered Democrats, only a limited number of races are contested. In 11 contested NYS Assembly races, the Republican was canceled. In 5 of the 9 contested NYS Senate races, the Republican was canceled. *<u>Of note, the Asian, Hispanic, and Black GOP candidates were disproportionately targeted by the CFB for deletion.</u>*

**U.S. Senate General Election:**

| District | Democrat | Republican | Other |
|----------|----------|------------|-------|
| 34 | Charles Schumer | **Joe Pinion CANCELED** | Diane Sare |

**2022 New York State Senate General Election:**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 34 | Nathalia Fernandez | **Samantha Zherka CANCELED** | |
| 32 | Luis Sepulveda | **Antonio Melendez Sr. CANCELED** | Dion Powell |
| 31 | Robert Jackson | **Donald Skinner CANCELED** | |
| 28 | Liz Kreuger | **Dr. Awadhesh Gupta CANCELED** | |
| 26 | Andrew S. Gounardes | **Brian Fox CANCELED** | Martha M. Rowen |
| 16 | **John Liu CANCELED** | Ruben D. Cruz III | |

**2022 New York State Assembly General Election:**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 86 | Yudelka Tapia | **Betty Obregan CANCELED** | |
| 82 | Michael R. Benedetto | **John Greaney CANCELED** | |
| 74 | Harvey Epstein | **Bryan Cooper CANCELED** | |
| 69 | Daniel J. O'Donnell | **Cynthia Acevedo CANCELED** | |
| 68 | Edward Gibbs | **Daby Benjaminé Carreras CANCELED** | |
| 55 | Latrice Monique Walker | **Berneda Jackson CANCELED** | Anthony Jones |
| 52 | Jo Anne Simon | **Brett Wynkoop CANCELED** | |
| 49 | **Peter Abbate, Jr. CANCELED** | Lester Chang | |
| 45 | Steven Cymbrowitz | **Michael Novakhov CANCELED** | |

| 44 | Robert C. Carroll | **Brenda Horton CANCELED** | |
| 40 | **Ron Kim**<br>**Name but no photo or platform**<br>CFB: "This candidate has not<br>submitted a profile" | **Sharon Liao CANCELED** | |
| 26 | Edward C. Braunstein | **Robert Speranza CANCELED** | |

Even if these Republicans either could not meet deadlines or simply chose not to submit their candidate profiles at all, that doesn't explain what happened in *Assembly District 40: Ron Kim vs. Sharon Liao*. The CFB wrote next to Kim's name "This candidate has not submitted a profile[.]" If so, why is his name included while Liao's is not? If she did not submit a profile either, then theoretically (although still illegally) both their names should have been included– not his alone.

Canceling Liao and deleting me from our respective guides had similar effects. The CFB denied us our right to free speech and the public's right to listen and to assemble around like-minded candidates to organize a campaign. Educated voters might use the CFB's "Compare the Candidates" and "Add to My Ballot" functions to plan out their voting choices before going to the polls. Under the color of law, the CFB misled voters into thinking there were no Republican candidates in these races, so that supporters would stay home and forgo voting.

A reasonable person would believe the heading "Candidates on the Ballot" is all-inclusive. If so, that person would also assume someone not included in the CFB's Guide asking for money in the form of campaign contributions, must be a con artist. After being excluded from the voter guide, I have received hundreds of those accusations from members of the public– to my face, through my family, through my medical practice's receptionists and answering services, and through online trolls.

The only entity legislated to provide an accurate roster of the candidates' names is the CFB. As a member of the public, without knowing candidates' names, I cannot research their platforms, contribute to their campaigns, or contact them about fundraising or volunteering. Individual candidates, particularly challengers, cannot reach millions of voters without first having funding and workers, which is why the legislature put the onus for voter education on the CFB, and not on candidates. Without having their names and platforms promulgated to voters, candidates also cannot reach the CFB's threshold requirements for matching funds.

The CFB canceled two Democrats in this Guide. In 2014, John Liu sued the CFB[2] for violating the First Amendment and Fourteenth Amendments, stating the CFB discriminated against Asian-Americans (Liu v. N.Y.C. Campaign Fin. Bd., No. 14-cv-1687 (RJS) (S.D.N.Y. Mar. 31, 2015). Liu lost in part because there were no similarly situated candidates. He was a "class of one," being the first and only party-endorsed Asian-American nominee on the citywide general election ballot. Upon information and belief, I am the second. After being canceled from the 2022 guide, Liu barely retained his seat in office. Incidentally, Bill Thompson[3] and John Liu[4] are the only two other people I  found who were prosecuted OATH Court over illegal signs. After they lost their respective elections, both received penalties of over $500,000. Peter Abbate, Jr. chaired the NYS Committee on Government Employees. After the guide's publication, he lost the 2022 race and left office.

I did not see the full 2022 voter guide until January 8, 2024, long after I filed "the Negligence case" in NYS Supreme Court on October 20, 2022. Between 2021 and 2023, to use the CFB's online guide, voters needed to enter their home addresses. Afterwards, the site presented them with tailored guides limited to their own districts.They could only see [some of] the candidates they were eligible to vote for– never the full NYC guide. That information remained hidden.

In a show of force, the CFB flaunted how easily it could restrict candidate speech. The Defendants had just learned through this SDNY case, that I would run for office again if not for their censorship. This 2022 Guide was posted before the NYS GOP Convention, presumably to pressure the Republican party into threatening me and ostracizing me and to make me feel guilty about the other GOP candidates who they had harmed.

Speech that relates to an election but occurs nowhere near the ballot or any other electoral mechanism is treated as core political speech entitled to the fullest First Amendment protection (McIntyre v. Elections Commission of Ohio, 514 U.S. at 347). The CFB made it clear that the Voter Guide is not ballot speech. That is how they removed the "Dr." honorific and the "Elizabeth" from my name. When I spoke at the September 14, 2021 hearing before the bipartisan group of BOE Commissioners, I won the majority vote, arguing that voters should be able to recognize their desired candidates on the ballot and vote freely. The BOE protected my right and the voters' rights to freedom of assembly. The CFB barred me, and all of the other doctors with Indian-American/ Asian-American names from using the "Dr." title stating it was against its "long-standing

[2] Azi Paybarah. Now, Liu pursues the Campaign Finance Board. Politico (March 12, 2014)
[3] David Seifmah. City upholds decision orderingJohn Liu to pay $527K for illegal campaign posters. NY Post (July 2, 2012)
[4]  Clear the Books, Bill. NY Post (October 3, 2012)

policy." Meanwhile, it added the "Dr." title to a white male Republican candidate's name, a supporter of mine, who had his platform erased from the guide purportedly for not submitting a profile. Of note, because he had the "Dr." title and I did not, this guide generated tremendous skepticism among Republican donors and within the larger community about whether I was a *real* doctor. The CFB's justification was that its voter guide was different than the Board of Elections' ballot.

The Defendants' retaliated against a lifetime member of the DSA, Theo Bruce Chino Tavarez, who ran in the 2021 Democratic primary for Public Advocate. Even though we were running for the same position, he submitted an Affidavit of Support in the TRO Court [Exhibit]. Tavarez explained that he had also referred to the incumbent by his actual name and not by his title. Tavarez's profile was still included in the CFB's print and online guides. Of note, Tavarez also attested that the CFB compelled him to change his candidate profile, co-authoring his platform for him and substituting its words for his, another violation of the First Amendment.

In 2022, Tavarez served as the Treasurer for another Democratic candidate, Paperboy Love Prince ("Paperboy"), an artist, rapper, entrepreneur, and philanthropist who ran for Mayor in the 2021 Democratic Primary and garnered attention from Rolling Stone, CNN, the WSJ, and other media. If elected, Paperboy would have been the youngest NYC Mayor and the first transgender NYC Mayor. Paperboy also volunteered on my 2021 campaign. Photos and videos of us together appeared on social media. Even though there were purportedly no complaints against Paperboy's campaign, the CFB called individual campaign donors to look for violations, creating a negative impression of both Paperboy and Tavarez among donors (Exhibit AA). Both contacted me.

In response to a FOIL request (Exhibit AB), the CFB provided the following documents, which show that Paperboy timely submitted a candidate profile for inclusion in the voter guide. In response and under color of law, Defendant Duhalde wrote, "The CFB will not publish links to any sites that appear to be personal or commercial… Your website includes a GoFundMe link for the Love Gallery. Delete the link or submit a campaign-specific web page." Presumably to be included in the "critical" voter guide, Paperboy's campaign acted accordingly, and responded, "We updated the website and changed the links." Duhalde then wrote, "To be published in the Voter Guide, the community center link needs to be removed throughout the website." In violation of the First Amendment and Citizens United v. FEC 558 U.S. 310 (2010), the Defendants censored Paperboy's personal speech, campaign speech, and commercial speech. In Paperboy's case, the Defendants extended past the voter guide censoring their campaign website and interfering with donations towards Paperboy's community center.

In their 2022 email to Paperboy, Defendants Duhalde and the CFB warn, "If you do not update your website and resubmit by that date, all non-compliant links will be removed from your candidate profile before it is published in the Voter Guide." In Paperboy's case, the Defendants intended to publish their profile but only to remove a "non-compliant" weblink. In my case, the entire profile was censored. Other Republican candidates were also censored in their entirety. Meanwhile, other Democratic candidates, such as Sean Hayes, a 2021 Mayoral candidate, had only one small section censored presumably for non-compliance. We can presume this because CFB Rules do not allow candidates to leave any sections blank.

The CFB also retaliated against several of my donors to chill their speech and mine by publishing their identities in a manner that could cause others to retaliate against them.

<u>Deliberate Escalation of Unconstitutional Behavior</u>
A) On January 13, 2023 after "the Negligence case" had been "fully briefed' according to Defendant Perskie [Exhibit], the CFB held a public hearing to review Proposed Amendments to the Voter Guide. There were several barriers to joining this Virtual public hearing: the email broadcast was misleading, an RSVP was required, the RSVP was set several days in advance of the meeting, the time of the meeting was changed, and the start time was delayed so we couldn't enter the Zoom session. Ultimately, I was the *only* member of the public who overcame all these hurdles and participated. I objected to the Proposed Amendments.

NYS's Rulemaking procedure legislates that all objections to Proposed Amendments be presented to the legislature before the adoption of the Rules. Section 1043 of the NYC Charter requires that NYC Agencies post these public hearings, post their Proposed Amendments for public comment, and post any objections they have received– either in full or in summary– alongside the Proposed Amendments before the Mayor's office signs off. In this case, the CFB never posted the recording on its website, Twitter, or YouTube Channel as it did with its other hearings or publish a press release about the outcome. The entire public hearing along with my objections seem like they never occurred. This is a prior restraint on my speech since neither the Mayor nor the City Council, many of whose members are lawyers, might have considered my objections before they adopted these Rules into the Charter. Consider (Exhibit AC p3):

"Whether a candidate video statement satisfies the requirements of these rules is determined by the Board at its sole discretion."... "candidate video statements included in the voter guide will be made accessible to individuals with vision disabilities"... p10 "the candidate may not… refer to any opposing candidate by name… use…statements…or materials that are patently offensive… make statements… or assert facts that the candidate knows or should know to be false… engage in any commercial programming or advertising… display any literature, graphs, or props."

21

The CFB amended the Charter in New York State. In O'Neill v. Oakgrove Construction Inc., 71 N.Y. 2d 521, 521 (1988), the Court ruled, "The protection afforded by the guarantees of free… speech in the New York Constitution is often broader than the minimum required by the First Amendment." Nevertheless, with these new Rules, I would once again be compelled to disclose my race and gender under the pretext of providing reasonable accommodations for the disabled.

B) Deliberate Continuation of Wrongs

I could not have brought up Campaign Expenditures in the Negligence case because I was still duped by the CFB's misrepresentations. In Gerson v. New York City Campaign Fin. Bd. 2019 NY Slip Op 03268, the Appellate Court ruled:

*"**Apparently, any error, no matter how minor, in any aspect of the documentations submitted in support of a certain contribution would render the documentation wholly invalid** for purposes of calculating the error rate… The Board failed to provide any reason for setting the threshold at 20%, rather than another percentage, or for not taking an approach other than cutting off all funds when the threshold is reached, **the informal rule on which [the CFB's] determination was based is "so lacking in reason for its promulgation that it is essentially arbitrary."** (New York State Assn of Counties v. Axelrod, 78 NY2d 158, 166 [1991]; see also Matter of Nicholas v. Khan 47 NY 2d 24, 34 [1979])...*

In spite of this ruling that even a 20% error rate, based on any minor documentation issue, was arbitrary and capricious, the Defendants held my mother, my campaign and me to an even more stringent 0.00% error rate. Although we never submitted the additional certification and application forms for matching funds, and although we were never awarded any matching funds, and although we never accepted any matching funds, the CFB continues to call the campaign a "program participant" and subject it to its unconstitutional and evidently "arbitrary and capricious" formal and informal rules. All of this is intended to chill speech and to interfere with our freedom of assembly by tying up our resources.

After this ruling, the CFB amended its Rules, which Defendant Egerton emailed me about recently on February 14, 2024 and again on February 20, 2024. The new Rules allows the CFB to serve me a summons to appear in OATH Court (for the twelfth time) to answer for violations. However, if the Court finds in my favor (as it has the other eleven times), the CFB does not have to abide by the Court's *now* "non-binding decision." Instead, the CFB can vote whether to adopt or disregard the OATH Court's ruling. The CFB Board, which is legislated to be "bipartisan" comprises almost all Democrats and Working Families members. Upon information and belief, no Republican has won a majority vote in front of the Board after an OATH Court hearing, particularly after suing it.

In spite of the Gerson Appellate Court ruling, the Defendants willfully and deliberately continued to train new candidates– challengers– that they cannot retain legal representation unless their campaigns have fundraised enough to afford an attorney based on the fair market value of legal services. The value would be judged by the Agency itself. If any candidate spent their own money above the allowed amount, they would be subject to violations and penalties for over-contributions. This directly contradicts the Appellate Court's ruling. Upon information and belief, only challengers are compelled to listen to these misrepresentations since incumbents are not required to complete all of the CFB training sessions. Incumbents likely would not attend the CFB's training, "New To The CFB," for example. These are viewpoint discriminatory learning modules because challengers generally only run if they have a problem with the government's status quo. Essentially, new candidates are compelled to listen to the CFB's misrepresentations in their viewpoint discriminatory training sessions, so that they forfeit their own civil rights.

In the original 2015 OATH case (the one that was overturned), CFB v. Gerson et al., the Judge affirmed the CFB's "No Opting-Out" Provision and added, "The Act authorizes petitioner to impose civil penalties of up to $10,000 for each violation. Admin. Code §3-711(1). In addition, petitioner may impose a civil penalty of up to three times the amount of excess expenditures." There appears to be no cap on the penalties related to candidates' contributions to their own campaigns if they ever expressed a desire to apply for matching funds. A billionaire, for example, who had not expressed any desire for matching funds, would not be subject to the same spending restrictions or to the same over-contribution violations and penalties. Because challengers generally spend their money on space, staff and marketing materials to start– not on expensive legal services– there is no one to warn them about this *Deal With the Devil* matching funds registration form.

<u>Deliberate Continuation of Wrongs: Race and Gender</u>

This claim should not be precluded. Defendant Sollars emailed that he was collecting this information for a "press release." Although I became a member of the NY Press Club in 2012, although I am currently an on-air contributor for Fox 5 NY, and although I have published national news stories which certain CFB employees have commented on, often positively, since 2015 [Exhibit AD], I never received its press release. I was excluded from the press distribution list. This may be a viewpoint discriminatory violation of my freedom of the press—discovery is needed on this point. Since I did not know that I was excluded from the press release distribution list, I believed the CFB had simply changed its mind about publicizing this information on race and gender.

Defendants Sollars and the CFB deliberately offered the public a license to discriminate based on race and gender. Race is a complex social construct, which goes beyond skin color. It is not determined by sight alone.

People who are born blind have no concept of color because they have never seen it. Gender also cannot be determined solely by external characteristics. That is why 2021 Mayoral candidate, Scott Stringer, listed his pronouns in the press release (Exhibit AE). The CFB voter guide lists reasonable accommodations that have been provided for people with disabilities like voting machines with less glare. The CFB did not list their forced disclosures about candidates' race and gender as one of their achievements for the disabled.

The City retained me to be its expert witness in Osorio v HHC and the Queens County Supreme Court qualified me as an expert on pain and disability (Exhibit AF). The multimillion dollar malpractice suit started prior to this CFB voter guide event and is still being fought. It does not make sense for the City to tout me as its expert on disability in one case and simultaneously discredit my opinions on disability in this case. For years, I have been listed in the City's database of medical experts on disability. I have also written letters requesting reasonable accommodations for employees of City Agencies, including the Office of Corporation Counsel, in the past year. I have been published in peer-reviewed journals for my work on pain and visual disorders [Exhibit]. By my conservative estimate, I have treated over 15,000 patients in my career, at least 2000 of which have had visual abnormalities. The CFB's policies lie completely outside of the standard of care for reasonable accommodations. We do not force people to disclose their race and gender before speaking to the disabled.

In the CFB's so-called visual descriptors, candidates included information on their background and platforms. For example, 2021 Mayoral candidate, Dianne Morales, described herself as a "first generation Afro-Latina," qualities that cannot be determined by sight alone. How can you tell by looking at someone if they are first generation immigrants? Pale-skinned people immigrate here, too. In my case, because my platform had already been deleted by the Defendants, the only thing the press and public learned about my campaign is my race, my gender, and my bodily measurements, which Sollars and the CFB also compelled me to disclose. Selecting people for an employment opportunity– which is what an election is– solely on the basis of race and gender runs completely contrary to my actual platform and to my practices as an employer. The information about bodily measurements was absurd, and likely intended to conjure up negative stereotypes about women candidates, particularly since I was the only party-endorsed female candidate in the Mayoral, Public Advocate, or Comptroller general elections in 2021.[1]

**RESPONSE TO POINT 2: RETALIATION IS ADEQUATELY PLEADED UNDER $1983**

"[W]hen a municipality 'chooses a course of action tailored to a particular situation,' this may also 'represent an act of official government 'policy.''" Montero v. City of Yonkers, 890 F 3d 386, 403 (2d Cir. 2018). Thus, "even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered''' may deprive the plaintiff of his or her constitutional rights. Amnesty Am. v.

Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986)). The Defendants undertook a "course of action" (harassing and uncommon financial auditing) to retaliate against me for suing them.

The CFB said that all campaigns are audited after an election but that is not true (See CFB 2017 Post-Election Report, Exhibit AI). Also, the nature and scrutiny of the audit can vary.

"[R]etaliati[ion]… in violation of the First Amendment" requires showing that Plaintiff's '(1) speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [them]; and (3) there was a causal connection between this adverse action and the protected speech.;'" Montero v. City of Yonkers, N.Y., 890 F. 3d 386, 394 (2d Cir. 2018).

I have pleaded the existence of (1) a formal policy, officially endorsed by the municipality for censoring campaigns and for auditing campaigns. Both of these policies were codified by the CFB and enforced at the CFB's sole discretion. The CFB chose to censor my speech with its unlawful policy. It chose to interfere with my speech and freedom of assembly with its Rules on candidates' individual spending limits irrespective of whether they received matching funds. Moreover, after witnessing my official oral testimony before the Campaign Finance Board in December 2021, after receiving and posting my additional written testimony (before I was cut off prematurely after 3 minutes), and after reading my various affidavits from past cases, the Defendants amended the Voter Guide rules in a series of additional First Amendment violations. They simultaneously censored my public objections both from the public and from elected officials, such as the Mayor and City Council. who signed off on their changes.

If that is insufficient, I can also plead (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of my civil rights. Defendants Duhalde, Egerton, Loprest, Williams, and Perskie deleted my campaign profile from the voter guide. Then they retaliated against third-parties in my zone of influence. The CFB rewrote Theo Chino's platform for him in the 2021 primary; after he assisted me in the Hagler hearing, the CFB targeted his donors for troubling and burdensome questioning, chilling their speech. Mark Szuzkiewicz endorsed me at one of my main fundraisers. Subsequently, the CFB censored his video voter guide. Paperboy Love Prince volunteered on my campaign and their photos and videos with me circulated to their large following. The CFB censored Paperboy's campaign profile. Then it extended its censorship crusade into Paperboy's website, including interfering with fundraising by Paperboy's community center. Most egregiously, the CFB targeted my mother, when we all believed she was dying. Then, upon learning that I might run for office again, the CFB flaunted its unmitigated power to suppress the speech of the majority of the Republican slate for 2022 state office

without consequence. Moreover, the CFB issued its advisory opinion barring campaigns from obtaining professional services– paid or pro bono– unless they paid for those services with money obtained either through them or through direct fundraising. The CFB used its legislative, executive, and judicial powers to violate my civil rights.

I can also plead (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials. The CFB denied me the use of my "Dr." honorific, thereby interfering with my freedom of assembly and my ability to organize my supporters– who knew me as "Dr. Devi," not as 'Devi Nampiaparampil." Voters might also be more drawn to me since I was a physician working on the front lines to keep immunocompromised and disabled patients out of the Emergency Rooms. Duhalde, Egerton, and Loprest cited a "policy" that no one could find for why the identification was denied. The CFB, well-versed in variables that affect voter preferences and used this knowledge to interfere with my freedom of assembly. In terms of auditing and financial disclosures, the CFB repeatedly cited a "policy" whereby only my data entry and bookkeeping in their proprietary platform could be considered. The hard copy bank statements, credit card statements from NYC Votes, the campaign receipts, campaign contribution cards, and other bookkeeping materials could be ignored in favor of their proprietary system. Yet they have never produced this policy.

The CFB also enforced its unofficial policy allowing it to be discretionary about the nature, scope, timing, and even occurrence of audits to retaliate against me. For example, after this case was initiated, the CFB changed its website to now read that Draft Audit Reports will be issued within 8-10 months of the campaign's end, which is close enough to the window in which I received mine. However, that does not explain the absence of any type of audit for Edwin De La Cruz, who received public funds in 2021, or the absence of a similar audit for similarly situated candidates to me: Devin Balkind (the Libertarian candidate for Public Advocate), for Dr. Raja Flores (a physician who ran for the citywide office of Mayor), or Aaron Foldenauer, a citywide candidate for Mayor who was also absent a Treasurer.

The CFB website says the Audit Process will be completed within 14-18 months after the Final Disclosure statement is submitted. Since the CFB refuses to accept my Financial Disclosure statement, why was I ever issued a Draft Audit Report in the first place? If it is because the audit process is supposed to be completed within 14-18 months of an election, why has former Mayor Bill De Blasio, known for his billion-dollar Thrive NYC program,  never received a final audit report for his 2017 election campaign from seven years ago? (Exhibit AG)

Finally, I have pleaded (4) a failure by official policy-makers to properly train or supervise subordinates to such extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. The CFB chooses not to record or post any of its training sessions online for others to review. It chooses not to issue a software manual for its proprietary web platform, C-smart. The CFB opts to have their software support personnel providing legal advice about how campaigns should operate, while simultaneously refusing to answer basic questions about which banks the CFB works with. CFB employees, like Williams, are able to block emails from candidates, block phone calls, cancel meetings, and work from home so that there is no conduit for candidates to access or communicate with the government (Exhibit AH). Because there are no adequate internal or external controls, these individuals retaliate at will.

Only one of the four pleading criteria described above has to be met (Moray v. City of Yonkers, 924 F. Supp. 8, 12 (S.D.N.Y. 1996)). Nevertheless, I can all four. "Where evidentiary material is submitted and considered on a motion to dismiss a complaint pursuant to CPLR 3211(a)(7), and the motion is not converted into one for summary judgment, the question becomes whether the plaintiff has a cause of action, not whether the plaintiff has stated one, and unless it has been shown that a material fact as claimed by the plaintiff to be one is not a fact at all and unless it can be said that no significant dispute exists regarding it, dismissal should not eventuate." (Rabos v. R&R Bagels & Bakery, Inc., 100 AD 3d 849, 851-852, 955 NYS 2d 109; Guggenheimer v Ginzburg, 43 NY 2d 268, 274-275, 401 NYS 2d 182, 372 NE 2d 17).

Even though I conceded the Public Advocate race to the incumbent on Election Day (November 2, 2021), and even though I closed the campaign bank account on January 11, 2022, the CFB refuses to accept that my 2021 campaign is over. State law requires that candidates submit their "cease filing" "final statement" to the Campaign Finance Board when they end their campaigns. The CFB has not accepted mine. The CFB asserts that my campaign has assets, which there is no record of– anywhere– not in the bank records, not in the contribution cards, not in the NYC Votes credit card contributions, not in bank transfers from either my personal or professional bank accounts. For over two years, I have repeatedly asked to speak to IT/ Software Support, but there has been no movement on this front. Meanwhile, in each disclosure statement, I am forced to attest to statements, which I know are false. The campaign does not have assets– that is false. But if I do not sign the attestation, the CFB can impose a $10,000 penalty for failure to file. Since I remain in this infinite loop with no end in sight, I must sign the attestations to avoid endless penalties and fees.

As long as I am still running for office (in 2021), I am still subject to the $6000 campaign contribution limit. This is the contribution limit that barred me from hiring an attorney, an accountant, or a political consultant for the campaign for years. Also, because I closed the bank account at the Defendants' urging, I cannot

fundraise from others. Because the CFB has stated that I am still running for office for 2021, I am also still subject to their financial disclosures.

I campaigned for approximately 8 months total (March 1, 2021 through November 2, 2021). I had a campaign bank account for fundraising and spending for approximately 9 months total. The process of submitting financial disclosures and answering to CFB statement reviews has been ongoing for 35 months. The CFB has been auditing me for almost 3 years with no end in sight and Financial Disclosures and reviews projected to go on until 2032, according to my CFB web portal, with an Audit that is projected to continue for 5 years past the last Financial Disclosure. I campaigned for 8 months; according to the CFB, I will regularly submit financial information to them for 16 years. According to the CFB, the Audit begins after the campaign ends and the financial disclosures cease. In that case, why am I doing both at the same time?

Our small campaign had been scrutinized to a greater extent (a), asked to perform burdensome and unnecessary financial disclosures (b), and held to a much stricter error rate (c). All of this required significantly more time, manpower, money, and expertise. Nevertheless, according to the CFB, we met that standard. Exiting the election in November 2021, these auditors assigned a 0.00% error rate to our campaign for its compliance.

A) In terms of scrutiny, for example, my own financial contribution to myself was rejected by the CFB (but not the credit card company) because of a discrepancy in the address to the likes of: "250 West 50th Street" vs. "250 W. 50 St." The CFB honed in on this error and flagged my own contribution as suspicious. After I addressed that, our assigned liaison cited a different reason for why the contribution appeared suspicious. The CFB could not be sure that "Devi Nampiaparampil" the employer hadn't coerced "Devi Nampiaparampil" the worker into making the contribution to "Devi Nampiaparampil" the candidate for fear of being fired. This type of logic, which we at that time attributed to "bureaucracy," was applied to an overwhelming number of our campaign contributions.

B) NYS does not require pre-primary financial disclosures for campaigns where the candidate does not face a primary opponent. However, the CFB demanded that we perform tedious and time-consuming tasks like submitting these early disclosures (for and responding in writing to their "statement reviews," reviews of our financial disclosures, thereby tying up my mother, my father, and several other volunteers who could have assisted with fundraising.

C) The CFB allows for a 20% error rate to receive matching funds (Gerson v. CFB 2019). We were held to a 0.00% error rate even though we had never even applied for matching funds, much less received them. We had a hard time fundraising when almost the entire team had been involved in addressing the CFB's statement reviews and figuring out ways to insulate us from further issues. We also had difficulty tracking down each

individual contributor for the CFB's requested additional information. We were barred from filling out any of the paperwork for them– even ministerial tasks like filling in their addresses– for fear of being sent to jail for forgery. As a result, we could not meet the threshold for matchable contributions.

**RESPONSE TO POINT 3: ENTITIES THAT CAN BE SUED**

I, the Plaintiff, concede that the CFB is an "independent" agency of the City of New York. However, it is not like the Environmental Protections Board,  the Civilian Complaint Review Board, or the Taxi Limousine Commission. First, the CFB is the only Agency in the entire City that can dictate its own budget without oversight by the City's Executive or Legislative branches. This was discussed in November 2021 when multiple City Council members sponsored a bill to limit the CFB's powers. Defendant Schaffer stated that the CFB's budget, which is not subject to the normal checks and balances on governmental powers, is structured that way because of a ballot proposal that was approved by the voting public. The CFB itself was responsible for informing the voting public on this issue.

If the NYC Campaign Finance Board is not the proper named Defendant and it should be the City of New York, I respectfully request that the Court substitute the City for the CFB and for the amended Complaint to relate back to the date of the original Complaint. The City would not be prejudiced in its defense because it knows the identities of its agencies and its employees. It has also had access to the voter guide and all of the information contained in the audit. The other Defendants, and their Counsel, knew that they worked for the City of New York. Like the CFB, the City is represented by the Office of Corporation Counsel.

In addition, the City has received notice of this case through the Comptroller's office. In January 2023, after I filed my NYS Supreme Court case, I planned to amend my case with additional claims for harms that either occurred or were discovered after I filed my original Complaint. Therefore, I filed a timely Notice of Claim with the Comptroller's office (Exhibit AI).

**CONCLUSION**

For the foregoing reasons, I, the Plaintiff, respectfully request that the Court oppose the Defendants' motion to Dismiss, and approve the Complaint and these claims therein in their entirety, award a judgment in my favor, and grant to me such other and further relief that the Court may deem just and proper.

When deciding on this Motion, I ask that the Court consider that I was a first-time candidate for public office, a physician– and not a lawyer– forced to represent my mother and my campaign in 11 separate civil cases brought against them by the City (in 2022); forced by the Defendants to represent myself, my mother and my campaign in a campaign finance audit where candidates often employ tax attorneys, election attorneys

and occasionally criminal defense attorneys (between 2021 and 2024 with no end in sight); and forced through deceit and misrepresentations to intermittently represent myself in the pursuit of justice in the TRO Court (between 2021 and 2022), the Negligence case (between 2022 and 2023), the EDNY case (in 2023), and now this case (between 2023 and 2024). I am a physician who was treating patients on the frontlines and actively publishing research to develop means by which physicians could treat non-COVID-related medical conditions at the height of COVID and the lockdowns. Even my political opponents have formally and informally thanked me for keeping my practice open and keeping elderly, disabled, and immunocompromised patients out of the Emergency Rooms. This was the time the Defendants committed these wicked acts. They routinely forced me to choose between expressing the idealistic vision I had for the City versus the health and well-being of my mother, my children, my patients, my employees, my medical practice, and my supporters. Even with their relentless auditing and investigations, and even with the ongoing litigation, the Defendants have never actually determined that I am guilty of anything. My crimes are naivete, inexperience, and idealism.

Contrast that with the Defendants who all had more expertise in campaign finance law, election law, and constitutional law than I did. According to his profile, Defendant Schaffer is a Harvard Law School trained constitutional lawyer. Loprest is an election attorney and past President of the Council on Governmental Ethics [Ex]. Perskie is a constitutional lawyer who now serves as a Civil Rights prosecutor for New York State. Duhalde is an analyst and DSA Fund Chair who has performed regressions on over 900 elections, enabling him to predict what variables determine the outcome of an election and what factors suppress candidates and chill speech. Sollars attended Columbia University and then worked in news and media for 24 years, where freedom of the press is paramount. These individuals used their exceptional knowledge, skills, and expertise, as well as the tremendous power entrusted to them by the City, for nefarious purposes against the public interest and against individual civil liberties.

Moreover, the CFB exercises legislative powers with its Rulemaking, executive powers in its enforcement, and judicial powers with its advisory opinions and its final board determination hearings on campaign finance violations and penalties. The entire Agency violates the Separation of Powers Doctrine.

I certify, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Dated:  March 1, 2024
        New York, New York

                                        By      /s/ Devi Nampiaparampil

                                                Devi Nampiaparampil

                                                Plaintiff