To:   **Pro Se Intake Office**
      Thurgood Marshall U.S. Courthouse
      40 Foley Square
      New York, NY 10007
      **Courtroom 105**

From:  **Devi Nampiaparampil**
       111 John Street #2509
       New York, NY 10038
       Tel (312) 523-5935
       devichechi@gmail.com




# FOR FILING

### NAMPIAPARAMPIL V. NYC CAMPAIGN FINANCE BOARD, ET AL.

## No. 23 Civ. 6391

## PLAINTIFF'S RESPONSE TO THE DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

*Attempted e-filing on March 1, 2024 but the file sizes were
too large on the Exhibits-
even when zipped and pdfs were compressed

**Thank you in advance for your help!

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

DEVI NAMPIAPARAMPIL,

*Plaintiff,*

–against–

THE NEW YORK CITY CAMPAIGN FINANCE
BOARD, et. al.,

*Defendants*

**NOTICE OF OPPOSITION
TO MOTION TO DISMISS**

No. 23 Civ. 6391 (ER)

**TAKE NOTICE** that, upon the accompanying Declaration of Devi E. Nampiaparampil in Opposition to Defendants' Motion to Dismiss, dated March 1 2024, and the exhibits attached thereto; the accompanying Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated March 1, 2024; and upon all other papers and proceedings heretofore had herein, I, the Plaintiff Devi Nampiaparampil, a pro se (unrepresented) litigant, will move this Court before the Honorable Edgardo Ramos of the United States District Court for the Southern District of New York at the United States Courthouse located at 40 Foley Square, New York, New York 10007, on a date and time to be determined by the Court, for an order to deny the Defendants' New York City Campaign Finance Board, David Duhalde, Hannah Egerton, Amy Loprest, Bethany Perskie, Frederick Schaffer, Matthew Sollars, and Jaclyn Williams (collectively, "Defendants") Motion to Dismiss.

**TAKE FURTHER NOTICE**, that, pursuant to the direction of the Court's Minute Entry dated (), I shall serve my papers in opposition to this motion on or before March 1, 2024, and Defendants shall serve their reply papers, if any, on or before March 8, 2024.

Dated:        March 1, 2024
              New York, New York

                              Devi E. Nampiaparampil
                              Pro Se (Unrepresented) Litigant
                              The Plaintiff
                              Metropolis Pain Medicine PLLC
                              111 John Street Suite 2509
                              New York, NY 10038
                              Cell: 312-523-5935
                              Email: devichechi@gmail.com

                      By      /s/ Devi E. Nampiaparampil
                              DEVI E. NAMPIAPARAMPIL
                              Pro Se (Unrepresented) Litigant

ADDENDUM:
March 2, 2024 12:41am

I am experiencing some difficulty uploading the exhibits for this case because of the large file sizes. I will drop off flash drives with all the files at the Courthouse and at the NYC Campaign Finance Board front desk later today since it  may take a couple of days for the Pro Se Office to assist me in uploading those files. I will also upload them to Google Drive and send the link to Defendants' Counsel tonight.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x

DEVI NAMPIAPARAMPIL,

*Plaintiff,*

—against—

THE NEW YORK CITY CAMPAIGN FINANCE

BOARD, et. al.,

*Defendants*

**PLAINTIFF'S**
**RESPONSE TO THE**
**DEFENDANTS'**
**MOTION TO DISMISS**
**THE COMPLAINT**
No. 23 Civ. 6391 (ER)

Devi Nampiaparampil

Pro Se (Unrepresented) Litigant, The Plaintiff

Metropolis Pain Medicine PLLC

111 John Street Suite 2509

New York, NY 10038

Cell: 312-523-5935

Email: devichechi@gmail.com



1

# **TABLE OF CONTENTS**

INTRODUCTION                                      p3

FACTS                                             p3

FACTUAL DISPUTES                                  p5

    RESPONSE TO POINT 1                          p7

        THIS ACTION IS NOT CLAIM-PRECLUDED BY
        MY PRIOR ACTION IN NEW YORK COUNTY
        SUPREME COURT

    RESPONSE TO POINT 2                          p24

        MY $1983 CLAIMS OF RETALIATION ARE VIABLE
        AS A MATTER OF LAW

    RESPONSE TO POINT 3                          p29

        THE DEFENDANTS HAVE THE CAPACITY
        TO BE SUED

CONCLUSION                                        p29

## INTRODUCTION

This case is not a partisan attack on a City Agency from a disgruntled candidate; nor is it an assault on campaign finance reform. It is definitely not about whether an elected official should be addressed by his name or his title, as it might first appear. We live in a free society where people express their choices through their votes. In 2021, the Defendants deprived me and the public of that choice by "canceling" me on a whim– perhaps not even for what I personally said or did– but because they disapproved of the political party that gave me an opportunity to share my ideas and to further contribute to this city. This "cancel culture" ideology has no place in a democratic government. Moreover, the United States is governed by a system of checks-and-balances. For voters in New York City, arguably the most influential city in the world, to have a government Agency be at the mercy of a small group of unelected bureaucrats, unrestricted by internal or external controls, is unimaginable.

## FACTS

I, the Plaintiff, Devi Nampiaparampil, am an Associate Professor at NYU Grossman School of Medicine with a private practice in downtown Manhattan where I perform interventional pain (spinal) procedures, joint injections, and nerve blocks.  I completed all my specialty and subspecialty training through Harvard Medical School, where I was ranked by my professors (now peers) as among the top 5% of alumni from my residency program. I also have a masters degree from Columbia University Graduate School of Journalism and have appeared on-air in over 500 national and international news segments for Fox News, CNN, MSNBC, CNBC, and Fox 5 NY where I am currently an on-air medical contributor. I ran as the Republican nominee for New York City Public Advocate in the 2021 general election. (Compl. ¶¶ 3, 10, 24-28).

Defendant New York City (NYC) Campaign Finance Board (CFB) is an independent agency that administers the Campaign Finance Program created by the NYC Campaign Finance Act in 1988. (NYC Admin. Code §§ 3-701-719; NYC Charter §§1051-57). The CFB employed the individual defendants. The CFB says it promotes fair elections through various programs including (1) a citywide "Voter Guide" (the "Guide") and (2) the Matching Funds Program (*Id* ¶ 30).

The CFB has described the Guide as a "critical" resource that "helps NYC voters make informed choices at the polls." (*Id* ¶ 31). There are numerous restrictions on candidate statements, including that statements may not "refer to any opposing candidate by name." Candidate statements that violate the requirements outlined in the CFB Board Rules "as determined by the Board in its sole discretion," will not be included in the Guide (RCNY §§16-02(b)(i)(E), 16-02(b)(ii)(G)  .

3

I prepared a Guide profile that included my photo, background, platform, and my name as it appeared on the 2021 general election ballot and as I am recognized in the community. The Defendants excluded my timely submitted print and online Voter Guide profile from public view because I referred to my opponent by name (Compl., ¶¶ 56, 58). The offensive statement can be seen in Exhibit B, p26/ 31:

"Mismanagement, backwards laws and bureaucracy have pitted employees against employers, tenants against landlords, parents against teachers, patients against nursing homes & healthcare providers against hospitals: New Yorker against New Yorker, a survival of the fittest. The Public Advocate can publish the city's data. Jumaane Williams has failed. With transparency, private citizens will solve our city's problems. When our city was infected with COVID, I treated patients. When we needed answers, I contributed to medical research. When we had an economic crisis, I created jobs. Unlike Jumaane Williams, I will fulfill the Public Advocate's mandate."

Defendant Duhalde, who served as the former Deputy Director of the Democratic Socialists of America, and whose household had previously donated to Jumaane Williams' prior campaign, reviewed my video voter guide script and informed me that I could be sued for "mentioning the candidate's wife" and describing her as a "lobbyist." This was a term her employer had used. Because a government official had threatened a lawsuit, I revised my script (Id., ¶ 71, 72). Nevertheless, unlike the other candidates, my video was posted in a manner that made it undiscoverable. It likely lacked the search tags that the CFB had applied to the other candidates' videos ((Id., ¶ 74). In advance of a CFB-sponsored television debate about the job [opportunity] of Public Advocate, the Defendants asked me twice to email them with my "race [and] gender" for a government-issued press release. The information was purportedly for voters with disabilities to decide who to elect for the job position. The CFB had already excluded my background and campaign platform from its print and online Guide. My statements about race, gender and bodily measurements could be construed as my stance both as a candidate and as an employer, which they were not. Nevertheless, I felt I must disclose this information so the Defendants wouldn't exclude me from the televised debate.

On September 29, 2021, when I learned of my exclusion from the Guide, I sought a temporary restraining order asking for my information to be added either as an insert or a postcard. The CFB moved forward with its mailing, distributing the Guide to over 5 million households. The mailing resulted in a drop of my campaign's fundraising from approximately $80,000 the week before its release to approximately $1000 the week after its release. I never applied for matching funds during the campaign; nor did I ever receive them. My campaign exited the election on November 2, 2021 with zero violations and zero penalties (Id., ¶86). Our back-up documentation error rate was 0.00% (Id., ¶92). I received 23.4% of the vote (over 254,000 votes) (Id., ¶84). After the election, the CFB informed me that I was subject to post-election penalties for over-the-limit

4

contributions. It prohibited me from donating to any "other campaigns." After the election, the CFB recommended I close my bank account so I could cease filing disclosures (Id., ¶88). I closed the bank account on January 11, 2022.

In August 2022, I filed an order-to-show-cause in the TRO Court to pursue my case. The Court declined to sign. The decision was entered on the docket (Id., ¶¶89, 90). The "Draft Audit Report" issued to my campaign shortly afterwards listed dozens and dozens of minor infractions for a dormant campaign that had ended a year prior (Id., 93). The violations are exceedingly technical. For example, one supposed campaign finance violation (that can be penalized at $10,000 per violation) is for us having purchased balloons for a fundraiser and not separating out the base cost of the balloons from the associated fees in the C-smart web program. It did not matter that we entered the total cost of the balloons, submitted the receipt, and submitted the associated bank statement. Another violation was for a missing $8.96 receipt from Duane Reade, even though we reported the expense. The time I spent responding to these purported violations is time I was unable to treat new or existing patients.

In the same time frame, I proceeded pro se in a case for Negligence in NYS Supreme Court and in the audit investigation because the Defendants led me to believe that I would receive penalties for over-contributions if I retained counsel after my campaign was out of money. Ultimately, I lost the Negligence case.
If not for the CFB's ongoing and escalating civil rights violations, particularly the Challenged Rule and its spending restrictions, I would run for office again. As the Plaintiff, I bring this action under 42 U.S.C. $ 1983 and New York law, alleging that the Defendants New York City (NYC) Campaign Finance Board (CFB), David Duhalde, Hannah Egerton, Amy Loprest, Bethany Perskie, Frederick Schaffer, Matthew Sollars, and Jaclyn Williams ("the Defendants") acting both individually and together violated my civil rights under the U.S. and N.Y. Constitutions before, during, and after the 2021 general election, in which I was the Republican Party's nominee for NYC Public Advocate, a citywide position.

## FACTUAL DISPUTES
### (Including new facts to counter statements)

*Matching Funds "Program Participant"*
The Defendants state that I was a Matching Funds "program participant," a misleading term. Before I could be listed on the CFB's website as an official candidate, and before I could collect any contributions through the CFB's NYCVotes credit card platform, my campaign had to register with the CFB. This meant the campaign had to choose whether to remain eligible to apply for matching funds at any time in the future or whether to forfeit that opportunity altogether. The campaign chose to remain eligible to receive matching

5

funds. I signed a certification form, thereby expressing a *desire* to someday apply for 8:1 matching contributions from taxpayers through the CFB's Matching Funds program [Ex N, p11-13/16]. My campaign never completed or submitted the application forms for matching funds and we never received any matching funds. The only money my campaign committee, "Dr. Devi For NYC" ever asked for, or received, came through small dollar donations. We never received any public funds.

Of note, I was running for Mayor when I filled out the CFB's certification form. [Ex. N, p4/16]. When the Republican Party substituted me for the Public Advocate position, the CFB deleted my information from public view and prevented people from donating to my campaign noting an issue with the office sought. According to its own records (obtained through a FOIL), it terminated my candidacy and participation in the program when I didn't appear on the final ballot (Ex. (marked)).

*Misrepresentations*

The Defendants' current interpretation and characterization of the crucial representations they made to me during their mandated training sessions (Compl., ¶54) is not exactly correct.

The CFB informed me that it would judge the value of a service, not solely by its price tag to the campaign, but by its fair market value. In its judicial opinion, "To Volunteer or Not to Volunteer," the CFB assessed the fair market value of a political consultant's "volunteer" work at $250,000 and concluded that the campaign had to pay him the money. Essentially, the CFB determined that people could not volunteer valuable professional services to campaigns. The campaign needed to have fundraised the money to afford those costly services. As it was explained to me, lawyers could not work pro bono on a campaign, for example, (unless their legal advice was deemed worthless). The policy is explained to some extent in a NYT article (Ex. O, last 3 paragraphs) and in the CFB's own publication (Ex. P, last 2 paragraphs).A variety of similar examples were given to the trainees during these mandatory training sessions, including one about John Catsimatidis, the founder of Gristedes, who allegedly unknowingly received a food and beverage discount from a vendor servicing his Mayoral campaign fundraisers. According to the employees leading the training session, the CFB issued violations and penalties based on the amount of the discount.

For this reason, my mother and I believed we could not speak to lawyers, accountants, or political consultants to help us set up the campaign infrastructure, or to even get a second opinion on the CFB's legal advice. By September 2021, my campaign had finally fundraised enough for us to speak to a lawyer. The lawyer offered me a discount, which I refused, because I thought he and I would both be fined and I might end up in jail. I wrote this to him (Ex. Q).

6

In CFB v. Gerson et al.,a case I found more recently, the CFB prosecuted Alan Gerson, who had not received matching funds, for over-contributions related to a legal dispute (Gerson v. NYC CFB 2019 Slip Op 03268). In 2019, ten years after Gerson's election campaign, the Appellate Court ruled:

*"The court erred in upholding the Board's finding that petitioner Gerson's contribution of more than $30,912 to his campaign exceeded the $2500 limit on expenditures... [Gerson's expenditures] are covered by the exemption for expenditures made for the purpose of "bringing" or "responding" to a "proceeding" or "claim" before a court." (Administrative Code §3-706[4][a]; 52 RCNY 1-08[d][4][i][A]... We find the denial of matching funds and the penalties imposed... grossly disproportionate to any offenses committed by [Gerson and his campaign] (see generally Matter of Pell v Board of Educ. of Union Free School Distr. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 233-234 [1974])."*

The CFB persisted in its application of this policy as late as November 29, 2022 when I had a virtual session regarding my audit. My mother had previously volunteered as the Treasurer in 2021, regularly submitting financial documents to the CFB and answering its Statement Reviews. Upon learning that my mother had expertise in this area, Donna Ross, the auditor, told me that my mother could not be a volunteer. My mother should have been paid $30,000. Since the campaign no longer had any funds by the time of the audit, and since it had already closed its bank account, there was nothing we could do to rectify this "error." Moreover, if my mother had written a check to herself before I closed the bank account, I would probably have put $30,000 into the account to cover the expense. Otherwise, my personal credit would be damaged. Then she would have to return the money to me, and as the officers of the campaign, we would both personally be charged up to $100,000 in penalties by the CFB. (CFB v. Gerson et al. OATH Index 2421/14 (2015)). The Judge ruled in the CFB's favor, "The Act authorizes petitioner to impose civil penalties of up to $10,000 for each violation. Admin. Code 3-711(1). In addition, petitioner may impose a civil penalty of up to three times the amount of excess expenditures."

To this day, I cannot tell whether I was misled by the CFB's misrepresentations OR whether I correctly understood and interpreted the CFB's guidance about its informal policies. In either case, the CFB's policy interfered with our freedom of assembly (to organize a campaign) and our freedom of speech. Lawyers and accountants could not speak freely to us. We could not listen; nor could we speak freely to them. The value of the speech would be assessed by the government and subject to its contribution limits.

## RESPONSE TO POINT 1: THIS ACTION IS NOT CLAIM-PRECLUDED

I concede that I commenced two actions in New York State Supreme Court against the NYC Campaign Finance Board. I commenced the first one on **September 29, 2021** as an Order to Show Cause (OSC)/ Temporary Restraining Order (TRO) on the print voter guide until my profile could be included for the

voters ("the TRO Court"). The second action was commenced on **October 20, 2022,** approximately one year after the print Guide's publication, for Negligence, Libel and other claims "the Negligence case."

(1) <u>The Negligence case was not adjudicated on the merits.</u> Here, the Defendants argued a) that I had failed to state a claim and b) that the Court lacked jurisdiction. The Judge dismissed the case opining it was time-barred. In Exhibit M p4-5, (with the conclusion boldfaced by me), the Judge opined:

*"General Municipal Law §50-i (1) provides that no action shall be prosecuted or maintained against a city entity for personal injury, wrongful death, or damage to property resulting from the city's negligence "unless (a) a notice of claim shall have been made," "(b) at least thirty days have elapsed since the service of such notice," and "(c) the action or special proceeding shall be commenced within one year and ninety days after the event upon which the claim is based." (General Municipal Law §50-i.) §50-e of the same law requires that plaintiffs must serve notice on the city within 90 days after the claim arises.  (General Municipal Law §50-e.) Here, plaintiffs have not complied with these provisions. First, **Nampiaparampil and Metropolis did not serve the CFB with a notice of claim within 90 days**... Second, plaintiffs have failed to comply with §50-i(1)(c), which is also why the Court must deny plaintiffs' cross motion to rectify the failure to serve notice §50-e(5), entitled "application for leave to serve a late notice," provides "upon application, the court... may extend the time to serve a notice of claim" but such extension "shall not exceed the time limited for the commencement of the action by claimant." (GML §50-e[5].) Where a plaintiff moves to rectify the failure to provide notice after the 1-year-and-90-day period for an action in which the statute applies, the court is without authority to grant it…. **As such the Court is powerless to grant an extension for a notice of claim… [F]or these reasons alone, plaintiffs' causes of action are dismissed."***

Because the Judge viewed the Notice of Claim/ Statute of Limitations as a fatal flaw to the case, she dismissed it. She wrote that the Notice of Claim and the Statute of Limitations issues were the <u>only</u> reasons the causes of action were dismissed.

(1a) <u>I contend I could have corrected the pleading deficiencies with an Amended Complaint to</u> <u>address the merits.</u> The Defendants state that the Court found that the CFB did not have a "special duty" to me, so I could not plead Negligence effectively, and that I had not adequately pleaded Libel. First, the CFB extended itself by providing legal advice to me during the training sessions and at various other times during the campaign. The CFB liaisons voluntarily assumed a special duty. Moreover, because I did not understand the legal definition of "Actual Malice," I did not plead Libel effectively. However, after I received the Judge's feedback, I understood what needed to be done. As seen on p2-3 of Plaintiff's Exhibit M, the Judge reviewed all of the Defendant's exhibits, but only a couple of mine. There is a gap between 18 and 104. She likely did not see the purpose if the claims were <u>time-barred.</u> Many of the pleading requirements were met in my

8

Affidavit and in my Exhibits, which I could have extracted for an Amended Complaint. Even Defendant Perskie commented on this in Exhibit K, p3/ 20:

*"Plaintiffs make numerous claims allegedly bolstered by voluminous exhibits which seek to prove the factual claims alleged in the Complaint, as well as additional factual claims asserted for the first time in the Plaintiffs' Affidavit. However, The Plaintiffs' Affidavit and accompanying exhibits fail to comply with the timing requirements of CPLR 2214(b)... Defendant reserves its right to seek relief from this Court striking such submissions from the record... [T]he Complaint's facts are not in dispute at this time, and insofar as the exhibits purport to establish new facts or legal theories, they are immaterial to the sufficiency of the Complaint. Plaintiffs cannot use their opposition to Defendant's Motion to Dismiss as a backdoor to amending their Complaint absent leave from the Court."*

Whether I stated the relevant facts in the Complaint or the Affidavit, the courts liberally construe pleadings prepared by pro se litigants and hold them "to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007).

The Court can consider affidavits submitted by a pro se Pllaintiff to remedy any defects in the complaint (Rushaid v Picter & Cie, 28 NY3d 316, 327 [2016]); Chanko v. American Broadcasting Cos., Inc. 27 NY3d 46, 52 [2016]. "Whether the complaint will later survive a motion for summary judgment, or whether the plaintiff will ultimately be able to prove its claims, of course, plays no part in the determination of a prediscovery CPLR 3211 motion to dismiss" (Shaya B. Pac., LLC v Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, 38 AD3d 34, 38 [2006].

   (1b) <u>If the decision were on the merits, my company could have re-filed in Westchester County with an attorney, had I been aware of the Defendants' misrepresentations.</u> There were two plaintiffs: me and Metropolis Pain Medicine PLLC "Metropolis" d/b/a Devi Nampiaparampil, MD, which I solely own. The Judge dismissed the case for both of us and did not differentiate between us in her dismissal statements. She denied me the ability to legally represent my Metropolis (Ex. M, p3) likely based on Reilly Design v. Houraney, 40 A.D. 3d 592, which held, "[L]ike a corporation or a voluntary association, the LLC may only be represented by an attorney and not by one of its members who is not an attorney admitted to practice in the state of New York." This decision is supported by Limited Liability Companies: Tax and Business Law, ch 5, ¶ 5.05 [1][e]. Yet, if the case was decided on the merits and dismissed with prejudice, as the Defendants now argue, that necessitates believing that Judge Negligence also barred Metropolis from ever having attorney representation to litigate its claims– whether it was in the brief before her, in a future Amended Complaint before her, or in a future refiling in another jurisdiction. If she already concluded that I lacked the authority to initiate or litigate a case for Metropolis in the first place, and therefore the PLLC had insufficient counsel,

9

why would she restrain Metropolis in this manner? The Judge did not comment on the corporation's attorney representation, or lack thereof because the whole case appeared to be time-barred.

The Court did not believe it had the power to hear the case due to the date on the Notice of Claim, which led to the accompanying determination that the case was initiated after the Statute of Limitations had passed. The Court also determined it did not have jurisdiction over one of the Plaintiffs, Metropolis. Therefore, the case was never dismissed on the merits for Metropolis or for me. Res judicata should not apply.

Although the Judge provided constructive criticism of my Complaint, the language suggests this was for my edification, not for the purposes of adjudicating the case on the merits. She wrote, "**Given the importance of the allegations to plaintiffs**, the Court will address the merits of each cause of action below…" (Ex M., p5) and then commented on some, but not all, of my causes of action in her Judgment. Moreover, she never addressed the First Amendment issue, which the Defendants now argue I had a chance to fairly litigate and bring to a conclusion.

(2) <u>Constitutional claims are not hostage to Notice of Claim statutes.</u> Although my Negligence, Libel,and Disparagement of a Commercial Entity ("Devi Nampiaparampil, M.D.") causes of action appeared to be time-barred based on the City's statutes, I could move forward under Title 42 U.S.C. §1983. The City used a 1 year 90 day limit. The federal government employs a 3 year limit to these types of personal injury cases. In Wilson v. Garcia, the Supreme Court ruled:

*"Congress would not have characterized S1983 as providing a cause of action analogous to state remedies for wrongs committed by public officials. It was the very ineffectiveness of state remedies that led Congress to enact the Civil Rights Acts in the first place. Congress therefore intended that the remedy provided in §1983 be independently enforceable whether or not it duplicates a parallel state remedy (Monroe v. Pape, 365 U.S. 173)… It is most unlikely that the period of limitations applicable to such [personal injury] claims ever was, or ever would be, fixed in a way that would discriminate against federal claims, or be inconsistent with federal law in any respect… The Court of Appeals correctly applied the 3-year statute of limitations governing actions "for an injury to the person or reputation of any person."" (Wilson v. Garcia, 280 U.S. 471). The New York courts followed, "1983 is independently enforceable whether or not it duplicates a parallel state remedy" (South Salina, 68 N.Y.2d at 489, 503 N.E.2d at 71, 510 N)*

(3) <u>First Amendment claims are specifically exempt from New York City's Notice of Claims requirements.</u>

This is a First Amendment case. It is uncontested that the CFB erased my Voter Guide profile from this "critical" resource because of my noncompliance with the Board Rule. The CFB admitted to this in our

prior state case. In her Opposition Brief, Defendant Perskie wrote, "The deadline to submit a voter guide profile for the 2021 general election was August 2, 2021. Nampiaparampil timely submitted a voter guide profile that referred to an opposing candidate by name. On August 4, 2021, a CFB liaison notified Nampiaparampil that the profile text she had submitted for the voter guide did not comply with the requirements and to email a corrected version by August 5, 2021… Because Nampiaparampil did not submit a legally compliant voter guide profile, no profile for Nampiaparampil was included in the print voter guide." See Opp. Br., 2022 WL 19570753.

In Kassapian v. City of New York, an administrative law judge spoke to the press about pressures she endured to find more civil defendants guilty and to issue greater penalties in order to increase the City's revenues. The Defendants moved to dismiss based on the Notice of Claim, and the Plaintiff moved to amend her complaint to include First Amendment retaliation. The case was dismissed but the decision was overturned (boldfaced added by me).

*"The Supreme Court improvidently exercised its discretion in denying the plaintiff's cross motion pursuant to CPLR 3025(b) for leave to amend the complaint to assert an alternative First Amendment retaliation cause of action pursuant to 42 USC $1983, for which a notice of claim is not required (see Felder v. Casey, 487 US 131, 153 [1988]; Blake v. City of New York 148 AD 3d 1101, 1005 [2017]). Given the state constitutional causes of action included in the original complaint, the defendants would not be prejudiced or surprised by the assertion of a First Amendment cause of action… As with unlawful retaliation claims under the NYCHRL, in the First Amendment context, a plaintiff "need only show that the retaliatory conduct in question "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." (Kassapian v. City of NY 155 AD 3d 851.*

The Defendants' behavior, which I described in detail in numerous fora, all related to restrictions on my freedom of speech, freedom of assembly, and freedom to redress my grievances, and now, retaliation for my protected activities. In Defendant Perskie's November 15, 2022  Memorandum of Law in the Negligence case, she wrote,[1] "[Campaign-related] events… are a foundational and routine component of any candidacy for public office… CFB staff instructed Nampiaparampil that wages for employees, including… security personnel, were a…campaign expenditure." We both agreed. "Plaintiffs imply that Nampiaparampil was subjected to an increased risk of physical harm due to her participation in certain campaign-related events and activities, which she… would not have attended alone, if not for the guidance she received from CFB staff regarding the laws governing campaign expenditures… Plaintiffs obliquely claim that the training and advice provided by CFB staff, or possibly the campaign finance statutes themselves, caused these harms…The extraordinary actions allegedly taken by third parties during various campaign events were entirely

---

[1] I have re-ordered these sentences

11

unforeseeable and constitute a superseding cause of Plaintiffs' alleged injuries." As a layperson, it hadn't occurred to me that the statutes could be considered unconstitutional until after I read Perskie's Memo. Her Memo belied the Defendants' true motive behind contribution limits for those candidates who had not received, or even applied for matching funds, but who had expressed a desire to apply in the future. Those non-recipient candidates, typically challengers to the government like me, would have to choose between their own personal safety– in terms of potential political violence– or campaign finance violations and penalties if they spent their own money hiring security to participate (in Perskie's words) in "foundational and routine component[s] of any candidacy."

(4) Tort claims can also proceed in New York even if filed after 1 year and 90 days, as long as the Statute of Limitations is tolled and there is a good reason the Notice of Claim is being filed late. This is up to the Judge's discretion.

(a)   The Statute of Limitations can be tolled for continuous wrongs causing ongoing harm.

But not for the CFB's ongoing civil rights' violations and misconduct, particularly the Challenged Rule, and their harassment in the form of financial disclosures and an audit, I would run for office again. I concede that I referred to the Draft Audit Report in the Negligence case (Ex. L, p5-7/11). I also referred to eleven (11) proceedings brought against my campaign and my mother, which I had to defend **by myself** in OATH Court on the same day my mother was having parts of her stomach, small intestine, pancreas, liver, and greater omentum removed. I was her proxy and the only person allowed near her (because of COVID restrictions at Memorial Sloan Kettering Cancer Center) but I had to leave my mother by herself out of respect for patients' families in the O.R. Waiting Area. I could not participate in a hearing there.  Because I needed to win these cases to defend my medical license, I couldn't even skip it. Miraculously, over the course of the next few months, I won all of the cases [Ex. R]. What the Defendants neglected to mention is that I brought up the CFB's behavior in a Sur-Reply, which was never read by the Judge (Exhibit R). I wrote:

*"After going to court pro se and successfully getting all 11 Summons DISMISSED after a period of 6 months, I tried to find out what the CFB's exact involvement was in these accusations against my mother and me. After all, if I had been found guilty– of either the illegal postings or even of retaining an attorney and thereby making an over-the-limit contribution, a campaign finance violation– I would have had to explain all these illegal activities to the NYS Board of Medicine. I would have risked losing my medical license and potentially destroying my entire medical career over approximately $1000 worth of tickets for campaign signs that we never posted."*

Defendant Perskie's response [Exhibit R]  read in part, ""The CPLR does not provide for sur-reply papers, however denominated… Materials presented in violation of this Rule will not be read." Accordingly, Defendant New York City Campaign Finance Board respectfully requests that the Court disregard the

Sur-Reply in its entirety." The Court complied. The Court never adjudicated these matters. Nor did she address the misrepresentation about proceeding without counsel.

Although two OATH Court clerks told me that the CFB had participated in the proceedings against my mother and the campaign, I could not know for sure until recently. Although the CFB has been unable to produce any documents in response to my FOIL, the Department of Sanitation (DSNY) did. The CFB collaborated with the DSNY to retaliate against my mother. She and my campaign were prosecuted for putting up signs, in the days *after* the election (when there would be no point), in deserted and dangerous areas that are not near a subway and not near people who would see them. In fact, the areas were vandalized with graffiti with signs about "snitches" and "cop killers" and the City allegedly found my photo, phone number, and address in the midst of all of this, putting me and my practice at risk, and decided to issue these summonses against my campaign (Exhibit S).There were no 311 calls or other complaints, about these illegal signs. We received the summonses after my campaign was out of money, so the campaign could not pay. If I paid on behalf of the campaign, or if I hired an attorney to represent us, even if we won, we would receive violations and penalties. I had no idea if it was for each and every sign, which would amount to over $111,000 ($10,000 per violation plus the original $1000 in tickets). After all, the CFB prosecuted others in OATH Court demanding hundreds of thousands of dollars for purported over-contributions on legal proceedings and parking tickets (Campaign Finance Board v. Gerson et al. OATH Index No. 2421/ 14 (Sept. 8, 2015)).

This is also significant because, if the Judge had been aware of the ongoing and continuous wrongs that I was routinely subjected to, she might have extended the statute of limitations based on the most recent wrong. The continuous wrong doctrine "serves to toll the running of a period of limitations to the date of the commission of the last wrongful act" and "may only be predicated on continuing, unlawful acts and not on the continuing effects of earlier unlawful conduct… The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs." (Henry v. Bank of Am., 147 AD 3d 599, 601 (1st Dept. 2017). The doctrine "is usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act." (Selkirk v. State, 249 AD 2d 818, 819, 671 NYS 2d 824 [3d Dept. 1998]).

I filed my case within 1 year of the Hagler hearing and within 1 year of discovering the false statement added to my name in the Guide. I attempted to submit a Claim nunc pro tunc, dating back to the time of the *TRO hearing*. I believed the hearing served as Notice for the CFB to investigate. I was confused by the Claim form, and I believed based on the CFB's representations, that I was not allowed to ask any professionals about it. Even though every date in my Complaint and in my Affidavits fell within the 1 year 90 day statute of limitations, I wrote "March 9, 2021" on the Claim form. (March 9, 2021 is the first time I felt the CFB was

negligent in its duties). I thought I had to delineate the first instance of harm, not the last. If I had listed the most recent date of harm, the Notice of Claim would have been timely filed and the entire case could have fallen within the Statute of Limitations. This is something I could have explained in a hearing or corrected with an Amended Complaint and Motion, but we did not have an oral argument; nor was I allowed to amend my complaint.

This is a situation that could have been rectified by an attorney. Although I am pro se now, I was prepared to hire an attorney at that time. What prevented me from doing so were the prior threats and misrepresentations by the Defendants about campaign finance violations. This itself would have tolled the time for filing the Notice of Claim (Contento v. Cortland Memorial Hosp., 237 AD 2d 725). The poor presentation of my case, my "failure to state a claim" was in part due to the Defendants' misrepresentations about whether I could hire an attorney, an ongoing violation of both my rights to free speech and my right to due process at the time. The Judge did not comment on this– again, because she was not adjudicating this case on the merits.

The misrepresentations continued to matter because I had proceeded through so many courts pro se. Rather than allow me to engage an attorney for OATH Court who might have freed me from the shackles of this psychological prison, the City encouraged me to represent my mother and "Dr. Devi For NYC," myself even though I was not a named Defendant (Exhibit U). I was stressed about my mother's health; meanwhile, my business lost a fortune while I prepared for the 11 cases.

    (b) The Judge may have tolled the Statute of Limitations because this case falls within the public interest (423 S. Salina St. v City of Syracuse, 68 NY2d 493; Mills v County of Monroe, 59 NY2d 307, 312 [1983]; *855 Sager v County of Sullivan, 145 AD3d 1175, 1177 [2016]).

    "Core political speech" is the primary object of First Amendment protection." McConnell v. Fed Election Comm'n, 540 U.S. 93, 264 (2003). The CFB's Rules have been used to interfere with not only candidates' speech but with the public's ability to organize around candidates' platforms who they agree with. In NYC, candidates are unable to freely articulate their political platforms. Instead, there is a uniformity in the platforms because they are either censored or rewritten in order to conform with CFB employees' political views.

    © The Court could have tolled the time for the Notice of Claim for the litigation. Because of the delays in scanning and uploading items to the file, I did not know that Judge Hagler had made a decision already– before we submitted our affidavits. I thought the case was ongoing.

(5) <u>Dismissal on a Motion to Dismiss generally does not have a res judicata effect.</u> A decision based on a motion to dismiss is not claim preclusive against later actions. Vista Points, LLC v. Waterfront Resorts, Inc. 2019 N.Y. Slip Op. 33878 (N.Y. Sup. Ct. 2019) ("a dismissal for failure to state a cause of action is generally not on the merits and will not be given res judicata effect."). (when a motion to dismiss is predicated on a claim of failure to state a cause of action, the plaintiff must be afforded an opportunity to seek leave to replead within the prescriptions of CPLR 3211 (e)." Varo Inc. v. Alvis PLC, 261AD2d 262, 267 (1st Dep't 1999). Thus, "a dismissal for failure to state a cause of action is not on the merits and, thus, will not be given res judicata effect." Pereira v. St. Joseph's Cemetery, 78 AD3d 1141, 1142 (2d Dep't 2010).

In summary, although federal claims could have been heard in state courts, and although my case could have been adjudicated in NY State Supreme Court, I had no obligation to file a Motion for Reconsideration or fight an appeal– trying to represent Metropolis, no less. After the Court dismissed the case, I became free to file in federal court, particularly since this experience convinced me I would run for office again but not for the CFB's Rule and behavior.

(6) Where "plaintiffs alleged continuing misconduct by defendants… res judicata is inapplicable." Perez v Danbury Hosp., 347 F3d 419, 426 (2d Cir. 2003). The Challenged Rules and practices remain in effect and constitute an ongoing injury. (Patane v. Nestle Waters N. Am., Inc., 314 F Supp. 3d 375, 384 (D. Conn. 2018). "Sensibly enough, res judicata does not apply if the wrong suffered by the plaintiff is of a recurrent or ongoing nature… This rule applies to a defendant's continuing course of conduct, even if related to conduct complained of in an earlier action." Davis v. Halpern, 813 F 2d 37, 40 (2d Cir. 1987). Courts have also declined to apply res judicata where the second action asserts claims that a statute violates the Constitution (Whole Woman's Health v. Hellerstedt, 579 U.S. 582 (2016) rejecting the idea of "treating every statutory enactment as a single transaction which a given party would only be able to challenge one time."

(7) <u>Res judicata does not apply because the present action seeks different relief than the prior action.</u> "[U]nder New York law, the form of relief being sought is an element of the litigant's claim." Leather v. Eyck 180F 3d 420, 425 (2d Cir. 1999).

(8) <u>Even if res judicata were applicable, the Court should not bar the claims because it would be "fundamentally unfair."</u> (UBS Sec LLC v Highland Cap Mgmt, LP, 927 NYS 2d 59, 75 (1st Dept 2011). I did not have a "full and fair opportunity" to litigate the case. Minnich v. Gargana, 2001 WL 1111513, at *6 (SDNY Sept. 20, 2001).

15

(9) <u>If the Court finds this Complaint insufficient to escape res judicata, I respectfully ask to amend my Complaint to also include other parties within my zone of interest, who experienced third-party retaliation</u> (Thompson v. North American Stainless LP, 562 U.S. 170 (2011)), which held, "Thompson [the plaintiff] is not an accidental victim of the retaliation– collateral damage, so to speak, of the employer's unlawful act. To the contrary, injuring him was the employer's means of harming Relgado. Hurting him was teh unlawful act by which the employer punished her. In those circumstances, we think Thompson well within the zone of interested sought to be protected by Title VII. He is a person aggrieved with standing to sue."

(i.) The Defendants retaliated against <u>my mother</u> with the OATH Court proceedings (Exhibit V: Affidavit from Mary Nampiaparampil).

(ii) The Defendants retaliated against the Republican slate with a new posting I first saw on January 8, 2024– after I became pro se– and before the NYS GOP Convention where 2024 candidates are selected to run for office. My attorneys at HSG conveyed my interest in running for office again, in my original Complaint submitted to this Court. The Defendants responded by posting a *2022* Voter Guide on their website (Exhibit W: 2022 Online Voter Guide).

Ballotpedia and the Board of Elections both post certified election results from the candidates who appeared on the ballot or were written in [Ex. X]. Their candidate rosters and the CFB's slate do not match. For example, in the 2022 U.S. Senate race, the CFB lists the "Candidates on the Ballot" as Charles Schumer and Diane Sare. Where is Joe Pinion's name? He was the Republican candidate who obtained 42.7% of the vote. The Defendants canceled him. For the 5 million eligible NYC voters, in addition to other members of the public, he did not even exist.

Because NYC has so many registered Democrats, only a limited number of races are contested. In 11 contested NYS Assembly races, the Republican was canceled. In 5 of the 9 contested NYS Senate races, the Republican was canceled. *Of note, the Asian, Hispanic, and Black GOP candidates were disproportionately targeted by the CFB for deletion.*

### U.S. Senate General Election:

| District | Democrat | Republican | Other |
|----------|----------|------------|-------|
| 34 | Charles Schumer | **Joe Pinion CANCELED** | Diane Sare |

### 2022 New York State Senate General Election:

| District | Democrat | Republican | Other |
|----------|----------|------------|-------|
| 34 | Nathalia Fernandez | **Samantha Zherka CANCELED** | |
| 32 | Luis Sepulveda | **Antonio Melendez Sr. CANCELED** | Dion Powell |
| 31 | Robert Jackson | **Donald Skinner CANCELED** | |
| 28 | Liz Kreuger | **Dr. Awadhesh Gupta CANCELED** | |
| 26 | Andrew S. Gounardes | **Brian Fox CANCELED** | Martha M. Rowen |
| 16 | **John Liu CANCELED** | Ruben D. Cruz III | |

**2022 New York State Assembly General Election:**

| District | Democrat | Republican | Other |
|----------|----------|------------|-------|
| 86 | Yudelka Tapia | **Betty Obregan CANCELED** | |
| 82 | Michael R. Benedetto | **John Greaney CANCELED** | |
| 74 | Harvey Epstein | **Bryan Cooper CANCELED** | |
| 69 | Daniel J. O'Donnell | **Cynthia Acevedo CANCELED** | |
| 68 | Edward Gibbs | **Daby Benjaminé Carreras CANCELED** | |
| 55 | Latrice Monique Walker | **Berneda Jackson CANCELED** | Anthony Jones |
| 52 | Jo Anne Simon | **Brett Wynkoop CANCELED** | |
| 49 | **Peter Abbate, Jr. CANCELED** | Lester Chang | |
| 45 | Steven Cymbrowitz | **Michael Novakhov CANCELED** | |

| 44 | Robert C. Carroll | **Brenda Horton CANCELED** | |
|---|---|---|---|
| 40 | **Ron Kim**<br>**Name but no photo or platform**<br>CFB: "This candidate has not<br>submitted a profile" | **Sharon Liao CANCELED** | |
| 26 | Edward C. Braunstein | **Robert Speranza CANCELED** | |

Even if these Republicans either could not meet deadlines or simply chose not to submit their candidate profiles at all, that doesn't explain what happened in *Assembly District 40: Ron Kim vs. Sharon Liao*. The CFB wrote next to Kim's name "This candidate has not submitted a profile[.]" If so, why is his name included while Liao's is not? If she did not submit a profile either, then theoretically (although still illegally) both their names should have been included– not his alone.

Canceling Liao and deleting me from our respective guides had similar effects. The CFB denied us our right to free speech and the public's right to listen and to assemble around like-minded candidates to organize a campaign. Educated voters might use the CFB's "Compare the Candidates" and "Add to My Ballot" functions to plan out their voting choices before going to the polls. Under the color of law, the CFB misled voters into thinking there were no Republican candidates in these races, so that supporters would stay home and forgo voting.

A reasonable person would believe the heading "Candidates on the Ballot" is all-inclusive. If so, that person would also assume someone not included in the CFB's Guide asking for money in the form of campaign contributions, must be a con artist. After being excluded from the voter guide, I have received hundreds of those accusations from members of the public– to my face, through my family, through my medical practice's receptionists and answering services, and through online trolls.

The only entity legislated to provide an accurate roster of the candidates' names is the CFB. As a member of the public, without knowing candidates' names, I cannot research their platforms, contribute to their campaigns, or contact them about fundraising or volunteering. Individual candidates, particularly challengers, cannot reach millions of voters without first having funding and workers, which is why the legislature put the onus for voter education on the CFB, and not on candidates. Without having their names and platforms promulgated to voters, candidates also cannot reach the CFB's threshold requirements for matching funds.

The CFB canceled two Democrats in this Guide. In 2014, John Liu sued the CFB[2] for violating the First Amendment and Fourteenth Amendments, stating the CFB discriminated against Asian-Americans (Liu v. N.Y.C. Campaign Fin. Bd., No. 14-cv-1687 (RJS) (S.D.N.Y. Mar. 31, 2015). Liu lost in part because there were no similarly situated candidates. He was a "class of one," being the first and only party-endorsed Asian-American nominee on the citywide general election ballot. Upon information and belief, I am the second. After being canceled from the 2022 guide, Liu barely retained his seat in office. Incidentally, Bill Thompson[3] and John Liu[4] are the only two other people I found who were prosecuted OATH Court over illegal signs. After they lost their respective elections, both received penalties of over $500,000. Peter Abbate, Jr. chaired the NYS Committee on Government Employees. After the guide's publication, he lost the 2022 race and left office.

I did not see the full 2022 voter guide until January 8, 2024, long after I filed "the Negligence case" in NYS Supreme Court on October 20, 2022. Between 2021 and 2023, to use the CFB's online guide, voters needed to enter their home addresses. Afterwards, the site presented them with tailored guides limited to their own districts.They could only see [some of] the candidates they were eligible to vote for– never the full NYC guide. That information remained hidden.

In a show of force, the CFB flaunted how easily it could restrict candidate speech. The Defendants had just learned through this SDNY case, that I would run for office again if not for their censorship. This 2022 Guide was posted before the NYS GOP Convention, presumably to pressure the Republican party into threatening me and ostracizing me and to make me feel guilty about the other GOP candidates who they had harmed.

Speech that relates to an election but occurs nowhere near the ballot or any other electoral mechanism is treated as core political speech entitled to the fullest First Amendment protection (McIntyre v. Elections Commission of Ohio, 514 U.S. at 347). The CFB made it clear that the Voter Guide is not ballot speech. That is how they removed the "Dr." honorific and the "Elizabeth" from my name. When I spoke at the September 14, 2021 hearing before the bipartisan group of BOE Commissioners, I won the majority vote, arguing that voters should be able to recognize their desired candidates on the ballot and vote freely. The BOE protected my right and the voters' rights to freedom of assembly. The CFB barred me, and all of the other doctors with Indian-American/ Asian-American names from using the "Dr." title stating it was against its "long-standing

[2] Azi Paybarah. Now, Liu pursues the Campaign Finance Board. Politico (March 12, 2014)
[3] David Seifman. City upholds decision orderingJohn Liu to pay $527K for illegal campaign posters. NY Post (July 2, 2012)
[4] Clear the Books, Bill. NY Post (October 3, 2012)

policy." Meanwhile, it added the "Dr." title to a white male Republican candidate's name, a supporter of mine, who had his platform erased from the guide purportedly for not submitting a profile. Of note, because he had the "Dr." title and I did not, this guide generated tremendous skepticism among Republican donors and within the larger community about whether I was a *real* doctor. The CFB's justification was that its voter guide was different than the Board of Elections' ballot.

The Defendants' retaliated against a lifetime member of the DSA, Theo Bruce Chino Tavarez, who ran in the 2021 Democratic primary for Public Advocate. Even though we were running for the same position, he submitted an Affidavit of Support in the TRO Court [Exhibit]. Tavarez explained that he had also referred to the incumbent by his actual name and not by his title. Tavarez's profile was still included in the CFB's print and online guides. Of note, Tavarez also attested that the CFB compelled him to change his candidate profile, co-authoring his platform for him and substituting its words for his, another violation of the First Amendment.

In 2022, Tavarez served as the Treasurer for another Democratic candidate, Paperboy Love Prince ("Paperboy"), an artist, rapper, entrepreneur, and philanthropist who ran for Mayor in the 2021 Democratic Primary and garnered attention from Rolling Stone, CNN, the WSJ, and other media. If elected, Paperboy would have been the youngest NYC Mayor and the first transgender NYC Mayor. Paperboy also volunteered on my 2021 campaign. Photos and videos of us together appeared on social media. Even though there were purportedly no complaints against Paperboy's campaign, the CFB called individual campaign donors to look for violations, creating a negative impression of both Paperboy and Tavarez among donors (Exhibit AA). Both contacted me.

In response to a FOIL request (Exhibit AB), the CFB provided the following documents, which show that Paperboy timely submitted a candidate profile for inclusion in the voter guide. In response and under color of law, Defendant Duhalde wrote, "The CFB will not publish links to any sites that appear to be personal or commercial... Your website includes a GoFundMe link for the Love Gallery. Delete the link or submit a campaign-specific web page." Presumably to be included in the "critical" voter guide, Paperboy's campaign acted accordingly, and responded, "We updated the website and changed the links." Duhalde then wrote, "To be published in the Voter Guide, the community center link needs to be removed throughout the website." In violation of the First Amendment and Citizens United v. FEC 558 U.S. 310 (2010), the Defendants censored Paperboy's personal speech, campaign speech, and commercial speech. In Paperboy's case, the Defendants extended past the voter guide censoring their campaign website and interfering with donations towards Paperboy's community center.

In their 2022 email to Paperboy, Defendants Duhalde and the CFB warn, "If you do not update your website and resubmit by that date, all non-compliant links will be removed from your candidate profile before it is published in the Voter Guide." In Paperboy's case, the Defendants intended to publish their profile but only to remove a "non-compliant" weblink. In my case, the entire profile was censored. Other Republican candidates were also censored in their entirety. Meanwhile, other Democratic candidates, such as Sean Hayes, a 2021 Mayoral candidate, had only one small section censored presumably for non-compliance. We can presume this because CFB Rules do not allow candidates to leave any sections blank.

The CFB also retaliated against several of my donors to chill their speech and mine by publishing their identities in a manner that could cause others to retaliate against them.

<u>Deliberate Escalation of Unconstitutional Behavior</u>
A) On January 13, 2023 after "the Negligence case" had been "fully briefed' according to Defendant Perskie [Exhibit], the CFB held a public hearing to review Proposed Amendments to the Voter Guide. There were several barriers to joining this Virtual public hearing: the email broadcast was misleading, an RSVP was required, the RSVP was set several days in advance of the meeting, the time of the meeting was changed, and the start time was delayed so we couldn't enter the Zoom session. Ultimately, I was the *only* member of the public who overcame all these hurdles and participated. I objected to the Proposed Amendments.

NYS's Rulemaking procedure legislates that all objections to Proposed Amendments be presented to the legislature before the adoption of the Rules. Section 1043 of the NYC Charter requires that NYC Agencies post these public hearings, post their Proposed Amendments for public comment, and post any objections they have received– either in full or in summary– alongside the Proposed Amendments before the Mayor's office signs off. In this case, the CFB never posted the recording on its website, Twitter, or YouTube Channel as it did with its other hearings or publish a press release about the outcome. The entire public hearing along with my objections seem like they never occurred. This is a prior restraint on my speech since neither the Mayor nor the City Council, many of whose members are lawyers, might have considered my objections before they adopted these Rules into the Charter. Consider (Exhibit AC p3):

"Whether a candidate video statement satisfies the requirements of these rules is determined by the Board at its sole discretion."... "candidate video statements included in the voter guide will be made accessible to individuals with vision disabilities"... p10 "the candidate may not... refer to any opposing candidate by name... use...statements...or materials that are patently offensive... make statements... or assert facts that the candidate knows or should know to be false... engage in any commercial programming or advertising... display any literature, graphs, or props."

The CFB amended the Charter in New York State. In O'Neill v. Oakgrove Construction Inc., 71 N.Y. 2d 521, 521 (1988), the Court ruled, "The protection afforded by the guarantees of free... speech in the New York Constitution is often broader than the minimum required by the First Amendment." Nevertheless, with these new Rules, I would once again be compelled to disclose my race and gender under the pretext of providing reasonable accommodations for the disabled.

B) Deliberate Continuation of Wrongs

I could not have brought up Campaign Expenditures in the Negligence case because I was still duped by the CFB's misrepresentations. In Gerson v. New York City Campaign Fin. Bd. 2019 NY Slip Op 03268, the Appellate Court ruled:

> *"Apparently, any error, no matter how minor, in any aspect of the documentations submitted in support of a certain contribution would render the documentation wholly invalid for purposes of calculating the error rate… The Board failed to provide any reason for setting the threshold at 20%, rather than another percentage, or for not taking an approach other than cutting off all funds when the threshold is reached, the informal rule on which [the CFB's] determination was based is "so lacking in reason for its promulgation that it is essentially arbitrary." (New York State Assn of Counties v. Axelrod, 78 NY2d 158, 166 [1991]; see also Matter of Nicholas v. Khan 47 NY 2d 24, 34 [1979])…*

In spite of this ruling that even a 20% error rate, based on any minor documentation issue, was arbitrary and capricious, the Defendants held my mother, my campaign and me to an even more stringent 0.00% error rate. Although we never submitted the additional certification and application forms for matching funds, and although we were never awarded any matching funds, and although we never accepted any matching funds, the CFB continues to call the campaign a "program participant" and subject it to its unconstitutional and evidently "arbitrary and capricious" formal and informal rules. All of this is intended to chill speech and to interfere with our freedom of assembly by tying up our resources.

After this ruling, the CFB amended its Rules, which Defendant Egerton emailed me about recently on February 14, 2024 and again on February 20, 2024. The new Rules allows the CFB to serve me a summons to appear in OATH Court (for the twelfth time) to answer for violations. However, if the Court finds in my favor (as it has the other eleven times), the CFB does not have to abide by the Court's *now* "non-binding decision." Instead, the CFB can vote whether to adopt or disregard the OATH Court's ruling. The CFB Board, which is legislated to be "bipartisan" comprises almost all Democrats and Working Families members. Upon information and belief, no Republican has won a majority vote in front of the Board after an OATH Court hearing, particularly after suing it.

22

In spite of the Gerson Appellate Court ruling, the Defendants willfully and deliberately continued to train new candidates– challengers– that they cannot retain legal representation unless their campaigns have fundraised enough to afford an attorney based on the fair market value of legal services. The value would be judged by the Agency itself. If any candidate spent their own money above the allowed amount, they would be subject to violations and penalties for over-contributions. This directly contradicts the Appellate Court's ruling. Upon information and belief, only challengers are compelled to listen to these misrepresentations since incumbents are not required to complete all of the CFB training sessions. Incumbents likely would not attend the CFB's training, "New To The CFB," for example. These are viewpoint discriminatory learning modules because challengers generally only run if they have a problem with the government's status quo. Essentially, new candidates are compelled to listen to the CFB's misrepresentations in their viewpoint discriminatory training sessions, so that they forfeit their own civil rights.

In the original 2015 OATH case (the one that was overturned), CFB v. Gerson et al., the Judge affirmed the CFB's "No Opting-Out" Provision and added, "The Act authorizes petitioner to impose civil penalties of up to $10,000 for each violation. Admin. Code $3-711(1). In addition, petitioner may impose a civil penalty of up to three times the amount of excess expenditures." There appears to be no cap on the penalties related to candidates' contributions to their own campaigns if they ever expressed a desire to apply for matching funds. A billionaire, for example, who had not expressed any desire for matching funds, would not be subject to the same spending restrictions or to the same over-contribution violations and penalties. Because challengers generally spend their money on space, staff and marketing materials to start– not on expensive legal services– there is no one to warn them about this *Deal With the Devil* matching funds registration form.

Deliberate Continuation of Wrongs: Race and Gender

This claim should not be precluded. Defendant Sollars emailed that he was collecting this information for a "press release." Although I became a member of the NY Press Club in 2012, although I am currently an on-air contributor for Fox 5 NY, and although I have published national news stories which certain CFB employees have commented on, often positively, since 2015 [Exhibit AD], I never received its press release. I was excluded from the press distribution list. This may be a viewpoint discriminatory violation of my freedom of the press—discovery is needed on this point. Since I did not know that I was excluded from the press release distribution list, I believed the CFB had simply changed its mind about publicizing this information on race and gender.

Defendants Sollars and the CFB deliberately offered the public a license to discriminate based on race and gender. Race is a complex social construct, which goes beyond skin color. It is not determined by sight alone.

People who are born blind have no concept of color because they have never seen it. Gender also cannot be determined solely by external characteristics. That is why 2021 Mayoral candidate, Scott Stringer, listed his pronouns in the press release (Exhibit AE). The CFB voter guide lists reasonable accommodations that have been provided for people with disabilities like voting machines with less glare. The CFB did not list their forced disclosures about candidates' race and gender as one of their achievements for the disabled.

The City retained me to be its expert witness in Osorio v HHC and the Queens County Supreme Court qualified me as an expert on pain and disability (Exhibit AF). The multimillion dollar malpractice suit started prior to this CFB voter guide event and is still being fought. It does not make sense for the City to tout me as its expert on disability in one case and simultaneously discredit my opinions on disability in this case. For years, I have been listed in the City's database of medical experts on disability. I have also written letters requesting reasonable accommodations for employees of City Agencies, including the Office of Corporation Counsel, in the past year. I have been published in peer-reviewed journals for my work on pain and visual disorders [Exhibit]. By my conservative estimate, I have treated over 15,000 patients in my career, at least 2000 of which have had visual abnormalities. The CFB's policies lie completely outside of the standard of care for reasonable accommodations. We do not force people to disclose their race and gender before speaking to the disabled.

In the CFB's so-called visual descriptors, candidates included information on their background and platforms. For example, 2021 Mayoral candidate, Dianne Morales, described herself as a "first generation Afro-Latina," qualities that cannot be determined by sight alone. How can you tell by looking at someone if they are first generation immigrants? Pale-skinned people immigrate here, too. In my case, because my platform had already been deleted by the Defendants, the only thing the press and public learned about my campaign is my race, my gender, and my bodily measurements, which Sollars and the CFB also compelled me to disclose. Selecting people for an employment opportunity— which is what an election is— solely on the basis of race and gender runs completely contrary to my actual platform and to my practices as an employer. The information about bodily measurements was absurd, and likely intended to conjure up negative stereotypes about women candidates, particularly since I was the only party-endorsed female candidate in the Mayoral, Public Advocate, or Comptroller general elections in 2021.[1]

## RESPONSE TO POINT 2: RETALIATION IS ADEQUATELY PLEADED UNDER §1983

"[W]hen a municipality 'chooses a course of action tailored to a particular situation,' this may also 'represent an act of official government 'policy.'" Montero v. City of Yonkers, 890 F 3d 386, 403 (2d Cir. 2018). Thus, "even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered'" may deprive the plaintiff of his or her constitutional rights. Amnesty Am. v.

Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986)). The Defendants undertook a "course of action" (harassing and uncommon financial auditing) to retaliate against me for suing them.

The CFB said that all campaigns are audited after an election but that is not true (See CFB 2017 Post-Election Report, Exhibit AI). Also, the nature and scrutiny of the audit can vary.

"[R]etaliati[ion]… in violation of the First Amendment" requires showing that Plaintiff's '(1) speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [them]; and (3) there was a causal connection between this adverse action and the protected speech.;'" Montero v. City of Yonkers, N.Y., 890 F. 3d 386, 394 (2d Cir. 2018).

I have pleaded the existence of (1) a formal policy, officially endorsed by the municipality for censoring campaigns and for auditing campaigns. Both of these policies were codified by the CFB and enforced at the CFB's sole discretion. The CFB chose to censor my speech with its unlawful policy. It chose to interfere with my speech and freedom of assembly with its Rules on candidates' individual spending limits irrespective of whether they received matching funds. Moreover, after witnessing my official oral testimony before the Campaign Finance Board in December 2021, after receiving and posting my additional written testimony (before I was cut off prematurely after 3 minutes), and after reading my various affidavits from past cases, the Defendants amended the Voter Guide rules in a series of additional First Amendment violations. They simultaneously censored my public objections both from the public and from elected officials, such as the Mayor and City Council. who signed off on their changes.

If that is insufficient, I can also plead (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of my civil rights. Defendants Duhalde, Egerton, Loprest, Williams, and Perskie deleted my campaign profile from the voter guide. Then they retaliated against third-parties in my zone of influence. The CFB rewrote Theo Chino's platform for him in the 2021 primary; after he assisted me in the Hagler hearing, the CFB targeted his donors for troubling and burdensome questioning, chilling their speech. Mark Szuzkiewicz endorsed me at one of my main fundraisers. Subsequently, the CFB censored his video voter guide. Paperboy Love Prince volunteered on my campaign and their photos and videos with me circulated to their large following. The CFB censored Paperboy's campaign profile. Then it extended its censorship crusade into Paperboy's website, including interfering with fundraising by Paperboy's community center. Most egregiously, the CFB targeted my mother, when we all believed she was dying. Then, upon learning that I might run for office again, the CFB flaunted its unmitigated power to suppress the speech of the majority of the Republican slate for 2022 state office

without consequence. Moreover, the CFB issued its advisory opinion barring campaigns from obtaining professional services– paid or pro bono– unless they paid for those services with money obtained either through them or through direct fundraising. The CFB used its legislative, executive, and judicial powers to violate my civil rights.

I can also plead (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials. The CFB denied me the use of my "Dr." honorific, thereby interfering with my freedom of assembly and my ability to organize my supporters– who knew me as "Dr. Devi," not as 'Devi Nampiaparampil." Voters might also be more drawn to me since I was a physician working on the front lines to keep immunocompromised and disabled patients out of the Emergency Rooms. Duhalde, Egerton, and Loprest cited a "policy" that no one could find for why the identification was denied. The CFB, well-versed in variables that affect voter preferences and used this knowledge to interfere with my freedom of assembly. In terms of auditing and financial disclosures, the CFB repeatedly cited a "policy" whereby only my data entry and bookkeeping in their proprietary platform could be considered. The hard copy bank statements, credit card statements from NYC Votes, the campaign receipts, campaign contribution cards, and other bookkeeping materials could be ignored in favor of their proprietary system. Yet they have never produced this policy.

The CFB also enforced its unofficial policy allowing it to be discretionary about the nature, scope, timing, and even occurrence of audits to retaliate against me. For example, after this case was initiated, the CFB changed its website to now read that Draft Audit Reports will be issued within 8-10 months of the campaign's end, which is close enough to the window in which I received mine. However, that does not explain the absence of any type of audit for Edwin De La Cruz, who received public funds in 2021, or the absence of a similar audit for similarly situated candidates to me: Devin Balkind (the Libertarian candidate for Public Advocate), for Dr. Raja Flores (a physician who ran for the citywide office of Mayor), or Aaron Foldenauer, a citywide candidate for Mayor who was also absent a Treasurer.

The CFB website says the Audit Process will be completed within 14-18 months after the Final Disclosure statement is submitted. Since the CFB refuses to accept my Financial Disclosure statement, why was I ever issued a Draft Audit Report in the first place? If it is because the audit process is supposed to be completed within 14-18 months of an election, why has former Mayor Bill De Blasio, known for his billion-dollar Thrive NYC program,  never received a final audit report for his 2017 election campaign from seven years ago? (Exhibit AG)

Finally, I have pleaded (4) a failure by official policy-makers to properly train or supervise subordinates to such extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. The CFB chooses not to record or post any of its training sessions online for others to review. It chooses not to issue a software manual for its proprietary web platform, C-smart. The CFB opts to have their software support personnel providing legal advice about how campaigns should operate, while simultaneously refusing to answer basic questions about which banks the CFB works with. CFB employees, like Williams, are able to block emails from candidates, block phone calls, cancel meetings, and work from home so that there is no conduit for candidates to access or communicate with the government (Exhibit AH). Because there are no adequate internal or external controls, these individuals retaliate at will.

Only one of the four pleading criteria described above has to be met (Moray v. City of Yonkers, 924 F. Supp. 8, 12 (S.D.N.Y. 1996)). Nevertheless, I can all four. "Where evidentiary material is submitted and considered on a motion to dismiss a complaint pursuant to CPLR 3211(a)(7), and the motion is not converted into one for summary judgment, the question becomes whether the plaintiff has a cause of action, not whether the plaintiff has stated one, and unless it has been shown that a material fact as claimed by the plaintiff to be one is not a fact at all and unless it can be said that no significant dispute exists regarding it, dismissal should not eventuate." (Rabos v. R&R Bagels & Bakery, Inc., 100 AD 3d 849, 851-852, 955 NYS 2d 109; Guggenheimer v Ginzburg, 43 NY 2d 268, 274-275, 401 NYS 2d 182, 372 NE 2d 17).

Even though I conceded the Public Advocate race to the incumbent on Election Day (November 2, 2021), and even though I closed the campaign bank account on January 11, 2022, the CFB refuses to accept that my 2021 campaign is over. State law requires that candidates submit their "cease filing" "final statement" to the Campaign Finance Board when they end their campaigns. The CFB has not accepted mine. The CFB asserts that my campaign has assets, which there is no record of– anywhere– not in the bank records, not in the contribution cards, not in the NYC Votes credit card contributions, not in bank transfers from either my personal or professional bank accounts. For over two years, I have repeatedly asked to speak to IT/ Software Support, but there has been no movement on this front. Meanwhile, in each disclosure statement, I am forced to attest to statements, which I know are false. The campaign does not have assets– that is false. But if I do not sign the attestation, the CFB can impose a $10,000 penalty for failure to file. Since I remain in this infinite loop with no end in sight, I must sign the attestations to avoid endless penalties and fees.

As long as I am still running for office (in 2021), I am still subject to the $6000 campaign contribution limit. This is the contribution limit that barred me from hiring an attorney, an accountant, or a political consultant for the campaign for years. Also, because I closed the bank account at the Defendants' urging, I cannot

fundraise from others. Because the CFB has stated that I am still running for office for 2021, I am also still subject to their financial disclosures.

I campaigned for approximately 8 months total (March 1, 2021 through November 2, 2021). I had a campaign bank account for fundraising and spending for approximately 9 months total. The process of submitting financial disclosures and answering to CFB statement reviews has been ongoing for 35 months. The CFB has been auditing me for almost 3 years with no end in sight and Financial Disclosures and reviews projected to go on until 2032, according to my CFB web portal, with an Audit that is projected to continue for 5 years past the last Financial Disclosure. I campaigned for 8 months; according to the CFB, I will regularly submit financial information to them for 16 years. According to the CFB, the Audit begins after the campaign ends and the financial disclosures cease. In that case, why am I doing both at the same time?

 Our small campaign had been scrutinized to a greater extent (a), asked to perform burdensome and unnecessary financial disclosures (b), and held to a much stricter error rate (c). All of this required significantly more time, manpower, money, and expertise. Nevertheless, according to the CFB, we met that standard. Exiting the election in November 2021, these auditors assigned a 0.00% error rate to our campaign for its compliance.

A) In terms of scrutiny, for example, my own financial contribution to myself was rejected by the CFB (but not the credit card company) because of a discrepancy in the address to the likes of: "250 West 50th Street" vs. "250 W. 50 St." The CFB honed in on this error and flagged my own contribution as suspicious. After I addressed that, our assigned liaison cited a different reason for why the contribution appeared suspicious. The CFB could not be sure that "Devi Nampiaparampil" the employer hadn't coerced "Devi Nampiaparampil" the worker into making the contribution to "Devi Nampiaparampil" the candidate for fear of being fired. This type of logic, which we at that time attributed to "bureaucracy," was applied to an overwhelming number of our campaign contributions.

B) NYS does not require pre-primary financial disclosures for campaigns where the candidate does not face a primary opponent. However, the CFB demanded that we perform tedious and time-consuming tasks like submitting these early disclosures (for and responding in writing to their "statement reviews," reviews of our financial disclosures, thereby tying up my mother, my father, and several other volunteers who could have assisted with fundraising.

C) The CFB allows for a 20% error rate to receive matching funds (Gerson v. CFB 2019). We were held to a 0.00% error rate even though we had never even applied for matching funds, much less received them. We had a hard time fundraising when almost the entire team had been involved in addressing the CFB's statement reviews and figuring out ways to insulate us from further issues. We also had difficulty tracking down each

individual contributor for the CFB's requested additional information. We were barred from filling out any of the paperwork for them– even ministerial tasks like filling in their addresses– for fear of being sent to jail for forgery. As a result, we could not meet the threshold for matchable contributions.

## RESPONSE TO POINT 3: ENTITIES THAT CAN BE SUED

I, the Plaintiff, concede that the CFB is an "independent" agency of the City of New York. However, it is not like the Environmental Protections Board, the Civilian Complaint Review Board, or the Taxi Limousine Commission. First, the CFB is the only Agency in the entire City that can dictate its own budget without oversight by the City's Executive or Legislative branches. This was discussed in November 2021 when multiple City Council members sponsored a bill to limit the CFB's powers. Defendant Schaffer stated that the CFB's budget, which is not subject to the normal checks and balances on governmental powers, is structured that way because of a ballot proposal that was approved by the voting public. The CFB itself was responsible for informing the voting public on this issue.

If the NYC Campaign Finance Board is not the proper named Defendant and it should be the City of New York, I respectfully request that the Court substitute the City for the CFB and for the amended Complaint to relate back to the date of the original Complaint. The City would not be prejudiced in its defense because it knows the identities of its agencies and its employees. It has also had access to the voter guide and all of the information contained in the audit. The other Defendants, and their Counsel, knew that they worked for the City of New York. Like the CFB, the City is represented by the Office of Corporation Counsel.

In addition, the City has received notice of this case through the Comptroller's office. In January 2023, after I filed my NYS Supreme Court case, I planned to amend my case with additional claims for harms that either occurred or were discovered after I filed my original Complaint. Therefore, I filed a timely Notice of Claim with the Comptroller's office (Exhibit AI).

## CONCLUSION

For the foregoing reasons, I, the Plaintiff, respectfully request that the Court oppose the Defendants' motion to Dismiss, and approve the Complaint and these claims therein in their entirety, award a judgment in my favor, and grant to me such other and further relief that the Court may deem just and proper.

When deciding on this Motion, I ask that the Court consider that I was a first-time candidate for public office, a physician– and not a lawyer– forced to represent my mother and my campaign in 11 separate civil cases brought against them by the City (in 2022); forced by the Defendants to represent myself, my mother and my campaign in a campaign finance audit where candidates often employ tax attorneys, election attorneys

and occasionally criminal defense attorneys (between 2021 and 2024 with no end in sight); and forced through deceit and misrepresentations to intermittently represent myself in the pursuit of justice in the TRO Court (between 2021 and 2022), the Negligence case (between 2022 and 2023), the EDNY case (in 2023), and now this case (between 2023 and 2024). I am a physician who was treating patients on the frontlines and actively publishing research to develop means by which physicians could treat non-COVID-related medical conditions at the height of COVID and the lockdowns. Even my political opponents have formally and informally thanked me for keeping my practice open and keeping elderly, disabled, and immunocompromised patients out of the Emergency Rooms. This was the time the Defendants committed these wicked acts. They routinely forced me to choose between expressing the idealistic vision I had for the City versus the health and well-being of my mother, my children, my patients, my employees, my medical practice, and my supporters. Even with their relentless auditing and investigations, and even with the ongoing litigation, the Defendants have never actually determined that I am guilty of anything. My crimes are naivete, inexperience, and idealism.

Contrast that with the Defendants who all had more expertise in campaign finance law, election law, and constitutional law than I did. According to his profile, Defendant Schaffer is a Harvard Law School trained constitutional lawyer. Loprest is an election attorney and past President of the Council on Governmental Ethics [Ex]. Perskie is a constitutional lawyer who now serves as a Civil Rights prosecutor for New York State. Duhalde is an analyst and DSA Fund Chair who has performed regressions on over 900 elections, enabling him to predict what variables determine the outcome of an election and what factors suppress candidates and chill speech. Sollars attended Columbia University and then worked in news and media for 24 years, where freedom of the press is paramount. These individuals used their exceptional knowledge, skills, and expertise, as well as the tremendous power entrusted to them by the City, for nefarious purposes against the public interest and against individual civil liberties.

Moreover, the CFB exercises legislative powers with its Rulemaking, executive powers in its enforcement, and judicial powers with its advisory opinions and its final board determination hearings on campaign finance violations and penalties. The entire Agency violates the Separation of Powers Doctrine.

I certify, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Dated:  March 1, 2024
          New York, New York

                                        By      /s/ Devi Nampiaparampil
                                                Devi Nampiaparampil
                                                Plaintiff

# EXHIBIT N: CFB Certification

# CERTIFICATION

File this form to become eligible to receive public funds



If you are running for a CFB-covered office and wish to participate in the Campaign Finance Program and be eligible to receive public funds, this Certification must be filed by the deadline set by the CFB. Late or incomplete Certifications will not be accepted. Metered mail and other mail without a verifiable postmark will be presumed to have been mailed three days prior to receipt by the CFB.



# New York City Campaign Finance Board

100 Church Street, 12th Floor, New York, NY 10007 • 212.409.1800
www.nyccfb.info • CandidateServices@nyccfb.info

# CERTIFICATION

You must file this form with the New York City Campaign Finance Board ("CFB") to become a participant in the Campaign Finance Program ("Program").

If you are running for a CFB-covered office <u>and</u> wish to participate in the Program and be eligible to receive public funds, this Certification must be filed by the deadline set. *Late or incomplete Certifications <u>will not</u> be accepted.* Metered mail and other mail without a verifiable postmark will be presumed to have been mailed three days prior to receipt by the CFB.

---

**IMPORTANT INFORMATION—PLEASE READ**

Complete the entire Certification. All mandatory fields have been marked with an "*". All pages must be submitted by mail or hand-delivery with original signatures of the candidate and treasurer. Incomplete or illegible forms will not be accepted. Any changes to the information provided require an amendment to the Certification.

Communications, both written and oral, will be directed to the candidate's, treasurer's, and/or principal committee's address, telephone number, and/or email address.

**You must notify the CFB of any changes to the information.**

---

C-Access is the CFB's website for campaigns, providing secure online access to C-SMART, campaign information, and compliance notices. Campaign-specific usernames, passwords, and the C-SMART encryption key will be issued to both the candidate and treasurer upon acceptance of the Certification.

C-SMART is the CFB's proprietary web-based software that campaigns are required to use to enter all financial transactions and electronically submit disclosure statements to the CFB and the New York State Board of Elections (NYS BOE). **It is mandatory that email addresses be provided for both the candidate and treasurer as part of your registration with the CFB.**

---

Note: If after submitting this Certification you decide that you no longer wish to be a Program participant, you must fill out and submit the Rescission of Certification. The deadline to submit a Rescission of Certification is on or before the ninth Monday preceding the primary election or prior to the receipt of public funds, which ever occurs first.

---

To protect your privacy, the CFB will not provide specific information related to your campaign to any individual or entity not listed on this Certification unless such disclosure is required pursuant to the Freedom of Information Law, Article 6 of the Public Officers Law ("FOIL"), or other law.

**Reminder:** Public servants are prohibited from using government resources for their campaigns. Do not list any government phone, email, or address as campaign contact information on this form. Government information may only be included under the employment information of the candidate, treasurer, or campaign liaison(s) (if applicable).

**New York City Campaign Finance Board**
NYC CFB

100 Church Street, 12th Floor, New York, NY 10007 • 212.409.1800
www.nyccfb.info • CandidateServices@nyccfb.info

# CERTIFICATION

## 1. ELECTION CYCLE (MUST CHECK ONLY ONE)

☑ 2021 PRIMARY/GENERAL ELECTION CYCLE  ☐ SPECIAL ELECTION: _____  ☐ OFF-YEAR: _____

## 2. CANDIDATE NAME AND HOME ADDRESS

Enter the candidate's name, address, telephone numbers, and email address.

Note: The candidate's home address is an address to which legal notices may be sent. You must promptly notify the CFB of any changes.

**CFB USE ONLY**
CANDIDATE I.D. _____
COMMITTEE I.D. _____

| MR. | MS. | LAST* NAMPIAPARAMPIL | FIRST* DEVI | M.I. S |
|---|---|---|---|---|

STREET ADDRESS* 250 W. 50TH STREET  APARTMENT/SUITE/FLOOR 27A

CITY* NEW YORK  STATE* NY  ZIP CODE 10019

DAY TELEPHONE* (312) 523-5935  EVENING TELEPHONE (312) 523-5935

EMAIL ADDRESS* devichechi@gmail.com

## 3. CANDIDATE EMPLOYMENT

Enter the candidate's employment information.

EMPLOYER NAME* METROPOLIS PAIN MEDICINE PLLC

STREET ADDRESS III JOHN STREET  APARTMENT/SUITE/FLOOR 2509

CITY NEW YORK  STATE NY  ZIP CODE 10038

TELEPHONE (347) 424-4996

## 4. OFFICE SOUGHT[†]

Select the office you intend to seek. If you select borough president or City Council, you must include the borough or Council district.

[†] Effective June 22, 2020 candidates registering with the CFB must declare their office sought at the time of registration.

OFFICE*: ☑ MAYOR  ☐ PUBLIC ADVOCATE  ☐ COMPTROLLER

☐ BOROUGH PRESIDENT: _____ (borough)  ☐ CITY COUNCIL: _____ (council district)

9/17/2020

## 5. PROGRAM CHOICE

The City Council passed Local Law 128 of 2019 which expands on the changes to the Campaign Finance Program made by the 2018 Charter Revision Commission. Effective July 14, 2019, these combined changes:

- increase the matching rate on contributions from New York City residents
- increase the maximum matchable amount for citywide offices
- lower the contribution limits,
- increase the amount of public funds candidates may receive per election,
- make public funds available as early as December of the calendar year preceding the election year

Candidates in the 2021 election cycle can opt out of the new program and choose to have the higher contribution limits, lower matching rate, lower maximum public funds, and public funds distribution schedule as in effect before the charter revision, apply to them.

### NEW PROGRAM (OPTION A)

| OFFICE | CONTRIBUTION LIMIT | MATCHING RATE | MAXIMUM MATCHABLE PER CONTRIBUTOR | MAXIMUM PUBLIC FUNDS PER CONTRIBUTOR | MAXIMUM PUBLIC FUNDS PER ELECTION (89% OF APPLICABLE SPENDING LIMIT) |
|---|---|---|---|---|---|
| MAYOR | $2,000 | $8-TO-$1 | $250 | $2,000 | $6,476,444 |
| PUBLIC ADVOCATE AND COMPTROLLER | $2,000 | $8-TO-$1 | $250 | $2,000 | $4,048,888 |
| BOROUGH PRESIDENT | $1,500 | $8-TO-$1 | $175 | $1,400 | $1,457,777 |
| CITY COUNCIL | $1,000 | $8-TO-$1 | $175 | $1,400 | $168,888 |

See Join the Matching Funds Program for more information on the changes.

**You must choose whether you want to have the previous or new requirements apply. Choose only one:**

**OPTION A: New Program**
I, the candidate, choose the conditions and requirements of the new program.

*D N*
*candidate's initials*

**OPTION B: Old Program**
I, the candidate, choose to opt out of the new Campaign Finance Program and choose the conditions and requirements of the old program.

_____
*candidate's initials*

**Note: This choice is non-binding until the deadline to certify to receive public funds or prior to the receipt of public funds, whichever is earlier.**

CFB USE ONLY

9/17/2020

## 6. PRINCIPAL COMMITTEE

Enter the committee name, address, and other information about the committee. The CFB advises against using a P.O. Box for your committee address. Candidates must authorize and use only one political committee to make expenditures, raise contributions, and receive public matching funds for the election covered by this Certification. This political committee is the candidate's "principal committee." It cannot have been authorized nor used for any other election, or be the authorized committee for any other candidate. **Note: The committee address is an address to which legal notices may be sent. You must promptly notify the CFB of any changes.**

| COMMITTEE NAME* | | |
|---|---|---|
| DR DEVI FOR NYC | | |

| STREET ADDRESS* | | APARTMENT/SUITE/FLOOR |
|---|---|---|
| 250 W 50TH ST | | 27A |

| CITY* | STATE* | ZIP CODE* |
|---|---|---|
| NEW YORK | NY | 10019 |

| DAY TELEPHONE* | EVENING TELEPHONE |
|---|---|
| (312) 523-5935 | (312) 523-5935 |

| EMAIL ADDRESS* | WEBSITE ADDRESS(ES)* |
|---|---|
| devichechi@gmail.com | |

### MAILING ADDRESS (IF DIFFERENT)

If the principal committee's address is different from the mailing address, enter the mailing address here. This mailing address will be used for all notices sent to the committee.

| IF APPLICABLE, COMPANY OR BUILDING NAME; P.O. BOX. | | |
|---|---|---|
| | | |

| STREET ADDRESS | | APARTMENT/SUITE/FLOOR |
|---|---|---|
| | | |

| CITY | STATE | ZIP CODE |
|---|---|---|
| | | |

### COMMITTEE SOCIAL MEDIA

| FACEBOOK | TWITTER |
|---|---|
| | |

| LINKEDIN | OTHER |
|---|---|
| | |

## 7. PREVIOUS ELECTIONS

Enter the previous election(s), if any, in which the candidate sought nomination for election, or election, to public office or a party position.

Have you previously been a candidate for any elective office or political party position?*   ☐ YES   ☑ NO
If yes, please specify your most recent candidacies below:

| DATE OF ELECTION (MONTH/YEAR) | OFFICE OR PARTY POSITION SOUGHT | DISTRICT | PARTY PRIMARY ENTERED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

9/17/2020

## 8. TREASURER NAME AND HOME ADDRESS

Enter the treasurer's name, address, telephone numbers, and email address.

Note: The treasurer's home address is an address to which legal notices may be sent. You must promptly notify the CFB of any changes.

| MR. | MS. ✓ | LAST* NAMPIAPARAMPIL | FIRST* MARY | M.I. |
|---|---|---|---|---|

| STREET ADDRESS* 12 COLUMBIA RD | APARTMENT/SUITE/FLOOR |
|---|---|

| CITY* ARDSLEY | STATE* NY | ZIP CODE* 10502 |
|---|---|---|

| DAY TELEPHONE* (914) 693-0764; 914-720-5550 | EVENING TELEPHONE (914) 693-0764 |
|---|---|

EMAIL ADDRESS* mnampi @ gmail. com

## 9. TREASURER EMPLOYMENT

Enter the treasurer's employment information.

EMPLOYER NAME* RETIRED

| STREET ADDRESS | APARTMENT/SUITE/FLOOR |
|---|---|

| CITY | STATE | ZIP CODE |
|---|---|---|

TELEPHONE
( )

## 10. SCHEDULE OF ACCOUNTS

List all bank accounts opened by your committee and indicate the type and purpose of the account.

### PRIMARY BANK ACCOUNT

BANK/DEPOSITORY NAME

| CITY | STATE | ZIP CODE |
|---|---|---|

| ACCOUNT NUMBER | ACCOUNT NAME (IF ANY) |
|---|---|

| DATE OPENED | MONTH | DAY | YEAR | TYPE OF ACCOUNT (SELECT ONE) | PURPOSE OF ACCOUNT (SELECT ONE) |
|---|---|---|---|---|---|
| DATE CLOSED (IF ANY) | MONTH | DAY | YEAR | ☑ CHECKING | ☑ PRIMARY/GENERAL/SPECIAL ELECTION |
| | | | | ☐ SAVINGS | ☐ SEGREGATED ACCOUNT FOR SOLICITING NON-MATCHABLE CONTRIBUTIONS |
| CURRENT BALANCE $ . | MONTH | DAY | YEAR | ☐ MONEY MARKET | |
| | | | | ☐ OTHER (SPECIFY) _____ | ☐ OTHER (SPECIFY) _____ |

### SECONDARY BANK ACCOUNT (IF APPLICABLE)

BANK/DEPOSITORY NAME

| CITY | STATE | ZIP CODE |
|---|---|---|

| ACCOUNT NUMBER | ACCOUNT NAME (IF ANY) |
|---|---|

| DATE OPENED | MONTH | DAY | YEAR | TYPE OF ACCOUNT (SELECT ONE) | PURPOSE OF ACCOUNT (SELECT ONE) |
|---|---|---|---|---|---|
| DATE CLOSED (IF ANY) | MONTH | DAY | YEAR | ☐ CHECKING | ☐ PRIMARY/GENERAL/SPECIAL ELECTION |
| | | | | ☐ SAVINGS | ☐ SEGREGATED ACCOUNT FOR SOLICITING NON-MATCHABLE CONTRIBUTIONS |
| CURRENT BALANCE $ . | MONTH | DAY | YEAR | ☐ MONEY MARKET | |
| | | | | ☐ OTHER (SPECIFY) _____ | ☐ OTHER (SPECIFY) _____ |

Attach additional form page(s) if the principal committee has more than two bank accounts.

9/17/2020

## DIRECT DEPOSIT OF PUBLIC FUNDS

In order to receive public funds by direct deposit, you must list your ABA/Routing Number found on your committee check and attach a VOIDED check from your principal committee's checking account below. **Starter checks will not be accepted.**

ABA/ROUTING NUMBER*

ENTER YOUR PRINCIPAL COMMITTEE'S
ABA/ROUTING NUMBER →

Friends of Jane Henley                                                       280
44-22 Roosevelt Avenue, Ste 504
Jackson Heights, NY 11372

Pay to the order of:                DATE
                                    VOID                $

                                                        DOLLARS

MEMO
|:000067694|:    12345678

Checking Account (for Direct Deposit of Public Funds only)

## 11. ONLINE CREDIT CARD CONTRIBUTIONS

**NYC Votes Contribute** is the CFB's online credit card platform. By registering with the CFB, you will automatically have access to this feature, and you do not have to enter it below.

If you plan on accepting credit card contributions outside of NYC Votes Contribute, you must provide your acquiring bank's name(s) and your committee's merchant account number(s).

| ACQUIRING BANK'S NAME | COMMITTEE'S MERCHANT ACCOUNT NUMBER |
|---|---|
| ACQUIRING BANK'S NAME | COMMITTEE'S MERCHANT ACCOUNT NUMBER |

## 12. CAMPAIGN MANAGER (IF APPLICABLE)

If your campaign manager will function as a liaison to the CFB, enter the manager's name, address, telephone numbers, and email address.

| MR. | MS. | LAST | | FIRST | | M.I. |
|---|---|---|---|---|---|---|
| STREET ADDRESS | | | | | APARTMENT/SUITE/FLOOR | |
| CITY | | | STATE | | ZIP CODE | |
| DAY TELEPHONE* ( ) | | | EVENING TELEPHONE ( ) | | | |
| EMAIL ADDRESS | | | | | | |

## 13. CAMPAIGN LIAISON (IF APPLICABLE)

If you would like a person to function as a liaison to the CFB in addition to the candidate, treasurer, and campaign manager or consultant (if applicable), enter the person's name, address, telephone numbers, and email address.

| MR. | MS. | LAST | | FIRST | | M.I. |
|---|---|---|---|---|---|---|
| STREET ADDRESS | | | | | APARTMENT/SUITE/FLOOR | |
| CITY | | | STATE | | ZIP CODE | |
| DAY TELEPHONE* ( ) | | | EVENING TELEPHONE ( ) | | | |
| EMAIL ADDRESS | | | | | | |

## 14. CAMPAIGN CONSULTANT (IF APPLICABLE)

If you have retained a consultant for the purpose of complying with the Program, enter the consultant's name, address, telephone numbers, and email address.

| MR. | MS. | LAST | FIRST | | M.I. |
|---|---|---|---|---|---|

| STREET ADDRESS | APARTMENT/SUITE/FLOOR |
|---|---|

| CITY | STATE | ZIP CODE |
|---|---|---|

| DAY TELEPHONE*<br>(      ) | EVENING TELEPHONE<br>(      ) |
|---|---|

| EMAIL ADDRESS |
|---|

| CONSULTANT ENTITY NAME (IF APPLICABLE) |
|---|

## 15. ADDITIONAL INDIVIDUAL WITH SIGNIFICANT MANAGERIAL CONTROL (OPTIONAL)

The Board's Rules require that participating candidates, their treasurers, campaign managers, or "persons with significant managerial control over a campaign" attend a training provided by the CFB concerning compliance with the requirements of the Program and use of its software.

If someone other than the candidate, treasurer, or campaign manager has "significant managerial control" over the campaign, list that person's name and contact information. Note: The individual listed below cannot be the campaign consultant previously listed in Section 13 of this form.

| MR. | MS. | LAST | FIRST | | M.I. |
|---|---|---|---|---|---|

| STREET ADDRESS | APARTMENT/SUITE/FLOOR |
|---|---|

| CITY | STATE | ZIP CODE |
|---|---|---|

| DAY TELEPHONE*<br>(      ) | EVENING TELEPHONE<br>(      ) |
|---|---|

| EMAIL ADDRESS |
|---|

## 16. CONTACT ORDER

Select the order in which you would like the CFB to contact representatives of your campaign. Please choose only one representative per selection. We will try to contact representatives in the order selected. However, if we are unable to reach the individual, we will call or email the candidate and treasurer directly. Additionally, certain written notices will be sent directly to the candidate and treasurer's home addresses notwithstanding the order requested.

| | First | Second | Third | Fourth | Fifth | |
|---|---|---|---|---|---|---|
| Candidate should be contacted:* | ☑ First | ☐ Second | ☐ Third | ☐ Fourth | ☐ Fifth | |
| Treasurer should be contacted:* | ☐ First | ☑ Second | ☐ Third | ☐ Fourth | ☐ Fifth | |
| Campaign Manager should be contacted: | ☐ First | ☐ Second | ☐ Third | ☐ Fourth | ☐ Fifth | ☐ N/A |
| Liaison should be contacted: | ☐ First | ☐ Second | ☐ Third | ☐ Fourth | ☐ Fifth | ☐ N/A |
| Consultant should be contacted: | ☐ First | ☐ Second | ☐ Third | ☐ Fourth | ☐ Fifth | ☐ N/A |

## 17. ADDITIONAL AUTHORIZED COMMITTEES

Complete this section if the candidate has committees (including any political action committees) that are active and file disclosure statements with the New York State Board of Elections (NYS BOE) or Federal Election Commission (FEC). Please indicate the name of the committee, the date of the last election in which the committee was involved, office sought, treasurer's information, date opened with the NYS BOE or FEC, and whether the committee is a joint committee.

***Remember, only the principal committee can be used for the election covered by this Certification.***

| COMMITTEE NAME | | | | LAST ELECTION DATE & OFFICE | |
|---|---|---|---|---|---|
| MR. | MS. | TREASURER NAME: LAST | | FIRST | M.I. |
| DAY TELEPHONE* ( ) | | | EVENING TELEPHONE ( ) | | |
| NYS BOE FILER ID OR FEC COMMITTEE ID | | | NYS BOE OR FEC REGISTRATION DATE | | |
| IF JOINT COMMITTEE, LIST OTHER CANDIDATES | | | | | |

| COMMITTEE NAME | | | | LAST ELECTION DATE & OFFICE | |
|---|---|---|---|---|---|
| MR. | MS. | TREASURER NAME: LAST | | FIRST | M.I. |
| DAY TELEPHONE* ( ) | | | EVENING TELEPHONE ( ) | | |
| NYS BOE FILER ID OR FEC COMMITTEE ID | | | NYS BOE OR FEC REGISTRATION DATE | | |
| IF JOINT COMMITTEE, LIST OTHER CANDIDATES | | | | | |

9/17/2020

## 18. CANDIDATE VERIFICATION

The Candidate must read and initial each clause and sign the Candidate Verification. **The Candidate's signature must be notarized.**

I understand that I am responsible for reading, understanding, and complying with §§ 1052 and 1053 of Chapter 46 of the New York City Charter (the "Charter"); Title 3, Chapter 7 of the New York City Administrative Code (the "New York City Campaign Finance Act" or the "Act"), and Title 52 of the Rules of the City of New York, (the "Campaign Finance Board Rules" or the "Rules".

*DN*
*initial here\**

I understand that my affirming and accepting this Certification is a condition for qualifying for participation in the matching funds program (the "Program") and to receive public funds in the election(s) that this Certification covers and that I must satisfy the other conditions specified in the Act and Rules before I may receive public funds.

*DN*
*initial here\**

I hereby designate the authorized committee identified in this Certification as my sole committee (the "Principal Committee") for the election(s) that this Certification covers. I hereby verify that the Principal Committee (i) is the only committee I have authorized to aid or otherwise take part in the election(s) that this Certification covers; (ii) is not an authorized committee of any other candidate; and (iii) has not been, is not, and will not be, authorized or otherwise active for any elections other than the election(s) covered by this Certification.

*DN*
*initial here\**

I understand that the use of an entity other than the Principal Committee to aid or otherwise take part in the election(s) that this Certification covers is a violation of the Act and will trigger the application to such entity of all provisions of the Act and Rules governing principal committees.

*DN*
*initial here\**

I understand that I am responsible for my campaign's compliance with the Charter, the Act, and the Rules. I further understand that I, my treasurer ("the Treasurer"), and the Principal Committee, and any of my agents, must comply with the Charter, the Act, and the Rules, including any amendments thereto adopted after the date of my signature below, regardless of whether my name appears on the ballot, I meet the threshold for public funds eligibility or accept public funds.

*DN*
*initial here\**

I understand that to be eligible to receive an optional early public funds payment, I must select an office sought in the Office Sought section of this Certification and meet, or attempt to meet, all of the requirements of the New York State Election Law to have my name on the ballot(s) for the election(s) that this Certification covers. I understand that if the Principal Committee receives an early public funds payment, but I fail to meet the New York State Election Law requirements to have my name on the ballot, I must submit documentation to the Campaign Finance Board ("CFB" or the "Board") demonstrating my attempts to meet those requirements. I understand that if the Board determines that I failed to attempt to meet those requirements, failed to actively campaign for a covered office, or was otherwise ineligible to receive public funds, the CFB may recover, in whole or in part, any early public funds payment the Principal Committee received.

*DN*
*initial here\**

I understand that, pursuant to Admin Code § 3-720(a-f), whether I choose the Program as in effect beginning January 12, 2019 (Option A) or as in effect before January 12, 2019 (Option B) determines the contribution limits, matching fund rates, matchable contribution amounts, maximum matchable funds, and public funds distribution schedule applicable to me and the Principal Committee. I acknowledge that I will not be able to modify my selection after the Principal Committee receives public funds or the Certification deadline set forth in §§ 3-703(c)(i) or (ii) of the Act, whichever is first.

*DN*
*initial here\**

I understand that violations of the Act include, but are not limited to: (i) accepting any contribution in excess of the applicable contribution limit set forth in the Charter, the Act, and the Rules; (ii) making expenditures in excess of the applicable expenditure limit set forth in § 3-706(1) of the Act; and (iii) accepting any contribution, directly or indirectly, from any political committee that is not registered with the CFB or from any corporation, partnership, or limited liability partnership or limited liability company. I further understand that the Principal Committee must immediately return any prohibited or over-the-limit contributions it receives or has received.

*initial here**

I understand that the Board may assess penalties of up to $10,000 per violation of the Charter, the Act, or the Rules, and penalties in excess of $10,000 for violating the expenditure limit and for failing to provide a response to the draft audit report, as provided in § 3-711(2) of the Act. I further understand that the Board may hold me, along with the Treasurer, the Principal Committee, and any of my agents, jointly and severally liable for payment of such penalties. I further understand that the Board may assess penalties for violations that occurred prior to the date of my signature below against me, the Treasurer, the Principal Committee, and any of my agents.

*initial here**

I understand that, pursuant to Rule 3-01(e), the submission of fraudulent matchable contribution claims, cooperation in alleged independent expenditures, furnishing false information to the CFB, the use of public funds to make fraudulent campaign expenditures, and other serious violations of the Act and Rules constitute a fundamental breach of the obligations I have affirmed and accepted in this Certification. I further understand that in the event of a fundamental breach, the Board may assess penalties against me, the Treasurer, and the Principal Committee, and any of my agents, and I shall be ineligible to receive additional public funds and shall be required to return all public funds previously received.

*initial here**

I understand that the Board may determine that the Principal Committee and I must return public funds pursuant to § 3-710(2) of the Act. I understand that the Principal Committee may only spend public funds on "qualified campaign expenditures," that the Board may hold the Principal Committee and me jointly and severally liable for repaying to the Board any public funds not used for qualified campaign expenditures or used for purposes which are illegal, improper, or not in furtherance of my nomination or election. I further understand that my campaign must follow published CFB guidelines and procedures, employ trained staff, and implement standard financial controls and procedures

*initial here**

I understand that my home and email addresses, the Treasurer's home and email addresses, and the Principal Committee address and email address, as provided in this Certification, are addresses to which legal notices, including correspondence and legal papers, may be sent. I further understand that I am required to promptly notify the CFB, in writing, of any changes to these addresses.

*initial here**

I understand that by providing a voided check with this Certification, I am authorizing the CFB to deposit any public funds payments my campaign is eligible to receive directly into the checking account indicated in this Certification. I also grant authorization to the CFB for the full or partial reversal of any deposits to this account in the event that the deposit was made in error.

*initial here**

I understand that the CFB will issue usernames and passwords to the Treasurer and me to submit electronic disclosure statements and that only the Treasurer and I may complete the disclosure statement process and submit disclosure statements to the CFB. I further understand that the CFB will give the Treasurer and me a single encryption key to access campaign data entered electronically. I understand that I will not be able to access the campaign's financial data without the encryption key because it is kept in encrypted form. I further understand that, although the Treasurer or I may change the initial encryption key provided by the CFB, if the Treasurer or I later lose that modified encryption key, we will be unable to access any data previously entered, and the CFB will not be able to recover the modified encryption key or any of the campaign's data.

*initial here**

9/17/2020

I verify that the information contained in this document is true and complete to the best of my knowledge and belief. I understand that intentionally or knowingly making a false statement, including, but not limited to, in the form of an electronic submission, or intentionally or knowingly violating any provision of the Act, is a Class A misdemeanor pursuant to New York State Penal Law § 210.45 and § 3-711(3) of the Act.

*DN*

_initial here*_

I understand that knowingly offering false written information to the CFB, including, but not limited to, in the form of an electronic submission, with the belief that it will become part of the records of a public office and with the intent to defraud, is a Class E felony pursuant to New York State Penal Law § 175.35.

*DN*

_initial here*_

SWORN TO BEFORE ME THIS

First (01) _____ day of

march _____, 20 21

Yudiri Almanzar
_____
NOTARY PUBLIC*

**YUDIRI A ALMANZAR**
**Notary Public - State of New York**
**No. 01AL6407827**
**Qualified in Bronx County**
**My Commission Expires July 13, 2024**

_____
CANDIDATE SIGNATURE*

9/17/2020

## 19. TREASURER VERIFICATION

The Treasurer must read and initial each clause and sign the Treasurer Verification. **The treasurer's signature must be notarized.**

I understand that I am responsible for reading, understanding, and complying with §§ 1052 and 1053 of Chapter 46 of the New York City Charter (the "Charter"); Title 3, Chapter 7 of the New York City Administrative Code (the "New York City Campaign Finance Act" or the "Act"); and Title 52 of the Rules of the City of New York (the "Campaign Finance Board Rules" or the "Rules").

*initial here** *MJN*

I understand that my affirming and accepting this Certification is a condition for the Campaign to qualify for participation in the matching funds program (the "Program") and to receive public funds in the election(s) that this Certification covers and that the Campaign must satisfy the other conditions specified in the Act and Rules before I may receive public funds.

*initial here** *MJN*

I understand that the use of an entity other than the Principal Committee to aid or otherwise take part in the election(s) this Certification covers is a violation of the Act and will trigger the application to such entity of all provisions of the Act and Rules governing principal committees.

*initial here** *MJN*

I understand that I, the Candidate, and the Principal Committee, and any other agents of the Candidate, must comply with the Charter, the Act, and the Rules, including any amendments thereto adopted after the date of my signature below, regardless of whether the Candidate is on the ballot, meets the threshold for eligibility for is otherwise eligible to receive public funds, or accepts public funds.

*initial here** *MJN*

I understand that to be eligible to receive an optional early public funds payment, the Candidate must select an office sought in the Office Sought section of this Certification and must meet, or attempt to meet, all of the requirements of the New York State Election Law to have their name on the ballot(s) for the election(s) that this Certification covers. I understand that if the Principal Committee receives an early public funds payment, but the Candidate fails to meet the New York State Election Law requirements to have their name on the ballot, I must submit documentation to the Campaign Finance Board ("CFB" or the "Board") demonstrating the campaign's attempts to meet those requirements. I understand that if the Board determines that the campaign failed to attempt to meet those requirements, failed to actively campaign for a covered office, or was otherwise ineligible to receive public funds, the CFB may recover, in whole or in part, any early public funds payment the Principal Committee received.

*initial here** *MJN*

I understand that, pursuant to Admin Code § 3-720(a-f), whether the Candidate chooses the Program as in effect beginning January 12, 2019 (Option A) or as in effect before January 12, 2019 (Option B) determines the contribution limits, matching fund rates, matchable contribution amounts, maximum matchable funds, and public funds distribution schedule applicable to me and the Principal Committee. I acknowledge that the Candidate will not be able to modify the selection after the Principal Committee receives public funds or the Certification deadline set forth in §§ 3-703(c)(i) or (ii) of the Act, whichever is first.

*initial here** *MJN*

I understand that violations of the Act include, but are not limited to: (i) accepting any contribution in excess of the applicable contribution limit set forth in the Charter, Act, and Rules; (ii) making expenditures in excess of the applicable expenditure limit set forth in § 3-706(1) of the Act; and (iii) accepting any contribution, directly or indirectly, from any political committee that is not registered with the CFB or from any corporation, partnership, limited liability partnership, or limited liability company. I further understand that the Principal Committee must immediately return any prohibited or over-the-limit contributions it receives or has received.

*initial here** *MJN*

I understand that the Board may assess penalties of up to $10,000 per violation of the Charter, the Act, or the Rules, and that I, along with the Candidate and the Principal Committee, and any other agents of the candidate, may be held jointly and severally liable for payment of such penalties. I understand that the Board, as provided in § 3-711(2) of the Act, may assess penalties in excess of $10,000 against the Candidate and the Principal Committee for violations of the expenditure limit and for failing to provide a response to the draft audit report. I further understand that the Board may assess penalties for violations that occurred prior to the date of my signature below against me, the Candidate, and the Principal Committee, and any other agents of the Candidate.

*initial here\**

I understand that, pursuant to Rule 3-01(e), the submission of fraudulent matchable contribution claims, cooperation in alleged independent expenditures, furnishing false information to the CFB, the use of public funds to make fraudulent campaign expenditures, and other serious violations of the Act and Rules constitute a fundamental breach of the obligations I have affirmed and accepted in this Certification. I further understand that, in the event of a fundamental breach, the Board may assess penalties against me, the Candidate, and the Principal Committee, and any other agents of the Candidate, and the Candidate shall be ineligible to receive additional public funds and shall be deemed to have forfeited all public funds previously received.

*initial here\**

I understand that the Board may determine that the Principal Committee and the Candidate must return public funds pursuant to § 3-710(2) of the Act. I understand that the Principal Committee may only spend public funds on "qualified campaign expenditures," that the Board may hold the Principal Committee and the Candidate jointly and severally liable for repaying to the Board any public funds not used for qualified campaign expenditures or used for purposes which are illegal, improper, or not in furtherance of my nomination or election. I further understand that the campaign must follow published CFB guidelines and procedures, employ trained staff, and implement standard financial controls and procedures.

*initial here\**

I understand that my home and email addresses, the Candidate's home and email addresses, and the Principal Committee address and email address, as provided in this Certification, are addresses to which legal notices, including correspondence and legal papers, may be sent. I further understand that I am required to notify the CFB, in writing, of any changes to these addresses.

*initial here\**

I understand that by providing a voided check with this Certification, I am authorizing the CFB to deposit any public funds payments the campaign is eligible to receive directly into the checking account indicated in this Certification. I also grant authorization to the CFB for the full or partial reversal of any deposits to this account in the event that the deposit was made in error.

*initial here\**

I understand that the CFB will issue usernames and passwords to the Candidate and me to submit disclosure statements, and that only the Candidate and I may complete the disclosure statement process and submit disclosure statements to the CFB. I further understand that the CFB will give the Candidate and me a single encryption key to access campaign data entered electronically. I understand that I will not be able to access the campaign's financial data without the encryption key because it is kept in encrypted form. I further understand that, although the Candidate or I may change the initial encryption key provided by the CFB, if the Candidate or I later lose that modified encryption key, we will be unable to access any data previously entered and the CFB will not be able to recover the modified encryption key or any of the campaign's data.

*initial here\**

I verify that the information contained in this document is true and complete to the best of my knowledge and belief. I understand that intentionally or knowingly making a false a statement, including but not limited to in the form of an electronic submission, or intentionally or knowingly violating any provision of the Act, is a Class A misdemeanor pursuant to New York State Penal Law § 210.45 and § 3-711(3) of the Act.

*initial here\**

I understand that knowingly offering false written information to the CFB, including but not limited to in the form of an electronic submission, with the belief that will become a part of the records of a public office and with the intent to defraud, is a Class E felony pursuant to New York State Penal Law § 175.35.

_MJN_
*initial here\**

SWORN TO BEFORE ME THIS

_____ 27 _____ day of

_Februery_ , 20 _24_

_____ _H Cin_ _____
NOTARY PUBLIC*

**LIM KIM A.**
Notary Public, State of New York
No. 01LI6144154
Qualified in Westchester County
Commission Expires Apr. 24, 20__ _22_

_May Qohmphgimphl_
TREASURER SIGNATURE*

9/17/2020

# EXHIBIT 0: NYT Article on Hevesi

**The New York Times**

https://www.nytimes.com/2001/08/08/nyregion/hevesi-backs-down-on-campaign-funds-fight.html

# *Hevesi Backs Down on Campaign-Funds Fight*

**By Michael Cooper**

Aug. 8, 2001

See the article in its original context from August 8, 2001, Section B, Page 4    Buy Reprints

New York Times subscribers* enjoy full access to TimesMachine—view over 150 years of New York Times journalism, as it originally appeared.

| SUBSCRIBE |
|-----------|

*Does not include Crossword-only or Cooking-only subscribers.

!an G. Hevesi backed down from his confrontation with the Campaign Finance Board yesterday, dispatching aides to negotiate with the board and pulling back from a lawsuit the mayoral candidate's political consultant had prepared to file to try to force the board to give the campaign millions of dollars in matching funds.

Mr. Hevesi, the city's comptroller and a Democrat, also retreated from the aggressive tone adopted by his consultant, Hank Morris, against the board. On Monday, the board withheld as much as $3.2 million in matching funds in a dispute over Mr. Morris's unusual billing arrangement, in which he admitted volunteering his services. Mr. Morris had accused the board of trying to embarrass Mr. Hevesi and then threatened to sue it by retaining "the leading litigation firm in America."

In contrast, Mr. Hevesi said yesterday that he had ordered his staff to cooperate with the board and that he would not be filing any lawsuits right away because he still hoped to "amicably resolve this." He was the only one of the four Democrats running for mayor who did not get millions in matching funds on Monday.

An associate of Mr. Hevesi said yesterday that the comptroller had stopped the preparations for a court battle with the board, even though the campaign had already hired a prestigious law firm and drawn up court papers. "The comptroller has put a halt to it," the associate said.

Mr. Hevesi conceded publicly yesterday that the feud with the board had tarnished his campaign effort by creating the perception that "we were not abiding by the law and the rules; that's the biggest problem."

"This should not be the issue of the last month of the campaign," Mr. Hevesi said at a campaign appearance in downtown Brooklyn. "The issue has become a distraction."

Mr. Morris had been trying to prove to the board that Mr. Hevesi had not -- as his rivals had complained -- been violating the city's campaign finance laws or circumventing the spending caps by skimping on how much it pays Mr. Morris and his firm.

Candidates are entitled to public matching funds only if they agree to limit how much they will spend; in this case, they are allowed to spend $5.5 million in the primary.

Instead of hiring a costly campaign manager, Mr. Hevesi's campaign is being run by Mr. Morris, a normally high-priced political consultant who says that in this race he is a volunteer. Instead of renting office space, the campaign is being run from the Madison Avenue offices of Mr. Morris's consulting firm.

The arrangements have kept Mr. Hevesi's overhead costs hundreds of thousands of dollars lower than those of his rivals for the Democratic mayoral nomination. That strategy, based on significant savings, allowed Mr. Hevesi to begin running more than $1 million in television commercials months before his rivals.

Mr. Hevesi told reporters yesterday that he believed in the city's campaign finance laws and that he believed his campaign had complied with them. "This is not about finding loopholes," he said. "This is about finding the most frugal and best way to spend your money."

But that frugality now threatens to cost the Hevesi campaign millions of dollars in lost matching funds, or perhaps thousands of dollars in fines, unless the Hevesi campaign can convince the Campaign Finance Board that Mr. Hevesi's arrangements with Mr. Morris are legal.

Some Democrats say that the standoff could hurt Mr. Hevesi with voters who supported strict campaign finance laws and newspapers that endorsed candidates. And the television news reports showing Mr. Morris arguing with the Rev. Joseph A. O'Hare, the chairman of the Campaign Finance Board, who was wearing his clerical collar at the time, hardly represent the kind of image a campaign wants to project five weeks before the Sept. 11 primary.

To try to resolve the problem as quickly as possible, Mr. Hevesi said that he had instructed his campaign to provide the Campaign Finance Board with more information, which it had requested, including the amount of money Mr. Morris had charged to work on his campaigns for comptroller in 1993 and 1997 and the amount of money Mr. Morris charged for services he provided to James K. Hahn, the new mayor of Los Angeles.

He said that he believed the board would find that his past arrangements with Mr. Morris were comparable to the present one. But Mr. Hevesi declined to say whether Mr. Morris had volunteered or had been paid at full market value in the past. "The answer is I'm going to allow him to produce the documentation for the Campaign Finance Board first, before we provide information to the press," he said.

And while continuing to maintain that he believed Mr. Morris had a right to volunteer, Mr. Hevesi hinted that he might pay Mr. Morris more money if the campaign finance board was not satisfied with their current payment formulas. "If they want adjustments, we'll even make adjustments," Mr. Hevesi said. "Whatever's necessary to resolve this."

A version of this article appears in print on , Section B, Page 4 of the National edition with the headline: Hevesi Backs Down on Campaign-Funds ght

# EXHIBIT P: To Volunteer or Not to Volunteer

# An Election Interrupted...

## The Campaign Finance Program and the 2001 New York City Elections



Executive Summary
September 2002

 **New York City Campaign Finance Board**

## To Volunteer or Not to Volunteer: Hank Morris and the Hevesi Determination

In the spring of 2001, news reports and other mayoral candidates noted that Democratic candidate Alan Hevesi's spending for certain routine expenses appeared to be unusually low.[40] For example, the Hevesi campaign had reported no expenditures for rent. Questions were raised about the fee arrangement between the Hevesi campaign and its principal campaign consultants, Morris, Carrick & Guma. The services this firm provided to Hevesi were more comprehensive than those of other campaign consultants, yet the cost was far less. The Hevesi campaign maintained no formal campaign office, instead working out of the firm's headquarters. Of greater significance, it came to light that Hank Morris, the owner of Morris, Carrick & Guma, was volunteering his own services as a consultant while charging the Hevesi campaign for other work done by his firm.

Campaigns are allowed to use (and could not operate without) the assistance of volunteer workers. The Campaign Finance Act, however, recognizes limits on what can be considered volunteer services. Further, goods or services that are provided at below fair market value are considered in-kind contributions. In the spring of 2001, Hank Morris informally raised the question whether, hypothetically, he could provide his services to the Hevesi campaign on a volunteer basis without consequence to the campaign. He was encouraged to request an advisory opinion from the Board, but never did so.[41]

On August 6, 2001, Morris and the Hevesi campaign's legal counsel appeared before the Board. They argued that Morris was constitutionally entitled to volunteer his personal services to the Hevesi campaign. They also argued that the contract between Morris, Carrick & Guma (calling for payment of approximately $400,000) was commercially reasonable whether or not Morris was paid for his services. While recognizing the right of a candidate to run his or her campaign in a very different and frugal way, the Board determined that Morris could not be considered a volunteer under the Campaign Finance Act. Morris had never operated as a political consultant separately from his firm. The Board reasoned that as long as the firm he owned was receiving payment for its services to the Hevesi campaign, Morris could not volunteer his time, which instead was in effect an illegal contribution by the firm to the campaign. The Board suspended payment of more than $2.5 million in public funds until the Hevesi campaign could establish that it had a commercially reasonable arrangement with Morris' firm including the value of Morris' services. The *New York Times*, reporting one of the most memorable exchanges of the campaign, wrote that Morris said the campaign was going to sue the Board. Asked about Morris' remark, Board Chairman Joseph A. O'Hare, S.J., replied "[s]o sue me — go ahead."[42]

Ten days later, after the Hevesi campaign had provided additional information regarding the amounts charged by Morris, Carrick & Guma to other political campaigns, the Hevesi campaign agreed to modify its contract with the firm by paying an additional $250,000 to account for Morris' services. On August 16, 2001, the Board released approximately $2.6 million (including new matching claims from an intervening disclosure statement) in public matching funds to the campaign.

# EXHIBIT Q: Email to Attorney

 Gmail

Devi Nampiaparampil <devichechi@gmail.com>

___

**ollow-up about name in the Voter Guide**

**Devi Nampiaparampil** <devichechi@gmail.com>                    Tue, Sep 21, 2021 at 2:47 AM
To: "fish@davidmfish.com" <fish@davidmfish.com>

Hi Dave,

I'm sorry I've been MIA. Things were so chaotic today. Thank you SO much for the reduced rate offer :) That's so kind of you!!

Do you mind if we remove the language about the reduced rate? If that would pose a problem for other clients, then we can do the regular rate? It's ok.

Since I've been dealing with these people for 7 months, I can sort of anticipate how things will go down. As soon as you've spent a little over 6 hours on the case ($2000/ $325 (the difference in rates))-- they may say that you went over the max $2000 individual contribution to the campaign. That the reduced rate was an in-kind contribution. And therefore, you cannot contribute anymore. So they may try to remove you from the case and fine us both. That's my experience of how they operate. They look for something benign that doesn't fit with some archaic law.

Similarly, I think we have to change the name to the campaign name, which is Dr. Devi For NYC. It's all me, but I think if I pay for it as an individual, they will say I went over my individual contribution limit to the campaign, and I'll get fined-- and possibly jail time because I'm the candidate and I'm supposed to know better.

All of this stuff is bureaucracy intended to stop people from ever running.

Tomorrow, I'm free between 11am and 2pm if you have any time then. If not, I can just forward you the emails.

Thanks, Dave!!
Devi


Devi E. Nampiaparampil, MD, MS
Candidate for NYC Public Advocate
Director, Metropolis Pain Medicine
Clinical Associate Professor, NYU School of Medicine
Office: 347-424-4996
www.DrDeviForNYC.com


[Quoted text hidden]

# EXHIBIT R: Sur Reply



**New York City Campaign Finance Board**
100 Church Street, 12ᵗʰ Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
Chair

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Marianne Camille Spraggins
Members

Beth Rotman
Executive Director

December 15, 2022

Supreme Court of the State of New York
New York County
60 Centre Street
New York, NY 10007

Re:   <u>Nampiaparampil et al v. New York City Campaign Finance Board (Index No.
159019/2022)</u>

Dear Judge Ramseur:

On December 15, 2022, Plaintiffs Devi Nampiaparampil and Metropolis Pain Medicine PLLC filed the *Affidavit in Further Support of Cross-Motion* and four accompanying exhibits [NYSCEF Doc. Nos. 119-123] (the "Sur-Reply"). The CPLR and the rules of the Supreme Court of the County of New York do not allow sur-replies to be filed after a motion has been fully briefed. *See* Rule 14(c) of the Rules of the Justices of the Supreme Court, Civil Branch, New York County ("The CPLR does not provide for sur-reply papers, however denominated... Materials presented in violation of this Rule will not be read."). Accordingly, Defendant New York City Campaign Finance Board respectfully requests that the Court disregard the Sur-Reply in its entirety.

However, should the Court choose to allow the Sur-Reply to be entered into the record, Defendant respectfully requests an opportunity to respond to the legal and factual assertions contained therein prior to the issuance of any decision based upon that document.

Sincerely,

Bethany Perskie, General Counsel

**NEW YORK CITY
CAMPAIGN FINANCE BOARD**

# EXHIBIT S: OATH: FOIL Records

**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee        3.45

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $ 2.85
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postage        1.93

Total Postage and Fees        8.23

Sent To MARY J Nampia Parampil Tvas
DR DEVI FOR N.Y.C
Street and Apt. No., or PO Box No.
250 West 50th Street #27-A
City, State, ZIP+4 New York New York 10019

PS Form 3800, April 2015 7530-02-000-9047    See Reverse for Instructions

USPS Postmark Here
DEC 2021
Brooklyn, N.Y. 11214

**N YORK Department of Sanitation**
ENFORCEMENT DIVISION
1824 Shore Parkway
Brooklyn, New York 11214
(718) 714-2731

Petitioner,

AFFIDAVIT OF SERVICE
Summons No. 47355268R
+ 10 others

-against-

MARY J NAMPIA PARAMPIL TVAS.
DR DEVI FOR NYC

Respondent

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF NEW YORK       )

I, T Jenkins _____ being duly sworn and over 18 years of age,
on Dec. 30 2021 _____ served via certified mail, restricted delivery, return receipt
requested 11 Summons(es) (as represented on the attached list) to: Mary J NAMPAPARampil Tvas     DR Devi For NYC     at:
250 West 50th Street #27A N.Y.N. 10019

by enclosing the Summons(es) in a post paid envelope in a mailbox regularly maintained and
under the exclusive control of the United States Post Office.

_signature_

Sworn to before me this
30 day of DCC , 20 21.

_signature_

NOTARY PUBLIC

BENJAMIN SOTO
COMMISSIONER OF DEEDS
CITY OF NEW YORK
NO. 1-6662
CERT. FILED IN NEW YORK COUNTY
COMMISSION EXP. MARCH 01, 20 23

| DR. DEVI FOR NYC | Treasurer: | Candidate(s): |
|---|---|---|
| 250 West 50th Street , 27A | Mary J Nampiaparampil | Devi Nampiaparampil |
| New York, NY 10019 | | |
| **Is this committee incorporated?** No | | [X] Authorized |
| **Registration Date:** 03/03/2021 | | |
| **Telephone:** (312)523-5935 | | |
| **E-Mail:** devichechi@gmail.com | | |

20~28
11-1

u→ 3-4-5

# EXHIBIT T: OATH: My Submissions

# *Affidavit*

*State of New York*

*County of New York*

I, Dr. Devi Elizabeth Nampiaparampil, M.D. affirm the following under penalty of perjury. I ran for public office in 2021. My campaign committee, "Dr. Devi For NYC" received the following summonses, which I am disputing:

| | | | |
|---|---|---|---|
| 047355271H | 1250 Metropolitan Avenue, Brooklyn | F. Boston #631118 | $75 |
| 047355274N | 1250 Metropolitan Avenue, Brooklyn | F. Boston #631118 | $75 |
| 047355273L | 1250 Metropolitan Avenue, Brooklyn | F. Boston #631118 | $75 |
| 047355272J | 1250 Metropolitan Avenue, Brooklyn | F. Boston #631118 | $75 |
| 047021164M | 52-15 Metropolitan Avenue, Queens | M. Donald #610491 | $125 |
| 047355268R | 79-60 Metropolitan Avenue, Queens | F. Boston #631118 | $75 |
| 047021166X | 1881 Gates Avenue, Brooklyn | M. Donald #610491 | $125 |
| 047021165Y | 1881 Gates Avenue, Brooklyn | M. Donald #610491 | $125 |
| 047355269Z | 244-06 81st Avenue, Queens | F. Boston #631118 | $75 |
| 047355270X | 80-30 244 Street, Queens | F. Boston #631118 | $75 |
| 047021163K | 2880 Flatbush Avenue, Brooklyn | M. Donald #610491 | $125 |

**Background and Credibility:**

I am a physician who performs delicate minimally invasive spine surgeries that have stringent protocols. I have been performing these surgeries for 16 years. If I don't follow rules precisely—if I am off by a couple millimeters-- my patients can become paralyzed or even die during these surgical procedures. I am very careful in how I conduct myself. I was similarly careful to review the Department of Sanitation's rules regarding campaign signs. I personally selected the members of my campaign team. I personally informed each of them about these rules. My team was small enough that I could oversee all of the campaign operations. I was the Candidate and the Campaign Manager.

1

In terms of my background, I am a professionally licensed physician in the state of New York. I am the first physician in my family. I completed my specialty and subspecialty training at Harvard Medical School where I treated patients with gunshot wounds, spinal cord injuries, strokes, traumatic brain injuries, amputations, cancer-related pain, HIV and AIDS, sickle cell disease and other forms of refractory pain.

After I completed my training, I joined the Department of Veterans Affairs to use my skills to help veterans. Very few people can start new programs at the VA hospitals because of the various challenges. Nevertheless, in 2008, I started the Traumatic Brain Injury Program at the VA Central California for the OEF/ OIF veterans returning from Iraq and Afghanistan. In 2010, I started the Interventional Pain Management program at the Manhattan VA Hospital on 23rd Street. It still exists today and it is flourishing. I also worked at the Bronx VA Hospital treating veterans with blast injuries, gunshot wounds, amputations, spinal cord injuries, and strokes and performed surgical cases in the operating rooms there. I served as the Chief of Pain Management for the Tristate region between 2010 and 2013.

I am now an Associate Professor at NYU Langone Health/ NYU Grossman School of Medicine. I have also done over 500 medical news segments for CNN, MSNBC, Fox News and CNBC. I was the Fox 5 NY medical contributor and reported on Good Day NY as well as the evening news at 5pm, 6pm and 10pm between 2015 and 2020. In 2015, I started my own private practice at 111 John Street in the Financial District.

After working every day of the COVID pandemic, after being separated from my two year-old for 8 months so I could treat over 2500 elderly and vulnerable patients, after my husband nearly died of COVID in November 2020, and after giving birth to a sick baby born with COVID in 2020—before the existence of a vaccine—I decided to run for office in my home town, New York City. I have been a member of the NYC Medical Reserve ps since Superstorm Sandy.

I have never been investigated or formally accused of any professional or personal misconduct, malpractice or negligence—even during my campaign. I have no formal complaints against me, the campaign, or any business I'm involved in-- other than these summonses for illegal sign postings. I have never been arrested or accused of any crime. I have no traffic violations and no parking tickets. I have only received and paid one ticket once for $100 when I was 17. That was 28 years ago. I have three professional licenses—one as a physician, one as a laboratory director, and one to operate radiologic equipment.


**Locations of Our Actual Signs:**

My team and I had a limited amount of funding, staffing, and resources. Therefore, we put our signs only in permissible areas following the guidelines-- in high traffic areas where they would be clearly visible—near hospitals and near subway stops, for example. My campaign strategy was to appeal to certain groups to try to get them to the polls to vote for me. We put most of our flyers and signs around hospitals to target healthcare workers and patients. We appealed to small business owners (like myself), especially restaurant owners, deli owners, dry cleaners and gas station owners. People in primarily minority residential neighborhoods also put my signs up in their private homes.

2

Because I don't own a car, and because no one on my all-female office team owns a car, we had to put our signs in areas that were close to subway stops. That was our primary method of travel. On rare occasions, I borrowed my parents' car or called Ubers, Lyfts, or taxis for members of my team, but this was not to transport or distribute signs.

Because I was seeing patients throughout the campaign, and because most of my team worked or went to school during the day, we were working on the campaign at night. In November, the sun would set early. It was dark by the time my team went out to campaign. As the candidate, as an employer, and as a responsible person, I was very concerned for my staff's safety. My team is primarily composed of young women—other than my parents who are in their 70's and 80's. I had to be concerned about where and when people were going out to put up signs or distribute flyers. I personally was physically attacked earlier in the campaign cycle. After that experience, I was especially cautious about the safety of everyone on my team.

**Locations of the Illegal Postings:**

Last week, I borrowed my parents' car and went out with two members of my female team to visit as many of the sites listed on the summonses as we could in one work day. I have never been to any of these sites before in my life. Neither had any of the members of my team.

We were only able to visit five sites. This would not have been an efficient use of our time during the campaign since I live and work in Manhattan and all of the illegal postings were in Brooklyn and Queens. My staff members also do not live or work near any of these locations and did not have easy access to any of them. None of these illegal postings were near subway stops.

None of these illegal postings were in high traffic areas. Hardly anyone would have seen them so it did not even make sense in terms of our campaign strategy.

Five of the eleven illegal postings had the addresses of practically deserted warehouses covered in graffiti with stacks of broken tires in front, broken glass, and abandoned trashed rusted vehicles. The warehouses had barbed electrified wire on top as well as irons bars on the windows—if there were any windows at all. These were not places that anyone would campaign to attract voters. They were not places that I would have sent anyone on my team. I am attaching pictures of the sites and pictures of the drive to the sites. There was no benefit to us and there was significant risk.

Two additional summonses were of the same residential address. I am not sure why the home owner called Sanitation twice to have me ticketed on two separate occasions. I have no connection to that house or to that neighborhood. I do not know how the first sign got there. I do not know how the second sign got there. I am not sure why the homeowner didn't just throw the sign in the trash if there was an issue. None of the person's neighbors had signs or postings from us, it appears. We did not receive any tickets from the neighbors' addresses—just multiple tickets from this one house.

3

We were unable to visit the eighth location and photograph it because it was located in the middle of a golf course. None of us are members there, so we were unable to enter and photograph it. It also would not have been a strategic location for us to gain a large number of voters in cold November weather.

I were unable to visit the ninth, tenth, and eleventh locations of the illegal postings because they were too far out in Brooklyn and Queens. I live in Hell's Kitchen in Manhattan and work in the Financial District of Manhattan. The members of my team also work in the Financial District of Manhattan. None of us are near these locations. We had to block off patient office appointments and procedures to be able to visit the sites where these summonses were issued. I didn't want to block off additional days to patients who need medical care.

**Timing of the Violations:**

Several of the summonses were issued after the election. The election was on November 2, 2021 and the tickets were issued on November 3, 2021. It would not make sense for me to put campaign signs up after the election was over and after I had already lost. The penalties I would accumulate might benefit my opponents by dissuading me from running again. But there is no way that the signs would benefit me. I had already lost the election at that point.

**Mary Nampiaparampil, Past Treasurer for "Dr. Devi For NYC":**

All 11 of these summonses were initially issued to my mother, Mary Nampiaparampil. My mother was registered as the Treasurer for "Dr. Devi For NYC" but had no involvement with our signs. She was in charge of the bookkeeping for the campaign for several months. She is no longer listed as the Treasurer for the 2021 campaign because she is incapacitated from advanced cancer.

Mary Nampiaparampil is a 74 year-old Indian-American female who was diagnosed with Stage IIIb vs. Stage IV metastatic gastric cancer in January 2022. My mother had months of severe symptoms throughout the summer and fall of 2021. She was practically incapacitated in November 2021, when these summonses were issued in her name. (They were mailed to my New York City address even though she lives in Westchester so that led to some delays in delivery).

Mary Nampiaparampil spent over 40 years working for the City, at John Jay College of Criminal Justice, where she retired with the distinction of serving for longer than any other person on staff. She was always very strict about following rules, especially City agency rules, and that is one reason why I asked her to be my Treasurer. She has never been accused of any professional or personal misconduct in her life, to my knowledge.

When we first received the summonses, she was hospitalized at White Plains Hospital in Westchester County where she lives. When I first appeared before the court to address these summonses, my mother Mary Nampiaparampil was hospitalized at Memorial Sloan Kettering Cancer Center. The doctors there initially suggested she consider Hospice. Then she elected to have surgery to remove her stomach, parts of her small

4

intestine, pancreas, liver, greater omentum, and over 30 lymph nodes. I participated in the OATH court hearing with my cell phone. I kept my office phone handy to answer any emergent phone calls from the surgeon during that hearing since I am my mother's legal health care proxy.

̇ ̇e that time, I have updated my paperwork with the NYC Campaign Finance Board. I am now listed as both the Candidate and the Treasurer for "Dr. Devi For NYC." My mother, Mary Nampiaparampil, is no longer listed on any of the current campaign paperwork. She is still recovering from major surgery and she is still actively being treated for advanced stage cancer at Memorial Sloan Kettering Cancer Center.

Dated: _____June____ _2_, 20_22_

_____

**Devi Nampiaparampil, M.D.**

Sworn to before me this _2_ day of _June_, 20_22_

_____

**Notary Public**

Daniel Ellison
Commissioner of Deeds, City of New York
No.1-10197
Cert. Filed in New York County
Commission Expires March 1st 2024
The UPS Store @ 52 Nassau 212.406.9910

5

May 24, 2022

Dear Sir or Madam,

We are the core members of Dr. Devi Nampiaparampil's team. We manage Dr. Devi Nampiaparampil's medical practice, Metropolis Pain Medicine PLLC, which is affiliated with NYU Langone Health. We were also the core members of the Dr. Devi For NYC campaign. Like Dr. Nampiaparampil, we are all healthcare professionals. Some of us are currently enrolled in nursing school, public health school and medical school. We all started working with her in college—some of us since April 2019. All of us worked side-by-side with her treating patients throughout the worst of the COVID pandemic in March 2020 and beyond.

Along with Dr. Nampiaparampil herself, we purchased all of the campaign posters, lawn signs, and flyers for the campaign. We received all of these materials at our office at 111 John Street in the Financial District of Manhattan. We physically unloaded the boxes off trucks and carried them up to our office. We unpacked them. We also carried the signs back out of the office to distribute them to others and to post them at various locations. Dr. Nampiaparampil's mother, Mary Nampiaparampil (the Treasurer for the campaign), was not involved in distributing the campaign signs.

We were very conscientious about where we could post these signs. Dr. Devi Nampiaparampil educated us about the Department of Sanitation rules surrounding postings since we were the ones primarily responsible for the campaign. We also personally witnessed Dr. Devi regularly and routinely educating her friends and family to only post the signs on their own personal property.

Because we had such a small team and limited resources, we focused on distributing these signs around our workplaces, schools, and homes, and areas that we thought would be high-yield for our campaign.

We have no connection to the locations listed on these citations. None of us have ever been to the locations listed below. To our knowledge, none of Dr. Nampiaparampil's friends or family have any connection to these locations either.

| | | | |
|---|---|---|---|
| 047355271H | 1250 Metropolitan Avenue, Brooklyn | F. Boston #631118 | $75 |
| 047355274N | 1250 Metropolitan Avenue, Brooklyn | F. Boston #631118 | $75 |
| 047355273L | 1250 Metropolitan Avenue, Brooklyn | F. Boston #631118 | $75 |
| 047355272J | 1250 Metropolitan Avenue, Brooklyn | F. Boston #631118 | $75 |
| 047355268R | 79-60 Metropolitan Avenue, Queens | F. Boston #631118 | $75 |

| | | | |
|---|---|---|---|
| 047355269Z | 244-06 81st Avenue, Queens | F. Boston #631118 | $75 |
| 047355270X | 80-30 244 Street, Queens | F. Boston #631118 | $75 |
| 047021164M | 52-15 Metropolitan Avenue, Queens | M. Donald #610491 | $125 |
| 047021163K | 2880 Flatbush Avenue, Brooklyn | M. Donald #610491 | $125 |
| 047021166X | 1881 Gates Avenue, Brooklyn | M. Donald #610491 | $125 |
| 047021165Y | 1881 Gates Avenue, Brooklyn | M. Donald #610491 | $125 |

For these reasons, we conclude that these postings were completely unauthorized by our campaign. The signs ticketed by the Department of Sanitation were not posted by us or by anyone on our team. Since some of these signs were ticketed after Election Day, it is possible that some of our authorized signs were taken down from appropriate locations after the Election. They were put back up at these unauthorized locations by someone else later and ticketed.

Sincerely,

Tonima Islam

Nazly Suarez

Tenzin Trinley

Shirley Chen

Sworn to before me on 24th day of May, 2022

CHARO J BOURDIER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BO6339584
Qualified in New York County
My Commission Expires 04-04-2024

2

**Photographs Submitted by Dr. Devi Elizabeth Nampiaparampil, M.D., M.S.**

### *Affidavit*

State of New York

County of New York

Under penalty of perjury, I affirm that these are photos and screenshots that my employees and I took of the addresses listed on the summons:

## 1250 Metropolitan Avenue, Brooklyn (4 summonses):





1













4









Drive to the location from 111 John Street (Work):

