UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEVI ELIZABETH NAMPIAPARAMPIL,

           Plaintiff,

– *against* –

THE NEW YORK CITY CAMPAIGN FINANCE BOARD, DAVID DUHALDE, *in his official capacity as Senior Candidate Services Liaison for the New York City Campaign Finance Board*, HANNAH EGERTON, *in her official capacity as the Director of Candidate Services for the New York City Campaign Finance Board*, AMY LOPREST, *in her official capacity as Executive Director for the New York City Campaign Finance Board*, BETHANY PERSKIE, *in her official capacity as General Counsel for the New York City Campaign Finance Board*, FREDERICK SCHAFFER, *in his official capacity as Chairman of the New York City Campaign Finance Board*, MATTHEW SOLLARS, *in his official capacity as Director of Public Relations for the New York City Campaign Finance Board*, and JACLYN WILLIAMS, *in her official capacity as a Candidate Services Liaison for the New York City Campaign Finance Board*,

           Defendants.

**OPINION & ORDER**

23-cv-6391 (ER)

---

RAMOS, D.J.:

    Devi Elizabeth Nampiaparampil, currently appearing *pro se*, brings this action, pursuant to 42 U.S.C. § 1983 and the New York State Constitution, against the New York City Campaign Finance Board ("the CFB"), David Duhalde, Hannah Egerton, Amy Loprest, Bethany Perskie, Frederick Schaffer, Matthew Sollars, and Jaclyn Williams (collectively, "Defendants"), alleging violations of her federal and state constitutional rights before, during, and after her 2021 campaign for New York City Public Advocate. Before the Court is Defendants' motion to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is GRANTED.

I.     BACKGROUND

    A. Factual Background

Nampiaparampil ran as the Republican candidate for the office of the New York City Public Advocate in the 2021 election. Doc. 1 ¶ 28. The CFB is a New York City agency created to "limit the role and influence of private money in the political process." *Id.* ¶ 29 (citation and alterations omitted). The CFB operates various programs to promote fair elections in the city, including the publication of a citywide "Voter Guide;" hosting of a debate for the candidates for the Public Advocate position; and administering a matching funds program ("the Program") for candidates. *Id.* ¶¶ 30, 75.

*1. The Voter Guide*

The CFB's Voter Guide contains information and statements from every candidate running for public office in New York City. *Id.* ¶ 31. The CFB is required to publish the Voter Guide—both in print and online—and to mail a copy of the print version to every "city household in which there is at least one registered voter." *Id.* (citation omitted). Candidates submit a candidate profile to be included in the Voter Guide, which includes two separate candidate statements: a print statement for the printed guide and a video statement for the online guide. *Id.* ¶ 32. The statements must be submitted to the CFB for approval before publication. *Id.* The CFB rules include four restrictions on content for the print statement, with similar restrictions for the video statement: the statements may not (1) refer to any opposing candidate by name; (2) contain profanity or statements that are patently offensive, obscene, libelous, or defamatory; (3) assert facts the candidate knows or should know are false; or (4) violate any city, state, or federal law. *Id.* ¶¶ 33–34. Statements that violate the restrictions will be excluded from the Voter Guide. *Id.* ¶ 36.

Nampiaparampil claims that her video statement for the Voter Guide was initially flagged as "improper" when David Duhalde, the CFB's Senior Candidate Services Liaison, warned her that she could be sued for "mentioning [an opposing] candidate's

wife." *Id.* ¶¶ 70–71. This "threat of suit" from Duhalde led Nampiaparampil to submit a revised script without the reference to her opponent's wife or her job, and the script was approved. *Id.* ¶¶ 72–73. Nampiaparampil's video was recorded and posted with the online Voter Guide, but she claims that it was posted in a way that made it "virtually unsearchable."[1] *Id.* ¶ 74.

Nampiaparampil submitted her print statement for Voter Guide via the CFB web portal on August 3, 2021, which was the deadline for submissions. *Id.* ¶¶ 55–56. Duhalde informed Nampiaparampil that her statement could not be used because she had mentioned her opponent, Jumaane Williams, by name, in violation of the rules. *Id.* ¶ 56. Duhalde advised Nampiaparampil that she could submit a revised statement by email by August 5, 2021. *Id.* Nampiaparampil revised her statement and resubmitted it via the CFB web portal, rather than by email, on August 5, 2021. *Id.* ¶ 57. Nampiaparampil alleges that "although the CFB web portal was still technically accepting submissions on the user end, the CFB was no longer receiving those statements on its end." *Id.*

Nearly eight weeks later, on September 28, 2021, an email from Hannah Egerton, the CFB's Director of Candidate Services, informed Nampiaparampil that her candidate profile had been excluded from the Voter Guide because her original submission had "violated [CFB] rules [by] mentioning opposing candidates by name," and the CFB had never received a revised statement, which had been due by August 5, 2021. *Id.* ¶ 58. Nampiaparampil sought a temporary restraining order in the New York Supreme Court, requesting that a flyer or postcard with her full profile be included with the print Voter Guide. *Id.* ¶ 80–81. The court ultimately rejected the case as moot because the print guide had already been mailed. *Id.* ¶ 82.

---

[1] The complaint does not make any specific allegations as to *what* made her video "unsearchable," but implies that Nampiaparampil's video was not given search tags that were included with other candidates' videos. Doc. 1 ¶ 74.

3

The print guide that was distributed only included Nampiaparampil's name, with an asterisk, and a caption explaining that the "[c]andidate did not submit a complete profile in time for inclusion in this printed Voter Guide." *Id.* ¶ 60. Nampiaparampil claims that her absence from the print guide contributed to a widespread voter impression that she was unable to meet basic deadlines, and was not running a serious campaign. *Id.* ¶ 62. Her campaign fundraising dropped from approximately $80,000 the week before the Voter Guide was published, to approximately $1,000 the week after. *Id.* ¶ 64–65.

2. *The Debate*

The CFB hosted a debate for Public Advocate candidates in October 2021. *Id.* ¶ 75. The CFB asked each of the candidates for a visual description to include with a press release that would issue to the media in advance of the debate. *Id.* ¶ 77. Matthew Sollars, the CFB Director of Public Relations, asked Nampiaparampil to provide a "[v]isual description," which would "include [her] race [and] gender." *Id.* (first alteration in second quotation added). Nampiaparampil did not want to include her race or gender in the release because she thought it was inconsistent with her platform, but Sollars sent a follow up insisting that he "would like to send this release out ASAP." *Id.* ¶ 78. Nampiaparampil alleges that she "was forced to provide a description" that included her physical appearance, including her race and gender. *Id.* The press release featuring her personal description was released on October 19, 2021. *Id.* ¶ 79.

3. *The Matching Funds Program*

The CFB administers the Program to match each dollar of local donations with up to eight dollars of matching city funds. *Id.* ¶ 37. To be eligible for matching funds, candidates must:

> (1) raise a minimum number of contributions of $10 or more from the district(s) they hope to represent and raise a minimum amount from New York City residents; (2) agree to comply with, and demonstrate continued compliance with, the requirements of the

>    Campaign Finance Act and CFB Rules; (3) be on the ballot and have an opponent; and (4) submit a financial disclosure form.

*Id.* ¶ 39. After the election, campaigns are required to return any unspent public funds and participate in an audit. *Id.* Contributions for participating Public Advocate candidates in the 2021 election were limited to $2,000, while candidates were permitted to spend up to three times that amount, or $6,000, on their own campaigns. *Id.* ¶ 38.

Nampiaparampil alleges that the CFB made several representations to her about the Program during mandatory candidate training. *Id.* ¶¶ 53–54. First, she claims she was instructed that any third-party services offered to the campaign must be paid for with campaign funds, and that they would be considered in-kind contributions subject to expenditure limits if offered for free. *Id.* ¶ 54(a). Candidates therefore could not personally fund any such services beyond their individual contribution limit of $6,000. *Id.* Second, Nampiaparampil claims she was told that she would be subject to the personal expenditure limit simply for seeking to participate in the Program, regardless of whether or not she ended up receiving any public funds. *Id.* ¶ 54(b). Nampiaparampil attempted to participate in the Program but was ultimately ineligible because she failed to raise the minimum number of qualifying contributions. *Id.* ¶ 40. Nevertheless, Jaclyn Williams, a Candidate Services Liaison for the CFB, notified Nampiaparampil five days before the election that she would be subject to "post-election penalties" due to "[o]ver-the-limit contributions." *Id.* ¶ 83 (alteration in original).

The day after the election, Williams sent another email to Nampiaparampil warning her to be "mindful of spending remaining campaign funds only on permissible post-election expenditures," and that "[Nampiaparampil's] campaign [could] only spend on very limited activities." *Id.* ¶ 86. Williams attached to the email a guide that explained Nampiaparampil's campaign could only continue to make "reasonable expenditures" for legal fees if she had a "reasonable chance of winning." *Id.* Nampiaparampil claims that her campaign ended with no penalties or campaign finance

violations. *Id.* ¶ 88. The campaign had no assets by 2022. *Id.* Nampiaparampil claims that Williams suggested she close the campaign bank account so that she would no longer need to file financial disclosures. *Id.* She closed the campaign's bank account in January 2022, but was still required to file financial disclosures as of July 24, 2023. *Id.*

### 4. Post-Election Activities and Audit

Almost a year after the election, in August 2022, Nampiaparampil "sought to bring libel claims against the CFB," and filed a proposed order to show cause in furtherance of her claims.[2] *Id.* ¶ 89. The court declined to sign the proposed order. *Id.* ¶ 90. A few weeks later, on October 7, 2022, Nampiaparampil received a letter from the CFB alleging campaign violations, threatening "significant penalties," and commencing an audit of the campaign.[3] *Id.* ¶¶ 91, 95. Nampiaparampil responded to the audit on her own, without hiring an attorney or accountant, because she believed that hiring help would violate campaign finance rules. *Id.* ¶ 95. After hundreds of hours of work, Nampiaparampil eventually responded to the CFB's audit related inquiries on May 8, 2023. *Id.* ¶ 96. Nampiaparampil does not believe that the CFB made similar inquiries into campaign finances for similarly situated candidates. *Id.* ¶ 97.

Nampiaparampil brought an action against the CFB in New York state court in October 2022 ("the 2022 State Case"). *Id.* ¶ 98. She proceeded *pro se* because, as with the audit, she feared that paying for professional representation would cause her to violate campaign finance rules. *Id.* ¶ 99. The complaint alleged, *inter alia*, that the CFB negligently made various representations about the contribution limits and spending restrictions of the Program during the candidate training sessions. *Nampiaparampil v.*

---

[2] Rather than attempting to bring a new complaint for libel, Nampiaparampil filed the proposed order to show cause in the same case that she had brought almost a year earlier in her effort to halt the distribution of the print Voter Guide. Doc. 1 ¶ 89; *see also* Doc. 26 at 9 n.2.

[3] The Rules of the City of New York require the CFB to "conduct desk and field audits of participants and non-participants [in the New York City Campaign Finance Program], regardless of whether the candidates receive public funds . . . before or after an election . . . in accordance with generally accepted government auditing standards." 52 RCNY § 10-01(a).

*N.Y.C. Campaign Fin. Bd.*, 2023 NY Slip Op 31165(U), at *2–3 (N.Y Sup. Ct. Apr. 14, 2023).[4]  It further alleged that the CFB published a libelous statement in the Voter Guide when it said that Nampiaparampil did not submit her candidate profile in time, and another by stating in a press release that the debate for Public Advocate was not required under city law because two or more candidates had not met the necessary criteria.[5]  *Id.*  The state court initially found that Nampiaparampil had failed to comply with the New York's notice provisions[6] in filing her suit.  *Id.* at *3–4.  The court also denied a cross motion by Nampiaparampil to file late notice and deem it as timely served *nunc pro tunc*, because the statute of limitations had elapsed.  *Id.*  The court noted that these reasons were sufficient for dismissal, noting that "for these reasons alone, plaintiffs' causes of action are dismissed," yet continued its analysis because "given the importance of the allegations to plaintiffs, the Court will address the merits of each cause of action below." *Id.* at *4.  The court then addressed the merits of Nampiaparampil's negligence and libel claims.  *Id.* at *4–8.  The court found that the negligence claim failed because Nampiaparampil did not establish the existence of either the requisite special duty or causation elements of a negligence claim.  *Id.* at *4–7.  The libel claims failed because Nampiaparampil could not show that any of the allegedly libelous statements were false,

---

[4] Prior state court decisions are public records of which the Court may take judicial notice on a motion to dismiss.  *Kassenoff v. Kassenoff*, No. 22 Civ. 2162 (KMK), 2023 U.S. Dist. LEXIS 52146, at *3 (S.D.N.Y. Mar. 27, 2023).  Importantly, the Court may only take judicial notice of other documents "for the fact of their existence," but "not for the truth of information contained therein." *Hernandez v. Wonderful Co. LLC*, No. 23 Civ. 1242 (ER), 2023 U.S. Dist. LEXIS 231476, at *9–10 (S.D.N.Y. Dec. 29, 2023).

[5] The statement did not identify Nampiaparampil by name, but allegedly defamed her by indicating to the public that she had not qualified for a mandatory debate.  *Nampiaparampil*, 2023 NY Slip Op 31165(U), at *2.  The motion papers in the 2022 State Case clarify that the CFB still administered a *voluntary* debate between Nampiaparampil and her opponent, Jumaane Williams.  Doc. 25-10 at 25.

[6] New York law provides that no action shall be initiated against a city entity for personal injury, wrongful death or damage to real or personal property due to the city's negligence "unless (a) a notice of claim shall have been made," (b) "at least thirty days have elapsed since the service of such notice," and "(c) the action or special proceeding shall be commenced within one year and ninety days after the event upon which the claim is based."  N.Y. Gen. Mun. Law § 50-i(1) (Consol. 2024).

7

or that the statement about the debate specifically identified her. *Id.* at *7–8. The court dismissed the complaint with prejudice on April 14, 2023. *Id.* at *8.

### B. Procedural History

Nampiaparampil, then assisted by counsel, filed the instant action on July 24, 2023, against the CFB, Duhalde, Egerton, Sollars, and Williams, as well as Amy Loprest, the Executive Director of the CFB, Bethany Perskie, the General Counsel for the CFB, and Frederick Schaffer, the Chairman of the CFB—all in their official capacities. Doc. 1. Nampiaparampil brought claims against all defendants under 42 U.S.C. § 1983, claiming that the CFB violated her First Amendment right to free speech by restricting what was allowed in the print and online Voter Guide, by requiring a personal description for the debate's press release, through the Program's campaign expenditure limits, and by auditing her in retaliation for her post-election litigation. *Id.* ¶¶ 106–62. In the alternative, Nampiaparampil claims that Defendants' actions violated her right to free speech pursuant to Article I § 8 of the New York state constitution. *Id.* ¶¶ 163–99, 163 n.14.

On November 10, 2023, Defendants filed the instant motion to dismiss all claims pursuant to Federal Rule 12(b)(6). Doc. 24. Nampiaparampil's counsel subsequently sought to withdraw, and the Court granted the request on November 22, 2023. Docs. 27, 28. Nampiaparampil has been proceeding *pro se* since.

## II. LEGAL STANDARD

"The applicable standard for a motion to dismiss a claim pursuant to Rule 12(b)(6) also applies to a motion to dismiss a counterclaim pursuant to Rule 12(b)(6)." *Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*, No. 16 Civ. 9918 (ER), 2018 WL 1027754, at *2 (S.D.N.Y. Feb. 20, 2018) (citing *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12 Civ. 6017 (KBF), 2013 WL 342922, at *2 (S.D.N.Y. Jan. 18, 2013); *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 531 F. Supp. 2d 620, 622 (S.D.N.Y. 2008)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555. The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

Generally, the Court is obligated to construe a *pro se* complaint liberally, and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006). Here, however, while Nampiaparampil is currently proceeding *pro se*, the Amended Complaint was

9

drafted with the assistance of her retained counsel. Courts in this District have observed that it would be "fundamentally unfair" to extend the special solicitude typically afforded *pro se* parties to submissions drafted by lawyers. *Simpson v. Wells Fargo Bank*, No. 15 Civ. 1487 (JMF), 2016 U.S. Dist. LEXIS 11507, at *6 (S.D.N.Y. Feb. 1, 2016) (citing *CIT Group/Commercial Servs. v. Prisco*, 640 F. Supp. 2d 401, 407 (S.D.N.Y. 2009)). Accordingly, although she prepared her motion papers *pro se*, Nampiaparampil's complaint does not warrant special consideration. *See West v. Harkness*, No. 17 Civ. 0621 (GTS), 2021 U.S. Dist. LEXIS 220735, at *12 (N.D.N.Y. Nov. 16, 2021) ("[I]f the filing party was not proceeding *pro se* at the time of filing, he or she is not entitled to an extra-liberal construction, even where he or she comes to proceed *pro se* later in the action.").

## III. DISCUSSION

### A. The Claims Arising from the Voter Guide, the Debate, and the Program are Precluded

Defendants argue that all Nampiaparampil's claims are precluded by the judgment in the 2022 State Case. Doc. 26 at 12–14. Nampiaparampil responds that dismissal on a motion to dismiss generally does not have res judicata effect; the judgment is not preclusive because it was not a judgment on the merits; and the present action seeks different relief than the prior action. Doc. 41 at 11–18. Specifically, Nampiaparampil argues that in the 2022 State Case, she sought monetary damages based on libel and negligence, whereas in the instant action, she is seeking monetary damages, declaratory judgment, and injunctive relief based on violations of her First Amendment rights.

The doctrine of res judicata, or claim preclusion, prevents "parties or their privies from relitigating issues that were or could have been raised in" a previous action that was adjudicated on the merits. *Simmons v. Trans Express Inc.*, 955 F.3d 325, 328 (2d Cir. 2020). It is well settled law that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the [s]tate in

which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). In New York, claim preclusion "bars successive litigation based upon the same transaction or series of connected transactions if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was." *Avilon Auto. Grp. v. Leontiev*, 91 N.Y.S.3d 379, 384 (N.Y. App. Div. 2019) (citation omitted). Preclusion extends beyond the "claims actually litigated . . . to claims that could have been raised in the prior litigation." *In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005). New York applies a transactional approach to claim preclusion, such that "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *Id.* (citation omitted). "A dismissal 'with prejudice' generally signifies that the court intended to dismiss the action 'on the merits,'" bringing the action to a "final conclusion." *Yonkers Contracting Co. v. Port Auth. Trans-Hudson Corp.*, 712 N.E.2d 678, 681 (N.Y. 1999).

There is little question that the parties satisfy the privity requirement. The CFB was a defendant in both suits, and each of the named defendants is sued in their official capacity as CFB employees during the time of the events in the complaint (Doc. 1 at 1), and "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The two questions then are whether the 2022 State Case was adjudicated on the merits, and whether it arose out of the same transaction or series of transactions as the instant claims. *See Avilon Auto. Grp.*, 91 N.Y.S.3d at 384.

Nampiaparampil is mistaken that a dismissal for failure to state a claim cannot be claim preclusive and overstates the "general rule" in New York that "dismissal for failure to state a cause of action is not on the merits and, thus, will not be given res judicata effect." *See Pereira v. St. Joseph's Cemetery*, 912 N.Y.S.2d 121, 122 (N.Y. App. Div.

11

2010). The general rule is not universal, and dismissal "with prejudice" may still indicate a preclusive judgment on the merits. *Yonkers Contracting Co.*, 712 N.E.2d at 681 ("We have used the words 'with prejudice' interchangeably with the phrase 'on the merits' to indicate the same preclusive effect."); *cf. Avins v. Fed'n Emp't & Guidance Serv., Inc.*, 889 N.Y.S.2d 34, 35 (N.Y. App. Div. 2009) (concluding that a dismissal for failure to state a cause of action did not have preclusive effect because it lacked "any indication that the dismissal was intended to be with prejudice or on the merits"). Because the state court granted the motion to dismiss with prejudice, the decision was decided on the merits and preclusive for res judicata purposes. *Nampiaparampil*, 2023 NY Slip Op 31165(U), at *2.

The state court's analysis of the notice requirements and statute of limitations does not diminish the decision's res judicata effect for two reasons. First, it is clear in the context of the opinion that the court intended "for these reasons alone, plaintiffs' causes of action are dismissed" only to mean that they were sufficient for dismissal—not that they were the sole basis of the decision. *See generally id.* The court explicitly went on to analyze the merits of each cause of action and determined that each failed to state a claim and warranted dismissal.[7] *Id.* at *4–8. And, second, even if the state court had intended to limit its holding to just the notice requirement and statute of limitations, it would still be a determination on the merits. Nampiaparampil's failure to serve a notice of claim on the city could not be rectified because the statute of limitations had elapsed for all of Nampiaparampil's claims. *Id.* at *3–4. This also indicates a decision on the merits, because "a dismissal on the ground that the statute of limitations has expired is a determination on the merits for res judicata purposes." *Cohen v. Glass*, 100 N.Y.S.3d 872, 873 (N.Y. App. Div. 2019).

---

[7] Nampiaparampil dedicates substantial space in her motion papers rearguing the merits of the 2022 State Case and attacking the state court's decision. *See* Doc. 41. The attempt to reargue those merits here is an "impermissible collateral attack and should have been resolved by either an appeal from or a motion to vacate the judgments." *Divito v. Glennon*, 147 N.Y.S.3d 759, 761 (N.Y. App. Div. 2021).

Having determined that the instant and prior claims involve the same parties and the prior claims were brought to a final determination, the only remaining question is whether the claims arise out of the same transaction or series of transactions. To make this determination, New York courts "analyze whether the claims turn on facts that are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Simmons*, 170 N.E.3d at 736 (internal quotation marks omitted). The claims in the current case arising out of the Voter Guide, the debate, and the Program are based on much of the same allegations that served as the basis for the 2022 State Case. Doc. 1 ¶ 106–54. These facts are fundamentally identical in "time, space, origin, [and] motivation," *Simmons*, 170 N.E.3d at 736, making up "the same pattern of behavior" by the CFB, *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 111 (2d Cir. 2000). The claims would also be a convenient trial unit because they stem from the same actions taken by the CFB. *See Soules v. Connecticut*, 882 F.3d 52, 56 (2d Cir. 2018) (finding that "there can be no question" that claims alleging the same conduct by the defendants form a convenient trial unit). The factual similarity between the cases similarly indicates that the parties would reasonably expect the claims to be tried together. *See UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 927 N.Y.S.2d 59, 65 (N.Y. App. Div. 2011) (finding that treatment as a unit conformed to parties' expectations because the claims were not "so unrelated" that the parties "would have expected them to be tried separately"). The fact that Nampiaparampil now seeks a declaratory judgment and injunctive relief in addition to monetary damages is irrelevant on its own, because res judicata extends to subsequent claims that seek different remedies.[8] *In re Hunter*, 827 N.E.2d at 274.

---

[8] Nampiaparampil also makes no arguments as to why the court in the 2022 State Case would have been unable to grant any of the relief sought in the instant action.

The Court does not agree, however, that the instant retaliation claim is precluded. Nampiaparampil's complaint in the 2022 State Case did not mention the post-election audit or raise any claims of retaliation, which the Defendants acknowledge, but they argue that she brought those facts into her case when she mentioned the post-election audit in her motion papers.[9]  Doc. 26 at 14.  However, "[f]or the purposes of res judicata, the scope of litigation is framed by the complaint at the time it is filed," and the mere fact that Nampiaparampil mentioned new facts in her subsequent motion papers does not mean that she added new claims to her complaint.  *See Comput. Assocs. Int'l v. Altai, Inc.*, 126 F.3d 365, 369–70 (2d Cir. 1997).  This is supported by the fact that the state court's opinion addresses only those claims raised in the initial complaint, and makes no mention of the audit, alleged retaliation, or of any attempt to amend the complaint.  *Cf. Soules*, 882 F.3d at 56 (finding that res judicata applied to a claim raised after the initial complaint when the plaintiff "effectively amended his complaint" to add a new claim). Nampiaparampil's complaint did not raise a retaliation claim or any claim arising from the post-election audit, and the state court did not indicate anywhere in its opinion that it considered Nampiaparampil to have amended her complaint through her motion papers. *See generally Nampiaparampil*, 2023 NY Slip Op 31165(U).  Because Nampiaparampil did not raise any claim regarding the post-election audit in her 2022 State Case, it is not precluded now.  *See Comput. Assocs. Int'l.*, 126 F.3d at 369–70.

In sum, Nampiaparampil's claims based on the Voter Guide, the debate, and the Program all arise out of the same "transaction or series of transactions" that formed the basis for the 2022 State Case.  Her retaliation claim is not precluded because none of her

---

[9] After the CFB moved to dismiss the 2022 State Case, Nampiaparampil filed a cross motion in that case requesting permission to file a late notice of claim and deem it as timely served *nunc pro tunc*.  Doc. 25-10. It appears that she mentioned the audit in her cross motion as support for her argument that the CFB had actual knowledge of her claims.  *See id.* at 62–64.  The CFB's opposition to the cross motion demonstrated that it understood the mention of the audit to be in support of Nampiaparampil's cross motion, and not any attempt to amend her complaint to state a new claim.  *See* Doc. 25-11 at 7 ("[Nampiaparampil] allege[s] that Defendants had actual knowledge of [her] claims due to . . . Defendant's routine post-election audit of Nampiaparampil . . . .").

prior claims were based on the post-election audit or any other retaliatory behavior. Accordingly, res judicata applies to the claims arising from the print and online Voter Guide, the debate, and the Program, and they must be dismissed.

### B. The Retaliation Claim Fails to Allege an Official CFB Policy or Custom

Defendants argue Nampiaparampil's retaliation claim fails because, for purposes of *Monell* liability, she does not sufficiently allege either a policy or custom of the CFB to perform retaliatory audits against candidates, or that any person with policymaking authority made a decision to conduct a retaliatory audit.  Doc. 26 at 15–17.  Defendants further argue that the CFB's obligation to audit *all* city candidates, pursuant to 52 RCNY § 10-01, prevents any reasonable inference that the audit of Nampiaparampil's campaign was causally connected to her prior state court proceedings.  *Id.* at 16.  Nampiaparampil argues that the audit of her campaign constitutes a "course of action tailored to a particular situation" sufficient to indicate an official policy.  Doc. 41 at 27–32.

Nampiaparampil claims that the CFB's allegedly retaliatory audit violated her First Amendment rights.  Doc. 1 ¶ 162.  A municipality may only be sued pursuant to § 1983 when the government's "policy or custom" inflicts the alleged injury.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  The elements of a *Monell* claim "are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right."  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).  A complaint may show the existence of a municipal policy by pleading any of the following:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to

15

such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Ortiz v. City of N.Y.*, 19 Civ. 7887 (ER), 2021 U.S. Dist. LEXIS 130333, at *6–7 (S.D.N.Y. July 13, 2021). An official policy need not be a formal rule, but may be shown by a municipality's chosen "course of action tailored to a particular situation." *Montero v. City of Yonkers*, 890 F.3d 386, 403 (2d Cir. 2018). When actions are taken by a sole individual, "a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered may deprive the plaintiff of his or her constitutional rights." *Id.* (internal quotation marks omitted) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)).

The complaint does not sufficiently allege any policy of retaliation on the part of the CFB. Nampiaparampil asserts that the audit was retaliatory because it took place after the election "in apparent retaliation" for her actions taken against the CFB. Doc. 1 ¶ 158. However, the "mere assertion" that a municipality has a particular custom or policy is insufficient without "allegations of fact tending to support . . . such an inference." *Montero*, 890 F.3d at 403–04. As Defendants point out, any inference that the audit is causally connected to her lawsuits is refuted by the fact that the CFB is *required* by the rules of the City of New York to audit candidates, "regardless of whether the candidates receive public funds," and that the audits may be done "before or after an election." 52 R.C.N.Y. § 10-01(a). The mere fact that an audit took place as required by law is insufficient to support the claim that a policy of retaliation existed. *See Montero*, 890 F.3d at 403–04 (explaining that the plaintiff failed to state a claim when he merely asserted that the municipality had adopted an "unwritten policy" by condoning alleged retaliation against him).

Nampiaparampil also fails to allege that her audit was ordered by anyone with "final authority to establish municipal policy," or anyone "responsible under state law for making policy." *Hurdle v. Bd. of Educ.*, 113 F. App'x 423, 425 (2d Cir. 2004). The

16

complaint does not claim that any of the named defendants possessed final authority to make policy, or even that any of the named defendants were involved *at all* in the decision to audit her campaign.  See *Montero*, 890 F.3d at 404 (explaining that the plaintiff failed to state a claim because he failed to allege that the named official had any knowledge of the retaliatory action).

In sum, Nampiaparampil failed to plausibly state a claim that the CFB violated her First Amendment rights by retaliating against her because she "merely asserts the existence of a policy or custom," without facts to support the assertion.  See *Montero*, 890 F.3d at 403–04.  She further fails to allege that any "final policymaker" directed the audit of her campaign.  *Id.* at 404.  For these reasons, the retaliation claim is also dismissed.

### C. The CFB Does Not Have the Capacity to be Sued

Defendants argue that the complaint must be dismissed because the CFB is an agency of New York City, and New York City law dictates that any suit against a city agency must be brought against the City of New York instead.  Doc. 26 at 17. Nampiaparampil responds that although the CFB is an agency, this law does not apply because the CFB is a unique agency in that it can dictate its own budget. Doc. 41 at 32. Alternatively, Nampiaparampil asks that if the CFB is not a suable entity the Court construe the complaint as asserting claims against the City of New York.  *Id.*

New York City requires that "actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."  N.Y. City Charter § 396.  Nevertheless, "[w]hen claims are brought against non-suable entities, the court may construe them as brought against the City of New York."  *Romero v. City of N.Y.*, 839 F. Supp. 2d 588, 602 (E.D.N.Y. 2012) (internal quotation marks and citation omitted).

The CFB has regularly been identified as an agency of the City of New York.  *See, e.g., Brodsky v. N.Y.C. Campaign Fin. Bd.*, 796 F. App'x 1, 5 (2d Cir. 2019) ("The [CFB]

17

is a New York City agency . . . ."); *Liu v. N.Y.C. Campaign Fin. Bd.*, No. 14 Civ. 1687 (RJS), 2016 U.S. Dist. LEXIS 135687, at *3 (S.D.N.Y. Sep. 29, 2016) (describing the CFB as "an independent, nonpartisan five-person city agency").  Nampiaparampil concedes that the CFB is a New York City agency, and offers no explanation as to why the CFB's ability to "dictate its own budget without oversight by the City's Executive or Legislative branches" should exclude it from the City's rule.  Doc. 41 at 32.  However, the CFB's status as a non-suable entity would not warrant dismissal of the claims because the court would be able to "construe them as brought against the City of New York."  *See Romero*, 839 F. Supp. 2d at 602.  To that end, the Court will construe Nampiaparampil's claims against the CFB as brought against the City of New York.  *See id.*

### D.  The Court Declines to Exercise Jurisdiction over the State Law Claims

In the alternative to her federal claims, Nampiaparampil claims that the CFB's actions were violative of the New York State Constitution.  Doc. 1 ¶ 163 n.14.  Pursuant to 28 U.S.C. § 1367(c)(3), if the Court has dismissed all of the claims over which it has original jurisdiction, it may decline to exercise jurisdiction over any non-federal claims over which it could have exercised supplemental jurisdiction.

Subject matter jurisdiction in the instant action is based on federal question jurisdiction.  *Id.* ¶ 20.  Because no federal claims remain that are subject to a merits determination by this Court, it would be inappropriate to adjudicate Nampiaparampil's state law claims.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *McGugan v. Aldana-Bernier*, No. 11 Civ. 00342 (TLM), 2012 U.S. Dist. LEXIS 60340, at *21 (E.D.N.Y. Apr. 30, 2012) *aff'd*, 752 F.3d 224 (2d Cir. 2014) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice.").  Therefore, all non-federal claims contained in Nampiaparampil's complaint are hereby dismissed without prejudice.

### E. The Court Grants Leave to Amend Solely as to the Retaliation Claim

Nampiaparampil seeks leave to amend her complaint to include other plaintiffs in the event that this Court believes the action is claim precluded. Doc. 41 at 19. Defendants oppose leave to amend because it would be futile. Doc. 44 at 5 n.1.

Pursuant to Federal Rule of Civil Procedure 15(a)(2), a "court should freely give leave [to amend a complaint] when justice so requires." In particular, a *pro se* litigant "should be afforded every reasonable opportunity to demonstrate that [the *pro se* litigant] has a valid claim." *Dluhos v. Floating and Abandoned Vessel*, 162 F.3d 63, 69 (2d Cir. 1998) (citation omitted). However, leave to amend need not be granted if an amendment would be futile. *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997). An amendment is futile when a plaintiff cannot cure the defects by reframing the complaint. *Ashmore v. Prus*, 510 F. App'x 47, 49 (2d Cir. 2013). Generally, courts will not deny leave to amend based on futility unless the proposed amendment is "clearly frivolous or legally insufficient." *See In re Ivan F. Boesky Sec. Litig.*, 882 F. Supp. 1371, 1379 (S.D.N.Y. 1995) (citation omitted).

The Court agrees with Defendants that it would be futile to amend any of the claims already barred by claim preclusion. *See, e.g.*, *Vega v. Dep't of Educ.*, 19 Civ. 6963 (ER), 2020 U.S. Dist. LEXIS 213792, at *17–18 (S.D.N.Y. Nov. 16, 2020) (denying leave to amend claims that were barred by claim preclusion); *Rochester v. Fortune Soc'y*, No. 16 Civ. 9423 (PGG), 2018 U.S. Dist. LEXIS 152239, at *20 (S.D.N.Y. Sept. 4, 2018) (denying *pro se* plaintiff leave to amend where claims were barred by res judicata). Leave to amend is therefore denied for all claims except the retaliation claim.

As for the retaliation claim, Defendants have not articulated any reason other than preclusion as to why amendment would be futile. The Second Circuit has counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190-91 (2d Cir. 2015)). Because this is the Court's

19

first opportunity to highlight the precise defects of Nampiaparampil's retaliation claim, and it is not yet apparent that amendment would be futile, the Court will grant leave to amend the dismissed retaliation claim.[10]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. If Nampiaparampil wishes to file an amended retaliation claim, she must do so by May 30, 2024. If she fails to do so, the case will be closed.

The Clerk of Court is respectfully directed to terminate the motion (Doc. 24).

It is SO ORDERED.

Dated:  May 9, 2024
        New York, New York

                                                        _____
                                                        EDGARDO RAMOS, U.S.D.J.

---

[10] The Court notes that Nampiaparampil indicated that she intended to amend to include additional plaintiffs. She is advised that, if she seeks to add any plaintiffs in an amended complaint, she would not be able to represent them as a *pro se* litigant. *See, e.g.*, *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) ("[B]ecause *pro se* means to appear for one's self, a person may not appear on another person's behalf in the other's cause.").