UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

—-------------------------------------------------x

DEVI NAMPIAPARAMPIL,                                        **FIRST AMENDED COMPLAINT**

                                    *Plaintiff,*

                    –against–                               No. 23 Civ. 6391 (ER)


THE NEW YORK CITY CAMPAIGN FINANCE              JURY TRIAL DEMANDED

BOARD, AMY LOPREST, DAVID DUHALDE,

HANNAH EGERTON, FREDERICK SCHAFFER,

BETHANY PERSKIE, MATTHEW SOLLARS,

JACLYN WILLIAMS & THE CITY OF NEW YORK

                                    *Defendants*



Devi Nampiaparampil

Pro Se (Unrepresented) Litigant, The Plaintiff

Metropolis Pain Medicine PLLC

111 John Street Suite 2509

New York, NY 10038

Cell: 312-523-5935

Email: devichechi@gmail.com

**INTRODUCTION:**

We live in a free society where people express their choices through their votes. In 2021, the Defendants deprived me and the public of that choice by "canceling" me on a whim– perhaps not even for what I personally said or did– but because they disapproved of the political party that gave me an opportunity to share my ideas and to further contribute to this city. This "cancel culture" ideology has no place in a democratic government. Moreover, the United States is governed by a system of checks-and-balances. For voters in New York City, arguably the most influential city in the world, to have a government Agency be at the mercy of a small group of bureaucrats, unrestricted by internal or external controls, is unimaginable. These individuals drafted, enforced, and adjudicated their codified reprisal policies, which were adopted by the City of New York.

**JURISDICTION AND VENUE:**

1. This court has jurisdiction over this action because the controversy arises under 42 U.S.C. 1983.
2. This Court has authority to award attorneys' fees pursuant to 42 U.S.C 1988
3. The venue is proper because a substantial portion of the events giving rise to the present claims occurred in this district.

**PARTIES:**

Plaintiff:
Devi Nampiaparampil, the 2021 Republican nominee for NYC Public Advocate

Defendants (in their official capacity):
The New York City Campaign Finance Board (CFB)
Amy Loprest, formerly the Executive Director of the CFB
David Duhalde, a Senior Candidate Services Liaison at the CFB
Hannah Egerton, the Director of Candidate Services at the CFB
Bethany Perskie, formerly General Counsel of the CFB

Frederick Schaffer, the Chair of the CFB

Jaclyn Williams, formerly a Candidate Services Liaison

Matthew Sollars, formerly the Director of Public Relations at the CFB

The City of New York- the presumed Defendant in a case against the CFB


**RETALIATION FOR PROTECTED FIRST AMENDMENT ACTIVITY**

1.      I, Devi Elizabeth Nampiaparampil, appearing as a pro se untrained litigant, bring this action, pursuant to 42 U.S.C. § 1983 and the New York State Constitution, against the New York City Campaign Finance Board ("the CFB"), David Duhalde, Hannah Egerton, Amy Loprest, Bethany Perskie, Frederick Schaffer, Matthew Sollars, and Jaclyn Williams (collectively, "Defendants"), alleging violations of my federal and state constitutional rights before, during, and after my 2021 campaign for New York City Public Advocate. This Amended Complaint relates back to the original filing date of July 24, 2023.

2.      A municipality may only be sued pursuant to § 1983 when the government's "policy or custom" inflicts the alleged injury. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). The elements of a Monell claim "are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86, 97 (2d Cir. 2020). (ER)

3.      The CFB is an independent New York City agency created to "limit the role and influence of private money in the political process." The CFB publishes a citywide Voter Guide, hosts multiple mandatory debates for each citywide position, and administers the public matching funds program. It has legislative powers to write Rules, executive powers to enforce audits, and judicial powers to give advisory opinions and hold adjudicative hearings where it issues campaign finance violations and penalties.

4.      On December 13, 2022, prior to her resignation, the CFB's Executive Director, Beth Rotman, testified to the City Council, "In 2021, we paid approximately $130 million in public funds to over 300 candidates."  For comparison, the Presidential Election Fund, which distributes public funds to presidential candidates, has distributed approximately $3 million

between 2012 and 2022.[1] She added, "The New York City program fundamentally changes how New Yorkers run for city office… [A]ll 51 [City Council] members have been program participants."

5.      The CFB is the largest single donor in the City's local elections and its employees are arguably the City's most influential lobbyists. In this Amended Complaint, will describe how the Defendants have ensured politicians' "compliance" with their goals through a combination of actual and threatened retaliation, intimidation, and censorship. This can be summarized as an unconstitutional interference with freedom of assembly. The Supreme Court has previously stated, "In speaking of 'improper influence' and 'opportunities for abuse' in addition to 'quid pro quo arrangements,' we recognized a concern… extending to the broader threat from politicians too compliant with the wishes of large contributions." Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 389 (2000).

6.      I, the Plaintiff, Devi Nampiaparampil, am an Associate Professor at NYU Grossman School of Medicine with a private practice in downtown Manhattan where I perform interventional pain (spinal) procedures, joint injections, and nerve blocks.  I completed all my specialty and subspecialty training through Harvard Medical School, where I was ranked by my professors (now peers) as among the top 5% of alumni from my residency program. I also have a masters degree from Columbia University Graduate School of Journalism and have appeared on-air in over 500 national and international news segments for Fox News, CNN, MSNBC, CNBC, and Fox 5 NY where I am currently an on-air medical contributor. I ran as the Republican nominee for New York City Public Advocate in the 2021 general election.

7.      Defendant New York City (NYC) Campaign Finance Board (CFB) is an independent agency that administers the Campaign Finance Program created by the NYC Campaign Finance Act in 1988. (NYC Admin. Code $$ 3-701-719; NYC Charter $$1051-57). The CFB employed the individual defendants. The CFB says it promotes fair elections through various programs including (1) a citywide "Voter Guide" (the "Guide") and (2) the Matching Funds Program

---

[1] https://www.businessinsider.com/400-million-in-forgotten-government-account-presidential-election-campaign-fund-2021-7 - Last accessed 5/26/24

8.      The CFB has a separate division, the Voter Assistance Advisory Committee, that oversees the voter guide. The incumbent Public Advocate is a member of its nine-member team. The CFB has described the Guide as a "critical" resource that "helps NYC voters make informed choices at the polls." There are numerous restrictions on candidate statements, including that statements may not "refer to any opposing candidate by name." Candidate statements that violate the requirements outlined in the CFB Board Rules "as determined by the Board in its sole discretion," will not be included in the Guide (RCNY $$16-02(b)(i)(E), 16-02(b)(ii)(G)  .

9.      I prepared a Guide profile that included my photo, background, platform, and my name as it appeared on the 2021 general election ballot and as I am recognized in the community. The Defendants excluded my timely submitted print and online Voter Guide profile from public view because I referred to my opponent by name. The offensive statement can be seen in my Response to the Motion to Dismiss Exhibit B, p26/ 31:

"Mismanagement, backwards laws and bureaucracy have pitted employees against employers, tenants against landlords, parents against teachers, patients against nursing homes & healthcare providers against hospitals: New Yorker against New Yorker, a survival of the fittest. The Public Advocate can publish the city's data. Jumaane Williams has failed. With transparency, private citizens will solve our city's problems. When our city was infected with COVID, I treated patients. When we needed answers, I contributed to medical research. When we had an economic crisis, I created jobs. Unlike Jumaane Williams, I will fulfill the Public Advocate's mandate."

10.     Defendant Duhalde, who served as the former Deputy Director of the Democratic Socialists of America, and whose household had previously donated to Jumaane Williams' prior campaign, reviewed my video voter guide script and informed me that I could be sued for "mentioning the candidate's wife" and describing her as a "lobbyist." This was a term her employer had used. Because a government official had threatened a lawsuit, I revised my script. Nevertheless, unlike the other candidates, my video was posted in a manner that made it undiscoverable. It likely lacked the search tags that the CFB had applied to the other candidates' videos.

11.     In advance of a CFB-sponsored television debate about the job [opportunity] of Public Advocate, the Defendants asked me twice to email them with my "race [and] gender" for a government-issued press release. The information was purportedly for voters with disabilities to decide who to elect for the job position. The CFB had already excluded my background and campaign platform from its print and online Guide. My statements about race, gender and bodily measurements could be construed as my stance both as a candidate and as an employer, which they were not. Nevertheless, I felt I must disclose this information so the Defendants wouldn't exclude me from the televised debate.

12.     On September 29, 2021, when I learned of my exclusion from the Guide, I sought a temporary restraining order asking for my information to be added either as an insert or a postcard. The CFB moved forward with its mailing, distributing the Guide to over 5 million households. The mailing resulted in a drop of my campaign's fundraising from approximately $80,000 the week before its release to approximately $1000 the week after its release. I never applied for matching funds during the campaign; nor did I ever receive them. My campaign exited the election on November 2, 2021 with zero violations and zero penalties. Our back-up documentation error rate was 0.00%. I received 23.4% of the vote (over 254,000 votes). After the election, the CFB informed me that I was subject to post-election penalties for over-the-limit contributions. It prohibited me from donating to any "other campaigns." After the election, the CFB recommended I close my bank account so I could cease filing disclosures. I closed the bank account on January 11, 2022.

13.     In August 2022, I filed an order-to-show-cause in the TRO Court to pursue my case. I wrote to the Judge asking that he remove my attorney because of the legal fees. The decision was entered on the docket. Shortly afterwards, the CFB issued a Draft Audit Report.

14.     After I figured out how to file my case pro se in Supreme Court, I reviewed the Draft Audit Report. I did not feel a sense of urgency since my mother, who had served as my Treasurer, had been in charge of the campaign's finances. I knew she was meticulous. Also, she told me that after Election Day, we had received a letter from the CFB that said we had a 0.00% error rate. (I subsequently verified this and she was correct). This Draft Audit Report listed dozens and dozens of bizarre violations for a defunct campaign that had ended almost 10 months' prior. For example, one supposed campaign finance violation (that can be penalized at $10,000 per violation) is for us having purchased balloons for a fundraiser and not separating

6

out the base cost of the balloons from the associated fees in the C-smart web program. It did not matter that we entered the total cost of the balloons, submitted the receipt, and submitted the associated bank statement. Another violation was for a missing $8.96 receipt from Duane Reade, even though we reported the expense. The time I spent responding to these purported violations is time I was unable to treat new or existing patients. The written response was not the difficult part. The CFB required us to use its proprietary software to respond to each violation. Because I did not know how to use the software and because they would not offer meaningful Software Support, it was difficult to proceed.

15.     Since the spring of 2021, I have maintained that the Defendants _told me_ it was a campaign finance violation, and an illegal act, for me to speak to an attorney about unless my campaign was wealthy enough to pay the "fair market value" of that compensated or uncompensated legal advice.

16.     Essentially, the CFB would appraise the fair market value of the lawyers' speech, thereby restricting the lawyers' right to speak, my rights to listen and be heard, and our overall right to free assembly. Since my campaign generally could not afford legal advice without a massive personal contribution from me or some other single donor, we were unable to verify this, and generally left without any guidance on our civil rights. According to the Defendants, knowledge and speech would be restricted to the wealthy [campaigns].

17.     Where did this convoluted and undemocratic idea come from? And as an educated physician who has worked as a medical expert witness on numerous cases, even for the Defendant City of New York, why would I even believe it?

Generally, the Court is obligated to construe a pro se complaint liberally, and to interpret a pro se plaintiff's claims as raising the strongest arguments that they suggest. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d. Cir. 2006).

**Drafting of the Retaliatory Policy by the Defendant in Its Legislative Capacity**

18.     The Rules in effect for the 2021 election cycle were proposed by the CFB on August 16, 2019, adopted by the City "the municipality," and enacted on September 15, 2019. I submit a copy of the Final Rules [Exhibit: 2019 CFB Final Rules], the "Track Changes" version of the CFB's proposed 2019 Rules [Exhibit: Track Changes 2019 CFB Rules], the CFB's Summary of Changes to the Proposed 2019 Rules, and American Legal Publishing's online record of the dates that these Rules took effect [Exhibit: American Legal Publishing: Dates Related to 2019 Rules: Campaign Finance Board].

19.     New or inexperienced politicians running for office in New York City might not understand the intricacies of campaign finance, so the City teaches them about its statutes. My 75 year-old mother, Mary Joseph Nampiaparampil, volunteered to be my campaign's Treasurer. She and I attended each of these training sessions together.

Rule § 2-06: "A candidate or such candidate's representative must attend a training provided by the Board concerning compliance… The individual attending the training may be the candidate, the candidate's campaign manager or treasurer, or another individual with significant managerial control over a campaign (not including campaign consultants).

20.     The Defendants interpreted their 2019 Rules for us in the training sessions we attended in March and April 2021, and explained to us how to comply with their Rules. Per my recall (albeit more than three years later), these training sessions had on the order of 10 participants in them. The virtual training involved listening to CFB employees' guidance and interpretation of their Rules, watching their slideshow presentation, responding to pop quiz type polling throughout the sessions, and participating in sidebar chats. This occurred at the multiple online live virtual training sessions. The training forecasted what could happen during the audit process if the campaign did not comply with the Defendants' Rules. In the CFB's words, the training exists "to help campaigns comply with the rules, disclose their financial activity via C-SMART, and navigate the audit process."[2]

21.     Although the sessions are conducted on Zoom where live recording is possible, the CFB does not record any of the sessions. Although Zoom can provide free closed captioning and transcripts of the entire training sessions (through artificial intelligence), the CFB turns off that

---

[2] https://www.nyccfb.info/candidate-services/trainings/ ; Last accessed 5/27/24

feature and does not provide any transcripts of the sessions. Candidates, including me, have asked for recordings to help with compliance during the election cycle, but have been denied. The sessions are not posted online on the Agency's website, YouTube channel, Facebook page, Twitter / X page, or any other form of media. According to its website, its training registration deadline closes the day before. Therefore, the CFB has advanced notice of which campaigns will attend each session. It also has the ability to cancel the sessions suddenly at its "sole discretion."

Although I cannot recall the exact words used by the Defendants in these training sessions, I do have a specific recall of the concepts taught to us and specific recall of some of the examples used.

As the Defendants explained it to us in these training sessions, if our campaign had money to pay for expert services, these fees would be listed as a regular campaign expense. If the campaign did not have the money to pay for that expertise, things became more complicated.

If I chose to cover the expense myself (as the candidate), then I could be penalized according to the over-the-limit contribution rules. As a candidate in the Public Advocate race, I could only contribute up to three times the maximum individual contribution limit. That meant my mother could contribute the maximum individual limit of $2000 and I could contribute the maximum of $6000.

If a lawyer chose to help me for free, that would also likely result in violations and penalties based on:

Rule: § 5-06: "In-kind contribution" means: (1)... any thing of value (other than money) made to or for any candidate; or (2) the payment by any individual or entity other than an authorized committee of compensation for the personal services of another individual or entity which are rendered to the candidate without charge. "In-kind contribution" does not include personal services provided without compensation by individuals volunteering a portion or all of their time on behalf of a candidate."

22.     Most lawyers offering pro bono services work for a law firm, a university, a think tank, or through a society that offers pro bono assistance. As it was explained to me by the CFB, that

would count as payment by an entity for the personal services of another. This was the same reason campaigns were barred from receiving uncompensated services from accountants or other professionals. Furthermore, the CFB explained to me that this is the reason my own employees were barred from organizing or scanning any paperwork to assist me during the campaign or later during the audit. In any case where a law practice, an accounting firm, or even my medical practice had a receptionist, assistant, intern or other volunteer performing even a ministerial task under the auspices of the other entity, it would qualify as one entity offering the services of another. Even though other politicians were allowed to use their home "offices" during COVID without listing any contributions or expenses, because I am the sole proprietor of my medical practice, I was told I was barred from printing or scanning items at my office for any campaign-related activities because that would be Devi Nampiaparampil, MD (the professional entity) offering the services of others. The professional entity cannot volunteer services. The same applied to lawyers asking team members (paralegals, receptionists, law students, etc.) to perform any tasks for them. Even office supplies and electronic record retention software would be considered contributions. If a lawyer used a software program to keep track of legal documents, that would be considered an in-kind contribution to the campaign.

As it was explained to me (using different examples but this concept), volunteer services were very specific. A lawyer providing legal advice would be regarded as an uncompensated service i.e. an in-kind contribution. A lawyer handing out flyers on the street would be regarded as an unpaid volunteer.

Unknown to me at the time, this topic had already been addressed by the American Bar Association Rule 7.6 [2}, which states:

The term "political contribution" denotes… anything of value made directly or indirectly to a candidate… to influence or provide financial support for election… in judicial or other government office… [T]he term "political contribution" does not include uncompensated services." Nevertheless, as a non-lawyer, I was not familiar with the ABA Rules, so I believed what the CFB told me.

23.     Now if I somehow found an unemployed lawyer that didn't answer to any legal aid entity, who happened to be licensed to practice law in New York, and who also wanted to work for me for free, I would still have a problem.

Rule § 5-06(b): "[A] candidate may use a reasonable estimate to document the fair market value of an in-kind contribution…"

Definitions § 1-02: "Fair market value" means… for services, other than those provided by an unpaid volunteer, the hourly or piecework charge for the services at a commercially reasonable rate prevailing when the services were rendered." The CFB would appraise  the fair market value of the attorney's legal advice (his or her speech) and charge it to the campaign and to me personally.

Rule § 5-06(a): "...An in-kind contribution to a candidate's authorized committee is also considered an expenditure made by such committee, and the amount of the in-kind contribution thus counts toward the candidate's contribution and expenditure limits."

24.     Since I could only spend $6000 total for the entire 2021 election, we were potentially limited to only $6000 worth of conversation about the law. Since I had already spent money during the March 2021 petitioning period in order to get on the ballot, we had to fundraise before I could speak to a lawyer. We were still limited, however, because most attorneys charge a hefty retainer fee and/ or charge for an expensive Memorandum before they will sign on. This presented a substantial obstacle for our campaign that was limited in its spending ability solely by these Rules.

Eventually, we did find a lawyer who did not charge a retainer or a threshold amount for a Memorandum. He even offered a discount but I explained to him that that was not allowed either [Exhibit]. In fact, I told him I could end up in "jail" if I accepted any discounts on his legal advice.

"Where goods or services are purchased by a candidate for less than fair market value, the difference between the fair market value when they were received, including any applicable tax, and the amount charged to the candidate is an in-kind contribution." In fact, the CFB employees specifically addressed this issue in the training. They brought up the case of John Catsimatidis who was penalized because a vendor had applied the same rate for food for one of his

fundraisers that Gristedes normally pays. Apparently, because Gristedes is a wholesaler, this was considered a discounted rate, below the fair market value.

25.     If the attorneys charged me but didn't collect the entire payment, as might be the case with my most recent attorneys at this federal case, I would face:

Rule 5-06(e): "...[A] debt forgiven or settled for less than the amount owed is an in-kind contribution."

26.     If my medical private practice had retained an attorney and pursued its legitimate claim against the CFB for "disparagement of a commercial entity," and if it had won and vindicated my campaign and me in the process, I still would have received multiple campaign finance violations and penalties because the medical practice cannot subsidize any part of the campaign's legal claim.

Rule § 6-03(c): Non-proportional payment may lead to in-kind contribution. To the extent a candidate does not pay for the proportional benefit it receives, the candidate is considered to have received an in-kind contribution…

Rule: $5-03(a)(i): "A candidate may not accept a contribution from a prohibited organization, i.e. a corporation, limited liability company, or partnership, including professional corporations and limited liability partnerships."

27.     If the CFB were to harm multiple candidates at once (as occurred recently when the CFB deleted multiple Republican candidates' names and platforms from the voter guide), and we wanted to cooperate to sue the Defendants, we are barred from joining together unless each and every campaign has enough funds on hand to pursue the claim.

Rule $3-715: Joint campaign activities: ... the benefit each candidate derives from the joint material or activity is proportionally equivalent to the expenditures authorized by such candidate."

28.     If my political party pursued a cause of action against the CFB on behalf of me and the other candidates in our slate, that would result in penalties for us candidates:

Rule § 6-04(e)(ii) The Board may require a candidate to demonstrate that expenditures made by a [political] party committee… for the purpose of furthering or facilitating the nomination or election of a candidate… are not in-kind contributions to the candidate.

Rule § 6-04(d): An expenditure for the purpose of furthering or facilitating the nomination or election of a candidate which is determined not to be an independent expenditure, is a contribution to, and an expenditure by, the candidate.

"Rule § 6-04(a): Factors for determining independence (iii) whether a candidate has authorized, requested, suggested, fostered, or otherwise cooperated in any way in the formation or operation of the person or entity making the expenditure."

29.     Moreover, our speech was restricted. If I even notified my political party that I was being targeted because of my political affiliation, and my party acted on that information, that could result in severe penalties:

"Rule § 6-04(a): "(viii)… if the candidate knew or should have known that the candidate's communication or relationship to the third party or parties would inform or result in expenditures to benefit the candidate."

30.     As noted in a prior filing, my former attorneys charged me approximately $150,000 for their legal services, and I paid them. There are still approximately $150,000 in outstanding bills. (Of note, all of these charges are related to work that took place up through the Discovery hearing. There are no charges for the Response to the Motion to Dismiss or this Amended Complaint, both of which I wrote myself as a pro se untrained litigant). It is unclear to me what will happen with those charges, but let us say their law firm waives the remaining charges. It will not help me when I have to face the CFB.

According to the CFB's retaliation policy:

§ 5-06(e): "[A] debt forgiven or settled for less than the amount owed is an in-kind contribution."

§ 5-06(a): "An in-kind contribution is received on the date the goods or services are received or rendered, which is presumed to be the date of the associated expenditure."

31.     Although I conceded the Public Advocate race on November 2, 2021, closed the campaign's only bank account on January 11, 2022, and submitted the campaign's final disclosure statement to the Defendants multiple times thereafter, the Defendants have refused to accept it. They have kept "Dr. Devi For NYC" my 2021 campaign alive, brain-dead on life support, throughout this litigation. Because I have been unable to end my old campaign and start a new campaign (for 2025, for example), I am still subject to the maximum contribution limit for the 2021 election cycle. Rather than $6000 being an election cycle limit, it appears to be a lifetime limit on personal spending, and on speech, since I cannot end my 2021 run for office without the Defendants' approval.

32.     But even if I were to somehow convince the Defendants that these legal expenses were not for my 2021 campaign but rather for a forthcoming 2025 campaign, and even if I were to argue that I do not plan to sign up for matching funds eligibility even if they deemed me eligible despite potential violations and penalties, I would still face reprisal.

After all, my attorneys said they were fighting the unconstitutional content-based restrictions in the Defendants' Voter Guide Rules, so that I could run for office again. According to the CFB's retaliation policy:

§ 6-04(d): "An expenditure for the purpose of furthering or facilitating the nomination or election of a candidate which is determined not to be an independent expenditure, is a contribution to, and an expenditure by, the candidate."

§ 6-04(a): "...In determining whether an expenditure is independent, the Board may consider any of the factors from the following non-exhaustive list: (i) whether the person or entity making the expenditure is also an agent of a candidate."

33.     Independent expenditures are not allowed without prior registration and authorization from the Defendants.

The punishment for each individual campaign finance violation is $10,000. The CFB is also authorized to collect compensatory damages, and three times that amount in punitive damages, from the candidate. "The Act authorizes petitioner to impose civil penalties of up to $10,000 for each violation. Admin. Code 3-711(1). In addition, petitioner may impose a civil penalty of up to three times the amount of excess expenditures." Gerson v. NYC CFB 2019 Slip Op 03268.

34.     The common villain comes up with relatively one-step "if a, then b" forms of retaliation. We are dealing with an agency run by Harvard Law School graduates, Order of the Coif members, self-proclaimed constitutional attorneys, and civil rights prosecutors, so we must delve deeper and pierce through the bureaucratic filler designed to bore, confuse, and distract the reader. Mathematically, the reprisal policy for breaking the code of silence is—

**_But for the protected activity_**

> [Litigation (through compensated or uncompensated legal services)
> to redress grievances committed by the CFB and its agents],

**_The adverse action_**

**[($\leqq$ 3) x [("CFB's Fair Market Value" Cost of Litigation) - (Campaign's Liquid Assets)]] + $\leqq$ \$10,000**
**= [($\leqq$ 3) x ("Over-the-Limit Contribution")] + $\leqq$ \$10,000**
**= Violation + ($\leqq$ "Treble") Penalties +/- Lifetime Ban On Receiving Matching Funds**

**_Would not have occurred._**

35.     The CFB Rules purportedly have "exempt" legal expenditures. These exemptions are specific and targeted. The CFB exempts legal fees from the spending limit IF the campaign has been selected by CFB employees to receive public funds (emphasis added below).

Chapter 9: **Public Funds** Repayments:

Rule: 9-02 Reasons for Repayment

© Final Bank Balance:

(i) Before repaying campaign funds remaining in the committee bank account, a candidate may make **post-election expenditures** [for] reasonable staff salaries and consultancy fees for responding to a post-election audit; reasonable staff salaries and legal fees incurred prior to the date of issuance of the candidate's final audit report and **associated with a claim that public funds must be repaid**;... payment of taxes and other reasonable expenses for compliance with applicable tax laws."

However, if you were in my situation, and did not receive 8:1 matching funds from the CFB, then you had to follow a different set of rules (emphasis added below):

Chapter 6: Expenditures:

**Expenses related to a post-election audit**

"(ii) Exempt expenses related to the post-election audit shall include **pre-election** expenses for organizing and copying [records]…" That means the CFB will exempt secretarial work before the election.

36.     However, the Board will not allow exemptions for expenses that could safeguard against an impending campaign finance violation or penalty.

"[Exempt expenses] **shall not include** pre-election **expenses** for: (a) ordinary compliance activities, such as the review of records to identify missing documents, evaluating whether the documents meet **Board standards,** and identifying, preventing, and correcting any potential violation… ©… payments to campaign managers, finance chairpersons, treasurers, accountants, advisors, or other consultants; (D) legal or accounting fees; (E) costs associated with record creation and retention; (F) costs associated with running an office or business such as standard bookkeeping… (G) bookkeeping for payroll or vendor payments; and (H) Other **standard** practices…"

This is against the public interest. Why does the public want to see more candidates penalized for preventable missteps? This can demoralize them and limit the pool of candidates. Moreover, there are ripple effects that affect society as a whole.

As a professional physician who could be tainted by any type of financial misconduct, if I wanted to preemptively address a potential violation and didn't know how to do it myself, there's nothing I can do. If I hired a lawyer or accountant to help me after I hit my $6000 limit, that would itself be a financial violation that could taint my medical career and private practice.

37.     Of note, the CFB does allow exemptions for other very specific legal fees but none of these exemptions involve torts or civil rights actions. There is no exemption for litigation related to the voter guide, the mandatory debates, the financial disclosures or the audit as a whole. See below (emphasis added):

Rule 6-01(v)(i): The following shall not be subject to the expenditure limits:

(a) Expenses [for litigation] to determine a candidate's or political committee's compliance with the requirements of **this chapter** [on Expenditures], including eligibility for public funds payments, or [with respect to] law or regulation governing candidate or political committee activity or ballot status

(b) Expenses to challenge or defend the validity of petitions… and expenses [for] canvassing or re-canvassing…

(c) Expenses related to the post-election audit, **except as provided**

Even if the Court believes the term, "political committee activity" could allow for uncapped legal fees related to the voter guide and debates, these Rules should still be considered unconstitutional for vagueness, as per the "void for vagueness doctrine." Given the context, it could be referring to the committee's registration as a PAC or as an independent spender. For my own part as an ordinary citizen, I could not follow this legal jargon and the CFB's inadequate explanation of complex topics. Because I was effectively barred from asking a lawyer about these Rules, I was forced to rely more heavily on CFB employees' interactive guidance. I am not the only one. Most lawyers do not have the time to dissect and decode these burdensome and unreadable Rules. Therefore, in my relatively recent search for legal representation, most lawyers tell me I must be confused about the Rules or that I misunderstood what was taught in the training sessions. Essentially, I am a fool at best and a liar at worst.

**Enforcement of the Retaliatory Policy in its Executive Capacity:**

38.     Should this Court feel the same way and believe that these retaliatory policies can be attributed to confusion and misunderstanding from me and my campaign, careless wording or oversight by the CFB employees who wrote the Rules in the legislative capacity,, and plain mistakes by the CFB employees who trained us on these Rules, then consider that the CFB also enforces their retaliatory policy. "A municipality is liable under $1983 for even its good faith constitutional violations presuming that the municipality has a policy that causes those violations," and "Discretion to enforce or not enforce a statute in an individual situation is different from discretion to choose not to enforce a statute– or, as in this case, portions of a statute…" Vives v. City of New York. 524 F.3d 346 (2d Cir. 2008).

_Alan Gerson (Acted against the CFB):_

The CFB prosecuted Alan Gerson, a City Council candidate who had not received matching funds, for over-contributions related to a legal dispute (Gerson v. NYC CFB 2019 Slip Op 03268). In 2019, ten years after Gerson's original election campaign, the Appellate Court ruled:

"The court erred in upholding the Board's finding that petitioner Gerson's contribution of more than $30,912 to his campaign exceeded the $2500 limit on expenditures… [Gerson's expenditures] are covered by the exemption for expenditures made for the purpose of "bringing" or "responding" to a "proceeding" or "claim" before a court." (Administrative Code $3-706[4][a]; 52 RCNY 1-08[d][4][i][A]... We find the denial of matching funds and the penalties imposed… grossly disproportionate to any offenses committed by [Gerson and his campaign] (see generally Matter of Pell v Board of Educ. of Union Free School Distr. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 233-234 [1974])."

Celia Devi Dosamantes (Acted against the CFB):

39.     Since the CFB has a history of identifying individuals by their protected characteristics (a point I will return to), I will state that upon information and belief, Celia Devi Dosamantes is like me: an Indian-American Christian female. I had a 3-month old baby and a 3 year-old in 2021 when I first experienced conflicts with the CFB. According to news reports, Dosamantes also had a small baby during the course of her conflicts with the CFB. Her mother, who also doubled as her campaign Treasurer, is a physician who specializes in Obstetrics & Gynecology and practiced in a predominantly minority-populated part of Queens during COVID.

The 27 year-old Dosamantes was accused and convicted of various serious crimes. Before being convicted and sentenced to imprisonment at Rikers Island (intermittent, perhaps because she had to care for her baby), Dosamantes claimed the CFB had violated her constitutional rights. In The People v. Dosamantes, 180 A.D.3d 518 (2020). 118 N.Y.S.3d 106. 2020 NY Slip Op 01118. The Judges referred to this claim, "The motion court properly denied, as untimely… defendant's third motion to suppress, in which she sought to challenge an additional seizure not addressed in her earlier motions… Because defendant was undisputedly present at a compliance interview when an auditor acquired a folder, defendant would know whether it was taken without a warrant or consent, regardless of whether the grand jury minutes, allegedly received later, revealed that they were taken in that matter… Defendant did not preserve any of her arguments regarding evidentiary matters."

On April 23, 2018, after this appeal was denied, Loprest (the long-time Executive Director of the Agency) and the CFB posted a press release about it, which remains on their website to warn people about the potentially drastic consequences of an audit. Loprest wrote, "I think District Attorney Cy Vance and his staff for their hard work in obtaining this conviction… Taxpayers should know that the Campaign Finance Board's rigorous audit work detected this fraud… Criminal prosecutions like this one are an important deterrent… there can be serious consequences… beyond the civil penalties available to the CFB."

On July 27, 2023, shortly after our current federal case was filed, and after Dosamantes complained to her lawyer and the Court about the CFB violating her constitutional rights, Defendants Perskie and the CFB filed a civil case against her and her mother, Dr. Ramanathan Devbala. They sought to recover civil penalties from their campaign, which had never received public funds.

It seems like punishing someone for exerting their Fifth Amendment Miranda rights is another constitutional violation, but that is exactly what the CFB did, by tacking on fees with "Failing to provide bank statements," and "Failing to respond to the draft audit report." And of relevance here, associated with the $9750 penalty for "Over-the-limit contributions," we see

40.     Defendants Perskie and the CFB wrote, "Creditors who extend credit beyond 90 days are considered to have made a contribution equal to the credit extended, unless the creditor

continues to seek payment of the debt. Outstanding liabilities that are forgiven or settled for less than the amount owed are also considered contributions… The Campaign provided a contract for legal services with an individual that stipulates a 'minimum flat fee' of $8,000. The Campaign reported a $2,000 payment towards his contract, resulting in an underpayment of $6,000, which is considered an in-kind contribution $3,250 in excess of the $2,750 limit." [Exhibit p3-4/ 7]. If legal fees are exempt, particularly for an audit and a criminal prosecution, then why is this candidate being prosecuted according to the retaliatory Rules I outlined above?

The CFB also prosecuted Dosamantes and her mother for uncompensated services whether the services were performed or not. Defendant Perskie wrote, "The Campaign provided a contract with an employee that stipulates payment of $3000 a month from June 18, 2015 until termination [which is] presumed to be September 10, 2015, the day of the primary election. The amount owed… calculates to $8,300 in total wages. The Campaign reported paying this employee a total of $4,500 in wages, resulting in an underpayment of $3,800, which is considered an in-kind contribution of $1,050 in excess of the $2,750 limit." Perskie did not specify who the unpaid employee was. It could have been her mother who is jointly responsible for the penalty.

These were the only over-the-limit contributions Dosamantes and her campaign were accused of. Perskie wrote, "The Board assessed total penalties of $9,750 for these [over-the-limit] violations." If a person wants to volunteer as their First Amendment right, why can't they? Or if they just stopped working and Dosamantes just stopped paying them, why is that an over-the-limit contribution?

The penalties being demanded in the civil suit currently in progress are consistent with the mathematical reprisal formula I created above. The majority of the penalties are related to "filing false documentation," another point that I will return to. Dosamantes' total penalties came to approximately $68,556.

41.     The CFB persisted in its application of this no volunteer policy as late as November 29, 2022, albeit with a different twist. At that time, I had a virtual session regarding my audit. My mother had previously volunteered as the Treasurer in 2021, regularly submitting financial documents to the CFB and answering its Statement Reviews. Upon learning that my mother had expertise in this area, Donna Ross, the auditor, told me that my mother could not be a

volunteer. My mother should have been paid $30,000. Since the campaign no longer had any funds by the time of the audit, and since it had already closed its bank account, there was nothing we could do to rectify this "error." Moreover, if my mother had written a check to herself before I closed the bank account, I would probably have put $30,000 into the account to cover the expense. Otherwise, my personal credit would be damaged. Then she would have to return the money to me, and as the officers of the campaign, we would both personally be charged up to $100,000 in penalties [((3) x ($30,000)) + $10,000] by the CFB. (CFB v. Gerson et al. OATH Index 2421/14 (2015)).

*Albert Baldeo (Did not criticize the CFB)*

42..   Like Dosamantes, Albert Baldeo, another City Council candidate, confessed to filing false documentation with the CFB in 2010. He also confessed to operating a straw donor scheme in 2010. The Department of Justice prosecuted him for obstructing an FBI investigation and he was subsequently imprisoned. Perhaps because his 2010 campaign was out of funds, Baldeo appeared pro se on October 31, 2023  in an OATH proceeding involving Defendants Schaffer and Perskie. Baldeo did not accuse any of the Defendants of any constitutional violations. The CFB *won* its case and gave him a $0 name-only campaign finance violation. The Judge wrote (emphasis added by me), "[The CFB] brought this proceeding seeking a finding of breach of certification against respondents Albert Baldeo and People for Albert Baldeo (collectively, "the Campaign") during Mr. Baldeo's unsuccessful campaign in a special election to the City Council in 2010… Such a finding would make respondents ineligible to receive public funds for the **2010** election cycle and **may** make respondents ineligible for public funds in the future." Since Baldeo had not received public funds in 2010, nothing really happened. Baldeo's prosecution occurred almost exactly 3 months after the Dosamantes case was filed. No press releases were issued. The determination was filed as though it occurred back in 2010 rather than 2023. The irony of the "Breach of Certification" violation, meaning the politician could no longer participate in the 2010 matching funds program, is that it protected Baldeo. It freed him from any spending caps. In my case, I cannot break the so-called contract that apparently isn't a contract. I can never escape from my *Deal with the Devil.*

**Adjudication of the Retaliatory Policy by the Defendant in Its Judicial Capacity:**

43.     If the Court should still doubt whether the CFB wrote a formal policy that the City adopted, or whether the CFB enforced this retaliatory policy, then consider the Advisory Opinions it provided in its judicial capacity. (Since the outcomes of its judicial hearings are not readily accessible to the public, I cannot provide those at this time).

In Advisory Opinion 1989-8, posted on the CFB website as of 5/30/23, the CFB stated, "[T]he value of a law firm's goods and services provided to the candidate by the [law] partner is not exempt from the definition of a 'contribution,' unless the candidate pays the law firm its usual and normal charge for these goods and services. Advisory Opinion No. 1989-8 also addresses the situation of an associate at the partner's law firm interested in providing pro bono work to the campaign as part of his law firm's expected pro bono educational activities. The Board concluded that such activity could not be classified as volunteered because the law firm would be making a contribution to the candidate."

My mother has never been paid for her services to our Campaign. However, in Advisory Opinion No. 2003-1, "the Board examined the issue of a candidate's spouse volunteering some of his time providing compliance services to the campaign… The result of the spouse's actions would have been significantly reduced expenditures by the candidate's campaign… The Board explained… the campaign would in reality be receiving services at below fair-market value, which would result in an in-kind contribution equal to the value of the discount."

44.     Although the CFB's rules suggest a professional can volunteer their time as long as another entity doesn't volunteer the support staff and supportive services to assist. However, that did not work for the 2001 Alan Hevesi Campaign, which tried to separate the individual from the firm's services. According to the CFB website, "Although the services this consultant provided were more comprehensive than those of other consultants, the cost to the campaign was unusually low… [T]he owner of the consulting company was volunteering his own services as a consultant while charging the Hevesi campaign for other work performed by his firm… [T]his constituted a violation of the corporate contribution ban and a violation of the contribution limit because [the owner] had never operated as a political consultant separately from his firm… To allow such "volunteer" services would effectively allow the acceptance of an in-kind contribution from the firm to the Hevesi campaign… [The campaign]paid an additional $250,000 to account for the fair market value of [the volunteer's] services." [Exhibit: Campaign Finance Board: Campaigns Must Not Compensate Volunteers for Personal Services.]

45.     Almost since the inception of the Agency, candidates' rights and their volunteers' rights to free speech and free assembly have been routinely violated. The campaigns are unable to obtain legal advice about their civil rights unless their campaigns are wealthy, a factor that depends on the CFB itself., as highlighted most clearly by the CFB's ultimate determination in Hevesi case. The campaign was charged a mere $1260 in penalties after receiving millions of dollars in matching funds.

The New York Times contemporaneously reported on the volunteer, Hank Morris's, retention of a law firm to sue the CFB for constitutional violations. Ultimately, Hevesi retreated from that stance, separated himself from Morris. Hevesi deferred to the CFB and received matching funds and a slap-on-the-wrist penalty [Exhibit: New York Times: Hevesi Backs Down on Campaign Funds Fight]. This penalty may have been paid by the taxpayers using matching funds, which the CFB allows. Only the candidates who do not receive matching funds have to pay penalties with their own personal finances.

**New Rules After Gerson's Win:**

46.     In Gerson v. New York City Campaign Fin. Bd. 2019 NY Slip Op 03268, the Appellate Court ruled, "Apparently, any error, no matter how minor, in any aspect of the documentations submitted in support of a certain contribution would render the documentation wholly invalid for purposes of calculating the error rate… The Board failed to provide any reason for setting the threshold at 20%, rather than another percentage, or for not taking an approach other than cutting off all funds when the threshold is reached, the informal rule on which [the CFB's] determination was based is "so lacking in reason for its promulgation that it is essentially arbitrary." (New York State Assn of Counties v. Axelrod, 78 NY2d 158, 166 [1991]; see also Matter of Nicholas v. Khan 47 NY 2d 24, 34 [1979]).

After Gerson's ruling, the CFB amended its Rules, which Defendant Egerton emailed me about recently on February 14, 2024 and again on February 20, 2024. The new Rules allows the CFB to serve me a summons to appear in OATH Court (for the twelfth time) to answer for violations. However, if the Court finds in my favor (as it has the other eleven times), the CFB does not have to abide by the Court's ***now "non-binding decision."*** Instead, the CFB can vote whether to adopt or disregard the OATH Court's ruling. The CFB Board, which is legislated to be

"bipartisan" comprises almost all Democrats and Working Families members. Upon information and belief, no Republican has won a majority vote in front of the Board after an OATH Court hearing, particularly after suing it.

In the original 2015 OATH case (the one that was overturned), CFB v. Gerson et al., the Judge affirmed the CFB's "No Opting-Out" Provision and added, "The Act authorizes petitioner to impose civil penalties of up to $10,000 for each violation. Admin. Code $3-711(1). In addition, petitioner may impose a civil penalty of up to three times the amount of excess expenditures."

47.     After a campaign has submitted its Draft Audit Report, as I have, all campaigns are barred from spending on lawyers. Before any candidate can assert constitutional violations, they must go through this process. And the new Rule allows only for an Article 78 proceeding as an appeal– effectively barring anyone from challenging the statutes. How can it be constitutional to just write a new Rule to allow you to do whatever you want to do? There should be a compelling government interest in the Rule. Why waste judicial resources on a CFB determination if the person is vindicated in an OATH proceeding? There is no public interest in this and there is a significant loss of liberty for the candidate.


**Stealing From the Poor To Give to the Rich: The Anti-Robin Hood**

48.     Why wouldn't the public want to prevent accidental rule-breaking and prevent a waste of judicial resources? It is because the CFB encourages new candidates to run, deprives them of their money using unconstitutional methods, and then redistributes wealth, acting as a anti-Robin Hood with a self-righteous twist.

Consider my past opponent, Jumaane Williams. The CFB Audit Unit reviewed Jumaane Williams' 2017 campaign for office and assessed $12, 674 in penalties. This Final Board Determination was published on the CFB's website. The associated social media press releases and announcements also stated the CFB would be discussing its enforcement action against Williams' campaign. There is no other information posted in either the Board's agenda or its minutes about the enforcement action against Jumaane Williams.

Since Williams has never accused the CFB of civil rights violations, the reprisal policy should not apply to him.

At the 2019 Board meeting to formalize the Audit Unit's enforcement action, Defendant Schaffer, who directed the meeting stated, "These proposed penalties are not being contested… The candidate is Jumaane Williams, who is the successful candidate for Public Advocate… Total recommended penalties therefore are  $7524… In addition, with respect to Mr. Jumaane's campaign, there are further public funds due, so I move that the following public funds be paid to that campaign totalling $43,450… Motion carries."

Schaffer is a decision-maker for the CFB since he can override other units in his Agency and convert penalties to payments. The poorer campaigns essentially subsidized this payment to the incumbent's campaign. The penalty number was a different number than what was assessed by the Audit team and posted publicly. But more interestingly, after deciding to adopt these penalties, Schaffer added a topic that is not listed anywhere in the CFB's associated press releases or public announcements. Most likely, only the people who watched the meeting on YouTube would know about the public funds payment.

49.   **Summary**

I will attempt to define the CFB's threatened and actual punishment for conversations with attorneys, accountants, consultants and those who might be familiar with civil rights and campaign finance law.

1.   This policy is a First Amendment violation of both mine and my (potential) attorney's rights to free speech.
   a)   There is no compelling interest in banning speech
2.   This is a First Amendment violation against my right to redress my grievances, my business's right to redress its grievances and my campaign's right to redress its grievances. Since any one victory could provide a benefit to the campaign, all three were suppressed.
   a)   There is no mandatory "pay your fair share" for justice. This is not a group dinner outing where everyone has to feel comfortable when the bill comes around and needs to be split equally. If I want to pay for an attorney, I

should not have to ensure that every other person, business, or campaign that might benefit from my spending can pay for their equal parts of freedom and liberty. The same is true should a larger group want to subsidize my right to redress my grievances.

b) My campaign, "Dr. Devi For NYC" has been unconstitutionally deprived of its civil rights past the statute of limitations for many of its claims. It continues to be deprived of its First Amendment rights today.

1. This is because my campaign comprises 603 donors, additional vendors, and significantly more supporters and it needs an attorney to redress its grievances. That means it must raise and spend money in order to redress its grievances. "Although a litigant may appear in federal court either pro se or through counsel, a corporation, or association, such as a political committee, must be represented by a licensed attorney." Rowland v. California Men's Colony, 506 U.S. 194, 201-02 (1993), Cousino v. Nowicki, No. 97-1905, 1998 WL 708800 at *1 (6th Cir. Oct. 2, 1998).

2. The campaign cannot obtain an attorney in part because its original bank account is now closed (based on the Defendants' guidance), in part because banks will not allow it to open a new bank account to raise and spend funds for the *2021* election. If the CFB allowed me to register for 2025 and I tried to use funds raised from that election to try to fund this federal proceeding and free myself of the lifetime spending cap of $6000, or even if I created and fundraised for a new PAC solely related to this litigation, that would be a campaign finance violation, in part because of the in-kind and outright contributions, and also because of (emphasis added):

   "Rule 5-04(d): Post-election contributions. Contributions accepted after an election may be used to pay liabilities incurred in that election, subject to the applicable contribution limit and prohibitions, **only if deposited in and disbursed from an account established and maintained for that election**"

3. This is a First Amendment violation of my right to free assembly to organize a campaign.

a) By saddling me with these collectively unconstitutional Rules, the CFB presented a substantial obstacle to organizing a campaign: past, present, and future.

4. This is a Fourteenth Amendment violation of due process

a) By preventing me from speaking with an attorney, the CFB created a substantial obstacle to my ability to comply with campaign finance laws in an efficient and cost-effective manner. My time was extremely valuable during the campaign and it was wasted trying to comprehend and comply with the CFB's bureaucratic checkmate

5. This constitutes a formal codified reprisal policy that meets the first element of a Monell claim. Those candidates and/or campaigns who use compensated or uncompensated lawyers to address the municipality's wrongdoing will be punished severely.

*Nota Bene:* I have not cited my Fifth Amendment rights here because the only Rule breaking I've been found guilty of is calling my opponent his name.

50.     The CFB deprived me of my liberty interest by keeping me in a psychological prison and in a state of ignorance. I have a property interest not only for the value of my time, effort and resources spent on all these activities, but because I previously retained a law firm to assist me with this litigation. Moreover, if I have made any direct or indirect errors due to the CFB's ban on volunteer services, I can face medical malpractice, hostile work environment, privacy, and other litigation.

51.     Local officials can be sued under $1983 "for monetary, declaratory, and injunctive relief [where] the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy." Monell v. Department of Soc. Svcs., 436 U.S. 658 (1978).

"A [Monell] complaint may show the existence of a municipal policy by pleading any of the following: (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise

27

subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact." Ortiz v. City of N.Y., 19 Civ. 7887 (ER), 2021 U.S. Dist. LEXIS 130333, at *6–7 (S.D.N.Y. July 13, 2021).

The first three options for a Monell claim have been met with this reprisal policy, which is executed through the Defendants' enforcement actions.

The Defendants codified their reprisal policy and promulgated this unconstitutional policy through their mandatory training sessions, which themselves are likely unconstitutional. "Free speech… carries with it some freedom to listen." New York Civ. Liberties Union v. New York City Transit Auth., 684 F.3d 286, 2011 U.S. App.

"The First Amendment's guarantees of freedom of speech and the press entail that "the government [be prohibited] from limiting the stock of information from which members of the public may draw." (First National Bank of Boston v. Bellotti, 435 U.S. 765, 783, 98 S.Ct. 1408, 55 :. Ed. 2d 707 (1978)).

**Nature of the Audit and Financial Disclosures**

52.     Even though I conceded the Public Advocate race to the incumbent on Election Day (November 2, 2021), and even though I closed the campaign bank account on January 11, 2022, the CFB refuses to accept that my 2021 campaign is over. State law requires that candidates submit their "cease filing" "final statement" to the Campaign Finance Board when they end their campaigns. The CFB has not accepted mine. The CFB asserts that my campaign has assets, which there is no record of– anywhere– not in the bank records, not in the contribution cards, not in the NYC Votes credit card contributions, not in bank transfers from either my personal or professional bank accounts. For over two years, I have repeatedly asked to speak to IT/ Software Support, but there has been no movement on this front. Meanwhile, in each disclosure statement, I am forced to attest to statements, which I know are false. The campaign does not have assets– that is false. But if I do not sign the attestation, the CFB can impose a $10,000 penalty for failure to file. Since I remain in this infinite loop with no end in sight, I must sign the attestations to avoid endless penalties and fees.

53.    As long as I am still running for office (in 2021), I am still subject to the $6000 campaign contribution limit. This is the contribution limit that barred me from hiring an attorney, an accountant, or a political consultant for the campaign for years. Also, because I closed the bank account at the Defendants' urging, I cannot fundraise from others. Because the CFB has stated that I am still running for office for 2021, I am also still subject to their financial disclosures.

I campaigned for approximately 8 months total (March 1, 2021 through November 2, 2021). I had a campaign bank account for fundraising and spending for approximately 9 months total. The process of submitting financial disclosures and answering to CFB statement reviews has been ongoing for 36 months. These financial disclosures will go on until 2032, according to my CFB web portal, with an Audit that is projected to continue for 5 years past the last Financial Disclosure. I campaigned for 8 months; according to the CFB, I will regularly submit financial information to them for 16 years.

_According to the CFB, the Audit begins after the campaign ends and the financial disclosures cease. In that case, why am I doing both at the same time?_

55.    It is because I initiated litigation against the Defendants. My attorneys charged me approximately $150,000 for their services. They charged me another $150,000 (approximately). I have not paid them and I am not sure what will happen with that. I am not sure what the CFB will determine is the fair market value for the services I have received.

According to the retaliation formula

$$[(3) \times [(\$300,000) - (\$0)]] + \$10,000$$
$$= [(3) \times (``\$300,000")] + \$10,000$$
$$= \text{Violation} + \$910,000 + \text{Ban on matching funds eligibility}$$

Although I have not received a bill from the CFB yet, consider the time course of this audit. I was done with the campaign. Jaclyn Williams told me to close my bank account and I did. Then I re-initiated the litigation with Judge Hagler. However, there was a procedural issue because I asked him to separate me from my attorney. I wrote in my request that I could not ask my

attorney to remove himself because he might charge me for his time. I wrote to the Judge in order to comply with the CFB's Rules.

Afterwards, the CFB initiated this burdensome audit. The CFB set the deadline to run contemporaneously with appeal deadline for the New York State Supreme Court case that I had just lost. I had to choose between the two, because the CFB's document requests and other inquiries within the C-SMART platform were so burdensome, I couldn't do both. I chose to respond to their audit over filing the appeal.

56.     I submitted my Response to the Audit on May 8, 2023. There is no other documentation left for me to provide. With all of the financial disclosures, separate responses to the statement reviews, my response to their Audit, and all of the modifications in C-SMART, the CFB should have been able to complete their Audit. They may have planned to do that since they set the deadline immediately after the appeal deadline.

However, when I filed in federal court, they needed to push back the time of the audit in order to apply their retaliatory and unconstitutional formula to the cost of the litigation. Then they resumed the financial disclosures. What changed? Only this litigation.

 Our small campaign had been scrutinized to a greater extent (a), asked to perform burdensome and unnecessary financial disclosures (b), and held to a much stricter error rate (c). All of this required significantly more time, manpower, money, and expertise. Nevertheless, according to the CFB, we met that standard. Exiting the election in November 2021, these auditors assigned a 0.00% error rate to our campaign for its compliance.

A) In terms of scrutiny, for example, my own financial contribution to myself was rejected by the CFB (but not the credit card company) because of a discrepancy in the address to the likes of: "250 West 50th Street" vs. "250 W. 50 St." The CFB honed in on this error and flagged my own contribution as suspicious. After I addressed that, our assigned liaison cited a different reason for why the contribution appeared suspicious. The CFB could not be sure that "Devi Nampiaparampil" the employer hadn't coerced "Devi Nampiaparampil" the worker into making the contribution to "Devi Nampiaparampil" the candidate for fear of being fired. This type of logic, which we at that time attributed to "bureaucracy," was applied to an overwhelming number of our campaign contributions.

B) NYS does not require pre-primary financial disclosures for campaigns where the candidate does not face a primary opponent. However, the CFB demanded that we perform tedious and time-consuming tasks like submitting these early disclosures (for and responding in writing to their "statement reviews," reviews of our financial disclosures, thereby tying up my mother, my father, and several other volunteers who could have assisted with fundraising.

C) The CFB allows for a 20% error rate to receive matching funds (Gerson v. CFB 2019). We were held to a 0.00% error rate even though we had never even applied for matching funds, much less received them. We had a hard time fundraising when almost the entire team had been involved in addressing the CFB's statement reviews and figuring out ways to insulate us from further issues. We also had difficulty tracking down each individual contributor for the CFB's requested additional information. We were barred from filling out any of the paperwork for them– even ministerial tasks like filling in their addresses– for fear of being sent to jail for forgery. As a result, we could not meet the threshold for matchable contributions.

## The fourth option for a Monell claim can also be met.

56.    Because of this "anything goes" culture where any employee is free to inflict harm on a candidate without fear of reprisal, each individual Defendant is able to act as a final decision-maker. Their individual and collective deliberate indifference to every concern I brought up led to numerous people in my zone of interest being harmed. This caused me tremendous distress in the form of self-doubt, despair and a sense of futility in dealing with them.

57.    **The Salem Witch Trials**

The CFB and the City prosecuted my mother OATH Court on the same day that my mother was having parts of her stomach, small intestine, pancreas, liver, and greater omentum removed. She had been diagnosed with advanced cancer on December 21, 2021. The City never served her any of the summonses. Nor did the City formally serve me. Instead, our assigned postal worker left me a note to come by the local post office. There, someone asked me if I had any relationship with my mother– since we had the same last name– and since I was the only "Nampiaparampil" in all of New York City.

I was my mother's healthcare proxy and power of attorney and the only person allowed near her (because of COVID restrictions at Memorial Sloan Kettering Cancer Center) but I had to leave my mother by herself on the day of her surgery and of her hearing out of respect for patients' families in the O.R. Waiting Area. I could not participate in a hearing there. Because I needed to win these cases to defend my medical license, I couldn't even skip it. If I was saddled with all these campaign finance violations, that would damage my relationship with health insurance companies and also with professional societies. I am the elected Treasurer of a major medical society.

When I went in-person to the assigned office several days before the hearing, the OATH Court told me that I could not postpone the hearing. After I explained my dilemma,  two people in the "front office" at the OATH Court checked with others in the "back office" for about 30-60 minutes before giving me an answer. They  told me that since I was not allowed to hire an attorney, I should legally represent my mother (as her power of attorney) and legally represent the campaign. Of note, Dr. Devi For NYC has a separate EIN, submits its tax documents to the IRS separately from me, and comprises over 600 donors and numerous other vendors and supporters.

Although I was not familiar with Sanitation Rules or the CFB's Rules (to the extent I am now) or the laws about practicing law without a license, the City should have known at that point that there was a conflict.

58.     Miraculously, over the course of the next few months, I won all of the cases [Ex. R]. Of note, when I brought up the CFB's behavior in a Sur-Reply, which was never read by the Judge (Exhibit R). I wrote:

"After going to court pro se and successfully getting all 11 Summons DISMISSED after a period of 6 months, I tried to find out what the CFB's exact involvement was in these accusations against my mother and me. After all, if I had been found guilty– of either the illegal postings or even of retaining an attorney and thereby making an over-the-limit contribution, a campaign finance violation– I would have had to explain all these illegal activities to the NYS Board of Medicine. I would have risked losing my medical license and potentially destroying my entire medical career over approximately $1000 worth of tickets for campaign signs that we never posted."

Defendant Perskie's response [Exhibit R]  read in part, ""The CPLR does not provide for sur-reply papers, however denominated… Materials presented in violation of this Rule will not be read." Accordingly, Defendant New York City Campaign Finance Board respectfully requests that the Court disregard the Sur-Reply in its entirety." The Court complied. The Court never adjudicated either the retaliation against my mother or the CFB's Rules effectively barring lawyers from the less wealthy campaigns.

59.     Perskie remained indifferent. She simply redrafted the Rules, called for a Rules meeting that was held approximately one month afterwards, and then substituted these new Rules for the ones that I had been following and referring to in my New York State Supreme Court case. Aside from deleting these Rules entirely from the public record, not backing up any of this information in paper or electronic form with the City's Municipal Archives, Perskie also destroyed information protected by discovery since the Supreme Court case was ongoing.

60.     Although two OATH Court clerks told me that the CFB had participated in the proceedings against my mother and the campaign, I could not know for sure until recently. Although the CFB has been unable to produce any documents in response to my FOIL, the Department of Sanitation (DSNY) did. The CFB collaborated with the DSNY to retaliate against my mother. She and my campaign were prosecuted for putting up signs, in the days *after* the election (when there would be no point), in deserted and dangerous areas that are not near a subway and not near people who would see them. In fact, the areas were vandalized with graffiti with signs about "snitches" and "cop killers" and the City allegedly found my photo, phone number, and address in the midst of all of this, putting me and my practice at risk, and decided to issue these summonses against my campaign (Exhibit S).There were no 311 calls or other complaints, about these illegal signs. We received the summonses after my campaign was out of money, so the campaign could not pay. If I paid on behalf of the campaign, or if I hired an attorney to represent us, even if we won, we would receive violations and penalties. I had no idea if it was for each and every sign, which would amount to over $111,000 ($10,000 per violation plus the original $1000 in tickets). After all, the CFB prosecuted others in OATH Court demanding  hundreds of thousands of dollars for purported over-contributions on legal proceedings and parking tickets (Campaign Finance Board v. Gerson et al. OATH Index No. 2421/ 14 (Sept. 8, 2015)).

My mother's name did not even appear on the City's photo of a torn-up sign found in the midst of a vandalized and graffitied area after Election Day, and after I had conceded the election. The City prosecuted this by statute 10-119 as an Illegal Posting.

61.     Parents and children possess a constitutionally protected liberty interest in companionship and society with each other. At the time of this prosecution, my mother had been diagnosed with advanced cancer. I had emailed the CFB that she had metastatic cancer and that is why she could no longer serve as Treasurer. According to two different clerks at the OATH Court who I spoke to on two different occasions, the CFB or the Board of Elections must have provided her information. A FOIL on the Department of Sanitation, revealed that the CFB provided her name and directed her prosecution.

The CFB did this to terrorize my mother, to deter her from helping me any further with the audit, to retaliate against me through her, and to cause me tremendous distress as I felt like I had to choose between a) trying to save my mother or spending precious time with my mother who might die, and b) trying to save my patients and employees who would inevitably be harmed if my medical license was tainted and also helping my Dad who would suffer financial repercussions from CFB's penalties since he shares accounts with my mother.

Parents and children possess a constitutionally protected liberty interest in companionship and society with each other. Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987). To prove a violation of this liberty interest, defendants must have: (1) acted under color of state law, and (2) harmed a parent or child in a manner that shocks the conscience. Porter v. Osborn, 546 F.3d 1131, 1136 (9th Cir. 2008).

62.     There are two tests to determine if the defendants' actions shock the conscience: the "purpose to harm test" and "deliberate indifference test." Porter, 546 F.3d at 1137. Under the "purpose to harm test," the defendants must have "acted maliciously and sadistically for the very purpose of causing harm." See Hammel v. Tri-County Metro Dist. of Or., 955 F.Supp.2d 1205, 1213 (D. Or. 2013). To qualify as malicious and sadistic, the defendants' alleged actions must be unrelated to legitimate law enforcement objectives.  Porter, 546 F.3d at 1137.

63.     **Call me Cassandra, the one cursed by Apollo**

The Defendants retaliated against the Republican slate with a new posting I first saw on January 8, 2024– after I became pro se– and before the NYS GOP Convention where 2024 candidates are selected to run for office. My attorneys at HSG conveyed my interest in running for office again, in my original Complaint submitted to this Court. The Defendants responded by

posting a *2022* Voter Guide on their website (Exhibit W: 2022 Online Voter Guide). This was done to retaliate against me by harming those who I had collaborated with. The CFB wanted to demonstrate their power over me and to show me that I was responsible for their suffering. In altering the public record in this manner, the CFB also attempted to turn my party against me for pursuing this case.

Ballotpedia and the Board of Elections both post certified election results from the candidates who appeared on the ballot or were written in [Ex. X]. Their candidate rosters and the CFB's slate do not match. For example, in the 2022 U.S. Senate race, the CFB lists the "Candidates on the Ballot" as Charles Schumer and Diane Sare. Where is Joe Pinion's name? He was the Republican candidate who obtained 42.7% of the vote. The Defendants canceled him. For the 5 million eligible NYC voters, in addition to other members of the public, he did not even exist.

Because NYC has so many registered Democrats, only a limited number of races are contested. In 11 contested NYS Assembly races, the Republican was canceled. In 5 of the 9 contested NYS Senate races, the Republican was canceled. *Of note, the Asian, Hispanic, and Black GOP candidates were disproportionately targeted by the CFB for deletion.*

**U.S. Senate General Election:**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 34 | Charles Schumer | **Joe Pinion CANCELED** | Diane Sare |

**2022 New York State Senate General Election:**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 34 | Nathalia Fernandez | **Samantha Zherka CANCELED** | |
| 32 | Luis Sepulveda | **Antonio Melendez Sr. CANCELED** | Dion Powell |

| 31 | Robert Jackson | **Donald Skinner CANCELED** | |
| 28 | Liz Kreuger | **Dr. Awadhesh Gupta CANCELED** | |
| 26 | Andrew S. Gounardes | **Brian Fox CANCELED** | Martha M. Rowen |
| 16 | **John Liu CANCELED** | Ruben D. Cruz III | |

**2022 New York State Assembly General Election:**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 86 | Yudelka Tapia | **Betty Obregan CANCELED** | |
| 82 | Michael R. Benedetto | **John Greaney CANCELED** | |
| 74 | Harvey Epstein | **Bryan Cooper CANCELED** | |
| 69 | Daniel J. O'Donnell | **Cynthia Acevedo CANCELED** | |
| 68 | Edward Gibbs | **Daby Benjaminé Carreras CANCELED** | |
| 55 | Latrice Monique Walker | **Berneda Jackson CANCELED** | Anthony Jones |
| 52 | Jo Anne Simon | **Brett Wynkoop CANCELED** | |
| 49 | **Peter Abbate, Jr. CANCELED** | Lester Chang | |

| 45 | Steven Cymbrowitz | **Michael Novakhov CANCELED** | |
| 44 | Robert C. Carroll | **Brenda Horton CANCELED** | |
| 40 | **Ron Kim** **Name but no photo or platform** CFB: "This candidate has not submitted a profile" | **Sharon Liao CANCELED** | |
| 26 | Edward C. Braunstein | **Robert Speranza CANCELED** | |

Even if these Republicans either could not meet deadlines or simply chose not to submit their candidate profiles at all, that doesn't explain what happened in *Assembly District 40: Ron Kim vs. Sharon Liao*. The CFB wrote next to Kim's name "This candidate has not submitted a profile[.]" If so, why is his name included while Liao's is not? If she did not submit a profile either, then theoretically (although still illegally) both their names should have been included– not his alone.

Canceling Liao and deleting me from our respective guides had similar effects. The CFB denied us our right to free speech and the public's right to listen and to assemble around like-minded candidates to organize a campaign. Educated voters might use the CFB's "Compare the Candidates" and "Add to My Ballot" functions to plan out their voting choices before going to the polls. Under the color of law, the CFB misled voters into thinking there were no Republican candidates in these races, so that supporters would stay home and forgo voting.

A reasonable person would believe the heading "Candidates on the Ballot" is all-inclusive. If so, that person would also assume someone not included in the CFB's Guide asking for money in the form of campaign contributions, must be a con artist. After being excluded from the voter guide, I have received hundreds of those accusations from members of the public– to my face, through my family, through my medical practice's receptionists and answering services, and through online trolls.

The only entity legislated to provide an accurate roster of the candidates' names is the CFB. As a member of the public, without knowing candidates' names, I cannot research their platforms, contribute to their campaigns, or contact them about fundraising or volunteering. Individual candidates, particularly challengers, cannot reach millions of voters without first having funding and workers, which is why the legislature put the onus for voter education on the CFB, and not on candidates. Without having their names and platforms promulgated to voters, candidates also cannot reach the CFB's threshold requirements for matching funds.

The CFB canceled two Democrats in this Guide. In 2014, John Liu sued the CFB[3] for violating the First Amendment and Fourteenth Amendments, stating the CFB discriminated against Asian-Americans (Liu v. N.Y.C. Campaign Fin. Bd., No. 14-cv-1687 (RJS) (S.D.N.Y. Mar. 31, 2015). Liu lost in part because there were no similarly situated candidates. He was a "class of one," being the first and only party-endorsed Asian-American nominee on the citywide general election ballot. Upon information and belief, I am the second. After being canceled from the 2022 guide, Liu barely retained his seat in office.

64.     Of note, John Liu[4] and Bill Thompson[5] are the only two other people I found who were prosecuted in OATH Court over illegal signs before my case. After they lost their respective elections, both received penalties of over $500,000. According to Court records and press reports, John Liu accused the CFB of First and Fourteenth Amendment constitutional violations.

According to PSC-CUNY.org, "The ongoing federal probe at City College led CUNY Board of Trustees Chairperson Bill Thompson to commission an investigation led by [the] State Inspector General… to look into what he called 'waste, fraud and abuse and any unethical or illegal activities.' Two top CUNY officials left their posts after the inspector general published an interim report… [The second,] Frederick Schaffer, CUNY's general counsel, who was criticized in the report, announced his retirement after the investigation went public.[6] Shortly afterwards, Defendant Schaffer became Chair of the CFB.  Bill Thompson and his campaign were saddled

---

[3] Azi Paybarah. Now, Liu pursues the Campaign Finance Board. Politico (March 12, 2014)
[4]  Clear the Books, Bill. NY Post (October 3, 2012)
[5] David Seifmah. City upholds decision orderingJohn Liu to pay $527K for illegal campaign posters. NY Post (July 2, 2012)
[6] https://psc-cuny.org/clarion/2017/april/cuny-probe-widens/

with over $500,000 in illegal signs-related violations. This is consistent with the CFB's informal policy of retaliation.

65.     Peter Abbate, Jr. chaired the NYS Committee on Government Employees. After the guide's publication, he lost the 2022 race and left office.

**2022 U.S. Congressional General Election:**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 6 | **Grace Meng** **CANCELED** | Thomas Zmich | |
| 7 | **Nydia Velazquez** **CANCELED** | Juan Pagan | |
| 10 | Daniel Goldman | **Benine Hamdan** **CANCELED** | **Steve Speer** **CANCELED** |
| 15 | **Ritchie Torres** **CANCELED** | Stylo Adonis Sapaskis | |
| 16 | Jamaal Bowman | **Miriam Flisser** **CANCELED** | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

66.     Given the context, we can infer why the Republicans have been canceled. But why should these three prominent incumbent Democrats be canceled? In 2022, there was a *redistricting* debate. A quick glance at the 2022 Congressional District Map shows that these three Congress people had the potential to take voters from the DSA-endorsed candidate, Alexandria Ocasio-Cortez (AOC). They were on the contested borders. This suggests the CFB acted to conceal any information about AOC's opponents from the voters. Of note, Celia Devi Dosamantes was an aide to Grace Meng, and may have fallen within the Congresswoman's zone of interest.

Even though I come from the opposing political party, I am distressed thinking about how these government workers can exert their power over our elected national representatives. All of it gave me the feeling that an ordinary citizen like me– just one person alone– would be completely destroyed.

I did not see the full 2022 voter guide until January 8, 2024, long after I filed "the Negligence case" in NYS Supreme Court on October 20, 2022. Between 2021 and 2023, to use the CFB's online guide, voters needed to enter their home addresses. Afterwards, the site presented them with tailored guides limited to their own districts.They could only see [some of] the candidates they were eligible to vote for– never the full NYC guide. That information remained hidden.

67.     In a show of force, the CFB flaunted how easily it could restrict candidate speech. The Defendants had just learned through this SDNY case, that I would run for office again if not for their censorship. This 2022 Guide was posted before the NYS GOP Convention, presumably to *pressure* the Republican party into threatening me and ostracizing me. Irrespective of the Defendants' intentions, I felt guilty about the other GOP candidates who they had harmed.

**Retaliation Against My Friends and Supporters**

68.    *Theo Chino*

The Defendants' retaliated against my friends and supporters to cause me distress. Theo Bruce Chino Tavarez, a lifetime member of the DSA, ran in the 2021 Democratic primary for Public Advocate created a platform that allowed me to reach millions of voters. In early August 2021, his software platform allowed me to send the following text message to what the Board of Elections dubbed the most active voters:

"Only Dr. Devi has the strength and stamina to fight an army of corrupt bureaucrats."

This text message had two immediate effects. First, our weekly fundraising shot up to almost $80,000 per week. Second, I was deleted from the voter guide.

69.    Even though we were running for the same position, he submitted an Affidavit of Support in the TRO Court [Exhibit]. Tavarez explained that he had also referred to the incumbent by his actual name and not by his title. Tavarez's profile was still included in the CFB's print and online guides. Of note, Tavarez also attested that the CFB compelled him to change his candidate profile, co-authoring his platform for him and substituting its words for his, another violation of the First Amendment.

In 2022, Tavarez served as the Treasurer for another Democratic candidate, Paperboy Love Prince ("Paperboy"). On June 8, 2023, CFB employees began calling the donors to that campaign inquiring about activities that could lead to campaign finance violations, creating the appearance of a fishing expedition, particularly since the government did not send any written correspondence but rather conducting informal phone calls to donors.

*Paperboy Love Prince*

70.    Paperboy is an artist, rapper, entrepreneur, and philanthropist who ran for Mayor in the 2021 Democratic Primary and garnered attention from Rolling Stone, CNN, the WSJ, and other media. If elected, Paperboy would have been the youngest NYC Mayor and the first transgender NYC Mayor. Paperboy also volunteered on my 2021 campaign. Photos and videos of us together appeared on social media.

Even though there were purportedly no complaints against Paperboy's campaign, the CFB called individual campaign donors to look for violations, creating a negative impression of both Paperboy and Tavarez among donors (Exhibit AA). Both contacted me.

In response to a FOIL request (Exhibit AB), the CFB provided the following documents, which show that Paperboy timely submitted a candidate profile for inclusion in the voter guide. In response and under color of law, Defendant Duhalde wrote, "The CFB will not publish links to any sites that appear to be personal or commercial… Your website includes a GoFundMe link for the Love Gallery. Delete the link or submit a campaign-specific web page." Presumably to be included in the "critical" voter guide, Paperboy's campaign acted accordingly, and responded, "We updated the website and changed the links." Duhalde then wrote, "To be published in the Voter Guide, the community center link needs to be removed throughout the website." In violation of the First Amendment and Citizens United v. FEC 558 U.S. 310 (2010), the Defendants censored Paperboy's personal speech, campaign speech, and commercial speech. In Paperboy's case, the Defendants extended past the voter guide censoring their campaign website and interfering with donations towards Paperboy's community center.

In their 2022 email to Paperboy, Defendants Duhalde and the CFB warn, "If you do not update your website and resubmit by that date, all non-compliant links will be removed from your candidate profile before it is published in the Voter Guide." In Paperboy's case, the Defendants intended to publish their profile but only to remove a "non-compliant" weblink. In my case, the entire profile was censored. Other Republican candidates were also censored in their entirety. Meanwhile, other Democratic candidates, such as Sean Hayes, a 2021 Mayoral candidate, had only one small section censored presumably for non-compliance. We can presume this because CFB Rules do not allow candidates to leave any sections blank.

*Dr. Awadhesh Gupta*

71.      Speech that relates to an election but occurs nowhere near the ballot or any other electoral mechanism is treated as core political speech entitled to the fullest First Amendment protection (McIntyre v. Elections Commission of Ohio, 514 U.S. at 347). The CFB made it clear that the Voter Guide is not ballot speech. That is how they removed the "Dr." honorific and the "Elizabeth" from my name. When I spoke at the September 14, 2021 hearing before the bipartisan group of BOE Commissioners, I won the majority vote, arguing that voters should be

able to recognize their desired candidates on the ballot and vote freely. The BOE protected my right and the voters' rights to freedom of assembly. The CFB barred me, and all of the other doctors with Indian-American/ Asian-American names from using the "Dr." title stating it was against its "long-standing policy." Meanwhile, it added the "Dr." title to a white male Republican candidate's name, a supporter of mine, who had his platform erased from the guide purportedly for not submitting a profile. Of note, because he had the "Dr." title and I did not, this guide generated tremendous skepticism among Republican donors and within the larger community about whether I was a *real* doctor. The CFB's justification was that its voter guide was different than the Board of Elections' ballot.

After I explained all of this in my NYS Supreme Court litigation, the CFB singled out Dr. Awadhesh Gupta's candidate profile for cancellation altogether. It no longer exists in the public record even though Defendant Perskie stated that his candidate profile related to the litigation. If so, shouldn't discovery have attached and protected it from deletion? [Exhibit: Perskie Email About Awadhesh Gupta].


80.    *Donors Named In the Audit*

I have over 3000 patients in my medical practice. When I was running for office a large number of patients asked to contribute to the campaign and I refused to accept their contributions. I warned them about patient privacy concerns and I told them that I did not want them to feel coerced or for there to be any perception of coercion. I could never have imagined that the CFB would go after the rest of my supporters. As part of the audit process, the CFB also retaliated against several of my donors to chill their speech and mine by publishing their identities in a manner that could cause others to retaliate against them. For example, they singled out union workers in their audit.

The Defendants also burdened physicians with additional documentation requirements during COVID. If the interventional cardiologist and the pediatric ICU physician had been too busy to address the CFB's concerns during the staffing shortages of Omicron, my mother and I would have been assessed thousands in penalties.

81.    Deliberate Escalation of Unconstitutional Behavior

Voter Guide Rules

A) On **January 13, 2023** after "the Negligence case" had been "fully briefed' according to Defendant Perskie [Exhibit], the CFB held a public hearing to review Proposed Amendments to the Voter Guide. There were several barriers to joining this Virtual public hearing: the email broadcast was misleading, an RSVP was required, the RSVP was set several days in advance of the meeting, the time of the meeting was changed, and the start time was delayed so we couldn't enter the Zoom session. Ultimately, I was the *only* member of the public who overcame all these hurdles and participated. I objected to the Proposed Amendments.

NYS's Rulemaking procedure legislates that all objections to Proposed Amendments be presented to the legislature before the adoption of the Rules. Section 1043 of the NYC Charter requires that NYC Agencies post these public hearings, post their Proposed Amendments for public comment, and post any objections they have received– either in full or in summary– alongside the Proposed Amendments before the Mayor's office signs off. In this case, the CFB never posted the recording on its website, Twitter, or YouTube Channel as it did with its other hearings or publish a press release about the outcome. The entire public hearing along with my objections seem like they never occurred. This is a prior restraint on my speech since neither the Mayor nor the City Council, many of whose members are lawyers, might have considered my objections before they adopted these Rules into the Charter. Consider (Exhibit AC p3):

"Whether a candidate video statement satisfies the requirements of these rules is determined by the Board at its sole discretion."... "candidate video statements included in the voter guide will be made accessible to individuals with vision disabilities"... p10 "the candidate may not… refer to any opposing candidate by name… use…statements…or materials that are patently offensive… make statements… or assert facts that the candidate knows or should know to be false… engage in any commercial programming or advertising… display any literature, graphs, or props."

The CFB amended the Charter in New York State. In O'Neill v. Oakgrove Construction Inc., 71 N.Y. 2d 521, 521 (1988), the Court ruled, "The protection afforded by the guarantees of free… speech in the New York Constitution is often broader than the minimum required by the First Amendment." Nevertheless, with these new Rules, I would once again be compelled for future elections to disclose my race and gender under the pretext of providing reasonable accommodations for the disabled.

83.     After my October 20, 2022 New York State Supreme Court Complaint was filed, the CFB deleted information about my fundraising from its website and altered public information about my fundraising. They did nothing to address the false and misleading statements they made about me but did add new Rules to the Charter.

Rule 3-709.5(b)(ii)12: "The city of New York shall indemnify each sponsor for any liability of such sponsor arising out of the acts or omissions of the city of New York in connection with the selection of candidates for participation in any debate held pursuant to this section."

The Defendants informed other campaigns that they could exclude any candidate from the City-sponsored debate without due process. The campaigns would not be able to pressure the television sponsor to address the issue.


84.     Cybersecurity Breach

On or about **December 9, 2022,** I contacted my bank, Bank of America, because I was experiencing major disruptions in paying my bills and running my practice. We were having trouble with orders for medical supplies not going through and we had run out of our inventory on several occasions. This caused tremendous stress because I was responsible for performing delicate spine procedures and nerve blocks in a safe and effective manner.

On September 29, 2021, Bank of America had locked my accounts on the day of the mandatory debate fundraising deadline almost one year prior. This event set off a chain reaction where I had to spend personal funds to meet the CFB's spending requirement. Of course, the CFB refused to accept any of my personal spending on that day.

I thought I had resolved it after several months of altered billing in 2021.  I had to ask my colleagues to donate me supplies. I asked an anesthesiologist in my office building, a foot and ankle surgeon in my office building, and at another time, another interventional pain specialist for specialty spinal kits. I was forced to start asking for supplies again. I also had to give out my personal cell phone number to patients because our phone systems went down in December 2022, one year after the election.

I thought maybe Bank of America had flagged my account somehow because I had spent almost $100,000 in one day triggering all sorts of fraud alerts.However, the bank informed me that was not the reason. Rather, my personal identity information and both my business's and the campaign's bank account information repeatedly appeared on the Dark Web on the day of the debate fundraising/ spending deadline. The bank locked all the accounts for my protection because it was the third separate day that this had occurred.

I believe I was transferred to Experien Credit Reporting, who then informed me what the two other dates were that this occurred. Both dates correlated with the CFB's financial disclosure deadlines. I used checks to contribute to my own campaign. That same checking account number was used to purchase medical supplies, office supplies, phone and internet services, etc. for the medical practice.

I am not in the habit of using checks. Only a limited number of campaign vendors would have a copy of the campaign's checks. They had no incentive to sabotage the campaign on the day of the debate deadline, especially since they might have gotten more business if my campaign gained more momentum. We also did not use many vendors around the time of the financial disclosures because we did not have money. This made me suspect the CFB had done this.

85.    On December 9, 2022, I submitted a FOIL to the CFB to find out who at the CFB had accessed my campaign's information. If I couldn't figure it out, my patients and my employees would be at risk. I might have to close my practice to avoid any medical malpractice issues.

The FOIL request was denied and I appealed it to Defendant Perskie, according to the administrative process, on January 7, 2023. In that email, I wrote, "Can you send me the CFB's 2020, 2021, 2022 policies and procedures for safeguarding candidates' and donors' financial and other bank information? My campaign, personal, and professional bank accounts were frozen in September 2021 on the day of the spending deadline for the mandatory debate… After my practice ran out [sic] its inventory, other doctors and surgeons donated injectables and surgical supplies in order for me to treat my own patients. I am still trying to determine why exactly I was blocked from making purchases."

86.    I also wanted to protect my donors and vendors and asked, "Can you send me the CFB's 2020, 2021 and 2022 policies and procedures for protecting donors from identity theft?"

Perskie never gave me information on who had accessed my protected information. She wrote, "The CFB does not possess records responsive to your request. This is because the vast majority of the CFB's systems do not track the identity of each user who accesses any particular record, nor the date and time of each such access."

Perskie sent me a redacted Table of Contents listing partial and abbreviated titles of different documents with dates of access. This information was not useful for protecting against identity theft and cybersecurity breaches. The FOIL Department sent me a copy of the Employee Handbook, filled with "rules" that employees like Duhalde routinely disregard, and offered that as their means of safeguarding donors' identity and financial information.

Perskie did not report any attempt to investigate the issue or correct the problem and I continue to suffer from these breaches today.

Back in 2021 and 2022, I found out I was denied COVID relief funds from a combination of skepticism that I was a real doctor (after the voter guide debacle) and skepticism about my accounts (after the Dark Web data dump). Ultimately, I turned to a State Senator who put his political differences aside to help me help my patients.

On September 15, 2023, I was denied over $20,000 in tax credits as part of COVID Relief. I could not figure out what the issue was.

On May 7, 2024, I spoke to a FORWARD/ LiveStories employee who said the contractor denied my expenses as part of their "fraud prevention" efforts, and although all of my expenses were legitimate, in the time it took for them to perform their safety checks, the program ran out of money, and there was nothing that could be done.

The CFB failing to investigate these repeated data breaches, which are most likely originating within their agency, is deliberate indifference. If it is true that they have no safety measures to protect anyone's financial information, does that mean that any candidate services liaison, like Duhalde or Egerton, can simply access Michael Bloomberg or John Catsimidatidis' information and create new and fraudulent bank accounts?

87.    _Freedom of Information Denials and a Deprivation of Property and Liberty Interest_

The CFB has already failed to do what is necessary for candidates, campaigns and donors. However, the Defendants are also interfering in my ability to safeguard my property and liberty interests by constructively denying my Freedom of Information requests.

The CFB has a FOIL unit comprising four people: Mark Griffin, Rhonda Gaskins, Rudy Castro and Tim Hunter. According to Muckrack, the CFB is relatively fast at responding to FOIL requests with an average response rate of a few months.

In my case, however, the requests have taken over 500 days and remain unanswered. Instead, the CFB has repeatedly asked me to withdraw my FOIL requests reminding me that I lost my case in New York State Supreme Court. What does that have to do with FOIL?

More importantly, my FOIL requests appear to be acting as a checklist of information that is being deleted from the public record. For example, the 2021 Voter Guide information is not available. Nor are any of the doctors' candidate profiles anymore. Nor are the Rules that were in effect at the time I ran for office. There are numerous other deletions in the public record, the most important of which is the CFB's video recording of the public testimony that took place on December 16, 2021.

88.    Because there were no checks or balances on the CFB, and no recourse, each Defendant was able to act as a final policymaker.

89.    Matthew Sollars–
The Rules of the City of New York allow for two mandatory debates for the Public Advocate position so long as certain criteria are met by certain deadlines. The 2021 criteria were disseminated to the candidates, to the press and to the public throughout the 2021 election cycle. The criteria for the second mandatory Public Advocate debate [Exhibit ] could only be determined on October 22, 2021. However, on October 5, 2021, approximately two weeks in advance of that deadline, Loprest and Sollars emailed me and wrote me a letter that they would be canceling the second debate [Exhibit]. Loprest stated that I had not met the eligibility criteria for the first debate, but she did not explain why I would _never_ meet the criteria for the second debate.. I argued all of this to them, and to the CFB, over email, with no response other than their threat to cancel the first, now voluntary, debate altogether.

This established that Loprest and Sollars could override City Council's legislation. They had final decision-making ability.

Sollars also ignored the terms of the CFB's contract with the debate sponsor, Spectrum, and forbid the press from viewing the debate. The contract had been written during COVID and did provide for the press to enter. Sollars also refused to release the debate footage to the press, interfering with their ability to effectively report on what was discussed. They could not go back for quotes. Moreover, he refused to answer any questions from the medical ,or conservative or Asian-American outlets.

Since there was no effective recourse for these actions, particularly with the time pressure, these actions gave Sollars final decision-making authority.

90.     Bethany Perskie:

Perskie acted as the final decision-maker after I filed my September 29, 2021 case against the CFB. At that time as well as at the October 21, 2021 hearing before Judge Hagler, Perskie had the decision-making authority to allow my candidate profile into the Voter Guide.

As General Counsel and the one reviewing my Complaint in the October 21, 2022 Supreme Court case before Judge Hagler, Perskie also had the authority to investigate the violence I had reported and to make changes. In fact, she had draft-making authority for the Rules.

In Defendant Perskie's November 15, 2022  Memorandum of Law in my NYS Supreme Court Negligence case, she wrote,[7] "[Campaign-related] events… are a foundational and routine component of any candidacy for public office… CFB staff instructed Nampiaparampil that wages for employees, including… security personnel, were a…campaign expenditure." We both agreed. "Plaintiffs imply that Nampiaparampil was subjected to an increased risk of physical harm due to her participation in certain campaign-related events and activities, which she… would not have attended alone, if not for the guidance she received from CFB staff regarding

---

[7] I have re-ordered these sentences

the laws governing campaign expenditures… Plaintiffs obliquely claim that the training and advice provided by CFB staff, or possibly the campaign finance statutes themselves, caused these harms…The extraordinary actions allegedly taken by third parties during various campaign events were entirely unforeseeable and constitute a superseding cause of Plaintiffs' alleged injuries." As a layperson, it hadn't occurred to me that the statutes could be considered unconstitutional until after I read Perskie's Memo. Her Memo belied the Defendants' true motive behind contribution limits for those candidates who had not received, or even applied for matching funds, but who had expressed a desire to apply in the future. Those non-recipient candidates, typically challengers to the government like me, would have to choose between their own personal safety– in terms of potential political violence– or campaign finance violations and penalties if they spent their own money hiring security to participate (in Perskie's words) in "foundational and routine component[s] of any candidacy."

91.     If Perskie had checked the City's records, she would have found what I later did: that the City had apparently arrested and prosecuted those who had attacked me in front of Gracie Mansion in the summer of 2021. (This is the incident she is referring to). Since I did not file a police report, I didn't know. Presumably a witness to the attack followed up. [Exhibit: FOIL Response of NYPD]. Even if Perskie was deliberately indifferent to my statements that someone had threatened to kill and subsequently acted on it, she should naturally have wondered if members of the public are safe at these campaign events. if the CFB has barred me from spending my money on staff or security to ensure a peaceful gathering, can anyone be safe?

92.     Police were called to the Gracie Mansion incident. My understanding is that they were also called to another event on August 5, 2021 where I joined the Mayoral candidate, Curtis Sliwa. Per my recall, according to CFB records, Sliwa had spent over $150,000 on staff and security. I had spent $0. I could not afford to pay the employees throughout the campaign. Nor could I afford to purchase Workers Compensation and Disability Insurance policies, as required by New York State.

Sliwa finished speaking and turned to me to let me speak. As I was about to start, we heard a rapid succession of nearly deafening sounds. My office manager, Nazly Suarez, who was at the event, ran over to try to save me because she believed– as did I– that somebody was shooting at us. It turned out somebody was shrieking and beating an unusual drum to create that impression. The threat of violence was so disruptive that Sliwa ended the event prematurely. He

may not have had enough Guardian Angels with him to protect the public in this potentially dangerous situation. His sister, who was watching on television, emailed me shortly after the event [Exhibit]. However, I could not participate in any further campaign events with Sliwa because of the CFB's Rules against Joint Campaign Activities since my campaign could not afford paid security or the fair market value of unpaid security.

On January 12, 2023, Bethany Perskie held a public hearing on Voter Guide Rules. She had the authority to draft the Rules and to modify them. She chose to escalate the speech restrictions in order to potentially exclude more candidates and further limit expression.

93.     Perskie also chose to exclude my testimony from the Rulemaking package she presented to the Mayor and to City Council.

Then she and Sollars chose to exclude my testimony from the official public record. They willfully and purposely chose to hide this information from the press, the public, and any government officials that follow their activities. This allowed for candidates to be unconstitutionally censored from the Voter Guide in the future, as they were. In that respect, she and Sollars have final decision-making power.

I ask for this Court's permission to submit a video recording of my testimony, which I screen recorded on my laptop.

_94. Defendants Schaffer and Loprest have final decision-making authority:_
On December 16, 2021, I participated in a public hearing to discuss the 2021 elections. In order to speak at CFB public hearings, you must state your race, gender among other protected characteristics, which again was compelled speech.

95.     Loprest opened the meeting, "
"Good morning, Chair Schaffer, I was muted. My name is Amy Loprest. I am the Executive Director of the Campaign Finance Board. I am a white middle-aged woman who is bald wearing a black head scarf… Here are some ground rules for speaking during the hearing. {We are] asking everyone to provide an audio description of themselves as I did at the beginning of the hearing."

When it was my turn to speak, I explained my concerns about the Voter Guide and the Debate although I was cut off by the CFB at approximately three minutes. Therefore, I followed up by submitting my written statement, again with the descriptors of my gender and skin color specifically so that I would not be excluded from the public posting of the hearing for non-compliance.

After I became pro se in this federal action, and some time on or about December 2023, the CFB deleted me from the public record while keeping the "Live: Recording" mark on the video to make it seem as though it was true and accurate. Moreover, the upload date is still listed as the original upload date in 2021 even though that is false. (YouTube Help provides information on how a video can be edited after upload). Someone deleted my portion and stitched together the testimony of the person who spoke before me and the person who spoke after me: my office manager, Nazly Suarez. It appears as though the editor added both video and audio transitions. The CFB has not warned the public that there has been a change in the substance of the testimony.

96.     Moreover, this is protected electronically stored information, which was altered, with the intent of concealing my testimony to these Defendants. They had knowledge about the constitutional violations occurring at the CFB, but rather than addressing the violations, they chose to delete the protected information.

I have screen recordings of both my testimony and the new and revised version of the same hearing. In both versions, Nazly Suarez says, "I would like to add to Dr. Devi's testimony…"  If I never testified at the hearing in the first place, how could she add to my testimony?

I ask for this Court's permission to submit a video recording of my testimony, which I screen recorded on my laptop, as well as the Defendants' version as it appeared on May 3, 2024.

Jaclyn Williams:

97.     Jaclyn Williams injected errors into our electronic accounting and bookkeeping, refused to answer software and documentation-related questions that we had no other way of knowing the answer to, withheld critical information at critical times, canceled appointments with us, and

even blocked our campaign email address. She was also a final decision-maker since the CFB provided for no recourse for any of these actions. Williams also directed me to close my campaign bank account purportedly so that I could cease the CFB's burdensome financial disclosures.

In spite of all of this, the bookkeeping for "Dr. Devi For NYC" has been as meticulous as the documentation from my medical practice, which undergoes numerous routine insurance and regultory audits per year as legislated by the Affordable Care Act. "Dr. Devi For NYC" received a 0.00% error rate from the CFB Audit Unit on November 3, 2021.

Perhaps this is because the original auditors, who reviewed the financial disclosures and back-up documentation, comprehensively looked at everything. After August 2022, after I asked Judge Hagler for permission to continue my litigation– absent an attorney– (in order to comply with CFB Rules), the CFB decided to only look at the reporting in the C-SMART platform, which they refused to help us with.

The CFB passed a rule that all transactions had to be reported in their proprietary software system "C-SMART." Only the CFB employees, trained by the CFB's C-SMART developers, know how to use the system. Perhaps a person who knows how to use it can teach another person, but that is considered a consulting service., so it must be compensated at fair market value as determined by the Defendants. That makes all campaigns vulnerable to CFB retaliation, but especially those that alienate these Candidate Service Liaisons who can provide the restricted knowledge about how to use their programs at their sole discretion.

The New York State Campaign Finance Board allows individuals to file hard copies of documents, particularly if they do not have professional consultants with knowledge of how to use the software. The Southern District of New York does the same.

98.    With the Defendants, the Devil is in the details. Rule 5-04(iv) hides this ability to retaliate through an audit by stating, "Any candidate who seeks to submit disclosure statements… in any format… other than that permitted by this section, including but not limited to non-electronic formats and electronic formats not generated by C-SMART, must submit a written request for authorization to the Board…" First, the Board must approve. Second, and more importantly, only the financial disclosure statements can be submitted in paper. Every campaign has to deal with

the C-SMART platform when it comes to the audit making it easy for the CFB to prosecute campaigns solely for their lack of familiarity with the software.

I will give one example of how Williams injected errors into our campaign's C-SMART record. I discovered this one while I spent over 500 hours looking at each and every transaction in the platform to figure out where potential errors may be coming from. These are errors that do not appear in the hard copy bookkeeping. My mother, the Treasurer, attributed four credit card transactions to spending on my personal credit card. In reality, I had spent the money using the campaign debit card. This is clear from the campaign's bank statements, my personal credit card statements, and from the receipts themselves, all of which have been uploaded into the C-SMART platform.

The C-SMART platform does not allow you to address errors like this easily. When my mother discovered the error, she re-entered all of the information, with all of the associated receipts, into new files attributing the spending to the campaign– and not to me.

99.     In order to make this "right," my mother needed to delete the transactions that were incorrectly attributed to my personal credit card. However, Williams stopped her, writing in an underlined sentence, "Do not delete any of the Bills/ Bill Payments or documentation yet." Then she gave my mother homework to do.

If the CFB refuses to accept responsibility for any errors in guidance it provides, and if the CFB bars campaigns from speaking to any consultants– paid or unpaid– if the campaign cannot afford the fair market value, then why did my mother have to write an essay for Williams before correcting the bookkeeping error? And why does the CFB refuse to consider the actual paper statements, which have the correct reporting?

In terms of these technical errors, Jaclyn Williams served as a final decision-maker since we had no recourse to address these errors. The CFB added a lock on our campaign account preventing us from making modifications to correct these past errors IF I was lucky enough to even find them in the midst of the thousands of separately filed documents [Exhibit]

**99.     David Duhalde:**

David Duhalde is a final decision-maker. He showed this when he excluded the City Council candidate, Paperboy Love Prince's, candidate profile from the voter guide, and when he censored Paperboy's personal speech and his non-profit community center's speech on its website. Paperboy had no recourse [Exhibit:]

Duhalde also established his final decision-making authority when he censored Mark Szuszkiewicz's video voter guide profile at a critical time in the election. There was no recourse for the candidate. Upon information and belief, Duhalde has also regularly interfered with my video voter guide statements and its searchability, ultimately deleting it entirely, thereby altering the public record as well as protected discovery electronically stored information.

David Duhalde also excluded the "Dr." title from all of the non-white physicians who ran for office in New York City. These included Dr. Raja Flores, Dr. Awadhesh Gupta, and me. We are the only non-white physicians who ran for office in New York City after Duhalde started. None of us run on Duhalde's party line. Meanwhile, Duhalde purposely included the "Dr." title for the candidate profile of the only other physician who ran. That candidate ran as a Republican, so although he was given the "Dr." title, his statements and platform were excluded from the voter guide.

100.    Duhalde, Egerton, and Perskie were aware of the potential bias when I emailed them on January 25, 2023 and when Perskie responded on January 27, 2023 without taking any action on the potential bias other than to remind me about my ongoing audit and my (constructively denied) FOIL requests.

101.    Moreover, the 2019 Employee Handbook and the Ethical Guidelines currently posted on the CFB website all prohibit CFB staff from activities that might make them appear partisan. Nevertheless, Duhalde donates regularly to City candidates. His household donated to my opponent. Duhalde goes several steps further– going door-to-door petitioning for DSA-endorsed candidates running for office in New York City, fundraising for candidates and causes, and even acting as Chair of the DSA Fund, a PAC that advocates for socialist candidates. Duhalde acted as a final decision-maker in terms of his own activities. There were no internal or external controls at the CFB. That is why he is routinely able to assign himself as "to assist" Republican

campaigns while he causes them to implode. See a sample of his activities [Exhibit: Sampling of Duhalde's Social Media Posts].

## PRAYER FOR RELIEF

I respectfully request that the Court enter a judgment in my favor and against the Defendants, and issue the following relief:

(a) Monetary damages against the Defendants for all the economic, monetary, actual, consequential, and compensatory damages that I have endured as a result of their conduct.

(b) Restoration of my name, campaign statements, platform, public debate, fundraising results, public testimony and all other core political speech in a manner that is true and accurate, visible to the public, and free of any additional false statements

(c) Resolution of the never-ending audit against my mother and me

(d) Injunctive relief from the financial disclosures imposed my defunct campaign

(e) Injunctive relief from these Rules that gave rise to the constitutional violations, including the reprisal policy

(f) A blurb from this case and an explanation of the anatomy of the CFB's reprisal policy prominently displayed in every primary and general Voter Guide for the next 10 years, so that all candidates, and all eligible voters, can appreciate how the Defendants have been managing taxpayer monies

(g) Punitive damages-

    a) Particularly for destroying privileged electronically stored information, social media posts, and information that was previously part of the public record in an attempt to conceal and destroy evidence related to this case, and

    b) For escalating their wicked behavior in the middle of a pandemic when people's lives were at stake

(h) Attorneys' fees

(i) Any further legal or equitable relief that the Court may find proper

I certify, under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

If there are any deficiencies in this filing, I respectfully ask the Court for permission to file an Amended Complaint.


Dated: May 30, 2024

     New York, New York             By     /s/ Devi Nampiaparampil

                                              Devi Nampiaparampil

                                              111 John Street Suite 2509

                                              New York, N.Y. 10019

                                              Cell: 312-523-5935

                                              Email: devichechi@gmail.com

                                              Pro Se Untrained Plaintiff