**New York City**
**Campaign Finance Board**
**Notice of Final Rules**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN COMPLIANCE WITH SECTION 1043 OF THE NEW YORK CITY CHARTER, and exercising authority vested in the Campaign Finance Board (the "Board") under Chapters 45 and 46 of the New York City Charter (including Sections 1043, 1052(a)(8) and 1052(a)(12) thereof) and under the New York City Campaign Finance Act (the "Act") (including Section 3-708(8) of the New York City Administrative Code (the "Code")), the Board hereby adopts amendments to the Campaign Finance Board Rules (the "Board rules") related to disclosure, contributions, expenditures, public funds payments, disclosure of independent expenditures, and various other aspects of the New York City Campaign Finance Program (the "Program"). These amendments are being made to clarify and update content to help support public understanding of, and compliance with, the Board rules. The rules also include minor plain language revisions and reorganization of text.

# I. Explanation, Basis, and Purpose

The Board rules are codified in Chapter 52 of the Rules Compilation of the City of New York.

The Campaign Finance Board ("CFB" or "the Board") is a nonpartisan, independent City agency that empowers New Yorkers to make a greater impact in elections. The CFB administers the City's campaign finance system, overseeing and enforcing the regulations related to campaign finance and holding candidates accountable for using public funds responsibly. The CFB publishes detailed public information about money raised and spent in City elections by candidates and independent spenders, and engages and educates voters through community outreach, the Voter Guide, and the Debate Program.

The CFB is amending its rules with clarifications and updates to help support public understanding and compliance. While some substantive changes have been made, the majority of the amendments will make minor revisions and reorganize text for clarity.

The following is a summary of the changes.

## Summary of Final Rules

## Throughout the rules

The chapters are reorganized to correspond roughly with the chronology of a typical campaign. Sections concerning special and runoff elections are moved into separate chapters so that candidates in such elections can use those chapters as a quick reference and brief overview of their responsibilities. Certain definitions previously contained in other chapters are moved into Chapter

1. The only definitions remaining in other chapters are for terms that may have a different meaning in the context of that particular chapter than in the rest of the Board rules.

Certain sections whose substance was duplicative are combined, and sections containing confusing or unclear phrasing are edited for clarity.

Short titles are added where possible to clarify the purpose and scope of individual rules.

Changes are made to standardize punctuation, capitalization, numbering, and other grammatical and stylistic issues, in order to conform to the CFB's internal style guide.

Certain amendments are made to allow for evolving technology and banking practices. For example, filing requirements are described more broadly to encompass both printed and electronic submissions, and all references to "charge cards" are deleted. Additionally, the term "cashier's check" is added separately from "money order," to clarify that both instruments are covered by the rules.

Use of the words "candidate" and "participant" is standardized, with preference given to the word "candidate." For example, it is not necessary to use the word "participant" in a section concerning public funds payments, as such sections are by definition applicable only to participating candidates. Additionally, the word "campaign," which is not legally defined, is replaced wherever possible with the term "candidate," whose definition includes the treasurer, authorized committee, and any agent of the candidate, thus effectively encompassing the campaign in most instances. The word "committee" is used in instances where the use of "candidate" could cause ambiguity as to whether the reference was to the candidate in the candidate's personal capacity and, in specific instances described below, the phrase "participant or nonparticipant or an agent of the participant or nonparticipant" is used to refer to the individual candidate, to the exclusion of the treasurer and committee. Moreover, in most instances, where a section referenced "the candidate or an agent of the candidate," the phrase "or an agent of the candidate" is removed, as the definition of "candidate" includes all agents thereof. In certain instances, where it was deemed necessary for clarity, the reference to a candidate's agent remains in the section.

All references to limited participants, and sections that apply only to such candidates, are removed. Pursuant to section 3-717 of the Act, a candidate may register as a limited participant. Limited participants do not receive public funds, but are subject to all applicable requirements of the Act and Board rules, including (unlike non-participants) the expenditure limits, except that limited participants may contribute an unlimited amount to their campaigns from their own personal funds. Since 2004, when the Act was amended to add section 3-717, not a single candidate has opted to register as a limited participant. Candidates who register as limited participants remain subject to all applicable provisions in the Act and the Board rules.

Similarly, all references to disclosure statement resubmissions are removed, as the amendment process subsumes any resubmission that would be made.

The amendments also include plain language revisions throughout.

**Chapter 1: Definitions and General Provisions**

Previous section 11-01, detailing the scope of Chapter 11, regarding Transition and Inauguration Entities ("TIEs"), is incorporated into section 1-01, which details the scope of each chapter.

Section 1-02 is amended to add a definition for the terms "loan" and "segregated account," and to separate out the definition of "other receipts" from the definition of "receipts." Definitions are added for the following terms, which apply in the context of TIEs: "donation," "inauguration expenses," "transition and inauguration entity," and "transition expenses." The latter definition incorporates the presumption (previously contained in section 11-04(e)(ii)) that incumbent elected candidates do not have transition expenses, and adds that such expenses may not be incurred after January 31 in the year after the year of the election or, in the case of a special election, 30 days after inauguration. Additionally, the definitions of "Certification" and "Filer Registration" are amended to reflect evolving technological processes, which may include electronic submission of information in lieu of paper forms. The definition of "fair market value," previously located in the chapter governing independent expenditures, is moved to section 1-02, as the term appears elsewhere in the rules. The definitions of "federal form," "multicandidate committee," and "rule" are deleted, as the terms are used rarely in the rules and the definitions are not ambiguous. The definition of "unspent campaign funds" is deleted, because the Board no longer seeks to collect unspent campaign funds as previously defined.

Section 1-03(b) (previously section 7-06) is amended to delete extraneous language regarding the ethical standards of the Board.

Sections 1-04(a) and (b) are added to clarify the Board's standards for computation of days and procedures for submitting documentation in accordance with Board deadlines. Additionally, section 1-04(b) is amended to delete previous section 1-09(a)(3)(iv), which stated that a candidate who fails to deliver a complete disclosure statement in a timely manner is in violation of the Act and subject to penalty. This provision was redundant with other provisions of the Act and rules requiring complete and timely disclosure, and stating that any violation of the Act and rules may be the basis for a penalty determination.

**Chapter 2: Registration and Certification**

Section 2-02(d) (previously section 2-01(c)) is amended to allow candidates who have already submitted a Filer Registration to file a Certification in electronic format, unless a new treasurer has been appointed.

Section 2-03 (previously sections 1-11(b) and 2-01(d)) is amended to require that, if any information required to be listed on the Filer Registration or Certification changes within five years after the election, the candidate must submit an amendment within 30 days of the change. Previously the prescribed period was within six years of the election, and there were certain exceptions to the 30-day deadline. The five-year requirement is consistent with the new record retention requirement (*see* section 4-02).

Section 2-04 (previously section 2-11) is amended to remove a reference to non-participants being permitted to accept contributions from unregistered political committees, consistent with the amendment to section 3-707 of the Act enacted by Local Law Number 171 for the year 2016.

Section 2-06 (previously section 2-12) is amended to provide that candidates must attend the required training session on or before the deadline for submission of the 32-day pre-election primary disclosure statement. Additionally, the section is amended to require all candidates to attend the pre-election training; previously, the requirement applied only to participants.

**Chapter 3: Eligibility to Receive Public Funds**

Section 3-01(c) (previously section 5-01(g)) is amended to delete the statement that a payment of public funds does not constitute the final determination of the amount of public funds for which the candidate is eligible. This statement is contained in section 7-01(a).

Section 3-01(d) (previously section 5-01(f)) is amended to clarify that public funds may be denied if a candidate has committed fraud or material misrepresentation, been found in breach of certification, or engaged in conduct detrimental to the Program that is in violation of any other applicable law at any time in the course of that candidate's Program participation, which may include previous election cycles. Additionally, the requirement that, in order to be eligible to receive public funds, a candidate who loses the primary election but remains on the ballot for the general must certify to the Board that such candidate will actively campaign for office in the general election, is amended to require such certification on or before the 32-day pre-general election disclosure statement deadline.

Finally, section 3-01(d) is bifurcated to distinguish between bases for denial of public funds that apply only to a pre-election public funds payment, and those that apply to both pre-election and post-election public funds payments. A candidate may be deemed ineligible to receive a pre-election public funds payment, but not a post-election payment, based on: failing to file a disclosure statement, failing to provide documentation or records in response to a Board request, and if there is reason to believe that the candidate has committed a violation of the Act and/or Board rules not otherwise listed in this section. Failing to file a disclosure statement, failing to provide documentation or records, and committing other violations of the Act and Board rules are in this category because they can be remedied and, prior to the election, denying a public funds payment to a candidate who fails to demonstrate compliance creates an incentive for the candidate to resolve the issue as quickly as possible in order to become eligible to receive public funds. For example, if the review of a candidate's pre-election disclosure statement reveals a possible over-the-limit or prohibited contribution, a pre-election payment could be denied based on there being reason to believe that the candidate has committed a violation of the Act and Board rules. This encourages the candidate to refund the contribution immediately, which promotes fairness and reduces the corrupting influence of large contributions by minimizing the amount of time for which the candidate's campaign had the benefit of those funds. However, after the election, the timing of the refund is less important because the candidate's opponent is no longer at a greater disadvantage based on how long the candidate has the benefit of the contribution. This also applies to the filing of disclosure statements; the value of public disclosure is greatest prior to the election, so that the voters have as much information as possible when making their choice.

Moreover, after the election, the candidate would be subject to a penalty for accepting and failing to refund the contribution. The same is true of failing to file a disclosure statement and failing to provide documents and records. The only conduct that may result in a penalty as well as a denial of public funds both pre-election and post-election is the type of conduct underlying the most serious violations of the Act and Board rules, which effectively cannot be remedied: exceeding the expenditure limit, fraud or material misrepresentation, and any other action that may cause a finding of breach of certification pursuant to section 3-01(e). In addition to being severe enough to warrant ineligibility to receive public funds on top of the penalty, such conduct is frequently not known to the Board until the post-election audit, so it would not be reasonable to limit the resulting public funds ineligibility to the pre-election period. This type of conduct is enumerated in paragraph (i) of section 3-01(e), which includes the remaining bases for eligibility listed in previous section 5-01(f).

Section 3-02 (previously section 2-07) is amended to remove the requirement that candidates who are disqualified from the ballot provide immediate notification of such disqualification to the Board, as the CFB itself generally collects the information.

Section 3-04 (previously section 2-09) is amended to require that candidates notify the Board of a request for reversal of termination of their candidacy within five days of receiving the notice of termination. Previously the request was required to be submitted within 10 days. Section 3-04 is also amended to provide that the Board will notify the candidate of the termination within five business days of receiving a Verification of Terminated Candidacy form. Finally, the section is amended to remove separate references to limited participants and non-participants, as its provisions are applicable to all candidates.

Section 3-05(a) (previously section 3-11(a)) is amended to provide that candidates must demonstrate compliance with Conflicts of Interest Board ("COIB") reporting requirements on or before the deadline established by the COIB or by the reporting deadline immediately preceding the date on which the candidate seeks to receive a public funds payment, whichever is earlier. This change is made to provide for a situation in which the COIB deadline is set on a date following the date on which the CFB makes determinations for a particular public funds payment.

**Chapter 4: Records and Reporting**

Section 4-01(b)(ii)(E) (previously section 4-01(c)) is amended to clarify that the fair market value of an in-kind contribution must be reported.

Section 4-01(c)(iii) (previously section 4-01(e)(3)) is amended to remove language concerning "charge cards" and to clarify that receipts provided for credit card purchases must include information about the underlying purchase, including but not limited to the vendor.

Section 4-01(c)(iv) (previously section 4-01(d)) is amended to clarify that candidates must maintain written documentation showing that a bill has been forgiven or settled for a lesser amount. Additionally, the requirement that an additional record created be "contemporaneous" is removed

and incorporated by the reference to section 4-01(a), which provides for the creation of contemporaneous records.

Section 4-01(c)(vi) (previously sections 4-01(e)(4), 4-01(m)) is amended to require that a record of an advance must be signed by the individual making the advance purchase. Additionally, the requirement that candidates obtain vouchers for advance reimbursements is deleted.

Section 4-01(c)(viii) is amended to clarify the categories of documentation that candidates are required to maintain for different types of political advertisements and literature. This change is made in part to maintain consistency with § 14-106 of the New York State Election Law, which was amended on April 12, 2018.

Section 4-01(c)(ix) (previously section 4-01(o)) is amended to provide that the documentation exception for public transportation within New York City does not apply in its entirety to unlimited-use MetroCards. For such cards, candidates must maintain a contemporaneous record containing the date on which each card was purchased and the name of any individual who was assigned a particular card for long-term use.

Section 4-02 (previously section 4-03(a)) is amended to change the required record retention period from six years after the date of the election to five years after the last disclosure statement deadline for that election, or until the Board has issued the candidate's final audit report and the candidate has extinguished all outstanding liabilities resulting from the applicable election including payment of any penalties or repayment of public funds owed to the Board, whichever is later.

Section 4-03(b), which required candidates to notify the Board in writing of any change in the location of their records on or before the deadline for the next disclosure statement, is deleted.

Section 4-05(a) (previously section 9-01) is amended to require that all backup documentation accompanying disclosure statements, including bank statements, be submitted electronically via the CFB's C-SMART (Candidate Software for Managing and Reporting Transactions) software. Section 4-05(a)(i) (previously sections 1-09(c), 3-07, and 9-03(b)) is amended to clarify that a disclosure statement *may* (rather than will) be deemed incomplete and rejected if it does not meet certain submission requirements. Section 4-05(a)(iii) (previously sections 3-08 and 9-03(a)) is amended to remove the provision for non-electronic submission of disclosure statements, as disclosure statements are now required to be submitted electronically. Section 4-05(a)(iv) (previously section 9-02(a)(1)) is amended to remove the exemption for small campaigns from the electronic filing requirements, as small campaigns are not required to file disclosure statements at all. Section 3-06, which stated that disclosure statements must be submitted in such form and manner as shall be provided by the Board, is deleted, as its substance is incorporated into section 4-05(a)(i). Sections 9-02(a)(2), which provided that state and federal forms may not be submitted to the Board unless specifically permitted, and 9-03(c), which required that electronic submission be accompanied by printed versions, are deleted.

Section 3-02(f)(3), which provided for deferred filing for candidates who raised less than $2,000 and spent not more than 45% of the expenditure limit since the last disclosure statement, is deleted.

Section 4-05(c)(ii) (previously sections 1-09(c), 3-03(c)(1), 3-03(c)(4), 3-04(a), 3-04(b), and 3-04(c)) is amended to delete the requirement that disclosure statements indicate whether the candidate has met the threshold for eligibility to receive public funds; to provide that candidates must itemize contributions received from a contributor who is an employee of the candidate, even if such contributions total $99 or less; to clarify that for each contribution returned to a contributor, candidates must report the account from which the funds originated and the number of the refund check used; to remove the requirement that candidates disclose whether the contributor of a contribution claimed as matchable or in excess of the doing business limit has business dealings with the city, as candidates are no longer required to inquire whether a contributor has business dealings with the city pursuant to Local Law No. 185 of 2016 (codified in § 3-703(1-b) of the Code); to require that matchable contributions be reported in the disclosure statement covering the period in which they are received; and to clarify that for each contribution received, candidates must indicate in their reporting if the contribution was accepted for a runoff or rerun election or for a segregated account.

Section 4-05(c)(iii) is added to clarify the reporting requirements for other receipts, which are payments received by a candidate that are not contributions or loans, such as interest, dividends, proceeds from sales or leases of assets, and any other sources of income.

Sections 4-05(c)(iv)(A) and (B) (previously section 3-03(e)(1)) are amended to require that, for each expenditure, in addition to all other information previously required to be reported or otherwise provided to the Board, candidates must report an explanation, the vendor address, and an exempt code (if any), and must provide to the Board the payment method and the amount of any remaining outstanding liability to the vendor or payee. This reflects existing CFB policy.

Section 4-05(c)(iv)(F) (previously section 3-03(e)(5)) is amended to provide that the amount above which contributions to political committees from all candidates' personal funds are considered to be expenditures in furtherance of their campaigns is the doing business limit applicable to mayor, rather than to all three citywide candidates (which are currently the same). This results in no change to the current threshold, but decouples the citywide offices in case the Act is changed.

Section 4-05(c)(iv)(G) is added to require that candidates properly report and document expenditure refunds.

Section 4-05(c)(v) (previously section 3-03(c)(7)) is amended to provide that candidates need not report an intermediary who is a member of the candidate's immediate family, and to delete certain reporting requirements for fundraising agents.

Section 4-05(c)(vi) (previously section 3-03(c)(2)) is amended to clarify the information and documentation required to be provided for transfers, as well as the method for attribution of contributions underlying the transfer, and to state that transfers shall not contain public funds.

Section 4-05(c)(vii) (previously section 3-03(c)(3)) is amended to require that if an advance is reimbursed by check, the candidate must report the bank account from which the check is issued.

Section 3-03(c)(10), which required a list of joint fundraising events to be provided with disclosure statements, is deleted.

Section 4-05(c)(viii) (previously section 3-03(d)) is amended to clarify the information required to be reported for loan repayments.

**Chapter 5: Contributions, Loans, and Other Receipts**

Section 5-01(b) (previously section 7-05(a)) is amended to reflect the fact that the contribution limit adjustment was performed in 2018, and that the next such adjustment shall occur in 2022.

Section 5-02(a) (previously section 1-08(n)) is amended to require that the statement required to be included on fundraising solicitations be in the same language as the solicitation itself.

Section 5-03 is added to enumerate the categories of prohibited contributions and loans.

Section 5-03(e) is added to provide that candidates may not accept a cash contribution or other cash receipt aggregating in excess of $100 from a single source. This requirement is consistent with § 14-118(2) of the New York State Election Law.

Section 5-03(f) (previously section 1-04(s)) is amended to clarify that candidates may not accept any contribution made, received, solicited, or otherwise obtained in violation of any local, state, or federal law.

Section 5-04(c) (previously section 1-04(k)) is amended to provide that the contemporaneous documentation to substantiate the amount of a joint contribution may include a contribution card.

Section 5-05 is added to enumerate the categories of non-matchable contributions.

Section 5-05(l) (previously section 5-10(d)(20)) is amended to clarify that contributions made, received, solicited, or otherwise obtained in violation of any local, state, or federal law are not matchable.

Section 5-05(u) (previously sections 5-01(d)(10), (21), and (25)) is reworded to ensure that it accurately reflects existing CFB policy. Contributions first reported in an amendment to a disclosure statement – rather than in the statement itself – are not matchable. Due to the administrative processes associated with reviewing disclosure statements and issuing public funds payments, it is crucial that matchable contributions be claimed and reported in a timely manner, and that all contributions that will be claimed for match are reported with the initial statement filing. If a contribution first reported in an amendment were permitted to be claimed for match, the auditor would be required to restart the review of the disclosure statement being amended, which might not allow sufficient time for all matching claims to be reviewed prior to the next public funds payment date. Additionally, the phrase "contributions that were not received within the reporting period" is deleted for redundancy, because it is covered by the requirement that the contributions be reported timely and as part of the original statement rather than an amendment,

and by section 4-05(c)(ii)(B)(1), which states that matchable contributions must be reported in the statement covering the reporting period in which they were received.

Section 5-05(v) is added to clarify that a contribution is not matchable if the corresponding matching claim was submitted after January 15 in the year after the year of the election, even if the contribution itself was timely reported. This reflects existing CFB policy.

Section 5-05(w) (previously sections 5-01(d)(10), (17), and (18)) is amended to clarify that a contribution may not be matchable if the information on the documentation submitted to substantiate the contribution does not match the information reported by the campaign. This includes the provision in the previous section that contributions made by post-dated check (thus reflecting a receipt date other than that reported by the campaign) are not matchable.

Section 5-05(aa) is added to provide that contributions for which a matching claim was previously made and withdrawn are not matchable. This reflects existing CFB policy.

Section 5-06(a) (previously section 1-04(g)(1)) is amended to remove the statement that if a debt, other than a loan, incurred by a candidate is forgiven, the act of forgiving the debt is an in-kind contribution to the candidate. This statement was duplicative with new section 5-06(e), which states that a debt forgiven or settled for less than the amount owed is an in-kind contribution. The section is also amended to remove the statement that the act of forgiving a debt is a contribution to, but not an expenditure by, the candidate. In-kind contributions are both contributions to and expenditures by the candidate (*see* new section 6-03(c) (previously section 1-04(g)(1))).

Section 5-06(b) (previously section 1-04(g)(2)) is amended to state that a candidate may use a reasonable estimate to document the fair market value of an in-kind contribution if no invoice is available and obtaining one would not be practicable.

Section 5-06(c) (previously section 1-04(g)(3)) is amended to clarify that the amount of any applicable tax is included in the calculation of an in-kind contribution.

Section 5-06(d) (previously section 1-04(g)(4)) is amended to provide that an extension of credit by a corporation, limited liability company, or partnership that is not commercially reasonable and is not made in the regular course of business is presumed to be a prohibited in-kind contribution. Previously, if a candidate demonstrated that a creditor that was a corporation, limited liability company, or partnership did not intend to make a contribution, the extension of credit would not in itself result in the candidate being deemed to have accepted a contribution from that entity.

Section 5-06(f) (previously section 1-04(g)(7)) is amended to provide that an outstanding liability not contemporaneously reported may be presumed to be an in-kind contribution if other indicia of a contribution exist.

Section 5-07(a) (previously section 1-04(c)(1)) is amended to acknowledge that excess or prohibited contributions may be returned to the New York City Election Campaign Finance Fund (the "Fund") as an alternative to being returned to the contributor. The section further clarifies that nominee or anonymous contributions must be returned to the state comptroller, as required by §

14-128 of the New York State Election Law, because a refund to the reported contributor would be impossible (in the case of anonymous contributions) or would compound the illegality (in the case of nominee contributions).

Section 5-07(b) (previously section 1-04(c)(1)) is amended to delete the provision stating that no violation shall exist if the excess portion of a doing business contribution is refunded within 20 days of notification, as the provision was redundant with the Act and other sections of the rules.

Section 5-07(d) (previously section 1-04(c)(2)) is amended to specify that a contribution returned due to the source or intermediary involved must involve a reputational interest associated with such source or intermediary.

Section 5-07(f) (previously section 1-04(c)(1)) is amended to reflect the lack of matchability of contributions intermediated by individuals doing business with the city, pursuant to Local Law No. 167 of 2016 (codified in Admin. Code § 3-702(3)(i)). The section is further amended to provide that, for purposes of calculating compliance with the doing business limits, while contributions received from a contributor who appears on the Doing Business Database ("DBDB") are aggregated with all contributions received from that contributor during the same cycle, contributions accepted when the contributor did not appear on the DBDB are not required to be refunded. For example: a candidate for City Council accepts a $1,000 contribution during the first year of an election cycle from a contributor who is not on the DBDB. One year later, the contributor begins doing business with the city. This contributor has already reached the doing business limit of $250, but the candidate is not required to return the excess, as the contributor did not appear on the DBDB when the contribution was made. However, the candidate may not accept any additional contributions from that contributor while the contributor is on the DBDB.

Section 5-08(a) (previously section 1-03(a)) is amended to clarify that funds remaining in a segregated account after the election may not be transferred into another account or used for any future election. Such funds must be returned to contributors or to the Fund or used to pay outstanding liabilities from the election for which the account was established. Additionally, previous section 1-03(a)(4), which provided that after a participant first receives public funds for an election, the principal committee for that election may not make expenditures to pay expenses or debt from a previous election (other than a primary election held in the same calendar year), is deleted. Participants are permitted to make such expenditures, but the amount of the expenditure will be deducted from the amount of public funds payable to the participant, in accordance with section 7-07(a)(ii)(B).

Section 5-08(c)(i) (previously section 1-07(c)) is amended to add that candidates have the burden of demonstrating that surplus funds and transfers of funds from committees not otherwise involved in the covered election do not derive from contributions in violation of state or federal law.

Section 5-09(i) (previously section 1-05(g)) is amended to provide that a loan to a candidate's committee from the candidate's personal funds, made after the Board has issued a final determination for the campaign and for the purposes of paying penalties or repaying public funds pursuant to that determination, is not subject to the contribution limits, even if the candidate

subsequently forgives the loan. Previously, this provision applied to all loans made after the election, including those made prior to the issuance of the final Board determination.

Previous section 1-04(p), regarding joint fundraising and endorsements, is deleted for redundancy. The substance of the section – which requires candidates to properly report and document all joint expenditures and to demonstrate compliance with contribution limits and restrictions – is covered elsewhere in the rules.

Section 5-11(a)(iii) (previously section 2-06) is amended to clarify that candidates must use a merchant account for collecting credit card contributions, and that funds accepted for an election may not be commingled with personal or business funds or funds accepted for a transition and inauguration entity ("TIE").

Section 5-12 (previously section 1-04(o)) is amended to provide that candidates in court-ordered rerun elections that are canceled have the burden of demonstrating that any portion of the contributions raised may be reasonably attributed to expenses incurred for the rerun election before its cancellation. Previously, this burden existed only for contributions in excess of the limit.

## Chapter 6: Expenditures

Section 6-01(g) (previously section 1-08(d)(3)) is amended to clarify that only expenditures made by a participant's principal committee – rather than from the participant's personal funds – to advocate for against a ballot proposal are subject to the applicable expenditure limits. Further, the section is amended to clarify that such expenditures are subject to the applicable contribution limits in addition to the expenditure limits, as provided in Admin. Code § 3-703(1)(o).

Section 6-01(h)(iii)(B) is added to state that expenditures incurred after the date of a contested or write-in primary election will be attributed to the general election.

Section 6-01(h)(iv)(B)(1) (previously section 1-08(c)(2)(iii)) is amended to provide that an affidavit submitted with a petition to demonstrate that a candidate reasonably anticipated a primary election must be sworn to or affirmed by the candidate.

Section 1-08(d)(2), which provided that, to be permitted to spend the total aggregate amount of the out-year, primary election, and general election expenditure limits, a candidate must spend at least the amount of the out-year limit during the three years preceding the year of the election, is deleted, because the Act clearly provides that the out-year expenditure limit applies to the three years preceding the election year.

Section 6-01(h)(iv)(C) (previously section 1-08(c)(2)(iv)) is amended to clarify that expenditures made after a primary election is no longer reasonably anticipated are subject to the general election expenditure limit.

Section 6-01(i)(ii) (previously section 1-04(d)(4)(ii)) is amended to provide that expenditures for childcare services made pursuant to Admin. Code § 3-702(21)(a)(13) are exempt from the expenditure limits up to $20,000, as provided by Local Law No. 196 of 2018, codified in Admin.

Code § 3-706(5). This local law allows for pre-election childcare services provided during the year of the election or the year preceding the election to be paid for with private campaign funds, provided that the candidate is a primary caregiver for one or more children under 13 years of age; that either the need for the services would not exist but for the campaign, or the candidate has experienced a significant loss of salary or wages that would not exist but for the campaign; and that the candidate submits a statement of childcare eligibility that is approved by the Board. Additionally, the law provides that such expenditures are not qualified. *See also* section 6-02(a)(ii)(V).

Section 6-01(i)(v) (previously section 1-08(l)(3)) is amended to remove the provision excluding expenditures attributed to a period ending on or before the closing date of the 10 day post-primary election disclosure statement from the general election expenditure limit, provided that the candidate was subject to the primary election expenditure limit. The CFB's current audit standards and methodology provide for close scrutiny of transactions reported on the 10 day post-primary statement, in order to determine on a case-by-case basis which expenditures should be subject to the general election expenditure limit.

Sections 6-01(k)(i) and (ii) (previously sections 1-08(e)(i) and (ii)) are amended to clarify that the amount raised and the amount spent are not added together for the purpose of determining whether expenditure limit relief should be granted.

Section 6-02(a)(i) (previously section 1-08(g)) is amended to delete the statement that public funds may only be used for expenditures in furtherance of the candidate's campaign and during the calendar year of the election, as those requirements are covered in new section 6-02(a)(ii).

Section 6-02(a)(ii)(B) (previously section 1-08(g)(2)(ii)) is amended to state that qualified expenditures may only be made between December 15 in the year preceding the election and the date of the election, as provided in Admin. Code § 3-704(1).

Section 6-02(a)(ii)(U) is added to state that expenditures to facilitate, support, or otherwise assist in the execution or performance of the duties of public office are not qualified, as provided by Local Law No. 190 of 2016 (codified in Admin. Code § 3-704(2)(l)).

Previous section 1-08(g)(3), which provided that bills that are first reported in a disclosure statement submitted later than the 10 day or 27 day post-election disclosure statement applicable to that election, and bills first reported in a disclosure statement amendment that is made after the last election in an election year, or after a special election, are presumed not to be qualified expenditures, is deleted. Candidates are encouraged to add and amend any remaining bills or bill payments in filing the final disclosure statement for each cycle, which is due after the disclosure statements listed in the previous section. Thus, previous section 1-08(g)(3) is deleted to conform to CFB practices and procedures.

Section 6-02(a)(ii)(V) is added to state that expenditures related to childcare services are not qualified, i.e., they may not be made with public funds, as provided by Local Law No. 196 of 2018, codified in Admin. Code § 3-704(2)(m). This local law allows for pre-election childcare services provided during the year of the election or the year preceding the election to be paid for with

private campaign funds, provided that the candidate is a primary caregiver for one or more children under 13 years of age; that either the need for the services would not exist but for the campaign, or the candidate has experienced a significant loss of salary or wages that would not exist but for the campaign; and that the candidate submits a statement of childcare eligibility that is approved by the Board. Additionally, the law provides that such expenditures are exempt from the spending limits up to $20,000. *See also* section 6-01(i)(ii).

Section 6-03(d) (previously section 1-08(h)(1)) is amended to delete the sentence stating that the amount spent by a candidate for a joint expenditure is subject to the expenditure limit unless otherwise exempt. This sentence is unnecessary because all expenditures are subject to the limit unless exempt, and in particular, section 6-03 makes clear that non-proportional payment for a joint expenditure may result in the presumption of an in-kind contribution, which is also considered an expenditure by the campaign receiving such contribution.

Section 6-04(e)(ii) (previously section 1-08(f)(5)(ii)) is amended to describe the types of expenditures that will be presumed to be in-kind contributions from a party committee or constituted committee to a candidate as those made "for the purpose of promoting or facilitating the nomination or election of" the candidate. This description consolidates the list of types of expenditures contained in the previous section.

Section 6-04(e)(iii) (previously section 1-08(f)(5)(ii)) is amended to clarify that if a candidate makes or promises reimbursement to a party committee or constituted committee for an expenditure, but has not reported an outstanding liability for the reimbursement, then the expenditure will be considered an in-kind contribution from the party or constituted committee to the candidate until the reimbursement by the candidate is made. The previous section provided that, under such circumstances, the Board could require the candidate to demonstrate that the expenditure was not an in-kind contribution; the new section still allows for such documentation to be provided, but clarifies that the presumption of an in-kind exists whether or not the documentation is requested by the Board.

Section 6-04(g) is added to provide that certain routine interactions between campaigns and outside entities will not, absent other indicia of non-independence, lead to a determination of non-independence. This section is a codification of CFB Advisory Opinion No. 2013-1 (January 10, 2013).

Section 6-06(c) (previously section 2-13(c)) is amended to clarify the requirements for identification of communications broadcast over the internet, as well as the distinctions between text, audio, and video communications.

**Chapter 7: Pre-Election Public Funds Payments**

Section 7-01(e)(ii) (previously section 5-02(b)) is amended to remove the requirement that a petition for a candidate to receive public funds after having been disqualified from the ballot include a demonstration that hardship will exist if the funds are not paid.

Section 7-02(a) (previously section 5-01(i)) is amended to require that a candidate seeking to receive the optional early public funds payment declare the specific office to which such candidate is seeking nomination or election. In order to receive the early payment, candidates must certify their intention to meet all the requirements of law to appear on the ballot; for such certification to occur in good faith, the candidate must know what office such candidate seeks. Additionally, both the threshold for eligibility to receive public funds and the maximum amount of the early payment depend on the office sought.

Section 7-02(b) (previously section 5-01(b)(i)) is amended to clarify the process of preliminary review of disclosure statements, including to specify that, in order for the Board to issue a public funds payment to a candidate within four business days of receiving that candidate's disclosure statement, the statement must be received by the Board by 5:00 p.m. on the due date.

Section 7-02(c) (previously section 5-01(p)) is amended to describe clearly and in additional detail the process of responding to invalid matching claims reports, and to clarify that failure to respond may lead to a delay in the issuance of public funds payments. The section is further amended to delete the provision requiring that candidates respond to an invalid matching claims report by the March 15 after the election or 60 days after receiving the report, whichever is sooner. CFB practice is for each invalid matching claims report to include a deadline; the amount of the response time may differ depending on the circumstances.

Section 7-04(a) (previously section 5-01(a)(2)) is amended to change the deadline for filing a Certified Statement of Need. Such statements must be filed no later than the 32-day pre-election disclosure statement deadline applicable to the election in which the participant is a candidate, except that if the candidate's basis for filing the statement of need arises for the first time after that deadline, then the statement of need must be filed by the due date of the disclosure statement immediately preceding the next public funds payment date. For example, if, after the 32-day pre-election disclosure statement deadline, a candidate receives an endorsement as described in § 3-705(7)(a)(1)(B) of the Act, and no other basis for filing a statement of need previously existed in that race, the candidate's opponent may file a statement of need up until the disclosure statement immediately preceding the subsequent payment date.

Section 7-06 (previously section 5-01(e)) is amended to define in more detail the circumstances under which the Board may withhold a portion of a public funds payment, and to clarify that such withholdings are subject to post-election audit. The phrase "a reasonable portion" is deleted and replaced with more precise language. Specifically, the section is amended to clarify that, in addition to the overall 5% withholding applicable to all candidates, the Board may withhold a percentage equal to the projected rate of invalid matching claims, and up to an additional 5% if the Board determines that there is reason to believe that the candidate has failed to comply with the Act.

Section 7-08 (previously section 5-01(h)) is amended to delete the sentence providing that, after the Board notifies a candidate of the difference between the amount of matching claims and the amount of the corresponding payment, subsequent payments may be adjusted upward or downward to reflect further review and auditing of previous matching claims. The sentence was self-evident and redundant with the remainder of the chapter, which makes clear that a preliminary

public funds determination may be followed by subsequent determinations based on further audit review and submission of additional reporting and documentation.

Section 7-09(a) (previously section 5-02(a)(1)) is amended to require that a petition for review of a Board determination include either a request to appear before the Board, or an affirmative waiver of the right to such an appearance.

Section 7-10(a) (previously section 7-03(c)) is amended to delete the presumption that cash on hand after an election consists of contributions that are available for expenditures in the next election, to maintain consistency with the requirement that participating candidates return their final bank balance to the Board after the election.

Section 7-10(b)(i) (previously sections 7-03(d) and (e)) is amended to add deadlines for submission of petitions for reconsideration; to require that such petitions include sufficient specificity and a request for a hearing, if desired; and to delete the sentence providing that failure to file required disclosure forms may constitute a sufficient basis for a determination, and must be addressed in the response to the petition.

Section 7-10(b)(vi) (previously section 7-03(j)) is amended to provide that a new petition for review of a preliminary public funds determination must be based on new evidence.

Section 7-10(b)(vii) (previously section 7-03(k)) is amended to require that the Board respond to such petitions within five business days of their filing.

**Chapter 8: Post-Election Public Funds Payments**

Section 8-02 (previously sections 1-08(g)(4), 3-02(b)(3), and 5-01(l)) is amended to detail the bases for post-election public funds payments, and to clarify that such a payment may only be made if all three bases exist, and that the amount to be paid is the lesser of the applicable amounts. For example, if a candidate has unpaid public funds claims of $5,000, a qualified expenditure surplus of $7,500, and documented outstanding liabilities of $10,000, the post-election payment amount is $5,000. All three factors must be present because each one is a necessary component of eligibility to receive a post-election payment. To receive a post-election payment, a candidate must have submitted valid matching claims corresponding to an amount of public funds greater than the amount previously received, must have documented qualified expenditures in excess of the amount of public funds previously received, and must have timely and properly reported liabilities that remain outstanding after the election, and which will be reduced by the amount remaining in the campaign's bank account. In order to receive a post-election payment, a candidate may therefore be required to submit any bank statements not previously provided. This enables CFB staff to verify the amount of the final bank balance in the committee account, which is required to calculate the amount the candidate is eligible to receive based on documented outstanding liabilities. These changes to the section reflect existing Board policy.

Section 8-04 (previously section 5-01(m)) is amended to move the deadline by which a disclosure statement may be amended in order for the content of such statement to serve as a basis for a public funds payment from December 31 in the year of the election to January 15 in the year following

the election, and to provide that a payment may be made based on amendments or resubmissions in response to expenditure sample reports to which the CFB has requested a response after January 15 in the year after the year of the election.

**Chapter 9: Public Funds Repayments**

Section 9-01 (previously sections 5-03(a) and (g)) is amended to clarify that public funds repayments must be paid to the Board separately from, and in addition to, any penalties owed. Accordingly, candidates may not use their final bank balance to pay penalties, because the bank balance exists as a wholly independent amount that must also be repaid. This reflects existing Board policy.

Section 9-02(c)(iii) is added to clarify the requirements regarding bonus payments to staff. Generally, pursuant to section 9-02(c)(i), candidates who received public funds may not make post-election bonus payments to employees. However, a bonus payment to an employee may be considered a permissible pre-election expenditure, even if it is paid after the election, provided that the bonus is related to services performed prior to the election; is based on quantifiable, merit-based criteria; is not conditioned upon the result of the election or whether the campaign received public funds or has funds remaining after the election; is clearly detailed in a contract executed before the services in question were provided; and does not constitute more than 10% of total payments to the employee.

Section 9-02(d) is added to clarify that where more than one ground exists for a candidate or committee to repay public funds to the Board, the applicable repayment amount is the larger of the amounts. For example, if a committee has a qualified expenditure deficit of $1,000 and an overpayment of $500, the committee's repayment obligation is $1,000. This reflects existing Board policy.

**Chapter 10: Audit and Enforcement**

Section 10-02(a) (previously section 2-12(b)) is amended to clarify that, as provided by the Act, the 14- or 16-month deadline for the issuance of a candidate's final audit report may be satisfied by issuing the candidate's enforcement notice by such deadline.

Sections 10-02(b) and (c) (previously section 4-05(b)) are amended to state the extended final audit report deadlines for candidates who do not complete a required training by the applicable deadline, pursuant to Admin. Code § 3-710(1)(b).

Section 10-03(a)(ii) (previously section 7-02(c)(1)) is amended to clarify who has the authority to waive the right to an adjudication pursuant to section 1046 of the City Charter on behalf of a campaign, a TIE, and an independent spender. Such authority is held by the individual candidate, the elected candidate, and the independent spender or authorized representative, respectively, or an agent of one of those individuals. The word "candidate" is therefore replaced with the phrase "participant or nonparticipant" in order to clarify that only the individual candidate (rather than the treasurer or the committee, who are included in the definition of the term "candidate"), or someone acting directly on the candidate's behalf, such as an attorney or compliance consultant,

has the authority to waive the right to such an adjudication unilaterally. A waiver received from any of the individuals listed in the section is deemed an effective waiver on behalf of the treasurer and committee, the TIE, and the independent spender, as applicable. Conversely, for example, a treasurer does not have the authority to waive adjudication on the candidate's behalf.

Section 10-03(b) (previously section 7-02(c)(2)) is amended to clarify that extensions to respond to enforcement notices may be granted only upon good cause shown, and must be requested prior to the response deadline. The section specifies that a "complete response" must be submitted by the deadline, clarifying that piecemeal responses, with a portion submitted after the deadline, are not permitted. Information or documentation submitted after the deadline shall be disregarded, except that the Board may choose, under extraordinary circumstances, to accept such information or documentation at its sole discretion. Such circumstances are events beyond the control of the campaign, TIE, or independent spender that make it impossible for the candidate, treasurer, or independent spender/authorized representative to respond in a timely manner. Examples include serious health issues, disasters, and accidents. Campaigns, TIEs, and independent spenders will be required to submit documentation explaining and demonstrating these circumstances.

Section 10-03(e) (previously section 7-02(g)) is amended to provide that aggravating and mitigating circumstances "may" be considered in the Board's assessment of whether to deviate from the Penalty Guidelines. Previously the section provided that such factors "shall" be considered. The amendment reflects existing Board policy as stated in the existing Penalty Guidelines.

## Chapter 11: Procedural Rules for Formal Adjudications

No substantive changes are made to Chapter 11.

## Chapter 12: Complaints and Investigations

Section 12-02(b) (previously section 7-01(c)) is amended to require that a formal complaint filed with the Board include the complainant's full name and contact information.

Section 12-02(c) (previously section 7-01(d)) is amended to provide that, within ten days of receiving a complaint, the Board will determine whether to reject such complaint as moot, facially meritless, or not in substantial compliance with the Board's requirements. If a complaint is not rejected, the Board will send each party complained about a copy of the complaint. The section is further amended to provide that, even if the complaint is not in substantial compliance, the Board may investigate its subject matter, but need not follow the procedural requirements of the rules.

Section 12-02(d) (previously section 7-01(e)) is amended to extend the period in which the Board can specify a shorter response time from 40 days before the election to 90 days before the election, and to require that answers to complaints be accompanied by copies of all documentary evidence available to the respondent. The section is further amended to provide that, based on the answer received, a complaint may be dismissed as moot.

**Chapter 13: Transition and Inauguration Entities**

Section 13-01 (previously section 11-02) is amended to provide that TIEs may accept donations prior to registration for the purpose of paying fees and depositing any minimum balance required to open a bank account for the TIE; to clarify the dates on which a TIE registration may be submitted; to delete the provision for submission of registration in a non-electronic format; and to clarify that each elected candidate may maintain only one TIE, with one bank account, per election.

Sections 13-02(a) and (b) (previously section 11-03(a)) are amended to provide that only donations exceeding $99 must be itemized, and to specify the information that must be reported for each in-kind donation. Additionally, section 13-02(a) is amended to align the disclosure requirements for TIEs more closely with the analogous requirements for candidates.

Section 13-02(d) (previously section 11-03(c)) is amended to require monthly reports (previously bimonthly) and to modify the due dates for each such report. Additionally, the provision for filing of such reports in non-electronic format is deleted.

Section 13-03(a)(v) (previously section 11-04(e)(i)) is amended to remove the provisions regarding expenditures, which are now contained in section 13-03(b), and special elections, which are now contained in section 15-07.

Section 13-03(b)(i) (previously section 11-04(b)(4)) is amended to add a list of presumptively TIE-related expenditures.

Section 13-03(b)(ii) is added to provide that purchases of durable goods are presumed not to be TIE-related.

Section 13-03(b)(iii) (previously section 11-04(b)(6)) is amended to clarify the distinction between transition liabilities and inauguration liabilities. The section is further amended to add exceptions allowing for expenditures after January 31 in the year after the election related to 1) fundraising to satisfy liabilities incurred on or before that date, and 2) responding to the post-election audit.

Section 13-03(b)(iv) is added to provide that expenditures incurred after January 31 in the year following a general election are presumed to be for the next election in which the elected candidate is a candidate, and not for a TIE.

Section 13-03(b)(vi) is added to provide that only one single inaugural event is presumed to be TIE-related.

Section 13-03(c)(i) is added to require that TIEs be terminated after extinguishing all liabilities or on April 30 in the year following the election, whichever is earlier.

Section 13-04(b) (previously section 11-05(b)) is amended to describe in more detail the records required to be kept by TIEs, including requiring that the written records for donations include the date and amount of the donation and, for cash, cashier's check, and money order donations, the donor's signature.

Section 13-04(d) (previously section 11-05(e)) is amended to modify the record retention period for TIEs from six years to five years.

## Chapter 14: Disclosure of Independent Expenditures

Section 14-01 (previously section 13-01) is amended to add a definition for the term "authorized representative."

Section 14-02(b)(ii) is added to provide that a mass mailing is considered to have been distributed on the date it was postmarked, or accepted by a common carrier.

Section 14-02(c)(i) (previously section 13-02(c)(1)) is amended to require that invoices for independent expenditures be itemized.

Section 14-03(b) (previously section 13-03(b)) is amended to provide that the reporting period for ballot proposals begins on January 1 in the year in which the proposal will appear on the ballot. Previously, the reporting period began on the date the first communication was distributed or first expenditure was made.

Section 14-04(a) (previously section 13-04(a)) is amended to ensure that the Board's requirements for identification of communications are consistent with the requirements provided in New York State law.

Section 14-07 (previously section 13-07) is amended to clarify that independent spenders must provide documentation to the Board upon request.

Previous section 3-10, which provided for a political committee making expenditures supporting or opposing a ballot proposal to file voluntary disclosure statements with the Board, is deleted. Expenditures regarding ballot proposals are covered by the provisions of Chapter 14.

## Chapter 15: Special Elections

Section 15-01 (previously section 1-06) is amended to remove the reference to determining the amount of surplus funds for special elections. For special election candidates who already have a committee registered with the CFB from a previous election, that committee becomes a special election committee, but surplus funds remaining in the committee account may not be used for the special election.

Section 15-02(a) is added to provide that a Certification filed for a special election may not be rescinded.

Section 15-02(c) is added to provide that candidates who have already been raising funds for other elections within the same election cycle may use their existing committees and bank accounts in the special election, provided that they amend their registration with the Board of Elections to

reflect the change in election, and further provided that once that committee and account have been used for the special election, they shall not be used for any future election, including any other elections during the same election cycle.

Section 15-02(d)(i) is added to provide that disclosure statements reporting financial activity that occurred after a candidate's most recent election prior to a special election will be considered to be for the special election.

Section 15-02(d)(ii)(A) (previously section 3-03(a)(3)) is amended to provide that if a candidate is already registered for a future election and an intervening special election is called, the candidate must re-register with the Board for the special election and re-submit all of the candidate's financial activity with the first special election disclosure statement.

Section 15-02(d)(vii) is added to require that each disclosure statement submitted for a special election include a copy of the candidate's most recent bank statements, as is required for primary and general election disclosure statements.

Section 15-03(b) (previously section 1-08(c)(4)) is amended to provide that expenditures incurred prior to the date a special election was reasonably anticipated may be presumed to be subject to the special election expenditure limit, beginning when a candidate has registered for a covered office or has begun raising and/or spending funds.

Section 15-03(e) is added to clarify certain types of expenditures that may be made with public funds in a special election.

Section 15-04(b) is added to provide that contributions received after a candidate's most recent election and prior to a special election are presumed to be for the special election.

Section 15-04(c) is added to provide that, for contributions received on or before the date the special election was first reasonably anticipated that are in excess of the contribution limit, the campaign must refund the excess portion to the contributor.

Section 15-04(e) (previously section 5-01(p)) is amended to remove the set deadline for responding to invalid matching claims reports. *See also* section 7-02(c).

Section 15-04(g) (previously section 2-06(d)) is amended to clarify that receipts accepted for a special election may not be commingled with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds, and to provide that such receipts may not be used for any other election until after the special election is actually held.

Section 15-05 is added to require that candidates in a special election must attend a compliance training session designed specifically for that election, and that the training must be completed on or before the financial disclosure cut-off date of the 11-day pre-election disclosure statement.

Section 15-06(d) (previously section 13-03(a)(3)(ii)) is amended to provide that the reporting period for the first disclosure statement for independent expenditures related to special election

ballot proposals begins on the date on which the first reportable expenditure is incurred. This was not explicitly stated in the previous section because the reporting period began on the same date for primary and general elections, as it did for special elections, which is no longer the case. *See* section 14-03(b). The section is also amended to provide that, for ballot proposals anticipated to be voted on at a special election, additional independent expenditure disclosure statements are due on January 15 and July 15 in the year *of* the election, rather than the year prior to the year of the election.

Section 15-07 (previously section 11-04(e)(i)) is amended to provide that a special election TIE may not incur expenditures more than 30 days after the candidate's inauguration, except for expenditures made to satisfy liabilities incurred within that time period or for fundraising to pay such liabilities, or expenditures related to terminating the entity or responding to the post-election audit. The section further provides that a special election TIE must terminate after it has extinguished all liabilities or 60 days after inauguration, whichever is earlier.

**Chapter 16: Runoff Elections**

Section 16-05(c) (previously section 1-04(q)(3)) is amended to clarify that no single contribution may be divided between runoff and non-runoff accounts.

Section 16-05(d) is added to detail the documentation requirements for runoff contributions, including runoff-specific contribution cards.

Section 16-05(e)(i) (previously section 5-01(j)), regarding flat grants for runoff elections, is amended to remove the provision stating that the amount of public funds paid "may be adjusted to reflect further review and auditing of matchable contribution claims for the preceding election." The amendment reflects the Board's practice, which is that the flat grant is calculated as a percentage of the amount actually paid to the candidate for the preceding election, not the amount the candidate may theoretically have been eligible to receive.

Section 5-01(i)(l)(ii) is amended to remove the provision stating that no public funds would be paid in a runoff election prior to the day after the day of the primary election held to nominate candidates for the runoff. Section 5-01(i)(l)(iii), which provided that no public funds would be paid in a runoff special election prior to the day after the day of the special election, is deleted. These provisions were redundant, as no public funds can be paid for an election until such election is reasonably anticipated and the identities of the candidates have been determined.

Section 16-05(e)(ii) (previously section 5-01(j)) is amended to provide that no public funds shall be issued to candidates in a runoff election until the Board has determined that the runoff election is reasonably anticipated to occur.

Section 16-05(f) (previously section 2-06(c)(1)(ii)) is amended to clarify that receipts accepted for a runoff primary or special election may not be commingled in any account with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds, and to provide that such receipts may not be used for any other election held in the year that the runoff election is held or anticipated.

Section 16-05(g) clarifies the requirements applicable to an anticipated runoff election that is not held.

Section 16-06(a)(i) (previously section 2-06(c)(1)(i)) is amended to provide that transfers may occur from a primary election account to a runoff primary election account after the primary election is held, and from a runoff primary election account to a general election account after the runoff primary is held.

Section 16-06(a)(ii) is added to require that runoff bank accounts be disclosed to the Board as an amendment to the candidate's Filer Registration or Certification.

Section 16-06(b)(i) is added to clarify that runoff special elections are held only for the office of mayor. New York State Election Law requires a runoff election if no candidate receives 40% or more of the vote in a primary election for the office of mayor, public advocate, or comptroller, but does not provide for runoff special elections for any office. *See* N.Y. Elec. Law § 6-162(1). However, the City Charter requires runoff special elections for the office of mayor. *See* New York City, N.Y., Charter § 10(c)(10). This section is added because both the Act and Board rules refer to runoff special elections, but do not specify to which office they apply.

Sections 16-06(b)(ii), (iii), and (iv) are added to clarify that funds raised for a runoff special election are subject to the same requirements as those raised for a runoff primary election.

Section 16-07(a) is added to provide that the reporting period for the first disclosure statement for independent expenditures related to a runoff election begins on the day the Board issues a determination stating that the runoff election is reasonably anticipated.

## Chapter 17: Voter Education and Engagement

Section 17-02(b)(i)(C) (previously section 10-02(b)(1)(iii)) is amended to provide that photographs submitted with candidate statements for the print edition of the Voter Guide must comply with size and resolution requirements as determined by the Board. The previous section provided that only photographs must "not exceed" such requirements; this clarification is to allow for the possibility of minimum size and resolution requirements in addition to maximum requirements.

Sections 17-02(b)(i)(D) (previously section 10-02(b)(1)(iv)) and 17-02(b)(ii)(A) (previously section 10-02(b)(2)(i)) are amended to provide that candidate print and video statements for the Voter Guide may not refer to any opposing candidate by name, and must not include statements, gestures, or materials that are patently offensive. A prohibition on the unauthorized use of copyrighted material or invasion of privacy in such statements is replaced by a broader prohibition on the violation of any city, state, or federal law, which mirrors the analogous provision related to the video Voter Guide (*see* section 17-02(b)(ii)(A)(6)).

Section 17-02(b)(ii)(C) (previously section 10-02(b)(2)(iii)) is amended to state the Board's authority to approve and set deadlines for the submission of video Voter Guide statements.

Section 17-02(b)(ii)(H) (previously section 10-02(b)(2)(viii)) is amended to delete the statement that the filming schedule for the video Voter Guide will permit candidates filing designating and nominating petitions to participate.

Sections 17-02(b)(iii)(A) and (B) (previously sections 10-02(b)(3)(i) and (ii)) are amended to remove the requirement that candidates be named in designating or nominating petitions in order to appear in the Voter Guide for the primary and general elections.

Previous section 2-07(d), which provided that write-in candidates not appearing on the ballot would not appear in the Voter Guide for that election, is deleted. The substance of this section is covered in new sections 17-02(b)(iii)(A) and (B).

**Chapter 18: Public Access to Information**

Section 18-02 (previously section 6-01(a)) is amended to delete the list of the Records Access Officer's duties, as the procedure is adequately detailed in the rest of the chapter.

Section 18-03(a) is added to provide that a candidate may request access to records previously provided to the Board by contacting the Candidate Guidance and Policy Unit, which may, in its discretion, provide the records without a Freedom of Information Law ("FOIL") request.

Sections 18-03(b) and (c) (previously section 6-01(c)) are amended to provide additional detail regarding the procedure and requirements of submitting a FOIL request.

Section 18-03(d) is added to state that if the Board is unable to locate responsive records, the Board will, upon request, certify either that it is not the custodian of the records, or that the records cannot be found after a diligent search.

Section 18-03(e) (previously section 6-01(b)) is amended to clarify the procedure for inspection of records and to require the requester to promise that the records will not be removed, damaged, or modified in any way.

Sections 18-04(a) and (b) (previously section 6-01(d)) are amended to provide that appeals of FOIL denials should be directed to the General Counsel, to state that the appeal must be filed within 30 days of receiving the denial, and to specify that the appeal must include a copy of the original request and a reasonable description of the records to which access was denied.

The following rules will take effect thirty days after final publication in The City Record:

## II. **Final Rules**

New material is underlined.
[Deleted material is in brackets.]

"Shall" and "must" denote mandatory requirements and may be used interchangeably in the rules of the Board, unless otherwise specified or unless the context clearly indicates otherwise.

**Section 1. Title 52 of the rules of the city of New York is REPEALED, and a new title 52 is added to read as follows:**

**Title 52: Campaign Finance Board**

**Chapter 1: Definitions and General Provisions**

**§ 1-01 Scope of Rules**

**Chapters 1 through 8** contain requirements applicable to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or member of the City Council ("Council member") during the pre-election period.

**Chapters 9 through 11** pertain to post-election audit and enforcement of candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as independent spenders.

**Chapter 12** pertains to investigations conducted by, and complaints filed with, the Board.

**Chapter 13** contains requirements for transition and inauguration entities ("TIEs"), which apply to all candidates elected to the office of mayor, comptroller, public advocate, borough president, or Council member, regardless of whether the elected candidate is a participant in the voluntary Campaign Finance Program.

**Chapter 14** contains requirements for disclosure of independent expenditures related to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as ballot proposals.

**Chapter 15** contains requirements for special elections for the office of mayor, comptroller, public advocate, borough president, or Council member.

**Chapter 16** contains requirements for runoff elections for the office of mayor, comptroller, public advocate, borough president, or Council member.

**Chapter 17** pertains to the Voter Guide and voter engagement and applies to candidates seeking nomination or election to the office of mayor, comptroller, public advocate, borough president, or Council member, as well as city ballot proposals or referenda.

**Chapter 18** contains requirements for public access to information as provided by the Freedom of Information Law.

Except as otherwise specified, the requirements of these rules related to authorized committees do not apply to an authorized committee that does not, at any time, aid or otherwise take part in an election in which the candidate is a participant or non-participant. Aiding or

otherwise taking part in an election includes accepting contributions, loans, or other receipts, and making expenditures, including expenditures of surplus funds, for such election.

### § 1-02 Definitions

"**Act**" means the New York City Campaign Finance Act, codified in Chapter 7 of Title 3 of the Code (§ 3-701, *et seq*.).

"**Administrative law judge**" means the hearing officer assigned to preside over a case that is referred to the Office of Administrative Trials and Hearings.

"**Advance**" means a payment for goods or services on behalf of a candidate made with the expectation that the payment will be reimbursed by the candidate.

"**Authorized committee**" means an authorized committee as defined in the Act.

"**Board**" means the Campaign Finance Board.

"**Board of Elections**" means the New York City Board of Elections, unless otherwise specified as the New York State ("State") Board of Elections.

"**Business dealings with the city**" means business dealings with the City of New York as defined in the Act.

"**Candidate**" means a candidate as defined in Article 14 of the New York State Election Law. Except as otherwise provided in these rules, a "candidate" includes every authorized committee of the candidate, the treasurer of each such committee, and any other agent of the candidate.

"**CAPA**" means the City Administrative Procedure Act, §§ 1041 to 1047 of the Charter.

"**Certification**" means the submission of the information required pursuant to section 2-02 in order to join the Program.

"**Charter**" means the New York City Charter.

"**Code**" means the Administrative Code of the City of New York.

"**Contribution**" means a contribution as defined in the Act.

"**Covered election**" means any election for the office of mayor, public advocate, comptroller, borough president, or Council member.

"**Disclosure statement**" means the campaign finance disclosure statement filed with the Board under Chapter 4 of these rules.

"**Doing business database**" means the computerized database containing the names of individuals and entities engaged in business dealings with the city as defined in the Act.

"**Domestic partner**" means a domestic partner as defined in § 1-112(21) of the Code.

**"Donation"** means a gift, subscription, advance, payment, or deposit of money or any thing of value, made by an individual or entity, in connection with the transition or inauguration expenses of an elected candidate, including but not limited to compensation for the personal services rendered in connection with such transition or inauguration expenses without charge. A loan is deemed to be a donation, subject to the limits and restrictions of the Act, to the extent the loan is not repaid by the date that the elected candidate is sworn into office. The term "donation" shall not include:

(a) The value of personal services provided without compensation by individuals volunteering a portion or all of their time on behalf of a TIE, provided that such an individual may not provide any paid services to a TIE at the same time as such individual serves as a volunteer for that TIE;

(b) The use of real or personal property and the cost of invitations, food, and beverages voluntarily provided by an individual to a TIE on the individual's residential premises for TIE-related activities to the extent such services do not exceed $500 in value; and

(c) The travel expenses of any individual who, on the individual's own behalf, volunteers personal services to any TIE to the extent such expenses are unreimbursed and do not exceed $500 in value.

**"Election"** means any primary, runoff primary, special, runoff special, or general election for nomination or election.

**"Election cycle"** means the period beginning on the first January 12 following the most recent general election for the specific office to which a candidate is seeking nomination or election and ending on the first January 11 following the next general election for that office.

**"Electronic means"** means facsimile transmission, email, or any other electronic manner of communication that shall be prescribed by the Board.

**"Entity"** means any organization of one or more individuals, and includes any parent, subsidiary, branch, division, department, or local unit thereof.

"**Expenditure**" means an expenditure as defined in the Act.

**"Fair market value"** means: (1) for goods, the price of those goods when received in the market in which they ordinarily would have been purchased; and (2) for services, other than those provided by an unpaid volunteer, the hourly or piecework charge for the services at a commercially reasonable rate prevailing when the services were rendered.

**"Filer Registration"** means the submission of the information required pursuant to section 2-01 prior to the filing of disclosure statements.

**"Fund"** means the New York City Election Campaign Finance Fund established by the Act.

**"Fundraising agent"** means any of the following individuals or entities that have accepted or may accept contributions on behalf of the candidate: (1) paid or volunteer full-time campaign workers; or (2) commercial fundraising firms retained by the candidate and the agents thereof.

**"Hearing officer"** means the person assigned to preside over a case before OATH.

**"Inauguration expenses"** means expenses for an inaugural event held within seven days before or 30 days after the elected candidate is officially sworn into office. Factors used by the Board in determining whether an event is an inaugural event include but are not limited to: (1) the celebratory or commemorative nature of the event; (2) the location of the event in relation to the geography of the elected official's district; and (3) the inclusion of non-celebratory and/or commemorative functions, including but not limited to constituent outreach or services. The burden of proving that an event is an inaugural event rests with the TIE.

**"In-kind contribution"** means: (1) a gift, subscription, loan, advance of, or payment for, any thing of value (other than money) made to or for any candidate; or (2) the payment by any individual or entity other than an authorized committee of compensation for the personal services of another individual or entity which are rendered to the candidate without charge. "In-kind contribution" does not include personal services provided without compensation by individuals volunteering a portion or all of their time on behalf of a candidate.

**"Intermediary"** means an intermediary as defined in the Act.

**"Labor organization"** means a labor organization as defined in the Act.

"**Loan**" means a monetary payment made to an authorized committee with the expectation that the funds will be repaid by such committee.

**"Matchable contribution"** means a matchable contribution as defined in the Act.

**"Mobile fundraising vendor"** means any persons or entities that provided services to a candidate related to the processing or receipt of any text message contribution.

**"Non-participant"** means a candidate for nomination or election to a covered office who has not filed a Certification as a participant. Except as otherwise provided in these rules, a "non-participant" includes the candidate, every political committee authorized by the candidate for the covered election, the treasurer of each such committee, and any other agent of the candidate.

**"OATH"** means the Office of Administrative Trials and Hearings.

"**On the ballot**" means on the ballot as provided in Article 6 of the New York State Election Law and as recorded on the Board of Elections nomination or designation ledgers or contest lists.

**"Optional early public funds payment"** means the disbursement of optional public financing occurring prior to two weeks after the last day to file designating petitions for a primary election.

"**Other receipts**" means payments received by a candidate that are not contributions or loans, such as interest, dividends, proceeds from sales or leases of assets, and any other sources of income.

"**Participant**" means a candidate for nomination or election to a covered office who has chosen to join the Program for an election by submitting a Certification pursuant to § 3-703(1)(c) of the Code. Except as otherwise provided in these rules, a "participant" includes the candidate, the principal committee authorized by the candidate pursuant to § 3-703(1)(e) of the Code, the treasurer of such committee, and any other agent of the candidate.

"**Political committee**" means a political committee as defined in the Act.

"**Principal committee**" means the principal committee as defined in the Act.

"**Program**" means the New York City Campaign Finance Program established by the Act.

"**Public funds**" means monies disbursed from the Fund.

"**Receipts**" means monetary and in-kind contributions, loans, and any other payment received by a candidate.

"**Registered user**" means the individual registered with the wireless carrier to use the specific mobile device from which a contribution made via text message was initiated.

"**Reporting period**" means a time period covered by a disclosure statement, as described in section 4-05.

"**Segregated account**" means a bank account that may be established by a participating candidate in accordance with section 7-07(b).

"**Single source**" means any individual, individuals in combination, entity, or entities in combination that establish, maintain, or control another entity and every entity so established, maintained, or controlled, including every political committee established, maintained, or controlled by the same individual, individuals in combination, entity, or entities in combination.

"**State form**" means a statement of campaign receipts and expenditures required to be filed by a candidate or political committee with the State Board of Elections.

"**Text message contribution**" means a text message contribution as defined in the Act.

"**Transfer**" means any exchange of funds or any other thing of value between political committees, other than multicandidate committees, authorized by the same candidate pursuant to § 14-112 of the New York State Election Law. In section 16-06 the term "transfer" means funds exchanged between different bank or other depository accounts.

"**Transition and inauguration entity**" or "**TIE**" means an entity established by an elected candidate to raise and spend private funds for transition or inauguration expenses.

"**Transition expenses**" means expenses relating to an elected candidate's transition into office for goods and services received, used, or rendered before the elected candidate's date of inauguration. Transition expenses shall be limited to those incurred solely for the purpose of preparing to take office, such as those listed in section 13-03(b)(i), and may not be incurred after January 31 in the year after the year of the election, or, in the case of a special election, 30 days after inauguration. Incumbent elected candidates shall not incur transition expenses.

"**Treasurer**" means the treasurer of any authorized committee involved in a covered election, except as otherwise provided in these rules.

## § 1-03 The Board

### (a) The Board is nonpartisan

    (i)  Pursuant to § 3-708 of the Code, the Board consists of five members.

        (A)  Two Board members are appointed by the Speaker of the City Council ("Speaker"). No more than one of them shall be enrolled in any one political party.

        (B)  Two Board members are appointed by the Mayor. No more than one of them shall be enrolled in any one political party.

        (C)  The chair of the Board is appointed by the Mayor in consultation with the Speaker.

    (ii)  The Board shall conduct all its activities in a strictly nonpartisan manner.

### (b) Board members and staff are governed by ethical standards

    **(i) The Act and the Charter.** Board members and staff are subject to the standards set forth in the Act and in Chapter 46 of the Charter.

    **(ii) Ethical guidelines.** The Board shall establish and publish ethical guidelines governing the conduct of its members and staff.

    **(iii) Additional city ethical guidelines.** Board members and staff are subject to the standards set forth in Chapter 68 of the Charter.

### (c) Board administration of the Fund. To safeguard the administration of the Fund and assure candidates that sufficient public funds will be available to make all payments required by the Act in upcoming elections, the Board shall:

    (i) make budget requests for the Fund sufficient to cover all anticipated Fund obligations in the upcoming fiscal year and to maintain a reserve for contingencies;

    (ii) when it has determined that monies in the Fund are insufficient or likely to be insufficient for payments to candidates, report this determination to the Commissioner of Finance and provide its estimate of the additional amount which will be necessary to

make such payments pursuant to the Act (together with a detailed statement of the assumptions and methodologies on which the estimate is based), as required by § 1052(a)(10) of the Charter, not more than four days after which the Commissioner of Finance is required by § 1052(a)(10) of the Charter to transfer an amount equal to the Board's estimate from the city's general fund to the Fund;

(iii) take steps to ensure that the Fund is maintained in a separate account, credited with all sums appropriated therefor and all earnings accruing thereon, in the custody of the comptroller on behalf of the Board, as required by § 1052(a)(10) of the Charter;

(iv) take steps to ensure that the Fund and its administration are insulated from the risk of improper action by any city official or agency or any agent or contractor thereof;

(v) subject the Fund to periodic audits by independent outside auditors; and

(vi) take such other actions as are necessary and proper to ensure the integrity of the Fund.

**(d) Advisory opinions.** Upon the written request of a candidate or any other individual or entity, the Board shall issue an advisory opinion interpreting the Act and these rules, or otherwise respond in writing to the request, within 30 days of receipt of such request, or within 10 business days of receipt if such request is received less than 30 days before a covered election, to the extent practicable. At its discretion, the Board may issue advisory opinions in the absence of a request. The Board shall make public its advisory opinions and the questions of interpretation for which advisory opinions will be considered by the Board, including by publication on its website.

**(e) Public petitions for rulemaking.**

**(i) Procedures for submitting petitions.**

(A) Any individual or entity may petition the Board to consider the adoption of a rule. The request must be sent to the Executive Director and contain the following information:

(1) the rule to be considered, with proposed language for adoption;

(2) a statement of the Board's authority to promulgate the rule and its purpose;

(3) arguments in support of adoption of the rule;

(4) the period of time the rule should be in effect; and

(5) the name, address, telephone number, and signature of the petitioner or the petitioner's authorized representative.

(B) Any change in the information provided pursuant to clause (5) of subparagraph (A) must be communicated promptly in writing to the Executive Director.

(C) All requests should be typewritten or submitted electronically, if possible, but handwritten petitions will be accepted, provided they are legible.

**(ii) Responses to petitions.** Within 60 days from the date the petition was received, the Board shall either deny such petition in a written statement containing the reasons for denial, or shall state in writing the Board's intention to grant the petition and to initiate rulemaking by a specified date. In proceeding with such rulemaking, the Board shall not be bound by the language proposed by petitioner, but may amend or modify such proposed language at the Board's discretion. The Board's decision to grant or deny a petition is final.

## § 1-04 Deadlines

### (a) Computation of days.

**(i) Counting calendar days.** Where a number of days is specified as a period from a certain day, the days will be counted as the number of calendar days except for the first day of the counting period.

**(ii) Where holiday falls within two-day counting period.** If the counting period is two days in duration, then Saturday, Sunday, or a legal holiday must be excluded if it falls on the first or last day of the counting period.

**(iii) Weekends and holidays.** If the deadline for submitting a Certification or for filing a disclosure statement, other than a daily pre-election disclosure statement, falls on a Saturday, Sunday or legal holiday, the next business day becomes the deadline.

### (b) Meeting Board deadlines.

**(i) Submission in person.** Submissions filed in person on weekdays between the hours of 9:00 a.m. and 5:00 p.m. at the offices of the Board, unless otherwise provided, are deemed submitted upon receipt, subject to review and acceptance.

**(ii) Submission by electronic means, non-electronic mail or common carrier.**

**(A) Electronic submissions.** A submission sent electronically shall be deemed filed when received by the Board, subject to review and acceptance.

**(B) Non-electronic submissions.**

**(1) With postmark.** A submission sent by non-electronic mail or common carrier shall be deemed to have been received, subject to review and acceptance, on the date it was postmarked or date stamped by the carrier.

**(2) Without postmark.** Submissions sent by non-electronic mail in an envelope without a postmark will be presumed to have been sent three days prior to receipt, subject to review and acceptance, unless evidence presented to the Board, such as a post office receipt with a date stamp indicating when the submission was sent, demonstrates otherwise.

**(iii) Board evaluation of submissions that arrive after the deadline.** Submissions of disclosure statement documentation that arrive after 5:00 p.m. on the date of the deadline, even if submitted on or before 11:59 p.m. on such date, may prevent the Board from making a timely determination regarding payment of public funds. The Board shall make such a determination at such time as is practicable.

**§ 1-05 Legibility of submissions.** The Board will not accept any electronic disclosure statement or other document, or any part thereof, that is infected with a virus, damaged, blank, improperly formatted, or otherwise unreadable or illegible.

**§ 1-06 Severability**

(a)  If any provision of these rules or portion thereof is adjudged invalid by a court of competent jurisdiction, such determination shall not affect or impair the validity of the remainder of these rules.

(b)  If the application of any provision of these rules or portion thereof to any individual, entity, or circumstances is adjudged invalid by a court of competent jurisdiction, such determination shall not affect or impair the application thereof to other individuals, entities, and circumstances.

## Chapter 2: Registration and Certification

**§ 2-01 Filer Registration.** A candidate must submit a Filer Registration, prior to filing disclosure statements, in the form and manner required by the Board, unless such candidate has previously submitted a Certification for the same election.

**(a) Not a statement of intent.** The submission of a Filer Registration shall not be construed as a statement of intent to run for any particular office or to join the Program.

**(b) Applicable requirements.** Because the requirements of the Act and these rules apply to financial transactions that take place before a candidate joins the Program, the Board advises candidates to begin compliance with all applicable requirements set forth in the Act and these rules prior to joining the Program.

**(c) Deadline.** A candidate must submit a complete Filer Registration no later than the day that the candidate files the first disclosure statement for an election.

**(d) Form.** The Filer Registration must contain any signatures and notarizations as may be required by the Board.

**(e) Contents.** The Filer Registration must include:

(i) the candidate's name, residential address information and telephone numbers, email address, and employment information;

(ii) the name and mailing address, and treasurer name, treasurer residential address information and telephone numbers, treasurer email address, and treasurer employment information, of every political committee authorized by the candidate that has not been

terminated, and, in the case of a participant or limited participant, an indication of which such committee is the principal committee;

(iii) the name, mailing address, email address, and telephone number of any person designated by the candidate to act as liaison with the Board for each committee filing disclosure statements;

(iv) identification of all bank accounts and other depository accounts, including merchant and payment processor accounts, into which receipts have been, or will be, deposited, and all bank accounts used for the purpose of repaying debt from a previous election; and

  (v) other information as required by the Board.

**(f) Small campaign registration**

(i) If neither the expected total cumulative receipts nor the expected total cumulative expenditures of a campaign, including expenditures made with the candidate's personal funds, exceeds an amount equal to the amount applicable to qualify for the exception provided in § 14-124(4) of the New York State Election Law, the candidate may, instead of submitting a Filer Registration, submit a small campaign registration form, which must contain such information as may be required by the Board. The small campaign registration form must also include an affirmation stating that neither the total cumulative receipts nor the total cumulative expenditures of the campaign, including expenditures made with the candidate's personal funds, will exceed the amount applicable to qualify for the exception provided in § 14-124(4) of the New York State Election Law, and that if such amount is exceeded, beginning on or before the deadline to file the next disclosure statement, the candidate will submit a Filer Registration and all subsequent required disclosure statements, which must include all prior financial activity beginning at the inception of the campaign.

(ii) A candidate who has filed a small campaign registration form pursuant to this section need not submit disclosure statements. If a candidate who has filed a small campaign registration form raises or spends an amount exceeding the amount necessary to qualify for the exception provided in § 14-124(4) of the New York State Election Law, the candidate must submit a Filer Registration and all subsequent required disclosure statements, beginning on or before the deadline to file the next disclosure statement. The first such statement filed must include all prior financial activity beginning at the inception of the campaign.

**§ 2-02 Certification.** To join the Program, a candidate must submit a Certification by the election year's deadline date as provided in § 3-703(1)(c) of the Code. A candidate may submit a Certification, in lieu of the Filer Registration, prior to filing disclosure statements.

**(a) Applicability.** The Certification applies to all covered elections that are held in the same calendar year or to a special election to fill a vacancy in an office covered by the Act. A candidate need only file one Certification for the primary and general election, and any related runoff election. Special elections and all other elections require a separate Certification.

**(b) Deadlines.** The deadline for filing a Certification shall be: (i) in the case of a primary or general election, the later of the tenth of June in the year of the covered election or the thirtieth day after a special election is held to fill a vacancy for the office sought by the candidate; or (ii) in the case of the declaration of an extraordinary circumstance, on or before the seventh day following the declaration by the Board of the extraordinary circumstance.

**(c) Rescission; Failure to timely certify.** A candidate may rescind such candidate's Certification by submitting a Certification rescission form on or before the ninth Monday preceding the primary election or prior to the receipt of public funds, whichever occurs first. A candidate who rescinds a Certification in a timely manner or who does not file a timely Certification shall be deemed to be a non-participant.

**(d) Form.** The Certification must contain any signatures and notarizations as may be required by the Board. A candidate who has already submitted a Filer Registration may submit a Certification in electronic format, except that if a new principal committee treasurer has been appointed since the Filer Registration was submitted, the Certification must be submitted in non-electronic format. A Certification submitted in a non-electronic format must contain an original notarized signature from both the candidate and the principal committee treasurer.

**(e) Contents**. The Certification must include all filer registration information required by section 2-01 and such other information as required by the Board, including all information necessary to receive payment by electronic funds transfer.  In the Certification, the candidate shall designate a principal committee.

**(f) Legal effect**. The candidate must comply fully with Program requirements in all elections for which the Certification is submitted, regardless of the office sought and regardless of whether the candidate: (1) meets all the requirements of law to have such candidate's name on the ballot in the election; (2) meets the Act's threshold for eligibility for public funds; (3) accepts public funds; or (4) is otherwise not eligible to receive public funds in the election.

**§ 2-03 Amendments to Filer Registration or Certification**. The candidate must notify the Board of any material change in the information required to be listed on the candidate's Filer Registration or Certification occurring prior to the covered election or within a period of five years following the covered election, including any new information, or any change to any required information, concerning any political committee, bank account, merchant or payment processor account, candidate or treasurer employment, address, telephone number, or email address, in such manner as may be provided by the Board. Such notification must be submitted no later than the next deadline for filing a disclosure statement, or, in the case of changes that occur after the deadline for the last disclosure statement required to be filed, no later than 30 days after the date of the change; provided, however, that if the candidate has extinguished all outstanding liabilities resulting from the applicable election, including payment of any penalties or repayment of public funds owed to the Board, the candidate need not notify the Board of any material change after the issuance of the candidate's final audit report.

**§ 2-04 Non-participants**. A non-participant is not eligible to receive public funds pursuant to § 3-705 of the Code and shall not be subject to the expenditure limitations provided in § 3-706 of

the Code. A non-participant is not subject to the contribution limitations set forth in §§ 3-703(1)(f) and (1-a) of the Code when such contributions are made from the non-participant's personal funds or personal property, including funds or property jointly held with the non-participant's spouse, domestic partner, or unemancipated children. **A non-participant is subject to the contribution and disclosure requirements provided in § 3-718 of the Code, and may be subject to penalties pursuant to §§ 3-710.5 and 3-711 of the Code for violations of the Act and of these rules.**

## § 2-05 Petition for extraordinary circumstances

(a) Pursuant to § 3-703(1)(c) of the Code, a Certification may be filed on or before the seventh day after the occurrence of an extraordinary circumstance in a covered election. A candidate in such election may file a petition setting forth facts alleged to constitute an extraordinary circumstance within seven days of the date on which the candidate reasonably believes that the extraordinary circumstance occurred. The Board, following review of the petition, or on its own initiative, may declare an extraordinary circumstance.

(b) An "extraordinary circumstance" includes: (i) the death of a candidate in an election, (ii) the resignation or removal of the person holding the office sought, and (iii) the submission to the Board of a written declaration, sworn to or affirmed by the holder of the office sought, terminating such officeholder's campaign for reelection (which may be submitted together with a petition under subdivision (a)).

**§ 2-06 Training**. A candidate or such candidate's representative must attend a training provided by the Board concerning compliance with the requirements of the Program and use of the disclosure software. Such training must be completed on or before the financial disclosure cut-off date of the 32-day pre-election primary disclosure statement. The individual attending the training may be the candidate, the candidate's campaign manager or treasurer, or another individual with significant managerial control over a campaign (not including campaign consultants). The training attendee must be listed on the candidate's Filer Registration or Certification.

## Chapter 3: Eligibility to Receive Public Funds

### § 3-01 Candidates must demonstrate eligibility

(a) No payments from the Fund shall be made to a candidate unless the Board has determined that such candidate has demonstrated that such candidate has met all eligibility requirements set forth in the Act and these rules, including the threshold for eligibility pursuant to § 3-703(2) of the Code.

**(b) Ballot status.** In order to be eligible to receive public funds, a candidate in a covered election must meet all of the requirements to appear on the ballot as provided in Article 6 of the New York State Election Law, and be opposed by at least one other candidate on the ballot, or, for the optional early public funds payment, certify that such candidate intends to meet all the requirements of law to have such candidate's name on the ballot for the primary or general election.

**(c) Preliminary determinations.** Throughout the audit process or as a result of an investigation, the Board may make a preliminary determination that a candidate is ineligible to receive public funds. In the event of a preliminary determination of ineligibility, the Board will send written notification to the candidate and the candidate may request reconsideration of such determination pursuant to section 7-09.

**(d) Basis for ineligibility determination**

**(i) Pre-election.** The Board may determine that a pre-election public funds payment shall not be paid to a candidate if:

(A) the candidate fails to submit a disclosure statement required by these rules;

(B) the candidate fails to provide to the Board, upon its request, documents or records required by Chapter 4 of these rules, or other information that verifies campaign activity; or

(C) there is reason to believe that the candidate has committed a violation of the Act or these rules not otherwise enumerated in paragraph (ii) of this subdivision.

**(ii) Pre-election or post-election.** The Board may determine that neither a pre-election nor a post-election public funds payment shall be paid to a candidate if:

(A) the candidate has failed to meet one of the eligibility criteria of the Act or these rules;

(B) the candidate is required to repay public funds previously received, as described in sections 9-01 and 9-02, or the candidate has failed to pay any outstanding claim of the Board for the payment of civil penalties or the repayment of public funds against such candidate or such candidate's authorized committee or an authorized committee of such candidate from a prior covered election, provided that the candidate has received written notice of the potential payment obligation and potential ineligibility determination in advance of the certification deadline for the current covered election and an opportunity to present reasons for such candidate's eligibility for public funds to the Board;

(C) previous public fund payments to the candidate for the election equal the maximum permitted by the Act;

(D) the candidate fails to demonstrate compliance with § 12-110 of the Code, as required pursuant to § 3-703(1)(m) of the Code and section 3-05;

(E) the candidate endorses or publicly supports such candidate's opponent for election pursuant to § 3-705(9) of the Code;

(F) the candidate loses in the primary election but remains on the ballot for the general election and fails to certify to the Board, as required by § 3-705(10) of the Code, that such candidate will actively campaign for office in the general election, provided that such certification must be complete on or before the 32-day pre-general election disclosure statement deadline; or the candidate certifies to the Board that such candidate will actively campaign for office in the general election but thereafter fails to engage in

campaign activity that shall include but not be limited to, raising and spending funds, and broadly soliciting votes;

(G) the candidate has exceeded the applicable expenditure limits provided in § 3-706 of the Code;

(H) the candidate has been found by the Board, in the course of Program participation, to have committed fraud or material misrepresentation or to be in breach of certification pursuant to section 3-01(e); or

(I) there is reason to believe that, in the course of Program participation, the candidate has engaged in conduct detrimental to the Program that is in violation of any other applicable law.

**(e) Breach of certification**

(i) The Board considers any of the following to be a fundamental breach of a candidate's certification:

(A) the submission to the Board of documentation or information that the candidate knew or should have known was false or fictitious in whole or in part, including a disclosure statement which the candidate knew or should have known includes substantial fraudulent matchable contribution claims;

(B) the misrepresentation of a material fact in any submission of such documentation or information to the Board;

(C) the falsifying or concealment of any such documentation or information;

(D) the use of public funds to make or reimburse substantial campaign expenditures that the candidate knew or should have known were fraudulent;

(E) coordination in alleged independent expenditures, whereby material or activity that directly or indirectly assists or benefits a candidate's nomination or election, which is purported to be paid by independent expenditures, was in fact authorized, requested, suggested, fostered, or cooperated in by the candidate; and

(F) the use of a political committee or other entity over which a candidate exercises authority to conceal from the Board expenditures that directly or indirectly assist or benefit the candidate's nomination or election.

(ii) In the event of a fundamental breach of a candidate's certification, the candidate will be deemed by the Board to be ineligible for public funds for the covered election and to have forfeited all public funds previously received for the elections covered by the Certification. Additionally, the candidate will be subject to such civil and criminal sanctions as are applicable under § 3-711 of the Code and other applicable law.

(iii) This section is not intended to be an enumeration of all circumstances that may constitute a fundamental breach of a candidate's certification, as may be determined by the Board.

**§ 3-02 Disqualification from ballot.** A candidate who has been disqualified from the ballot, or who is no longer opposed by a candidate who appears on the ballot, is not eligible to receive public funds.

**(a) Notice of appeal.** The candidate must notify the Board immediately, in writing, if the disqualified candidate is seeking to appeal or otherwise remedy a disqualification. This notice must indicate whether a judicial appeal is being taken as of right or by permission and the specific nature of any other judicial remedy sought.

**(b) Disqualification reversed.** The candidate must immediately inform the Board, in writing, if the disqualification of the candidate or the opponent is reversed by a court of competent jurisdiction.

**§ 3-03 Write-in candidates.** A candidate who is seeking nomination or election to a covered office as a write-in candidate must promptly notify the Board in writing.

**§ 3-04 Termination of candidacies**

(a) The Board may send a notice to a candidate that such candidate's candidacy has been deemed terminated if such candidate: (1) has not received public funds; (2) has not submitted a petition for payment after final disqualification from the ballot, pursuant to section 7-01(e)(ii); and (3) is not on the ballot for that election.

(b) If the terminated candidate is seeking nomination or election as a write-in candidate, or, in the case of a participant, intends to submit a petition for public funds pursuant to section 7-01(e)(ii), the candidate must notify the Board within five business days after receiving the notice of termination, in which case the Board may reverse the termination. A candidate whose termination has been reversed must continue to submit disclosure statements as required by these rules.

(c) A candidate may also request that the Board deem such candidate's candidacy terminated because such candidate has satisfied all three requirements of subdivision (a), or has satisfied requirements (1) and (2) of subdivision (a) and has ceased campaigning and has verified that fact in the form and manner required by the Board.

(d) Terminated candidates are required to abide by Program obligations, such as maintaining requisite records, submitting documentation or information in response to requests by the Board, and paying penalties for violations of the Act and these rules.

**§ 3-05 Proof of filing with the Conflicts of Interest Board (COIB); payment of penalties**

**(a) Requirements**. In order to be eligible to receive public funds, a candidate must comply with the requirements in § 12-110 of the Code, including payment of any penalties assessed by the conflicts of interest board. The Board may obtain confirmation of the candidate's compliance

from the conflicts of interest board. The failure of a candidate to demonstrate such compliance by the deadline established by the conflicts of interest board or by the reporting deadline immediately preceding the date on which the candidate seeks to receive a public funds payment, whichever is earlier, may result in a delay of any payment by the Board of public funds the candidate may otherwise be eligible to receive until the next scheduled payment date.

**(b) Due dates**. A candidate may submit proof of compliance with the Board and such proof shall be considered timely submitted if it is submitted to the Board on or prior to the last business day of July in the year of the covered election, except as provided by subdivision (a).

## Chapter 4: Records and Reporting

### § 4-01 Records to be kept

**(a) Generally**

(i) Candidates must keep records that enable the Board to verify the accuracy of disclosure statements, substantiate that expenditures were made in furtherance of the campaign, were qualified expenditures, or were permissible post-election expenditures, and confirm any matchable contributions claimed. Candidates must maintain and may be required to produce originals and copies of checks, bills, or other documentation to verify contributions, expenditures, or other transactions reported in their disclosure statements. Candidates must maintain clear and accurate records sufficient to show an audit trail that demonstrates compliance with the Act and these rules. The records must be made and maintained contemporaneously with the transactions recorded, and maintained and organized in a manner that facilitates expeditious review by the Board. Nothing in this chapter shall be construed to modify the requirements of § 14-118 of the New York State Election Law. The records maintained for each campaign finance transaction, whether maintained on paper or electronically, must be accurate and, if necessary, modified promptly to ensure continuing accuracy.

(ii) If at any time a candidate becomes aware that a record of an expenditure is missing or incomplete, the candidate may create a new record or modify an existing record, provided that the record so created or modified is clearly identified by the candidate as such, and provided that the candidate also creates a record, in the form of a signed, dated, and notarized statement by the candidate, treasurer, or other campaign representative having first-hand knowledge of the matter, explaining the reasons for and the circumstances of the creation or modification of the missing or incomplete record. If the missing or incomplete record is an invoice or contract from a vendor, the candidate must in the first instance attempt to get a duplicate or more complete record directly from such vendor. The Board reserves the right not to accept such non-contemporaneous record created or modified pursuant to this paragraph if it deems that the record is not sufficient to document the actual transaction.

**(b) Receipts**

**(i) Deposit slips.** Candidates must maintain copies of all deposit slips. The deposit slips must be grouped together with the monetary instruments representing the receipts deposited into the bank or other depository accounts held by the candidate for an election. Where the bank or depository does not provide itemized deposit slips, candidates must make a contemporaneous written record of each deposit. Such written record must indicate the date of the deposit, the amount of each item deposited, whether each item deposited was a check, a cashier's check, a money order, or cash, and the total amount deposited.

### (ii) Contribution and loan records

**(A) Generally.** For each contribution received, all candidates must maintain records demonstrating the source and details of the contribution as described herein. All records required to be maintained must be provided to the Board upon request.

**(1) Cash contributions.** For each contribution received from an individual contributor via cash, the record must be in the form of a contribution card.

**(2) Money order and cashier's check contributions.**

(I) For each contribution received via cashier's check or money order, the record must include a copy of the cashier's check or money order made out to the authorized committee.

(II) The candidate must also maintain a contribution card, if the contributor's name and residential address are not printed on the cashier's check or money order by the issuer.

**(3) Check contributions.**

(I) For each contribution received via check, the record must include a copy of the check made out to the authorized committee and signed by the contributor.

(II) For each contribution received from an individual contributor via check, the candidate must also maintain a contribution card, if the check used to make the contribution is not signed by the contributor.

**(4) Credit card contributions.**

(I) For each contribution received via credit card, including contributions received over the internet, the record must have been provided by the merchant or processor and must contain: the contributor's name, residential address, credit card account type, credit card account number, credit card expiration date, the amount of the contribution, and an indicator showing that the contribution was charged to the contributor's account and processed.

In the case of credit card contributions made over the internet, the contributor must actively agree online to an affirmation statement, as required by subparagraph (C)(1) of this paragraph, and the candidate must maintain a copy of all website content concerning the solicitation and processing of credit card contributions.

(II) The candidate must also maintain copies of the merchant account or payment processor agreement, all merchant account statements, credit card processing company statements and correspondence, transaction reports, or other records demonstrating that the credit card used to process the transaction is that of the individual contributor (including proof of approval by the credit card processor for each contribution and proof of real time address verification), the account's fee schedule, and the opening and closing dates of the account. Merchant account statements must be provided in such form as may be required by the Board.

**(5) Text message contributions.** For each contribution received via text message, the record must have been provided by the mobile fundraising vendor and must contain: the contributor's name, residential address, and phone number; the amount of the contribution; and the name, residential address, and phone number of the registered user of the specific mobile device used to initiate the contribution, to the extent that such information may be reasonably obtained under law. The candidate must also maintain the following records for each text message contribution received:

(I) copies of all relevant third-party vendor agreements between the candidate and mobile fundraising vendor, copies of records maintained by a mobile fundraising vendor listing contributors and amounts pledged and paid, receipts indicating fees paid by the candidate to a mobile fundraising vendor and fees deducted by such vendor, and similar records relating to the solicitation or receipt of text message contributions;

(II) copies of any content used by the candidate to solicit text message contributions; and

(III) copies of any templates or scripts used by a mobile fundraising vendor to communicate with a contributor in facilitating and processing a text message contribution.

**(6)  Segregated account documentation.**

(I) Segregated account contribution cards. For each contribution from an individual contributor that the candidate deposits into a segregated bank account pursuant to section 7-07(b), the record must be in the form of a contribution card.

(II) Segregated account bank statements, contribution cards, and checks. Candidates seeking to comply with the exception contained in section 7-07(b) must submit segregated account contribution cards and copies of segregated account bank statements and checks to the Board in the manner and to the extent provided by section 7-07 with each disclosure statement filing.

**(7) Intermediaries.** For each contribution accepted from an intermediary, including any contributions delivered to a fundraising agent, or solicited by an intermediary where such solicitation is known to the candidate, the candidate must maintain a separate record in the form of an intermediary statement. The intermediary statement must contain: the intermediary's name, residential address, employer and business address; the names of the contributors; and the amounts contributed. This record must be signed by the intermediary, or if the intermediary is unable to sign such intermediary's name, marked with an "X" by the intermediary and signed by a witness. Adjacent to the signature or mark, the intermediary must write the date on which such intermediary signed or marked the form.

**(B) Contribution cards**

(1) Contribution cards must contain the contributor's name and residential address, the amount of the contribution, the authorized committee's name, and the contributor's selection of an instrument code corresponding to the instrument used to make the contribution. Credit card contribution cards must also contain the credit card account type, account number, and expiration date.

(2) Contribution cards must be signed by the contributor or, if the contributor is unable to sign such contributor's name, marked with an "X" by the contributor and signed by a witness to the contribution. Adjacent to the signature or mark, the contributor must write the date on which such contributor signed or marked the contribution card.

(3) After a contribution card has been signed, it may not be corrected, modified, or altered by anyone other than the contributor.

(4) The Board shall provide a template of all contribution cards required to be maintained pursuant to this subparagraph.

(5) A contribution card that contains any additional information and signatures required by section 7-07(b) must also satisfy the requirements of that section.

**(C) Affirmation statements**

(1) Unless otherwise specified herein, above the line for the contributor's signature, contribution cards must state: "I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I

was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation."

(2) For text message contributions, the candidate must maintain records demonstrating that the contributor has certified via text message the following statement: "I certify I am the registered user of this phone and will pay the amount specified from my personal funds."

(3) Segregated account contribution cards must state, above the line for the contributor's signature: "I understand that this entire contribution will be used only (i) to pay expenses or debt from a previous election; (ii) by the candidate for an election other than the election for which this contribution is made; or (iii) to support candidates other than the candidate to whose campaign this contribution is made, political party committees, or political clubs. I further understand that this contribution will not be matched with public funds. I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate affiliation."

(4) Intermediary statements must state, above the line for the intermediary's signature: "I hereby affirm that I did not, nor, to my knowledge, did anyone else, reimburse any contributor in any manner for a contribution, and that none of the submitted contributions were made by the contributor as a loan. The making of false statements in this document, which will be submitted to the Campaign Finance Board, is punishable as a class E felony pursuant to § 175.35 of the Penal Law or a Class A misdemeanor pursuant to § 210.45 of the Penal Law."

**(D) Transfers.** Candidates must maintain all records specified by the Board regarding transfers. In the case of a transfer to an authorized committee from a committee not otherwise involved in the covered election, unless the transferring committee is another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, the candidate must maintain records demonstrating that the funds underlying the transfer derive from contributions intended for the committee receiving the transfer. Such records must include, for each contribution to be transferred, a record indicating the contributor's intent to designate the contribution for the covered election. The record must be obtained prior to receipt of the transfer and must be signed by the contributor, or, if the contributor is unable to sign such contributor's own name, marked with an "X" and signed by a witness. Adjacent to the signature or mark, the contributor must write the date of the contribution. Above the line for the contributor's signature, the record must state: "I understand that this contribution will be used by the candidate for an election other than that for which the contribution

was originally made. I further understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation."

**(E) In-kind contributions.** For each in-kind contribution, candidates must maintain a written record that provides the date the contribution was made, the name and residential address of the contributor, a detailed description of the goods or services provided, the fair market value of the contribution, and such further information and documentation necessary to show how the fair market value of the contribution was determined. The Board shall provide a specimen of such a record.

**(F) Loans.** For each loan received, including loans made by the candidate, candidates must maintain a loan agreement, documentation of each loan repayment, and, if applicable, documentation that shows that the loan has been forgiven. The loan agreement must be contemporaneous and in writing, must be signed and dated by both parties, and must provide all terms and conditions of the loan, including the amount and term of the loan and whether interest is being charged. The candidate must retain copies of loan and loan repayment checks and records of electronic transactions showing the source of the funds.

**(G) Business dealings with the city**. For each individual or entity making a contribution, loan, guarantee or other security for such loan in excess of the amounts set forth in § 3-703(1-a) of the Code, candidates must maintain all records specified by the Board concerning whether such individual or entity has business dealings with the city.

**(iii) Photocopies of checks and other monetary instruments.** Candidates must maintain a photocopy of each check or other monetary instrument, other than cash, representing a contribution or other monetary receipt. In order for a contribution in the form of a check signed by an authorized agent of the contributor to be matchable, candidates must maintain:

(A) a copy of the check upon which is printed the name of the actual contributor; and

(B) a document, signed by the contributor, which indicates:

(1) that the person signing the check is authorized to do so;

(2) the date and amount of the contribution; and

(3) the principal committee's name.

**(c) Disbursements**

**(i) By check or debit.** Candidates must make all disbursements by check or debit from the committee bank account, except for petty cash.

**(ii) Petty cash.** Candidates may maintain a petty cash fund of no more than $500 out of which they may make disbursements not in excess of $100 to any individual or entity per purchase or transaction. If a petty cash fund is maintained, the candidate must maintain a petty cash journal in C-SMART including the name of every individual or entity to whom any disbursement is made, as well as the date, amount, and purpose of the disbursement.

**(iii) Credit card purchases.** Candidates must maintain a monthly billing statement and customer receipt for each disbursement from a committee credit card showing the underlying purchases, including the vendor for each charge.

**(iv) Bills**

   (A) Candidates must maintain bills for disbursements for goods or services provided.

   (B) Documentation for goods or services must be contemporaneous and must provide the date the vendor was retained or the date the goods or services were provided, the vendor's name and address, the amount of the expenditures, and a detailed description of the goods and services provided. If the invoice supplied by the vendor does not meet these requirements, the vendor may provide an additional, more detailed document or replacement document with sufficient detail. If the vendor does not provide such a document, the candidate must create an additional record containing the necessary information, and such record must be signed by the candidate, treasurer, or other representative of the candidate. The newly created record must satisfy the requirements of section 4-01(a).

   (C) For wages, salaries, and consulting fees, candidates must maintain a contemporaneous record, signed by the employee or consultant and the candidate, and dated, providing the name and address of the employee or consultant, a detailed description of the services, the amount of the wages, salary or consulting fees, the date(s) on which the work was performed, the period for which the individual was retained, and, if applicable, a detailed breakdown of the number of hours worked. The Board shall provide specimens of records for employees and consultants, including timesheets for election day workers and consultant agreements.

   (D) Candidates must maintain written documentation showing that a bill has been forgiven or settled for a lesser amount.

**(v) Vendors.** In addition to obtaining and keeping contemporaneous documentation (such as bills) for all goods and services provided by vendors, including campaign consultants and attorneys, and employees, when a candidate retains or otherwise authorizes an individual or entity (including an employee) to provide goods or services to the campaign, and the candidate knows or has reason to believe that the goods or services to be provided directly or indirectly by this vendor will exceed $1,000 in value during the campaign, the candidate must:

   (A) keep a copy of the contemporaneously written contract with the vendor, which must, at a minimum, provide the name and address of the vendor, be signed and dated

by both parties, state the terms of the contract including the terms of payment and a detailed description of the goods or services to be provided, and must include, if the contract was at any time amended, a contemporaneously written amendment, signed and dated by both parties and describing in detail the changes to the terms and conditions of the contract, or

(B) if no contemporaneously written contract has been entered into, keep a contemporaneously written record that includes the date the vendor is retained or otherwise authorized by the candidate, the name and address of the vendor, and the terms of the agreement or understanding between the candidate and the vendor including the terms of payment and a detailed description of the goods or services the vendor is expected to provide. If the agreement or understanding was at any time amended, the candidate must create and maintain a contemporaneously written record describing in detail the changes to the terms and conditions of the agreement or understanding.

(C) In addition to the records to be kept pursuant to subparagraphs (A) or (B) above, the candidate must keep evidence sufficient to demonstrate that the work described in the contract was in fact performed and completed. Such evidence may include samples or copies of work product, emails, time records, phone records, and photographs or other documentary evidence. Where such evidence is nonexistent or unavailable, the candidate must maintain affidavits signed by the vendor and either the candidate, treasurer, or other campaign representative having first-hand knowledge, describing the goods or services provided and the reason(s) why documentary evidence is nonexistent or unavailable.

**(vi) Advance purchases and reimbursement of advances.** Candidates must maintain records of advances, which must include the name and address of each individual or entity that made an advance on behalf of the campaign, the amount so advanced, the date of the advance, the name and address of the payee to whom advanced funds were paid, the amount paid, the purpose of the payment, and the manner of payment, including check number, credit card name, or cash. The record of the advance must be signed by the individual making the advance purchase. A receipt, bill, or invoice from the vendor must be attached to the record.

**(vii) Subcontracted goods and services.** Candidates required to itemize the cost of subcontracted goods and services pursuant to section 4-05(c)(iv)(D) must obtain and maintain documentation from the vendor, consultant, or other individual or entity who or which subcontracts, containing all information required to be disclosed pursuant to that section.

**(viii) Political advertisements and literature.** Pursuant to § 14-106 of the New York State Election Law, candidates must maintain copies of all broadcast, cable, or satellite schedules and scripts; paid internet or digital, print, and other types of advertisements; pamphlets, circulars, flyers, brochures, letterheads and other printed matter purchased or produced; and

reproductions of statements or information published to 500 or more members of a general public audience by computer or other electronic device, including but not limited to electronic mail or text message.

**(ix) Travel.** Candidates must obtain and maintain copies of all checks, bills, or other documentation to verify campaign-related travel transactions reported in disclosure statements. In addition to the above, for all travel candidates must create and maintain a contemporaneous record describing the campaign-related purpose of the travel, the complete travel itinerary, the dates of the travel, and the names of all individuals who participated in the travel; provided, however, that such records shall not be required for travel by public transportation within New York City, with the exception of unlimited-use MetroCards, for which candidates must create and maintain a contemporaneous record containing the dates on which each such card was purchased and, if a card is assigned to a single individual, the name of each such individual. For travel by private car, candidates must create and maintain a contemporaneous travel log providing, for each trip and each vehicle, the names of the driver and passengers, the date(s) and purpose of each trip, the itinerary, including all the locations of any campaign events and other stops, the beginning and ending mileage, and the total mileage. Travel between two stops is considered an individual trip for logging purposes even if the stops are part of a multi-stop itinerary. For the purposes of reporting and reimbursing campaign expenditures, candidates must calculate expenditures for travel by private car based on mileage according to the provisions of Directive Six of the New York City Comptroller.

**(d) Bank records.** Candidates must maintain the following records received from or in connection with banks and other depositories relating to accounts, and must submit with each disclosure statement a copy of all such records not previously provided:

(i) all periodic bank or other depository statements in chronological order, maintained with any other related correspondence received with those statements, such as credit and debit memos, deposit slips, and contribution checks returned because of insufficient funds; and

(ii) the front and back of all returned and cancelled disbursement checks, including substitute checks which may be returned by the bank in lieu of cancelled checks.

**(e) Fundraisers.** Candidates must maintain records for all fundraising events, which must contain: the date and location of the event; the individual(s) or organization(s), other than the candidate's authorized committee, hosting the event; an itemized list of all expenses incurred in connection with the event, including all expenses whether or not paid or incurred by the authorized committee; and the contributor name and amount of each contribution received at or in connection with the event. This subdivision does not apply to activities at an individual's residential premises, including house parties, to the extent that the total costs of such activities do not exceed $500 and are not contributions pursuant to § 3-702(8)(ii) of the Code.

**(f) Campaign offices.** Candidates shall maintain a list identifying the address of each campaign office.

**§ 4-02 Record retention.** The candidate must retain all records and documents required to be kept under section 4-01 for five years after the last disclosure statement deadline set by the Board for the covered election, or until the Board has issued the candidate's final audit report and the candidate has extinguished all outstanding liabilities resulting from the applicable election including payment of any penalties or repayment of public funds owed to the Board, whichever is later.

**§ 4-03 Assistance to candidates.** In order to promote compliance with the requirements of the Act and these rules, the Board's staff shall offer assistance to candidates in developing campaign procedures for gathering campaign finance information and keeping records and shall, to the extent feasible, provide model recordkeeping forms and templates.

**§ 4-04 Failure to maintain or provide records**. A candidate's failure to keep or provide records or other information to the Board, upon its request or as required by these rules, may result in a determination that matchable contribution claims are invalid; a determination that the candidate must repay public funds to the Board; the withholding of all or a portion of a public funds payment; and the assessment of penalties.

**§ 4-05 Disclosure statements**

**(a) Form.** Disclosure statements must be generated by C-SMART, and such statements, as well as all supporting documentation, including bank statements, must be submitted using C-SMART. Daily pre-election disclosure statements must be submitted using C-SMART within 24 hours after a contribution, loan, or expenditure that meets the pre-election daily disclosure requirement has been accepted or made.

> **(i)     Deficient submissions**. A submission is deficient and may be rejected or deemed incomplete if: (1) it is not submitted in a format or manner authorized by the Board; (2) it is not submitted with the backup documentation substantiating each matchable contribution claimed within the particular statement, or said records are not accessible or legible; or (3) it is not submitted with all of the committee's bank statements from the applicable disclosure period. Any document that is illegible, improperly annotated, damaged, blank, improperly formatted, or otherwise unreadable by the Board, shall be deemed not to have been submitted.

> **(ii)    C-SMART upgrades.** The Board may issue upgrades or system improvements of C-SMART or its user instructions. To the extent reasonably practicable, the Board shall provide candidates with reasonable advance notice of such upgrades.

> **(iii)   Verification.** The candidate or treasurer must verify that the submission is true and complete to the best of such candidate's or treasurer's knowledge, information, or belief. The disclosure statement must contain such signatures as may be required by the Board.

> **(iv)    Exceptions.** Any candidate who seeks to submit disclosure statements, or a portion thereof, in any format or manner other than that permitted by this section, including but not limited to non-electronic formats and electronic formats not generated by C-SMART, must submit a written request for authorization to the Board no later than four weeks before the

filing date for the first disclosure statement for which the candidate desires an exception from such requirements, or in the case of a special election, as soon as possible but no later than seven days before such disclosure statement filing date. Such written request must be in a form and manner as prescribed by the Board. Candidates who demonstrate that submission of disclosure statements in an electronic format would pose a substantial hardship shall be permitted, upon request, to submit disclosure statements to the Board in non-electronic formats. Board authorization shall be in writing and shall apply only to the candidate, paper forms, and electronic submission form and manner specified therein. The authorization shall indicate whether it applies to one or more disclosure statements.

**(b) Timing of submissions**

**(i)** Disclosure statements must be received by the Board no later than 11:59 p.m. on the due date.

**(ii) Filing dates.** The Board shall publish a schedule of disclosure statement filing dates on its website on or before March 1 in the first year of each election cycle, or as soon as is practicable after the State Board of Elections has published its schedule.

(A) Semi-annual disclosure statements are due on January 15 and July 15 in each year of the election cycle and on January 15 in the year after the election.

(B) Pre-election disclosure statements are due 32 and 11 days before the election and, at the Board's discretion, on March 15 and May 15 in the year of the election.

(C) Post-election disclosure statements are due 10 days after a primary election and 27 days after a general or special election.

**(D) Weekends and holidays.** The Board's published schedule of disclosure statement filing dates shall reflect that if a disclosure statement is due to be submitted on a Saturday, Sunday, or legal holiday, submission must be made on the next business day.

**(iii) Reporting period.** The Board shall publish a schedule of the reporting periods for each disclosure statement.

**(A) First disclosure statement.** The reporting period for a candidate's first disclosure statement shall begin on the day the candidate first raises or spends funds in furtherance of the candidate's election for a covered office.

**(B) All subsequent disclosure statements.** The reporting period for each disclosure statement shall: (i) begin on the third day before the deadline for the submission of the candidate's preceding disclosure statement; and (ii) conclude on and include the fourth day before the deadline for the submission of that disclosure statement.

**(c) Content**

**(i) Summary information.** Each disclosure statement must include the following information about the committee involved in the election: (A) the cash balance at the beginning and end of the reporting period; (B) total itemized and unitemized contributions,

loans, and other receipts accepted during the reporting period; and (C) total itemized and unitemized expenditures made during the reporting period. A separate disclosure statement must be submitted for each committee involved in the election. All data reported in disclosure statements and amendments must be accurate as of the last day of the reporting period.

**(ii) Contributions**

**(A) Reporting requirements.** To fully report a contribution accepted during the reporting period, the candidate must report, for each contribution:

(1) the contributor's and intermediary's (if any) full name, residential address, occupation, employer, and business address;

(2) the date the contribution was received by the candidate;

(3) the amount of the contribution;

(4) the form of the contribution (cash, check, cashier's check, money order, credit card, text, or other);

(5) the number of the check, cashier's check, or money order, if applicable;

(6) the date and amount of each contribution returned to a contributor, the account from which the funds used to make the return originated, and the number of the bank or certified check used to issue the return of funds;

(7) each previously reported contribution for which the check was returned unpaid;

(8) whether the contribution was accepted for a runoff or rerun election in accordance with Chapter 16 and section 5-12;

(9) whether the contribution was accepted to be deposited into a segregated bank account in accordance with section 7-07(b); and

(10) such other information as the Board may require.

**(B) Matchable contribution claims**

**(1) Contemporaneous reporting.** Matchable contributions must be reported in the disclosure statement covering the reporting period in which they were received. The candidate's disclosure statement must state the amount of matchable contributions claimed in a reporting period, and must indicate which contributions are claimed for match.

**(2) Backup documentation.** For each matchable contribution claimed in the disclosure statement, candidates must submit a copy of the records required to be maintained pursuant to section 4-01(b).

**(C) Contributions totaling $99 or less from a single source.** Contributions totaling $99 or less from a single source need not be separately itemized in a disclosure statement, unless such contributor is an employee of the candidate or of the spouse, or domestic partner of such candidate or of a business entity in which such candidate, spouse, or domestic partner has an ownership interest of 10% or more or in which such candidate, spouse or domestic partner holds a management position, such as the position of officer, director, or trustee.

**(D) Must itemize all contributions from a single source that exceeds $99.** If a candidate has accepted contributions totaling more than $99 from a single source, all contributions comprising the total (including previously unitemized contributions) must be fully reported (i.e., itemized) in the same disclosure statement. All subsequent contributions from that single source must be fully reported as well.

**(E) Affiliated contributors.** Affiliated contributors considered to be a "single source" under sections 1-02 and 5-10(b) must be reported.

**(iii)  Other receipts.** To fully report other receipts accepted during the reporting period, the candidate must report, for each receipt:

(A)  the date of receipt;

(B)  the amount of the receipt;

(C)  the type of receipt; and

(D)  such other information as the Board may require.

**(iv) Expenditures**

**(A) Reporting requirements.** To fully report expenditures, including outstanding liabilities, made by the candidate during the reporting period, the disclosure statement must be itemized to include the following information:

(1) the name and address of each vendor or payee;

(2) the bill or invoice date and amount;

(3) the purpose code and explanation of each expenditure;

(4) the exempt code, if any; and

(5) such other information as the Board may require.

**(B)** In addition to the information required in subparagraph (A), candidates must provide the following information concerning each payment:

(1) the date and amount of each payment, including exempt amount, if any;

(2) the payment method, including check number and committee bank account; and

(3) the amount of remaining outstanding liability to the vendor or payee; and

(4) such other information as the Board may require.

**(C) Expenditures of less than $50.** Expenditures of less than $50 do not need to be separately itemized in a disclosure statement; however, public funds may not be used to pay for unitemized expenditures.

**(D) Subcontractors**

(1) In addition to reporting any expenditures to the vendor, if aggregate payments by the vendor to a subcontractor exceed $5,000, the candidate must report:

(I) the name and address of that subcontractor;

(II) the amount(s) expended to the subcontractor; and

(III) the purpose code(s) of the subcontracted goods or services.

(2) Disclosure must occur either beginning in the reporting period in which such cost first exceeds $5,000 or in the first post-election disclosure statement for the election to which the expenditure relates.

**(E) Credit card purchases.** For expenditures paid with a credit card, the candidate must report the vendor and purchase price of any goods or services purchased. Disbursements to credit card accounts must not be itemized as such.

**(F) Contributions to political committees.** Political contributions to political committees that support or oppose candidates in New York City (except political committees of other candidates), including state party committees, that are made by a candidate with such candidate's personal funds and that, in the aggregate for any single political committee, exceed the contribution limit applicable to the office of mayor for contributors having business dealings with the city pursuant to section 3-703(1-a) of the Code, are presumed to be expenditures in furtherance of the campaign's candidate and contributions from the candidate to the candidate's campaign, and, as such, must be reported to the Board. The candidate may rebut this presumption by providing evidence indicating that the contributions were not in furtherance of the campaign's candidate. Such contributions are subject to all applicable expenditure and contribution limits, except that contributions made to committees registered with the State Board of Elections or the Federal Election Commission as independent expenditure committees are not subject to such limits. Candidates must create and maintain records of such contributions. Contributions made with a candidate's personal funds as provided in this subparagraph shall not be the basis for a deduction from such candidate's public funds payment pursuant to section 7-07(a).

**(G) Expenditure refunds.** For expenditures of which all or a portion was refunded to the candidate by the vendor, the candidate must report the refund and provide an amended invoice or other documentation from the vendor specifying the amount, date, and reason for the refund, as well as proof of receipt of the refund in the form of a check, bank statement, or other financial documentation.

**(v) Intermediaries.** In addition to fully reporting contributions, candidates must fully report any intermediary that solicited or delivered a contribution as provided in paragraph (ii) of this subdivision.

**(A) Exceptions**

(1) The candidate need not report an intermediary for aggregate contributions of $500 or less collected from a contributor in connection with an event held at an individual's residence, unless the expenses related to such event exceed $500.

(2) The candidate need not report an intermediary for contributions collected at an event organized by a candidate to raise funds for such candidate and paid for in whole or in part by such candidate's authorized committee.

(3) The candidate need not report an intermediary who is a spouse, domestic partner, parent, child, or sibling of the candidate.

**(B) Contributions collected at a non-campaign sponsored fundraising event with multiple hosts.** In the case of contributions collected at a fundraising event neither organized by the candidate nor paid for in whole or in part by such candidate's authorized committee, where there are multiple hosts, the hosts must designate one host who must be reported by the candidate as the intermediary for all such contributions.

**(C) Contributions delivered by an intermediary's agent.** The candidate must report as the intermediary an individual who solicits contribution(s) and directs such individual's agent to deliver them to the candidate or fundraising agent. The candidate must not report the agent as an intermediary.

**(vi) Transfers**

(A) Transfers of funds shall consist entirely of contributions previously raised by the transferor committee and shall not include any public funds.

(B) Candidates must report contemporaneously: (1) the aggregate amount of each transfer and (2) each contribution the transfer consists of (using a last-in/first out attribution), including the name and residential address of the contributor and the amount and date of the contribution.

(C) In the case of a transfer to an authorized committee from a committee not otherwise involved in the covered election, unless the transferring committee is another

authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, participants must (1) report to the Board, in the same disclosure statement in which the transfer is reported, any expenditures incurred by the transferor committee in connection with raising or administering the transferred contributions, regardless of when the expenditures were incurred, and (2) upon request by the Board, disclose all expenditures made by the transferor committee during the covered election cycle for purposes other than raising or administering the transferred contributions. Further, candidates must submit contemporaneously the records required to be maintained pursuant to section 4-01(b)(ii)(D).

**(vii) Advances and reimbursements**

(A) For advance payments, the candidate must report in each disclosure statement:

(1) the name and address of each individual or entity, including the candidate, that has made purchases on behalf of the committee during the reporting period with the expectation of being reimbursed by the committee;

(2) the date and amount of each purchase;

(3) the name and address of the individual or entity from whom the purchase has been made;

(4) the payment method;

(5) the purpose code and explanation of the purchase; and

(6) such other information as the Board may require.

(B) For advance reimbursements, the candidate must report in each disclosure statement:

(1) the name of each individual or entity, including the candidate, whom the candidate reimbursed for purchases made on behalf of the committee during the reporting period;

(2) the date and amount of each reimbursement;

(3) the payment method of each reimbursement, provided that, if the reimbursement is done by check, the candidate must also report the bank account and check number from which the check was issued; and

(4) such other information as the Board may require.

**(viii) Loans.** Each disclosure statement shall include the following information about loans accepted, forgiven, or repaid by the candidate during the reporting period:

(A) for each loan accepted, the lender's, guarantor's or other obligor's full name, residential address, occupation, employer, and business address;

(B) the date and amount of each loan, guarantee, or other security for a loan accepted;

(C) for each loan repayment made, the date, amount, check number, name of bank account or credit card, and name of any third party payor; and

(D) the date and amount of any portion of a loan which has been forgiven.

**(ix) Documentation.** Together with each disclosure statement, the candidate must submit documentation to verify the accuracy of the data reported, including all bank records and deposit slips required to be maintained pursuant to sections 4-01(b)(i) and 4-01(d)(i) not previously submitted.

(d) Amendments to disclosure statements are prohibited unless expressly authorized or requested by the Board.

**§ 4-06 Daily disclosures during the two weeks preceding the election**. If a candidate, during the 14 days preceding an election, accepts aggregate contributions and/or loans from a single source in excess of $1,000 or makes aggregate expenditures to a single vendor in excess of $20,000, the candidate must report, in a disclosure to the Board, all contributions and loans accepted from such source or expenditures made to such vendor during that 14-day period. The first such disclosure must be received by the Board within 24 hours after the contribution or loan that causes the total to exceed $1,000 is accepted or the expenditure that causes the total to exceed $20,000 is made. Each subsequent disclosure must be received by the Board within 24 hours after any additional contribution or loan is accepted or expenditure is made. Information reported in these disclosures must also be included in the candidate's next post-election disclosure statement.

**§ 4-07 Terminated candidacy**. A candidate need not submit any disclosure statements for periods subsequent to the termination of such candidate's candidacy, as described in section 3-04, unless the termination is reversed pursuant to section 3-04(b).

**§ 4-08 Write-in candidates.** Any candidate who is seeking nomination or election as a write-in candidate must file all disclosure statements for the election as required by section 4-05(b).

**§ 4-09 Candidates not in primary or general elections**

**(a) Not in primary election.** A candidate need not submit the two pre-primary and the 10 day post-primary election disclosure statements if the candidate is not a candidate in a primary election unless the candidate is a participant claiming that expenditures are subject to a primary election spending limit, pursuant to section 6-01(h)(iii)(A) or 6-01(h)(iv). If the candidate is not a candidate in the primary, daily disclosures during the two weeks preceding the primary need not be submitted.

**(b) Not in general election.** A candidate need not submit the two pre-general election and 27 day post-general election disclosure statements or daily disclosures during the two weeks preceding the general election, if the candidate is not a candidate in the general election.

**§ 4-10 Other political committees.** The financial records of any committees of a candidate are subject to Board review for purposes of monitoring the candidate's compliance with the requirements of the Act and these rules and must be made available to the Board upon its request.

## Chapter 5: Contributions, Loans, and Other Receipts

**§ 5-01 Contribution limits**

(a) Candidates may not accept contributions from a single source in excess of the limits set forth in § 3-703(1)(f) of the Code.

**(b) Adjustment.** Pursuant to § 3-703(7) of the Code, not later than the first day of March in the year 2018, and every fourth year thereafter, the Board shall adjust the contribution limits. Such adjustment shall be made in accordance with changes in the consumer price index for the metropolitan New York-New Jersey region published by the United States Bureau of Labor Statistics. The adjustment shall be based on the difference between the average consumer price index over the 12 months preceding the calendar year of such adjustment, and either (a) the calendar year preceding the year of the last such adjustment or (b) such other calendar year as may be appropriate pursuant to any amendment to the Act.

**§ 5-02 Solicitation of contributions**

**(a) Fundraising solicitations.** Each written solicitation of contributions (including, but not limited to, letters, contribution cards, flyers, and other invitations to contribute or attend events) by or on behalf of a candidate, whether in paper or electronic format, must include the following statement, written in a conspicuous and clearly recognizable manner: "State law prohibits making a contribution in someone else's name, reimbursing someone for a contribution made in your name, being reimbursed for a contribution made in your name, or claiming to have made a contribution when a loan is made."  If the solicitation is written in a language other than English, the statement must be written in the same language as the solicitation.

**(b) Solicitation of contributions for elections not subject to the Act.** If a candidate makes a solicitation for a contribution for an election not subject to the requirements of the Act, the solicitation must specify that the contribution is being solicited for an election that is not subject to the requirements of the Act.

**§ 5-03 Prohibited contributions and loans**

**(a) Contributions and loans from corporations, limited liability companies, and partnerships, including professional corporations and limited liability partnerships**

(i) A candidate may not accept a contribution from a prohibited organization, *i.e.*, a corporation, limited liability company, or partnership, including professional corporations and limited liability partnerships.

(ii) A candidate may not accept a loan from a prohibited organization unless the loan is made in the regular course of the lender's business.

(iii) A candidate may not accept a guarantee or other security for a loan from a prohibited organization.

(iv) This prohibition does not apply to contributions by political committees.

**(b) Nominee contributions**. A candidate may not accept a contribution made in the name of an individual or entity for which the source of the funds is a different individual or entity.

**(c) Anonymous contributions**. A candidate may not accept a contribution from an unidentified source.

**(d) Contributions from foreign nationals.** A candidate may not accept a contribution from a person who is not a naturalized U.S. citizen or a holder of a green card.

**(e) Cash contributions in excess of $100.** A candidate may not accept cash receipts aggregating in excess of $100 from a single source.

**(f) Contributions in violation of state or federal law.** A candidate may not accept a contribution that was made, received, solicited, or otherwise obtained in violation of any local, state, or federal law.

**§ 5-04 Contributions subject to special requirements**

**(a) Contributions from political committees**

(i)  A candidate may accept a contribution from a political committee, provided that the political committee:

(A) was registered with the Board for the period that includes the candidate's next covered election at the time the contribution was received; or

(B) registers with the Board within 10 days of receipt of the contribution.

(ii) A political committee must register in such form and manner as shall be determined by the Board. Such registration shall include but is not limited to:

(A)  the name and address of the committee, and the name, address, and employer of the chairperson, treasurer, and liaison of the committee;

(B)  an indication whether the committee is a political action committee, a candidate committee (and if so, identification of the candidates supported by the committee), or another kind of political committee;

(C)  identification of the governmental agency or agencies with which the committee files disclosure statements;

(D)  an indication whether the committee makes monetary contributions, in-kind contributions, or independent expenditures, and the name, address, and employer of each individual or entity with the authority to determine the candidates for whom the committee makes contributions or independent expenditures; and

(E)  an indication whether the committee accepts contributions from corporations, limited liability companies, or partnerships, and an agreement not to use funds from such entities for contributions to candidates.

(iii) A list of registered political committees for each election cycle will be maintained on the Board's website. Candidates have the burden to check the list of registered political

committees published by the Board to ensure that each political committee contribution accepted is from a registered committee.

(iv) The registration shall remain in effect through the end of the election cycle, unless there has been a material change in the information included in the registration.

(v) Political committees that do not submit the information required by the Board, or any required signatures or notarizations, will not be considered to be registered.

**(vi) Earmarked contributions from political committees**

(A) A candidate may accept a contribution given to a political committee by a contributor who limited the committee's choice or directed the selection of the recipient, but the contribution shall be considered to be from both the original contributor and from the political committee.

(B) A contribution that a political committee has received solely because of its actions as an intermediary as defined in these rules is not an earmarked contribution.

(C) A nominee contribution is not an earmarked contribution.

**(b) Contributions from minors.** A candidate may accept a contribution from an individual under 18 years of age, provided that:

(i) the decision to contribute was made knowingly and voluntarily by the minor;

(ii) the funds, goods, or services contributed were owned and controlled exclusively by the minor, such as income earned by the minor, or a bank account opened and maintained exclusively in the minor's name; and

(iii) the contribution was not made from the proceeds of a gift, the purpose of which was to provide funds to be contributed.

**(c) Contributions from joint contributors**

(i) A candidate may accept a single contribution made jointly by two or more individuals or entities, provided that the contribution check or monetary instrument includes the signature and pre-printed information of each individual making the contribution or, in the case of an entity contribution, the signature of each authorized individual.

(ii) If a check or other monetary instrument representing a joint contribution, or a contribution card or other contemporaneous document related to the contribution, does not indicate the amount to be attributed to each contributor, the contribution shall be attributed equally to each contributor.

**(d) Post-election contributions.** Contributions accepted after an election may be used to pay liabilities incurred in that election, subject to the applicable contribution limit and prohibitions, only if deposited in and disbursed from an account established and maintained for that election, as provided in sections 5-11(a)(iii) and (iv).

**(e) Text message contributions.** A text message contribution is received on the date it is delivered to the candidate, after payment of the contributor's wireless bill, by a wireless carrier or other mobile fundraising vendor.

**§ 5-05 Non-matchable contributions.** The following are not matchable:

**(a) In-kind contributions and loans.** In-kind contributions and loans, regardless of whether such loans are considered contributions pursuant to § 3-702(8) of the Code.

**(b) Purchase price**. Contributions in the form of the purchase price paid for an item with significant intrinsic and enduring value, or paid for or otherwise induced by a chance to participate in a raffle, lottery, or a similar drawing for valuable prizes.

**(c) Certain contributions from vendors**. Contributions from individuals, other than employees of the candidate's principal committee, who are vendors to the committee or individuals who have an interest in a vendor to the committee, unless the expenditure to the vendor is reimbursement for an advance. For the purposes of this subdivision, "individuals who have an interest in a vendor" means individuals having an ownership interest of 10% or more in a vendor or control over the vendor. An individual shall be deemed to have control over the vendor firm if the individual holds a management position, such as the position of officer, director or trustee.

**(d) Doing business, lobbyist, and lobbyist-related contributions**. Contributions from individuals having business dealings with the city as defined in § 3-702(18) of the Code, and contributions from lobbyists as defined in § 3-211 of the Code, or persons required to be included in a statement of registration filed pursuant to §§ 3-213(c)(1) or 3-213(d) of the Code.

**(e) Contributions intermediated by a person doing business with the city**. Contributions for which any individual or entity listed in the doing business database at the time of the contribution acted as an intermediary.

**(f) Contributions from business accounts**. Contribution checks drawn on business accounts, or accounts that bear indicia of being business accounts, such as the contributor's professional title.

**(g) Prohibited or excess contributions**. Contributions from contributors subject to the prohibitions of §§ 3-703(1)(k) or (l) of the Code or that are otherwise prohibited by these rules, or that, in the aggregate for a given contributor, exceed the contribution limits applicable under the Act.

**(h) Returned contributions.** Contributions that are returned or refunded to, or not paid by, the contributor.

**(i) Unitemized contributions**. Contributions for which required information is missing from or illegible in a disclosure statement.

**(j)  Contributions with unreported occupation, employer, and business address**. Contributions for which the candidate has not reported the contributor's occupation, employer, and business address, where such contributions: (i) total more than $99; or (ii) total $99 or less, and the contributor is an employee of the candidate, of the spouse or domestic partner of such candidate, or of a business entity in which such candidate, spouse, or domestic partner has an ownership interest of 10% or more or in which such candidate, spouse, or domestic partner holds a management position, such as the position of officer, director, or trustee.

**(k)  Contributions from minors.** Contributions from individuals under 18 years of age.

**(l)  Contributions in violation of law.** Contributions that were made, received, solicited, or otherwise obtained in violation of any federal, state, or local law, including the Act and these rules.

**(m)  Contributions from entities.** Contributions received from entities other than individuals, including political committees.

**(n)  Contributions not from New York City residents**. Contributions from contributors whose residential addresses are not within New York City, or for whom other indicia exist that the contributor is not an individual New York City resident.

**(o)  Contributions made after the election year**. Contributions made later than December 31 of the year of the covered election in which the participant is a candidate.

**(p)  Contributions for other elections.** Contributions originally received for elections other than the election in which the participant is currently a candidate, as described in section 5-08.

**(q)  Claims exceeding the gross amount of the contribution**. Matchable contribution claims that exceed the gross amount of the contribution.

**(r)  Excess matching claims**. Matchable contribution claims that would yield more than the maximum public funds payment per contributor as provided in § 3-705(2)(a) of the Code.

**(s)  Contributions made with checks drawn by someone other than the contributor**. Checks drawn by an individual or entity other than the contributor, except for checks signed by a contributor's authorized agent, where the documentation required under sections 4-01(b)(ii)(A)(3) and 4-01(b)(iii) has been maintained and provided.

**(t)  Contributions to other committees**. Contributions made payable to, or originally received by, entities other than the principal committee, including committees not otherwise involved in the covered election;

**(u)  Contributions not timely and properly reported**. Contributions that were not timely reported and itemized in disclosure statements, or that were reported for the first time in an amendment to a disclosure statement.

60

**(v)** **Contributions claimed after the year of the election**. Contributions not claimed as matchable on or before January 15 in the year after the year of the election.

**(w)** **Contributions not properly documented**. Contributions for which a record required under Chapter 4 was not kept or provided upon request, for which complete supporting documentation required by section 4-05(c)(ii)(B)(2) has not been submitted, or for which the information on such documentation is not consistent with the information reported in the disclosure statement.

**(x)** **Contributions made with consecutively numbered cashier's checks or money orders.** Contributions purportedly from different contributors that were made by cashier's checks or money orders bearing consecutive serial numbers, or other indicia that they were purchased simultaneously.

**(y)** **Cash, money order, or cashier's check contributions exceeding $100.** Cash, money order, or cashier's check contributions from any one contributor that are greater than $100 in the aggregate.

**(z)** **Contributions for a runoff election**. Contributions solicited for, or required to be deposited into an account established for, a runoff election, as provided in section 16-06.

**(aa)** **Withdrawn matching claims**. Contributions for which a matching claim was previously withdrawn by the candidate.

**(bb)** **Non-matchable contributions**. Contributions that are otherwise not matchable contributions within the meaning of the Act.

**(cc)** **Additional factors**. In addition, the Board shall consider the following factors in determining whether matchable contribution claims are invalid and in projecting a rate of invalid matchable contribution claims:

(i)   any information that suggests that a contribution has not been processed or reported in accordance with Program requirements;
(ii)   any other information that suggests that matchable contribution claims may be invalid; and
(iii)   arithmetical errors in totals reported.

## § 5-06 In-kind contributions

**(a) An in-kind contribution is an expenditure.** An in-kind contribution to a candidate's authorized committee is also considered an expenditure made by such committee, and the amount of the in-kind contribution thus counts toward the candidate's contribution and expenditure limits. An in-kind contribution is received on the date the goods or services are received or rendered, which is presumed to be the date of the associated expenditure, unless the candidate provides evidence to demonstrate that the contribution should be deemed received on a different date.

**(b) The value of an in-kind contribution**

(i) Candidates must maintain invoices or other written records supporting the valuation of all in-kind contributions.

(ii) If no invoice is available and obtaining an invoice is not practicable, a candidate must use a reasonable estimate of value in documenting the fair market value of an in-kind contribution.

(A) The fair market value of goods is the price of those goods in the market from which they ordinarily would have been purchased when the goods were received.

(B) The fair market value of services is the hourly or piecework charge for the services at a commercially reasonable rate prevailing when the services were rendered.

**(c) Good or service purchased below fair market value.** Where goods or services are purchased by a candidate for less than fair market value, the difference between the fair market value when they were received, including any applicable tax, and the amount charged to the candidate is an in-kind contribution.

**(d) Extension of credit that is not commercially reasonable is an in-kind contribution**

**(i) Generally.** A creditor that extends credit to a candidate for a period beyond 90 days has made a contribution equal in value to the credit extended, unless the creditor is making a commercially reasonable attempt to collect the debt.

**(ii) Prohibited in-kind contribution.** Extension of credit by a corporation, limited liability company, or partnership that is not commercially reasonable and is not made in the regular course of business is presumed to be a prohibited in-kind contribution.

**(e) Debt forgiven is an in-kind contribution**

**(i) Generally.** A debt owed by a candidate, which is forgiven or settled for less than the amount owed, is an in-kind contribution, unless the debt was forgiven or settled by the creditor in a commercially reasonable manner.

**(ii) Commercially reasonable treatment of debts.** The Board will consider as evidence of commercially reasonable treatment that: (A) all commercially reasonable efforts have been taken to satisfy the outstanding debt; and (B) the creditor has pursued its remedies in the same manner as that customarily employed by creditors of other debtors.

**(iii) Advances.** An advance is considered to be an in-kind contribution from the individual or entity making the advance until it has been reimbursed by the candidate, and a candidate may not accept an advance from a prohibited source.

**(f) Failing to report a liability leads to a presumption of an in-kind contribution.** An outstanding liability not contemporaneously reported as outstanding by a candidate may be presumed to be an in-kind contribution to the candidate, if other indicia of a contribution exist.

**§ 5-07 Refunding prohibited and over-the-limit contributions**

**(a) Generally.** When a candidate knows or has reason to know that such candidate has accepted a contribution or aggregate contributions from a single source in excess of the applicable contribution limit, including a contribution or contributions from a contributor having business dealings with the city, or from a source prohibited by the Act or the Charter or by state or federal law, the candidate must promptly refund the excess portion or prohibited contribution by bank or certified check made out to the contributor or to the Fund; provided, however, that when a candidate knows or has reason to know that such candidate has accepted a nominee or anonymous contribution, the candidate must promptly disgorge the amount of such contribution by bank or certified check made out to the comptroller of the state of New York for deposit in the general treasury of the state.

**(b) Contribution refunds must be timely.**

    (i) When a candidate knows or has reason to know that such candidate has accepted a prohibited or over-the-limit contribution, the candidate must return or refund the contribution, or the over-the-limit portion thereof, on or before the next disclosure statement filing deadline or the deadline set by the Board.

    (ii) When a candidate is notified by the Board that such candidate has accepted a prohibited or over-the-limit contribution, the candidate must return the contribution by the date specified in the notice sent by the Board.

**(c) Contribution refunds must be documented and reported.** If a candidate issues a refund for a contribution after it has been deposited in the committee's account, the contribution and corresponding refund must be documented and reported to the Board.

**(d)  Restrictions on return.** After receiving public funds for an election, a candidate may not return a contribution, unless directed by the Board to do so, until any required repayments to the Fund have been made, except if the contribution: (i) exceeds the contribution limit, including the limit applicable to contributors having business dealings with the city, (ii) is otherwise illegal, (iii) is returned because of the candidate's reputational interest in light of the particular source or intermediary involved, or (iv) was deposited in a separate account pursuant to section 16-06 for a runoff election that is not held.

**(e) Where refund is impracticable.** If a timely refund of a contribution to the contributor is impracticable, the candidate may pay the Fund an amount equal to the amount of the refund.

**(f) Over-the-limit contributions from contributors doing business with the city**

    (i) When a candidate reports an over-the-limit contribution from a contributor having business dealings with the city:

        (A) The Board will provide such notification to the candidate within 20 days of the reporting of the contribution; provided, however, that if such twentieth day is a Saturday, Sunday, or legal holiday, notification by the Board on the next business day shall be considered timely. In the case of a contribution reported during the six weeks preceding the candidate's next covered election, the Board shall provide such notification within three business days.

        (B) The candidate must:

(1) refund the excess portion of the contribution within 20 days of the date of the notice; or

(2) demonstrate to the Board, within 20 days of notification, that the contributor identified by the Board as having business dealings with the city has applied to the Mayor's Office of Contract Services for removal from the doing business database and that such application is pending.

(C) For purposes of calculating compliance with the limits applicable to contributors having business dealings with the city, contributions accepted from a contributor who appears on the doing business database shall be aggregated with all other contributions accepted from such contributor during the same election cycle; provided, however, that contributions accepted while the contributor did not appear on such database shall not be required to be refunded pursuant to this section.

(ii) Where a contributor has made an application for removal from the doing business database, the candidate may retain any contribution received from the contributor until the Board notifies the candidate that the Mayor's Office of Contract Services has denied the application for removal, in which case the candidate shall have 20 days from the date of such second notice to refund the excess portion of the contribution.

(iii) Contributions from or intermediated by individuals who have applied for removal from the doing business database shall not be considered matchable unless and until the contributor or intermediary is removed from the doing business database.

## § 5-08 Contributions originally received for other elections

### (a) Transfers

**(i) Generally.** Notwithstanding section 5-11(a), participants may transfer funds previously received for another election to the principal committee. Additionally, participants may transfer funds from the principal committee to another authorized committee, after all excess funds have been returned to the Board as provided by sections 5-11(c)(ii) and 9-02(c).

**(ii) Segregated accounts.** Notwithstanding paragraph (i) of this subdivision, if a candidate has funds remaining in a segregated account after the election for which the account was established, such funds must be refunded to the contributors or paid to the Fund, or used to pay outstanding liabilities related to such election. Such funds may not be transferred into any other account or used for any future election.

**(b) Surplus funds.** The cash balance reported in a non-participant's first semi-annual Board disclosure statement at the beginning of the first reporting period for an election is the total amount of surplus funds the committee had from a previous election; except that the amount deemed to be surplus funds may be reduced by the following:

(i) the total amount of debts and obligations outstanding at the beginning of the reporting period;

(ii) the total amount subsequently transferred to a political committee that is not involved in a covered election; and

(iii) if the candidate was a participant in the previous election, the total amount of public funds subsequently repaid.

**(c) Additional requirements for transfers and surplus funds**

(i) Candidates have the burden of demonstrating that surplus funds and transfers of funds from committees not otherwise involved in the covered election do not derive from:

(A) contributions in excess of the Act's contribution limits, including contributions that would exceed the Act's contribution limits when aggregated with other contributions accepted from the same source; or

(B) contributions from sources prohibited by the Act, the Charter, or state or federal law.

(ii) Participants have the burden of demonstrating that funds transferred from a committee, other than another authorized committee of the same candidate that has filed contemporaneous disclosure statements with the Board in a timely manner, derive solely from contributions for which records demonstrating the contributors' intent to designate the contributions for the covered election have been submitted and maintained as required pursuant to sections 4-05(c)(vi) and 4-01(b)(ii)(D), respectively.

(iii) For purposes of enforcing the contribution limit and contribution prohibitions, the Board shall attribute surplus funds and such transfers to the last monetary contributions, loans, and other receipts received by:

(A) the candidate on or before the date of the cash balance described in subdivision (b), in the case of surplus funds; or

(B) the transferor committee before making the transfer.

(iv) For any prohibited or over-the-limit contribution, the candidate must either:

(A) promptly refund the excess portion or amount of the prohibited contribution, or

(B) keep the excess portion or amount of the prohibited contribution in the transferor committee bank account, not to be used in a covered election.

**(d)  Related expenditures.** Expenditures incurred in connection with raising or administering funds transferred from a committee not otherwise involved in a covered election, other than from another principal committee of the same candidate, are presumed to be subject to the expenditure limits of the Act. Participants have the burden of demonstrating that any such expenditures are not subject to the expenditure limits of the Act, as provided in section 6-01(j).

**§ 5-09 Loans**

**(a) Deposit.** All loans must be accepted and deposited, or rejected and returned, within 10 business days after receipt.

(b) Loans over $100 may not be made by cash or credit card.

**(c) Loans forgiven.** Any portion of a loan that is forgiven is a monetary contribution from the source of the loan, subject to the contribution limits and prohibitions.

**(d) Third party repayment of loan.** If any portion of a loan is repaid by an individual or entity other than the committee that received the loan, the portion thus repaid is a contribution by that individual or entity.

**(e) Repayment by next election.** If a loan is not repaid by the date of the next election in which the candidate appears on the ballot, the loan, guarantee, or other security for the loan will be considered a contribution subject to the Act's contribution limits and prohibitions.

**(f) Loans made in regular course of business.** A loan made in the regular course of the lender's business shall be deemed, to the extent not repaid by the date of the next election in which the candidate appears on the ballot, a contribution by the lender and by any other individual or entity endorsing, cosigning, guaranteeing, collateralizing, or otherwise providing security for the loan.

**(g) Loans not made in regular course of business.** A loan not made in the regular course of the lender's business shall be deemed, to the extent not repaid by the date of the next election in which the candidate appears on the ballot, a contribution by the lender.

**(h) Attributing a loan to an election.** A loan is presumed to be accepted for the next election in which the candidate seeks nomination or election following the day that the loan is received, except as otherwise provided in section 5-09(i), and except that:

> (i) in the case of a state or local election, loans received before the first January 12 after an election will be presumed to be accepted for that election; and

> (ii) in the case of a federal election, loans received before the first January 1 after the election will be presumed to be accepted for that election, except as may otherwise be provided under federal law and regulations.

**(i) Post-election loans**

> (i) Loans received after an election are considered contributions attributed to the previous election, and may be used for such election as provided in this section.

> (ii) Loans received after an election must be deposited in the committee bank account for that election.

> (iii) A loan to a candidate's principal committee made from such candidate's personal funds, after a final determination of the Board has been issued with respect to such committee, for the purpose of paying penalties or making required repayments to the Fund pursuant to such determination, is not subject to the contribution limit, even if such loan is subsequently forgiven by such candidate.

**§ 5-10 Attributing contributions**

**(a) Attributing a contribution to an election.** A contribution is presumed to be accepted for the first covered election in which the candidate seeks nomination or election following the day that the contribution is received, unless the contribution was properly transferred to the committee from another committee of the candidate for a different election, and except that:

> (i) in the case of a state or local election, contributions received before the first January 12 after the election will be presumed to be accepted for that election; and

(ii) in the case of a federal election, contributions received before the first January 1 after the election will be presumed to be accepted for that election, except as may otherwise be provided under federal law and regulations.

**(b) Attributing multiple contributions to a single source and contribution limit**

    (i) Multiple contributions from a single source will be totaled to determine the candidate's compliance with the applicable contribution limits.

**(ii) General factors for determining a "single source."** Factors for determining whether an individual, individuals in combination, entity, or entities in combination establish, maintain, or control another entity include, but are not limited to:

    (A) whether the persons or entities make decisions or establish policy for the other entity, including determinations of the recipients of its contributions and the purposes of its expenditures;

    (B) whether the persons or entities have the authority to hire, appoint, discipline, discharge, demote, remove, or otherwise influence other persons who make decisions or establish policies for the other entity;

    (C) whether contributions made by the persons or entities and the other entity reflect a similar pattern; and

    (D) whether the persons or entities know of and have acquiesced in public representations by the other entity that it is acting on their behalf or under their direction.

**(iii) Attributing single source contributions from labor organizations.** Notwithstanding paragraph (i), different labor organizations shall not be considered to be a single source for the purpose of compliance with the applicable contribution limit if the candidate demonstrates that the contributors satisfy the four criteria below:

    (A) the labor organizations do not share a majority of members of their governing boards;

    (B) the labor organizations do not share a majority of the officers of their governing boards;

    (C) the labor organizations maintain separate accounts with different signatories; and

    (D) the labor organizations make contributions from separate accounts.

**(iv) Attributing single source "doing business" contributions.** If a candidate accepts multiple contributions from a single source consisting of at least one contribution from an individual having business dealings with the city and one or more contributions from an entity established, maintained, or controlled by that individual, the limit applicable to persons having business dealings with the city shall apply.

**(v) Burden is on the candidate.** If multiple contributions appear to be from a single source in excess of the contribution limit, the candidate has the burden of demonstrating that they

are from different sources. Candidates must review the relationship between contributors who appear to constitute a single source before accepting and depositing contributions.

**(c) Attributing contribution amount for fundraiser ticket or fundraising item**

**(i) Fundraiser ticket.** When attendees purchase entrance to a fundraiser, the entire amount paid to attend a fundraising event is a contribution.

**(ii) Fundraising item.** When an individual buys an item sold by a candidate to raise funds, the entire amount paid as the purchase price for such item is a contribution.

**§ 5-11 Use of receipts**

**(a) Bank accounts**

(i) Candidates must maintain a committee account with check writing privileges. Checks issued from such account must be signed by the candidate or an individual so authorized by the candidate.

(ii) Candidates must maintain a bank account in the name of the principal or authorized committee. Such bank account:

(A) must be used for the deposit of receipts, including public funds, and the making of expenditures, for the covered election;

(B) must be used exclusively for the purpose of furthering the candidate's nomination or election in the covered election, and for post-election expenditures as provided in subdivision (c) of this section; and

(C) must not contain personal, business, or other non-campaign funds.

(iii) Receipts accepted by a participant for one election may not be commingled in an account with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds. Notwithstanding the foregoing, participants:

(A) may use one account for both the primary and general election in the same calendar year;

(B) may open a segregated account pursuant to section 7-07(b);

(C) must use a court-ordered rerun account for public funds received for a court-ordered rerun election; and

(D) must use a merchant account for the purpose of accepting credit card contributions pursuant to section 4-01(b)(ii)(A)(4)(II).

**(iv) Separate accounts for different elections.** A candidate seeking election both to an office subject to the Act and to a state or federal office may maintain a separate allocation account for shared expenses in accordance with Advisory Opinion No. 1996-2 (July 18, 1996).

**(v) Deposit of receipts.** All monetary contributions must be accepted and deposited into the account(s) listed on the candidate's Filer Registration or Certification and in disclosure statements filed with the Board, or rejected and returned to a contributor, within 20 business days after receipt, except contributions made in the form of cash must be accepted and deposited, or rejected and returned to a contributor, within 10 business days after receipt. All monetary receipts accepted for an election must be deposited into the candidate's authorized committee bank account.  A monetary receipt is received on the date it is delivered to the candidate.

**(b) Receipts may be used only to further a candidate's nomination or election**. A candidate may use receipts only for the covered election for which that account was established or an associated runoff election.

**(i) Expenditures not in furtherance of the campaign.** In determining whether or not an expenditure is in furtherance of a candidate's nomination or election, the Board may consider the factors from the following non-exhaustive list:

(A) the timing of the expenditure;

(B) whether the candidate has already purchased duplicative services or equipment;

(C) the nature of the goods or services purchased;

(D) whether an unusually high proportion of funds was spent on a specific category of expenditure;

(E) whether a high total dollar amount or proportion of payments was made to individuals rather than to entities;

(F) whether the candidate has demonstrated a pattern of making other expenditures not in furtherance of the campaign or impermissible post-election expenditures; and

(G) whether an expenditure made less than one month prior to the election, or after the election, is accompanied by the reporting of a corresponding outstanding liability.

**(c) Post-election use of receipts**

(i) After the last day of the final reporting period of a covered election, a candidate in that election may not expend, transfer, or use receipts accepted for another election, unless the receipts have been deposited in and are disbursed from a separate account, as provided in sections 5-11(a)(iii) and (iv). Funds accepted and separately deposited for the previous election may be transferred to this account only after any required repayments to the Fund have been made and any fines or civil penalties assessed pursuant to the Act have been paid. Contributions and loans accepted for the previous election after such election are subject to sections 5-04(d) and 5-09(i).

(ii) A participant may not use receipts for any purpose other than disbursements in the preceding election until all unspent campaign funds have been repaid, except as otherwise provided in subparagraph (i) of this paragraph and section 5-07(d). Notwithstanding the

presumption of section 6-01(h)(i), a participant has the burden of demonstrating that a post-election expenditure is for the preceding election.

**§ 5-12 Court ordered rerun elections**

**(a) No contributions may be accepted until court contest has begun.** A candidate may not accept contributions for a court-ordered rerun election until a complaint has been filed in a court of competent jurisdiction concerning the canvass of returns or the conduct of the election.

**(b) Where rerun election is canceled, contributions must be reasonably related to expenditures.** If a rerun election is ordered by a court but subsequently canceled, a candidate who would have been on the ballot has the burden of demonstrating that any portion of contributions raised may be reasonably attributed to expenses incurred for the rerun election before its cancellation.

## Chapter 6: Expenditures

**§ 6-01 Expenditure limits**

(a) Participants may not exceed the applicable expenditure limits provided in § 3-706 of the Code.

**(b) Adjustment.** Pursuant to § 3-706(1) of the Code, not later than the first day of March in the year 2010, and every fourth year thereafter, the Board shall adjust the expenditure limits. Such adjustment shall be made in accordance with changes in the consumer price index for the metropolitan New York-New Jersey region published by the United States Bureau of Labor Statistics. The adjustment shall be based on the difference between the average consumer price index over the 12 months preceding the calendar year of such adjustment, and either (a) the calendar year preceding the year of the last such adjustment or (b) such other calendar year as may be appropriate pursuant to any amendment to the Act.

(c) Participants have the burden of monitoring their expenditures to be sure that they do not exceed the limit.

**(d) Applicability.** All expenditures made by a participant to further the participant's nomination or election, including expenditures made for the purpose of furthering or facilitating the defeat of the nomination or election of an opponent or prospective opponent, are subject to the expenditure limit applicable under the Act. All expenditures made by the participant shall be totaled to determine the participant's compliance with the applicable expenditure limit. Expenditures incurred after the last election in an election year in which the participant is a candidate, or a special election, are not subject to the expenditure limits for that election.

**(e) Expenditures made during the three calendar years preceding the election.** Expenditures made by a participant during the three calendar years preceding the year of a covered election are subject to the applicable expenditure limit set forth in § 3-706(2) of the Code. A participant is permitted to make expenditure in excess of this limit. However, pursuant to § 3-706(2a)(a), the

amount by which the limits of § 3-706(2) are exceeded will be counted against the participant's first election year expenditure limit under § 3-706(1).

**(f) Expenditures made during the year of the election.** Expenditures made on or after the first day of January in the year of a covered election, and expenditures attributed to the year of the election pursuant to paragraph (v) of subdivision (h) of this section, are subject to the applicable expenditure limit set forth in § 3-706(1) of the Code.

**(g) Expenditures for or against a ballot proposal.** Expenditures made by a participant's principal committee for the purpose of advocating a vote for or against a proposal on the ballot in an election that is also a covered election, regardless of whether the expenditures were also made to further or facilitate the participant's nomination or election, shall be subject to the contribution and expenditure limits applicable to such covered election.

**(h) Attributing an expenditure**

(i) An expenditure is presumed to be made for the first covered election in which the participant or non-participant is a candidate following the day it is made, except:

(A) expenditures made before the first January 12 after a state or local election will be presumed to be made for that election; and

(B) expenditures made before the first January 1 after a federal election will be presumed to be made for that election, except as may otherwise be provided under federal law and regulations.

**(ii) No contested primary.** If there is no contested primary election in any party for an office, expenditures made by a candidate seeking that office will be entirely attributed to the general election.

**(iii) Contested primary or write-in primary**

(A) If there is a contested or write-in primary election in any party for an office, every participant or limited participant seeking that office, regardless of whether the participant or limited participant is in the primary election, may make expenditures subject to the primary election expenditure limit of § 3-706(1) of the Code, provided the participant or limited participant files the two pre-primary and 10 day post-primary election disclosure statements and daily disclosures pursuant to sections 4-05(b)(ii)(B), (C), and 4-06 in a timely manner. In this case, the general election expenditure limit will first apply after the date of the primary election.

(B) Expenditures incurred after the date of the contested or write-in primary election will be attributed to the general election.

(C) Expenditures incurred before the primary election by a candidate in a contested primary election are attributed to the primary election, regardless of whether the candidate also received the nomination of another party without a primary election.

**(iv) Reasonably anticipated primary.** Expenditures may be attributed to a primary election that the Board has determined is reasonably anticipated.

(A) If a participant demonstrates to the Board that for a period preceding the primary election the participant had reasonably anticipated a primary election in any party for the office the participant seeks, the participant may attribute expenditures made before and during that period to the primary election expenditure limit of § 3-706(1) of the Code, provided the participant files the two pre-primary and 10 day post-primary election disclosure statements and daily disclosures pursuant to sections 4-05(b)(ii)(B), (C), and 4-06 in a timely manner. In this case, the general election expenditure limit will first apply after that period.

(B) In order to demonstrate to the Board that for a period preceding the primary election the participant had reasonably anticipated a primary election, the participant must file a petition, consisting of an affidavit with supporting documentation, with the Board no later than 10 business days following the date the last remaining candidate other than the participant was finally disqualified from the ballot as set forth in section 7-01(e)(i).

(1) The affidavit must:

(I) be sworn to or affirmed by the candidate;

(II) specify the period of time during which it was reasonable to anticipate that a primary election would be held;

(III) identify the prospective candidate(s); and

(IV) provide a factual basis for the participant's belief that a primary election was reasonably anticipated during the specified period of time.

(2) The supporting documentation must demonstrate that the prospective candidate(s) engaged in activities that would lead a reasonable person to believe that such candidate(s) would participate in the primary election. Such activities may include:

(I) authorizing a political committee with the Board of Elections for the primary election;

(II) filing a Filer Registration or Certification with the Board;

(III) engaging in petitioning activity, including the filing of petitions with the Board of Elections;

(IV) producing and/or distributing campaign communications related to the primary election;  and

(V) campaigning for office or otherwise publicly declaring an intent to participate in the primary election.

(C)  Once it is determined that no primary election will be held for nomination to an office, or that such primary election is no longer reasonably anticipated, subsequent expenditures will be subject to the general election expenditure limit.

**(v) Timing of expenditures**. As provided and described in §§ 3-706 (1) and (2) of the Code, an expenditure for goods or services is made when the goods or services are received, used, or rendered, regardless when payment is made. Expenditures for goods or services received, used, or rendered in more than one year, including campaign websites, shall be attributed in a reasonable manner to the expenditure limits of § 3-706(1) or (2) of the Code, as appropriate.

(A) Expenditures for campaign advertising or other campaign communications shall be attributed to the expenditure limit in effect when the advertisement or communication is distributed, broadcast, or published. For the purposes of this paragraph, "campaign advertising or other campaign communications" shall not include a campaign website. A communication that is mailed shall be considered to have been "distributed" on the date on which it was postmarked.

(B) Expenditures for services performed or deliverables provided over a period that includes both the primary and the general elections shall be attributed in a reasonable manner to the expenditure limits of §§ 3-706(1) and (2) of the Code, as appropriate.

(C) Notwithstanding the requirements of this subdivision, the Board may require a candidate to demonstrate that an expenditure should be attributed to the expenditure limit provided in § 3-706(1) or (2) of the Code, as appropriate, based on the timing, nature, and purpose of the expenditure.

**(i) Exempt expenditures**

(i) The following shall not be subject to the expenditure limits:

(A) expenses made for the purpose of bringing or responding to any action, proceeding, claim, or suit before any court or arbitrator or administrative agency to determine a candidate's or political committee's compliance with the requirements of this chapter, including eligibility for public funds payments, or pursuant to or with respect to election law or other law or regulation governing candidate or political committee activity or ballot status;

(B) expenses to challenge or defend the validity of petitions of designation or nomination or certificates of nomination, acceptance, authorization, declination or substitution, and expenses related to the canvassing or re-canvassing of election results;

(C) expenses related to the post-election audit, except as provided in paragraph (ii) of this subdivision; and

(D) expenditures for childcare services made pursuant to § 3-702(21)(a)(13) of the Code for an aggregate amount of $20,000 or less.

(ii) Exempt expenses related to the post-election audit shall include pre-election expenses for organizing and copying existing records in preparation for submission during the post-election audit, but shall not include pre-election expenses for:

(A) Ordinary compliance activities, such as the review of records to identify missing documents, evaluating whether documents meet Board standards, and identifying, preventing, and correcting any potential violation;

(B) Post-election work for which an invoice is issued or paid prior to the election;

(C) Salaries or other payments to campaign managers, finance chairpersons, treasurers, accountants, advisors, or other consultants;

(D) Legal or accounting fees;

(E) Costs associated with record creation and retention;

(F) Costs associated with running an office or business, such as standard bookkeeping, maintaining checkbook registers, petty cash journals, bank records, and loan records;

(G) Bookkeeping for payroll or vendor payments; and

(H) Other standard practices that political committees routinely perform as entities that raise and spend funds.

(iii) Candidates have the burden of demonstrating that expenditures are exempt pursuant to § 3-706(4) of the Code. To meet this burden, a candidate must maintain contemporaneous, detailed records that demonstrate that each individual expenditure is exempt in accordance with the Act and these rules, and submit such documentation as required. Expenditures not demonstrated to be exempt will be included in the expenditure limit calculation.

(iv) Notwithstanding anything otherwise provided for in this subdivision, the reimbursement of an advance shall not be considered an exempt expenditure.

(v) For purposes of this subdivision, in determining whether a participant's total expenditures exceed the expenditure limits of § 3-706(1) or § 3-706(3)(a) of the Code, as appropriate, expenditures made in the first three years of the election cycle, to the extent such expenditures do not exceed the limit applicable under § 3-706(2) of the Code, shall be excluded.

**(j) Expenditure limit compliance for a transfer between political committees**

　　(i) A committee of a participant that receives a transfer of funds from another political committee, other than another principal committee of the same candidate, must:

　　　　(A) allocate to the transferred contributions any expenditures incurred by the transferor committee in connection with raising transferred contributions, and any expenditures incurred by the transferor committee during the covered election cycle in connection with administering transferred contributions; and

　　　　(B) upon request, provide documentation related to any such expenditures, including copies of federal forms or disclosure statements filed with the New York State Board of Elections on behalf of the transferor committee.

　　(ii) Expenditures will be applied towards the expenditure limit in effect at the time of the transfer; provided, however, that in the case of transfers made prior to the covered election cycle, expenditures will be applied towards the expenditure limits of § 3-706(2) of the Code.

　　(iii) The participant has the burden of demonstrating, for the purpose of compliance with the expenditure limits, that an expenditure made by the transferor committee was not made in connection with raising or administering the transferred contributions.

**(k) Expenditure limit relief**

　　(i) Pursuant to § 3-706(3)(a) of the Code, where the Board has determined that a non-participating candidate has spent or contracted or become obligated to spend, or received in loans or contributions, an amount which, in the aggregate, exceeds half the applicable expenditure limit pursuant to § 3-706(1)(a) of the Code, the expenditure limit applicable to participating candidates in the election for that office will be increased to 150% of the expenditure limit.

　　(ii) Pursuant to § 3-706(3)(b) of the Code, where the Board has determined that a non-participating candidate has spent or contracted or become obligated to spend, or received in loans or contributions, an amount which, in the aggregate, exceeds three times the applicable expenditure limit pursuant to § 3-706(1)(a) of the Code, the expenditure limit will no longer apply to participating candidates in the election for that office.

**§ 6-02 Restrictions on expenditures**

**(a) Spending public funds; qualified expenditures**

　　(i) Public funds may be used only for qualified expenditures.

　　(ii)  The following are not considered qualified expenditures:

　　　　(A) expenditures for any purpose other than to further the candidate's nomination or election;

(B) expenditures not incurred between December 15 in the year preceding the year of the election in which the participant is a candidate, and the date of such election;

(C) expenditures in violation of any law;

(D) payments to the candidate or a spouse, domestic partner, child, grandchild, parent, grandparent, brother, or sister of the candidate or spouse or domestic partner of such child, grandchild, parent, grandparent, brother, or sister, or to a business entity in which the candidate or any such person has a 10% or greater ownership interest;

(E) payments in excess of the fair market value of services, materials, facilities, or other things of value received;

(F) expenditures made after the candidate has been finally disqualified or such candidate's petitions have been finally declared invalid by the Board of Elections or a court of competent jurisdiction, except that such expenditures may be made (1) as otherwise permitted pursuant to § 3-709(7) of the Code, or (2) for a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office;

(G) expenditures made after the only remaining opponent of the candidate has been finally disqualified or such opponent's petitions have been finally declared invalid by the Board of Elections or a court of competent jurisdiction, except that such expenditures may be made for a different election (other than a special election to fill a vacancy) held later in the same calendar year in which the candidate seeks election for the same office;

(H) expenditures made for any other election, if the public funds were originally received for a special election to fill a vacancy;

(I) payments in cash;

(J) contributions, transfers, or loans made to another candidate or political committee;

(K) gifts, except brochures, buttons, signs, and other printed campaign material;

(L) expenditures to challenge or defend the validity of petitions of designation, or nomination, or certificates of nomination, acceptance, authorization, declination, or substitution, and expenses related to the canvassing of election results;

(M) expenditures for which records required by section 4-01 are not maintained or obtained by the candidate and submitted to the CFB;

(N) expenditures that are not itemized in a disclosure statement;

(O) payments that are not made or reimbursed from an account disclosed by the candidate pursuant to section 2-01 or 2-02(e);

(P) reimbursement for advances, except in the case of individual purchases in excess of $250, provided that the individual purchase is not otherwise not a qualified expenditure on the basis of any of the other subparagraphs of paragraph (ii);

(Q) expenditures made in connection with any action, claim, or suit before any court or arbitrator;

(R) expenditures made primarily for the purpose of expressly advocating a vote for or against a ballot proposal, unless such expenditures were also made to further the participating candidate's nomination or election;

(S) payments of any penalty or fine imposed pursuant to federal, state, or local law;

(T) payments for services that were never received, including payments for legal services pursuant to a retainer agreement to the extent payments for such services exceed the value of the services rendered;

(U) expenditures to facilitate, support, or otherwise assist in the execution or performance of the duties of public office;

(V) expenditures related to childcare services; or

(W) payments for liabilities that were not reported in the disclosure statement covering the reporting period in which the liability was incurred.

**(b) Expenditures in cash.** A candidate may not use cash for an expenditure of more than $100.

**(c) Volunteer services.** Candidates may not pay volunteers for services already performed on a voluntary basis for that election, but may hire them as paid employees or retain them as consultants for future services. Candidates may not accept professional services on a volunteer basis from individuals who previously provided, on a paid basis, services of a similar nature to the same candidate during the same election cycle. Candidates may not accept volunteer services from any entity, or from an individual having an ownership interest of 10% or more in, or control over, any entity that provided paid services to the same candidate during the same election cycle. Notwithstanding the foregoing, after the election, candidates may accept volunteer services from individuals who previously provided paid services.

**(d)** Candidates may not enter into contracts or agreements that provide for payments to vendors or employees that are conditional upon the receipt of public funds.

**§ 6-03 Joint expenditures; endorsements**

**(a) Generally.** Candidates may engage in joint campaign activities, including joint fundraising, joint petitioning, and the production of joint campaign literature, subject to applicable expenditure limits.

**(b) Candidates must pay proportionally.** A candidate must pay for the portion of the joint expenditure that is proportionally equivalent to such candidate's campaign's exposure in or benefit from the joint activity, unless the benefit is *de minimis*.

(i) Candidates and other individuals or entities may present information to the Board establishing such a *de minimis* benefit pursuant to section 12-02.

**(ii) Factors for proportional payment.** Among the factors the Board will consider in determining whether the benefit to a candidate is proportionally equivalent to its expenditure or is *de minimis* are:

> (A) the geographic distribution or location of the material or activity;

> (B) the subject matter of the communication;

> (C) the references to the candidate or the candidate's appearances therein;

> (D) the relative prominence of a candidate's references or appearances in the communication, including the size and location of references to the candidate and any photographs of the candidate;

> (E) the timing of the communication; and

> (F) other circumstances of the communication.

**(c) Non-proportional payment may lead to in-kind contribution.** To the extent a candidate does not pay for the proportional benefit it receives, the candidate is considered to have received an in-kind contribution from the other candidate. An in-kind contribution is also an expenditure by the candidate receiving the contribution.

**(d) Not joint expenditures.** The following activities, by themselves, are not joint expenditures:

> (i) the act of appearing with another candidate;

> (ii) endorsing a candidate, or communicating about an endorsement or appearance in an insubstantial way, such as where the endorser's name is one of several names appearing on a communication and is of equivalent prominence as the other names; and

> (iii) giving fundraising assistance to another candidate in the form of *de minimis* written communications, such as allowing the use of one's name or signature on a letter soliciting funds for another candidate or on fundraising material where the endorser's name appears alone or with other names and is of equivalent prominence as the other names.

## § 6-04 Independent expenditures

**(a) Factors for determining independence.** In determining whether an expenditure is independent, the Board may consider any of the factors from the following non-exhaustive list:

> (i) whether the person or entity making the expenditure is also an agent of a candidate;

> (ii) whether any person authorized to accept receipts or make expenditures for the person or entity making the expenditure is also an agent of a candidate;

(iii) whether a candidate has authorized, requested, suggested, fostered, or otherwise cooperated in any way in the formation or operation of the person or entity making the expenditure;

(iv) whether the person or entity making the expenditure has been established, financed, maintained, or controlled by any of the same persons or entities as those that have established, financed, maintained, or controlled a political committee authorized by the candidate;

(v) whether the candidate shares or rents space for a campaign-related purpose with or from the person or entity making the expenditure;

(vi) whether the candidate has solicited or collected funds on behalf of the person or entity making the expenditure, during the same election cycle in which the expenditure is made;

(vii) whether the candidate, or any public or private office held or entity controlled by the candidate, including any governmental agency, division, or office, has retained the professional services of the person making the expenditure or a principal member or professional or managerial employee of the entity making the expenditure, during the same election cycle in which the expenditure is made; and

(viii) whether the candidate and the person or entity making the expenditure have each consulted or otherwise been in communication with the same third party or parties, if the candidate knew or should have known that the candidate's communication or relationship to the third party or parties would inform or result in expenditures to benefit the candidate.

**(b) Board determination.** Upon consideration of the factors described in subdivision (a), the Board may determine by a preponderance of evidence that an expenditure was not independent. Prior to such determination, the candidate and/or the person or entity making the expenditure shall have an opportunity to provide evidence indicating that such expenditure was independent.

**(c) Presumed non-independent expenditures.** Financing the dissemination, distribution, or republication of any broadcast or any written, graphic, or other form of campaign materials prepared by a candidate is presumed to be a non-independent expenditure, unless the candidate can show that the activity was not in any way undertaken, authorized, requested, suggested, fostered, or otherwise cooperated in by the candidate.

**(d) Non-independent expenditures are contributions and expenditures**. An expenditure for the purpose of furthering or facilitating the nomination or election of a candidate which is determined not to be an independent expenditure, is a contribution to, and an expenditure by, the candidate.

**(e) Expenditures made by party committees or constituted committees.** Communication between, or common agents shared by, parties and their nominees will not require a conclusion

that all spending by the party's constituted committees and party committees in an election is an in-kind contribution to the nominee.

(i) The following expenditures made by party committees or constituted committees are not considered in-kind contributions to a candidate unless it is demonstrated that the candidate in some way cooperated in the expenditure and that the expenditure was intended to benefit that candidate:

(A) materials or activities that promote the party, or oppose another party, by name, platform, principles, history, theme, slogans, issues, or philosophy, without reference to particular candidates in an upcoming election subject to the requirements of the Act.

(B) materials or activities in connection with candidates and elections not subject to the requirements of the Act.

(C) training, compensating, or providing materials for poll watchers appointed by the party pursuant to § 8-500 of the New York State Election Law.

(D) promoting party enrollment or voter turnout without reference to particular candidates in an upcoming election subject to Program requirements, including research, polling, recruitment of party employees and volunteers, and development and maintenance of voter and contributor lists.

(E) raising funds for the party without reference to particular candidates in an upcoming election subject to the requirements of the Act.

(F) mailing of absentee ballot applications in a special or general election in which an office not subject to the requirements of the Act is on the ballot.

(ii) The Board may require a candidate to demonstrate that expenditures made by a party committee or constituted committee for the purpose of furthering or facilitating the nomination or election of a candidate, including expenditures for the purpose of furthering or facilitating the defeat of the nomination or election of such candidate's opponent or prospective opponent, are not in-kind contributions to the candidate.

(iii) Where a candidate has, without making public disclosure of an outstanding liability in a timely manner, promised or made reimbursement or other payment to a party committee or constituted committee for an expenditure, such expenditure will be considered an in-kind contribution to the candidate during the time preceding the reimbursement or other payment by the candidate.

**(f) Running as a "ticket."** If candidates announce they are running together as a "ticket" for which they have chosen to join together in a broad spectrum of activities to promote each other's election, the Board will presume that expenditures made by one candidate's campaign for materials or activities that clearly identify the other candidate are in-kind contributions to the second candidate. If the expenditures are in-kind contributions, the expenditures are subject to

apportionment requirements as joint expenditures. The following factors would increase the burden a candidate would have in overcoming this presumption:

(i) the campaigns have staff, consultants, office space, or telephone lines in common; and

(ii) other in-kind contributions, expenditure refunds, advances, or joint expenditures have been made between these candidates, or one of the candidates has reported a liability owed to the other candidate(s).

**(g) Certain routine interactions with entities.** Certain routine interactions with entities, absent other indicia of non-independence, will not in themselves lead to a determination of non-independence pursuant to section 6-04(b), including:

(i) Discussions of logistics, including scheduling, regarding a non-fundraising event hosted by the entity;

(ii) Communications directly related to an entity's endorsement process, including questionnaires and interviews; and

(iii) Requesting, obtaining, or distributing publicly available materials such as a candidate's photograph, biography, position paper, or press release, but not including leaflets, posters, or other similar materials, nor video or audio materials.

**§ 6-05 Expenditures made by other committees established for the candidate**

(a) A candidate has the burden of demonstrating that expenditures made by a committee authorized by such candidate for a different election should not be attributed to the covered election.

(b) Failure to meet this burden will result in the application of all Program requirements to these committees for the covered election, including attribution of expenditures to the covered election.

**(c) Expenditures for fundraising for more than one election.** When a candidate makes expenditures for a single event or other activity to raise funds for more than one office, and the next election that will be held is:

(i) a covered election, the full amount of such expenditures is subject to the expenditure limit.

(ii) not a covered election, a portion of such expenditures will be subject to the expenditure limit in the same proportion as the funds raised for the covered election bears to the total funds raised, unless the candidate can demonstrate to the Board that a different apportionment is applicable.

**§ 6-06 Identification of communications**

**(a) "Paid for by."** When a candidate makes expenditures for any literature, advertisement, or other communication, the communication must include the words "paid for by" followed by the first and last name of the candidate or the name of the authorized committee that made the

expenditures; provided that, if the name of the committee does not include the first or last name of the candidate, the words "paid for by" must be followed by the first and last name of the candidate, either instead of or in addition to the name of the committee.

**(b) "Authorized by."** When a candidate authorizes any individual or entity, other than the candidate, to pay for any literature, advertisement, or other communication in support of or in opposition to any candidate in any covered election, the communication must include the words "authorized by" followed by the first and last name of the candidate or the name of the candidate's authorized committee; provided that, if the name of the committee does not include the first or last name of the candidate, the words "authorized by" must be followed by the first and last name of the candidate, either instead of or in addition to the name of the committee.

**(c) Form.** The identification required by subdivision (a) or (b) of this section must be in the following form:

(i) For printed material, an internet text advertisement, or a website, the identification must be written in a font of conspicuous size and style and contained in a box within the borders of the communication.

(ii) For an audio communication broadcast on radio or over the internet, the identification must be clearly spoken at the beginning or end of the communication.

(iii) For a video communication broadcast by television, satellite, cable, internet, or similar medium, the identification must be clearly spoken at the beginning or end of the communication and, simultaneous with the spoken disclosure, written in a font of conspicuous size and style contained in a box within the borders of the communication.

(iv) For a telephone communication, the identification must be clearly spoken at the beginning or end of the communication. If the identification is spoken at the end of the communication, the name of the candidate must also be clearly spoken at the beginning of the call.

**(d) Languages other than English.** For communications primarily in a language other than English, all required written or spoken identification required by this section must be in such language.

**(e) Where identification would be impractical.** This requirement may be modified by the Board concerning items upon which identification would be impractical.

**§ 6-07 Routine communication sent by a political club to its members.** A routine communication sent by a political club to its members that includes the name of a candidate is not an in-kind contribution to such candidate, provided that:

(a) the candidate is already a member of the club;

(b) the club has fewer than 500 members; and

(c) the communication does not solicit funds on behalf of or otherwise promote the candidate's campaign for a covered election.

## Chapter 7: Pre-Election Public Funds Payments

### § 7-01 Eligibility

(a) A determination that a candidate has met all eligibility requirements of the Act and these rules, as of the date on which payment is to be made, shall not constitute the Board's final determination of the amount, if any, for which the candidate qualifies. The Board shall provide specific notice of any such final determination.

(b) Failure to respond to a request for audit documentation or information by the Board may be a basis for a non-payment determination.

**(c) Payment amount.** A candidate in any covered primary, general, or special election, having demonstrated eligibility to receive public funds, including by meeting the threshold for eligibility for public funding pursuant to § 3-703(2) of the Code, may receive public matching funds based on valid matchable contribution claims and the matching rate set forth in § 3-705(2)(a) of the Code, up to the maximum amount set forth in § 3-705(2)(b) or § 3-705(7) of the Code, as applicable. Payments are subject to withholdings and deductions as set forth in the Act and these rules.

**(d) Approval by Board subject to correction of limited, isolated, and easily corrected compliance issues.** The Board may, at its discretion, approve a public funds payment to a candidate, notwithstanding limited, isolated, and easily corrected compliance issues, conditioned upon a demonstration by the candidate that such candidate has taken the action specified by the Board, by the deadline specified by the Board, to correct the compliance issues. The candidate shall have the burden of demonstrating to the Board that such candidate has taken the action specified by the Board by the applicable deadline.

**(e) Ballot disqualification; unopposed candidates.** Pursuant to § 3-703(1)(a) and (5) of the Code, the Board will not make payment to any candidate disqualified from the ballot by the Board of Elections or by a court, or to any candidate for an election in which all other candidates have been disqualified from the ballot by the Board of Elections or by a court, until such candidate or other candidate is restored to the ballot by a court of competent jurisdiction. A candidate who appears as the only candidate on the ballot in an election shall not be eligible to receive public funds, notwithstanding any write-in candidates in that election, except as otherwise provided in paragraph (ii) below.

(i) The Board will consider a candidate to be finally disqualified from the ballot on the earlier of the date of an administrative or judicial determination disqualifying the candidate for which there is no appeal as of right (unless the disqualification is reversed on appeal or otherwise) or of the election.

**(ii) Payment petition.** Payment may be made to a candidate who was temporarily on the ballot or opposed in an election, pursuant to a determination of the Board of Elections or a court of competent jurisdiction, but then ultimately disqualified from the ballot or unopposed in that election, only when the Board's audit of the candidate's campaign has been completed and only if the candidate has, within 30 days after the date of the final

disqualification, as provided herein, filed a written petition, sworn to or affirmed, and supporting documentation that demonstrates that: (1) liabilities in qualified campaign expenditures incurred before the date of final disqualification remain unpaid; (2) the total amount of cash on hand is insufficient to pay these liabilities; (3) all expenditures made and liabilities incurred after the final disqualification were reasonable and necessary; and (4) the candidate was otherwise eligible and in compliance with all other Program requirements as of the date of final disqualification and has remained in compliance at all times since that date. The petition must also include an undertaking to use all public funds received to extinguish the liabilities enumerated pursuant to subparagraph (1) of this paragraph.

**(f) Write-in candidates.** A candidate who is seeking election exclusively as a write-in candidate, or who is only opposed by a candidate who is seeking election exclusively as a write-in candidate, is not eligible to receive public funds.

## § 7-02 Timing

**(a) Three payment dates in the 30 days prior to an election.** The Board shall schedule at least three payment dates in the 30 days prior to a covered primary, general, or special election.

(i) No public funds shall be paid to candidates in a primary or general election any earlier than four business days after the final day to file a written Certification for such election pursuant to paragraph (c) of subdivision 1 of § 3-703 of the Code.

(ii) Pursuant to §§ 3-703(1)(a) and (5) of the Code, public funds are not payable to a participant who has not met the legal requirements to have such participant's name on the ballot, who is unopposed, or, for the optional early public funds payment, who has not certified that such participant intends to meet all the requirements of law to have such participant's name on the ballot and stated the specific office to which such participant is seeking nomination or election.

**(b) Preliminary review of disclosure statements; reasons for delay.** In order to enable payment within four business days after receipt of disclosure statements, or as soon thereafter as is practicable, pursuant to § 3-705(4) of the Code, the Board shall conduct a preliminary review of all disclosure statements filed.

(i) If a candidate's complete disclosure statement is not actually received by 5:00 p.m. on the due date, or if the candidate submits a disclosure statement that fails to comply substantially with the requirements of the Act or these rules, the Board may be unable to make payment within four business days, and may review the disclosure statement for possible payment determinations at the next payment date.

(ii) A preliminary review may also be delayed for reasons including, but not limited to, consideration of whether a basis exists for an ineligibility determination. A delayed preliminary review may result in a payment determination being delayed until such time as it is practicable.

**(c) Preliminary review of matching claims.** Prior to making a pre-election payment determination, the Board may issue a report to the candidate indicating any matching claims determined to be invalid based on preliminary review of each disclosure statement and of the matchable contribution claims reported therein. The candidate may respond to such report by providing information or documentation demonstrating that any such matching claims should be considered valid. Failure by the candidate to respond to such report by the deadline set by the Board may result in a delay in payment of public matching funds.

**(d) Characterization of payments as for the primary or general election.**

 (i)  If a participant is on the ballot and has an opponent on the ballot in both a primary and the general elections, payments made after the primary election will be characterized initially as follows:

   (A)  As a primary election payment, if the payment is made on the basis of contribution and expenditure information reported in or before the disclosure statement due 10 days after the primary election, except as otherwise provided in subparagraph (B).

   (B)  As a general election payment, to the extent that any further primary election payments would exceed a maximum applicable in the primary election pursuant to the Act.

   (C)  As a general election payment, if the payment is made on the basis of contribution and expenditure information reported in disclosure statements due later than 10 days after the primary election.

 (ii)  If the Board determines that payments characterized initially as either primary or general election payments were, in fact, used for qualified campaign expenditures incurred in the other election, the payments will be recharacterized accordingly, and additional payments may be made or repayments required, if appropriate.

**§ 7-03 Payment by electronic funds transfer.** All payments of public funds shall be by electronic funds transfer unless the Board determines, at its sole discretion, to use an alternative payment method. In order to receive prompt payment, the participating candidate must provide the Board with a voided committee check and such additional information as shall be required by the Board.

**§ 7-04 Public funds cap**

(a) Pursuant to § 3-705(7)(a)(1) of the Code, a candidate shall not be eligible to receive more than one quarter of the applicable maximum pursuant to § 3-705(2)(b) of the Code unless the candidate submits a certified signed statement attesting to, and stating the reason for, such candidate's need for additional public funds. The statement of need must be filed with the Board no later than the due date for the applicable disclosure statements as follows, except that, if the basis for filing the statement of need arises after such due date, and no such basis existed prior to such due date, then the statement of need shall be due by the deadline for the disclosure statement immediately preceding the next date on which a public funds payment is to be made:

(i)     Candidates in the primary election must file the statement of need no later than the due date for the 32-day pre-primary election disclosure statement.

(ii)    Candidates in the general election must file the statement of need no later than the due date for the 32-day pre-general election disclosure statement.

(b) The Board shall verify the truthfulness of any certified signed statement submitted pursuant to § 3-705(7)(a)(1) of the Code and determine whether supporting documentation demonstrates the existence of the condition or conditions described in such statement. For the purposes of making a determination pursuant to § 3-705(7)(a)(1)(A) of the Code, a non-participating candidate shall be presumed to have the ability to self-finance when it is demonstrated through supporting documentation that such candidate has readily available funds in excess of one fifth of the applicable expenditure limit and that such candidate can reasonably be expected to spend such funds for such candidate's election.

## § 7-05 Small primaries

(a) A candidate on the ballot in one or more primary election(s) in which the number of persons eligible to vote for party nominees in each such election totals fewer than 1,000 shall not receive public funds in excess of $5,000 for qualified campaign expenditures in such election or elections; provided, however, that the foregoing limitation shall not apply to such candidate if the candidate is opposed in a primary election by (i) a participant who is not subject to such limitation or (ii) a non-participant who has spent or contracted or become obligated to spend in excess of $10,000 for such primary election. The Board shall determine whether a non-participant has exceeded such $10,000 level pursuant to § 3-705(6) of the Code.

(b) For the purposes of subdivision (a), the number of persons eligible to vote for party nominees in a primary election shall be as determined by the Board of Elections for the calendar year of the primary election pursuant to § 5-604 of the New York State Election Law. If such determination for any primary election is not available from the Board of Elections as of the day before the due date for filing a Certification pursuant to § 3-703(1)(c) of the Code, the most recent determination by the Board of Elections of the persons eligible to vote for party nominees for the office for which such primary election is held shall be relied upon.

## § 7-06 Withholdings.
The Board may withhold up to 5% of the amount of public funds payable to a candidate until the final pre-election payment for any election in which the candidate is eligible to receive public funds. In addition, the Board may withhold from pre-election public funds payments: (a) a percentage equal to the projected rate of invalid matching claims; and (b) up to an additional 5% if the Board determines that there is reason to believe that the candidate has failed to comply with the Act, including by failing to adequately respond to a Board request for information or documentation. Such withholdings shall be subject to post-election audit.

## § 7-07 Deductions from payments

(a) The total amount of public funds payable to a participant for a covered primary, general, or special election shall be reduced by the sum of the following:

(i) the amount of outstanding civil penalties assessed by the Board as a result of the participant's failure to comply with the Act and these rules during the current covered election; and

  (ii) the amount of the participant's:

   (A) transfers and other disbursements from a political committee that is involved in an election in which the candidate is currently a participant, to a political committee that is not involved in that election;

   (B) expenditures made to pay expenses for or debt from a previous election, including repayments of public funds and payment of penalties owed to the Board for a previous election;

   (C) contributions to other political committees that do not meet the requirements provided in § 3-705(8) of the Code for contributions that shall not be a basis for reducing public funds payments;

   (D) loans to other candidates that are not repaid within 30 days or by the date of the election, whichever is earlier, or spending for other candidates, including joint expenditures, to the extent such expenditures benefit another candidate, and independent expenditures; provided that independent expenditures made by the principal committee of a candidate shall not be a basis for reducing public funds payments to that candidate, where such expenditures do not, in the aggregate, exceed the amount provided in §§ 3-705(8)(i), (ii), or (iii) of the Code, as applicable, for contributions to political committees;

   (E) loans to or spending for political party committees and political clubs that are not reimbursed within 30 days or by the date of the election, whichever is earlier, provided that if the candidate demonstrates that the expenditure was for a tangible item that directly promotes the candidate's election, such as an advertisement in a fundraising journal, this subparagraph shall not apply to the fair market value of that item; and

   (F) expenditures made for the purpose of furthering the candidate's election to the position of Speaker of the City Council.

(b) Disbursements that would otherwise result in a deduction pursuant to paragraph (ii) of subdivision (a) of this section shall not result in any such deduction if:

   (i) such disbursements are made out of a segregated bank account;

   (ii) at no time does the segregated bank account contain any funds other than contributions received by the candidate and deposited directly into the account pursuant to this section, and bank interest paid thereon;

   (iii)  funds deposited into the segregated bank account are not used for any purpose other than disbursements governed by paragraph (ii) of subdivision (a) above or payment of bank fees associated with the segregated bank account;

(iv) contributors whose contributions are deposited into the segregated bank account have confirmed in writing, pursuant to section 4-01(b)(ii)(B), that they understand that these contributions will only be used for such disbursements and will not be matched with public funds;

(v) copies of such written confirmations are submitted to the Board by the due date for the disclosure statement in which such contributions are required to be reported pursuant to these rules;

(vi) copies of checks for each disbursement out of the segregated bank account are submitted to the Board by the due date for the disclosure statement in which such disbursements are required to be reported pursuant to these rules;

(vii) a copy of each bank statement for the segregated bank account is submitted to the Board by the due date for the next disclosure statement; and

(viii) for each individual contribution deposited into the segregated bank account, and each disbursement out of the segregated bank account, the candidate has complied with all other applicable provisions of the Act and these rules, including but not limited to the record keeping and reporting provisions.

(c) Candidates must deposit the entire amount of a contribution into the segregated bank account provided for in subdivision (b), and may not divide the contribution between different accounts.

(d) Contributions deposited into a segregated bank account pursuant to this section will not be matched with public funds.

(e) Any funds remaining in a segregated bank account after the election must be returned to the contributors whose contributions were deposited into the account, or, if that is impracticable, to the Fund, on or before December 31 in the year following the year of the election.

(f) A candidate who establishes a segregated bank account pursuant to this section, but fails to comply with any provision of subdivisions (b), (c), (d), or (e) of this section, shall no longer be entitled to the exception from subdivision (a) contained in subdivision (b) of this section.

(g) Funds deposited into, and disbursements made from, a segregated bank account established and maintained in compliance with this section for the purpose of making expenditures to pay expenses for or debt from a previous election, including repayments of public funds owed to the Board, will not be considered to be raised or spent for the current covered election for purposes of the participant's expenditure limit calculation.

**§ 7-08 Notice to candidates**. The Board shall notify the candidate in writing of any non-payment determination or of the difference between the amount of public funds claimed and the amount paid.

**§ 7-09 Petitions for review**

(a) After the Board provides a candidate a written determination specifying the basis for payment or non-payment of public funds prior to the election, the candidate may petition the Board in

writing for reconsideration of such determination. Such petition must state the grounds for reconsideration and must also include either a request to appear before the Board concerning the petition or a statement that the candidate waives such candidate's right to appear. The Board shall review the determination that is the subject of the petition within five business days of the filing of such petition. If the Board is unable to convene within five business days, the Board may delegate to the Chair of the Board or the Chair's designee authority to make a determination regarding the petition.

(b) To be considered by the Board, a petition for review of a pre-election payment or non-payment determination must not include any documentation or factual information not submitted to the Board prior to the determination under review, unless the participating candidate can demonstrate good cause for the previous failure to submit such documentation or information and for any failure to communicate on a timely basis with the Board.

(c) The Board shall timely issue a written determination on the subject of the petition. If the petition is denied, the determination shall inform the candidate of the right to appeal such determination pursuant to Article 78 of the Civil Practice Law and Rules.

## § 7-10 Review of contributions and expenditures

**(a) Facial Determinations**. The Board may find that a candidate's registration and financial disclosure submitted to the Board or to the State Board of Elections provide on their face a sufficient basis for a determination of the amount such candidate has spent or contracted or become obligated to spend, or received in loans or contributions. The Board will presume that contributions and loans are accepted, disbursements are made, and liabilities are incurred by a candidate for such candidate's next election. In the absence of contrary evidence, the Board will rely upon the date of contributions, loans, disbursements, and liabilities as they appear on disclosure statements filed with the Board or the State Board of Elections.

**(b) Petitions for reconsideration**

> **(i) Contents.** A candidate may file a petition for reconsideration of a preliminary Board determination made pursuant to subdivision (a). Such petition must be written and must:
>
>> (A) be sworn to or affirmed;
>>
>> (B) indicate on whose behalf the petition is being submitted;
>>
>> (C) contain sufficient specificity and detail for the Board to make a decision, including:
>>
>>> (1) if alleging that information submitted to the Board or the State Board of Elections is inaccurate or incomplete, the petition must describe the inaccuracies or omissions in detail, or the Board may presume that any information on file is true and complete;

(2) if alleging fundraising or spending activities to have taken place after the close of a reporting period, the petition must describe the activities in detail;

(3) if alleging that a third party is providing unreported contributions, goods, services, or benefits to a candidate in coordination with that candidate, the petition must include all relevant names, dates, and amounts, including information concerning the fair market value of services, materials, facilities, advertising, or other things of value reported to have been received or expended; and

(4) if alleging that statements have been made, the petition must include content of statements, name, dates, how speaker is affiliated with a candidate or other actor, and any other relevant information.

(D) include a request for a hearing, if desired;

(E) be submitted no later than 10 days after the determination or decision; and

(F) be accompanied by evidence that supports the allegations made in the petition. The petitioner has the burden of demonstrating a sufficient basis for a determination.

**(ii) Notice of petition**

(A) The Board shall send a copy of the petition to any opposing entities named in the petition or known by the Board to have an opposing interest in the petition.

(B) The notice shall specify:

(1) the deadline for the opposing entities to submit a response; and

(2) the date and time at which the Board will conduct a hearing on the petition, if any.

**(iii) Response to the petition**. The opposing entities may submit a response to the petition. A failure to submit a response may be deemed an admission of the allegations in the petition and sufficient reason to deny a request to reconsider any determination based on the petition. The response must:

(A) be submitted in the manner and by the deadline set forth by the Board;

(B) be sworn to or affirmed;

(C) either acknowledge that fundraising or spending on behalf of the respondent is sufficient to permit the Board to make a determination, regardless of the merit of the petitioning candidate's particular allegations, or contend that a determination would be inappropriate and specify the allegations in the petition that are denied and those that are admitted;

(D) explain any failure to disclose any information to the Board or the City or State Board of Elections;

(E) include evidence that supports the response, including, but not limited to, all relevant names, dates, and amounts, including information concerning the fair market value of services, materials, facilities, advertising, or other things of value reported to have been received or expended;

(F) include a request for a hearing, if desired; and

(G) be signed by the opposing entity.

**(iv) Hearing**

(A) The Board may decide to conduct a hearing upon request or on its own initiative.

(B) The hearing date will be no earlier than 10 days after the petition is received, except:

(1) for good cause shown; or

(2) for petitions received less than 30 days before the election, in which case the hearing date will be no earlier than  three days after the petition is received.

(C) The respondent and each opposing candidate must notify the Board no less than one day in advance whether they will be represented at the hearing. Representation of a party at a hearing must be by a person with knowledge of the facts at issue.

(D) At the hearing, testimony given may be under oath and no new documentary evidence will be considered unless good cause is shown for the party's failure to submit it with its petition or response.

**(v) Notice of determination.** Following the review of disclosure statement filings; the petition and response, if any; and testimony and evidence presented at a hearing, if any, the Board will:

(A) decide whether there is a sufficient basis for a determination; and

(B) provide written notice to the petitioner and opposing entities, if any, of its determination.

**(vi) New petition for a preliminary public funds determination may be submitted based on new evidence.** The Board's decision not to award public funds shall not be construed to preclude the subsequent submission of any petition based on new evidence for a determination respecting that candidate.

**(vii) Request for reconsideration**. The petitioner or an opposing party may request reconsideration of a preliminary public funds determination.

> (A) A request for reconsideration must be made in writing no later than 10 days after the determination, and must include:
>
>> (1) an affidavit of the party affirming that neither fundraising nor spending on behalf of the respondent that has taken place after the close of the most recent reporting period is sufficient to permit the Board to make a determination; and
>>
>> (2) an undertaking by the respondent to notify the Board immediately in writing if and when either fundraising or spending on behalf of the respondent becomes sufficient to permit the Board to make a determination pursuant to subdivision (a).
>
> (B) The Board shall consider the evidence, may conduct a hearing, and shall notify the petitioner of its determination.
>
> (C) The Board may consider a respondent's failure to respond to the petition, or the failure of the party requesting reconsideration to be represented at a hearing on the petition, to be a sufficient basis for denying a request for reconsideration. The Board shall notify the respondent, all opposing candidates, and the petitioner whether it will reconsider the determination pursuant to subdivision (a) or decision not to make such a determination, as the case may be.
>
> (D) The Board will respond within five business days of the filing of such petition.

**(viii) Appeal.** A party may bring a special proceeding as set forth in Article 78 of the Civil Practice Law and Rules within four months of the Board's final determination denying the petition for reconsideration.

## Chapter 8: Post-Election Public Funds Payments

### § 8-01 Payment determinations

(a) Candidates who fail to demonstrate compliance with the Act and these rules, including candidates who satisfy one or more criteria for ineligibility as provided in section 3-01(d), are not eligible to receive a post-election public funds payment.

(b) Candidates have the burden of demonstrating eligibility to retain public funds received prior to the election and to receive additional public funds after the election. Candidates who fail to demonstrate eligibility to retain all or a portion of the public funds previously received may be required to repay such amount to the Fund.

(c) A candidate's post-election payment, if any, will be reduced by the amount of any applicable deductions pursuant to section 7-07(a), if such amounts were not deducted from pre-election public funds payments.

(d) The post-election payment, repayment, or nonpayment determination shall be the final determination regarding that candidate's public funds payment status, except as provided in section 8-05.

## § 8-02 Amount of post-election payment

**(a) Reasons for post-election payment.** A post-election payment shall only be made if, at the conclusion of the post-election audit, a candidate has demonstrated unpaid matching claims, a qualified expenditure surplus, and documented outstanding liabilities.

**(i) Unpaid matching claims**. Candidates may be entitled to receive a post-election payment equal to the amount by which the candidate's total valid matchable claims multiplied by the applicable matching rate pursuant to § 3-705(2)(a) of the Code exceed the total pre-election payments received by the candidate.

**(ii) Qualified expenditure surplus**. Candidates may be entitled to receive a post-election payment equal to the amount by which the candidate's total qualified expenditures exceed the total pre-election payments received by the candidate.

**(iii) Documented outstanding liabilities**. Candidates may be entitled to receive a post-election payment equal to the amount of the candidate's properly reported and documented liabilities that remain outstanding, less the amount remaining in the candidate's principal committee bank account.

(A) Prior to issuing a post-election payment, the Board may require the candidate to submit any bank statements not previously provided.

(B) In order to be the basis for a post-election payment, an outstanding liability must be reported on or before the due date for the final disclosure statement required to be submitted for the covered election to which the liability relates.

(C) To document an outstanding liability for the purpose of receiving a post-election payment, the candidate must provide documentation demonstrating that the reported payee has made a commercially reasonable attempt to collect the debt.

**(iv) Post-election payment is smallest amount.** The amount of the post-election payment shall be the lowest of the three amounts detailed in paragraphs (i), (ii), and (iii) of this subdivision. If any of these amounts is zero, the candidate is not entitled to receive a post-election public funds payment.

**(b) Statutory maximum.** Combined with the total pre-election payments received by the candidate, the post-election payment shall not exceed the maximum payment allowed for each election in which the candidate was a participant pursuant to § 3-705(2)(b) of the Code.

## § 8-03 Use of final post-election payment. Before the Board makes the final post-election payment determination, if eligible, the candidate must submit to the Board bills or other documentation of outstanding debt for which such payment will be used. Within 60 days after the final public funds payment, the candidate must demonstrate that the public funds were used

to pay such outstanding debt. If such demonstration is not made, the candidate must repay the public funds to the Board.

**§ 8-04 Disclosure statement amendments**. The Board shall not make payments based on disclosure statement amendments filed after January 15 in the year following the year of the election; provided, however, that the Board may make payments based upon such amendments solely if they are made in response to invalid matching claims reports or expenditure sample reports to which the Board has requested a response after January 15 in the year following the year of the election.

**§ 8-05 Post-election petitions for review**

(a) After the Board provides a candidate a written determination specifying the basis for payment or non-payment of public funds after the election, the candidate may petition the Board in writing for reconsideration of such determination.

(b) A petition for review of a post-election payment determination must be submitted within 30 days of the candidate's final audit report, and must include:

    (i) a statement of the grounds for reconsideration;

    (ii) information or documentation that was unavailable to the Board previously and is material to such determination;

    (iii) a showing that the candidate had good cause for the previous failure to provide such information or documentation; and

    (iv) either a request to appear before the Board concerning the petition or a statement that the candidate waives such candidate's right to appear.

(c) The Board shall timely issue a written determination on the subject of the petition. If the petition is denied, the determination shall inform the candidate of the right to appeal such determination pursuant to Article 78 of the Civil Practice Law and Rules.

## Chapter 9: Public Funds Repayments

**§ 9-01** Candidates must promptly repay public funds upon a determination made by the Board that a repayment is required. Candidates returning public funds must make a check payable to the "New York City Election Campaign Finance Fund." Candidates may not reclaim public funds they have returned. Public funds must be repaid to the Board separately from, and in addition to, any penalties owed by the candidate.

**§ 9-02 Reasons for repayment.** The Board shall determine whether a candidate or such candidate's principal committee is required to repay public funds previously received as follows:

**(a) Overpayment of public funds.** Pursuant to § 3-710(2)(a) of the Code, the candidate's principal committee is required to pay to the Board an amount equivalent to the amount of public funds received in excess of the amount which the candidate is eligible to receive.

**(b) Qualified expenditure deficit**. Pursuant to § 3-710(2)(b) of the Code, the candidate's principal committee is required to pay to the Board an amount equivalent to the amount of public funds paid to the candidate that were not spent on qualified expenditures.

    **(i) Determination of personal liability.** A candidate may be personally liable for paying to the Board the amount of public funds not spent on qualified expenditures, or a portion of that amount. In considering whether and to what extent a participating candidate shall be personally liable for repayment of public funds, the Board shall act in accordance with the following:

        (A) where credible documentation supporting each qualified expenditure exists but is incomplete, the Board shall not impose such liability for such expenditure;

        (B) where there is an absence of credible documentation for each qualified expenditure, the Board may impose such liability upon a showing that such absence of credible documentation for such expenditure arose from a lack of adequate controls including, but not limited to, trained staff, internal procedures for following Board guidelines and internal procedures for employing standard financial controls.

**(c) Final bank balance.** Pursuant to § 3-710(2)(c) of the Code, the candidate and the principal committee are required to pay to the Board an amount equivalent to the campaign funds remaining in such candidate's principal committee account. The candidate must promptly pay to the Board such remaining funds; provided, however, that all remaining funds for a candidate shall be immediately due and payable to the Board upon a determination by the Board that the candidate has delayed the post-election audit process. The candidate must promptly pay to the Board any additional remaining campaign funds based upon a determination made by the Board at a subsequent date. The amount of remaining campaign funds shall be presumed to be equal to the candidate's authorized committee bank account balance on January 11 in the year following the election, or for special elections, on the last day of the reporting period for the final disclosure statement the candidate is required to file with the Board for such election, less any permissible documented post-election expenditures pursuant to paragraph (i) of this subdivision. The Board may also consider information revealed in the course of an audit or investigation in making a remaining funds determination, including, but not limited to, the fact that campaign expenditures were made in violation of law, that expenditures were made for any purpose other than the furtherance of the candidate's nomination or election, or that the candidate has not maintained or provided requested documentation. If a candidate repays to the Fund all funds remaining in such candidate's authorized committee bank account on or before December 31 in the year of the election, or, for special elections, on or before the last day of the month following the month in which the election took place, such candidate shall be presumed not to owe additional remaining funds, provided that any contributions received and expenditures made after such funds are repaid must be raised and spent in compliance with the Act and these rules.

    (i) Before repaying campaign funds remaining in the committee bank account, a candidate may make post-election expenditures only for routine activities involving

nominal cost associated with winding up a campaign and responding to the post-election audit. Such expenditures may include: payment of utility bills and rent; reasonable staff salaries and consultancy fees for responding to a post-election audit; reasonable staff salaries and legal fees incurred prior to the date of the issuance of the candidate's final audit report and associated with defending against a claim that public funds must be repaid; a post-election event for staff, volunteers, or supporters held within 30 days of the election; reasonable moving expenses related to closing the campaign office; a holiday card mailing to contributors, campaign volunteers, and staff; thank you notes to contributors, campaign volunteers, and staff; payment of taxes and other reasonable expenses for compliance with applicable tax laws; and interest expense. Routine post-election expenditures that may be paid for with remaining campaign funds do not include such items as post-election mailings other than as specifically provided for in this paragraph; making contributions; or making bonus payments or gifts to staff or volunteers. Campaign funds remaining in the committee account may not be used for transition and inauguration activities.

(ii) Notwithstanding the restriction on the use of receipts provided in subdivision (c)(i), a candidate who has outstanding liabilities from the election, including a candidate who owes public funds or penalties to the Board, may make post-election expenditures for the purpose of raising funds to repay such debt, provided, however, that such expenditures and any contributions received shall be included in the calculation of the candidate's remaining funds, unless such expenditures and contributions are incurred or received after the date of the issuance of the candidate's final audit report.

(iii) Notwithstanding the prohibition on post-election bonus payments provided in subdivision (c)(i), a bonus payment to an employee may be considered a permissible pre-election expenditure, even if paid after the election, provided that:

> (A) the bonus is paid pursuant to a contract executed before the services that serve as the basis for the bonus are performed;

> (B) such contract states in detail the amount of the bonus and the criteria that must be satisfied in order for the bonus to be paid;

> (C) such criteria are quantifiable, merit-based, and related to services provided prior to the election;

> (D) the bonus is not conditioned, either in existence or amount, on the result of the election, the amount of funds remaining in the committee account, or whether the candidate received public funds; and

> (E) the bonus does not constitute more than 10% of the total amount paid to the employee.

**(d) Repayment is largest amount.** Where more than one grounds for repayment exists as provided in subdivisions (a), (b), and (c) of this section, the amount to be paid to the Board shall be the largest of the amounts.

**(e) Breach of certification.** A candidate found to have breached such candidate's certification pursuant to section 3-01(e) may be deemed ineligible to receive public funds and may be required to return all public funds previously received.

**(f) Ballot disqualification**. Pursuant to § 3-709(7) of the Code, a candidate who has been finally disqualified or whose designating or nominating petitions have been finally declared invalid by the Board of Elections or a court of competent jurisdiction, may not thereafter spend public funds for any purpose other than the payment of previous liabilities incurred in qualified campaign expenditures. All public funds in excess of such liabilities previously incurred shall be promptly repaid to the Board; the amount to be repaid shall be determined in accordance with § 3-710(2)(b) of the Code and subdivision (b) of this section. A repayment made pursuant to § 3-709(7) shall not preclude a determination that an additional repayment is required pursuant to that or any other provision of the Act.

**(g) Ballot fraud.** Pursuant to § 3-710(3) of the Code, a candidate who has been disqualified by a court of competent jurisdiction on the grounds that such candidate committed fraudulent acts in order to obtain a place on the ballot, if such decision is not reversed, must pay to the Board an amount equal to the total public funds paid to the candidate. Repayments pursuant to this subdivision must be made promptly upon the court's determination of disqualification.

**(h) Other reasons for repayment.** The Board may require a candidate to repay public funds because:

> (i) the candidate failed to maintain copies of checks or contribution cards that document matchable contributions;

> (ii)  the public funds paid were based on contributions that were returned or contribution checks that have not been paid;

> (iii) the candidate has failed to demonstrate eligibility for the public funds paid or compliance with Program requirements; or

> (iv) a determination pursuant to §§ 3-705(6) or (7) of the Code is reversed following reconsideration pursuant to section 7-10(b)(vii).

## **Chapter 10: Audit and Enforcement**

### **§ 10-01 Audits**

(a) The Board shall conduct desk and field audits of participants and non-participants, regardless of whether the candidates receive public funds. Field audits may be conducted before or after an election, as the Board deems appropriate. In conducting audits, the Board may use random sampling of data and other analytic techniques, as appropriate. The Board shall conduct campaign audits in accordance with generally accepted government auditing standards.

(b) Candidates are required to respond to all Board requests for information and documentation during the audit process. Failure to respond in a timely fashion may cause delay in the issuance of a final audit report. In addition, the Board may assess penalties for failing to respond or responding late to requests for documentation or information pursuant to § 3-711 of the Code.

**§ 10-02 Audit deadlines; optional post-election training.** The Board shall issue all draft and final audit reports in accordance with the deadlines provided in § 3-710(1)(a) and (b) of the Code subject to any applicable exceptions to those deadlines provided in § 3-710(1)(d), (e), and (f) of the Code.

**(a) Candidates who attend a post-election training.** Pursuant to § 3-710(1) of the Code, where the candidate, the campaign manager, or the treasurer has attended a post-election audit training provided by the Board, the Board will issue the candidate's enforcement notice or final audit report within 14 months after the deadline for submission of the final disclosure report for the covered election, in the case of city council and borough-wide races, and within 16 months after the deadline for submission of the final disclosure report for the covered election in the case of citywide races.

**(b) Candidates who do not attend a post-election training.** For candidates who do not attend a post-election training, the Board will issue an enforcement notice or final audit report:

> (i) For City Council and borough-wide races, within 16 months after the deadline for submission of the final disclosure report for the covered election; and

> (ii) For citywide races, within 18 months after the deadline for submission of the final disclosure report for the covered election.

**(c) Deadline for attending post-election training.** To be subject to the deadlines provided in subdivision (a) of this section, candidates must attend a post-election training on or before the earlier of 20 days following issuance of the candidate's draft audit report or one year after the deadline for submission of the final disclosure report for the covered election.

**§ 10-03 Board determinations concerning violations, infractions, penalties, and repayment of public funds**

**(a) Notice and opportunity to contest.** The Board will notify the candidate, the TIE, or the independent spender and its authorized representative, as applicable, in writing of any infractions or violations alleged to have been committed by such party, as well as any corresponding recommended penalties, and any recommended public funds repayment. Such notice shall:

> (i) set forth in detail the factual and legal basis for staff's recommendation that a violation, infraction, or public funds repayment obligation be found;

> (ii) inform the party that hearings are conducted in accordance with the requirements for adjudications contained in § 1046 of the Charter unless such procedures are waived by, as applicable: the participant or nonparticipant, the elected candidate, the independent spender or authorized representative, or an agent thereof;

(iii) notify the party of the opportunity to submit information and documentation for the Board's consideration within a time period to be specified in such notice; and

(iv) notify the party of the opportunity to appear at a hearing before the Board or an administrative law judge to contest the alleged violations or infractions, penalties, and public funds repayment obligation.

**(b) Response to the notice**

(i) The noticed party must submit a complete response to the notice by the due date. Extensions may be granted for good cause shown. Extension requests must be made in writing and must be submitted prior to the deadline.

(ii) Unless specifically notified to the contrary by the Board, the opportunity to submit information and documentation in response to the notice shall be the only such opportunity, and any information and documentation that is not timely received by the Board shall be disregarded. Under extraordinary circumstances, the Board may, at its sole discretion, choose to accept information or documentation not timely received.

**(c) Final Board determination.** Based on the evidence, the Board will make a final Board determination as to the party's violations or infractions, penalties, and public funds repayment obligation, and shall provide the party with a written copy of its determination. Such determination shall notify the party that it may be appealed within four months as set forth in Article 78 of the Civil Practice Law and Rules.

**(d) Payment.** If the Board has determined that the party must pay penalties or repay public funds, the party must make payment by the deadline set forth in the final Board determination. If these amounts are not paid by the payment deadline, they may be sought through appropriate legal action or, in the case of civil penalties against participants, by deduction from any public funds otherwise due for any election.

**(e) Penalty Guidelines.** The Board shall publicize staff guidelines for presumptive penalties to be recommended for certain violations of the Charter, Act, and these rules, subject to consideration of aggravating and mitigating factors that may be considered in determining the appropriate penalty assessment for the violation.

**§ 10-04 Submission of false information.** If the Board has reason to believe that any individual or entity has knowingly submitted false information or fabricated evidence or has knowingly withheld or concealed information in a written or oral submission or representation to the Board, the Board may refer the matter to the appropriate agency for criminal prosecution and may commence a civil action to recover public funds and/or civil penalties, if appropriate.

## Chapter 11: Procedural Rules for Formal Adjudications

### § 11-01 Definitions

Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition, the following terms mean:

**"Case"** means an adjudication pursuant to CAPA, § 1046 of the Charter.

**"Filing"** means submitting papers to the hearing officer, whether in person, by mail, or by electronic means, for inclusion in the record of proceedings in a case.

**"Petition"** means a document filed by the Board, analogous to a complaint in a civil action, which states the claims to be adjudicated.

**"Petitioner"** means the Board.

**"Respondent"** means a party against whom claims are asserted by the Board.

### § 11-02 Applicability

(a) This chapter applies solely to cases that are subject to CAPA, including hearings, pre-hearing and post-hearing matters, brought by the Board pursuant to the Act or the Charter.

(b) In the event of any inconsistency between this chapter, other chapters of this title, and the rules of OATH, this chapter shall govern.

### § 11-03 Proceedings before designation of hearing officer

Proceedings before the case is referred to a hearing officer shall be governed by § 1046 of the Charter and Chapters 9 and 10 of the Board rules.

### § 11-04 Designation of hearing officer

The Board shall designate, at its sole discretion, one or more hearing officers to preside over cases pursuant to this chapter. The designated hearing officer(s) shall be: (i) one or more members of the Board; (ii) another person or persons assigned by the Board; or (iii) the chief administrative law judge of OATH or such administrative law judge as the chief administrative law judge may assign.

### § 11-05 Commencement of proceedings and pleadings

### (a) The petition

(i) The Board shall institute proceedings pursuant to this chapter by serving a petition, sworn to or affirmed as to the truth thereof, on the respondent(s). The petition shall

100

comply with the requirements in OATH Rules of Practice § 1-22. The petition shall set forth the facts which, if proved, constitute violations of the Act or these rules or require repayment of public funds.

(ii) The petition shall be accompanied by the following: notice of the respondent's right to file an answer, the deadline to file an answer, and the place(s) to serve and file an answer; notice that failure to serve and file a timely answer shall be deemed an admission of all allegations contained in the petition; notice of the respondent's right to representation by an attorney or other representative; and notice that a person representing the respondent(s) must file a notice of appearance with the hearing officer.

**(b) Service of the petition**

(i) The Board shall serve the petition upon the respondent(s).

(ii) Service of the petition may be made by regular first-class mail or electronic means to the respondent's last known residential or business address or last known email address or fax number.

(iii) Service of the petition shall be complete upon mailing, if service was by first-class mail, or upon the date of transmission, if service was by electronic means.

**(c) Answer**

(i) The respondent(s) must file an answer to the petition with the hearing officer and serve the same answer on the Board.

(ii) If the petition was served on the respondent(s) by regular first-class mail, the answer must be filed and served within 26 calendar days of the date the petition was postmarked. If the petition was served on the respondent(s) by electronic means, the answer must be filed and served within 21 calendar days of the date of the transmission of the petition.

(iii) The answer may include affidavits or affirmations, documentary exhibits, or other evidentiary material in rebuttal of the petition. The answer may be accompanied by a memorandum of law.

(iv) If the respondent fails to serve and file a timely answer, all allegations of the petition shall be deemed admitted, and the case shall proceed as scheduled. If the answer fails to specifically address any allegation in the petition, such allegation shall be deemed admitted.

(v) The time to serve and file an answer may be extended only upon the consent of all parties or upon application to the hearing officer for good cause shown.

**(d) Amendment of Pleadings.** Pleadings shall be amended in accordance with OATH Rules of Practice § 1-25.

## § 11-06 Filing of Papers

**(a) Generally.** The notice accompanying the petition shall notify the parties of the designated hearing officer(s) and of the place to file papers. Papers may be filed with the hearing officer in person, by mail or by electronic means.

**(b) Headings.** If an OATH index number has been assigned pursuant to section 11-07(c), the subject matter heading for each document must indicate the OATH index number.

**(c) Means of service on adversary.** Submission of papers to the hearing officer by electronic means, mail, or personal delivery without providing equivalent method of service to all other parties shall be deemed to be an ex parte communication.

**(d) Proof of service.** Proof of service must be maintained by the parties for all papers filed with the hearing officer. Proof of service must be in the form of an affidavit by the person effecting service, or in the form of a signed acknowledgement of receipt by the person receiving the papers. A written acknowledgment of service by the person served is adequate proof of service. Proof of service for papers served by electronic means, in addition to the foregoing, may be in the form of a record confirming delivery or acknowledging receipt of the electronic transmission.

## § 11-07 Docketing the Case at OATH

(a) Only cases referred to OATH must be docketed, and only the Board may docket a case at OATH.

(b) Following service of the petition upon the respondent, the Board shall docket a case by delivering to OATH a completed intake sheet, with a petition and appropriate proof of service of the petition.

(c) When a case is docketed, OATH shall place it on the trial calendar, the conference calendar, or on open status. Cases involving the same respondent(s) shall be scheduled for joint hearings or conferences. The case shall be given an index number and assigned to a hearing officer pursuant to OATH Rules of Practice § 1-26(b).

(d) After docketing the case at OATH and selecting a hearing or conference date, the Board shall serve a notice of hearing or notice of conference on the respondent within five business days. The notice shall be served by first class mail or electronic means, and appropriate proof of service shall be maintained by the Board.

(e) A conference or hearing shall be scheduled for a date that is at least two weeks after the date the answer must be served and filed.

(f) The administrative law judge may determine that the case is not ready for a conference or hearing and may adjourn the conference or hearing, or may remove the case from the conference or hearing calendar and place it on open status.

**§ 11-08 Disqualification of hearing officers.** Motions for disqualification of administrative law judges serving as hearing officers must be filed in accordance with OATH Rules of Practice § 1-27.

**§ 11-09 Conferences**

(a) Only cases referred to OATH are eligible for conferences.

(b) Conferences may be held for the formulation and simplification of issues, the possibility of obtaining admissions or stipulations of fact and of admissibility and authenticity of documents, the order of proof and of witnesses, discovery issues, legal issues, pre-hearing applications, scheduling, and settlement of the case.

(c) Conferences may be scheduled at the discretion of the administrative law judge, whether or not a case has been placed on the OATH conference calendar, on the application of either party or sua sponte. At the discretion of the administrative law judge, conferences may be conducted by telephone.

(d) All parties are required to attend conferences as scheduled unless timely application for additional time is made to the administrative law judge.

(e) Settlement conferences and agreements must be conducted in accordance with OATH Rules of Practice § 1-31.

(f) If the case is not settled at the conference, outstanding pre-hearing matters, including discovery issues, must be raised during the conference. If the case is not settled at the conference, a hearing date may be set. The parties must know their availability and the availability of their witnesses for a hearing.

**§ 11-10 Notice of conference or hearing**

(a) When a case is placed on either the conference calendar or the trial calendar, the Board shall serve the respondent(s) with notice in accordance with OATH Rules of Practice § 1-28.

(b) The notice of conference or hearing shall be served by first class mail or electronic means, and appropriate proof of service shall be maintained.

**§ 11-11 Adjournments**

Applications for adjournments of conferences or hearings before OATH shall be governed by OATH Rules of Practice § 1-32.

**§ 11-12 Discovery.** Discovery in OATH proceedings shall be conducted in accordance with OATH Rules of Practice § 1-33.

**§ 11-13 Pre-hearing motions.** Pre-hearing motions pursuant to OATH proceedings shall be filed in accordance with OATH Rules of Practice § 1-34.

**§ 11-14 Appearances at OATH.** Appearances at OATH shall comply with the requirements set forth in OATH Rules of Practice § 1-11.

**§ 11-15 Ex-parte communications.** No *ex parte* communications, other than those related to ministerial matters regarding a conference or hearing, shall be made to a hearing officer.

**§ 11-16 Role of the hearing officer.** In the conduct of an adjudication, a hearing officer may:

(a) administer oaths and affirmations, examine witnesses, rule upon offers of proof, receive written and oral testimony, and oversee and regulate discovery procedures;

(b) upon the request of any party, or subject to the hearing officer's discretion, subpoena the attendance of witnesses and the production of books, records, or other information;

(c) regulate the course of the hearing in accordance with section 11-20;

(d) dispose of procedural requests or similar matters;

(e) make findings of fact or decisions, determinations or orders, as authorized by law; and

(f) take any other action authorized by law or agency rule consistent therewith.

**§ 11-17 Consolidation; separate hearings.** All or portions of separate cases may be consolidated for the hearing, or portions of a single case may be severed for separate hearings, in accordance with OATH Rules of Practice § 1-41.

**§ 11-18 Witnesses and documents.** The parties must have all of their witnesses available on the hearing date. A party intending to introduce documents into evidence must bring to the hearing copies of those documents for the hearing officer, the witness, and the other parties. Repeated failure to comply with this section may be cause for sanctions, as set forth in OATH Rules of Practice § 1-13(e).

**§ 11-19 Subpoenas.** Subpoenas may be issued in accordance with OATH Rules of Practice § 1-43.

**§ 11-20 Order of proceedings.** Testimony and argument on the law and facts shall be presented in the following order: petitioner; witnesses called by the petitioner, if any; cross-examination; the respondent(s); witnesses called by the respondent(s); cross-examination; and closing statements. Each party shall be afforded an opportunity to present rebuttal testimony, if deemed appropriate by the hearing officer. Closing statements, if any, shall be made first by petitioner. The order of proceedings may be modified at the discretion of the hearing officer.

**§ 11-21 Interpreters.** The hearing officer will make reasonable efforts to provide language assistance services to a party or its witnesses who are in need of an interpreter to communicate at a hearing or conference.

**§ 11-22 Failure to appear.** All parties, counsel and other representatives are required to be present at the hearing and prepared to proceed at the time scheduled for commencement of the hearing, subject to the requirements set forth in OATH Rules of Practice § 1-45.

**§ 11-23 Evidence at the hearing.** Evidence shall be governed by OATH Rules of Practice §§ 1-46 and 1-47.

**§ 11-24 Official notice**

(a) In reaching a decision, the hearing officer may take official notice, before or after submission of the case for decision, on request of a party or sua sponte on notice to the parties, of any fact which may be judicially noticed by the courts of this state, pursuant to OATH Rules of Practice § 1-48(a).

(b) Official notice may be taken, without notice to the parties, of rules published in the Rules of the City of New York or in The City Record, pursuant to OATH Rules of Practice § 1-48(b).

**§ 11-25 Public access to proceedings.** Other than conferences, all proceedings shall be open to the public, in accordance with OATH Rules of Practice § 1-49.

**§ 11-26 Hearing motions.** Motions may be made during the hearing orally or in writing, in accordance with OATH Rules of Practice § 1-50.

**§ 11-27 Transcript.** Hearings shall be stenographically or electronically recorded, and the recordings shall be transcribed, in accordance with OATH Rules of Practice § 1-51.

**§ 11-28 Decision made on the record.** The hearing officer may conclude a case by making a report and recommendation on the record.

**§ 11-29 Written comments.** Once the hearing officer has issued a recommended final determination, each party shall have 20 days from issuance of the recommendation to submit written comments to the Board. The comments should raise any objections to the recommended determination, and objections not raised in the comments will be deemed waived in any further proceedings. Comments shall be limited to the record of the adjudicatory proceeding. Comments shall be served upon all other parties. Upon application filed with the Board's General Counsel, the General Counsel may shorten or extend the time for comments for good cause shown. No personal appearances shall be made before the Board unless the Board specifically requests that the parties appear.

**§ 11-30 Final determination.** The Board shall provide a final determination affirming, rejecting, or modifying the hearing officer's recommended final determination within 30 days of the conclusion of the written comments period, or as soon thereafter as is practicable. The final

determination shall notify the candidate of the commencement of the four-month period during which a special proceeding may be brought to challenge the Board's determination pursuant to Article 78 of the Civil Practice Law and Rules. If the Board rejects or modifies the hearing officer's recommended final determination, the Board shall provide a written determination stating the basis for any assessed penalty or public funds determination, including any findings of fact and conclusions of law. Determinations made by the Board pursuant to this chapter may not be appealed to the Board unless the Board specifically provides otherwise in its determination.

## Chapter 12: Investigations and Complaints

**§ 12-01 Investigations.** The Board may conduct an investigation into possible violations of the Charter, Act, or these rules. In its investigation, the Board may use its investigative powers pursuant to § 1052(a)(5) of the Charter and §§ 3-708(5) and 3-710(1) of the Code. An investigation may include, but is not limited to, field investigations, desk and field audits, the issuance of subpoenas, the taking of sworn testimony, the issuance of document requests and interrogatories, and other methods of information gathering.

### § 12-02 Complaints

**(a) Filing a complaint.** A complaint must be filed by hand delivery, mail, fax, or scanned and sent as an attachment via email to the Board's offices.

**(b) Complaint requirements.** Complaints must:

(i) be made in writing;

(ii) be sworn to or affirmed;

(iii) be based on personal knowledge, if possible, and if a complaint is based on information and belief, the complainant must state the source of that information and belief;

(iv) specify the conduct alleged to be in violation of the Charter, Act, or these rules, and to the extent known:

(A) the date(s) and time(s) of the conduct,

(B) the place(s) the conduct occurred, and

(C) the names of witnesses, if any.

(v) be accompanied by copies of all documentary evidence available to the complainant; and

(vi) contain the complainant's full name, current address, telephone number, and email address.

### (c) Initial review of complaint

**(i) If in compliance.** Upon receipt, the complaint will be reviewed for substantial compliance with the above requirements. If the complaint is in compliance, the Board shall, within 10 days of receipt, send each party complained about a copy of the complaint.

**(ii) Deficient complaints.**

(A) If the complaint is moot, facially meritless, or not in substantial compliance, it may be rejected and the complainant so notified.

(B) If the complaint is not in substantial compliance, the Board may investigate the subject matter of the complaint, but need not follow the procedural requirements of this chapter.

**(d) Response to complaint; possible dismissal**

(i) The party complained about may submit an answer to the complaint:

(A) within 20 days of the date the complaint was sent by the Board, or

(B)  within such lesser time as may be specified by the Board for complaints received less than 90 days before an election.

(ii) The answer must:

(A) be sworn to and affirmed,

(B) set forth a response to the allegations contained in the complaint, including any reasons why the Board should dismiss the complaint in full or in part, if applicable, and

(C) be accompanied by copies of all documentary evidence available to the respondent.

(iii) Based on the answer, a complaint may be dismissed as moot.

**(e) Board action**. Based on its review of the complaint and any answer filed, and of any investigation it chooses to conduct, the Board may:

(i) determine the complaint to be moot or lacking in merit and dismiss the complaint; or

(ii) determine that violations or infractions of the Charter, Act, or these rules have been substantiated, and initiate an enforcement proceeding pursuant to the procedures outlined in Chapter 10.

## Chapter 13: Transition and Inauguration Entities

**§ 13-01 Registration**

(a) Before any private funds are raised or spent for transition or inauguration into office, the elected candidate must register a TIE with the Board; provided, however, that donations may be accepted prior to the registration of the TIE for the purpose of paying fees and depositing any minimum balance required to open a bank account for the TIE.

(b) The registration may be submitted at any time between the day after the general election and the due date of the first disclosure statement following the date of the candidate's election, at such time as the form is made available by the Board.

(c)  The elected candidate must register no more than one TIE per election, and such TIE must have no more than one bank account. The elected candidate may not use any other bank accounts, including those of the candidate or any political committee.

(d) The registration must be submitted in such form and manner as shall be provided by the Board and must contain all information required by the Board, including: (i) the name and address of the elected candidate and of the TIE; (ii) the name, address, and employment information of the treasurer and of the liaison, if any; (iii) information about the TIE's bank account and merchant account; and (iv) any signatures and notarizations as may be required by the Board.

### § 13-02 Periodic disclosure reports

**(a) Required information.** Disclosure reports must contain all information for the reporting period required by the Board, including:

(i) the cash balance at the beginning and end of the reporting period;

(ii) total itemized and unitemized donations, loans, and other receipts accepted during the reporting period;

(iii) total itemized and unitemized expenditures made during the reporting period;

(iv) for each donation accepted in excess of $99, the contributor's and intermediary's (if any) full name, residential address, occupation, employer, and business address;

(v) the date and amount of each donation accepted or other receipt;

(vi) the form of the donation (cash, check, cashier's check, money order, credit card, text, or other);

(vii) the number of the check, cashier's check, or money order, if applicable;

(viii) the date and amount of each donation returned to a donor, the account from which the funds used to make the return originated, and the number of the bank or certified check used to issue the return of funds;

(ix) each previously reported donation for which the check was returned unpaid;

(x) for each loan accepted, the lender's, guarantor's or other obligor's full name, residential address, occupation, employer, and business address;

(xi) the date and amount of each loan, guarantee, or other security for a loan accepted;

(xii) for each loan repayment made, the date, amount, check number, name of bank account or credit card, and name of any third party payor;

(xiii) the date and amount of any portion of a loan which has been forgiven;

(xiv) the bill or invoice date and amount, name and address of the vendor or payee, the purpose code and explanation of each expenditure;

(xv) the date and amount of each payment;

(xvi) the payment method, including check number and committee bank account;

(xvii) the amount of remaining outstanding liability to the vendor or payee;

(xviii) for each in-kind donation, the date the donation was made, the name and residential address of the donor, a detailed description of the goods or services provided, the amount of the fair market value of the donation, and such further information and documentation as necessary to show how the fair market value of the donation was determined; and

(xix) such other information as the Board may require.

**(b) Unitemized expenditures.** Expenditures of less than $50 do not need to be separately itemized in a disclosure statement.

(c) All information reported in disclosure reports and amendments must be accurate as of the last day of the reporting period.

**(d) Electronic submissions.** Disclosure report submissions must follow the submission standards applicable to candidates under Chapter 4 of these rules.

**(e) Monthly reports**

(i) The first report is due on the fifth business day of the month immediately following the month during which the TIE first registers.

(ii) The first report must cover the period from the day of the first financial activity of the TIE through the last day of the calendar month immediately preceding the month in which the report is due. Each subsequent report shall cover the next consecutive calendar month, and shall be due on the fifth business day of the subsequent month.

(iii) The final report must cover the period from the day after the conclusion of the preceding report through the day the TIE terminates its activities and must be filed within five business days of such termination.

(iv) Disclosure reports that fail to comply substantially with the disclosure requirements described in the Act or these rules will not be accepted by the Board. Amendments to disclosure reports are prohibited unless expressly authorized or requested by the Board.

(v) The disclosure report must contain a verification from the elected candidate, treasurer, or other officer designated in the registration that the disclosure report is true and complete to the best of such elected candidate, treasurer, or other designee's knowledge, information, and belief, and must contain such signatures as may be required by the Board.

**§ 13-03 Limits and requirements.** The following limits and requirements apply pursuant to § 3-801 of the Code.

**(a)  Donations and receipts**

(i) An elected candidate must not: (A) authorize or register a political committee to raise or spend funds for transition or inauguration into office; (B) use funds accepted by a political committee authorized by the candidate for transition or inauguration into office; (C) authorize or register a previously existing entity to raise or spend funds for transition or inauguration into office; (D) continue a TIE in existence after it has paid all liabilities it incurred for transition and inauguration into office and otherwise has disposed of all funds pursuant to paragraph (ii) of subdivision (c) below; or (E) continue in existence an entity registered under section 13-01 after (1) April 30 in the year following the year of the election, or (2) in the case of a special election, 60 days after inauguration.

(ii) A TIE must not:

(A) accept donations or other receipts from any political committee authorized by the elected candidate;

(B) accept donations from a political committee that has not registered with the Board under § 3-801(3) of the Code on a form that includes the information set forth in section 5-04(a) (political committees registered for an election cycle pursuant to § 3-707 of the Code shall be deemed registered for purposes of § 3-801(3) of the Code with respect to transition and inauguration expenditures immediately following an election held in that cycle);

(C) accept donations in excess of the donation limits set forth in § 3-801(2)(b) of the Code;

(D) accept cash donations totaling more than $100 from a single donor;

(E) accept any donations after all liabilities are paid;

(F) accept any donations from any corporation, limited liability company, limited liability partnership, or partnership;

(G) accept any donations from any individual or entity whose name appears in the doing business database as of the date of such donation; provided, however, that this limitation on donations shall not apply to any donation made by a natural person who has business dealings with the city where such donation is from the elected candidate, or from the elected candidate's parent, spouse, domestic partner, sibling, child, grandchild, aunt, uncle, cousin, niece or nephew by blood or by marriage; or

(H) commingle receipts in any account with personal or business funds, or funds accepted for an election.

(iii) An elected candidate may donate to such elected candidate's TIE with such elected candidate's personal funds or property, make in-kind donations to such elected candidate's TIEs with such elected candidate's personal funds or property, and make advances to such TIE with such elected candidate's personal funds or property, without regard to the donation limits of § 3-801(2)(b) of the Code. An elected candidate's personal funds or property shall include such elected candidate's funds or property jointly held with such elected candidate's spouse, domestic partner, or unemancipated children.

(iv) In determining compliance with the donation limits of § 3-801(2)(b) of the Code, the Board shall total all donations from a single source to the TIE, using the definition of "single source," and the factors for so determining, pursuant to sections 1-02 and 5-10(b).

(v) Any donation, loan, or other receipt received by a TIE after January 31 in the year following the date of a regularly scheduled general election shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is received, and not received for the purposes of transition or inauguration.

(vi) Loans are deemed to be donations, subject to the limits and restrictions of the Act, to the extent the loan is not repaid by, or is made after, the date of the elected candidate's inauguration into office.

**(b) Expenditures**

(i) Funds raised for a TIE may not be used for any purpose other than transition or inauguration expenses. Expenses related to the holding of office, or related to any past or future election, are prohibited. The following are examples of types of expenditures that are presumed to be TIE-related:

    **(A) Transition**

      (1) Conferences and seminars related to city government and elected service;

      (2) Costs related to seeking and selecting city office staff;

      (3) Payroll and consulting fees directly related to transition; and

      (4) Costs related to fundraising to pay for transition expenses.

    **(B) Inauguration**

      (1) Payroll and consulting fees directly related to holding an inauguration event;

      (2) Printing and postage for inauguration event invitations;

      (3) Inauguration event site and equipment rental;

      (4) Inauguration event catering, decoration, entertainment, and photography; and

(5) Costs related to fundraising to pay for inauguration event.

(ii) There is a rebuttable presumption that the purchase of durable goods is not TIE-related.

(iii) Transition liabilities may not be incurred nor expenditures made after the elected candidate assumes office, and inauguration liabilities may not be incurred nor expenditures made after January 31 in the year after the year of the election, except for:

(A) expenditures made to satisfy liabilities incurred on or before January 31,

(B) expenditures related to fundraising to satisfy liabilities incurred on or before January 31, and

(C) routine and nominal expenditures associated with and necessary for satisfying such liabilities, terminating the entity, and responding to the post-election audit.

(iv) Unless permitted by paragraph (iii) of subdivision (b) above, any expenditure incurred after January 31 in the year following the date of a regularly scheduled general election by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is incurred, and not incurred for the purposes of transition or inauguration.

(v) A TIE may maintain a petty cash fund of no more than $500 out of which it may make disbursements not in excess of $100 per transaction. The TIE must maintain a petty cash journal including the name of every individual or entity to whom any disbursement is made, as well as the date, amount, and purpose of the disbursement.

**(vi) Single inaugural event**. No more than one inaugural event shall be presumed to be TIE-related.

**(c) Termination**

(i) The TIE must be terminated after it has paid all liabilities and otherwise disposed of all funds pursuant to paragraph (ii) below and, in any event, no later than April 30 in the year following the election.

(ii) If a TIE has funds remaining after all liabilities have been paid, it shall refund such funds to one or more of its donors, or if that is impracticable, to the Fund.

**§ 13-04 Records and audit**

(a) Each TIE must keep records that enable the Board to verify the accuracy of disclosure reports and compliance with all requirements of § 3-801 of the Code and this chapter. The records kept must be clear, accurate, and sufficient to demonstrate compliance. The records must be made and maintained contemporaneously with the transactions recorded, and maintained and organized in a manner that facilitates expeditious review by the Board.

(b) The records that must be kept include:

(i) Copies of all deposit slips;

(ii) A copy of each check or other monetary instrument, other than cash, representing a donation or other monetary receipt;

(iii) For each cash, credit card, cashier's check, or money order donation received, a written record containing (i) the donor's residential address, employer, business address, and occupation, (ii) the date and amount of the donation, (iii) if any, the intermediary's name, address, employer, business address, and occupation, and (iv) for cash, cashier's check, and money order donations, the donor's signature;

(iv) For each in-kind donation, a receipt or other written record showing how the value of the donation was determined;

(v) Each contract, invoice, bill, and receipt for goods or services provided;

(vi) Written documentation for each loan received, loan repayment, and loan forgiven;

(vii) A monthly billing statement or customer receipt for each disbursement to a TIE credit card account showing vendors underlying the disbursement; and

(viii) The following from banks and other depositories relating to accounts:

(A) all periodic bank or other depository statements in chronological order, maintained with any other related correspondence received with those statements, such as credit and debit memos and donation checks returned because of insufficient funds; and

(B) the front and back of all returned and cancelled disbursement checks.

(c) All of the TIE's records are subject to Board review and must be made available to the Board upon its request, within such time as shall be specified by the Board.

(d) Each TIE must retain all records and documents required to be kept pursuant to section 13-04 for five years after the date of its registration.

**§ 13-05 Other provisions concerning TIEs.** *See* sections 9-02(c)(i) (Final bank balance); 10-03 (Enforcement); 15-07 (Special elections); Chapter 12 (Complaints).

### Chapter 14: Disclosure of Independent Expenditures

**§ 14-01 Definitions**. Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition, the following terms mean:

"**Authorized representative**" means an officer or owner of an independent spender who is authorized to submit, and is jointly responsible with the spender for, independent expenditure reports.

113

"**Ballot proposal**" means a municipal ballot proposal, initiative, measure, or referendum. Activities associated with ballot proposals initiated by petition include the circulation of petitions to place the proposal on the ballot. Activities associated with ballot proposals not initiated by petition include those conducted after the measure or language is filed with the City Clerk.

"**Clearly identified**" means: (1) the name of the candidate or ballot proposal appears; (2) a photograph or drawing of the candidate appears; or (3) the identity of the candidate or ballot proposal is otherwise apparent by unambiguous reference.

"**Contribution**" means any monetary gift made to an entity. Contributions do not include membership dues paid by an individual or revenue from goods and services.

"**Covered communication**" means an express advocacy communication or electioneering communication.

"**Covered election**" means a covered election as defined in § 1052(a)(15)(a)(iii) of the Charter.

"**Covered expenditure**" means an expenditure directly related to the design, production, or distribution of a covered communication. An expenditure made during the ordinary conduct of business in connection with covering or carrying a news story, commentary, or editorial by any broadcasting station (including a cable television operator, programmer, or producer), website, newspaper, magazine, or other periodical publication, including any internet or electronic publication, is not a covered expenditure.

"**Electioneering communication**" means a communication that: (1) is disseminated by radio, television, cable, or satellite broadcast, a paid advertisement such as in a periodical or on a billboard, or a mass mailing; (2) is disseminated within 30 days of a covered primary or special election, or within 60 days of a covered general election; and (3) refers to one or more clearly identified ballot proposals or candidates for a covered election. Electioneering communication shall not include a campaign-related communication made by an organization operating and remaining in good standing under § 501(c)(3) of the Internal Revenue Code of 1986.

"**Entity**" means an entity as defined in § 1052(a)(15)(a)(ii) of the Charter.

"**Express advocacy communication**" means a communication that contains a phrase including, but not limited to, "vote for," "re-elect," "support," "cast your ballot for," "[Candidate] for [elected office]," "vote against," "defeat," "reject," or "sign the petition for," or a campaign slogan or words that in context and with limited reference to external events, such as the proximity to the election, can have no reasonable meaning other than to advocate the election, passage, or defeat of one or more clearly identified ballot proposals or candidates in a covered election, and is disseminated by: (1) radio, television, cable, or satellite broadcast; (2) telephone communication; (3) mass mailing; (4) other printed material; or (5) any other form of paid electoral advertising. Paid electoral advertising shall not include communications over the internet, except for: (1) communications placed for a fee on another individual or entity's website; or (2) websites formed primarily for, or whose primary purpose is, the election, passage, or defeat of a candidate in a covered election or of a ballot proposal.

**"Independent expenditure"** means an independent expenditure as defined in § 1052(a)(15)(a)(i) of the Charter.

**"Independent spender"** means an individual or entity that makes an independent expenditure, or an agent of such individual or entity.

**"Mass mailing"** means a mailing by United States mail, common carrier, or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period.

"**Principal owner**" means an individual or entity that owns or controls 10% or more of an entity, including stockholders and partners.

**"Telephone communication"** means 500 or more telephone calls, whether live or recorded, of an identical or substantially similar nature within any 30-day period.

**§ 14-02 Disclosure statements**. Each disclosure statement must include the following information:

**(a) Filer information**

(i) All independent spenders must provide their:

(A) name, mailing address, telephone number, email address, and employer information;

(B) contact person's name, mailing address, email address, telephone number, and employer information; and

(C) other similar information that may be required by the Board.

(ii) Independent spenders that are entities must also provide their:

(A) website URL;

(B) authorized representative's name, mailing address, email address, telephone number, and employer information;

(C) type of organization;

(D) name(s) of principal owners, and employer information for any such owners who are individuals; and

(E) name and employer information of board members and officers or their equivalents.

(iii) Independent spenders that are individuals must also provide their occupation and employer information.

**(b) Communications**

(i) When an independent spender makes covered expenditures aggregating $1,000 or more during an election cycle for communications that refer to a specific candidate or ballot proposal, it must report these communications and each future communication associated with an expenditure of $100 or more that refers to that candidate or ballot proposal. Expenditures of less than $100 shall not be covered expenditures for the purposes of this subdivision. Each communication must be disclosed in the reporting period in which it is first published, aired, or otherwise distributed, except that no communication is required to be disclosed before the $1,000 threshold has been reached. For each communication, the independent spender must provide:

(A) The type of communication;

(B) Its distribution date;

(C) The names of the candidates and/or ballot proposals referred to in the communication;

(D) For a printed communication, an electronic or paper copy of the communication as it was distributed to the public;

(E) For a broadcast or internet communication, an audio, video, or source file of the communication as it was distributed to the public, except that if a source file is not available for an audio communication then a script will be accepted; and

(F) Such other similar information as the Board may require.

(ii) A mass mailing shall be considered to have been distributed on the date on which it was postmarked, or accepted by a common carrier.

**(c) Expenditures**

(i) When a covered communication has been reported, each covered expenditure of $100 or more associated with that communication must be reported. If the communication refers to more than one candidate or ballot proposal, only those expenditures for candidates or ballot proposals that have met the $1,000 threshold need be reported. Each expenditure must be disclosed in the reporting period in which the expenditure is incurred, except that no expenditure is required to be disclosed prior to the reporting of its associated communication. For each expenditure, the independent spender must provide:

(A) The names of the candidates or ballot proposals referred to by the associated communication;

(B) The name of the vendor;

(C) The date, amount, and purpose;

(D) The names of the individuals or entities paying for the expenditure, if not the independent spender;

(E) The itemized invoice detailing the expenditure, when it becomes available; and

(F) Such other similar information as the Board may require.

**(ii) Valuation.** All expenditures must be reported at their fair market value. If it is not practicable to obtain an invoice, the independent spender must use a reasonable estimate of fair market value and must provide a written record supporting the estimate.

**(iii) Apportionment.** For reporting purposes, an expenditure associated with a communication that refers to more than one candidate or ballot proposal shall be apportioned among the candidates or ballot proposals based on the following factors:

(A) The focus of the communication;

(B) The geographic distribution or location of the communication;

(C) The subject matter of the communication;

(D) The relative prominence of references to or the appearance of a candidate or ballot proposal in the communication, including the size and location of references to the candidate or ballot proposal and any photographs of the candidate;

(E) The timing of the communication; and

(F) Other circumstances of the communication.

**(d) Contributions**

(i) When an independent spender that is an entity makes covered expenditures of $100 or more aggregating $5,000 or more in the 12 months preceding the election for communications that refer to any single candidate, it is required to report:

(A) All contributions accepted from other entities since the first day of the calendar year preceding the year of the covered election; and

(B) All contributions aggregating $1,000 or more accepted from an individual during the 12 months preceding the election.

(ii) Each contribution must be disclosed in the reporting period in which it was received. For each contribution, the independent spender must provide:

(A) For each contribution accepted from another entity, the entity's name, address, and type of organization and the names of the entity's principal owners, partners, board members and officers, or their equivalents, or, if no natural persons exist in any such role, the name of at least one natural person who exercises control over the activities of such entity;

(B) For each entity from which contributions aggregating $50,000 or more have been accepted in the 12 months preceding the election (the "major contributor"), (A) the name, address, and type of each entity that contributed $25,000 or more to the major contributor in the 12 months preceding the election; and (B) the name, residential address, occupation, and employer of each individual who contributed $25,000 or more to the major contributor in the 12 months preceding the election;

(C) For each contribution accepted from an individual, the individual's name, residential address, occupation, and employer;

(D) The date of receipt and amount of each such contribution accepted by the independent spender or the major contributor; and

(E) Such other similar information as the Board may require.

**(iii) Exemption for earmarked contributions**. Contributions to independent spenders or major contributors that are earmarked for an election that is not a covered election, or for an explicitly stated non-electoral purpose, are not required to be reported; provided, however that records of such contributions to independent spenders must be maintained and may be requested by the Board to verify their qualification for this exemption.

**(e) Verification**. Each independent spender filing a disclosure statement must verify that each reported expenditure referring to a candidate was not authorized, requested, suggested, fostered, or cooperated in by such candidate, an agent of such candidate, an opponent of such candidate, or an agent of such opponent. The independent spender must verify that the disclosure statement is true and complete to the best of the filer's knowledge, information, and belief. The disclosure statement must contain such signatures or notarizations and other verifications as may be required by the Board.

**(f) Format**. All disclosure statements must be submitted electronically as specified by the Board. Supporting documents must be submitted electronically, by hand, or by common carrier.

## § 14-03 Disclosure dates

**(a) Filing dates.** The Board shall publish a schedule of disclosure statement filing dates and reporting periods for primary and general elections, and for ballot proposals, based on the following:

(i) Disclosure statements are due on January 15, March 15, May 15, and July 15 of the election year.

(ii) Additional disclosure statements are due:

(A) For a primary election: 32 and 11 days before and 10 days after the election.

(B) For a general election: 32 and 11 days before and 27 days after the election.

(iii) During the 14 days before a primary or general election, or a related runoff election, an independent spender must submit a disclosure statement to the Board within 24 hours

118

of distributing any reportable communication, making any reportable expenditure, or receiving any reportable contribution.

(iv) The Board's published schedule of disclosure statement filing dates shall reflect that if a disclosure statement is due to be submitted on a Saturday, Sunday, or legal holiday, submission shall be considered timely if made on the next business day.

(v) An independent spender that has not distributed any reportable communications, made any reportable expenditures, or received any reportable contributions within a reporting period is not required to file a disclosure statement for that period.

**(b) Reporting periods**

**(i) First disclosure statement**

(A) The reporting period for the first disclosure statement containing communications or expenditures related to candidates in a primary or general election begins on the first day of the election cycle.

(B) The reporting period for the first disclosure statement for communications or expenditures related to ballot proposals begins on the first day of January in the year in which the proposal appears on the ballot.

**(ii) Each subsequent disclosure statement.** The reporting period for each subsequent disclosure statement begins on the third day before the deadline for the submission of the previous disclosure statement.

**(iii) Conclusion of reporting period.** The reporting period for all disclosure statements concludes on and include the fourth day before the deadline for the submission of that disclosure statement.

**(iv) Weekends and holidays.** The Board's published schedule of reporting period dates shall reflect that if a disclosure statement is due to be submitted on a Saturday, Sunday, or legal holiday, the reporting period will conclude on and include the fourth day before the next business day.

**§ 14-04 Identification of communications**

**(a) Independent spender identification.** When an independent spender makes covered expenditures of $100 or more aggregating $1,000 or more during an election cycle, the communication associated with the expenditure that meets the $1,000 threshold and all subsequent communications, regardless of dollar value, must include:

**(i) Printed material.** For printed material, the words "Paid for by" must appear, followed by (i) the name of the independent spender; (ii) if the spender is an entity: (A) the name of any individual or entity that owns or controls more than 50% of the independent spender, (B) the name of the independent spender's chief executive officer or equivalent, if any, and (C) the independent spender's top donors as described in subdivision (b) of this section; and (iii) the words "Not expressly or otherwise authorized or requested by

any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney". Such words must appear in a conspicuous size and style and must be enclosed in a box within the borders of the communication.

**(ii) Television, internet video, other video.** For television, internet videos, or other types of video communications, the words "Paid for by" followed by the name of the independent spender must be clearly spoken at the beginning or end of the communication in a pitch and tone substantially similar to the rest of the communication. Additionally, simultaneous with the spoken disclosure, in a conspicuous size and style and enclosed in a box, the words "Paid for by" must appear followed by: (i) the name of the independent spender; (ii) if the spender is an entity, the spender's top donors as described in subdivision (b) of this section; and (iii) the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney".

**(iii) Radio, internet audio, automated telephone calls.** For radio, internet audio, or automated telephone calls, the words "Paid for by" followed by (i) the name of the independent spender; (ii) if the spender is an entity, the spender's top donors as described in subdivision (b) of this section; and (iii) the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information at nyc.gov/FollowTheMoney", must be clearly spoken at the end of the communication in a pitch and tone substantially similar to the rest of the communication. For radio and internet audio communications of 30 seconds in duration or shorter, subparagraph (ii) of this paragraph may be omitted.

**(iv) Non-automated telephone calls longer than 10 seconds.** For non-automated telephone calls lasting longer than 10 seconds, the words "This call is paid for by" followed by the name of the independent spender and the words "Not expressly or otherwise authorized or requested by any candidate or the candidate's committee or agent. More information is available at nyc.gov/FollowTheMoney" must be clearly spoken during the call in a pitch and tone substantially similar to the rest of the call.

**(b) "Top donor(s)" identification.** Identification of an independent spender's top donors in a communication shall be as follows:

(i) A spender's top donors are its largest aggregate contributors during the 12 months preceding the election, in descending order by aggregate amount, who have contributed at least $5,000.

(ii) If there are at least three such donors:

(A) Printed identification shall be the words "Top Three Donors" followed by the names of such donors;

(B) Video identification shall be the words "The top three donors to the organization responsible for this advertisement are" followed by the names of such donors;

(C) Audio identification shall be the words "with funding provided by" followed by the names of such donors;

(D) If the third largest donor has donated the same amount as the fourth largest donor, the independent spender may choose which three donors to include, so long as no donor is included that has donated less than any other donor that is not included.

(iii) If there are only two such donors, the words "Top Donors" must replace "Top Three Donors."

(iv) If there is only one such donor, the words "Top Donor" must replace "Top Three Donors."

(v) If there are no such donors, all references to donors must be removed from the identification.

**(c) Languages other than English.** All written or spoken identification required by this section must be in the primary language of the communication, except that the web address nyc.gov/FollowTheMoney, if required to be written or spoken in the identification, must be in English.

**(d) Modification.** The requirements of this section may be modified by the Board concerning items upon which disclosures cannot be reasonably printed, pursuant to § 1052(a)(15)(c)(i) of the Charter or any other items whose disclosures are not otherwise provided for in § 1052(a)(15)(c) of the Charter.

(e) This section shall not apply to communications required to include a disclosure pursuant to § 3-703(16) of the Code.

**§ 14-05 Non-independent expenditures**. An expenditure by an individual or entity referring to a candidate, that was authorized, requested, suggested, fostered by, or cooperated in by such candidate or the opponent of such candidate, or their agents, is not an independent expenditure and is not governed by this Chapter. Factors used by the Board to determine whether an expenditure is independent or non-independent are referenced in section 6-04(a)**.**

**§ 14-06 Guidance for independent spenders**. Prior to dissemination of a communication, an individual or entity may seek guidance regarding whether the communication would be subject to these rules by submitting a written request in the form and manner prescribed by the Board, including a description or sample of the proposed communication and a description of its proposed dissemination. If the request is received more than 14 days before the election, guidance shall be provided within seven days, and if such request is received during the 14 days prior to the election, guidance shall be provided within 24 hours. Such guidance applies only to the communication exactly as submitted and disseminated exactly as described, and constitutes

neither approval nor disapproval of the content, appropriateness, or accuracy of the communication.

**§ 14-07 Document retention**. Independent spenders must provide documentation to the Board upon request, and must maintain for three years after the date of the election to which they apply:

(a) records that enable the Board to verify the accuracy of disclosure statements, including bills for goods or services used to produce and disseminate a communication, as well as records of all contributions received by independent spenders that are entities; and

(b) copies of all advertisements, pamphlets, circulars, flyers, brochures, and other printed communications disseminated, and a schedule of all radio or television time purchased, and scripts used therein or the audio or video source files. Documents previously provided to and received by the Board do not need to be maintained by the independent spender.

**§ 14-08 Penalties**. Any independent spender who violates any provision of this chapter, and any agent of an independent spender who commits such a violation, shall be subject to a civil penalty in an amount not in excess of $10,000.

**§ 14-09 Other provisions concerning independent expenditures.** *See* sections 15-06 (Special elections); 16-07 (Runoff elections); 10-03 (Enforcement); Chapter 12 (Complaints).

## Chapter 15: Special Elections

**§ 15-01 Special requirements and procedures.** If a special election to fill a vacancy is declared, the Board, after considering the date of the election and any other relevant factors, may provide for special requirements and procedures for candidates, including:

(a) a standard by which contributions, loans, and expenditures are presumed to be accepted or made for the special election, notwithstanding sections 5-10(a), 5-09(h), and 6-01(h)(i); and

(b) such other requirements and procedures as the Board may deem necessary to implement the provisions of the Act in the special election fully and effectively.

**§ 15-02 Filing requirements**

**(a)    Certification.** Candidates who wish to participate in the Program for a special election must file a Certification with the Board specifically for such election. The Certification must be filed on or before the 14ᵗʰ day after the proclamation of such election and may not be rescinded.

**(b)    Filer Registration.** Candidates who do not wish to participate in the Program are not required to file a Certification, but must file a Filer Registration specifically for the special election with the Board.

**(c)    Candidates raising funds for other elections within the same election cycle.** Candidates who have already been raising funds for other elections occurring after the special election, but within the same election cycle, may use their existing committees and bank accounts in the special election, provided that they amend their registration with the Board of Elections to reflect the change in election, and further provided that once such committee and account have been

used for the special election, they must not be used for any future election, including any other elections during the same election cycle.

**(d)**   **Disclosure statements**

**(i) Post-election financial activity.** Financial activity that occurred after a candidate's most recent election prior to a special election will be considered to be for such special election.

**(ii) First disclosure statement.** The first disclosure statement for a special election is due 32 days before the election unless otherwise provided by New York State Election Law. As provided pursuant to New York State Election Law, if the first disclosure statement for a special election is otherwise due within a period of five days of a required semi-annual disclosure statement, the candidate may file a single combined statement on the date on which the latter of the two separate statements is required to be filed.

(A) The reporting period for the first disclosure statement shall conclude on the 36th day before the election, unless otherwise provided pursuant to New York State Election Law. If a candidate is already registered for a future election and an intervening special election is called, the candidate is required to re-register with the Board for the special election and re-submit all of the candidate's financial activity with such candidate's first special election disclosure statement.

(B) Submissions required by paragraph (ii) above shall cover the reporting periods of the missing disclosure.

**(iii) Semi-annual disclosure statements**

(A) Semi-annual disclosure statements are due on January 15 and July 15 in each year of the election cycle and on January 15 in the year after the election.

(B) Notwithstanding subparagraph (A) above:

(1) for candidates in a special election who proceed to raise or spend funds for the following primary or general election, the 27 day post-election disclosure statement described in paragraph (iv) shall be the last statement required for the special election; provided, however, that if there is a runoff special election, the semi-annual disclosure statement described in paragraph (iv) shall be the last disclosure statement required for all candidates in the special election who continue to raise or spend funds for the following primary or general election, regardless of whether they were candidates in the runoff special election; and

(2) for candidates in a special election who do not proceed to raise or spend funds for the following primary or general election, the first semi-annual disclosure statement due following the date of the special election shall be the last statement required for the special election; provided, however, that if the first semi-annual disclosure statement following the

date of the special election is due less than 30 days after the deadline for filing the 27 day post-election disclosure statement, the second semi-annual disclosure statement after the date of the special election shall be the last statement required for the special election.

**(iv) Daily disclosures during the two weeks preceding the election**. If a candidate, during the 14 days preceding an election, accepts aggregate contributions and/or loans from a single source in excess of $1,000 or makes aggregate expenditures to a single vendor in excess of $20,000, the candidate must report, in a disclosure to the Board, all contributions and loans accepted from such source or expenditures made to such vendor during that 14-day period. The first such disclosure must be received by the Board within 24 hours after the contribution or loan that causes the total to exceed $1,000 is accepted or the expenditure that causes the total to exceed $20,000 is made. Each subsequent disclosure must be received by the Board within 24 hours after any additional contribution or loan is accepted or expenditure is made. Information reported in these disclosures must also be included in the candidate's next post-election disclosure statement.

**(v) Post-runoff special election disclosure statements.** For runoff special election candidates, post-election disclosure statements must be filed 27 days after the special election and on the first January 15 or July 15 following the election. Candidates in the special election must file both post-runoff special election disclosure statements, regardless of whether they were on the ballot for the runoff special election.

**(vi) Disclosure statement amendments**. The Board shall not make payments based on disclosure statement amendments filed after the final disclosure statement; provided, however, that the Board may make payments based upon such amendments solely if they are made in response to invalid matching claims reports to which the Board has requested a response after the final disclosure statement.

**(vii) Bank statements.** Each disclosure statement submitted by the candidate must include a copy of the most recent bank statements for the candidate's special election account.

**(viii) Special election due dates for compliance with § 12-110 of the Code.** If the deadline for filing financial disclosure reports with the conflicts of interest board pursuant to § 12-110(b)(2) of the Code is before the due date for the first disclosure statement required to be filed with the Board pursuant to section 15-02(d)(ii), the candidate's compliance with the requirements in § 12-110 of the Code shall be considered timely demonstrated to the Board if the Board receives confirmation of the candidate's compliance on or prior to the disclosure statement due date. If the deadline for filing financial disclosure reports with the conflicts of interest board pursuant to § 12-110(b)(2) of the Code is on or after the due date for the first disclosure statement required to be filed with the Board pursuant to section 15-02(d)(ii), the candidate's compliance with the requirements in § 12-110 of the Code shall be considered timely demonstrated to the Board if the Board receives confirmation of the candidate's compliance no later than one business day after the last day for filing disclosure reports with the conflicts of interest board.

124

## § 15-03 Expenditures

**(a) Limit**. The expenditure limit for a special election is the same as the limit for a primary or general election.

(b) Expenditures are presumed to be subject to the special election expenditure limit on and after the date a special election was first reasonably anticipated, as determined by the Board. Expenditures incurred prior to the date such election was reasonably anticipated may also be presumed to be subject to the special election expenditure limit beginning when a candidate committee has already registered for the covered office that is the subject of such special election, or has begun raising or spending funds.

(c) Candidates may present evidence to the Board demonstrating the date a special election was first reasonably anticipated.

(d) Candidates who have received public funds for a special election may not make expenditures after such election, except for narrowly defined purposes as provided in section 9-02(c), until any required public funds repayments are made to the Board. Expenditures made after a special election by the special election committee are presumed to be for the next election and are covered by the expenditure limit applicable to such election, pursuant to section 6-01(h)(i).

**(e) Qualified expenditures**

   (i) Public funds received for a special election to fill a vacancy may be used only for expenditures made by a candidate to further the candidate's nomination or election to fill such vacancy, and may not be used for any expenditure that is not qualified as defined in § 3-704 of the Code and section 6-02(a). An expenditure made prior to the date on which a vacancy was declared shall be presumed not to be in furtherance of the campaign's nomination or election, unless the candidate provides evidence demonstrating that the vacancy was reasonably anticipated when the expenditure was made.

   (ii) It is presumed that the following bills for goods and services are not qualified campaign expenditures:

      (A) bills for a special election that are first reported in a disclosure statement submitted later than the first post-election disclosure statement applicable to that special election; and

      (B) bills first reported in an amendment to a disclosure statement that is made after the special election.

## § 15-04 Contributions

**(a) Limit.** The contribution limit for a special election is one half of the contribution limit applicable to the office for which the special election is occurring.

(b) Contributions received after a candidate's most recent election and prior to a special election are presumed to be for such special election, except that contributions received on or before the

date the special election was first reasonably anticipated, which do not exceed the applicable contribution limit, will not be presumed to be for the special election.

(c) For contributions received on or before the date the special election was first reasonably anticipated which are in excess of the contribution limit for the special election, the authorized committee established for such special election must refund the excess portion to the contributor.

(d) Candidates may present evidence to the Board demonstrating the date a special election was first reasonably anticipated.

**(e) Public funds.** To receive public matching funds, candidates in a special election must meet the same threshold and eligibility requirements as candidates in a primary or general election. A candidate in a special election must respond to an invalid matching claims report no later than the deadline set by the Board.

**(f) Bank account.** Candidates must use a special election account.

(g) Receipts accepted for a special election may not be commingled in any account with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds, and may not be used for any other election until after the special election is actually held.

**§ 15-05 Training.** A candidate in a special election, or such candidate's representative, must attend a compliance training session designed specifically for such election. Such training must be completed on or before the financial disclosure cut-off date of the 11-day pre-election disclosure statement.

**§ 15-06 Independent expenditure disclosure**

(a) The reporting period for the first independent expenditure disclosure statement in a special election concerning candidates begins on the day the vacancy is declared.

(b) Disclosure statements are due 32 and 11 days before and 27 days after the election. If the first disclosure statement for a special election is otherwise due within a period of five days of a required disclosure statement, a single combined statement may be filed on the date on which the latter of the two separate statements is required to be filed.

(c) During the 14 days before the election, an independent spender must submit a disclosure statement to the Board within 24 hours of distributing any reportable communication, making any reportable expenditure, or receiving any reportable contribution.

(d) For ballot proposals anticipated to be voted on at a special election, additional disclosure statements are due on January 15 and July 15 in the year of the election. The reporting period for the first disclosure statement begins on the date the first reportable expenditure is incurred.

**§ 15-07 Transition and inauguration entities**

(a) A special election TIE must not incur liabilities or make expenditures after 30 days following the candidate's inauguration, except for expenditures made to satisfy liabilities incurred within

30 days of inauguration, expenditures related to fundraising to satisfy such liabilities, or expenditures related to terminating the entity or responding to the post-election audit.

(b) Unless permitted by subdivision (a) above, any donation or other receipt received after 30 days following the date of the elected candidate's inauguration by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is received, and not received for the purposes of transition or inauguration.

(c) Unless permitted by subdivision (a) above, any expenditure incurred after 30 days following the date of the elected candidate's inauguration by a TIE shall be presumed to be for the next election in which the elected candidate is a candidate following the day that it is incurred, and not incurred for the purposes of transition or inauguration.

(d) The TIE must be terminated after it has paid all liabilities and otherwise disposed of all funds pursuant to the requirements set forth in this chapter and, in any event, no later than 60 days after inauguration.

### Chapter 16: Runoff Elections

### § 16-01 Demonstrating that a runoff is reasonably anticipated

(a) A candidate may not accept contributions or make expenditures for a runoff election unless the Board has determined that a runoff election is reasonably anticipated.

(b) A candidate may not accept contributions or make expenditures for a runoff election once the Board determines that it is no longer reasonable to anticipate such an election.

(c) In determining whether a runoff election is reasonably anticipated, the Board shall consider factors including, but not limited to:

(i) the history of runoff primaries in a particular party for the office at issue;

(ii) media reports discussing the likelihood of a runoff primary;

(iii) polling information;

(iv) the proximity to the date of the primary;

(v) whether an incumbent officeholder is a candidate in the race;

(vi) the number of candidates running;

(vii) the amount of funds raised by the candidates; and

(viii) endorsements made to the candidates in the race.

### § 16-02 Certification. A candidate's Certification for a primary, general, or special election applies to any related runoff or runoff special election.

### § 16-03 Reporting

(a) Pre-election disclosure statements must be filed four days before a runoff election.

(b) Post-election disclosure statements must be filed 10 days after a runoff primary election.

(c) Each disclosure statement submitted by the candidate must include a copy of the most recent bank statements for the candidate's runoff election account.

**§ 16-04 Expenditure limit.** The expenditure limit for a runoff election is one half the amount of the applicable limitation for the associated primary, general, or special election.

**§ 16-05 Contributions**

**(a) Limit.** The contribution limit for a reasonably anticipated runoff election is one half of the contribution limit applicable to the office for which the runoff election is occurring.

**(b) Solicitation of contributions.** Until a primary or special election is held that results in a runoff election, each solicitation of runoff election contributions must expressly state that such contributions are being solicited only for a runoff election that may not occur.

(c) No single contribution may be divided between runoff and non-runoff accounts, nor may a single contribution be accepted in an amount that exceeds the limit applicable for the primary and general election, or runoff election, under § 3-703(1)(f) or (h) of the Act.

**(d) Contribution documentation**

   (i) Each contribution must be documented and disclosed to the Board as a runoff contribution.

   (ii) For each contribution from an individual contributor that the candidate deposits into a runoff bank account, the candidate must maintain a contribution card, which shall be provided to the Board upon request.

      (1) Runoff account contribution cards must include all information required pursuant to section 4-01(b)(ii)(B).

      (2) Runoff account contribution cards must state, above the line for the contributor's signature: "I understand that this entire contribution will be used only for a runoff election. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate affiliation."

**(e) Public funds payments**

   **(i) Flat grants for run-off elections.** Pursuant to § 3-705(5)(a) of the Code, the Board shall pay to a candidate in a runoff primary election or runoff special election an amount equal to 25 cents for each one dollar of public funds paid to the candidate for the preceding election.

**(ii) Timing.** The Board shall make payments pursuant to this subdivision within four business days after the date of the preceding election, or as soon thereafter as practicable; provided, however, that no public funds shall be paid to candidates in a runoff election until the Board has determined that such runoff election is reasonably anticipated to occur.

(f) Receipts accepted for a runoff election may not be commingled in any account with receipts accepted for another election, with receipts accepted for a TIE, or with personal or business funds, and may not be used for any other election held in the year that the runoff election is held or anticipated.

(g) Receipts accepted for an anticipated runoff election that is not held may not be spent or otherwise transferred until the earlier of (i) the first January 12 after the date of the election for which the runoff election was anticipated or (ii) the date upon which all the candidate's liabilities from the election for which the runoff election was anticipated have been extinguished.

## § 16-06 Runoff bank accounts

### (a) Runoff primary elections

**(i) Candidates must use a runoff primary bank account.** No disbursements, withdrawals, or transfers may be made from the runoff account prior to the day of the preceding primary election, except that contributions may be returned to contributors until the candidate first receives public funds for the runoff election.

(ii) A runoff bank account must be disclosed to the Board in an amendment to a Certification or Filer Registration.

**(iii) Exchange of funds.** Funds may be exchanged between an account maintained for a primary or the general election and an account maintained for a runoff primary for the following purposes only:

(A) exchanges from a primary or general election account to a runoff primary account made after the primary election so that the funds transferred may be spent in the runoff primary; and

(B) exchanges from a runoff primary account to a primary or general election account made after the runoff primary is held so that the funds exchanged may be spent in the general election.

### (b) Runoff special elections

(i) A runoff special election may be held for the office of mayor, as provided by § 10(c)(10) of the Charter.

**(ii) Candidates must use a runoff special bank account.** No disbursements, withdrawals, or transfers may be made from the runoff account prior to the day of the preceding special election, except that contributions may be returned to contributors until the candidate first receives public funds for the runoff election.

(iii) A runoff bank account must be disclosed to the Board in an amendment to a Certification or Filer Registration.

**(iv) Exchange of funds.** Receipts accepted for a runoff special election may not be used for any other election until after the runoff special election is actually held; provided, however, that funds may be exchanged between an account maintained for a special election and an account maintained for a runoff special only after the special election, in order for the funds transferred to be spent in the runoff special.

## § 16-07 Independent expenditure disclosure

(a) The reporting period for the first disclosure statement in a runoff election begins on the day the Board issues a determination stating that such runoff election is reasonably anticipated.

(b) For a runoff primary election, a disclosure statement is due 10 days after the election.

(c) For a runoff special election, a disclosure statement is due 27 days after the election.

(d) During the 14 days before a runoff primary or special election, an independent spender must submit a disclosure statement to the Board within 24 hours of distributing any reportable communication, making any reportable expenditure, or receiving any reportable contribution.

## Chapter 17: Voter Education and Engagement

## § 17-01 Definitions

Except as otherwise provided, the definitions set forth in section 1-02 apply in this chapter. In addition, the following terms mean:

"**Ballot proposal**" means any proposition, referendum, or other question submitted to New York City voters pursuant to the Charter, the New York Municipal Home Rule Law, or any other law.

"**Candidate print statement**" means the document filed by a candidate containing biographical and other information requested by the Board, and a photograph of the candidate, for inclusion in the printed or online primary or general election Voter Guide.

"**Candidate video statement**" means a video-recorded statement by the candidate for inclusion in the video and online edition(s) of the primary or general election Voter Guide.

"**Election**" means any primary or general election for the office of mayor, public advocate, comptroller, borough president, or Council member, or a general election in which a ballot proposal is on the ballot, and does not include any special election held to fill a vacancy, runoff primary election, runoff special election, or election held pursuant to court order.

"**Registered candidate**" means an individual who has registered or filed a Certification with the Board pursuant to section 2-01 or 2-02 and § 3-703 of the Code.

## § 17-02 Contents of the Voter Guide

**(a) Generally**. In addition to any information that the Board determines to be useful for promoting public awareness of the voting process, city government, and the candidates and ballot proposals in an election, the printed and online Voter Guides for an election shall contain: (1) the date of the election; (2) the hours during which the polls will be open; (3) an explanation of the voter registration process, including deadlines to register for both the primary and general elections; (4) an explanation of how to obtain and cast or mark an absentee ballot; (5) an explanation of how to cast a vote, including write-in votes; (6) information about the boundaries of City Council districts to aid voters in determining their appropriate district; and (7) tables of contents, graphics, and other materials which the Board determines will make the Voter Guide easier to understand or more useful for the average voter.

**(b) Candidate statements**

    **(i) Candidate print statements**

        (A) Candidate print statements contain the following biographical information:

            (1) the name of the candidate;

            (2) the political party, if any, in which the candidate is enrolled, and for which party lines the candidate's name will appear on the ballot;

            (3) the previous and current public offices held by the candidate;

            (4) the current occupation and employer of the candidate;

            (5) prior employment and positions held by the candidate;

            (6) the experience the candidate has had in public service;

            (7) the educational background of the candidate;

            (8) a list of the candidate's major organizational affiliations;

(9) information about the candidate's principles, platform, or views, in a form prescribed by the Board; and

(10) such other information as may be determined by the Board and requested of the candidate.

(B) The candidate print statement must be submitted in English.

(C) The photograph of the candidate submitted as part of a candidate print statement must:

(1) be a recent photograph;

(2) have a plain background;

(3) show only the face or the head, neck, and shoulders of the candidate;

(4) not include the hands or anything held in the hands of the candidate;

(5) not show the candidate wearing any distinctive uniform, including but not limited to a judicial robe, or a military, police, or fraternal uniform; and

(6) comply with the size and resolution requirements as determined by the Board.

 (D) Candidate print statements may not:

(1) refer to any opposing candidate by name;

(2) contain profanity or statements that are patently offensive, obscene, libelous, or defamatory;

(3) assert facts that the candidate knows or should know to be false; or

(4) violate any city, state, or federal law, including regulations of the New York State Public Service Commission.

(E) A candidate print statement that violates any of the requirements outlined in this chapter, as determined by the Board at its sole discretion, shall not be included in the Voter Guide.

**(F) Timing of submission**

(1) In the election year, all registered candidates considering filing designating petitions must submit their complete and final print statements in accordance with a deadline set by the Board.

(2) A candidate not named in a filed designating petition who anticipates filing an independent nominating petition for the general election must submit a candidate print statement on or before the "independent candidates" submission deadline set by the Board.

(3) Complete and final print statements for the general election Voter Guide must be submitted prior to the publication of the primary election Voter Guide.

## (ii) Candidate video statements

(A) Candidate video statements must contain information regarding the candidate's platform and candidacy, and may contain such other information as the candidate may choose; provided, however, that the candidate may not:

(1) refer to any opposing candidate by name;

(2) use profanity, or statements, gestures, or materials that are patently offensive, obscene, or pornographic;

(3) make statements that are slanderous, or defamatory, or assert facts that the candidate knows or should know to be false;

(4) engage in any commercial programming or advertising;

(5) display any literature, graphs, or props; or

(6) violate any city, state, or federal law, including regulations of the New York State Public Service Commission and the Federal Communications Commission.

(B) Candidates recording video statements may dress as they choose and are responsible for their own clothing, make-up and hairdressing; provided, however, that when recording a video statement, candidates may not:

(1) engage in full or partial nudity;

(2) wear any distinctive uniform, including but not limited to a judicial robe, or a military, police, or fraternal uniform; or

(3) violate any city, state or federal law, including regulations of the New York State Public Service Commission and the Federal Communications Commission.

(C) To ensure that candidate scripts meet the requirements of this section, candidate video statement scripts must be submitted for Board approval in advance of the candidate's scheduled recording session, and on or before the script submission deadline set by the Board. Candidates must follow their approved video statement script during the recording. Recorded statements shall not be edited by the Board or any entity participating in the production of the video edition of the Voter Guide, except that candidate identification and other election information may be displayed.

(D) Only the candidate may appear on camera, and only the candidate may record a candidate video statement.

(E) Candidates shall be allowed to sit or stand while recording statements. Reasonable accommodations for candidates with special needs shall be made.

(F) Video statements shall be recorded in English. Candidates may record a portion of their video statements in a language other than English; provided, however, that the script submitted for Board approval contains both the English and non-English text, and an English translation of all non-English text. No additional time will be allotted for statements recorded in multiple languages.

(G)  Candidate video statements that violate any of the requirements outlined in this chapter shall not be included in the Voter Guide.

(H) Timing of candidate video statement recordings. In the election year, the recording schedule for candidates' video statements shall be provided to registered candidates in advance. Appointments for candidate video statement recordings shall be made at a time within the prescribed production schedule. A candidate who fails to appear at the scheduled time shall be deemed to have waived participation in the video edition of the Voter Guide.

**(iii) Inclusion of candidate statements in Voter Guide editions**

**(A) Primary election edition.** Candidate print and video statements shall be included in primary election editions of the Voter Guide only for registered candidates who have met the requirements set forth in this chapter and are on the ballot in a contested primary. In the case of printed editions of the Voter Guide, print statements of candidates anticipated to appear on the ballot in a contested primary on the date that the primary election print edition goes to press shall be included, based on the Board's assessment of information available from the Board of Elections.

**(B) General election edition.** Candidate print and video statements shall be included in general election editions of the Voter Guide only for registered candidates who have met the requirements set forth in this chapter and are on the general election ballot. Candidates who are seeking nomination or election exclusively as write-in candidates shall not be included in the Voter Guide. In the case of printed editions of the Voter

Guide, print statements of candidates anticipated to appear on the general election ballot on the date that the general election print edition goes to press shall be included, based on the Board's assessment of information available from the Board of Elections. Candidates running unopposed in the general election shall be included in general election editions of the Voter Guide, except where the only election being covered is uncontested, in which case the Board shall not produce or distribute print or video editions of the Voter Guide, but shall produce an online Voter Guide.

(C) If a candidate in the general election was included in the primary election Voter Guide, then that candidate's primary election Voter Guide statement shall be included in the general election Voter Guide. No modifications or additions to the original statement shall be accepted.

(D) Candidates' print statements shall be included in the primary and general election online editions in accordance with the requirements set forth in paragraphs (i), (ii), and (iii).

(E) The Board shall not accept a candidate print or video statement unless it is submitted in a manner provided by the Board, includes any signatures or notarizations as may be required by the Board, and the candidate has verified that the contents of the submission are true to the best of such candidate's knowledge. The Board may, at its discretion, reject any candidate print or video statement, or portions thereof, it deems to contain matter that is obscene, libelous, slanderous, defamatory, or otherwise in violation of these rules.

(iv) Candidate statements must not exceed the length and space limitations provided by the Board. The Board may, at its discretion, require that candidate print statements follow a consistent format, and edit statements to achieve uniformity of presentation, conformance with length and space limitations, and consistency with existing law. Candidate video statements that exceed their allotted statement time, as determined by the Board, shall be cut off at the time limit.

(v) A candidate print statement or video script is a written instrument which, when filed, becomes part of the Board's records. A candidate may not include any false information in such candidate's print statement or video script. The candidate must verify that such candidate's print statement and video script are true, to the best of such candidate's knowledge. Knowingly filing a written instrument that contains a false statement or false information is a Class A misdemeanor under New York State Penal Law § 175.30.

(vi) With each candidate print statement, the Board shall publish one of the following notices:

(A) In the case of a participant: "Participant in the Campaign Finance Program" or language to like effect.

(B) In the case of a non-participant: "Not a participant in the Campaign Finance Program" or language to like effect.

**(c) Ballot proposals**

(i) The print and online editions of the Voter Guide for a general election in which a city ballot proposal is anticipated to appear on the ballot shall contain: (A) the form of each ballot proposal as it will appear on the ballot in the general election; (B) a plain-language abstract of each ballot proposal; and (C) to the extent feasible, the major arguments for and against the passage of each ballot proposal, clearly labeled as such. If feasible, the Board shall solicit and accept from the public statements for and against passage of each ballot proposal for possible inclusion in the Voter Guide for the general election.

(ii) A public statement shall not be accepted by the Board unless it: (A) is submitted in a form and manner provided by the Board and includes any signatures required by the Board; (B) conforms to the length and space limitations provided by the Board; (C) identifies the organization, if any, on whose behalf the statement is made; and (D) clearly argues for or against passage of the proposal. No person may submit more than one statement per ballot proposal pursuant to this paragraph.

**(iii) Board determines whether to publish statements for and against ballot proposals**. With respect to statements for or against passage of ballot proposals, the Board, at its discretion, may determine: (A) not to publish any such statements; (B) not to publish any statement submitted pursuant to paragraph (i) of subdivision (c); (C) to publish any portion of a statement submitted pursuant to paragraph (i) of subdivision (c); and (D) to compose and publish such statements as it deems appropriate.

**(iv) State ballot proposals**. The Board shall include information about state ballot proposals in Voter Guides for a covered office or a city ballot proposal. At its discretion, the Board may produce an online Voter Guide to provide information about state ballot proposals during an election for which no print Voter Guide is produced.

**§ 17-03 Voter Guide publication and distribution**

(a) The Board shall publish printed Voter Guides in English and Spanish, and in such other languages as may be required by law. The Voter Guide shall be distributed by mail to each city household in which there is at least one registered voter eligible to vote in the primary or general election, as applicable.

(b) The Board shall produce an online Voter Guide in English and make the translated versions of the printed editions available online.

(c) The Board shall make all reasonable efforts to produce a video edition of the Voter Guide for citywide elections, and shall seek partners for the production, marketing, and broadcasting of video editions of the Voter Guide. The Board shall post online the scripts provided pursuant to section 17-02(b)(ii)(C), along with translations of those scripts into Spanish and such other languages as may be required by law.

(d) Any conflicts related to the submission or public release of candidate print or video statements shall be decided by the Board.

(e) All decisions made by the Board with respect to any edition of the Voter Guide, including resolution of conflicts, are final.

(f) The Board retains ownership of, and distribution rights to, all Voter Guide content, including candidate statements. Unedited candidate statements may be republished or broadcast with the Board's permission.

**§ 17-04 Elections not held as scheduled.** Notwithstanding any other provision of this chapter, the Board shall take such actions as are practicable to prepare, publish, and distribute a Voter Guide in a timely manner for an election that is not held as initially scheduled.

## Chapter 18: Public Access to Information

**§ 18-01 Records available to the public.** The New York State Freedom of Information Law (FOIL) (Public Officers Law, Article 6, § 84 et seq.) governs public access to the Board's records. The Board may deny access to records or portions of records that are exempted from disclosure by state or federal law.

**§ 18-02 Records access officer.** The Board's records access officer is designated by the Executive Director and is responsible for ensuring appropriate agency response to public requests for access to records.

**§ 18-03 Requesting records**

(a) A candidate may request access to records such candidate submitted to the Board by contacting the Candidate Guidance and Policy Unit, which may, at its discretion, provide access to such records without a FOIL request.

(b) To request access to Board records, a member of the public must:

    (i) make a written FOIL request in person, by mail, or by email, addressed to the Board's records access officer;

    (ii) reasonably describe the records sought;

    (iii) provide the requestor's name and mailing or email address; and

(iv) specify preference for inspection of records or copies of records.

(c) Within five business days of receipt of a FOIL request made in accordance with subdivision (b) above, the Board will:

(i) grant or deny the request, in whole or in part, in writing; or

(ii) provide:

(A) a written acknowledgment of the request and state the approximate date on which the request will be granted or denied; or

(B) where circumstances prevent granting or denying the request within 20 business days of the written acknowledgment,

(1) a written statement of the reasons for the delay in making a determination; and

(2) a date, within a reasonable period depending on the circumstances, when the request will be granted or denied.

(d) Where the Board is unable to locate records responsive to the request, the Board, upon request, will certify that:

(i) the Board is not the custodian of such records; or

(ii) such records cannot be found after a diligent search.

(e) Where the request is granted, the Board will:

(i) make records available for inspection:

(A) between the hours of 10:00 a.m. and 4:00 p.m., on business days, Monday through Friday;

(B) at the offices of the Board or another location chosen by the Board;

(C) in quantities that may be limited to the amount available at the time; and

(D) contingent on the requester's promise that the records will not be removed, damaged, marked, or changed in any way during the inspection; or

(ii) make copies of records available in the medium requested, where practicable, upon payment of fees as described in this Chapter, and provide, on request, a certification that the copies are true copies;

(f) Where a request is denied, the Board will explain the reasons for the denial in writing and set forth the right to appeal.

**§ 18-04 Appealing a denial of access to records**

(a) To appeal a denial of access to records, the requester must, within 30 days of the denial, submit a written appeal to the Board's General Counsel including:

   (i) a copy of the original request;

   (ii) a reasonable description of the records to which access was denied; and

   (iii) the name and address of the requester.

(b) Upon receipt of an appeal, the Board's General Counsel shall, within 10 business days:

   (i) decide the appeal and send a copy of the written decision to the requester; and

   (ii) send a copy of the appeal and a copy of the written decision to the Committee on Open Government of the Department of State of the State of New York.

**§ 18-05 Fees.** The Board may require payment for copies of records, as follows:

(a) 25 cents per page for photocopies not exceeding 8-1/2 inches by 14 inches; or

(b) the actual cost of reproducing any other record, in accordance with § 87 of the New York Public Officers Law.