UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

—------------------------------------------------------x

DEVI NAMPIAPARAMPIL,

|  | **PLAINTIFF'S** |
|---|---|
| *Plaintiff,* | **MEMORANDUM OF LAW IN RESPONSE TO THE DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| –against– | No. 23 Civ. 6391 (ER) |

THE NEW YORK CITY CAMPAIGN FINANCE

BOARD, AMY LOPREST, BETHANY PERSKIE, DAVID DUHALDE, HANNAH EGERTON,

FREDERICK SCHAFFER, MATTHEW SOLLARS, JACLYN WILLIAMS, AND THE CITY OF NEW

YORK

*Defendants*

Devi Nampiaparampil

Pro Se Litigant, The Plaintiff

Metropolis Pain Medicine PLLC

111 John Street Suite 2509

New York, NY 10038

Cell: 312-523-5935

Email: devichechi@gmail.com

## TABLE OF AUTHORITIES

*Cases:*

Ruotolo v. I.R.S., 28 F.3d 6, 8 (2d Cir. 1994)

Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)

Boag v. MacDougall, 454 U.S. 364, 365 (1982)

Erickson v. Pardus, 551 U.S. 89, 94 (2007)

Garcia v. SUNY Health Sciences Center of Brooklyn, 280 F.3d 98 (2d Cir. 2001)

Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004)

Gorman-Bakos v. Cornell Co-op Extension, 252 F.3d 545 (2d Cir. 2001

Bell At. Corp v. Twombly, 550 U.S. 544, 570 (2007)

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

Sackler v. American Airlines, Inc. 777 F.App'x 558 (2d Cir. 2019)

Alpern v. UtiliCorp United, Inc., 531 F.App'x 98 (2d Cir. 2013)

DiFolco v. MSNBC Cable LLC, 622 F.3d 104 (2d Cir. 2010)

Cf. Lyman v. CSX Transp., Inc., 364 F. App'x 699, 702 (2d Cir. 2010)

Nixon v. City of New York, 94 F.3d 457 (2d Cir. 1996)

Cabrera v. City of New York, 202 F.3d 160 (2d Cir. 2000)

Lynch v. Town of Haverstraw, 18 F. Supp. 3d 416 (S.D.N.Y. 2014)

Sharikov v. Philips Med. Sys. MR, Inc

Carr v. NYC Transit Auth.

Sarkar v. NYC Dep't of Educ.

Schuloff v. Fields, 950 F. Supp. 66, 67-68 (E.D.N.Y. 1997)

New York City Campaign Finance Board v. Mahadeo

Citizens United v. Federal Election Commission, 558 U.S. 310 (2010).

NAACP v. Alabama, 357 U.S. 449, 462 (1958)

*Statutes:*

R.C.N.Y. 10-01(a)

 Title 11 Chapter 1, Subchapter A, Part 110 $110.10

<u>*Articles:*</u>

Amy Loprest and Bethany Perskie, *Empowering Small Donors: New York City's Multiple Match Public Financing as a Model for a Post-Citizens United World*, 40 Fordham Urb. L.J. 639 (2012).

**RESPONSE TO**

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AND PROCEDURAL HISTORY:**

The Defendants write about the First Amended Complaint (FAC), "Plaintiff newly made a scattershot set of allegations that, from Defendants' perspective, are not obviously related or connected to her post-election audit by the Board." Let me briefly respond with the connections:

1. *"Plaintiff points to judicial decisions reviewing the merits of the Board's audits of other candidates, (FAC ¶¶ 38-42, 46)*

   I have reviewed the merits of candidates similarly situated to me. The ones who accused the Defendants of misconduct were punished harshly, as were their family members and supporters. The ones who did not accuse the Defendants of misconduct did not face significant sanctions. Of note, after I filed the FAC, the Defendants deleted these audit reports from their public-facing government Agency website, arguably destroying electronically stored evidence.

2. *"...as well as claims of ambiguity, inconsistencies, or inequities in connection with the Board's rules for audits… (FAC ¶¶ 44-45) and "(E.g. FAC at pp 34-49). Defendants cannot make sense of this portion of the FAC."*

   I identified and discussed numerous situations in which the Defendants selectively interpreted and applied their Rules to candidates' audits. After I filed the FAC, the Defendants deleted the applicable Rules from their public-facing government Agency website, destroying electronically stored information relevant to the FAC.

3. *"She also contends that the Board has since amended its rules without saving her comments on those amendments (FAC ¶¶ 81-83, 93)."*

   The Defendants have enforced numerous "prior restraints" on speech. Following the prescribed time, place, and manner restrictions, I attempted to communicate my objections to the CFB's Rules for Enforcement, to the City Council and the Mayor. My comments, suggesting a bias in the CFB's procedures, were excluded in another act of content-based discrimination. Although my specific testimony had been excluded,

prior to the filing of my FAC, the Defendants had various social media posts referencing this public hearing. After my FAC was filed, all references to the hearing were deleted from the Agency's interactive social media sites, creating the false impression that a hearing had never taken place.

4. *"[T]hat the Board retaliated against her friends and supporters (FAC ¶ ¶ 68-80);"*
   The Defendants harassed the donors and vendors to my campaign under the guise of the Audit. The Defendants also harassed people who never even had a financial relationship to me or my campaign. The Defendants suggested they should have been paid because their endorsements and volunteer work helped me get votes.

5. *"[T]hat the Board deleted information about her on its website (FAC ¶ ¶ 83, 95);"*
   The deletions and alterations pertain to material facts in this case and in the audit, such as how much money the campaign fundraised. They are also prior speech restraints, since those numbers would affect my viability for future races.

6. *"[T]hat the Board was somehow a participant in a breach of Plaintiff's cybersecurity (FAC ¶ ¶ 85-87);"*
   As part of their auditing procedures, the Defendants obtained the routing and bank account information, as well other relevant security details for my personal, business, and campaign bank accounts. The information for all three accounts was posted on the Dark Web on three separate occasions, each of which corresponded to key campaign and litigation deadlines. One of these deadlines was the day before the filing deadline for my Response to the MTD the Complaint in my (dismissed) NYS Supreme Court case against the Defendants for Libel and Disparagement of a Commercial Entity. The timing of all three breaches suggest a political motivation, as well as an intention to harm me, my campaign, and my business.

7. *[A]nd that the Board has not properly responded to a request under the Freedom of Information Law, (FAC ¶ 87)."*
   For over 500 days, the CFB has denied me access to the *general* Rules, guidelines, and protocols it uses to audit *all* campaigns. Also, for over 500 days, the CFB has denied me information on its organizational structure (i.e. final decision makers) and information about (any) appeals processes, short of judicial intervention.

**RESPONSE TO**

**DEFENDANTS' LEGAL STANDARD:**

In reviewing a Motion to Dismiss, the Second Circuit has held, "A court is under no duty to rework a pro se litigant's complaint, but dismissals for failure to state a claim should be granted sparingly and with caution." (Ruotolo v. I.R.S., 28 F.3d 6, 8 (2d Cir. 1994)) and ""Implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." (Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)). The Supreme Court has also held, ""We have consistently held that pro se pleadings are to be given a liberal construction." (Boag v. MacDougall, 454 U.S. 364, 365 (1982)) and "A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (Erickson v. Pardus, 551 U.S. 89, 94 (2007)).

The Defendants' make additional contentions (p6) to which I will respond briefly:

*"Plaintiff spends several pages in the FAC talking about candidates who were "canceled." (E.g., FAC at pp-34-39). Defendants cannot make sense of this portion of the FAC."*
I created a table of the candidates for city, state and federal office in the 2022 general elections. Then by comparing the Defendants' online 2022 voter guides (Exhibit A and Exhibit B) to the actual 2022 ballot, I demonstrated how candidates similarly situated to me, had been excluded from the CFB's public-facing government Agency website. The "canceled" candidates are the ones who are on the ballot, but who are somehow missing from the 2022 Voter Guide. Even their names are missing.

For example, in contested races between Democrats and Republicans, the Republican candidates' names were missing, creating the false impression those races were uncontested. Typically, there is less voter turnout in an uncontested race. Further, the Defendants deprived Republican candidates of their ability to present their platforms directly to the public, depriving Republican candidates of the full ability to fundraise through the taxpayer-funded "NYC Votes" platform on the CFB website. The Defendants

deprived members of the public of their ability to seek out these Republican candidates' campaign websites. Without the candidates' names, NYC voters would have a hard time identifying the candidates.

These actions also speak to the Defendants' *mens rea*, which is viewpoint discriminatory censorship that interferes with the public's right to free assembly.

Moreover, the instruments through which the Defendants enact their speech restraints are the same instruments used against me previously. The Defendants acknowledge that I repeatedly presented and litigated the Defendants' content-based restrictions in the voter guide-- both in my 2021 case for a Temporary Restraining Order (TRO) before Judge Hagler and in my 2022 case for Libel before Judge Ramseur. The ongoing speech restrictions, demonstrated in my tables, show that the City has a long-standing informal policy of restraining speech by Republican challengers, particularly those from ethnic minorities. They failed to act after my case. The Defendants' actions were not isolated incidents but part of an ongoing pattern of conduct, which the City has failed to correct. The City has acted with deliberate indifference towards the CFB's pattern of enforcing unconstitutional policies. This meets an element of my Monell claim.

In that same set of tables, I also identified the limited number of Democratic candidates who had been excluded from the Defendants' 2022 online voter guide. Two of the six excluded Democratic candidates had accused the Defendants of misconduct, including First Amendment violations, suggesting a retaliatory motive. Three of the six Democratic candidates were the sole incumbent Democrats involved in redistricting disputes with Alexandria Ocasio-Cortez, and could have attracted voters away from her. This suggests a political motivation for their exclusion. The last of the six excluded Democratic candidates, had some authority to regulate the Defendants' because of his position in the NYS legislature. He lost his election. This also suggests prior restraint on core political speech.

Of note, after I filed the FAC (on July 23, 2024), the Defendants deleted the 2022 city, state, and federal online Voter Guides from the public-facing government Agency website, where that information had previously been archived, thereby destroying protected ESI.

Moreover, the Defendants' actions demonstrate their mens rea. The Defendants acknowledge they have heard my grievances numerous times in the past. They did not take any actions to address these grievances. When faced with similar grievances from a much larger swath of similarly situated candidates, these Defendants failed to take corrective action, and instead, sought to destroy evidence of their misconduct.

### RESPONSE TO DEFENDANTS' POINT I:
### "TO THE EXTENT THAT PLAINTIFF REPLEADS HER PRECLUDED CLAIMS IN THE GUISE OF RETALIATION, THESE CLAIMS REMAIN PRECLUDED AND SHOULD BE DISMISSED."

The Defendants write (p2/6), "For ease of understanding, Defendants have relied on the original Complaint where possible to provide a readable accounting of this action's assertions," followed by (p7/16), "[A]ny claims arising out of Plaintiff's qualms about her inclusion in the print or online Voter Guide, the debate, or the Board's public campaign finance program, including those claims seemingly set forth on pages 25 through 27 of the FAC, must be dismissed."

To prove a First Amendment claim, the plaintiff must show that they engaged in conduct protected by the First Amendment (Garcia v. SUNY Health Sciences Center of Brooklyn, 280 F.3d 98 (2d Cir. 2001). I demonstrated that I engaged in core political speech and that this was the basis for my relationship with the CFB. I also demonstrated that the Defendants' have a pattern and policy of enforcing prior restraints on core political speech. This extends across similarly situated candidates. Their viewpoint discrimination also extends across all of the governmental functions they provide. This goes to their *mens rea*. Moreover, I explained why I initiated the legal proceeding, which precipitated the audit. This connects the dots between the political speech during the campaign, the speech constraints, my

petition to the government for a redress of my grievances, and the retaliatory audit. I met the first element of a claim for retaliation. I also demonstrated how my core political speech has substantially motivated the Defendants' actions past and present (See *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004)) and that the Defendants had a desire to punish me (see *Gorman-Bakos v. Cornell Co-op Extension*, 252 F.3d 545 (2d Cir. 2001)). These are factors that have strengthened First Amendment claims.

<u>**RESPONSE TO DEFENDANTS' POINT II:**</u>
**"THE COURT SHOULD DISMISS THOSE CLAIMS THAT PLAINTIFF WAS NOT GIVEN LEAVE TO AMEND."**

The Defendants write (p8/16), "In the FAC, however, Plaintiff has taken the opportunity to seemingly expand her claims of retaliation beyond those of a retaliatory audit and raise new theories of retaliation… Plaintiff has no basis as of right to amend her original Complaint in such a fashion."

The Defendants cite *Bell At. Corp v. Twombly*, 550 U.S. 544, 570 (2007) as their legal standard for this case (MTD the FAC p6,7/16). *Twombly* also states, "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A plausible claim based on factual content is all that is required for a complaint to move forward. The legal theory behind the claim does not need to be fully deconstructed.

It is the facts that determine whether a claim can proceed in federal court. The Defendants have not disputed the sufficiency of the facts I presented. Their contention is with the legal theory. This emphasis on facts, rather than legal theories, is supported by several Second Circuit decisions that followed Twombly as well as Ashcroft v. Iqbal, 556 U.S. 662 (2009).

The Second Circuit has held, "To survive a motion to dismiss the complaint must include sufficient facts to support a plausible inference of the defendant's liability (Sackler v. American Airlines, Inc. 777 F.App'x 558 (2d Cir. 2019), and, "The court must assess the

adequacy of the allegations, not the merits of the legal theory." (Alpern v. UtiliCorp United, Inc., 531 F.App'x 98 (2d Cir. 2013)). The Third Circuit has held, "The Court's function on a motion to dismiss is not to weigh the evidence, but to assess whether the complaint's factual allegations are sufficient to state a claim." (DiFolco v. MSNBC Cable LLC, 622 F.3d 104 (2d Cir. 2010)).

For <u>Point II</u>, the Defendants only cite one legal case that supports their argument. They write. "Cf. Lyman v. CSX Transp., Inc., 364 F. App'x 699, 702 (2d Cir. 2010) (holding there was no abuse of discretion when district court refused to consider new theories of liability set forth at summary judgment when plaintiff had not sought leave to amend)." That same case includes this quote (emphasis added), "Lyman had ample opportunity during discovery to assert these new claims, but failed to do so. The district court correctly concluded that it would be improper to allow Lyman to introduce new theories of liability at the summary judgment stage **after discovery had closed.**" In my case, the Defendants have benefitted from a Stay on Discovery on both the original Complaint and the FAC. In *Lyman*, the Second Circuit emphasized that it was the Discovery issue that motivated them to deny the plaintiff's new theory of liability, writing, "By raising these new claims only in opposition to the motion for summary judgment, Lyman effectively seeks to introduce a new theory of liability for the first time at the summary judgment stage, which would unduly undermine the discovery process." These cases are not similar, and therefore, the decision held in Lyman does not apply here.

### RESPONSE TO DEFENDANTS' POINT III:
### "PLAINTIFF'S CLAIMS OF RETALIATION FAIL AND SHOULD BE DISMISSED."

The Defendants reframed several facts from my FAC and I will respond to each below:

1. *"The FAC… is inscrutable. So far as the Defendants can discern, Plaintiff's primary argument is (i)… the Board's commencement of the post-election audit constituted retaliation against her. (See FAC ¶ ¶ 13, 49)"*

This is a mischaracterization. It is not the commencement of the audit that is retaliatory. As explained in my FAC, it is the timing, nature, duration, and conduct of the audit that is retaliatory. The Defendants' repeated and disruptive demands for information that has already been provided, refusal to provide necessary software support for their proprietary system, and pressure to attestate to false statements under threat of economic harm all suggest retaliation. Furthermore, their failure to explain who has been conducting these audits creates a lack of transparency that reinforces my claim. The audit has been conducted in a manner significantly different from other similarly  situated candidates who did not incur the ire of the Defendants with their political speech. This further substantiates my claims of retaliation. While my NYS case was still open, I was even pressured to make false statements that ran counter to the Affidavit I submitted to the Court. Most importantly I was restricted, by the Defendants, in obtaining assistance to respond to the Audit.

2. *"She further contends (ii) that several generally applicable regulations of the Board are actually "retaliation polic[ies]" of the Board. (E.g. id ¶ ¶ 30-31, 34)."*

While the Defendants argue that these regulations are general, I maintain that certain statutes, coupled with their selective enforcement, serve to incapacitate, retaliate against, and deter specific individuals from engaging in political speech that the Defendants wish to suppress. The selective enforcement demonstrates the mens rea. Note that the Defendants already acknowledge selective enforcement, as it relates to legal representation, writing on 15 of their MTD the FAC (emphasis added) that a "campaign's **post-election legal fees** going forward is **rarely,** if ever, the subject of the Board's retrospective audit."

3. *"[A]t alternate points in the FAC, Plaintiff appears to contend (iii) that she will be subject to future retaliation in the form of campaign finance violation penalties (e.g., id. ¶ 29)."*

Based on their pattern and conduct historically, this is a reasonable presumption.

4. *"[A]s well (iv) that the Board's publication of the complete 2022 Voter Guide was retaliatory… (id. ¶ 67);"*

The 2022 Voter Guide was a prime example of how the Defendants' actions interfere with free speech and free assembly. My litigation in NYS Supreme Court raised concerns, among Republicans, that Republican candidates would face backlash as a result of my case, and indeed, even more Republicans were excluded from the guide than it seemed in the past. The exclusion of these candidates, which could have harmed my political standing among them, further supports my claim that the Defendants' actions were retaliatory.

5. *"(v) that the Board "deleted information about [her] fundraising from its website and altered public information about [her] fundraising" in a retaliatory fashion," (id ¶ 83);"*
The Defendants altered publicly-available financial records, which fall under their audit. They were altering evidence pertaining to both the audit and this litigation. Moreover, their actions were designed to suppress my ability to run for office, since the campaign's financing ties directly to determinations about political viability.

6. *"(vi) that the Board failed to investigate breaches of her cybersecurity out of retaliation, (see id. At p. 47);"*
The timing of the repeated breaches aligns suspiciously with key deadlines, both for the audit and for my litigation in NYS Supreme Court. Moreover, the Defendants' failure to investigate, and refusal to provide me with the information necessary for the bank to investigate (both initially and on appeal), suggests retaliation. The breaches, which involved the unauthorized disclosure of sensitive financial information, severely disrupted my ability to operate my medical practice. I was left without timely recourse.

7. *"[A]nd (vii) that the Board somehow edited a video to exclude her from its contents, (see id., at p52)."*
On December 16, 2021, I testified before Defendant Schaffer (the Chairman of the Board) and Defendant Loprest (then Executive Director of the CFB) about pervasive misconduct at the Agency. Defendant Schaffer replied that he would look into it. The video is evidence that the Defendants had notice of the misconduct. After I filed my Response to the MTD the original Complaint in this federal case, and referenced this video, the video was altered to exclude my testimony. These actions demonstrate not only an intent to retaliate against me for exercising my First Amendment rights to

criticize the government, but also an effort to falsify the public record to erase evidence of misconduct, and knowledge of misconduct.

The Defendants go on to state, "[T]he Board is required to perform audits of *all* candidates in elections for City offices. R.C.N.Y. 10-01(a)." They quote the Court, in its O&O on the original Complaint, stating, "The mere fact that an audit took place as required by law is insufficient to support the claim that a policy of retaliation existed."

In my FAC, I added facts to support my claim of First Amendment retaliation, and addressed the deficiency the Court identified. Specifically, I presented facts pertaining to the following issues with my ongoing Audit:

**Suspicious Timing:** This audit occurred shortly after I attempted to initiate a legal proceeding against the Defendants for their prior First and Fourteenth Amendment violations. After Election Day, our campaign was notified there were no errors. Defendant Jaclyn Williams advised me to close the campaign bank account, which I did. Almost a year passed before I received this audit that suddenly mentioned dozens upon dozens of supposed violations. This audit was emailed to me just weeks after I returned to the Hagler Court to resume my case against the Defendants. Judge Hagler presided over the hearing where I requested a TRO against the 2021 voter guide until I could be included. The Defendants ignored the notice of the TRO, mailing out the Voter Guide to millions of people. At the hearing, Judge Hagler had denied the TRO, declaring the action moot. However, at the conclusion of the hearing, he told me I could return to court to request a new remedy. My renewed case appeared on the docket on August 28, 2022. The Defendants would have received a notice, both as a party, and because Judge Hagler had allowed them to e-file. At that time, because I had legal representation, I could not e-file. I also could not litigate my timely-filed, timely-noticed, First Amendment case because my campaign no longer had money, and I was subject to a lawyer ban. The Defendants are correct that Judge Hagler denied my August 8, 2022 O.S.C.. I asked the Court to remove my attorney so I could pursue my case (which I attached to the O.S.C.) without incurring penalties for speaking to an attorney. Judge Hagler's clerk emailed me that there was ambiguity as to the relief being requested. Therefore, the Judge had declined to sign my request but the Court opened a case for me on August 28, 2022, which continued to list me as having legal representation.

Meanwhile, I filed a new case pro se (on October 20,2022), which was deemed to be past the statute of limitations.

Reviewing the Court docket for their own enforcement cases, the Defendants would have realized what I was trying to do. Perhaps Judge Hagler's clerk had even emailed the Defendants a copy of my O.S.C.. While the Judge didn't understand the lawyer ban I had been operating under, the Defendants did. My file was transferred to new auditors, who suddenly appeared with a new audit listing almost 75 different issues.

| Case #<br>Received Date | eFiling Status<br>Case Status | Caption | Court<br>Case Type | Action |
|---|---|---|---|---|
| Not Assigned<br>08/28/2022 | Waiting for Index Number<br>*Pre-RJI* | Devi Nampiaparampil v. New York City Campaign Finance Board | New York County Supreme Court<br>*Torts - Other* | |
| 159019/2022<br>10/20/2022 | Full Participation Recorded<br>*Disposed* | Devi E Nampiaparampil MD et al v. New York City Campaign Finance Board | New York County Supreme Court<br>*Torts - Other Negligence* | File \| Consent |

In *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), the Second Circuit held that, "The timing of the disciplinary action against the plaintiff, which followed so closely after his complaints about the conditions of his confinement, is sufficient to establish a prima facie case of retaliation."

In *Morris v. Lindau*, 196 F.3d 102 (2d Cir. 1999), the Second Circuit ruled, "A retaliatory motive can be inferred from the timing of the action taken against the plaintiff, particularly where it follows closely after the plaintiff's engagement in protected conduct."

In *Harmonia Holdings Group, LLC v. The United States*, 944 F.3d 996 (Fed. Cir. 2019), the Federal Circuit held that "The timing of the IRS audit in close proximity to the plaintiff's disclosures raises the possibility that the audit was in retaliation for the plaintiff's protected actions."

**<u>Prolonged Duration:</u>** The Defendants audited my campaign, under great scrutiny, at times not required by law, throughout the campaign itself in 2021. We exited the campaign with 0 campaign finance violations and a 0.00% error rate. The Defendants then resumed auditing shortly after I attempted to reopen my case before the Hagler Court. In total, the auditing has been ongoing for 3 years and 9 months. Of note, the campaign has had no financial activity since November 2, 2021 (Election Day).

In Duplan v. City of New York, 888 F.3d 612 (2d Cir. 2018), the Second Circuit determined, "The duration of the investigation, particularly when it follows shortly after the plaintiff's protected conduct, raises a strong inference of retaliatory intent." This is supported by a case in the Third Circuit. In Tverberg v. Aetna, Inc., 602 F.3d 1174 (10th Cir. 2010), the Tenth Circuit held, "The duration of the audit, without any reasonable explanation for its prolonged nature, combined with the timing of the audit, creates a strong inference that the audit was retaliatory." A case in the SDNY was reviewed similarly. In Rodriguez v. City of New York, 72 F. Supp. 3d 362 (S.D.N.Y. 2014), the Court noted, "The length and intensity of the audit, coming shortly after the plaintiff's filing of a discrimination claim, support the inference that the audit was retaliatory in nature."

**Overly Burdensome Demands and Disruptive Conduct:** The Defendants' repeatedly demanded information that has already been given to them numerous times. They make their demands in a manner disruptive to medical practice and my ability to treat patients (Exhibit C). In *United States vs. Powell* 379 U.S. 48 (1964), the Second Circuit held in reference to IRS auditing, "The investigation must not be used as a fishing expedition or a means of harassment. The taxpayer is entitled to protection from undue burdens in the form of repeated, unnecessary demands for documents."

**Intense Scrutiny:**

Also, in Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004), the Second Circuit held that, "The intensity of the scrutiny, particularly in the context of disciplinary action that followed shortly after protected speech, strongly suggests that the actions taken were not for legitimate purposes but as a form of retaliation."

Similarly, in Rodriguez v. City of New York, 72 F. Supp. 3d 362 (S.D.N.Y. 2014), the Court determined, "The unusually intense scrutiny following the plaintiff's complaints could reasonably be seen as an attempt to retaliate against her for asserting her rights."

**Recommended Penalties Out of Proportion to the Offense:**

Consider these situations: FEC-registered, professional medical societies, repeatedly contacted the City for information on how to register. Their requests were ignored. My mother, the Treasurer, asked Defendant Williams how to register them. She ignored the question. I asked Defendant Williams how to register them. She refused to answer. The medical societies sent the money anyway. Per CFB Rules, campaigns must deposit checks

we receive within a narrow window. We did. The Defendants informed us we could not accept money from these unregistered groups. We returned the money immediately, for a net $0 contribution from each. We were warned of impending $2000 penalties for each of the net $0 contributions.

In Nixon v. City of New York, 94 F.3d 457 (2d Cir. 1996), the Second Circuit held, "A disproportionate penalty can suggest that the actions taken by the employer were not for legitimate reasons but were in retaliation for the plaintiff's protected activity." And in Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999), the Court held that, "The penalty imposed was so out of proportion to the alleged misconduct that it supports an inference of retaliation." In Cabrera v. City of New York, 202 F.3d 160 (2d Cir. 2000), the Second Circuit held that "A disproportionate penalty in the context of retaliation claims can suggest that the government action was motivated by the plaintiff's exercise of protected rights."

**<u>Denial of Assistance From Internal and External Resources:</u>**

Of note, we have a disputed fact about the existence of a lawyer ban and a knowledge ban (which I will shortly delve into more deeply). In the interim, I will cite case law about the Defendants' interference with my ability to obtain assistance:

In Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999), the Second Circuit held, "When a person is prevented from obtaining necessary resources to perform their duties or meet legal obligations, it can be seen as a retaliatory act."

In Lynch v. Town of Haverstraw, 18 F. Supp. 3d 416 (S.D.N.Y. 2014), the government denied the plaintiff the ability to consult with her family members about the audit. This occurred in my case as well. The Defendants restricted my ability to speak to my mother (the volunteer Treasurer of the campaign) and my spouse (a former CFB auditor), stating that the campaign did not have the funds on hand to pay "the fair market value" of their services. In Lynch, the Court determined, "The government's refusal to allow reasonable access to assistance during the audit process constitutes an undue burden and could raise an inference of retaliation, especially when the interference occurs after the plaintiff engaged in protected conduct." This is particularly true here since my campaign had money, and therefore had legal representation, during the election cycle. If I had known I would be subjected to such an intensive audit, I would have fundraised further. Instead, I followed the

Defendants' guidance to close the registered campaign bank account, effectively ending my ability to legally fundraise for any campaign-related issue. After the campaign became insolvent, and after I approached the NYS Supreme Court to resurrect my legal case, I faced an overall knowledge ban.

### Lack of Procedural Safeguards

In Cabrera v. City of New York, 202 F.3d 160 (2d Cir. 2000) (Second Circuit), the Second Circuit noted, "A government's failure to provide adequate procedural safeguards in investigations can undermine the fairness of its actions and suggest that the inquiry may not be based on legitimate grounds but may instead be driven by impermissible retaliatory motives."

The CFB has deliberately chosen not to hav internal or external controls on its employees' actions. Moreover, CFB employees appear to have no defined roles. The Comptroller, Scott Stringer, raised this issue in his report on the CFB, shortly before he was voted out of office. These circumstances allow any employee to act as a final decision-maker for any administrative decision because there is no appeals process short of judicial intervention. The only exception is that, for FOIL decisions, where there is one local Agency appeal before judicial intervention is needed. In response to my first FOIL about oversight, the CFB responded with the CFB Employee Handbook. There is no oversight protocol, policy, or organizational hierarchy that allows for oversight in the Handbook. In response to my second FOIL on this issue, the Defendants resent the Handbook. When I posed this question a third time, the Defendants noted they have no responsive records. And when I brought this up at a media briefing on November 21, 2024 (a new fact), the Defendants made a statement against interest. The Defendants noted that City Council could review their actions, acknowledging that City Council members also receive matching funds from the Defendants and also faces regulatory audits by the Defendants. The Defendants then stated that a "voter referendum" is the only means of reviewing the Defendants' actions. Complaints about the CFB must be put on the ballot for the voters to review and vote on.


### Lack of Transparency:

The standards and procedures by which the CFB conducts its Audits have never been disclosed to the public, and are not available to Campaigns or Candidates. I have never been

given the identities of all my auditors, although I have been told that the auditors who found ZERO violations at the conclusion of my campaign were removed from my audit, and new auditors (Donna Ross and Leandra Flores) were instructed to perform a second audit of the same information I had already provided. It is unclear why certain documents are being requested. I have never been told why my audit has been going on since 2021. My FOIL requests for general Rules on audit procedures have all been denied.

*Rodriguez v. City of New York*, 72 F. Supp. 3d 362 (S.D.N.Y. 2014) is an SDNY case that was appealed and remanded for a new trial. On appeal, the Court determined that the lack of factual detail in the plaintiff's Complaint was due to the lack of transparency in the government's actions. The Court wrote, "The failure to provide transparency in the decision-making process, including who is making the decisions and why, can signal that the process is not a fair one and may suggest retaliatory intent."

At an official press briefing on November 21, 2024, held at CFB headquarters, the CFB Press Secretary, in the presence of CFB General Counsel, explained that he did not want to provide a "roadmap" of the CFB's audit procedures "for the campaigns to follow." When questioned on this point again by multiple reporters, he emphasized that he could not provide "insight" on this matter because, "We don't want to tip people off." Later, when discussing the official actions of the Board, he stated, "The Board has full discretion with these determinations… The Board can do whatever they want frankly." The Press Secretary also stated that the Agency has "complete discretion" and acts to promote "equity" without providing any specificity as to what that means.

It is not the government's role to amplify the political speech of certain candidates for office and to chill the speech of other candidates based on their own personal viewpoints. The matching funds program purportedly amplifies the votes of regular New Yorkers, but that can't happen when the Defendants use their powers to make matching funds determinations, and their power in enforcement actions, to amplify their own personally held political and social views. That is why they simply delete numerous candidates from their multimillion dollar voter guide. Neither City Council, nor the Mayor, authorized this use of their power. This was a statement, made by the party, against its own interest, in an official media briefing, so the hearsay exception should apply. The lack of

18

standard procedures and the lack of transparency, in combination with the lack of oversight, create an environment where selective enforcement easily occurs.

In <u>Point III</u>, the Defendants cite several cases– Torres v. City of New York, Sarus v. Rotundo, and DeCarlo v. Fry– which all reference this quote, "[C]ase law is clear that a 'single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury." I have provided ample evidence of the Agency's "errant behavior," not just in a single incident, but in a pattern of conduct across multiple candidates and campaigns. This includes the entire duration of my interactions with the Defendants in their official capacity. I have demonstrated their mens rea, and the continuous efforts they have made to carry out their intentions to harm me.

The Defendants also cite Sharikov v. Philips Med. Sys. MR, Inc. and Carr v. NYC Transit Auth. to argue that, in the employment context, the "employer's adverse action vis-a-vis an employee that is consistent with generally applicable workplace policies is insufficient to constitute retaliation against the employee." These cases are not applicable here. I do not work for the Defendants. I am a citizen, entitled to express my point of view without fear of retaliation. The Defendants do not employ candidates. Instead, they are legislated to serve a public function. Government employees, such as *Carr*, may have to accept some free speech restrictions to carry out their public functions. However, my core political speech was integral to my platform and my candidacy for office. It should be protected under the First Amendment.

In the same section, <u>there is a disputed fact</u>. The Defendants state that I enrolled myself in the public campaign financing program an am therefore, subject to them. While res judicata may apply to the voter guide and the debates, it does not apply to the series of transactions that underlie this Retaliation by Audit claim. My speech restrictions directly impacted my ability to respond to the Audit. They also should have factored into the criteria by which I was being audited.

In order for me to waive my constitutional rights– especially in this program, where there is no voluntary escape– I had to have done so "knowingly and voluntarily." That did not happen here. This issue of consent was never litigated in my prior case, or in my original Complaint before this Court. Specifically, I was only given two choices: to remain eligible for matching funds and face a personal expenditure cap of $6000 or to opt out of eligibility entirely and face a lower expenditure cap. The Defendants emailed me it would be $5100, but the applicable Rule for "non-participants" was actually $3500. I also needed to sign the form immediately. If I didn't, I would be removed from the election ballot. The Defendants have my signature on a form that says I agreed to follow the Rules and laws of New York, which I (naively) presumed were constitutional. I have never consented to waive my constitutional rights; nor have my actions suggested that I intended to do so. The burden falls on the Defendants to prove that I knowingly and voluntarily waived my First and Fourteenth Amendment rights.

To further describe the Defendants' *mens rea* here, let me again quote the Press Secretary at the media briefing that occurred on November 21, 2024. He referenced Citizens United and stated, "I don't want the Supreme Court to eliminate us." Acting as the official representative of the CFB and in the presence of General Counsel Gallagher, he explained to a room full of reporters, "You can't limit speech… Spending limits are unconstitutional… We figured out ways to work around that system." The Defendants' mens rea also comes through in a publication by Defendants Loprest and Perskie where they describe how they created a "model system for other jurisdictions" that circumvents the Supreme Court's *Citizens United* ruling. (Amy Loprest and Bethany Perskie, *Empowering Small Donors: New York City's Multiple Match Public Financing as a Model for a Post-Citizens United World*, 40 Fordham Urb. L.J. 639 (2012)).

In the same section, I believe that the Defendants are arguing that the one-month delay between when I approached the Hagler Court to pursue my case and when they issued the Audit is insufficient to establish causation. That time was likely necessary to draft a report with so many purported violations. The effect of the timing may be a disputed fact.

By calling my disputes about the audit "accounting grievances," (on p11/16), the Defendants also mischaracterize the ongoing Audit. This is a factual dispute. My entire audit interrogatory, submitted on May 8, 2023– from the first page to the last page– details civil rights abuses- not accounting issues.. Consider this excerpt from the first page:

> The Campaign submitted all Statement Disclosures in a timely manner. All of the concerns raised by the CFB throughout the 2021 election cycle were addressed in real-time. Prior to the issuance of the Draft Audit Report, the Campaign appeared to have zero (0) outstanding campaign finance-related issues.
>
> It has been my understanding that if I hire any outside consultants, accountants, or lawyers to assist me with my response to this Draft Audit Report– while my Campaign lacks the funds to pay these professionals with knowledge and expertise– then I will be even further past the maximum allowed contribution to my Campaign. Even if they volunteered to help me, I would be penalized for their in-kind contributions. That would subject me personally to additional campaign finance violations and penalties. Since the fundraising period ended in late 2021/ early 2022, approximately ten (10) months before I received the Draft Audit Report, my Campaign was not able to fundraise to address this issue. That has placed me and the Campaign in a very difficult position.
>
> I have addressed the 75+ new campaign finance concerns raised on the Draft Audit Report below to the best of my ability as a first-time Candidate.

Also consider the last page, which has to do with the CFB's ban on personal spending on reasonable accommodations. These are only allowed if the campaign has money.

> If I had been allowed to use my own money on my car as a personal expense– rather than as a campaign expense– I could have had reasonable accommodations for my situation. I would have had some place to sit down. I could have driven from place to place. I would have had a place to breast pump. And I could have stored the breast milk in a cooler with ice packs as I did with my first child.

The CFB's Audit, which has been ongoing for almost 4 years, has nothing to do with standard accounting. The only reason why I have not uploaded the Audit or my Response to this case file is because it is defamatory in itself. It would be like an innocent person having to upload an essay explaining why he is not a pedophile. I do not want to give any credibility to the Defendants' lies.

Let me also note that for all this debate about over-contributing and overspending, I have not been accused of either one.

The Defendants note, "[A]s the interim General Counsel of the Campaign Finance Board stated at the pre-motion conference, other candidates from the same election are still undergoing their audits alongside the Plaintiff, making any claims that the duration of the audit is somehow discriminatory against *her* implausible." The *only* candidate who CFB General Counsel could name, however, was Mayor Eric Adams who is under federal indictment for multiple counts of bribery and corruption. I have never been accused of a crime or misconduct. I have never even received a parking ticket or a speeding ticket. Moreover, I do not hold any public office. I am a private citizen. I do not have the power and the influence of the Mayor of New York City. For example, Mayor Adams had the power to remove the Chair of the CFB for his pattern of misconduct. I have to go through the Courts. Mayor Adams received $10 million in public funds whereas I received $0. His campaign raised approximately $23 million. Mine raised approximately $150,000. The CFB lost track of $2.3 million in public funds. Meanwhile, for two years, the CFB has been asking me what happened to my original ~$8 receipt from a Duane Reade where I bought office supplies for the campaign.

Even though Mayor Adams and I are not similarly situated in any obvious sense, I can see why the Defendants, who have a pattern of engaging in politically-motivated enforcement actions, claimed we are. The only similarity between me and Mayor Adams is that we have been obstacles to Jumaane Williams' rise to power. I opposed him in the 2021 general election for Public Advocate (his last City election). And if Mayor Adams were to voluntarily or involuntarily be removed as Mayor as a result of alleged campaign finance irregularities, Jumaane Williams would become the Interim Mayor of NYC. Then he could more easily win a run for Mayor as an incumbent in 2025. Note that Jumaane Williams currently works alongside the Defendants, within the infrastructure of the CFB as a member of its Voter Advisory Committee, a voter education initiative. Although I am only a pro se civil plaintiff, I suspect this entire Voter Advisory Committee may violate the Hatch Act.

Let's also consider other top-of-the-ticket candidates, like then-incumbent Scott Stringer who spent over $460,000 of public funds on public relations consultants. The Board's final decision (FBD) was made before the audit (FA) was even completed. The audit was

published afterwards to conform with the Defendants' desired political outcome. (See screenshots below).

| Candidate | Office Sought | FA Date Completed | FBD Date Sent |
|---|---|---|---|
| Stringer, Scott M | Comptroller | 05/16/2017 | 02/14/2017 |

| PAYEE | AMOUNT PAID |
|---|---|
| Berlin Rosen | $257,281.23 |
| The Mellman Group | $204,483.40 |

In response to the Draft Audit Report, the Campaign provided incomplete subcontractor information for Berlin Rosen and The Mellman Group. Berlin Rosen disclosed subcontracting with Westerleigh Concepts and Perception Imaging and provided a letter from the Managing Director at Berlin Rosen, Alex Navarro-McKay, which stated the amount paid to its subcontractors is "confidential and proprietary." The Mellman Group disclosed subcontracting with McGuire Research and Murray Hill Center/ RRU Research, but also did not disclose the amounts paid to the subcontractors. Therefore, the Campaign did not report complete subcontractor information for its vendors.

**Board Action**

The Board has taken no further action on this matter other than to make it a part of the Candidate's record with the Board.

The Defendants then generally argue that my "scattershot approach" to presenting my "fanciful claims" of retaliation "may be easily disregarded as incredible on their face," that they "strain credulity," and that "the FAC does not plead facts beyond rank speculation." They add that "it is unclear what the protected activity [is]" and they do not see "what concrete harm(s)" I have experienced.

These statements to the Court highlight the Defendants' long-standing deliberate indifference to both past and present deprivations of my constitutional rights. Even if the claims are now precluded, the Defendant City of New York has been informed of pervasive First Amendment violations at the CFB. Yet it chooses to do nothing. In Figueroa v. Mazza, 825 F.3d 89 (2d Cir. 2016), the Second Circuit determined that, ""The City [of New York] may be held liable under Section 1983 if its failure to act on known misconduct by its

employees constitutes a policy or custom that causes a constitutional violation." The Defendants repeatedly invoke *res judicata*. They cite my First Amendment case before Judge Hagler. They cite my case of "Libel" and "Disparagement of A Commercial Entity" (my medical private practice) before Judge Ramseur. They cite the original Complaint in this case. They have my Notice of Claim with the Comptroller. The OATH Court, which gives deference to City Agencies, dismissed 11 of the City's prosecutions against my mother and my campaign, perhaps because they were so obviously malicious. The NYPD also has records of my being attacked outside of Gracie Mansion. The City thought it was dangerous enough to arrest and prosecute the individual. But they did nothing to ease the spending restrictions that would have allowed me to hire security. Yet, even after three years, the City has done absolutely nothing to address the <u>ongoing</u> audit and harassment, or the <u>ongoing</u> speech restrictions and lawyer ban on me. *Preclusion is a double-edged sword.* The City should be held responsible for its complete and total failure to act throughout this time.

*On p13/16, the Defendants question the individual Defendants policymaking authority.* First, as the Comptroller Scott Stringer pointed out in his official review of the CFB, shortly before losing his re-election bid, the Defendants have no oversight. They have no internal or external controls. They cannot be effectively regulated by the legislative or executive branches. The CFB regulates those individuals– not other way around. They similarly cannot be regulated by the judicial branch. In the extremely rare case that the judiciary makes a ruling in a candidate's favor, the CFB just sets aside the verdict and waits for the now resource-depleted candidate to resume litigation. Here is an excerpt from Alan Gerson's final audit report:

The lack of transparency, the lack of standard procedures, the lack of a defined infrastructure, and the lack of an appeals process absent judicial intervention or "voter referendum" on the ballot, as the Press Secretary stated, permits each of the Defendants to act as a final authority. (The only exception here are FOIL requests where there appears to be a defined and consistently followed appeals process, which has been legislated by a different agency)

Second, each of the individual Defendants took actions that would foreseeably cause harm to me in the Audit process, knowing that my civil rights had been curtailed because of their "program." Three are Candidate Liaisons who are the equivalent of our "public defenders" in the in the campaign system. They are supposed to guide us. But instead, they acted to harm me, knowing that the issue would resurface in the audit.

Also, on p13/16, we have another factual dispute. The Defendants suggest that they posted my objections to their unconstitutional Rules "in summary." They never posted them at all, and never submitted them to the City Council or the Mayor. I confirmed this through a FOIL on the Mayor's office.

The Defendants argue that my allegations about retaliation against my friends and supporters should be disregarded, and that I cannot make claims on others' behalf. They have misread the purpose of my statements. This is evidence of their overall pattern of misconduct. For example, without any transparency about their auditing protocols, the Defendants specifically flagged as suspicious the monetary contributions my campaign received from union leaders, MSNBC employees, and CNN employees who happen to be from ethnic minorities. This was presumably because my supporters deviated from the Defendants' own political biases and expectations of minorities. I demonstrated another means by which the Defendants use their Audits to chill speech. If they harass donors, those individuals may hesitate to contribute to my campaign in future races, and may even hesitate to associate with me.

### <u>RESPONSE TO DEFENDANTS' POINT IV:</u>
### <u>"THE BOARD LACKS THE CAPACITY TO BE SUED."</u>

The Defendants did not cite any cases in this section. In their prior MTD the Original Complaint, however, they cited a case against the NYC Environmental Control Board (ECRB). Individual agencies can be sued in their own names when the agency has operational independence and the power to enter into contracts. The CFB meets that criteria. The ECRB does not. The Defendant CFB has operational independence, its own

separate budget and staffing, and it has been sued– and also sued candidates and campaigns– in its own name. Either way, the case cannot be dismissed. The City is a party.

This request goes to the Defendants' *mens rea*. The Defendants are fully aware of the vast numbers of people they have harmed. They seek to bury this case so potential plaintiffs cannot identify them in a party search. They are also attempting to hide any disputes about the existence of an unconstitutional lawyer ban– both from candidates who have been subjected to it, and from authorities who might delve deeper into this issue.

### RESPONSE TO DEFENDANTS' POINT V:
### "PLAINTIFF'S CLAIMS ABOUT HER FREEDOM OF INFORMATION LAW REQUEST ARE NOT COGNIZABLE IN THIS COURT."

The Defendants cite only two cases: Sarkar v. NYC Dep't of Educ., 19-cv-4040 (MKV), 2024 U.S. Dist. LEXIS 59754, at 30 (S.D.N.Y. Mar. 28, 2024) (quoting Schuloff v. Fields, 950 F. Supp. 66, 67-68 (E.D.N.Y. 1997)). Neither of those cases is applicable here. In Sarkar, the plaintiff argued that he had been deprived of due process, and the Court found that he had a remedy, which was an Article 78 proceeding. In Schuloff, the plaintiff argued that the First Amendment gave her a constitutional right to access information in the manner in which she preferred, in the company of a person she preferred. I have not made any similar requests, so that case is not applicable here either.

In my case, the denial was retaliatory in nature. In an email to me, then-General Counsel Perskie, the final decision maker for CFB FOIL requests, made the admission by email, that my FOIL requests were being denied because of my "pending litigation," in NYS Supreme Court. The litigation pertained to the Voter Guide and constituted a protected activity. *The Defendants have failed to contest any of the three elements of retaliation here.* They also fail to deny that a final policy decision was made. The claim meets the Monell requirements.

In my FOIL requests to the CFB, I asked for the Rules that I am supposed to follow for the campaign audit. The only remedy an Article 78 proceeding can potentially provide is the

Rules. Therefore, an Article 78 proceeding does not preclude a First Amendment case. In Whitfield v. City of New York, 2021 WL 1700592 (S.D.N.Y. Apr. 29, 2021) the Court ruled, "Res judicata does not bar a lawsuit brought under 42 U.S.C. § 1983 following the resolution of an Article 78 proceeding because the remedies available in an Article 78 proceeding are not as comprehensive as those available under § 1983. The Court agrees that if the remedies available in the Article 78 proceeding did not provide the plaintiff with an adequate remedy, he may relitigate his claims in this forum." I prefer not to waste my time and resources on an Article 78 proceeding, particularly since it cannot provide an adequate remedy for my Retaliation claim.

## RESPONSE TO DEFENDANTS' POINT VI:
### "THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION."

I have stated a viable federal claim. The Court can exercise supplemental jurisdiction.

## RESPONSE TO DEFENDANTS' POINT VII:
### "PLAINTIFF'S MOTION FOR A CORRECTION SHOULD BE DENIED."

Defendants' Counsel appears to have resolved his earlier factual dispute with his own clients. In this MTD the FAC, the Defendants write, "If a candidate wants to cover the costs of their campaign's legal fees, however, then the candidate is subject to the candidate's contribution limit, here, for Plaintiff, of $6000. N.Y.C. Admin. Code $$ 3-703(1)(f),(h)." We agree on this fact. This is the means by which the Defendants have created and enforced a "lawyer ban" and chilled speech.

So that their favored candidates are not limited by the lawyer ban, the Defendants selectively enforce it, which they acknowledge. They write on p15/16 (emphasis added), "[A] candidate's financing of their campaign's post-election legal fees going forward is **rarely**, if ever, the subject of the Board's retrospective audit." Who are the rare cases?

Note that

For the purposes of their Audit, the Defendants' argue that I am still running to win the 2021 election. **<u>This is a disputed fact.</u>** Why does this matter?

1. First, it keeps me subjugated under them and their $6000 personal expenditure cap. After all, if my 2021 run for office was over, then I would no longer be subject to that cap. I could spend my own money however I wanted– as a private citizen and *as a free person.* This way, my election cycle limit is converted to a **lifetime** limit.

Here is an excerpt from an email Defendant Egerton sent yesterday (November 21, 2024).



2. If I am purportedly still running to win the 2021 election, the Defendants continue to have a reason to harass me. Of note, this is part of a larger pattern in which the Defendants tend to contact me with Audit tasks and reminders shortly before critical litigation deadlines. In her email, Defendant Egerton added that I must set up an MS Teams appointment with her where I am expected to screen share and give the CFB access to my laptop. These virtual meetings are the equivalent of the CFB deposing me. After all, I am not allowed to lie to government agents or to speak to an attorney. It does not matter that Discovery has been repeatedly stayed.

3. As long as I am running to win the 2021 election, I cannot run in any other election. In 2021, I secured the highest number of votes, and the greater percentage turnout of any Republican in that race in NYC history. I also secured an approximately 8-percentage point gain compared to the Republican nominee in the 2017 race. Although I lost the Public Advocate race, I had secured a high enough percentage in NYC that certain party leaders felt the entire state could turn red in a state election. The Gubernatorial campaigns of Lee Zeldin and Andrew Giuliani reached out to me and before the OATH proceedings, the Republican party presented me as a viable option for its Lieutenant Governor nominee. I was subsequently approached about

running for U.S. Senate, instead. Other GOP party bosses asked me to move districts so I could run for office in their districts. During this time, the CFB created a false online voter guide profile of me– even though none had existed before the election. It was created to incite donor fury that I had not completed a candidate profile. None of it mattered, for the same reason I cannot run in the 2025 City elections. Defendant Loprest explained this herself in a letter to then-Governor Cuomo, then Mayor DeBlasio, and other legislators on March 23, 2020. (Exhibit E).

Administratively, candidates would need to open and maintain two different committees, with separate contribution limits, spending limits, and thresholds to receive public matching funds. This would create confusion for candidates who have registered and been actively campaigning using a single committee for fundraising. The recordkeeping that will be required of candidates, and the subsequent CFB audit of expenditures, will be borderline unmanageable. It will be enormously difficult to differentiate between expenditures in furtherance of the special election versus primary election, since under the Campaign Finance Act and CFB rules, all spending is presumed to be in furtherance of the next election. Requiring candidates to comply with two different sets of contribution limits as they raise funds for two committees simultaneously will be demanding.

I have no means of appealing the Defendants' determination that I am currently running to win the 2021 Public Advocate race, except through this federal court. As long as the 2021 Audit continues, my freedom of speech and freedom of assembly are restricted.

SPECIFICS:

All of the Defendants should have known that barring officers of a campaign from consulting with lawyers, accountants, and political consultants– solely based on their campaign's wealth– would pose a substantial harm. In Matican v. City of New York, 524 F.3d 151 (2d Cir. 2008), the Second Circuit acknowledged the 'state-created danger" doctrine, which holds that the government can be liable when its actions create or increase a risk of harm to an individual. The Court used "conscience-shocking" behavior as a threshold factor to establish a constitutional violation. In this case, the "lawyer ban" surely counts as behavior that shocks the conscience. Even in this case, at our last hearing, both the Court and Defendants' Counsel were so shocked by this concept that they thought I was mistaken about its existence. Hopefully, that initial skepticism has been addressed by the CFB's oral and written admission that a lawyer ban exists and that it is selectively enforced in NYC.

In cases where plaintiffs successfully invoked this doctrine in the Second Circuit Court of Appeals, the plaintiffs demonstrated that state actors took affirmative actions, such as the creation and enforcement of a lawyer ban. They placed the plaintiffs in specific danger distinct from the general public The general public can speak to attorneys– for hire or pro bono. We could do neither.. In this case, the Defendants attempted to deprive my mother, my father, my husband, and me of almost $100,000 through a combination of sanitation and campaign finance violations. Then they initiated the never-ending audit.

### ***CRITICAL FACTUAL DISPUTES:***

### <u>HAS A LAWYER BAN BEEN IN EFFECT?</u>

This case involves questions of both fact and law regarding whether a "knowledge ban" and more specifically, a "lawyer ban," can materialize against a candidate for political office. This is a two-pronged situation in which 1) the candidate's campaign must become insolvent, and 2) the individual candidate must have also hit the candidate-as-donor contribution cap (a.k.a. the candidate's personal expenditure limit). The Defendants contend that if those two prerequisites are met, they have the legal authority to deprive those candidates of their freedom of speech, their property interests, and their liberty interests. How? In *New York City Campaign Finance Board v. Mahadeo*, the New York Appellate Division, First Department, held that both the candidate and the treasurer of a campaign are jointly and severally liable for violations and penalties assessed by the Campaign Finance Board (CFB). The campaign cannot declare bankruptcy, for example. Essentially, once the dual conditions are met, it is illegal for Candidates to give money to lawyers, accountants, or political consultants as part of their legal defense against the alleged violations and penalties. Instead, they can only hand their money to the CFB.

The Defendants' Rules, in combination with the Appellate ruling, have placed me in an untenable situation, defending myself from the Defendants' misconduct without the ability to spend money or to speak to a lawyer. As the Defendants know, this situation can only arise in NYC. By contrast, the Federal Election (FEC), allows candidates to make unlimited

expenditures from personal funds (See Title 11 Chapter 1, Subchapter A, Part 110 $110.10). Every other state and local election board in the country follows the FEC's guidance. The Defendants contend the Rules they created, enforced, and adjudicated, without any separation of powers involved, is a "model system" for these other jurisdictions.[1] Defendants Loprest and Perskie explained how NYC has almost completely  nullified the Supreme Court's decision in *Citizens United v. Federal Election Commission*. Note also the Defendants' characterization of any uncompensated use of a "law firm's" services as a political contribution.

*Applicable Advisory Opinions and Board Actions*

(a)        Advisory Opinion No. 1989-8

In Advisory Opinion No. 1989-8 (January 25, 1989), the Board determined that a law firm partner's volunteered legal services were not a contribution.  Notably, however, if other compensated co-workers assisted the partner in providing legal advice to the campaign, such services would be considered a contribution by the law firm.  The Advisory Opinion also provides that: "the value of the law firm's goods and services provided to the candidate by the partner is not exempt from the definition of a 'contribution', unless the candidate pays the law firm its usual and normal charge for these goods and services." [3]

Advisory Opinion No. 1989-8 also addresses the situation of an associate at the partner's law firm interested in providing pro bono work to the campaign as part of his law firm's expected pro bono educational activities.  The Board concluded that such activity could not be classified as volunteered because the law firm would be compensating the associate for his volunteered services.  Thus the law firm would be making a contribution to the candidate.

In contrast, if the associate volunteered his own time to the candidate over and above what he normally devoted to the work of the law firm (including expected pro bono activities), the compensation to the associate by the law firm would not be considered a contribution by the law firm, but, rather, volunteered activity by the associate. Nevertheless, the Board placed the burden on the law firm to show that the associate continued to devote, over a reasonable period, an equivalent amount of hours that an associate was expected to work on law firm matters.

I have defended the property interests of my mother (the former Treasurer), the campaign, and my family in a four year-long campaign finance audit with no end in sight. I have litigated campaign-related issues– pro se– in *eleven* (failed) prosecutions by the City and the CFB in OATH Court against us. I have unsuccessfully litigated on behalf of my medical

---

[1] Amy Loprest and Bethany Perskie, *Empowering Small Donors: New York City's Multiple Match Public Financing as a Model for a Post-Citizens United World*, 40 FORDHAM URB. L.J. 639 (2012).

practice's property interests (and my patients' interests!)– again pro se– in state court. I lost in part because NYS requires corporations to be represented by attorneys, a condition which I could not meet *legally.* Now, I am representing myself before this Court. On top of all of that, since 2021, the City has launched multiple surprise inspections on my medical practice (all free of health code violations). In their Motion to Dismiss (MTD) the First Amended Complaint (FAC), the Defendants now suggest I open a new Article 78 proceeding to address their destruction of protected electronically stored information (ESI) relevant to this litigation.

The Defendants have repeatedly deprived me of my constitutional rights, knowing full well I was handicapped by the statutory lawyer ban they created and enforced. Meanwhile, I have been litigating this case, at substantial personal and professional cost, because I do not believe that knowledge should be restricted to the wealthy.

<u>The Defendants attempted to deceive the Court into thinking they had rescinded the lawyer ban.</u>

The Defendants write on p16/16 of their MTD (emphasis added), "[T]he Board's interim General Counsel confirmed on the record in this action that Plaintiff's legal fees for this action (and for any other proceeding she may bring concerning her post-election audit) <u>will not be the subject of the Board's auditing in connection with the 2021 **primary** election for the Republican candidate for Public Advocate</u>."

I never ran in a primary election. I ran unopposed. The Defendants are auditing me for the 2021 general election where I ran as the Republican nominee against the Democratic nominee, Jumaane Williams. This litigation similarly pertains to the 2021 general election. The penalties that my mother and I have been repeatedly warned about, are for speaking to a lawyer about the civil rights abuses I was subjected to around the 2021 general election.

At first glance, the Defendants' statement therefore appears meaningless, but it is not. This statement specifically reminds me that I will face economic injuries for speaking to an attorney about the general election. The statement is also a warning not to consult with a lawyer again about my rights. The exception proves the rule. The City acknowledges the lawyer ban, but through sophistry, *falsely* appears to rescind its retaliatory policy.

Like other statements by seasoned political operatives, this convoluted sentence has contradictory interpretations. Both the Defendants and I know I did not run in a primary. Their legislated purpose is to inform the entire NYC electorate who is on the primary and general election slates. Whether this statement succeeded or not, it was intended to deceive the Court into thinking there was no lawyer ban in effect.

If the Court should think this was just a typo, please refer to the MTD the FAC (p2/16) where the Defendants– *again*– add the qualifier "primary election" to their purported self-imposed temporary restraining order on the lawyer ban. They write, "Any attorney that she hires for this action, or in connection with the post-election audit of her campaign <u>in the 2021 **primary** election for the Republican candidate for Public Advocate</u> will not be the subject of the Board's audit."

I ask the Court to consider why the Defendants cannot make a plain and simple statement that audit and litigation costs are exempt, or that post-election litigation is exempt from the candidate's personal expenditure limits? Why are the Defendants unable to say that I will not suffer penalties for any post-election litigation costs? Because their lawyer ban has been one of the most powerful tools in their armamentarium against political challengers. If I were to circumvent it, or if they were to say it doesn't exist, they would see a surge of First Amendment lawsuits. Therefore, they work with these perplexing and unclear sentences, so the Court and I will have different interpretations of their meaning.

Even if the Court still believed that substituting "primary" for "general" was accidental, the Defendants' "new" policy would not free my mother from penalties. As the former

Treasurer, she is jointly and severally responsible for any penalties I accrued by speaking to an attorney.

The Court may recall that, during our hearing, the Defendants also substituted the term "*campaign* expenditures," which are unlimited, for "*donor* contributions," which in my case were statutorily capped at $6000. That repeated misrepresentation created the false impression there is no lawyer ban. The Defendants enforced the lawyer ban against Celia Dosamantes (FAC ¶ ¶ 39-40) in their own Court for speaking to a public defender[1] in a criminal case[2], alleging on p16 of the MTD, the penalty was because she "paid below market rates" for the public defender's guidance. They double down on this in their MTD the FAC, writing on p16/16, "Dosamantes was alleged to have paid below market-rate, the legal services vendor referenced in that document, and Dosamentes's campaign seemingly failed to recognize that the savings garnered by this below-market-rate payment could constitute a contribution subject to applicable limits." Days after our pre-motion hearing on July 25, 2024, where the Defendants claimed they were not familiar with Dosamantes, the Defendants enforced a default judgment for approximately $70,000 against her in NYS Supreme Court, presumably to intimidate her.

After the Defendants misrepresented the existence of a lawyer ban during our hearing, and after I disputed their assertion, General Counsel Gallagher reversed course and informed the Court (on p14 of the Transcript Docket #55), "As a participant in the program, you, yourself, have accepted a limitation on the amount of money you can donate to your own campaign. So if you want to spend on a lawyer and your campaign doesn't have the finances to spend on that lawyer, you can't pay for it out-of-pocket unless you stay with the contradiction [sic] limit. So in this matter, it would have been $6,000."

---

[1] *NYC Campaign Finance Board vs. Celia Dosamantes et al.* (Index #451903/ 2023)

[2] *People v. Dosamantes*, 180 A.D.3d 518, 118 N.Y.S.3d 106, 2020 N.Y. Slip Op. 1118 (N.Y. App. Div. 2020))

## DID THE DEFENDANTS LEGISLATE AN UNCONSTITUTIONAL SPEECH LIMIT ON "NON-PARTICIPANTS" IN THEIR MATCHING FUNDS PROGRAM?

<u>Yes.</u> (The Defendants have not addressed this point). See 3-703(f) from the 2019 NYC Admin Code, which states (emphasis added), "[A]uthorized committees must not accept… **any** contribution… from… a non-participating candidate which… (i) for the office of mayor, **public advocate** or comptroller shall exceed **three thousand five hundred dollars."**

Of note, the Defendants told me the amount was actually $5100, not $3500. I believe this is because of a change in Rules the CFB initiated in 2019 to lower the individual donor contribution limits for non-participants. They also emailed me this on February 26, 2021:

For more information about how the Program works, read the Preface of the Campaign Finance Handbook and see the Join the Matching Funds Program page.

*To join the Campaign Finance Program, you must complete and submit a Certification by the deadline.*

### 2021 CONTRIBUTION LIMITS

Contribution limits apply to all campaigns, whether or not you join the Program. These limits apply for the entire election cycle.

| Office | New Program (Option A) Participant | Old Program (Option B) Participant | Non-Participant |
|---|---|---|---|
| Mayor, Public Advocate, Comptroller | $2,000 | $5,100 | $5,100 |
| Borough President | $1,500 | $3,950 | $3,950 |
| City Council | $1,000 | $2,850 | $2,850 |

Campaigns can accept only up to $100 in cash per contributor, including the initial deposit to open your bank account.

» Doing Business Contributions

If a contributor has business dealings with the city at the time his/her contribution is made, the following lower limits apply:

| | |
|---|---|
| Mayor, Public Advocate, Comptroller | $400 |
| Borough President | $320 |
| City Council | $250 |

**There was a clearly established constitutional right at the time of the Defendants'
misconduct.** In *Randall v. Sorrell*, 548 U.S. 230, 248 (2006), a case appealed from the
Second Circuit, the Supreme Court ruled, "Contribution limits that are too low can harm the
electoral process by preventing challengers from mounting effective campaigns against
incumbent officeholders, thereby reducing democratic accountability." The Supreme Court
also added, at 241,""The Court in Buckley held that limits on a candidate's expenditures of
his own funds, as well as limits on overall campaign expenditures, are unconstitutional
because they impose significant restrictions on the ability of candidates, citizens, and
associations to engage in protected political expression."

The statutes the Defendant CFB drafted, and the Defendant City of New York adopted, were
already known to be unconstitutional at the time they were enacted. This meets the criteria
for a Monell claim and it defeats a qualified immunity defense. The Defendants presented
candidates with a choice between two options where their First Amendment rights would
be waived. If they didn't sign, they would be removed from the ballot, another choice that
would deprive them of their First Amendment rights.

Although the Defendants create the illusion that non-participants could spend unlimited
amounts of money and "participants" voluntarily gave up their rights, that is not true. I
would have been restricted either way, and I would have faced a lawyer ban either way.

## DID I "KNOWINGLY AND WILLINGLY" CONSENT TO BE IN THE MATCHING FUNDS
PROGRAM?

As I have attested to previously, I never could have imagined I would be trapped in this
modern-day reenactment of the Stanford Prison Experiment. The Defendants argue that I
am claim-precluded from bringing up the Matching Funds Program. The Court ruled that I
am claim-precluded as far as the Voter Guide and the Debates are concerned. However, the
facts can still be used to demonstrate why a retaliation claim is plausible. The facts remain
that I never consented to waive my constitutional rights. I simply signed a form that said I
would follow the Rules and Laws of the City and State of New York, a condition I thought I

36

had to follow anyway. I also initialed a form that said I wanted to remain eligible for matching funds– although I never actually applied and I never received matching funds.

## WHEN ARE YOU CONSIDERED A MATCHING FUNDS PARTICIPANT?

The press, the U.S.A.A. of the EDNY, the CFB, and I have all explained it differently. Seemingly, the Defendants change their definition depending on what they want to achieve. For example, in Mayor Adams' indictment, the U.S.A.A. writes, "Candidates that collected a minimum number of contributions and raised a minimum amount of qualifying contributions from New York City residents were eligible to opt into the Matching Funds program."

This is different than what the CFB has stated in this case. According to the U.S.A.A., Adams had to collect the money first, and had to opt in second, and then had to receive and accept the funds. That is the same way I described the program previously. However, the Defendants have argued in my case, that it was a one-step situation where I expressed an interest in applying to the program in the future and that was the end of it. I cannot voluntarily escape now. All the speech restrictions have taken hold. There is a dispute about a material fact. Mayor Adams is on trial. The Defendants argued that I am similarly situated to him in the pre-Motion hearing. Therefore, we should both have the same Matching Funds definition applied to us.

## WHAT HARM HAS THEIR "PROGRAM" OF SPEECH DEPRIVATION CAUSED ME?

The Defendants say there has been no harm. In addition to the extreme disruptions to my ability to practice medicine and to generate income and wealth, and in addition to the overall stress they have caused me, the Defendants have caused numerous other harms.

In their original 11/10/23 MTD, the Defendants wrote, "In October 2021, Plaintiff sought a temporary restraining order in the Supreme Court of the State of New York…" They uploaded my pro se O.S.C., which requested "fair and equal access" to the public through their Voter Guide mailing. I retained counsel before the hearing. Defendants also uploaded the hearing transcript as Exhibit E. On p31-33, the presiding Judge stated, "[I]t's moot. The

voter guide has been distributed and mailed citywide to millions of people. To take that back is a virtual impossibility… So I will allow [Plaintiff's attorney] to… properly move again for any relief that the plaintiff, or now the petitioner, sees fit… There will not be another election…. And that would disadvantage your client if there was not expedited treatment of this case."

My campaign became insolvent immediately afterwards and the "lawyer ban" took effect. I returned to the courthouse numerous times. The County Clerk would not allow me to file pleadings, pro se, because I had an attorney on record. The Bursar would not accept payment from me for a new Summons. The Help Desk would not answer my questions. I explained that it was against-the-law for me to speak to my attorney now that my campaign was bankrupt. They all appeared not to understand.

On 8/8/22, I persuaded the Clerk to let me file an O.S.C., which I submitted to the Ex Parte office. I asked Judge Hagler to remove my attorney from the record, so I could proceed without spending any cash. I enclosed my proposed Complaint and Exhibits. In the Memo accompanying their 11/10/23 MTD, the Defendants explained, "[S]he believed the Board's restrictions… implicated First Amendment issues."

Point 13 of Mr. Thayer's 11/10/23 Declaration acknowledges his receipt "from the Board a copy of a proposed Order to Show Cause, filed on May 8, 2023, but dated August 8, 2022, that Plaintiff filed in the same proceeding under Index No. 101118/ 2021. Justice Hagler declined to endorse this proposed order on August 9, 2022."

Nevertheless, Justice Hagler's clerk emailed me (Exhibit A), "It appears there is a disconnect (between what you were attempting to do and the manner in which your application was presented)… [Y]our research may discover various ways an attorney may be substituted out of a case without running up expense." As Justice Hagler's clerk acknowledged in his email, "Generally speaking, represented parties are not permitted to use this court's Help Center." Barred from speaking to any attorneys (including my own), the Help Desk, or the Judge, I could not figure out what to do.

The Court may have understood my intentions. Even though I had not paid filing fees, a new case appeared on the docket on 8/28/22. I did not know this.

Believing I had to start from scratch, I filed a new pro se case on 10/20/22, which was ultimately assigned to Judge Ramseur who dismissed it. She did not grant leave to amend, citing futility due to Notice of Claim and Statute of Limitations issues.

I am not asking this Court to revisit the prior decision. Rather I assert that *a constitutional injury occurred on 10/20/22,* the day I was forced to forego my timely-noticed, timely-filed, First Amendment claim, with an attorney-on-the-record. Instead, I had to file a different Complaint without counsel. By law, my corporation (Metropolis Pain Medicine), and my campaign (Dr. Devi For NYC), needed legal representation to access the courts, but I could not speak to an attorney. This remains true today. I even filed a Notice of Claim for ongoing perversions of justice, listing Judge Hagler as a witness (Ex. B). The Defendants subsequently embarked on this never-ending Audit, where I am barred from consulting with counsel and even with the campaign *Treasurer* because of the "fair market value" of her knowledge. In addition, the Defendants launched *eleven* similarly baseless and retaliatory prosecutions against my mother and my campaign (Ex. C). I lost time, effort, income, my competitive edge, and even patients (thereby devaluing my practice), to serve as their legal representation. As the Candidate, I would have been jointly and severally responsible for up to approximately $110,000 in campaign finance penalties. To further deprive me of rights, the Defendants claim I am <u>still</u> running to win the 2021 election. This converts an *election-cycle*-donation cap to an indefinite cap on speech.

The Defendants argue I am precluded from discussing candidate contribution caps. Because my campaign had money during the TRO case before Judge Hagler, it could access the courts. Before the Ramseur case began on 10/20/22, I could have potentially pursued the 8/28/22 case. "New York Courts, in determining when cause of action accrues, generally balance rights of defendant and plaintiff by looking [to the] date of injury." Dorsey v. Apple Comp, Inc., 936 F. Supp. 89 (EDNY, 1996).

The Defendants made me choose between a $6000 ("participant") contribution cap and a $3500 ("non-participant") cap to run for office. No matter what, I needed to forfeit my civil rights and contend with the Defendants' *knowledge* ban, a vestige of the North Carolina and Alabama Slave Codes[1], which they resurrected, in total disregard of the Thirteenth Amendment. Reviewing a Second Circuit decision, in Randall v. Sorrell, 548 U.S. 230 (2006), the Supreme Court held, "[C]ontribution limits that are too low can [prevent] challengers from mounting effective campaigns," and that Vermont's laws "imposed excessive burdens on… candidates, parties and volunteers, and thus, violated the First Amendment." Vermont did not even ban *volunteering*, as these Defendants have, stating they can appraise the "fair market value" of speech.

In U.S. v. Procter & Gamble, 356 U.S. 677 (1958), the Court found that discovery was necessary for a fair trial. In United States v. Nixon, 418 U.S. 683 (1974), the Court balanced the need for evidence with privilege and allowed discovery of the President's recordings. In our case, these individuals are not critical for sensitive government functions; nor am I seeking privileged or classified information (Reynolds v. United States, 245 U.S. 1 (1953)). Recently, the Defendants noted they located records they previously claimed did not exist. Therefore, the incremental burden of sharing those records is minimal. Discovery has been allowed to determine whether qualified immunity applies or not (Harlow vs. Fitzgerald, 457 U.S. 800 (1982)). Moreover, the government is already engaging in Discovery. These Defendants have used their Audit to conduct a prolonged, unrelenting, costly, and extremely burdensome discovery on me, my campaign, and my medical practice. This consists of lengthy questionnaires where I must write numerous essays and repeatedly reformulate information I previously provided. Under threat of economic injury through campaign finance penalties, I participate in video-game like challenges in their proprietary web portal, answer pop-quiz-type questions in their virtual meetings, and screen share information I have on my laptop with them.

---

[1] https://www.thirteen.org/wnet/slavery/experience/education/docs1.html; Accessed October 25, 2024

## HAVE RECORDS OF PUBLIC HEARINGS BEEN DESTROYED?

The Defendants issued a prior restraint on my comments at the January 17, 2023 Voter Guide Rules meeting where they solicited testimony. Then after I filed my FAC, they deleted all information pertaining to that hearing itself– from their websites and social media. Defendants' Counsel appears to agree. He attested he cannot locate any information about my testimony, writing instead in the Opposition Letter dated September 27, 2024, "For Plaintiff's accusations about the concealment and/or deletion of records of her testimony to the CFB on January 17, 2023, the CFB is again unaware of precisely to what Plaintiff is referring. The CFB met to vote on enforcement actions on that date and did not receive testimony," adding, ""Again, her complaints on this front appear to be related to her incredulity and dissatisfaction with a response she received to her FOIL request."

If the Court allows, I ask to submit a video recording of the public hearing. In it, I explain to Defendant Perskie that her proposed Voter Guide Rules violate First Amendment rights. (There are no enforcement actions being discussed in the public hearing I participated in). This testimony, and its deletion, are not barred by res judicata because both events occurred after the NYS Supreme Court filing on October 20, 2022.

**New York City Campaign Finance Board**

**Notice of Public Hearing and Opportunity to Comment on Proposed Rules**

**What are we proposing?** We are proposing amendments to the Campaign Finance Board's ("Board") rules regarding disclosure, transition and inauguration entities, and the voter guide.





**ARE THERE UNCONSTITUTIONAL RESTRAINTS ON SPEECH AT PUBLIC HEARINGS–**

### AND WHY DO THEY MATTER?

Anyone who wishes to speak at a public hearing must first state their name, race, gender and political affiliation (See FAC ¶ ¶  ). This policy dissuades people from participating in the meeting and limits the use of  another method of addressing the CFB's unconstitutional policies. In *NAACP v. Alabam*a, 357 U.S. 449, 462 (1958), the Supreme Court explained, "This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. Compelled disclosure of membership in an organization engaged in advocacy of particular beliefs is of the same order as compelled disclosure of the identity of a speaker. Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." This was a clearly established right.

(Of note, the Defendants have added additional speech restrictions since that time. People cannot join public meetings unless they receive an invite from an acceptable person. That person's name must be revealed to the CFB beforehand. A person who does not have a referral will not have the ability to participate).

In their Opposition letter dated September 27, 2024, the Defendants reference testimony I presented that starts with "I was the only woman of color…" Even though I believe it is bizarre to start off any sentence like that, and even though this type of opening goes against my stance as an equal opportunity employer, I followed the Rules of the forum. I have not seen elected officials do this at their press events or public hearings. Again, this is done specifically so political challengers (who generally do not start off sentences with their protected characteristics) are dissuaded from public participation.

The testimony where I started with "I was the only woman of color…" is visible publicly. On January 17, 2023, I did *not* follow the Rules of the forum, however. Because I did not state my race, gender, and political affiliation during my testimony, and because I was critical of the Defendants, my testimony was expunged from the public record.

### <u>ARE THE ELEMENTS OF THE CLAIM FACTUAL DISPUTES?</u>

There is enough dispute about each of the elements of the audit: the justification, the timing, the duration, the nature, the conduct, the lack of transparency, and the lawyer ban, etc. that the factual nature of those issues should be left to a jury for resolution.

### <u>CONCLUSION:</u>

I ask the Court to consider what the public interest is in all of this– the speech restrictions, the "fair market value" appraisal of supposedly free speech, the misrepresentations, the knowledge ban, and the endless auditing of political dissidents. The only reason the Defendants created the Rules, as they apply to the Audit, is so they could retaliate against people for speech they found offensive. There is no separation of powers here. There is no practical opportunity to appeal. The Defendants have a long-standing pattern of misconduct that the City has tacitly approved. Even worse, the City legislated a whole host of unconstitutional statutes that deprive candidates, treasurers, and campaigns of their constitutional rights, leaving them vulnerable to a myriad of attacks. I ask the Court to let a Jury, members drawn from the public, determine whether the Defendants can truly justify all of their unconstitutional (and likely illegal) policies.

The Defendants have not stated any reason why a Second Amended Complaint would be futile. If I must add more facts to the pleading, I ask the Court to provide me with that opportunity. Additionally, I have endured other speech restrictions and forms of retaliation since the filing of my First Amended Complaint.

Respectfully,

/s/ Devi Nampiaparampil
Devi Nampiaparampil
Pro se, Plaintiff

44