UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————————x
DEVI NAMPIAPARAMPIL,
                 *Plaintiff,*
      –against–
THE NEW YORK CITY CAMPAIGN FINANCE BOARD,
AMY LOPREST, DAVID DUHALDE, HANNAH EGERTON,
FREDERICK SCHAFFER, BETHANY PERSKIE, MATTHEW
SOLLARS, JACLYN WILLIAMS & THE CITY OF NEW YORK
              *Defendants*

**SECOND AMENDED COMPLAINT**

**1:23-cv-06391**

**JURY TRIAL DEMANDED**

## THE LAWYER BAN:

## THE GOVERNMENTAL RECLASSIFICATION OF LEGAL ADVICE

## AS A POLITICAL CONTRIBUTION

This case asks whether a municipal government can use campaign-finance law to reclassify legal advice, litigation assistance, family support, and professional compliance assistance as regulated political contributions, then penalize a political candidate for obtaining the guidance necessary to challenge the government itself.

**PRELIMINARY STATEMENT**

This case challenges a statutory and regulatory scheme administered by the New York City Campaign Finance Board ("CFB") under the New York City Campaign Finance Act. Under this scheme, the CFB classifies legal advice to political campaigns, candidates, campaign officers, donors, and volunteers as a form of "in-kind contribution." The CFB assigns a state-determined value to legal services— including pro bono assistance— and treats any legal advice exceeding an individual's contribution limit as an unlawful over-the-limit contribution. As a result, once a campaign becomes insolvent, candidates and campaign personnel are effectively barred from obtaining legal counsel.

The CFB has acknowledged this structure in federal proceedings. During oral argument before the Judicial Panel on Multidistrict Litigation, counsel for the City stated that he was "equally confused" about the scope of the "lawyer ban," and that the issue had not been

1

clarified in any forum. Members of the Panel expressed concern that such a restriction could be unconstitutional.

Despite this uncertainty, Defendants have consistently opposed efforts to clarify the scope of their restrictions, resisted judicial review, and maintained that the denial of counsel is permissible because there is "no constitutional right to counsel in civil cases." Defendants have further argued that Plaintiff— a U.S. citizen, political candidate, federal whistleblower, and civil plaintiff— is attempting to "escape the New York court system," a characterization that underscores the extent to which the Defendants view Plaintiff as a prisoner.

The cumulative effect of these restrictions is to deprive political challengers of meaningful access to counsel, to the courts, and to the electoral process. The structure and enforcement of the CFB's rules create procedural barriers that prevent candidates from asserting constitutional rights, defending themselves in administrative proceedings, or obtaining legal advice without risking penalties. Plaintiff brings this action to challenge these restrictions and to vindicate her constitutional rights.

```
        JUDGE GORTON:  Well, it may not have anything to do
with the centralization, but why isn't the lawyer ban clearly
unconstitutional?
        MR. MAIELLO:  Your Honor, I believe there's been a
large amount of misunderstanding as to this lawyer ban both --
by both parties over time.  I have not called the pro se
confused.  I'm equally confused about that.
   (Laughter.)
        MR. MAIELLO:  I do not have that Southern District
caption that's assessing the lawyer ban, so I do not know the
intricacies of the years of precedent that's been developed
```

2

here as to the lawyer ban.

It's a cap on a certain amount of spending that applies only to certain things, and I believe it comes down to, if the lawyer was employed by the campaign for certain parts of the campaign, then the ban would be in effect. But then, in other parts of the -- if the campaign hired a lawyer for other stuff, then that cap does not apply. But I am not a hundred percent sure to give you a pure definition today.

JUDGE KIMBALL: I would assume that most of us in this room would oppose a lawyer ban.

(Laughter.)

MR. MAIELLO: Understandable. And we would oppose a lawyer ban. I believe this is a case of a technical miscommunication and disagreement as to what falls under it and what does not. That has not been clarified so far yet, but the Southern District will clarify that or the New York county case that's been reopened.

*(See MDL #3146 Case Docket Doc #24
and NCWD Case Docket 1:25-cv-00894 Doc # 3-2 (JPML Hearing Transcript))*

If anything, the plaintiff is trying to transfer to Washington DC to escape the New York court system, which they have

*Defendant Maiello on Plaintiffs' Attempt to "Escape the New York Court System"*

3

> Here, the structure of Plaintiffs' Complaint makes it difficult to identify what federal statutory or constitutional rights each individual defendant allegedly violated. The Complaint addresses Plaintiff's grievances in a general sense, speaking of violations of constitutional rights in broad sweeps, i.e. violating the right of counsel, which notably does not exist for individuals
>
> Case 3:25-cv-00894-MOC-SCR    Document 21    Filed 01/20/26    Page 21 of 27
>
> affirmatively bringing civil actions. *See Lloyd v. Elliot*, No. 95–6158, 89 F.3d 828, 1996 WL 346522 *1 (4th Cir. June 25, 1996) (stating unequivocally "there is not a constitutional right to counsel in a civil case"). Based on Plaintiffs' Complaint, the predominate underlying alleged

*Excerpt from Defendants' Memo of Law (Doc # 21) in Support of a Motion to Dismiss*

**VENUE**

Venue is proper in the Southern District of New York (SDNY) under 28 U.S.C. § 1391(b)(2), as a substantial portion of the events giving rise to the claims occurred in this District.

**JURISDICTION**

This Court has jurisdiction under 42 U.S.C. § 1983, as this action concerns constitutional deprivations under color of law.

**PARTIES**
(Plaintiff has included the County in the address, as per instructions to pro se parties)

*Plaintiff*
**Devi Elizabeth Nampiaparampil**
111 John Street Suite 2509
New York, New York County
New York, 10038
Cell: 312-523-5935
Email: devichechi@gmail.com
*Pro Se*

4

*Parties Worth Noting*
*Plaintiff's Single Member LLC:*
Metropolis Pain Medicine, PLLC
d/b/a Devi Nampiaparampil, MD
111 John Street Suite 2509
New York, New York County
New York, 10038

*Plaintiff's Former Counsel:*
Blair Eden Kaminsky
Brian Taylor Goldman
Arian Soroush
Holwell Shuster & Goldberg LLP
425 Lexington Avenue
New York, New York County
New York 10017

In October 2022, Devi E. Nampiaparampil, M.D. ("Dr. Devi"), and Metropolis Pain Medicine PLLC ("Metropolis") filed suit against the New York City Campaign Finance Board in New York State Supreme Court. Judge Dakota Ramseur denied Dr. Devi's request to appear on behalf of the corporation as the single member of the single-member LLC.

In a subsequent Decision on Dr. Devi and Metropolis' joint Motion For Vacatur, the Court noted that the original pleadings stated that the Defendants' campaign-finance restrictions prevented the Plaintiffs from retaining counsel for the company, but the Court found that point insufficiently pleaded. The result was that Metropolis was deemed unable to proceed pro se, yet was still treated as sufficiently before the court to receive a dismissal with prejudice  based on the pro se pleadings.

Plaintiff thereafter retained Holwell Shuster & Goldberg LLP ("HSG") to represent the corporation in this federal litigation in the SDNY before Judge Ramos (1:23-cv-06391). Metropolis paid over $151,000 for that representation in 2023.

5



Plaintiff brings this to the attention of the Court because Metropolis is not a collateral entity. It is one of the clearest examples of the Lawyer Ban's operation.

*Defendants:*
The individual Defendants are all past or present municipal employees, who acted in their official capacities under color of law, with qualified immunity to be determined during these proceedings.

**The New York City Campaign Finance Board**
Address:
100 Church Street
New York, New York County
New York 10007

**David Duhalde**
Home Address:
148 Parkside Avenue #2A
Brooklyn, Kings County
New York, 11226
dduhalde@nyccfb.info
Work Address:
100 Church Street 12th Floor
New York, New York County
New York, 10007

**Bethany Perskie**

6

Home Address:
80 Cranberry Street Apt. 3G
Brooklyn, Kings County
New York 11201-1120
Work Address:
28 Liberty Street 15th Floor
New York, New York County
New York, 10005

**Amy Loprest**
Home Address:
227 Greene Avenue
Brooklyn, Kings County
New York, 11238

**Hannah Egerton**
Home Address:
678 Lincoln Place Apt. 2F
Brooklyn, Kings County
New York, 11216
hegerton@nyccfb.info
Work Address:
100 Church Street 12th Floor
New York, New York County
New York, 10007

**Matthew Sollars**
Home Address:
10 the Fenway
Hastings on Hudson, Westchester County
New York, 10706
718-793-2211
Work Address:
29 West 38th Street, 14th Floor
New York, New York County
New York, 10018

**Jaclyn Williams**
Work Address:
12 West 37th Street 7th Floor

New York, New York County
New York, 10018

**Frederick Schaffer**
Home Address:
924 West End Avenue Apt. 85
New York, New York County
New York, 10025
Work Address:
100 Church Street 12th Floor
New York, New York County
New York 10007

**The City of New York**
℅ Office of Corporation Counsel
100 Church Street 2nd Floor
New York, New York County
New York 10007

## FACTUAL BACKGROUND

### Part I: Plaintiff's Protected Activity As A Federal Whistleblower and Constitutional Plaintiff

In 2008, while working as a civilian consultant for the U.S. Department of Veterans Affairs (VA), treating brain and spinal cord injuries, amputations and other threats to life and limb, Plaintiff identified a relationship between blast-related traumatic brain injuries and the subsequent development of chronic pain. Plaintiff was informed the federal government would not  compensate her to pursue this line of inquiry, so she continued to research the association in her off-duty hours. At the age of 30, Plaintiff submitted a full meta-analysis linking traumatic brain injuries to chronic pain, with a comparison between military and civilian injuries, to the Journal of the American Medical Association (JAMA)[1]. After the study passed intensive peer review, but immediately before its ultimate

---

[1] Nampiaparampil DE. Prevalence of Chronic Pain After Traumatic Brain Injury: A Systematic Review. *JAMA.* 2008;300(6):711–719. doi:10.1001/jama.300.6.711

publication in the journal's special Human Rights issue, the publisher contacted Plaintiff. JAMA explained that since Plaintiff's meta-analysis inherently challenged the federal government's ongoing war effort, she could potentially face career-altering repercussions if she consented to its publication. Plaintiff expressed understanding and signed the authorship release. The study triggered numerous downstream publications and presentations in that subject area. Ultimately, the VA implemented a system redesign, revising its protocols and policies for soldiers returning from Iraq and Afghanistan. The same year, Plaintiff was brought into the federal system– as an employee– and made the Chief of Pain Management for a VA Healthcare System[2], which extended into the SDNY. Plaintiff also began participating in multiple federal advisory committees.

Just weeks after moving to New York and beginning her review of the hospital-wide data, Plaintiff identified the potential for preventable deaths related to clinicians' opioid prescribing habits. Plaintiff alerted decision-makers at the local VA healthcare system. Plaintiff's concerns were reviewed with the former two Chiefs of Pain Management, who she had replaced. These men were both disabled veterans, injured during service, one in his early 80s and other in his late 50s, upon information and belief. Both suggested Plaintiff was confused, inexperienced, and perhaps too young to fully understand the VA's directives on pain management. Plaintiff's concerns were sidelined, but since she believed lives were at stake, she wrote to former Presidential nominee, John Kerry, whose office responded:

---

[2] The VA equivalent title was "Pain Management Program Manager"



*2008 Letter From The Office of Former Presidential Nominee, Senator John Kerry*

Plaintiff had been in the habit of working 60-100 (avg. 80) hours per week for years, siloed in her medical field. She completed her intensive internship, residency and fellowship training through Harvard Medical School in Massachusetts in 2007. She then worked as a physician-consultant in New Hampshire, Vermont, California, Washington, and

10

Illinois before returning to New York. Given her work schedule, she was generally unfamiliar with political figures other than those who ran for President. Since she had just moved (back) to New York a couple weeks earlier, Plaintiff did not know who Charles Schumer was; nor did she understand why she would write to the former First Lady, Hillary Clinton, about excess mortality from chronic pain treatment. Plaintiff wrote to John Kerry because his Presidential campaign platform focused on ending the wars in Iraq and Afghanistan, and Plaintiff believed the brain injuries, chronic pain, and potential for opioid-related deaths were all strong arguments for ending the war.

Plaintiff then tried to address the problem locally– implementing restrictions on prescriptions for fentanyl, Oxycontin, and methadone– the three prescription drugs which she believed posed the highest risk to patients. These changes had immediate effects in terms of patient safety, but there was significant resistance. First, Plaintiff was informed she would be ousted as Chief, blacklisted at other clinical sites, and banned from performing interventional pain procedures (her forte), all due to the restrictions she placed on opioid-prescribing. Therefore– as an "insurance policy" of sorts, in March 2009, Plaintiff wrote to Senator Kirsten Gillibrand. There was no response.

**Pain Management for our Veterans**
1 message

Devi Nampiaparampil <devichechi@gmail.com>                                        Tue, Mar 31, 2009 at 9:33 PM
To: kirsten_gillibrand@gillibrand.senate.gov

Devi Nampiaparampil, MD
12 Columbia Road
Ardsley, NY 10502

March 31, 2009

Senator Kirsten E. Gillibrand
531 Dirksen Senate Office Building
Washington DC 20510

therapies to improve patient outcomes. We advocate for the safe use of opioids and continuously monitor our patients for appropriate indications for opioid therapy as well as for potential complications of opioid treatment. The population that we currently treat often has comorbid psychiatric and substance abuse disorders. These patients are often medically complex and face severe psychosocial stressors. Many of them are on high-dose opioid medications, have become disabled, and often still find themselves suffering from chronic unrelenting pain. I am trying to mobilize our resources so that we can assist those patients with multifaceted psychosocial problems. My plan is to improve the quality of care for our existing patients and also to better prepare ourselves for the impending return of the Iraq and Afhganistan veterans.

*Excerpts From March 2009 Email and Hard Copy Letter to Senator Kirsten Gillibrand*

Plaintiff disregarded a senior VA administrator's directive to step down from her position and continued to enact policies to decrease patient mortality, improve consistency in treatment among patients, and to improve access to care and patient satisfaction. The VA is a hierarchical system based on chain-of-command. Even though there were more senior officials than Plaintiff, she was the highest ranking person in her field in the healthcare system. Therefore, they could not easily override the patient safety policies she implemented. Eventually, suspected in drug dealers– registered as patients– promised to torture and kill Plaintiff if she did not change the healthcare system's policy on opioids. These individuals also threatened the safety of Plaintiff's parents: Mary Nampiaparampil ("Mary Nam") and Xavier Joseph Nampiaparampil ("XJN") with one menacing individual approaching Plaintiff when she stopped for gas at a station en route to her parents' home. In a separate incident, local law enforcement contacted the VA to say they confiscated all the guns from a veteran's home. They noticed the veteran had been acting in a concerning manner. Unbeknownst to the law enforcement officer, the veteran appeared to be stalking Plaintiff, demanding Plaintiff change the new opioid policy at the healthcare system. The veteran's son then contacted the VA Police asking that they independently contact the Sheriff and prevent the veteran from purchasing a new weapon.



*Excerpts From Filed Material in 2022 Case Before Judge Ramseur (159019/2022)*

12

Plaintiff received numerous threats and often managed to dodge and weave with only her wits and her words. But occasionally, she was injured. In one incident, a full investigation was launched because the veteran had caused ancillary federal property damage before the police arrived.

VA experts convened and found a separate death threat made against Plaintiff to be credible and high-risk. The veteran's psychiatrist called Plaintiff directly to warn her. The Disruptive Behavior Committee issued a restraining order on the individual, demanding the patient have a police escort on-campus at all times. The individual ignored the directive, bypassed the VA Police, and arrived in Plaintiff's outpatient clinic wing, threatening to kill those in the vicinity. In 2009, in the era before mass shootings, the hospital staff did not have any protocol for this type of scenario. Upon information and belief, at least one patient was injured– experiencing chest pain and shortness of breath, symptoms of coronary artery disease, while exerting themselves to flee the area using a walker. The disruptive individual received a large supply of opioid pills and left the area before federal police arrived. On June 18, 2009, Dr. Devi reported systemic prescription opioid-related dangers to the Drug Enforcement Administration (DEA) and subsequently followed up.

Dear Investigator Cason,

I apologize for the delay in getting back to you. I believe that a) the standard of care is not being upheld for several of our patients, b) there has been significant morbidity and mortality with possible preventable deaths as a result, c) there is not always a valid patient-physician relationship when narcotics are being prescribed, d) patients are not consistently being evaluated prior to receiving narcotics, and e) the doctors are often aware that the patients have a high likelihood of drug abuse or diversion and continue to prescribe narcotics. I do not believe that anyone is selling prescriptions for money.

Plaintiff had found concerning data pertaining to New York City (NYC), and met with Manhattan-based DEA investigators, including Investigator Leslie Cason and Acting Group Supervisor Norina Monaco at their Chelsea-based offices. Plaintiff was concerned patient privacy laws prevented her from disclosing the names of suspected drug dealers, but Agent Cason told her they did not.



FILED: NEW YORK COUNTY CLERK 01/20/2023 04:37 PM    INDEX NO. 159019/2022
NYSCEF DOC. NO. 130    RECEIVED NYSCEF: 01/20/2023

Even though the DEA originally reported that it had right of access to patient records, Acting Group Supervisor Monaco told Plaintiff that the DEA could not legally access the patient records Plaintiff had brought in a suitcase with her to their offices. While they could discuss the de-identified data, in order to use them, they needed a more public finding of misconduct. Plaintiff gave the DEA what it needed by going through the Equal Employment Opportunity Commission and explaining how a physical assault, multiple death threats, and various other menacing and often gender-based stalking behaviors towards her created a discriminatory and retaliatory hostile working environment.

Plaintiff initially filed without an attorney. The VA responded by asking Plaintiff to settle out-of-court and presenting her with a pre-signed settlement agreement that they told her acquiesced to all her demands. Plaintiff could not understand the initial agreement and asked for an attorney. The VA identified Plaintiff as a federal whistleblower and

14

transferred the constitutional claims from New York to Washington, DC. The VA Central Office assigned George Fisher, a federal investigator, to the case.



DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT
810 Vermont Avenue
Washington, DC 20420

In reply refer to: 08E

November 2, 2009

George Fisher, EEO Investigator
Office Resolution Management 08B
810 Vermont Avenue
Washington, DC 20420

SUBJECT: Assignment of Investigation

1. You are hereby assigned to investigate the following discrimination complaint:

The independent investigator conducted depositions and interrogatories and found the claims to be meritorious. Plaintiff hired David M. Fish as her attorney. Plaintiff was presented with a revised settlement agreement, this time including monetary damages.

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
NEW YORK DISTRICT OFFICE

DEVI NAMPIAPARAMPIL,
            Complainant,

            v.

ERIC K. SHINSEKI, Secretary,
U.S. Department of Veterans Affairs,
            Agency.

EEOC Hearing No.
▨▨▨▨▨▨▨▨▨

Agency Case No.:
▨▨▨▨▨▨▨▨▨▨▨

SETTLEMENT AGREEMENT

The parties to this Settlement Agreement, DEVI NAMPIAPARAMPIL,

(Complainant), and the Department of Veterans Affairs ▨▨▨▨▨▨▨▨▨▨

▨▨▨ (Agency), freely and voluntarily hereby agree to the following terms and

conditions, set forth below, as full settlement of the above captioned matter:

15

i. The parties have had the opportunity to consult with counsel concerning the meaning and application of the terms and provisions of this settlement agreement, and voluntarily enter into this settlement agreement.



*Excerpts From 2010 Settlement Agreement Between VA and Dr. Devi*

While the VA was preparing the agreement for review, Plaintiff rose through the ranks of the VA, eventually directing and developing the Interventional Pain Management referral center. The site, based in Manhattan, served NYC's five boroughs in addition to Westchester and Dutchess Counties (upstate), Nassau and Suffolk Counties (in Long Island), and all of New Jersey as its base catchment areas. *Military Medicine* portrayed the site Plaintiff directed and developed as a model for other VA and Department of Defense (DOD) sites in terms of innovation and access to care[3].

Plaintiff, working with her father, XJN, a statistician, also identified signs of systemic discrimination based on race in healthcare, performing the first randomized-controlled

---

[3] Devi E. Nampiaparampil, Bowlva M. Lee, Yan Y. Chen, David S. Cheng, Innovations in Access to Interventional Pain Management, *Military Medicine*, Volume 178, Issue 4, April 2013, Pages 362–364, https://doi.org/10.7205/MILMED-D-12-00398

double-blinded trial evaluating this issue in the treatment of chronic low back pain[4]. Plaintiff's work was recognized by the American Medical Association and by other distinguished institutions. The VA encouraged Plaintiff to perform a "needs analysis" on the entirety of the pain management policies for the NYC Tristate, the Virtually Integrated Service Network (the "VISN"). Senior VA officials told Plaintiff she had a relative carte blanche to address whatever needs she identified. Although this put Plaintiff directly in the cross-hairs of her prior whistleblower complaint, it was arguably the best job Plaintiff ever had. For the first time, she could meaningfully address barriers to safe and effective medical care on a larger scale. No one asked Plaintiff to sign a non-disclosure agreement for her settlement. However, a senior VA official convinced her that throwing a constitutional grenade at the VA would only detract from their *common goal* of improving the health and safety of the veterans, so Plaintiff stayed silent for over a decade– until this litigation. Plaintiff considered the matter resolved *until* the City threatened her parents, children, and patients.

As Plaintiff assumed these additional responsibilities within the VA, she explained that the facilities could not simply look at a list of physicians who prescribed the most pills or the greatest number of morphine equivalents or the most restricted drugs. After all, Plaintiff herself would likely have been one of the top prescribers on that list– because the most medically challenging patients tended to gravitate towards her. Instead, the VA would have to cross reference the pharmacy prescription data with the medical and laboratory data to determine if the prescriptions seemed clinically appropriate for the patients' situations, and determine whether the prescriber had performed an effective risks/ benefits/ alternatives analysis related to continued prescribing. In 2010, the VA compiled its data on the New York City veterans for review, finding the greatest risks in the Bronx.

---

[4] Nampiaparampil, D.E., Nampiaparampil, J.X. and Harden, R.N. (2009), Pain and Prejudice. Pain Medicine, 10: 716-721. https://doi.org/10.1111/j.1526-4637.2009.00612.x

**Subject:** RE: Bronx Large DOSE CN101 / Large Quantity TDF Review #1
**Importance:** High

I did receive the Bronx response on this review.

As a follow up, we are asking for another **ACTION** item on this **due 10/8/10.**

1. How many cases resulted in peer review?
2. How many cases resulted in action being taken?
3. What was that action?

4. What plans are in place to prevent the problem from recurring.

Thank you,

Then, in 2010, Plaintiff met with regional VISN Chief Medical Officer and other VA leadership to discuss the potential for opioid-related harm in NYC. Plaintiff was granted access to DoD data and noticed that some veterans received parallel treatment at the VA and the DoD, resulting in two sets of fills– or double doses– of opioids. She alerted her counterparts at the DoD. At that time, the VA resisted participation in state prescription monitoring programs, so VA providers generally could not see whether veterans were receiving medical care outside of the VA. However, Dr. Devi was a faculty member at NYU School of Medicine and a clinician at NYU Langone Health who participated in their weekly Pain Management faculty meetings. As such, Plaintiff learned that a significant contingent of patients at the VA obtained care at Bellevue, part of the Health & Hospitals Corporation ("HHC")/ City of New York (the "City"), obtaining double medication fills there as well.

On numerous occasions between 2010 and 2013, Plaintiff discussed the potential for opioid-related harm in NYC with Bellevue clinicians and administrators with mixed results. Some patients could be using opioids despite escalating harms; others could be diverting the medications. Some Bellevue clinicians were genuinely surprised and wanted to learn

18

more. Most had no response. And at least one threatened Plaintiff with a "Congressional" for Plaintiff's attempts to re-evaluate (and likely curtail) opioid use.

Although Plaintiff occasionally experienced friction with the City, her career continued to advance within the federal government. Plaintiff worked regularly with the VA Central Office and traveled to Washington, D.C., Arlington, and Alexandria, along with numerous other VA sites– either to learn or to teach. The VA also sent her as an official government representative to the Middle East and China to promote goodwill through medical education.

**From:** Ellis, Jordan (EES)
**Sent:** Tuesday, May 03, 2011 7:45 AM
**To:** Nampiaparampil, Devi
**Cc:** Spector, Susan
**Subject:** Service Chief Orientation (VISN 3)

## Instructions to the Traveler

810 Vermont Ave., NW
Washington, DC 20420

**Program Title:** Service Chief Orientation
**TRACE Project No.:** 11.CL.SCO.A
**Conference Location:** The Hilton Alexandria Old Town
1767 King Street
Alexandria, VA 22314

During the same interval period, Plaintiff was hired to serve as a medical expert witness and consultant for the City. The VA did not object.

19

Considering the VA data, DoD data, private NYU data, and City Bellevue data at the same time, Plaintiff noticed several patterns with regards to opioids. However, in 2013, because the main hospital where Plaintiff performed interventional pain procedures closed due to Sandy, Plaintiff did not get to act on her findings. She left to pursue a masters in journalism at Columbia University. She also reconnected with an old acquaintance, HT and they began dating.

In 2014, HT started working for the New York City Campaign Finance Board (the "CFB") and brought Plaintiff along to various CFB events, including a family barbecue in Prospect Park. In 2014-2015, Plaintiff met numerous CFB employees– including some of the Defendants named here– became familiar with some CFB processes, and often visited the CFB offices at 100 Church Street. Plaintiff became engaged to HT. Afterwards, HT informed her that the CFB objected to their marriage, a statement which Plaintiff initially assumed was a joke. HT explained that– because Plaintiff was an active member of the press– the CFB had serious concerns about their living arrangements. Plaintiff would have physical access to citywide politicians' campaign data, which he was auditing. Plaintiff responded that she was a physician who managed to keep electronically-stored patient data secure, and that she understood the importance of privacy. Besides, she was a medical journalist, with no interest in campaign finance– other than to talk to him.

In February 2015, Plaintiff and HT got married. The CFB initially denied HT leave for the wedding and honeymoon. Then days before the wedding, the CFB granted him three days' leave for a rush honeymoon. Afterwards, Plaintiff stopped actively supporting CFB events.

On March 28, 2015, the Central Intelligence Agency verbally offered Plaintiff a position with the Agency, presumably after vetting her. Plaintiff initially thought maybe she should keep it confidential but then she was given merch including pens, a mousepad, a mugwarmer and other logo items. Although Plaintiff was honored, she declined. That year sparked numerous career events. Plaintiff was promoted to Associate Professor on the clinical track at NYU School of Medicine. Plaintiff became an official on-air Medical Contributor for Fox 5 NY and continued to appear on other national news networks.

Plaintiff also opened her own medical practice, Metropolis Pain Medicine, PLLC ("Metropolis").

Even though Plaintiff had not applied to be part of an expert panel, in 2016, the City and HHC asked Plaintiff to formalize the business arrangement with Dr. Devi and Metropolis.

**Business Associate Agreement, CV**

4 messages

**JORDAN, WENDY** <jordanw1@nychhc.org>                    Mon, Aug 29, 2016 at 10:47 AM
To: "devichechi@gmail.com" <devichechi@gmail.com>

Good Morning Dr. Nampiaparampil,

Attached is a copy of the Business Associate Agreement. The Business Associate Agreement is not related to a specific case but rather it is NYC Health + Hospital policy to have experts on file. Please sign it and return it either by fax or email below. If you fax it please put to my attention. Also can you send your CV? We need this for our file as well. If you have questions please feel free to contact me.

Thank you

*Wendy Jordan*

Claims Specialist



Claims and Litigation Division

55 Water Street, 26th Floor

New York, NY 10041

Hope all is well. Quick question-- I'll be working on the case under my company, Metropolis Pain Medicine PLLC. That's the entity that will be listed on my W9 as well.

Should the business associate agreement be between me and NYC-HHC-- or between Metropolis Pain Medicine PLLC and NYC-HHC?

My staff will probably be involved in answering phone calls, sending faxes, etc. so I just want to make sure we're all covered under the PHI rules.

Thanks!
Devi

Devi E. Nampiaparampil, MD, MS
Director, Metropolis Pain Medicine PLLC
Clinical Associate Professor, NYU School of Medicine
Medical Contributor, Fox 5 NY
Office: 347-424-4996

**JORDAN, WENDY** <jordanw1@nychhc.org>                                    Mon, Aug 29, 2016 at 4:19 PM
To: Devi Nampiaparampil <devichechi@gmail.com>

HI Devi,

It should be between you and NYC-HHC. Or you could put doing business as. If you have any other questions let me know.

Thank you

*Excerpts From Email Conversation Between Plaintiff, Metropolis and HHC*

In March 2019, unbeknownst to Plaintiff, New York State Attorney General, Letitia James, filed suit against multiple opioid manufacturers and distributors for penalties and damages related to the opioid epidemic. These Defendants included Allergan. New York State would later redistribute whatever funds it received to the City and HHC.

Pursuant to Local Law 122 of 2022, this report discloses use of monies paid to New York City (NYC) pursuant to the New York opioid settlement sharing agreement. This report was compiled by the NYC Office of Management and Budget in collaboration with the NYC Department of Health and Mental Hygiene (Health Department), NYC Health + Hospitals (H+H), and the NYC Office of the Chief Medical Examiner (OCME).

| Total Amount of Opioid Funds Received as of the End of Fiscal Year 2024 | |
|---|---|
| Money in Millions | Total |
| Funds Received | $154.3 million |

*Excerpt From the 2025 NYC Opioid Funds Settlement Report*

In October 2019, Plaintiff joined Allergan's Speakers' Bureau on migraine. To be clear, Plaintiff has never spoken or consulted for Allergan on controlled substances. At the time, Plaintiff was completely unaware of Allergan's involvement with opiates. Plaintiff was familiar with the company because she had been injecting Botox mostly off-label for over 15 years– *before* ever becoming a speaker or interacting with the company representatives– for patients experiencing spasticity from strokes, spinal cord injuries, traumatic brain injuries, cerebral palsy and other similar neurologic conditions. Later, when Botox was FDA-approved for chronic migraine, Plaintiff began using it for that indication as well. Plaintiff had good outcomes with ubrogepant (Ubrelvy), a CGRP

22

receptor antagonist, and began prescribing it more. Then the company hired her as a speaker on migraine. On May 15, 2020, she was told that AbbVie had acquired Allergan and that her contract would continue. In 2021, her contract was renewed.

## SPEAKER AGREEMENT

THIS SPEAKER AGREEMENT ("**Agreement**"), effective October 10, 2019 ("**Effective Date**"), is by and between **Allergan USA, Inc.,** with a place of business located at 5 Giralda Farms, Madison, NJ 07940  ("**Allergan**") and **DEVI NAMPIAPARAMPIL, MD, MS**, located at 111 John Street #2509, New York, NY 10038 ("**Speaker**").

WHEREAS, Allergan is in the business of developing, manufacturing and distributing pharmaceutical, biotechnology, medical device and skincare products and wishes to conduct one or more speaker programs (each a "**Program**") relating to Ubrogepant (the "**Product(s)**") or unbranded material (collectively, with Products, the "**Material(s)**");

In December 2019, the Judicial Panel on Multidistrict Litigation (JPML) formed the largest multidistrict litigation in U.S. history: MDL #2804: *IN RE: National Opiate Prescription Litigation*, and consolidated and transferred the multi-billion dollar litigation to the Northern District of Ohio.

Also unbeknownst to Plaintiff, in 2018 and 2019, insurers for Defendants in MDL #2804 entered into their own opioid litigation– regarding whether they were required to pay the claims. One of these insurers, Chubb, retained Holwell Shuster & Goldberg ("HSG") as its counsel.

On April 13, 2020, Metropolis Pain Medicine ("Metropolis") and Plaintiff were retained as expert witnesses for state and federal litigation associated with MDL #2804.

23



April 13, 2020

**VIA EMAIL:** devichechi@gmail.com

Metropolis Pain Medicine PLLC
Attn: Devi E. Nampiaparampil, M.D.
▨▨▨▨▨▨▨

Re:    *In Re: National Prescription Opiate Litigation*
▨▨▨▨▨

Dear Dr. Nampiaparampil:

This letter serves to clarify a few points between ▨▨▨▨▨▨▨▨▨▨▨▨▨ and Metropolis Pain Medicine PLLC, specifically Devi E. Nampiaparampil, M.D. ("Expert"), concerning the three-way agreement between ▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨ dated April 13, 2020.

It is agreed and understood that you will bill ▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨

- ▨▨▨▨ for consulting, ▨▨▨▨▨▨▨▨
- ▨▨▨▨ for face-to-face meeting and deposition, ▨▨▨▨▨
- ▨▨▨▨ for trial testimony (10hr minimum), ▨▨▨▨▨▨

24

**Part II: Plaintiff's Protected Activity During the COVID Public Health Emergency:**

Between 2020 and 2021, Plaintiff appeared on national and local news networks, including Fox News, CNBC, CNN, Fox Business, PBS, and other major outlets, to discuss public health and pandemic-related issues, for between 150-200 on-air news segments.

Plaintiff offered her opinions on a variety of topics including pathology, physiology, and immunology. At times, she also publicly criticized the government's response to the pandemic on the national news. With respect to the City of New York, Plaintiff will note just a handful of the issues here, to demonstrate that her speech was *protected activity.*

*1. COVID Testing*

On March 3, 2020, on CNBC, Plaintiff questioned the accuracy of the COVID testing. Plaintiff explained that, in order to develop a gold standard for testing, the scientist must already know who has the disease and who does not. Otherwise, there is no way to ~test the test~ and without an accurate test, the NYC COVID numbers could not be relied upon. The host noted that she had never heard any skepticism about the test before. Afterwards, Plaintiff was kept off the air– across networks. While Plaintiff was initially cast as someone unnecessarily creating worry, the City played ads of then-Mayor Bill de Blasio encouraging New Yorkers to ride the subway.

*2. COVID Vaccine Rollout*

When the first vaccine became available, the government generally prioritized access to healthcare providers, and then to the elderly, medically vulnerable and immunocompromised. The City demanded that this cohort a) obtain letters from their doctors' offices verifying their status, then b) find a vaccine center and schedule an appointment, c) manage the logistics of getting injected after waiting in a line or crowd– without getting infected, d) all during a period of time where doctors' offices were often extremely short-staffed or closed and vaccine centers were also short-staffed and the newly recruited staff may or may not have had prior training performing injections.

25

Since Metropolis had approximately 3000 patients, most of whom met the eligibility criteria, Plaintiff asked the City to send the vaccine to her practice. Her employees could contact the patients, schedule them, administer the vaccine, monitor them for side effects, and provide the requisite documentation. Plaintiff explained that her staff performs x-ray-guided spinal procedures, nerve blocks, joint injections, and other procedures with a crash cart on site. This would likely speed up the process, decrease the chance of infection for the patients, ease the costs for the City, and decrease the documentation burden for Metropolis. Plaintiff knew of numerous other medical practices that could reach a large number of patients across the City and similarly speed up distribution. The City declined, noting that healthcare providers who were not in the habit of injecting vaccines needed to be supervised. (Notably, all doctors inject vaccines as part of medical school). Plaintiff could not abandon her patients to volunteer in one of the City's pods. Plaintiff's patients subsequently faced delays obtaining the vaccine due to problems with the digital sign-up portal and the City faced staffing shortages finding doctors who could volunteer in their pods. Plaintiff criticized various aspects of the City's vaccine rollout on national platforms.

---

## CIR Registration-Thank you for your interest.

2 messages

**cir-facility-manager** <cir-facility-manager@health.nyc.gov>                    Tue, Feb 9, 2021 at 8:36 PM
To: cir-facility-manager <cir-facility-manager@health.nyc.gov>

Dear Colleague:

We thank you for your interest in the COVID-19 Vaccination Program. Recent New York State guidance outlines vaccination opportunities and limitations for different provider types.  Licensed healthcare professionals who are designated as part of "Group 1"  can administer immunizations as part of their current scope of practice.  Additional healthcare providers as described in "Group 2" can administer immunizations at a Point of Dispensing (POD) location if under appropriate supervision and other training requirements are met.

**At this time the NYC Health Department is enrolling the COVID-19 Vaccination Program only facilities that regularly administer vaccines as part of their current scope of practice and have the necessary vaccine storage and handling capabilities,  provide medical care to eligible populations, and can report vaccination to the Citywide Immunization Registry.** If you are a "Group 2" provider and are interested in volunteering at a POD or for other health emergencies, please consider joining the Medical Reserve Corps which is actively recruiting volunteers.

If you are seeking COVID-19 vaccination for yourself or your staff, you may call 1-877-VAX-4NYC or go to https://vaccinefinder.nyc.gov/ to schedule a vaccination appointment.

If you have additional questions, please contact us at nycimmunize@health.nyc.gov .


Sincerely,

Bureau of Immunization

New York City Department of Health and Mental Hygiene

---

*3. Disincentivizing The Transport of Much-Needed Medical Supplies*

Throughout COVID, there was a shortage of medical supplies and protective gear. In the early days, the federal government actively worked to transport these medical supplies to major hospitals treating those with COVID. Some time passed before people realized that those who did *not* treat COVID– those who wanted to keep the elderly and immunocompromised out of the emergency rooms and away from COVID– also needed medical supplies. Metropolis fell into this category, and therefore, had to rely on traditional medical distribution mechanisms to obtain supplies. It was at this time that the City discussed increasing the tolls on the bridges and tunnels, further disincentivizing out-of-state truckers from bringing much-needed medical supplies into the City, which was one of the world's hotspots of COVID at the time. Plaintiff explained that the City was essentially fortifying a virtual border, diverting medical supplies to other areas outside the City.

*4. Congestion Taxes Burdening the Sick and the Frontline Workers*

During this period of mass devastation, the City advanced its climate change policies including congestion taxes. Even though the City had not yet formalized the mechanism in effect today, based on the government's words and other actions, rideshares had already started taxing sick patients who needed to use those services. These are the people who could not stay safe at home. Meanwhile, the City taxed the frontline workers with these congestion taxes, further disincentivizing them from providing essential labor.

*5. No Escape Hatch For the Disabled: A Royal Flush For Scam Artists*

The City's quarantine and isolation policies made it illegal for home health aides and VNA to enter the homes of anyone who tested positive for COVID irrespective of symptoms, the period of time that the person had tested positive, or the type of testing administered. As a result, disabled populations, including Plaintiff's patients– some of whom were completely paralyzed– were unable to receive medical services necessary for life. The City offered no solution for these individuals. They survived by making deals on the black market.

**Part III: Evolution of Plaintiff's Protected Speech From Whistleblower to Political Candidate**

During the COVID-19 pandemic, Plaintiff served as a frontline physician treating patients in person. In March 2020, when the City ordered a two-week shutdown, the daycare attended by Plaintiff's toddler closed. Plaintiff was responsible for approximately 3,000 patients, many of whom were medically complex, immunocompromised, and members of racial minority groups disproportionately affected by COVID. She believed that closing her practice to provide childcare would force these vulnerable patients into emergency rooms. At that time, hospitals were already overwhelmed and generally considered to be hotspots for COVID infections. For Plaintiff's patients, a hospital visit could expose them to life-threatening infection risks.

As a result, Plaintiff sent her toddler to live with her parents upstate. She repeatedly asked the City whether her child could attend one of the City's emergency childcare facilities, but

28

was told that such services were reserved for City employees and and for others the City unilaterally deemed 'eligible,' a discretionary framework that excluded Plaintiff despite her frontline role and the risks to her thousands of patients if she remained home with her child. Plaintiff did not see her child again for eight months. Because she continued treating patients in person without adequate protective equipment, she could not visit her parents' home without risking their safety.

During this period, Plaintiff became pregnant with twins. When she experienced symptoms suggestive of a pregnancy complication, she sought medical care but was turned away under the City's early-pandemic triage restrictions, which permitted evaluation only for conditions staff assessed as immediately life-threatening or COVID-related—a standard so narrow that even patients with active gastrointestinal bleeding and cancer routinely faced delays in care. Despite Plaintiff's repeated attempts to explain that her pregnancy might be in danger, she was denied care and sent away. She subsequently had a miscarriage at home. After the City's restrictions were eased, at a follow-up appointment, Plaintiff was surprised when a Doppler study revealed a single surviving fetal heartbeat.

When Plaintiff was finally reunited with her toddler, AT, the child became distressed at the sight of Plaintiff and fearful about separation from her grandparents who had cared for her for eight months. Shortly thereafter, both Plaintiff, her husband, and AT contracted COVID-19. Plaintiff's husband suffered acute complications. Plaintiff assisted the paramedics in managing his acute oxygen desaturation as he was removed from the home and hospitalized. Plaintiff was informed there was a shortage of ventilators but he could likely be managed using alternative methods. In the first week of his hospitalization, Plaintiff experienced intermittent contractions. She did not call 911 or go to the hospital herself because she feared that if she were hospitalized, there would be no one to care for her toddler. When Plaintiff contacted the City for assistance, a City worker stated she would call Child Protective Services to remove the child from the home, claiming Plaintiff's entire situation seemed "unsafe." Plaintiff immediately retracted her request for help.

Plaintiff prepared to deliver the baby at home while infected with COVID. She received text messages from scam artists, including one stranger who offered to take her toddler for $2,000 per day. Ultimately, a distant relative, who had previously had COVID, traveled from Atlanta to assist. When Plaintiff's husband was taken off oxygen, Plaintiff instructed him to return home rather than be transferred to a secondary nursing or rehabilitation facility. Plaintiff had been in labor throughout the day while continuing to treat patients via telemedicine because– with other medical practices closed or severely short-staffed and no City-supported continuity-of-care plan– her patients had no realistic or timely access to essential medications, including cardiac and other life-sustaining prescriptions, unless she provided them, even when doing so required prescribing outside her specialty.

When Plaintiff's husband returned home, Plaintiff went to the hospital alone to deliver the baby. At the hospital, she was denied entry by both the Obstetrics unit (because she was COVID-positive) and the Emergency Department (because she was in active labor). In 2020, Plaintiff's child was one of the first in the world to be born with COVID, so there appeared to be no plan for this situation.

As she walked alone between hospital entrances in below-freezing weather, in active labor and unable to gain admission, Plaintiff felt the profound isolation of giving birth without support — a circumstance that carried particular significance for her as a Catholic woman. Then suddenly, a security guard emerged from the hospital with a wheelchair for her. In between contractions, Plaintiff drafted her will and texted it to a friend to ensure her toddler and parents would be protected if and when she, her husband and their baby died. Once admitted, Plaintiff was unable to breathe effectively enough to either scream or to effectively participate in a normal childbirth. While on oxygen, Plaintiff texted screaming emojis to friends after contractions, and then ultimately underwent a C-section due to her medical situation. Her newborn was presumed to be COVID-positive and placed in isolation with her afterwards.

Within twelve hours of the C-section, Plaintiff resumed telemedicine visits from the isolation room– again because her patients had no other support.

30

When Plaintiff returned home, she had been prescribed visiting nurse services due to her medical risk factors and postpartum complications. However, because she remained COVID-positive, the visiting nurse agency informed her that the City's rules prohibited them from entering her home and assisting her. Plaintiff was forced to care for herself, a COVID-infected newborn, a toddler with a systemic inflammatory response to COVID, a disabled husband, and medically fragile patients.

In this context, Plaintiff began experiencing chest pain and shortness of breath. Plaintiff has a prior medical history of cardiac arrest at age 16 followed by multi-organ failure and years of disability accommodations for congestive heart failure. Plaintiff received care for these conditions.



31



*Excerpt From Plaintiff's Own Electronic Medical Record*

Per Plaintiff's recall, in 2020, she was seen in Pediatric Cardiology because of the COVID-related staffing shortages. Now, with increased cardiovascular risk due to postpartum status, recent surgery and recent COVID infection– Plaintiff recognized the symptoms as potentially serious. However, because she had no childcare and there was no redundancy in the system, she delayed seeking emergency care for three weeks. When she finally went to the ER, she was presumed to have had a pulmonary embolism weeks earlier.



*Excerpt From Plaintiff's Own Electronic Medical Record*

32

Plaintiff ended the work-up prematurely. She had to leave the Emergency Room because she learned there was not enough milk at home for the baby. Without milk, the child would starve.

After these events, Plaintiff concluded that the City's systems were structurally incapable of safeguarding medically vulnerable individuals, caregivers, or disabled residents. She believed that the barriers she faced were not personal misfortunes but systemic failures that endangered the public as a whole. Plaintiff searched online for contact information for her political party. She contacted the party for guidance on running for office but received no response. She then traveled across the City to the Board of Elections Customer Service Desk to confirm her voter registration and to learn how to run for office. The staff member, observing Plaintiff's postpartum condition and her difficulty breathing and speaking, asked: "Let me get this straight. You came all this way—during COVID and this blizzard—to make sure you were registered *Republican??*"

**Part IV: The 2021 "Dr. Devi For NYC" Campaign**

Plaintiff ran for NYC Mayor in the 2021 election cycle. NYC requires that all municipal candidates register with the CFB. Plaintiff reached out to Defendant Egerton, the Director of Candidate Services, and received no response. Plaintiff then reached out to friends–former CFB staff she knew through her husband– who followed up with the current CFB staff. Only then did the Agency respond.

Plaintiff's mother, Mary Nam,  one of the longest-serving City employees in history with more than 42 years of service, agreed in February 2021 to serve as volunteer Treasurer of the Dr. Devi For NYC campaign. Plaintiff informed Mary Nam that the campaign could not raise or spend money until it opened a dedicated campaign bank account. The bank required CFB verification that Dr. Devi was a candidate before opening the account. The CFB declined to provide that verification.

Instead, on February 26, 2021, the CFB required Plaintiff and Mary Nam to sign forms choosing among three contribution-limit options:

33

1. $2,000 limit with potential 8:1 matching funds;

2. $5,100 limit with potential 6:1 matching funds; or

3. $5,100 limit with no matching funds.

The CFB's pamphlet stated that contribution limits applied to all campaigns. Thus, whether or not the campaign ever received matching funds, candidate contributions would be capped. The CFB required the Candidate and Treasurer — the two offices the CFB required the campaign to fill — to certify that they understood all campaign-finance laws and rules. But the CFB did not provide the rules with the form or brochure, and did not provide links, citations, or instructions explaining where to find them. The campaign also could not consult attorneys, accountants, or consultants before signing. It could not hire anyone until the campaign bank account was opened and funded. The CFB therefore placed the campaign in a closed loop: it could not raise or spend money without a bank account; it could not open the bank account without CFB verification; it could not obtain verification without signing legal certifications; and it could not obtain professional advice before signing because it had no bank account and no funds. Plaintiff and Mary Nam signed the required forms to open the account.





*Figure 1: NYC CFB Completed Certification Form: Office Sought: Mayor; Filed By the CFB in*
*Devi Nampiaparampil and Metropolis Pain Medicine PLLC vs.*
*The NYC Campaign Finance Board (159019/ 2022)*

Even though the CFB acknowledged receipt of the forms, it still would not approve the certification for either the bank or the public. Therefore, during petitioning, when potential donors attempted to contribute, they were unable to. The campaign could not accept donations without a bank account. Some voters searched for Dr. Devi on the CFB website and could not find her listed. For both these reasons, members of the public accused the campaign of being fraudulent and publicly refused to sign petitions, dissuading nearby constituents from signing as well. The CFB's delay impaired fundraising, petitioning, and public confidence in the campaign's legitimacy, and created a risk that Dr. Devi would miss the ballot-qualification deadline. Dr. Devi contacted the New York State Board of Elections for assistance and one of its lawyers emailed Defendant Egerton and the CFB asking them to verify Dr. Devi's candidacy to the bank.

Days before the close of the March 2021 petitioning period, an elected official contacted Dr. Devi, expressing concern that even if she had collected the requisite number of valid petitions for ballot access—2,500, by Plaintiffs' recollection—her political action committee (PAC), Dr. Devi for NYC, might not have sufficient cash-on-hand to defend those signatures in court. It was insufficient that the signatures were authentic or properly witnessed; candidates needed enough funds to defend them against legal challenges, and Dr. Devi was restricted, under color of law, to spending no more than $6,000 of her own money. The campaign could theoretically spend unlimited funds but because the individual

donors comprising the campaign– including the candidate– were restricted in their ability to spend money, the overall expenditure limit was irrelevant. The situation was akin to telling a homeless person he could spend millions on a new home.

The elected official acknowledged that Dr. Devi's opponents might refrain from challenging her petitions due to optics—she was a physician working on the frontlines of the COVID-19 pandemic treating mostly elderly and immunocompromised patients—but he cautioned that the government itself, with effectively unlimited resources, could still contest her ballot access. In New York City (NYC), it was unlawful for a political party to expend its own funds to defend a candidate in such litigation, as the CFB classified this assistance as an illegal campaign contribution. Therefore, as this official explained, the Republican party could not spend money on litigation to defend Plaintiff from a ballot challenge.

After the petitioning period ended, but before the NYC ballot was finalized, Plaintiff received a call not to submit her petitions for Mayor. Per her recall, her political party appeared with approximately 10,000 valid petitions in her name for the office of Public Advocate—the City's second-highest elected position. This immediately dissuaded any potential ballot challengers and guaranteed her a place in the citywide elections.

But then– even though the ballot challenge period had passed, and her political party notified her that there were no objections and her appearance on the ballot was guaranteed, the CFB told her that she would be removed from the ballot. They removed her from their website and canceled her "NYC Votes" account, which allowed donors to contribute to her online. It looked as though she was *not running.* The CFB told Plaintiff that because she was running for a new office– Public Advocate– the Agency needed her to sign a new certification form. When Plaintiff hesitated, they sent her a Notice of Termination, informing her that candidates without a CFB-approved bank account could not appear on the ballot. And even though she had already received donations through her bank account, the CFB had ~frozen~ it. It could be rendered functional again IF she signed their certification in front of a notary, which involved choosing between one of

36

three different speech restrictions. Without the ability to consult with counsel– because they hadn't fundraised enough– Plaintiff and her mother signed up for the Matching Funds program.

**Notice of Termination**
1 message

**CFB Notice** <caccess-noreply@nyccfb.info>                    Wed, Mar 31, 2021 at 4:25 PM
To: "Devi E. Nampiaparampil" <devichechi@gmail.com>

C-Access

Dear Devi E. Nampiaparampil,

The NYC Campaign Finance Board has sent the **2021 Devi E. Nampiaparampil** (ID: 2655) campaign a new Notice of Termination message. **This message requires your attention.**

*Figure: Email Excerpt From March 31, 2021– Before NYC Ballot Was Finalized*

In March 2021, Plaintiff attended the Campaign Finance Board's mandatory training sessions for candidates. At those sessions, CFB staff explained that legal and accounting services were considered "services" requiring payment from campaign funds, and that free or discounted professional assistance would be treated as in-kind contributions subject to strict contribution limits. Because most law and accounting firms operate as LLPs or partnerships—entities prohibited from contributing to campaigns—candidates without sufficient funds to hire professionals were instructed to rely exclusively on CFB Candidate Liaisons for guidance.

Plaintiff's father, XJN, sought to volunteer his expertise in statistical modeling and donor-identification. The CFB informed the campaign that any volunteer services would be assigned a "fair market value" and treated as an in-kind contribution. If the assigned value exceeded the $2,000 individual contribution limit, the services would be prohibited. The CFB also deemed the use of XJN's prior professional datasets to be an in-kind contribution requiring valuation. The valuation process was opaque, and neither Plaintiff nor XJN could determine how the CFB would assess the value of his work. These restrictions applied broadly: once an individual contributed money, the CFB limited the amount of volunteer labor that person could provide.

37

During the same training sessions, CFB staff told candidates that they could work from home without reporting rent, use home laptops, printers, and Wi-Fi without penalty, spend money before raising it, and contribute up to $6,000 of personal funds. Plaintiff was treated differently. CFB employees informed her that she could not work on her campaign at her medical office at 111 John Street, could not use her office laptop, phone, printer, or Wi-Fi for campaign purposes, and could not pay herself or her medical practice for use of the office space. The CFB also prohibited Plaintiff from using her personal vehicle for campaign travel unless she first raised enough money to cover parking-garage costs. Plaintiff was further informed that she could not use her medical office staff for campaign assistance because their disability and workers' compensation premiums—prepaid by Metropolis during COVID—were deemed a prohibited "corporate contribution." The CFB did not inquire into whether Plaintiff's office was zoned residential or commercial, whether she had alternative workspace, or whether she had access to home office equipment. At the time, Plaintiff was physically present at her office 80–100 hours per week due to COVID-related medical demands and had no practical ability to work on her campaign elsewhere. Her employees offered to assist with campaign tasks, but the CFB barred them from doing so.

The CFB's prohibition on using Plaintiff's personal vehicle had significant consequences. Because Plaintiff typically commuted by subway, the CFB deemed the car a campaign-specific expense and required the campaign to pay for parking-garage costs, which it could not afford. Other candidates were not required to pay for the use of their own property. Plaintiff had recently given birth and was recovering from postpartum complications. During COVID, indoor spaces were closed, and Plaintiff needed the car to rest in between petitioning, breast-pump and store breast milk (which physicians advised was necessary to transfer COVID antibodies to her infant), and travel to areas of Staten Island, Brooklyn, and Queens that were inaccessible by subway and contained substantial Republican voter populations. Because the CFB barred use of the car, Plaintiff could not breast-pump or store breast milk while petitioning. Her infant was deprived of COVID antibodies, and Plaintiff's sister had to ship breast milk from Florida. Plaintiff estimates she walked 10–20 miles per day, stood 10–14 hours per day, carried 30–50 pounds of

38

materials, worked in freezing temperatures, experienced severe neuropathic pain at her C-section incision, developed hematuria, and nearly fainted multiple times. Medical records reflect that Plaintiff lost approximately 50 pounds during this period, without any weight loss medications, due to the physical demands imposed by the CFB's restrictions.

*Website and Portal Failures at Critical Campaign Junctures*

The campaign was not fundraising for money as an end in itself. Plaintiff and the campaign were fundraising to meet the CFB's mandatory televised-debate threshold so New Yorkers could hear the campaign platform. Plaintiff believed voters would support the campaign's ideas if they were allowed to hear them. The campaign could not afford consultants and did not know what expenditures were necessary or permissible. The CFB also told the campaign it could not open a line of credit because doing so would be illegal. Fundraising therefore became the only practical path to debate access, public visibility, and meaningful political participation.

The CFB required campaigns to submit frequent financial disclosures through its web portal. The portal did not include adequate manuals, instructional videos, or clear instructions. After each submission, the CFB emailed concerns about campaign financial activity, requiring additional responses, corrections, donor documentation, and follow-up. The portal failures were not isolated technical inconveniences. They occurred at critical campaign moments and affected challengers at the point when they most needed access to voters, donors, and public campaign infrastructure. The CFB's online systems auto-populated incorrect answers, rejected legitimate donations, repeatedly malfunctioned, and went down on critical deadlines, including the day Republican voter-guide submissions were due and the days before the deadline to qualify for the mandatory debate.

The CFB rejected donations based on minor address-formatting differences, including differences such as "ST" versus "Street" and "APT" versus "Apt." Credit-card companies accepted those same formatting differences as normal. The CFB nevertheless required Plaintiff to contact donors and obtain written confirmation letters to account for them.

39

Those donor-confirmation demands burdened the campaign and chilled contributions. Some donors refused to complete the forms or donate again. Married couples donating from joint accounts were required to specify individual donation amounts. Mary Nam and XJN informed Plaintiff that they had to drive to donors' homes during COVID to obtain corrected documentation, causing Plaintiff concern because they were elderly and at increased risk.

The timing mattered. Democratic candidates were more likely to have contested primaries, while Republican and independent candidates were more likely to become active in the general-election phase. Independent candidates often joined after the primary, and Republican candidates often ran primarily in the general election rather than dividing resources through contested primaries. As a result, portal failures after the primary disproportionately burdened general-election challengers, including Republican and independent candidates, at the exact point when they were trying to gain public visibility. The CFB did not extend deadlines despite the outages. The failures interfered with voter-guide submissions, donor contributions, documentation of qualifying activity, and debate-qualification materials.

The debate consequences were especially severe. Republican and independent candidates had to meet fundraising, spending, and documentation thresholds by a specific deadline to qualify for the mandatory debate. Plaintiff's campaign met the threshold, but the portal failures and documentation demands made it difficult to prove compliance in the form the CFB required. The CFB's website went down on the voter-guide deadline and again in the days before the debate-qualification deadline. Those failures impaired donors' ability to contribute, impaired the campaign's ability to document qualifying activity, and impaired submission of required materials. The CFB did not extend the debate-qualification deadline. Mary Nam spent significant time correcting portal errors, reconciling records, and contacting donors. Mary Nam later stated that she spent more time on campaign tasks than during her 42-year City career.

The CFB also required Plaintiff's campaign to complete audit forms and audit reviews that Plaintiff later learned applied only to primary candidates. Plaintiff did not run in a primary. Nevertheless, Mary Nam completed the concurrent audit because the CFB instructed her to do so at almost monthly intervals throughout the campaign. This diverted limited campaign resources away from voter contact, fundraising, safety, public communication, and debate preparation, and into bureaucratic paperwork that should not have been required of the campaign in the first place.

After the election, the CFB continued sending reminders about financial disclosures and statement reviews. The same portal and disclosure structure that had burdened the campaign during critical general-election deadlines then became part of the post-election audit mechanism. The failures therefore were not neutral glitches. They were timing-specific barriers that disadvantaged challengers, reduced visibility, impaired debate access, burdened donors, and created later audit exposure. The practical effect was to block the campaign from converting public support into public speech. Plaintiff did not seek fundraising for private gain or campaign excess. The campaign sought enough documented support to reach the mandatory televised debate, present its platform to New Yorkers, and allow voters to decide. The CFB's portal failures and documentation demands interfered with that process at the precise moment when the campaign's ideas could have reached the electorate.

*Campaign Safety Restrictions, Political Violence, and Erasure of Injury*
During the 2021 campaign for New York City Public Advocate, Dr. Devi was repeatedly subjected to threats and acts of political violence. These incidents were not isolated from the CFB's campaign-finance restrictions. Dr. Devi did not seek public matching funds for campaign security. She sought to use her own personal money to pay for safety measures so she could campaign publicly and protect voters, staff, volunteers, patients, and members of the public. The CFB and the City made that private spending unlawful or unsafe under campaign-finance rules. No substitute protection was provided. The CFB's refusal to permit private safety expenditures created both the appearance and reality of

vulnerability. It communicated that a political challenger could be exposed in public, denied security, and then punished if she used her own funds to protect herself. The danger increased as the CFB's public statements and regulatory positions damaged Dr. Devi's credibility with supporters and the public. The CFB's statements implied that Dr. Devi was potentially misusing campaign funds, defrauding donors, or functioning as a spoiler candidate to help the incumbent. Those statements inflamed public anger, estranged former supporters, and contributed to threats, including anonymous death threats directed to Dr. Devi at Metropolis. Those threats alarmed employees and disrupted patient care.

The public-event disruptions escalated. At one campaign event with 2021 Republican mayoral candidate Curtis Sliwa, a disruptive protester created a sound that mimicked gunfire, later revealed to be a drum. The sound caused confusion and panic and prematurely ended the event just as Dr. Devi was about to speak. Metropolis Office Manager Nazly Suarez had been recording the event but stopped filming when the chaos began. As others backed away from the candidates, Ms. Suarez ran toward the platform because she believed Dr. Devi was in danger and wanted to save her. Maria Sliwa, Curtis Sliwa's sister and a former Columbia University instructor of Dr. Devi, later emailed Dr. Devi acknowledging both the disruption and the silencing.

On March 5, 2021, while Plaintiff was collecting petitions at a mall, a motorist followed Plaintiff, screamed at her, and attempted to hit her with the vehicle. Plaintiff escaped by slipping between parked cars.

Also during petitioning, Dr. Devi was targeted while going door-to-door alone. An apartment occupant pulled her inside, chain-locked the door, and held her there against her will. The apartment was largely barren except for a bed, satanic pentagrams on one wall, and numerous unusual photo cutouts on another wall. In March 2021, when nearly everyone in New York City wore masks publicly, the occupant pulled off Dr. Devi's mask, grabbed her face, drew on it with red lipstick, claimed to be the Devil, and asked whether Dr. Devi was God.

42

The threats became more explicit at a later event in front of Gracie Mansion, where Dr. Devi was scheduled to address a crowd with Republican candidates for office, Curtis Sliwa, and Andrew Giuliani. A man wearing extensive makeup and a Joker costume approached Dr. Devi and compared her to "the capitalist" Thomas Wayne. Dr. Devi understood the reference as threatening. In the more recent Batman films, the Joker is associated with political violence; Thomas Wayne is a physician, entrepreneur, and mayoral candidate who is murdered before his child becomes Batman. Dr. Devi was also a physician, entrepreneur, and former mayoral candidate who had initially campaigned with her children. She interpreted the comment as a threat to her children.

The Joker then warned Dr. Devi that if she got on stage to speak, she would be killed just as "the capitalist Thomas Wayne" had been killed. Dr. Devi got on stage and took the microphone anyway. Before she could speak, a protester stormed the stage to attack her, injuring multiple people in the crowd. Supporters restrained the person and carried him away. The Joker appeared again at the end of the event and made eye contact with Dr. Devi. Another stranger then approached, showed Dr. Devi a holstered gun, and asked her to come with him. Dr. Devi went with him because she could not think of a better option at that moment. After about a block, she realized he was a supporter trying to help her leave safely.

Metropolis also experienced safety threats. The medical practice is located in a Financial District skyscraper near Freedom Tower, Wall Street, and South Street Seaport. In one incident, an intruder bypassed building security and COVID screening measures and entered Dr. Devi's office over a weekend while she was working alone. He suggested a quid pro quo arrangement. Dr. Devi retrieved a surgical scalpel from her medical supply closet and prepared to defend herself and the practice.

At the end of another campaign event that had not been professionally vetted because the campaign lacked funds for a political consultant, Dr. Devi found herself alone with three angry men who formed a semi-circle around her. One of the men had followed her during the evening and appeared to be flirting with her. Dr. Devi initially misjudged him as

43

annoying but harmless. He then assaulted her while flanked by the other two men. During the struggle, while defending herself, Dr. Devi flexed, abducted, and externally rotated her right arm against his body weight and felt sudden sharp pain in the right side of her neck, shoulder, and arm.

Several men witnessed parts of the attack. One fled at the assailant's command. Another appeared to film from a distance. Two others entered and stood stunned. When the attacker hesitated and loosened his grip, Dr. Devi broke free and escaped. Forgetting the CFB's transportation restrictions, she fled and took an Uber home. Inside the Uber, Dr. Devi developed altered speech and later anterograde amnesia lasting approximately twelve hours. Review of her phone showed that she called two physicians immediately after the attack. One physician understood that a man had kissed her and that something had happened to her rotator cuff; she offered a cortisone injection. The other physician understood that Dr. Devi had been attacked and expressed concern that a major-party nominee could be assaulted so easily. He worried that if would-be attackers learned that Dr. Devi, the only woman on a major-party citywide ticket, could not hire campaign security, attacks would become more frequent and more severe. He offered platelet-rich plasma treatment for the shoulder. Both physicians had the false impression that Dr. Devi was intoxicated, although she had not been drinking.

Later, physicians and Metropolis staff suspected Dr. Devi may have been drugged with delayed effects since these people were unlikely to be anesthesiologists. Patient care had to be adjusted because Dr. Devi temporarily lost full use of her dominant right arm. Within days, she developed severe weakness in her right thumb in a C6 distribution, limiting her ability to inject medications during procedures. She could not inject high-viscosity medications with her right hand alone because her thumb was too weak to push the plunger. Within weeks, she developed adhesive capsulitis, or frozen shoulder, on the right side, preventing her from reaching overhead to position the C-arm for spine procedures. With support from the Metropolis medical team, Dr. Devi retrained herself to perform many procedural tasks left-handed and preserved her ability to care for patients. Metropolis also provided multiple cortisone injections to her shoulder. The practice could

help her maintain clinical function, but it could not help her compensate as a mother in a childcare shortage Dr. Devi still had to carry two children, including a baby and a toddler, along with car seats, a double stroller, and diaper bags, around the City with only one fully functional arm.

Dr. Devi submitted medical documentation in the New York Supreme Court case before Judge Ramseur. At one point, every page of her medical records was fully redacted from the court file without explanation. The redaction was temporary, but Dr. Devi does not know exactly when or how it occurred. The records appeared fully redacted when Judge Ramos in the SDNY was adjudicating HSG's original complaint and when Defendants argued res judicata. They also appeared fully redacted while the cases were under JPML review for possible consolidation. Later, after Dr. Devi filed a Notice of Appeal from the denial of vacatur in spring 2025, the records returned to their prior partially redacted state, where Dr. Devi had redacted identifying information such as date of birth and medical record number but left the substantive content visible. The presumed justification was HIPAA, but there was no HIPAA violation in Dr. Devi submitting her own medical records. By redacting the records entirely, the court file temporarily erased evidence of the physical harm caused during the campaign. That erasure mattered because Defendants were simultaneously arguing that later claims were barred, unrelated, unsupported, or insufficiently pleaded. The full redaction removed visible proof of injury from the record during key moments in SDNY and JPML review.

This sequence connects directly to the First Amendment and compelled-labor claims. The CFB restricted Plaintiff's ability to use personal funds for safety; Plaintiff faced escalating threats and physical violence while campaigning; her medical injury increased the labor required to maintain her practice, care for her children, and litigate pro se; and the court record later obscured the medical evidence needed to show harm. The result was not ordinary campaign hardship. It was a system in which campaign-finance restrictions, public delegitimization, lack of safety resources, and record erasure combined to burden Plaintiff's political speech, assembly, petitioning, medical practice, motherhood, and bodily integrity.

45

**CC/History of present Illness:** Devi E. Nampiaparampil is a 45 y.o. female who presents complaining of chronic right shoulder pain. The pain is mostly posterior in the shoulder. She reports radiations of pain into her scapula, side, and chest wall. She reports pain with at night, first thing in the morning, and with lifting her kids. She reports getting assaulted about a year ago while she was running for NYC public advocate which aggravated her pain. She has three cortisone injections into the subacromial space with improvement of symptoms. She has had MRIs of the cervical spine and

MRI report of the right shoulder from 2019: rotator cuff tendinosis
MRI reports of the cervical spine from 2019: DDD, mild canal stenosis at c5-6

**Assessment:**
Right shoulder pain, rule out rotator cuff tear
Cervical radiculopathy

**Plan:**
The patients condition was explained in detail. The usual treatment course and expected recovery were discussed. It was recommmended that she undergo an MRI to evaluate the rotator cuff. I have

*Figure 188: Excerpts From Orthopedic Surgery- NYU  Langone:*

*Office Note on December 5, 2022*

**HPI:** Devi is a sports medicine physician had a prior practice that works alongside NYU. She has a chronic history of right shoulder pain for several years which has been treated with corticosteroid injections. Initially it got better up until about a year and a half ago when she was attacked. Since then she has tried multiple corticosteroid injections which has mildly improved her symptoms. Physical therapy and over-the-counter medications are mildly effective. Her pain is predominantly in the lateral aspect of her shoulder based on where she is pointing and radiates down the lateral aspect of the arm. Pain exacerbated with overhead movements and internal rotation. no numbness or paresthesia today. Her most recent subacromial corticosteroid injection was approximately 7 months ago.

She also has a history of cervical radiculopathy in the C5-C6 distribution. which she is not experiencing today. No numbness or paresthesia. She did have a MRI of the cervical spine several years ago.

**Images**: MRI of the right shoulder and cervical spine from 2019 suggestive of disc disease predominantly C5-6 and tendinopathy of the right shoulder without discrete tear. She also had adhesive capsulitis at that time.
On sonographic imaging there is calcification at insertional supraspinatus and margin of infraspinatus consistent with tendinopathy of the subscapularis, supraspinatus predominantly without tear noted, bursal thickening consistent with chronic bursitis.

Knee x-rays consistent with lateral joint space changes including marginal osteophyte consistent with early stage osteoarthritis.

**Assessment:** chronic rotator cuff tendinitis right shoulder, cervical radiculopathy, right knee arthritis

**Plan**: Discussed her presentation today including chronic cervical radiculopathy and chronic tendinopathy of the right shoulder. I offered barbotage and injection as well as PRP injection should she fail to improve with corticosteroid injection provided today and postural retraining including scapular engagement and rotator cuff stabilization. She will follow-up with us in a few weeks to monitor her progress. Formal physical therapy may be of benefit. As far as the cervical component of this there is chronic radiculopathy, but nothing on examination today to suggest that this is the primary driver for pain today.

*Figure 189: Excerpts From Sports Medicine- Weill Cornell Columbia:*

*Office Note on December 15. 2022*

46

*FOIL Obstruction and Erasure of Campaign Violence*

Dr. Devi had not previously filed police reports and did not think to contact law enforcement until years later, when a professional colleague raised the possibility that video evidence of one assault may have been turned over to the NYPD. The colleague noted that footage of the attack had never surfaced, no blackmailer had appeared, and the silence might have a different explanation than cases where the person filming was involved in the attack. If the person filming was an ordinary witness, not a participant, the video may have been provided to police.

Dr. Devi then submitted a FOIL request to the NYPD. The City acknowledged that responsive records existed but refused to produce them, citing privacy exemptions. The FOIL officer further confirmed that even as the victim, Dr. Devi had no way to access records or documentation of her own assault. The result was another layer of record suppression. The court file had temporarily redacted the medical records documenting Dr. Devi's injuries. The NYPD then withheld records that could have documented the assault itself. Together, those omissions left no accessible public record of the campaign-related physical violence, no accessible documentation of its severity, and no official recognition of the injuries.

As it pertains to records withheld because they are specifically exempted by state or federal statute [§87(2)(a)], the Court of Appeals has determined that "FOIL's statutory scheme separately makes clear that redacted disclosure cannot be compelled where, as here, an agency has met its burden of demonstrating that records are exempt from disclosure under Public Officers Law §87(2)(a)." Therefore, because the requested records are specifically exempted from disclosure pursuant to Criminal Procedure Law §160.50, this agency is, "not obligated to provide the records even though redaction might remove all details which 'tend to identify the victim,'" *Karlin v. McMahon*, 96 N.Y.2d 842, 729 N.Y.S.2d 435 (2001), *citing Short v. Board of Managers of Nassau County Medical Center*, 57 N.Y.2d 399, 456 N.Y.S. 2d 724 (1982).

Accordingly, **all associated records** related to an arrest which has been sealed under Criminal Procedure Law Section 160.50 are exempted from disclosure; and, absent a notarized authorization from the accused/arrested person, or an unsealing order from the court, any records associated with this incident may not be disclosed.

You may seek judicial review of this determination by commencing an Article 78 proceeding within four months of the date of this decision.

*FOIL Denial Even When Record Can Be Redacted So As Not To Identify Victim*

The FOIL officer confirmed that– even as the victim– Dr. Devi had no way to access any records or documentation of her own assault.



*FOIL Denial: "No Exception For the Victim"*

This absence of records materially affected the litigation. Defendants were able to characterize Plaintiff's claims as unsupported, unrelated, exaggerated, or procedurally defective while the records that could corroborate the physical danger and resulting harm remained inaccessible. The absence also protected the CFB's campaign-finance restrictions from scrutiny, because the restrictions on self-funded security could be treated as abstract rather than as a rule structure with foreseeable public-safety consequences. Since Plaintiff had never reported the assault, she had no idea who the officer involved was, or the prosecutor or the Judge.

HSG later reinforced that suppression by discouraging Plaintiff's FOIL strategy. In communications with Dr. Devi, HSG used phrases such as "serial litigant" behavior and "overly expansive fishing expedition" to describe the broader effort to obtain public records. HSG's August 2023 emails suggested waiting for discovery. But discovery had not begun in any state or federal case.

48

The practical effect was that Plaintiff was told to wait for discovery while the public-record channels that could preserve evidence were discouraged, obstructed, or delayed. Meanwhile, Defendants continued arguing from the absence of a record. These events show an administrative and judicial erasure of harm. The CFB's spending restrictions prevented Plaintiff from safely self-funding campaign security. Public-facing statements and audit threats undermined her legitimacy. Physical assaults and threats followed. Medical records documenting injury were temporarily fully redacted from the court file. Law-enforcement records were withheld from Plaintiff even though she was the victim. Counsel discouraged aggressive FOIL efforts and advised waiting for discovery that never arrived. The result was not just danger during the campaign. It was the removal of the evidence needed to show that the danger occurred. Defendants have never addressed the public-safety hazard created by their campaign-spending restrictions. Instead, they have defended the same statutory framework in multiple forums, including before the JPML, where they opposed consolidation and transfer of claims that would have exposed those safety consequences to outside review.

The City and CFB had notice of the constitutional danger long before Plaintiff's campaign. In 2008, LGBTQ+ activist and civil-rights attorney Yetta Kurland filed an order to show cause challenging similar spending disparities between incumbents and challengers. The petition was converted into an administrative proceeding and denied. Plaintiff is a lifelong Republican. Mary Nam is a lifelong Democrat. Most of the people who have accused the CFB of civil-rights violations are Democrats. The common issue is not party affiliation. It is opposition to government abuse of power and viewpoint-based suppression by a campaign-finance regulator. That bipartisan pattern matters. Defendants have used fragmentation, missing records, audit pressure, and forum opposition to prevent coordinated scrutiny of claims by candidates and supporters across political lines. When the matter reached the WDNC, Defendants opposed consolidation and transfer, preventing the JPML process from becoming a forum for bipartisan coordination against the CFB's enforcement structure. The threat remains ongoing. At least two citywide candidates privately informed Dr. Devi that they avoided campaigning publicly because of the risk of political violence — a risk their campaigns could not afford to guard against under the

49

same campaign-finance restrictions. If candidates cannot safely use personal funds for security, and if the City provides no substitute protection, then public campaigning becomes a privilege for incumbents, protected candidates, or candidates willing to accept physical danger.

Political violence does not need to be directly ordered by the government to become constitutionally relevant. When government rules foreseeably prevent challengers from protecting themselves, and when the same government later erases or withholds records of the resulting harm, the effect is to chill speech, deter assembly, and suppress political participation. If political violence and institutional erasure are tolerated against one candidate, they become a warning to others. The chilling effect is especially severe where the same regulator can make a campaign underfunded through audit demands, penalties, spending restrictions, and enforcement actions under color of law.

While all of this was going on, in the spring of 2021, Metropolis' and Dr. Devi's contract to serve as an expert witness in MDL #2804 was terminated with no cause stated; Plaintiff's name was not disclosed to the Court.

**Voter Guide, Debate Access, and Public Legitimacy**
Plaintiff provided confidential identity and financial information to the CFB in April 2021 and again in July 2021. Shortly after each disclosure, Plaintiff's secure financial information appeared on the Dark Web. These were the first such incidents in Plaintiff's 30-year financial history. On August 2, 2021, the CFB's web portal crashed on the voter-guide submission deadline. Plaintiff emailed her submission as Word documents and screenshots. The CFB refused to accept emailed submissions and required portal submission. The CFB extended the deadline to August 3, 2021. The portal remained unstable, but Plaintiff successfully submitted her materials through the portal on August 3. On August 4, Plaintiff received confirmation that her submission had been received. That same day, CFB employee David Duhalde emailed Plaintiff citing Board Rule 16-02(b)(1)(D)(1) and stated that Plaintiff could not refer to incumbent Public Advocate Jumaane Williams by name. Plaintiff revised her statement and submitted the revision