through the portal on August 5, while the portal still displayed that submissions were being accepted. Because of the portal instability, Plaintiff also emailed her video-script submission on August 5. Plaintiff received no further communication from Duhalde. The same sequence included a defamation threat. On August 3, 2021, Plaintiff identified the incumbent Public Advocate's wife as a lobbyist based on a Greenberg Traurig press release. On August 4, Duhalde emailed Plaintiff from his official CFB account and stated that she could be sued for defamation if she called the Public Advocate's wife a "lobbyist." Plaintiff altered her statements. Plaintiff's original video script complied with the New York City Charter, and Duhalde acknowledged that in writing. After the defamation threat, Duhalde instructed Plaintiff to rewrite the script to satisfy his preferences. Plaintiff rewrote the script and filmed a new commercial with CFB video producer Dru Gibson. After Plaintiff emailed Duhalde on August 4, the CFB deleted her entire voter-guide submission. No one at the CFB told Plaintiff for approximately eight weeks. Between August 4 and late September, Plaintiff, her Treasurer, and her husband, a former CFB employee, had multiple contacts with CFB staff by email, text, phone, virtual meetings, and in person at a wedding. No one mentioned any problem with Plaintiff's voter-guide submission.

On September 29, 2021, after learning she had been excluded from the Voter Guide, Plaintiff sought a temporary restraining order requiring the CFB to include her information through a flier or postcard insert. In October 2021, without speaking to Plaintiff or hearing her explanation, the CFB mailed the voter guide to approximately 5 to 8 million households and excluded Plaintiff entirely. The CFB also mailed the guide to the home address of the presiding judge. When Plaintiff told donors she had been deleted for calling her opponent by name, many did not believe her and became angrier because her explanation sounded absurd.

The printed Voter Guide displayed Plaintiff's name with a bright orange warning symbol and stated: "Candidate did not submit a complete profile in time for inclusion in this printed Voter Guide." Plaintiff received no notice of any issue before publication. She did not see the printed guide until October 21, 2021, the night before the injunction hearing.

1

On October 22, 2021, Plaintiff was muted for the entire injunction hearing and could not speak. CFB General Counsel Bethany Perskie testified as both attorney and witness. Perskie introduced new facts not contained in her affidavit, including that the CFB had closed the portal on its receiving end before the deadline. Perskie testified that the CFB never received Plaintiff's revisions, even though Plaintiff had submitted them through the portal. Perskie did not testify that anyone had checked the portal, referenced anonymous "staff impressions," did not identify the staff members, and no CFB staff member with direct knowledge — including the portal creator, content creator, or portal reviewer — testified.

The CFB also treated Plaintiff differently in use of the "Dr." title. From 2018 through 2021, the CFB allowed Dr. Jeffrey Ascherman, a white male physician, to appear as "Dr." in its voter guide. In 2021 and 2022, three East-Indian or Asian-American physicians — Dr. Devi Nampiaparampil, Dr. Awadhesh Gupta, and Dr. Raja Flores — ran for office. The CFB did not use the "Dr." title for any of the three.

Plaintiff repeatedly requested use of "Dr." in communications dated April 21, May 18, August 2, August 17, September 15, and September 16, 2021. The CFB's portal was programmed to block honorifics. On September 20, 2021, Duhalde stated that honorifics were prohibited and Plaintiff's name would appear as "Devi Nampiaparampil." Plaintiff requested the legal basis. Duhalde responded that the policy was "long-standing." CFB General Counsel Bethany Perskie refused to answer questions, citing pending litigation. CFB Director of Candidate Services Hannah Egerton stated that the CFB "cannot make exceptions." The CFB had nevertheless manually added "Dr." to Dr. Ascherman's name in 2018.

The CFB corrected similar visibility problems for other candidates but not for Plaintiff. In October 2021, Duhalde "hid" the video voter-guide submission of white male Republican candidate Mark Szuszkiewicz by posting an outdated link. When Szuszkiewicz complained, Duhalde immediately corrected the issue. Plaintiff received no comparable corrective action. Separately, CFB video producer Dru Gibson reviewed Plaintiff's video submission

2

and texted Plaintiff as "Mr. Nampiaparampil," raising Plaintiff's concern that the CFB might misgender her in the voter guide or remove "Elizabeth," making her unrecognizable to voters.

During the same general-election period, the CFB awarded $1,000,000 in public matching funds to incumbent Public Advocate Jumaane Williams between September 29 and October 12, 2021. That increased the funding disparity between Plaintiff and Williams from less than 2:1 to nearly 11:1. Candidates normally must submit a Statement of Need to receive public funds when their opponent has not qualified. The CFB required mayoral candidate Eric Adams to submit such a statement. The CFB waived that requirement for Williams. Plaintiff requested Williams's Statement of Need, but the CFB did not provide one. Plaintiff's liaison, Jaclyn Williams, later told Plaintiff that the CFB's official policy was that Williams did not need to submit a Statement of Need. At the same time, the CFB informed Plaintiff that she could not spend more than $6,000 of her own money without incurring campaign-finance violations.

Plaintiff also sought access to the mandatory televised debate, not for fundraising as an end in itself, but so New Yorkers could hear the campaign platform. To qualify for the debate, Plaintiff needed to raise and spend at least $113,878 by a preset deadline. A CFB employee initially gave Plaintiff the wrong deadline, creating the impression that she had more time.

Plaintiff raised approximately $150,000 to $170,000 near the end of the election cycle and spent approximately $85,000 from the campaign account within hours. Bank of America then froze Plaintiff's personal, business, and campaign accounts. Before Chase and Mastercard froze her credit cards, Plaintiff spent approximately $20,000 more on campaign materials. Plaintiff later learned the freeze was triggered by two Dark Web alerts tied to her personal information– not the high spending. A later FOIL response showed that the CFB had *no* tracking system identifying which employees accessed candidates' or donors' confidential financial information and relied on employees following the handbook despite known staff violations.

3

On October 12, 2021, the CFB issued a worldwide press release stating that Plaintiff had not met the spending requirement. The release identified Plaintiff as "Devi Nampiaparampil," without the "Dr." title. The CFB stated that the debate was "not required under city law" because "two or more candidates" had not met the criteria. The CFB published the general criteria but omitted the new rule it applied to Plaintiff concerning debit-card versus credit-card spending.

The CFB told Plaintiff she had not met the spending requirement because she used a credit card instead of a debit card. The CFB cited no law requiring debit-card spending. Plaintiff received no notice and no hearing before this quasi-judicial decision.
The CFB's actions affected public perception of Plaintiff's viability. Plaintiff had raised more money than all other Public Advocate candidates combined in the prior disclosure period– including the incumbent. Nevertheless, after the CFB's press release, political reporters treated her as nonviable. Because the CFB had already deleted Plaintiff from the Voter Guide, reporters could not verify her background or platform through the City's official publication. The CFB's fundraising graphics also distorted Plaintiff's totals and made it appear that another candidate, Tony Herbert, had raised more. Media outlets then ignored Plaintiff, denied interviews, misidentified the Republican nominee, and repeated the CFB's narrative that Plaintiff was not legitimate.

These facts are not included to relitigate the 2021 election. They show how the CFB used public-facing election infrastructure to diminish a political challenger's credibility, visibility, fundraising, debate access, professional identity, and public legitimacy. The same structure later reappeared in the audit: technical rules, portal failures, shifting explanations, unreviewable decisions, and official public statements converted Plaintiff's protected political activity into alleged noncompliance.

**Debate Suppression, Public Reaction, and Immediate Post-Election Harm**
In October 2021, the CFB sponsored the Public Advocate debate. Four candidates met criteria for CFB-sponsored debates: Eric Adams, Curtis Sliwa, Jumaane Williams, and Plaintiff. Adams and Sliwa received debates on major broadcast networks, including ABC

4

and NBC. Plaintiff's debate was scheduled on NY1, a subscription-restricted channel. The CFB heavily promoted the all-male debates but provided minimal promotion for Plaintiff's debate. The CFB also cancelled the second "Leading Contenders" Public Advocate debate by press release, without notice to Plaintiff and without giving her an opportunity to appeal. The cancellation further reduced Plaintiff's ability to speak directly to voters after the CFB had already deleted her from the Voter Guide and publicly stated that she had not met debate criteria. The CFB's public statements affected more than campaign coverage. After the CFB's press release, Plaintiff's medical practice received angry and threatening calls from individuals who believed Plaintiff had not earned the debate. Callers knew the exact address and hours of Plaintiff's medical practice. Plaintiff and her staff received threats referencing Plaintiff's race, gender, and the CFB's statements. Plaintiff purchased approximately ten new phone numbers to manage the call volume and protect patient access.

Plaintiff's medical practice also experienced hostile patient interactions, false assumptions that Plaintiff operated an opioid "pill mill," nuisance complaints to the New York State Department of Health, threats of violence, and reputational harm affecting her licensed professions. Metropolis had to implement new safety protocols and screening procedures for patients entering the practice. Negative media coverage, including coverage by 1010 WINS and PoliticsNY, repeated the CFB's narrative and further harmed Plaintiff's reputation.

After the October 2021 hearing, Theo Chino, another Public Advocate candidate, submitted an affidavit stating that he had used language the CFB considered "non-compliant," including "Jumaane Williams," but that a CFB attorney helped him revise his submission and ensured his inclusion in the Voter Guide. Plaintiff emailed Chino's affidavit to Bethany Perskie, Hannah Egerton, and Amy Loprest and requested inclusion in the online Voter Guide. The CFB did not respond and did not include Plaintiff. On November 1, 2021, Plaintiff fell under the City's selectively enforced Lawyer Ban, under which communications with counsel for reasons other than criminal defense became unsafe or unlawful as campaign-finance activity. That same day, HHS emailed

5

Plaintiff that Metropolis and Plaintiff had been pre-approved for pandemic relief funds and should sign into the portal immediately to accept them. Until then, Plaintiff had been using personal savings to cover losses related to patient care. Hospitals had received earlier rounds of COVID funding, while Plaintiff had been trying to keep immunocompromised patients away from hospitals and COVID without equivalent public support.

The timing mattered. As Plaintiff entered the final day of the campaign, she was simultaneously facing voter-guide deletion, debate suppression, hostile public reaction, threats to her medical practice, and a new federal healthcare funding portal obligation. The Lawyer Ban made legal assistance unsafe at the same moment Plaintiff needed counsel to protect her campaign, her medical practice, her patients, and her federal relief obligations.

**Submit Your Financial Information: Provider Relief Fund**
1 message

**NO-REPLY-LINKHHS** <noreply.trackit@uhc.com>                    Mon, Nov 1, 2021 at 1:10 PM
To: devichechi@gmail.com

Devi Nampiaparampil
TIN (Last 3 digits): 936

Dear Valued Provider:

Thank you for submitting your information to the Provider Relief Fund Application and Attestation Portal. Your Taxpayer Identification Number (TIN) is pre-approved to continue the application process.

What action should I take?
You should now return to the Provider Relief Fund Application and Attestation Portal to complete the next steps in the process to determine the funds you may be eligible to receive under this program.

Please submit your application as soon as possible to expedite the payment process and avoid unnecessary delays. Visit hrsa.gov/provider-relief for updates about timing and deadlines.

(Per Plaintiff's recall, Plaintiff completed the HHS audit in April 2023. The Agency had no questions or concerns. All monies either were– or became– federal grants. The portal was closed in July 2023).

6

## Provider Relief Fund Reporting Portal Account Deactivation

Attention:
Metropolis Pain Medicine PLLC

Dear Valued Provider:

Last month, you received an email notification about two updates concerning the Provider Relief Fund (PRF) Reporting Portal:

- PRF Reporting Portal accounts that have been inactive for 95 or more days will be deactivated
- HRSA upgraded the PRF Reporting Portal to include additional security enhancements that require providers to establish five security questions/answers and two-factor authentication preferences

HRSA will begin deactivating accounts on April 17, 2023 and will complete this process every 95 days. To assist providers with retaining active accounts, HRSA will send 5-day and

*NOVEMBER 2, 2021: ELECTION DAY*

Plaintiff conceded the Public Advocate race on November 2, 2021.

The New York City Department of Sanitation then alleged that Plaintiff had posted campaign signs on November 3 and November 4, 2021, after the election had concluded and began prosecuting Plaintiff's mother for 11 summons in a series of hearings which ended in June 2022.

*Immediate Post-Election Aftermath*

Plaintiff's 2021 campaign performance made the CFB audit a restraint on future political participation. Dr. Devi received approximately 23.4% of the vote in the 2021 citywide Public Advocate race, outperforming every recent Republican nominee for that office. The citywide results showed approximately 68.4% for the incumbent, 23.4% for Dr. Devi, 6.8% for the Conservative/Independent candidate, 1.3% for the Libertarian candidate, and 0.2% for write-ins or other votes. When the Republican, Conservative, and Libertarian totals are combined, non-Democratic candidates received approximately 31.5% of the vote. That figure exceeded the 30% New York City threshold political actors had identified as significant for statewide competitiveness.

The campaign's performance produced immediate post-election interest in higher office. Party officials encouraged Dr. Devi to consider Lieutenant Governor and U.S. Senate, including a December 2021 outreach regarding a possible U.S. Senate run and January 2022 communications regarding Lieutenant Governor. The audit therefore did not burden a closed political chapter. It burdened a candidate with live future political prospects. The CFB audit, Lawyer Ban, Accountant Ban, penalty exposure, and continuing disclosure obligations operated as a prior restraint on that future activity. Plaintiff could not safely raise money, hire counsel, retain accountants, accept professional assistance, or plan future campaigns while the CFB maintained an unresolved enforcement structure from the 2021 campaign. Defendants then described Plaintiff's claims as post-election disappointment, even though the audit and related restrictions continued to impair future speech, association, fundraising, and candidacy.



*December 30, 2021 Email About NYS Lieutenant Governor Nomination*



**Process**: We have narrowed the search down to 6 candidates.  The goal of this process is to narrow it down to 2-3 candidates that we can recommend to Lee. Everything is confidential. Some of the questions might end up sounding crazy, but the goal is to ask them now before the media potentially asks. We want to make sure we have answers to everything and to make sure that you and Lee will make an amazing team.

You are the first one we are interviewing during this stage. Eric Levine will likely ask you to introduce yourself, ask who are your political mentors, why you want to be LG,  what you believe you would bring to the ticket, any potential issues where you know you differ from Lee, what do you think are the 3 biggest challenges facing the state today, etc.

Regardless, I will stay in contact with you and hopefully we will be able to narrow it down very quickly. Let me know if you have any questions after.

*Excerpts from January 21, 2022 Email About Lieutenant Governor Interview*



*December 16, 2021 Voicemail (Time-Stamped) — Then–State GOP Chair and Now–Congressman Nick Langworthy Had Encouraged Dr. Devi to Forgo Future City and State Campaigns and Instead Consider a U.S. Senate Run*

Democrats reached out to Plaintiff, too– about switching parties– and running for office again. On November 13, 2021, less than 2 weeks after the election, a Democrat New York State Senator publicly acknowledged Plaintiff's service and sacrifice during major public health crises– the opioid epidemic and COVID.

10

): NEW YORK COUNTY            2/09/202    04:15 AM          INDEX NO. 159019/2022
DOC. NO. 24                                              RECEIVED NYSCEF: 12/09/2022



# Proclamation

# SENATOR KEVIN THOMAS

## HONORING

# DR. DEVI NAMPIAPARAMPIL

**WHEREAS,** A **GREAT STATE** IS ONLY AS GREAT AS THOSE **INDIVIDUALS** WHO PERFORM EXEMPLARY SERVICE ON BEHALF OF THEIR COMMUNITY, WHETHER THROUGH UNIQUE ACHIEVEMENT IN PROFESSIONAL OR OTHER ENDEAVORS, OR SIMPLY THROUGH A LIFETIME OF GOOD CITIZENSHIP; AND

**WHEREAS,** IT IS THE PRIVILEGE OF THIS LEGISLATIVE BODY TO HONOR **DR. DEVI NAMPIAPARAMPIL UPON** OUTSTANDING **ACHIEVEMENT AND SERVICE TO SOCIETY.**

**WHEREAS,** IT IS THE BELIEF OF THIS **LEGISLATIVE BODY** THAT WHEN **INDIVIDUALS** OF SUCH **NOBLE AIMS AND ACCOMPLISHMENTS** ARE BROUGHT TO OUR ATTENTION, IT IS **APPROPRIATE** TO **PUBLICLY PROCLAIM AND COMMEND** THOSE **INDIVIDUALS** FOR THE **EDIFICATION** AND **EMULATION** OF OTHERS; AND

**WHEREAS,** SUCH SERVICE, WHICH IS TRULY THE LIFEBLOOD OF THE COMMUNITY AND THE STATE, SO OFTEN GOES UNRECOGNIZED AND UNHERALDED; **NOW THEREFORE, BE IT**

**RESOLVED,** THEREFORE **I, STATE SENATOR KEVIN THOMAS,** RECOGNIZE **DR. DEVI NAMPIAPARAMPIL IS AN INDIVIDUAL WORTHY OF OUR HIGHEST RESPECT AND ESTEEM;** AND BE IT FURTHER

**RESOLVED,** THAT A COPY OF THIS **PROCLAMATION** BE TRANSMITTED TO **DR. DEVI NAMPIAPARAMPIL DURING** TODAY'S EVENT.



IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY
HAND AND SIGNATURE

On December 16, 2021, Plaintiff testified at a public hearing to Defendants Loprest, Schaffer, CFB and the City about the unconstitutional barriers she had faced during her campaign. Two other healthcare workers also testified in support.

At the end of December, Plaintiff's mother suddenly could not walk anymore. She was diagnosed with advanced cancer and told by multiple experts that she  was a candidate for Hospice. Plaintiff was still in shock when her mother started treatment with one of her Palliative Medicine colleagues.

*CFB Burdens and Delayed Medical Care*
Before December 2021, Mary Nam had been feeling unwell for some time, including persistent stomach symptoms. She later learned that those symptoms were related to advanced gastric cancer. During the same period, Mary Nam was performing extensive CFB-related work. She was responsible for monthly financial disclosures, repeated documentation responses, portal corrections, donor-confirmation requests, resubmission of documents the CFB already had, correction of donation rejections, and compliance with CFB deadlines that Plaintiff later learned did not apply to non-primary candidates.
The CFB's documentation demands consumed extraordinary time. Plaintiff's mother had to contact donors for written confirmations, address rejections of legitimate donations, correct minor address-formatting issues, and, during COVID, drive to donors' homes to obtain documentation. She later stated that she spent more time working on CFB tasks than she had ever spent working full-time for the City.

The burden affected Mary Nam's ability to seek medical care. She was too distraught and overloaded to focus on her health. She did not have the time or mental bandwidth to evaluate her symptoms or schedule medical care, despite ongoing stomach problems. The pressure came from the volume and frequency of CFB submissions, the lack of manuals or

meaningful guidance, the need to correct CFB errors, and the fear that any documentation mistake could trigger penalties. Plaintiff later learned that the CFB had effectively held her campaign to a 0.00% error rate. She also learned that OATH had previously found the CFB's documentation standards arbitrary and capricious, and that other campaigns were not held to the same perfect-documentation standard. Even a 50% error rate was allowed. Had Plaintiff's mother known that she did not need to achieve a 0.00% documentation error rate, she would have sought medical care earlier. Plaintiff's mother was diagnosed with advanced gastric cancer in December 2021, after the election and after months of CFB documentation demands. The CFB's burdens consumed the same period when Plaintiff otherwise would have sought medical evaluation for symptoms that were later connected to cancer.

On January 14, 2022, Plaintiff's liaison, Jaclyn Williams, stated during a virtual meeting that she had been unaware of Plaintiff's exclusion until after Plaintiff discovered it. Williams also stated that her supervisor had been unaware, and that had they known, they could have intervened. Williams further stated that Duhalde was never assigned to Plaintiff's campaign, and that Duhalde and Egerton made the decision to delete Plaintiff's submission together. Williams confirmed this in a follow-up email on January 14, 2022. Because Plaintiff believed her mother could survive, she took her mother for a 7th and 8th medical opinion. Then on March 1, 2022, Plaintiff's mother underwent major surgery at Memorial Sloan Kettering, having parts of her stomach, intestines, pancreas, liver, and other organs removed.

On the same day, March 1, 2022, even though I had been terminated from the opioid litigation, a lawyer contacted Plaintiff to discuss recent events in MDL #2804.

*Campaign Account Closure, Department of Sanitation Summonses, and Continuing Legal Exposure*
After the election, Plaintiff closed the campaign bank account in early January 2022 because CFB liaison Jaclyn Williams told her she could stop filing campaign disclosures if the account was closed.

Shortly afterward, Mary Nam, Plaintiff's mother and campaign Treasurer, was suddenly prosecuted for eleven DSNY/OATH violations involving alleged campaign flyers in Brooklyn and Queens. Mary had served as a City employee for more than 42 years, lived in Westchester County, and had been diagnosed with advanced cancer in December 2021. She was being treated by the Hospice & Palliative Medicine service at the time. The summonses carried a rebuttable presumption of guilt. The DSNY fines themselves totaled more than $1,000, but because the CFB treated sanitation violations as campaign-related, the eleven summonses exposed Mary, Plaintiff, and the campaign to more than $110,000 in potential CFB penalties. Plaintiff was also warned that paying the DSNY fines could trigger eleven campaign-finance violations because she had already reached the contribution limit. Hiring counsel could create additional campaign-finance exposure because legal fees could be treated as campaign expenses or in-kind contributions. The summonses also threatened Plaintiff's professional licensing. Plaintiff learned that DSNY violations could be reviewed by the New York State Board of Medicine and could affect medical licensing in all fifty states through federal credentialing systems. The legal and professional exposure therefore extended beyond sanitation fines.

Because the Lawyer Ban made paid or pro bono counsel unsafe, and because OATH clerks told Plaintiff she could serve as Mary's counsel, Plaintiff represented Mary and the political committee in OATH proceedings. The political committee represented more than 600 donors. The City appeared through counsel. Plaintiff appeared as coerced practical counsel for her mother and the committee, despite not being a party to the summonses. On March 4, 2022, the first OATH hearing began in New York County. During the hearing, the City's attorney attempted to transform Plaintiff from Mary's representative into a defendant, even though Plaintiff had not been accused in the original summonses. The Administrative Law Judge noted multiple irregularities, expressed concern about the legality of the proceedings, and adjourned the case. The matter was later reassigned to Bronx County.

Plaintiff then investigated the alleged sign locations herself. She visited five of the eleven locations and found them remote, vandalized, and unsafe. She submitted photographs,

14

affidavits from four supporters, and other evidence. At the June 2022 Bronx hearing, Plaintiff again represented Mary Nam. Mary Nam did not attend because of her medical condition. The judge dismissed all eleven cases for lack of evidence. The summonses also raised questions about how DSNY obtained Mary Nam's information. OATH employees told Plaintiff that DSNY typically obtains campaign contact information from the CFB or the Board of Elections. The Board of Elections would not have had Mary's information. A DSNY FOIL officer stated that DSNY's unofficial custom is to obtain campaign addresses from the CFB. The CFB had Mary's correct address on file but provided DSNY with the wrong address.

On January 24, 2023, Plaintiff filed a FOIL request with the CFB seeking correspondence between the CFB and DSNY. As of May 26, 2023, the CFB had not produced records. The timing matters. The summonses arrived shortly after Plaintiff filed a summons and complaint against the CFB and provided testimony during the CFB's post-election review. They also forced Plaintiff into the very role the Lawyer Ban had made unavoidable: unpaid legal representative, investigator, evidence collector, and compliance defender for her mother and campaign committee, under threat of campaign-finance penalties, professional consequences, and family harm.

*State-Court Litigation and the Pro Se Trap*
In spring 2022, an attorney approached Plaintiff at a cocktail event and told her to check on her case because it was not proceeding the way she thought it was.
On August 8, 2022, Plaintiff filed an ex parte motion in New York Supreme Court before Justice Shlomo Hagler, asking for permission to proceed pro se in her First and Fourteenth Amendment case, Index No. 101118/2021. Plaintiff sought pro se status because the City's Lawyer Ban made communication with counsel unsafe. Justice Hagler denied the motion.

That ruling completed the trap. The City's campaign-finance restrictions made counsel unsafe, while the court denied Plaintiff permission to proceed pro se. Judge Hagler dismissed the case the same day, even though the Notice of Intent deadline was still more

15

than six weeks away. His clerk emailed Plaintiff directly that the case was closed; Plaintiff's attorney was not copied, and neither was the CFB. Plaintiff understood the direct communication as another consequence of the Lawyer Ban, because ordinary attorney communication had been made unsafe.

Around the same time, Plaintiff noticed that neither she nor Metropolis could place Botox orders through the Allergan portal or over the phone. My staff spent a significant amount of time trying to correct this issue, but was unsuccessful. No explanation was provided and– as a stop gap measure– Plaintiff obtained Botox by purchasing from colleagues and by ordering outside of normal "buy and bill" procedures.

On August 18, 2022 Metropolis and Plaintiff were re-engaged for expert services in MDL #2804 and the associated state and federal opioid cases.

**Engagement Letter**

August 18, 2022



Re:    *Prescription Opiate Litigation*

Thank you for ██████████████████████ in the above-referenced matter. This letter will set forth the agreement ████████████████████████████████████ and Metropolis Pain Medicine PLLC, specifically Devi Nampiaparampil, M.D. ("Expert'), ████████████████ as a consulting and/or testifying expert witness.

This letter (this "Agreement") confirms the retention ███████████████████████ in connection with federal and state opioid litigation matters involving Client.

**VIA EMAIL:** devichechi@gmail.com

Metropolis Pain Medicine PLLC
Attn: Devi Nampiaparampil, M.D.
111 John Street, #2509
New York, NY 10038

Re:    ***In Re: National Prescription Opiate Litigation*** ▨

Dear Dr. Nampiaparampil:

This letter serves to clarify a few points between ▨▨▨ and Devi Nampiaparampil, M.D., ("Expert") concerning the three-way agreement between ▨▨▨ and the Expert regarding ▨▨▨ dated August 18, 2022.

It is agreed and understood ▨▨▨

- ▨▨▨ for consulting, ▨▨▨
- ▨▨▨ for face-to-face meeting and deposition, ▨▨▨
- ▨▨▨ for trial appearance, wait time, and testimony ▨▨▨
- ▨▨▨

In the fall of 2022, Plaintiff dedicated approximately 60 hours in September 2022 and 65 hours in October 2022 to the opioid litigation. An attorney reiterated that Plaintiff should not tell anyone about her witness status because it would give attorneys on the opposing side more time to do opposition research, which could then be used in a 7-hour deposition. Plaintiff appreciated the guidance and stayed silent– at that time.

*2022 Audit Escalation, Identity Destabilization, and Professional Harm*
On October 20, 2022, Plaintiff repackaged the motion she had submitted to Justice Hagler as a complaint and filed a pro se negligence and libel action against the CFB in New York State Supreme Court. Plaintiff did not retain counsel because she believed the City's campaign-finance restrictions made counsel unsafe.

17

The timing was critical. Plaintiff had to file by the statute of limitations for being punished for referring to Jumaane Williams as "Jumaane Williams." At the same time, Metropolis was overwhelmed by increased COVID cases, staffing shortages, and patient-care demands. Shortly after Plaintiff filed suit, the CFB claimed to have discovered more than 75 new campaign-finance violations that had not been identified during the election cycle. This occurred even though the CFB had already conducted a concurrent audit during the campaign, reviewed every financial transaction, and found a 0.00% error rate as the campaign exited Election Day.

The new audit was not ordinary reconciliation. It reopened already-reviewed activity after Plaintiff sued the CFB. Plaintiff had to respond without counsel or accountants. She performed hundreds of hours of data entry, document uploading, transaction review, technical corrections, and communications in the CFB's proprietary system. She made more than ten requests for technical assistance. Instead of assigning neutral technical support, the CFB assigned Hannah Egerton to handle all communications, even though Egerton was one of the CFB employees Plaintiff had informally accused of wrongdoing in the libel suit. Egerton sent threatening audit emails shortly before critical deadlines in Plaintiff's state-court case. During a virtual meeting, Egerton instructed Plaintiff to mark liabilities as "Paid" in the CFB system even though no payments had been made. Plaintiff refused because doing so would have been false. Plaintiff repeatedly feared that CFB staff were attempting to induce her to commit financial or reporting violations through incorrect audit instructions.

The audit also barred the people most familiar with the campaign from helping. The CFB informed Plaintiff that she could not volunteer, review records, or assist with audit responses because her work would be treated as an in-kind contribution. The CFB further stated that Plaintiff's mathematics background meant her work should have been valued at approximately $30,000.

That created a closed loop. The campaign had no funds. The bank account had been closed. Plaintiff could not pay herself. Dr. Devi could not pay Plaintiff because she had

already reached contribution limits. Any unpaid help could trigger additional over-the-limit violations. The CFB demanded audit responses while disabling the campaign from obtaining the help needed to prepare them.

The CFB audit served multiple purposes. For example, it prevented challengers from entering the ring. As long as Dr. Devi was restrained by the Lawyer Ban and the CFB's Rules, she could not run for City, state or federal office. As former CFB Executive Director, Defendant Amy Loprest, explained:

> Administratively, candidates would need to open and maintain two different committees, with separate contribution limits, spending limits, and thresholds to receive public matching funds. This would create confusion for candidates who have registered and been actively campaigning using a single committee for fundraising. The recordkeeping that will be required of candidates, and the subsequent CFB audit of expenditures, will be borderline unmanageable. It will be enormously difficult to differentiate between expenditures in furtherance of the special election versus primary election, since under the Campaign Finance Act and CFB rules, all spending is presumed to be in furtherance of the next election. Requiring candidates to comply with two different sets of contribution limits as they raise funds for two committees simultaneously will be demanding.

*Excerpt From Amy Loprest Letter to Then-Governor Andrew Cuomo*

The financial exposure was severe. Plaintiff was informed that she could be fined up to $10,000 per violation. With approximately 75 alleged violations, the audit created catastrophic potential liability. Plaintiff's mother feared losing her pension, Social Security income, home, and, because of joint assets, her husband's pension and Social Security income as well. Similarly situated Public Advocate candidates were not audited at all, including candidates who received public matching funds.

The audit demands were imposed despite Plaintiff's medical limitations. In July 2022, Plaintiff became partially blind due to cancer treatment and required eye injections every two months. Her vision impairment made it difficult to read audit materials, court documents, and CFB correspondence. The CFB nevertheless required highly technical audit responses.

The audit magnified both the Lawyer Ban and the Accountant Ban. The campaign needed legal and accounting assistance to respond, but the CFB treated professional assistance as campaign activity requiring campaign funds and subject to contribution limits. The campaign had no funds. Third-party payment would be treated as an over-the-limit contribution. Pro bono services would be treated as prohibited in-kind contributions. Plaintiff therefore could not safely obtain counsel or accounting help while the audit remained active, ambiguous, or capable of renewed enforcement.

The same sequence connects to Plaintiff's identity and financial destabilization. Between April and May 2021, Egerton had sent Plaintiff eight notices in five weeks demanding notarized forms making Plaintiff Treasurer instead of Mary Nam. Plaintiff declined because she saw no benefit and did not understand the legal risk. Plaintiff had already provided identification to open the campaign bank account and had passed multiple federal background checks.

When Plaintiff emailed Egerton explaining that she believed she could not hire an attorney and did not understand the risks of signing, Egerton did not resolve the legal-risk issue. Instead, Egerton administratively designated Plaintiff as both Candidate and Treasurer without Plaintiff's signature.

The harm extended beyond the campaign. Metropolis Pain Medicine is a 100% minority-owned, woman-owned medical practice serving patients across multiple states. Plaintiff also owns a business in Arizona and was involved in forming a business in Wyoming. Account freezes, identity instability, and CFB audit demands interfered with Plaintiff's ability to operate across state lines, preserve patient access, and maintain ordinary business functions.

The CFB's conduct also reached Plaintiff's medical practice. Egerton asked Plaintiff to block her practice to patients during a national emergency. The CFB investigated physicians who donated $10 to Plaintiff's campaign while declining to investigate far larger discrepancies in other campaigns. That scrutiny harmed Plaintiff's professional

20

reputation, chilled support from medical colleagues, and tied the campaign audit to Plaintiff's interstate medical practice.

After the 2021–2023 Dark Web alerts, Plaintiff experienced repeated identity-verification failures across multiple systems: bank freezes, credit-card shutdowns, inability to access available funds, government-portal failures, licensing and credentialing disruptions, payment-processing failures, and account-verification failures at Metropolis. Plaintiff received additional Dark Web alerts in later years, and the disruptions continued into 2026. The continuing identity destabilization caused professional and economic harm.

After the Defendants published false statements, patient referrals dropped by approximately 99%. Plaintiff's fundraising collapsed from approximately $80,000 to approximately $1,000 in one week. Plaintiff was denied COVID relief funds because a reviewer did not believe she was a physician and had to provide 27 forms of identification. Plaintiff and Metropolis experienced hostile patient interactions, nuisance complaints, threats of violence, reputational damage, payment-processing problems, and interference with interstate commerce. Plaintiff and her staff received continuous threatening calls, requiring Plaintiff to purchase approximately ten new phone numbers to manage call volume.

The CFB kept the false voter-guide post online through April 2023 and refused to correct or remove it. That continued publication compounded the identity harm. While Plaintiff was experiencing account freezes, identity-verification failures, professional doubt, and repeated demands for identification, the CFB left in place a public statement undermining her legitimacy as a candidate and physician.

This was not a discrete identity problem or ordinary audit burden. The CFB demanded notarized identity changes after Plaintiff had already provided identification; designated Plaintiff into campaign roles without her signature; required or received sensitive identity and financial information shortly before Dark Web alerts; assigned the same employee Plaintiff had sued to manage audit communications; allowed multiple employees to access

21

Plaintiff's records; continued audit activity after account freezes and identity failures; treated legal and accounting help as campaign-finance activity; and left defamatory public material online while Plaintiff's professional identity and financial systems destabilized. The result was a continuing pattern of audit retaliation, identity coercion, financial disruption, medical-practice interference, and interstate-commerce harm.

On January 17, 2023, Defendants accepted testimony from Plaintiff at a virtual public hearing. There, Plaintiff testified as to the unconstitutional nature of their Rules, providing them with actual notice. Defendants Perskie, the CFB and the City, with Timothy Hunter as a witness, responded by not uploading the public hearing to the CFB website. They then deleted all social media posts on the CFB website, Facebook, Twitter, Instagram, and YouTube pertaining to the hearing. The Defendants purged their social media platforms and public archives of information about the hearing. According to a subsequent Rulemaking package, claiming to incorporate public feedback, Defendants reported to the Mayor's office that there were objections to their revised Rules.

Subsequently, when Plaintiff referenced the hearing, Defendants and their Counsel denied its existence in their legal filings and questioned Plaintiff's credibility, only conceding its existence after Plaintiff produced timestamped screenshots from her screen-recording proving it had occurred, and only after the Plaintiff asked the Court to allow her to play her time-stamped screen-recording.

On January 27, 2023, Defendant Perskie emailed Plaintiff regarding her FOIL inquiries, "[W]e will not be responding to inquiries related to the subject of pending litigation," Since that time, Defendants have systematically denied Plaintiff's requests for public information, accessible to other members of the public who are not engaged in litigation with the Agency.

In January 2023, Plaintiff's name was considered to review a Purdue Pharma case unrelated to the MDL opioid litigation. This case involved a patent dispute about a brand

name vs. generic drug. Plaintiff, intermittently an expert witness for the City, was unaware at the time that the City had sued Purdue Pharma in the SDNY.



Purdue Pharma, L.P., Purdue Pharmaceuticals L.P., I have enclosed the copy of the patents for your cursory review.

That same winter, a CFB employee accused Plaintiff of breaking the law. Plaintiff had never been in such a position before and did what they do on Law & Order and Netflix: invoked the Fifth Amendment and said she wanted an attorney. The City told her the Fifth Amendment didn't apply here because she wasn't charged with a crime. These were civil violations. She had never seen that response before in a TV show or movie, so the encounter continued. In a subsequent encounter, this employee and her colleague asked Plaintiff repeatedly to give them remote access to my laptop, all its files (and my email). Plaintiff said the City's software was incompatible with my Mac– which it was. (She simply did not volunteer to get my PC from the other room).

She never heard back about the Purdue project, but in March 2023, she heard she was back as an expert in MDL #2804.



Hi Devi,

Congratulations on your most recent re-engagement

She responded, asking for clarification:



Because the documents don't specify the exact case, I just wanted to confirm that this is a continuation of the work with correct?

In April 2023, Judge Dakota Ramseur ruled against Metropolis. She determined that Plaintiff could not represent a corporate plaintiff as a pro se. She also denied Metropolis the ability to refile with an attorney. Metropolis was categorically denied access to the Courts– and to justice.

In April 2023, shortly afterwards, the Defendant CFB sent Plaintiff three separate requests for her to withdraw her FOIL requests, referencing the dismissal of her case in NYS Supreme Court.

The Defendant City of New York has denied Plaintiff access to a police report and the Court proceedings of the City's arrest and subsequent prosecution of at least one offender who threatened and attempted to violently assault Plaintiff on-stage at a campaign event. (Of note, Plaintiff is unsure whether the City arrested and prosecuted the correct individual(s)).

Afterwards– and in spite of the Lawyer Ban– Plaintiff received legal advice from two entities. The NYC courts are associated with legal aid groups that help pro ses navigate the filing process. Many of these services were unavailable during COVID but later resumed in a limited capacity. Since this service is available to all members of the general public for free, she thought it might fall into an exception under the City's Lawyer Ban– like a public library where everyone can access the public resource for free. It doesn't cost money. Plaintiff contacted the service and received three phone calls back from a lawyer. There were three calls because– even though she had initiated the contact– she  was hesitant to answer each time. She was still scared she was committing a crime. After all, she had already been punished harshly many times for bizarre esoteric apparent violations of the law. The pro bono lawyer did not appear to be the stereotypical TV version of an overworked and underpaid legal aid attorney. Although they only provided their first name, Plaintiff managed to track them down and found they were a senior partner at Kirkland Ellis.

Plaintiff referred to them as "the pro bono" lawyer even though they routinely stated that they were not *her* lawyer and that Kirkland Ellis had absolutely no involvement in her case. That was fine with Plaintiff– she did not want to call this person her lawyer either, since she thought it was illegal to have one, and she didn't want this person to have a moment of remorse and go confess to the City.

Because they only had informal conversations, there was never any discussion about conflicts. At the time, Plaintiff did not know Kirkland represented Allergan, a Defendant in MDL #2804 and Plaintiff never told the pro bono she was a retained witness in the same MDL.

The City had falsely accused me of approximately 70(?) financial violations– some just one tiny step from fraud. (Since then, I have been cleared of all violations twice– in redundant audits). At the time though, she was terrified that she would not be able to practice medicine if those "draft" findings were finalized. She would likely be locked out of Medicare and other insurance contracts. Professional societies would hesitate to have me as an officer, given the exposure. This pro bono attorney was helpful for practical "how-to" tips of navigating the courts but was often frustrated with me. They repeatedly advised me to "settle" irrespective of liability– explaining that she would never beat the City. She responded that I might as well sacrifice my medical career. She replied that– even if she wanted to settle– the City refused to state what the monetary fines came out to. She had repeatedly asked for a clear number. The City appeared intent on a never-ending investigation with no endpoint and no cap on penalties– just repeated threats, disruptions and burdens interfering with the normal functioning of the medical practice. Plaintiff said my First Amendment case was my only way out. The first step was to free myself from the Lawyer Ban.

The pro bono lawyer argued that no lawyer would ever pass a law restricting the amount of money that lawyers could make. Therefore, Plaintiff must be wrong about the Lawyer Ban. She gently reminded them this was not their area of expertise. After all, the City had already forced her to serve as coerced counsel– for six months– in the 11 cases it had brought against her mother. Then the pro bono  asked why her preference was always to take legal advice from the opposing party (the City). They said they didn't see jurisdiction for federal courts to act, but that she could have a viable state case for Misrepresentation. They urged her to hire a  lawyer– *not them.*

25

In the winter of 2023, Dr. Devi scheduled a video conference with Defendant Hannah Egerton, her campaign-liaison-turned-auditor to troubleshoot persistent technical issues with the CFB's software platform. During the meeting, Egerton requested that Dr. Devi enable screen sharing and grant full access to her laptop. Dr. Devi declined, considering security and privacy concerns.

Egerton then directed Dr. Devi to mark certain "open" transactions in the CFB's system as "paid," claiming it would resolve the software support issue and was standard procedure. However, Dr. Devi knew that no actual payments had been made for those entries. When Dr. Devi raised concerns about misrepresenting financial data—specifically that marking unpaid transactions as "paid" could later cause problems for her—Egerton dismissed the concern and insisted it was acceptable. Dr. Devi verbally agreed to make the changes in the moment but, critically, did not follow through. By refraining from altering the records, she protected herself from making false entries that could later be construed as financial misconduct.

Separately, in January 2024 and again in July 2024, the CFB's online disclosure platform generated financial forms that pre-filled false campaign data Plaintiffs could not correct.



*"You are not allowed to submit C-SMART amendments at this time."*
*From CFB Financial Disclosure Portal*



*CFB Financial Disclosure Portal- Wider View; Timestamped*

Plaintiffs notified the Defendants of the false data being generated by their web portal. Defendants responded that failure to attest to the pre-filled false data would result in a $10,000 penalty. Plaintiffs were simultaneously required to attest to the truth of the data three times and to acknowledge that they could be charged with misdemeanors for filing false statements under NYS Penal Code 210.45.



*CFB Financial Disclosure Portal: Time-stamped First and Second Attestations; Criminal Liability*



*CFB Financial Disclosure Portal: Time-stamped Second and Third Attestations; Criminal Liability*

Compliance constituted attestation to knowingly false information—potentially triggering civil and criminal penalties for two forms of fraud. First, signing the disclosures would constitute fraudulent attestation, a risk explicitly outlined in the CFB's own attestation form. Second, the false data itself created the appearance of missing– and potentially embezzled– campaign funds. Notably, the CFB had already removed Mary Nam as

28

Treasurer—without statutory authority—and unilaterally installed Dr. Devi as the PAC's sole officer. The City claimed Mary Nam had "exceeded" her in-kind contributions and could no longer volunteer as an officer of the campaign.

This change left Dr. Devi solely responsible for any alleged financial wrongdoing. Had she signed the false disclosures, she could have faced serious criminal exposure. Dr. Devi recognized this coercive dilemma, but could not make any contemporaneous notes because the web portal blocked all free-text entries. Dr. Devi searched for a work-around under time-pressure. The CFB's portal only provides a limited window in which to file. Dr. Devi wrote a spur-of-the-moment affirmation about the coerced confession. Although the PAC's bank account had been closed since January 2022, and the campaign had not had any financial activity since that time, she purposely misfiled her affirmation as a "bank record" so the system would accept it– and so she could preserve a verifiable timestamp on a filing showing she was signing under economic duress.



*Date of (Purposely) Misfiled Bank Record Upload*

29

I was the Republican nominee for Public Advocate in the 2021 election cycle. I conceded the race on Election Day (November 2, 2021) and I closed my campaign bank account in January 2022. This is supported by all the previously uploaded bank records and my affidavits.

I completely disagree with the "Assets" and "Liabilities" numbers the Campaign Finance Board (CFB) has assigned to my campaign, "Dr. Devi For NYC."

*Excerpt from Contemporaneous Affirmation of Signing Under Duress*

I am submitting and signing this false portrayal of my campaign's financial activity under duress. If I do not sign this submission, the CFB can isuse a campaign finance violation with penalties for failure to file. This will cause both me and my private medical practice economic injury.

I affirm this _15th_ day of _July_, _2024_, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Sincerely,

Devi Nampiaparampil, MD, MS
Associate Professor, Department of Rehabilitation Medicine
NYU Grossman School of Medicine
Medical Director, Metropolis Pain Medicine PLLC

*Excerpt from Contemporaneous Affirmation of Signing Under Duress*

On May 26, 2023, I filed a pro se constitutional case in the Eastern District of New York (EDNY), asserting a Lawyer Ban, but acknowledging City employees could have lied about aspects.

Despite my tremendous hesitation, I eventually reached out to several reputable law firms. Many of them said something about how they had never litigated the statutes the City was enforcing on me; therefore, it fell outside of their expertise. Others did not respond. A few said I would not be able to afford their legal services to fight the City. But I had no choice– I had to pay. I did find a firm that seemed enthusiastic– Holwell Shuster & Goldberg

30

(HSG)– and paid them a mandatory $50,000 as a threshold initial payment to review my materials and prepare a Memo. **Ultimately, I paid HSG $151,689.90 in SBA federal funds– to defend Metropolis.**

I disclosed that I had worked as an expert witness for corporate and government clients in the past. HSG didn't ask any questions and I didn't elaborate. I never revealed any of the subject matter of what I worked on– except for cases where the City had hired me as its expert. There too, I only revealed the general topic– not specific case details. HSG did not mention any conflicts. HSG did not inform me that it represents Chubb Insurance, an insurer involved in the national opiate litigation. It also did not say that Chubb appears to be a municipal insurer for the City of New York. Instead, HSG sent me an agreement with a clause, which I asked Blair Kaminsky and Brian Goldman about, and which they told me was standard.

> From time to time in a commercial practice such as HSG's conflicts of interest can arise, including circumstances where HSG may be asked to represent clients who are or have interests adverse to those of Client. Client agrees to waive any such conflicts to the fullest extent permitted by law; provided, however, that HSG will not appear in a litigation directly adverse to Client without specific consent for that particular matter.

☐ CORRECTED (if checked)

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | | OMB No. 1545-0116 | Nonemployee Compensation |
|---|---|---|---|
| Metropolis Pain Medicine PLLC 111 John Street #2509 New York, NY 10038 (327) 424-4996 | | Form **1099-NEC** (Rev. January 2022) For calendar year 20 23 | |

| PAYER'S TIN | RECIPIENT'S TIN | 1 Nonemployee compensation $ 151689.90 | Copy B For Recipient |
|---|---|---|---|
| RECIPIENT'S name Holwell Shuster and Goldberg LLP | | 2 Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale ☐ | This is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| Street address (including apt. no.) 425 Lexington Ave, 14th Floor | | 3 | |
| City or town, state or province, country, and ZIP or foreign postal code New York, NY 10017 | | 4 Federal income tax withheld $ | |
| Account number (see instructions) | | 5 State tax withheld $ | 6 State/Payer's state no. | 7 State income $ |
| | | $ | | $ |

Form **1099-NEC** (Rev. 1-2022)    (keep for your records)    www.irs.gov/Form1099NEC    Department of the Treasury - Internal Revenue Service

The SBA granted me multiple deferments on the loan. I am actively repaying it now.

31

## Disaster COVID-19 Economic Injury
for Metropolis Pain Medicine PLLC

**$141,526.85**
Outstanding Balance

Current Status
**Disbursed Current**

*Metropolis' Outstanding Balance; Accessed on the SBA portal on January 21, 2026*

After their $50,000 review, HSG concluded we should not raise the Lawyer Ban claim at all:

Still, Judge Holwell made the recommendation—which we (and Justice McGuire, a partner at our firm who was a state court appellate judge) agree with—that the claims you choose

1

## HOLWELL SHUSTER & GOLDBERG LLP
***PRIVILEGED & CONFIDENTIAL***
***ATTORNEY WORK PRODUCT***

to pursue must be selected with a larger strategy in mind and that under the circumstances, a targeted approach focused on select claims is likely to get the most traction with a court. That means that, even if a claim can technically be included in a complaint, it may be better to not plead the claim, so as to avoid coloring the court with skepticism—all it takes is one weaker

*HSG: "Better to not plead the claim"*

Even though I believed the Lawyer Ban existed, since HSG appeared skeptical, I asked if we should file a Misrepresentation claim instead. I told them the pro bono attorney had said that seemed like my most viable claim since– it had never been raised in my libel case and since I believed the City and had acted accordingly. HSG advised against it.

32

The pro bono noted it was irregular that I was allowed to practice law without a license (in OATH Court)-- whether or not I believed I was under a Lawyer Ban. I was not listed as a Respondent on the summonses. I relayed this message to HSG who said they would follow-up.

The pro bono also asked why the case was reassigned from Judge Hagler to Judge Ramseur and reviewed as two separate cases. Since I didn't know, the pro bono suggested I tell HSG to follow-up on that anomaly since it might have distorted statutes of limitations. HSG appeared to discount the pro bono's last suggestion– concluding they might be overthinking a minor clerical error and that the pro bono might not be familiar with how the courts work in terms of judicial assignments. I had serious doubts that someone with the pro bono's credentials would be confused about this. And I believed that I had accurately relayed the pro bono's message. It occurred to me that HSG might take the suggestion more seriously if I identified the pro bono.

But since I was convinced the pro bono had broken the law– by having this informal conversation with me as an acquaintance, not a client– I never gave HSG the pro bono's name or credentials. I wasn't going to give the person up for trying to help me. So that ended that.

*Third*, there may be a viable theory of negligent misrepresentation with respect to the CFB's false instruction to Dr. Devi that her retention of professional services, including an attorney, accountant, or consultant, would constitute campaign finance violations. This would not be a constitutional claim; rather, it would be a tort claim. However, the CFB is likely to raise very strong defenses against this claim, including claim preclusion; they are also likely to muddy the waters regarding what was or was not conveyed to Dr. Devi. Finally, before pursuing this claim, we would need to file a Notice of Claim by August 20, 2023. Given the defenses that the CFB will raise to this claim, and the need to file a Notice of Claim, we would be inclined to recommend against bringing the claim in the current case, although it is a close call.

*Excerpt from HSG Memorandum*

Later, HSG more strongly advised *against* filing a Notice of Claim for misrepresentation on the Lawyer Ban. They also recognized potential allegations of discrimination and fraud, but recommended I drop those altogether.

*Finally*, there are a series of other facts that speak to some of the gross negligence, if not outright discrimination and fraud, committed by the CFB. We do not take these allegations lightly. Still, it is part of our overall judgment that these claims are, on the whole, not worth

3

HOLWELL SHUSTER & GOLDBERG LLP
*PRIVILEGED & CONFIDENTIAL*
*ATTORNEY WORK PRODUCT*

pursuing. Many are likely to be barred by the doctrine of issue preclusion. Others will have

*Figure: HSG: "Outright discrimination and fraud... not worth pursuing"*

34

(HSG cited res judicata based on the pro se libel case Metropolis and I brought against the CFB). HSG voluntarily withdrew my pro se Complaint about the Lawyer Ban from the EDNY.

On July 20, 2023, I was re-engaged as an expert in the opiate litigation, but this time for a separate civil prosecution involving the DOJ.



**Engagement Letter**

July 20, 2023

Re:  *United States v.*

This letter will set forth the agreement and Metropolis Pain Medicine PLLC, specifically Devi Nampiaparampil, M.D. ("Expert"), concerning the retention and use of Expert, an



This letter (this "Agreement") confirms the retention of in connection with *United States v.* pending in the United States District Court

Then on July 23, 2023, HSG filed a new Complaint in the SDNY listing the primary injury as stemming from the harsh punishment I received for calling the elected official, Jumaane Williams, "Jumaane Williams." They did not include the reason *why* I referred to the elected official by his name, and not simply his title. Without an explanation, it seemed like I wanted to bring him down to my peasant level– something odd– but that was not it. In 2021, grappling with both COVID and the lockdowns, the public was generally unhappy about the City's policies. 2021 was a municipal election year and Williams had positioned himself as a political challenger opposing the administration's policies. Most people know who the President and the Mayor are, but they may not know the Public Advocate by

35

name. When I identified Williams by name as the *incumbent* Public Advocate, a part of the administration responsible for the existing policies, that might have compromised his reputation as a challenger.

Near the start of our work together, I asked HSG– when the patients were actively being put at risk, why did the responsibility– and all the costs– fall solely on me? I asked if Section 1983 was the only remedy that applied. Kaminsky and Goldman did not answer. Then I pushed further and asked– if the practice is subjected to all these extra challenges and burdens– while we are trying to treat sick patients– why is that only my problem? What are our taxes for?

I told a story about how– before I performed x-ray-guided spine procedures– I used to ask patients how they slept. I stopped asking because, almost always, the patients would respond with some variation of, "It doesn't matter how I slept, Doctor, only how you slept." Kaminsky responded that doctors are not entitled to special relief because of their profession. I felt a shift like I had alienated them, and since I was in a desperate situation, I did not say anything more.

In November 2023, I ended my relationship with HSG. I did not feel like we were litigating the same case and I could not understand anymore how their strategy would help me or Metropolis. I attempted to defend HSG's complaint against the City's Motion to dismiss but failed. Notably, even though I was pro se, the Court denied me the pro se liberal pleading standard. Therefore, I could not raise new claims like the Lawyer Ban in my Response– as pro ses are normally able to do. Afterwards, the City argued that my counsel and I had waived all claims pertaining to the categorical denial of counsel, discrimination, and fraud, and that I could no longer raise these claims. The Court allowed me to file an Amended Complaint, but with restrictions.

In October 2023, Plaintiff became a consultant to the state on eliminating racial disparities.



**NEW YORK** STATE OF OPPORTUNITY. | **Department of Health**

| KATHY HOCHUL | JAMES V. McDONALD, M.D., M.P.H. | JOHANNE E. MORNE, M.S. |
| Governor | Commissioner | Acting Executive Deputy Commissioner |

October 16, 2023

Dr. Devi Nampiaparampil MD MS
111 John Street #2509
New York, NY 10038

Dear Dr. Nampiaparampil,

I hope this letter finds you well. I am writing to extend an invitation to you to join a subcommittee dedicated to the examination and advancement of crucial legislation designed to address racial and ethnic disparities.

In 2022, New York Gov. Kathy Hochul signed Legislation (S2987/A5679) declaring racism a public health crisis therefore, establishing the Racial Equity Working Group (REWG). Its charge is to study issues related to racism as a public health crisis and develop recommendations for legislative or other actions that can be undertaken to reduce or eliminate racial and ethnic disparities. In addition, the group will provide the governor and legislative leadership with a report of findings and recommendations for consideration later this year.

You have been identified as someone with relevant expertise which could benefit the work of the Racial Equity Working Group and, ultimately, communities throughout the state. We are inviting you to join one of our subcommittees addressing racial and health inequities. Each subcommittee will focus specifically on one of the following focus areas in the proposed legislation:

**Focus Areas**
    A. Methods for community engagement and tools for government agencies to engage with communities of color regarding healthcare services
    C. Measures to promote racially equitable hiring and promotion of employees, including in healthcare.
    D. Support of initiatives at all levels of government that advance efforts to reduce or eliminate racism.

The subcommittee you have been chosen for will focus on area D.
If interested, please share your availability for a 15-minute conversation by 10/20/23.

Sincerely,

*Figure 117: Invitation to Consult on Addressing Racial and Ethnic Disparities*

On January 9-10, 2024, the New York Police Department (NYPD) FOIL Unit denied Plaintiff's request and appeal for possible records related to an attack on her person. Plaintiff had never filed any police reports and therefore never thought to submit a FOIL to the NYPD until a professional colleague strongly encouraged her to do so.

In July 2024, Defendants forced Plaintiff to sign a pre-populated financial disclosure statement containing false numbers within their web portal, while under economic

distress. If she did not electronically sign three times to confirm agreement with these false figures, she would face an immediate statutory penalty of $10,000 for failure to file.

There was no available field to write objections or corrections. To document her objections, Plaintiff had to deliberately mislabel a pdf document as 'bank records' and affirm in that document that she was submitting the false statements under duress. Plaintiff saved time-stamped screenshots of the Plaintiff's defective web portal and of her objections.

Plaintiff is a physician who is in the habit of routinely saving and backing up medical records as well as large high-resolution image files from her interventional spine and joint procedures. The Plaintiff has backed up all the campaign's actual financial transactions and has true and correct copies of the campaign's financial records. These documents directly contradict the false numbers that appeared in the Defendants' web portal, false numbers which made the Plaintiff appear as though she had committed fraud.

On July 25, 2024, at a hearing before Judge Ramos, Plaintiff explained that she has faced years of restrictions in obtaining legal counsel. Plaintiff read the CFB's own advisory opinions on the matter and cited cases where the CFB had prosecuted political challengers for spending money on legal expenses. When the Court questioned Defendants' Counsel, Mr. Thayer, about this, while acknowledging he was unfamiliar with these references– which had been included in Plaintiff's First Amended Complaint– before he even filed a Motion to Dismiss– he still insisted that Plaintiff was wrong. Then CFB General Counsel jumped in to clarify CFB policy: "[I]f you want to spend on a lawyer and your campaign doesn't have the finances to spend on that lawyer, you can't pay for it out-of-pocket unless you stay with the contribution limit. So, in this matter, it would have been $6000." As an individual donor to the campaign, Dr. Devi stated to the Court that she had already spent $6000 in 2021.

Four days after the hearing, Defendants obtained a judgment of approximately $80,000 against Celia Dosamantes, the 2015 political challenger who Plaintiff had referenced

during the July 25, 2024 hearing. Dosamantes stopped responding to Plaintiff's emails after that.

In September 2024, Plaintiff downloaded the pleadings from Dosamantes' case from the New York State Supreme Court website and also downloaded the campaign's filings from the CFB website. In order to clarify the Lawyer Ban– and whether Plaintiff could obtain counsel for this SDNY case– Plaintiff filed a Motion to Clarify Facts presented in the hearing. Plaintiff referenced the Defendants' policy barring legal counsel, under color of law, and again referenced Celia Dosamantes' case. Defendants deleted Dosamantes' campaign expenditures from the CFB website and deleted and restricted access to the Court filings. Mr. Thayer and his clients then responded in this Court that Plaintiff was mistaken and that Dosamantes had never been prosecuted for spending on an attorney. When Plaintiff produced her own downloaded versions of the relevant files, the Defendants backtracked, stating that Dosamantes was prosecuted for her legal expenses, because she had realized a cost benefit that other candidates had not. Notably, the cost benefit was that– because she could not afford an attorney– she had a public defender rather than a private practice attorney. So she essentially sustained the CFB's financial penalty for being poor. Plaintiff notes that the Defendants acted with deliberate indifference as to Plaintiff's rights when they misrepresented facts and spoliated evidence. Meanwhile, the Defendants provided no clarification and the Plaintiff sustained ongoing injury as she litigated this matter pro se.

Also in the fall of 2024, when Plaintiff again tried to overcome the Lawyer Ban in this case, Defendants' disregarded her concerns stating that Plaintiff was free to hire an attorney for the 2021 *primary* election, knowing full well that the case being litigated pertains to the 2021 *general* election, a major difference for an Agency whose business is campaigns. Mr. Thayer then backtracked stating that that was his "typo." Again, the Defendants provided no clarification and the Plaintiff sustained ongoing injury as she litigated this matter pro se.

On or about September 27, 2024, shortly after Plaintiff filed her Letter Motion for Sanctions/ Motion to Clarify Facts Presented At the Hearing, the Defendant-City of New York launched a surprise audit and inspection of Plaintiff's medical practice, which lasted for several weeks.

In the SDNY, Judge Ramos stated during an October 18, 2023 hearing that he had never handled a case involving the New York City Campaign Finance Board. Plaintiff later identified *Brodsky v. New York City Campaign Finance Board*, a prior First Amendment case involving the CFB over which Judge Ramos had presided. Neither Defendants nor Plaintiff's then-counsel corrected the statement during or after the hearing. Plaintiff, proceeding without conflict-checking tools available to lawyers, later discovered the issue through her own research. This matters because similarly situated First Amendment challengers could have supported numerosity, pattern, and coordination, but the absence of conflict disclosure left Plaintiff unable to evaluate the court's prior exposure to related claims in real time.

*CFB Media Briefing, Access Restrictions, and Tim Hunter Admissions*
On November 15, 2024, Defendants issued a press release announcing a CFB media briefing for November 21, 2024. Plaintiff timely RSVPed and received a November 19 confirmation stating that the briefing would begin promptly at 10:00 a.m.
Around the same time, Defendants instituted or applied access restrictions requiring public-hearing participants to disclose identifying and political information, including name, political affiliation, and referral source, through RSVP forms. Plaintiff had also previously been subjected to CFB rules requiring speakers at public hearings to state protected characteristics before speaking. At the December 16, 2021 CFB hearing, Executive Director Amy Loprest opened by identifying herself as "a white middle-aged woman who is bald wearing a black head scarf" and instructed speakers to provide similar audio descriptions. CFB employees then controlled speaking time.

Plaintiff invited Dr. Anss Annie-Augustine, a dentist specializing in oral and maxillofacial surgery, to assist with camera equipment. Plaintiff also obtained an official NYC press pass from the Mayor's Office of Media and Entertainment. Plaintiff holds an M.S. from Columbia University Graduate School of Journalism, joined the New York Press Club in 2012, has contributed to Fox 5 NY since 2015, has covered hundreds of national news stories, and has had her print journalism cited in a federal Eighth Amendment decision. Dr. Augustine sought a press pass but was denied because her medical and dental research publications did not qualify her for NYC press credentials.

On November 20, 2024, at 5:40 p.m., after business hours, CFB Press Secretary Tim Hunter told Plaintiff she would not be allowed to attend, writing: "Unfortunately, this event is only open to members of the press that cover campaign finance." Plaintiff replied twice, attached her official NYC press pass, and asked whether Hunter was the final decision-maker. Hunter then reversed course and stated that Plaintiff could attend.

On November 21, 2024, Plaintiff and Dr. Augustine arrived at 100 Church Street. Dr. Augustine, who did not have a press pass, was admitted because she appeared on the RSVP list. Plaintiff, who had both a press pass and Hunter's email confirmation, was stopped by security and told she was "not on the list." Security refused entry despite Plaintiff's press credentials. Plaintiff eventually called Hunter, who intervened and allowed her inside after delay. Dr. Augustine witnessed the incident.

Inside the briefing, journalists were told they could not make video recordings and could not quote CFB staff in published articles. During the briefing, Hunter, in the presence of CFB General Counsel Joseph Gallagher, made several admissions. Hunter stated that "speech is money and money is speech" under campaign-finance law; that the CFB lacks meaningful internal or external oversight and relies on self-policing; that if the Supreme Court fully understood how the CFB operates, it would likely "eliminate" the agency; and that recent CFB rules were designed to circumvent *Citizens United*. Hunter stated that the agency had "found ways around the Supreme Court."

41

Plaintiff and Dr. Augustine both kept recordings of the briefing. Later that same day, Defendants emailed Plaintiff suggesting she schedule a meeting with Egerton, continuing the pattern of financial scrutiny immediately after Plaintiff attempted to attend, document, and report on CFB operations.

On September 15, 2024, after I had taken over as pro se representation for my case, I filed my (First) Motion for Sanctions against the City for interference with counsel. I showed in court filings that there were at least two other prior situations where the City had enforced its restrictions on lawyers and legal claims– its Lawyer Ban.

In the fall of 2024, immediately before my Response to the City's Motion to Dismiss my Amended Complaint was due, I was contacted about a 2014 medical malpractice case where I had served as a Defense witness for HHC. I was asked if I would state the same opinion I had back in 2015.



## Opioid Settlement Funds Report

Pursuant to Local Law 122 of 2022, this report discloses use of monies paid to New York City (NYC) pursuant to the New York opioid settlement sharing agreement. This report was compiled by the NYC Office of Management and Budget in collaboration with the NYC Department of Health and Mental Hygiene (Health Department), NYC Health + Hospitals (H+H), and the NYC Office of the Chief Medical Examiner (OCME).

| Total Amount of Opioid Funds Received as of the End of Fiscal Year 2024 | |
| --- | --- |
| Money in Millions | Total |
| Funds Received | $154.3 million |

| Total Amount of Opioid Funds Appropriated in the Prior Fiscal Year (Fiscal Year 2024) | |
| --- | --- |
| Money in Millions | Fiscal Year 2024 |
| Funds Appropriated | $33 million |

| Total Amount of Opioids Appropriated for the Next Four Fiscal Years (Fiscal Year 2024 to Fiscal Year 2027) | | | | |
| --- | --- | --- | --- | --- |
| Money in Millions | Fiscal Year 2025 | Fiscal Year 2026 | Fiscal Year 2027 | Fiscal Year 2028 |
| Funds Appropriated | $41 million | $48 million | $50 million | $50 million |

https://www.nyc.gov/assets/doh/downloads/pdf/basas/opioid-settlement-funds-report-09102024.pdf

*Accessed January 25, 2026*

The City Agency continued to invite me to review cases– even as my litigation with the City over the Lawyer Ban expanded and escalated. I declined all subsequent cases.



In December 2024, Plaintiff and Mary Nam wrote and submitted a Motion for Consolidation and Transfer to the Judicial Panel on Multidistrict Litigation. In January (after the holiday break), the JPML docketed it as part of MDL No. 3146. Suddenly and unexpectedly,  NYU moved to terminate Plaintiff from the faculty and terminate Metropolis's insurance contracts, even though Plaintiff had served on the faculty for approximately fifteen years and had an active faculty appointment letter.  Termination

would have disrupted care for patients with blood thinners, pre-authorizations, pending procedures, and post-operative follow-up. Plaintiff objected because the patients could not safely be transferred on short notice. NYU later rescinded the termination.



**NYU Langone Health**

Steven Flanagan, MD
Professor and Chairman
Department of Rehabilitation Medicine

January 7, 2025

Devi Nampiaparampil, MD
250 West 50th Street Apt.27a
New York, NY 10019

Dear Dr. Nampiaparampil,

I am following up on our phone conversation dated January 3, 2025 and your e-mail communication dated January 6, 2025 regarding our discussion pertaining to terminating your faculty appointment. Your communications delineate several contributions to the academic mission of the Department of Rehabilitation Medicine at NYU Grossman School of Medicine, which were not conveyed to me prior to our phone conversation on January 3. Based on this information, I have reconsidered my decision, noting your faculty appointment as Associate Professor on the clinical track and ongoing participation in the University Physician Network will not be terminated at this time.

*Letter From NYU Canceling Termination*

NYU then initiated conflict-of-interest inquiries and requested information about Plaintiff's outside activities, including work connected to litigation and advocacy. Plaintiff reported all conflicts that she was aware of. However, the Lawyer Ban left her without safe access to counsel or institutional conflict-checking tools. Plaintiff is still investigating what conflicts are injuring her in this litigation.

44

**RE: Your NYU Langone Health COI Disclosures [NYULH-COI.FID1691]**

**Nester, Adam** <Adam.Nester@nyulangone.org>                    Tue, Jan 21, 2025 at 10:36 AM
To: "Nampiaparampil, Devi" <Devi.Nampiaparampil@nyulangone.org>, "devichechi@gmail.com" <devichechi@gmail.com>

Dr. Nampiaparampil:

1. I have no knowledge of the grievance you referenced. It is the routine practice of my office (CIMU) to request disclosure from faculty and employees any time outside activities that insect with their role and responsibilities at NYU Langone Health come to the attention of my office. This is so we can account for activities, advise you regarding any intersection with our policies, and discuss any steps that may be necessary to eliminate, manage and mitigate any conflicts that arise.

2. Faculty (including non-compensated faculty) are under an ongoing obligation to disclose all outside activities as they relate to their affiliation and employment at NYU Langone Health, the NYU Grossman School of Medicine and NYU Long Island School of Medicine and ensure their activities comply. Please see the *Faculty Conflict of Commitment* policy, *Business Conflicts of Interest* policy and *Endorsement and Use of NYU Name* policies for more information. These policies are available to you on Ellucid and NYU Langone Health COI policies are available publicly.

*Excerpt From Email From Attorney In the Conflicts of Interest Unit*

NYU also published or maintained a public statement suggesting that Plaintiff did not accept insurance, despite her continuing participation in the University Physician Network. Plaintiff notified NYU that the statement was false, but minimal corrective action followed at that time.



NYU Langone Health
https://nyulangone.org › doctors

## Devi E. Nampiaparampil, MD | NYU Langone Health

Devi E. Nampiaparampil, MD does not accept insurance. Locations and App Pain Medicine, PLLC. 111 John Street, Ste 2509, New York, NY 10038 View I

*False Statement: "Devi E. Nampiaparampil, MD does not accept insurance"*

45



*Notification of Impact and Falsity of Claim*

These actions affected Plaintiff's professional standing, patient access, insurance relationships, Metropolis operations, and litigation capacity while she was already defending the CFB audit pro se.

I did not know NYU was also slated to receive billions of dollars through HHC/ The City.



On February 5-6, 2025, Plaintiff testified on behalf of NYC HHC in Queens County in a case about meniscal (knee) injuries.

Shortly before Plaintiff's Reply on the JPML Docket was due, the NYS Attorney General's Office reached out to me about acting as an expert witness on a class action Section 1983 case unrelated to opioids. I was excited about this opportunity given my own Section 1983 litigation. I had the medical expertise for the case; I wanted to learn more about civil procedures. It did not occur to me at the time that the NYS AG was involved in the opioid litigation. This case did not trigger any red flags for me because the subject matter was so different. I never had a list of parties involved in the MDL, so I was only aware of the big name Defendants I saw on the news– and I only intermittently had time to keep up with medical news outside of COVID.



**Office of the New York State
Attorney General**

**Letitia James
Attorney General**

**MEMORANDUM OF AGREEMENT (Contract)
Contract Number/Name: C107275/ Metropolis Pain Medicine PLLC
(Rochester RO)**

This AGREEMENT, by and between the New York State Office of the Attorney General, with its principal offices at the State Capitol, Albany, New York 12224 (hereinafter referred to as OAG); and Metropolis Pain Medicine PLLC with the principal office of 111 John Street, Suite 2509, New York, NY, 10038 (hereinafter referred to as CONTRACTOR).

    WITNESSETH:

    WHEREAS the OAG, in its capacity as enforcer of New York State laws, is in need of expert(s) to

47

The reports shall be submitted to the following three (3) agencies:

NYS Office of the State Comptroller
Bureau of Contracts
110 State Street, 11th Floor
Albany, NY 12236
Attn: Consulting Reporting

NYS Department of Civil Service
Alfred E. Smith Building
Albany, NY 12239

Office of the Attorney General
Purchasing Team
State Capitol
Albany, NY 12224



**Office of the New York State
Attorney General**

**Letitia James
Attorney General**

January 17, 2025

Devi Elizabeth Nampiaparampil, M.D., M.S.
111 John Street, Suite 2509
New York, New York 10038

Thank you very much.

Sincerely

LETITIA JAMES
Attorney General of the State of New York
*Attorneys for Served Defendants*

After I got the green light and completed about $60,000 of work– working approximately 100 hours per week as I simultaneously prepared for the JPML– NYS sent me a new contract. The Assistant AG told me I had to sign this new one to get paid. I was hesitant to sign and unable to have it reviewed due to the City's Lawyer Ban. So I never signed it and I never got paid.

*February 14, 2025 Enforcement Notice and JPML Pressure*

On July 25, 2024, CFB General Counsel Joseph Gallagher confirmed the enforcement structure in SDNY: legal expenses count toward contribution limits, a candidate cannot exceed the $6,000 limit, and supporters such as XJN remain capped at their donor limits. Those statements confirmed that legal, accounting, family, and supporter assistance could be treated as campaign-finance activity subject to contribution limits and later audit enforcement.

On February 14, 2025, the JPML scheduled oral argument in MDL No. 3146, *In re Mary and Devi Nampiaparampil Litigation*, for March 27, 2025. The same day, after XJN filed his federal complaint, the CFB issued a Final Audit Report and enforcement notice recommending more than $20,000 in penalties. The notice required a response by March 21, 2025 — one week before JPML oral argument — and warned that failure to respond would waive hearing rights. It also stated that CFB recommendations could change, that the Board could assess higher or lower penalties, that civil penalties could reach $10,000 per violation, and that the campaign had to continue filing disclosures.

That timing turned the audit into litigation pressure. To respond meaningfully, Plaintiff, Mary Nam, XJN, and campaign supporters would have had to gather documents, evidence, explanations, and arguments overlapping with the materials being prepared for the JPML proceeding. Responding would have risked disclosing litigation strategy, factual framing, and JPML-related work product to Gallagher and the CFB immediately before federal oral argument. Not responding would risk waiver of hearing rights and additional penalties. The same notice preserved the ongoing audit structure. Although the campaign ended on November 2, 2021 and the bank account closed in January 2022, the CFB continued to require semi-annual disclosures. Those disclosures occur only during short fixed windows, cannot be filed early or late, cannot be filed on paper, must be filed electronically, and can only be submitted by the candidate.

That structure exposed Plaintiff's family while preventing them from helping. Mary Nam remained legally responsible as Treasurer, but her assistance could be treated as an

49

in-kind or over-the-limit contribution. XJN shared joint assets with Mary Nam and could be financially affected by penalties, but he also could not safely assist with money or volunteer work without creating additional exposure for himself, Mary Nam, or Plaintiff. The February 14 notice therefore created a multi-person Catch-22: Plaintiff had to file disclosures; Mary Nam was responsible for compliance but barred from helping; XJN faced financial consequences but could not safely assist; and any legal, accounting, financial, or volunteer support could be reclassified as a contribution or violation. The notice also chilled future political participation. Plaintiff wished to run in future election cycles, but remained constrained by contribution caps, in-kind valuation rules, the risk that volunteer work would be treated as a contribution, possible penalties, the audit itself, the Lawyer Ban, and concerns about retaliation against people in her zone of interest.

Defendants' inconsistent positions deepened the coercion. Gallagher stated that legal and accounting services count toward contribution limits and that enforcement occurs post-election. In SDNY, Defendants stated that Plaintiff's family was not prohibited from retaining counsel. In New York Supreme Court, Defendants argued that campaign-finance laws restricted donors and supporters from paying for legal representation. The ambiguity preserved the same practical result: legal help was supposedly available when Plaintiff sought relief, but dangerous when Plaintiff or her family actually needed it. The February 14, 2025 notice is therefore a central example of the retaliatory audit in operation. On the same day the JPML scheduled federal oral argument, the CFB imposed a response deadline one week before that argument, threatened waiver of hearing rights, preserved discretionary penalty exposure, required ongoing disclosures, and created pressure to disclose JPML-related work product to the agency Plaintiff was challenging.

On March 7, 2025, Immediately before JPML oral argument in Charlotte, third-party attorneys attempted to schedule a conference in Plaintiff's divorce and custody proceeding involving custody of Plaintiff's children and ownership/control of Metropolis Pain Medicine PLLC. Plaintiff's spouse appeared pro se and no attorney had filed a notice

50