Third, Plaintiff challenged the incumbent Public Advocate during a City election. Making her appear less credentialed, less legitimate, or potentially fraudulent helped protect the incumbent and weakened a political challenger whose campaign message depended on medical credibility.

The CFB's treatment of Plaintiff's name and title therefore was not a minor formatting decision. It was a discriminatory presentation choice with political, professional, and litigation consequences. By deleting Plaintiff's platform, suppressing her profile, denying her "Dr." title, and later disavowing honorifics in litigation while referring to her informally or by first name, Defendants diminished the identity that made her criticism powerful. That diminishment helped the City in the election, helped deflect COVID criticism, reduced public attention to Plaintiff's opioid/whistleblower/federal-witness role, and diminished her credibility in litigation– particularly for AI systems ingesting court documents and placing greater weight on government speech.

**Follow-up about name in the Voter Guide**

**Hannah Egerton** <HEgerton@nyccfb.info>                                    Tue, Sep 28, 2021 at 2:41 PM
To: Devi Nampiaparampil <devichechi@gmail.com>
Cc: David Duhalde-Wine <DDuhalde@nyccfb.info>

Dear Devi Nampiaparampil:

Thank you for providing the details about your request. The below response is on behalf of the Executive Director of the Campaign Finance Board (CFB). As we stated in our previous communications, the CFB will print your name as Devi Elizabeth Nampiaparampil, which matches your initial submission, in our 2021 general election Voter Guide. Moreover, it is our long-standing policy that honorifics such as "Dr." are not included as part of the candidate's name. We hold all candidates to the same standards and cannot make any exceptions.

*Figure 103: Egerton and Loprest Email About Long-Standing Policy of No "Dr." Title*

**From:** David Duhalde-Wine
**Sent:** Friday, September 24, 2021 2:44 PM
**To:** Devi Nampiaparampil <devichechi@gmail.com>
**Cc:** VGSA <VGSA@nyccfb.info>
**Subject:** RE: Follow-up about name in the Voter Guide

Dear Devi,

We recognize that candidates may wish to use a name which is not the same as the name that they use to register with the CFB. This is why we allow candidates to choose the name that will appear in the Guide. This is a long-standing policy that has been in existence since late last century.

On Mon, Sep 20, 2021 at 3:53 PM David Duhalde-Wine <DDuhalde@nyccfb.info> wrote:

Dear Devi Nampiaparampil:

The Campaign Finance Board cannot change your name in the general election Voter Guide based on our rules. Furthermore, on July 20th, and in subsequent reminder emails, we sent the following paragraph in the instructions:

### NAME

Enter your name as you would like it to appear in the Voter Guide. You may use a nickname (such as Al instead of Albert, Jim instead of James, etc. for your first name). This section is just for your name — do not include any honorifics (such as "Dr.", "Esq.", or "Reverend") before or after your name. These will not be published in the Voter Guide, and will be deleted if you enter them. Note: You may describe any advanced degrees or religious affiliations in the "Education" or "Organizational Affiliations" sections.

Therefore, your name will appear as Devi Nampiaparampil in the print version of the Voter guide. It would be against current CFB policy to ever included "Dr." regardless of the name filed with BOE.

Thank you,

David Duhalde

*Figure 106: Email From David Duhalde Regarding "Dr." Title*



*Figures 105: Voter Guide Profiles for "Dr. Jeff Ascherman" and "Awadhesh Gupta"*

Case 1:25-cv-01346-JPO    Document 37    Filed 09/26/25    Page 9 of 23

up request for this information from CFB staff, Devi claimed she "was forced to provide a description" of her height, heritage, gender, age, and hair/eye color. (*Id.* ¶ 78.)

*Figure 110: Excerpt From Defendant David Thayer's Motion to Dismiss in 25-cv-01346*

### *Discrimination to Provoke Foreseeable Retaliation Against Third Parties*

In its audit of Dr. Devi For NYC, the CFB singled out donors employed by CNN and MSNBC and published their names. It also flagged contributions made by Democrat elected union leaders and other elected Democrat County Committee and District Leaders. There was nothing suspicious about these campaign contributions. The purpose of these red flags was to intimidate potential tag-along plaintiffs, to provoke third-party retaliation against those who would cross traditional party lines, and to silence dissent.

Disability Discrimination as a Third Axis of the CFB's Enforcement Regime

Disability discrimination is not separate from the CFB's viewpoint and race-based discrimination. It is the third axis of the same enforcement regime. The Defendants increased the cost of political participation, forced Plaintiff into additional uncompensated labor, and made access to courts and government processes depend on physical stamina, technical capacity, and the ability to operate without accommodations.

Plaintiff's Disability Status and the City's Knowledge

Plaintiff has been covered by the Americans with Disabilities Act since age 16, after cardiac arrest and congestive heart failure. The City has had documentation of Plaintiff's disability status for more than a decade.

Despite that knowledge, the City and CFB repeatedly imposed procedures that Plaintiff could not safely or reasonably perform without accommodations. These included physical petitioning burdens across New York City, in-person and time-sensitive filing requirements. During the campaign, these burdens were especially severe. Plaintiff was recovering from serious medical and postpartum conditions, caring for a newborn, treating patients during the COVID-19 emergency, and navigating a campaign-finance regime that restricted her ability to use ordinary resources, obtain help, or pay for accommodations with her own money. The City nevertheless treated the physical and logistical burdens of participation as Plaintiff's problem, then used noncompliance, delay, or inability to perform as grounds for further pressure.

Defendants showed deliberate indifference to Plaintiff's patients– a significant portion of whom are disabled. While Plaintiff was running around performing tedious, time-wasting, and purposely demoralizing tasks, these medically vulnerable patients went without care. The Defendants then decided to disproportionately target and burden Plaintiff's donors, most of whom were healthcare providers, pulling them away from their sick patients during a pandemic.

Disability-Based Treatment of Plaintiff's Parents

The discriminatory structure extended to Plaintiff's parents, whose impairments made the City's procedures even more coercive. Mary Nam, Plaintiff's mother and campaign Treasurer, has significant health limitations. At the time that they prosecuted her, she was hospitalized at Memorial Sloan Kettering Cancer Center having major surgery. Plaintiff's parents also have mobility and visual impairments. During the DSNY/OATH proceedings, the City prosecuted Mary Nam for approximately six months without ever serving her.

The City refused pre-hearing submission of evidence, required real-time emailing of documents, denied reasonable accommodations, denied counsel, and forced Plaintiff — a

non-attorney — to appear in Mary Nam's place. At least one proceeding required real-time document handling by Plaintiff's mother, a hospitalized patient who had just left hospice and palliative care to participate in an experimental trial.

These conditions did not just burden Mary Nam. They burdened Plaintiff directly– emotionally, physically, and financially. Because the CFB's enforcement structure made the candidate, committee, and Treasurer jointly and severally exposed to penalties, the City's refusal to accommodate Mary Nam increased Plaintiff's own legal and financial exposure. It also forced Plaintiff to perform legal, administrative, and caregiving labor under threat of sanctions.

The disability-based burden therefore served the same function as the Lawyer Ban: it made ordinary defense impossible, increased the likelihood of default or procedural error, and forced Plaintiff to intervene personally to prevent harm to her family and campaign.

The disability-based barriers did not remain in one forum.

The same structure followed Plaintiff and her family into Charlotte into the Western District Court of North Carolina proceedings. Plaintiff's parents were co-plaintiffs with mobility and visual impairments. Denial of e-filing and accessible filing mechanisms made participation substantially harder for them and for Plaintiff, who was forced to compensate for those barriers while litigating pro se. The denial of accessible filing mechanisms was not simply an inconvenience. For disabled litigants and family members with mobility and visual impairments– where every Plaintiff needed to have a hard copy signature on the same document– filing by mail, hand delivery, or hard-copy submission creates physical, financial, and logistical barriers that represented parties and non-disabled litigants do not face in the same way. When the City and CFB then used filing delays, missing records, or procedural confusion to argue against coordination or relief, disability-based barriers became litigation weapons.

The City and CFB used procedural barriers, physical burdens, and access restrictions to achieve several unconstitutional purposes:

They burdened Plaintiff's whistleblower and public-health speech by creating unconstitutional physical barriers for Plaintiff. They exploited family disability vulnerabilities to pressure Plaintiff into abandoning claims, accepting distorted procedures, or performing additional uncompensated labor. They deterred political participation by making ballot access, campaign compliance, audits, hearings, and litigation inaccessible to disabled candidates, disabled family members, and disabled supporters– knowing that Plaintiff is one of their expert witnesses on disability and has a following among that population.

The Defendants created pretexts for penalties when disabled participants could not comply with procedures that were inaccessible, time-sensitive, technically unstable, or physically impossible. This pattern reflects a municipal policy or custom. The City used disability-based procedural barriers as part of the same political-suppression regime applied to challengers, whistleblowers, minority candidates, and litigants exposing the CFB's conduct.

Constitutional and Statutory Violations

The City's conduct violated the First Amendment by burdening political participation, speech, association, and petitioning activity. It violated the Fourteenth Amendment by denying equal protection and due process through inaccessible procedures, selective enforcement, and rendering spending on safety and reasonable accommodations as illegal acts. It violated the Americans with Disabilities Act and the Rehabilitation Act by denying access to reasonable accommodations during the campaign period, which Plaintiff wanted to pay for *with her own money.*

**Coerced Legal, Administrative, and Compliance Labor**
**Thirteenth Amendment and 42 U.S.C. § 1983**

Plaintiff realleges and incorporates the preceding paragraphs.

Defendants' structure created a closed system. Plaintiff could not campaign safely without risking campaign-finance violations. She could not obtain legal help without risking in-kind contribution penalties. She could not obtain accounting help without risking audit consequences. She could not protect her mother without becoming the practical lawyer for the Treasurer. She could not protect her patients without diverting time from litigation. She could not protect her children without losing filing time. She could not prove physical injury when records were redacted or withheld. She could not coordinate with related plaintiffs when cases were missing, misfiled, delayed, or difficult to search. She could not escape the audit because Defendants called it concluded when opposing relief and ongoing when preserving obligations.

This was not ordinary regulation. It was a system in which every lawful exit was blocked, every form of help was made dangerous, and every attempt to challenge the system generated more labor, more exposure, and more retaliation.

Defendants used campaign-finance rules, audit demands, threatened penalties, and litigation positions to compel Plaintiff to perform legal, administrative, compliance, and expert-level labor without compensation and without meaningful access to counsel, accountants, consultants, or other professional assistance.

The coercive structure operated through the alleged Lawyer Ban. Defendants treated or threatened to treat legal assistance, litigation support, family assistance, donor assistance, and campaign-related professional help as campaign contributions, in-kind contributions, or over-the-limit contributions. As a result, Plaintiff could not safely obtain the assistance normally required to respond to legal proceedings, audits, court filings, regulatory demands, medical-practice issues, and corporate obligations.

Defendants simultaneously required Plaintiff to respond to an audit with no fixed endpoint, no clear cap on potential penalties, no meaningful boundary as to subject matter, no predictable interval for demands, no internal control sufficient to prevent

arbitrary enforcement, and no clear exit mechanism. Plaintiff was required to perform this work under threat of escalating legal sanctions.

The compelled labor included, but was not limited to:

1. responding to CFB audit demands, including data entry, document uploading, transaction classification, legal research, factual investigation, and communications through the CFB's proprietary systems;

2. defending against alleged campaign-finance violations, including alleged in-kind contributions, over-the-limit contributions, "cancelled" credit-card transactions, PAC-contribution penalties, and alleged reporting irregularities;

3. representing herself in litigation against the CFB after being told or led to believe that hiring counsel could create campaign-finance exposure;

4. preparing constitutional claims, motions, opposition papers, and appellate filings in state and federal courts;

5. defending or responding to DSNY/OATH proceedings while facing the risk that paying fines or hiring counsel could itself trigger campaign-finance violations;

6. participating in JPML proceedings and related federal litigation while Defendants reserved or asserted costs and while campaign-finance consequences remained unresolved or ambiguous;

7. performing work that would normally be performed by attorneys, accountants, compliance professionals, campaign consultants, political consultants, technical support staff, and litigation staff;

8. protecting her family members, including her mother and campaign Treasurer, from penalties arising out of campaign or litigation activity;

9. protecting her medical practice, Metropolis Pain Medicine PLLC, from legal, contractual, regulatory, and operational consequences while the practice was allegedly disabled from obtaining ordinary legal assistance;

10. responding to identity, banking, credentialing, portal-access, and payment-processing disruptions allegedly arising during the same period; and

11. intervening on behalf of patients, employees, family members, donors, supporters, and others when Defendants' conduct created foreseeable risks to them.

This compelled labor was not ordinary litigation burden. Plaintiff alleges that Defendants first restricted the channels through which she could obtain assistance, then used the absence of assistance to force her to perform the work herself. Defendants thereby transformed Plaintiff from a candidate, physician, small-business owner, and litigant into the unpaid administrator of the very enforcement system being used against her.

The coercion extended beyond Plaintiff personally. Defendants' structure allegedly exposed Plaintiff's mother and Treasurer to penalties; interfered with Plaintiff's ability to communicate with lawyers, accountants, consultants, and other specialists; limited Plaintiff's ability to protect her medical practice and patients; and made Plaintiff morally and practically responsible for intervening when Defendants' actions threatened others close to her.

Plaintiff performed this labor under threat of legal sanctions, financial penalties, default, dismissal, reputational harm, professional consequences, harm to her medical practice, harm to her family, and continuing regulatory exposure.

Defendants acted under color of law. Their conduct deprived Plaintiff of rights protected by the Thirteenth Amendment, the First Amendment, Article III, and 42 U.S.C. § 1983, and caused Plaintiff injury including uncompensated labor, loss of income, professional disruption, emotional distress, reputational harm, loss of autonomy, and interference with her ability to pursue legal claims and operate her medical practice.

The Defendants' regulatory regime compromised Plaintiff's liberty in the following ways:

**Coerced labor** in service of an "audit" with no end-date, no cap on potential penalties, no boundaries as to the subject matter, no boundaries in terms of the time of day or the interval period to answer, no internal controls, and no escape hatch– all under threat of legal sanctions,

**A restriction on her education and knowledge** by limiting her ability to communicate with lawyers, accountants, political consultants, and any others with specialized training or expertise including her parents and her spouse,

**An intergenerational restriction on her family's education and knowledge** by denying her child, a NYC resident, access to "universal" kindergarten and increasing Plaintiff's parental burdens; and by limiting her parents' ability to communicate with lawyers, accountants, political consultants, and any others with specialized training, even as they faced fines where Plaintiff is "individually and severally liable"

**An isolation from legal systems** via Lawyer Bans, misrepresentations through "typos" and selective omissions, fictionalization of Plaintiff's stated facts and claims, and procedural gamesmanship,

**A lack of legal recognition or remedy** including denial of meaningful access to the courts including appellate review, forced service as others' legal representative without a license to practice law (in NYC's OATH Court) and forced submission to legal processes lacking transparency or accountability,

**A denial of economic autonomy** by forcing Plaintiff to perform labor without compensation, blocking access to income, and preventing intergenerational wealth accumulation,

**Severance of familial bonds** through state interference in family cohesion, threats or retaliation against Plaintiff's family to exert control, the creation and confinement in systems designed to entrap multiple generations—ultimately-- in poverty, and an inexplicably stalled or stayed divorce and child custody case– limiting Plaintiff's ability to move, spend her own money, or to associate with her children; Plaintiff remains married to a former NYC Campaign Finance Board employee– with no end date.

**Surveillance** via excessive reporting requirements as a form of policing, demands for "screen sharing," unlawful virtual searches of Plaintiff's laptop and emails, and actors conflicted by this case embedding themselves in Plaintiff's medical practice as patients,

**Control of movement** through restrictions on speech, assembly, and movement by motor vehicle, and threats of legal action for travel (ex. A Cost action for travel to North Carolina for Oral Argument before the Judicial Panel on Multidistrict Litigation),

**Physical retaliation for resistance** including being foreseeably assaulted on the campaign trail due to a lack of basic safety precautions; working without reasonable accommodations for medical illness and being denied the ability to breastfeed her sick newborn baby—all because of unlawful spending restrictions,

**Non-physical retaliation for resistance** in the form of reputational attacks during the campaign and throughout the litigation, then amplified by artificial systems that blocked Plaintiff's ability to prescribe medications, obtain preauthorizations for interventional pain procedures, and which subjected Plaintiff to even more burdensome third-party health insurer audits,

**Erasure of identity** through forced silence during proceedings and social nullification in written communications, blocking Plaintiff's corporate medical practice, which does business as Dr. Devi Nampiaparampil or "Devi Nampiaparampil, M.D." from accessing the courts without a lawyer, blocking Plaintiff's campaign "Dr. Devi For NYC" from asserting its independent identity as a voluntary association and accessing the courts, blocking Plaintiff from either speaking or being heard publicly in numerous fora, and destroying Plaintiff's legacy– her life's work– in the field of pain management through metadata erasures and shadow bans,

**Loss of autonomy as punishment** where Plaintiff has received a request from a Judge using controlled substances for transfer into the medical practice for continuation of care, where Plaintiff has been pushed towards subversive barter systems to try to obtain legal

guidance, and where independence is punished by more intense scrutiny or control such that the system enforces servitude as a condition of survival, and–

**Moral injury** being used as a "think tank" to harm other political challengers; Plaintiff has been coerced to perform highly skilled political expert labor without pay; she has been robbed of her intellectual property, which was then weaponized against like-minded individuals, including her own supporters.

Defendants have extended their coercive conduct beyond Plaintiff herself, targeting individuals within Plaintiff's close professional and familial circles—her children, parents, patients, employees, students, trainees, and colleagues—with an evolving understanding that Plaintiff would feel both distressed and morally compelled to intervene on their behalf.

**DAMAGES**

As a direct and foreseeable result of the Defendants' conduct, Plaintiffs have endured profound and continuing injury. Dr. Devi was stripped of security, autonomy, and dignity—coerced into serving as the City's unwilling intellectual laborer, performing endless uncompensated work under threat of legal and financial destruction. Every safeguard that should have protected her—access to counsel, due process, professional stability—was systematically dismantled. She has lived under a constant state of siege, without the ability to plan for the future or to feel safe in any forum.

Both her parents, already fighting life-threatening cancers, must live with the daily fear that they will be prosecuted or ruined for reasons no one can articulate, at any moment, without warning. The entire family has spent years trapped in an environment of retaliation, where false accusations, arbitrary penalties, and the specter of arrest hang over every decision. Their home, their work, and their faith have been invaded by an administrative machine that recognizes no limits and no mercy.

Plaintiffs have lost years of professional opportunity, income, and health. They have carried the mental and emotional toll of isolation, severe embarrassment, and unrelenting uncertainty. They seek compensatory and punitive damages, declaratory and injunctive relief, and any other remedy this Court deems just and proper—to end this cycle of coercion, to restore their rights, and to ensure that no citizen ever again faces the terror of being conscripted by their own government into servitude and silence.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable, including but not limited to claims for damages, retaliation, and constitutional rights deprivations arising under the First, Fifth, Thirteenth, and Fourteenth Amendments. Plaintiffs further reserve the right to have a jury determine factual questions related to the enforcement, impact, and damages stemming from the Defendants' Lawyer Ban and related unconstitutional acts.

## PRESERVATION OF CLAIMS

The Lawyer Ban and the Knowledge Ban remain active and ongoing. Defendants' retaliatory enforcement actions have extended beyond Plaintiffs' political speech and candidacy. They have reached into family life, professional relationships, campaign supporters, and affiliated businesses. These harms are not historical—they continue to unfold in real time and reflect the expansive scope of the unconstitutional regime at issue.

To the extent certain facts support claims of retaliation, coercion, or targeted enforcement against R.T. (age 4) and A.T. (age 7), Plaintiff Dr. Devi expressly preserves those claims on their behalf. These minor children are not parties to this lawsuit. Dr. Devi, as a non-attorney pro se litigant, cannot waive or adjudicate their independent constitutional rights. Moreover, because legal custody is actively contested in a separate New York proceeding, no appearance or omission here should be construed as a waiver of their claims. All constitutional, statutory, and tort claims related to R.T. and A.T. are preserved through the age of majority and may be brought in the future under applicable tolling provisions.

Nothing in this filing should be construed to waive any claims that are not yet fully formed, or that cannot yet be brought due to constitutional, legal, or practical constraints imposed by Defendants' own conduct.

**PRAYER FOR RELIEF**

This Court now stands where others once stood. Respectfully, it can retreat behind procedural jargon, or it can say what others would not: that rights without enforcement are not rights at all — and that citizenship without access to the courts is not citizenship at all. Plaintiffs cannot afford to wait sixty years for the courts to recognize what is already plain: that the Constitution "neither knows nor tolerates classes among citizens." (*Plessy v. Ferguson*, Harlan, J., dissenting).

For this reason, Plaintiffs respectfully ask that this Court issue immediate injunctive relief enjoining Defendants from enforcing the Lawyer Ban or any related practices that compel Plaintiffs, or similarly situated individuals or entities, to appear pro se against their will, prohibit them from consulting counsel, or chill the ability of attorneys to provide legal advice. Such relief is necessary to prevent the continuation of ongoing constitutional injuries and to ensure equal access to the courts. With limited or no access to the courts, Plaintiffs and related parties are actively being feasted on by a host of governmental and third-party predators.

The Lawyer Ban would not exist but for a series of discretionary enforcement choices and regulatory structures that the City controls. Specifically, the Ban relies on:
- Restrictions on candidate spending — including those who have not accepted any public matching funds;
- Prohibitions on individual expenditures to pursue, defend, or prevent legal actions that may result in personal penalties;
- The reclassification of unpaid volunteer work as in-kind contributions;
- And the City's unilateral authority to assign a monetary value to such goods or services.

It is not a neutral or inevitable outcome of campaign finance law; it is a constructed and weaponized restraint on speech, legal access, and political participation.

This Court has jurisdiction to issue such relief because the Lawyer Ban was enforced inside the WDNC courthouse during the JPML proceedings, where Plaintiffs were compelled to appear pro se and categorically denied equal access to counsel. With this unconstitutional scheme– having been exported and applied in this District– this Court is empowered to enjoin its further enforcement, and to consider Defendants' ongoing conduct in assessing the scope of damages and equitable relief. Plaintiffs request compensatory, declaratory, and injunctive relief, attorneys' fees should they prevail over the Lawyer Ban, equitable relief, punitive damages, and any other relief the Court may deem proper. To the extent Plaintiffs assert First Amendment retaliation claims, Defendants are not entitled to qualified immunity if the constitutional right at issue was clearly established at the time of the conduct. Retaliation for protected speech has long been recognized as a violation of clearly established law.

Even after *Monell vs. The Department of Social Services* established The City of New York as the gold standard against which all constitutional violators must be measured, the City has now outdone itself– producing a new American civil rights horror story. The real question is what Dr. Devi — or her elderly parents, her small children, her medical practice serving the medically frail, or her bipartisan campaign supporters — ever did to deserve the City's four-and-a-half-year taxpayer-funded reenactment of the Stanford Prison Experiment.

**APPENDIX I: SELECT CAMPAIGN FINANCE BOARD POLICIES**

https://nyccfb.info/PDF/per/2001_PER/2001_PER_Vol.1.pdf

## TO VOLUNTEER OR NOT TO VOLUNTEER:
## HANK MORRIS AND THE HEVESI DETERMINATION

Campaigns are allowed to use (and in fact could not operate without) the assistance of volunteer workers.[5] The Campaign Finance Act, however, recognizes limits on what can be considered volunteer services. The Act defines a contribution to include "any payment by a person other than a candidate or a political committee authorized by the candidate...including but not limited to compensation for the personal services of any individual which are rendered in connection with a candidate's election or nomination without charge."[6] In Advisory Opinion No. 1989-8, the Board discussed whether certain services provided without compensation by law firm partners and associates, without charge, are contributions.[7] The Board concluded that volunteered services by a law firm partner would not be a contribution. If paid for by the law firm, however, the services of lawyers, secretaries, paralegals, and others assisting the partner in providing legal services to the candidate would be considered a contribution by the law firm. The services provided by an associate attorney would be considered a contribution unless the associate volunteered his or her own time to the candidate over and above the time normally devoted to the work of the law firm, including on *pro bono* matters. Further, goods or services that are provided at below fair market value are considered in-kind contributions.[8] In the spring of 2001, Hank Morris informally raised the question whether, hypothetically, he could provide his services to the Hevesi campaign on a volunteer basis without consequence to the campaign. He was encouraged to request an advisory opinion from the Board. The Hevesi campaign never submitted a request for an advisory opinion on this issue.[9]

[13] Pursuant to Section 394(a) of the New York City Charter, the Corporation Counsel "shall be attorney and counsel for the city and every agency thereof and shall have charge and conduct of all the law business of the city and its agencies and in which the city is interested." *See also* Charter Section 395. (*See also* "Setting the Stage for the 2001 Elections" in Chapter 1.)

*2001 CFB Policy Advisory: Explaining Why the Office of Corporation Counsel Has Consistently*

*Opposed Mayor Eric Adams and Other Elected Officials*

*-With the Goal of Shielding the CFB from Any Oversight*

[6] Administrative Code §3-702(8)(c). *See also* Board Rule 1-02 (definition of "in-kind contribution").

*2001 CFB Policy Advisory (from CFB Website) — Interpreting Campaign Finance Law to Classify Volunteer Work, Legal Advice, and Political Knowledge as Potential In-Kind Contributions*

> 8   *See* Rule 1-04(g)(3), which states: "[i]f goods or services are provided at less than fair market value, the amount of the resulting in-kind contribution is the difference between the fair market value of the goods or services… and the amount charged to the participant."

*2001 CFB Guidance (from CFB Website) — Introducing a State-Assigned "Fair Market Value" Standard for Volunteer Work and Services, Effectively Allowing the Government to Dictate the Monetary Value of Political Participation*

> 28   Advisory Opinion No. 2001-5 (May 17, 2001) (income taxes not exempt from the spending limit).

*2001 CFB Guidance (from Official Website) — Warning That Complying with State and Federal Tax Obligations May Be Treated as an Illegal Campaign Contribution for Underfunded Campaigns*

In other words, the CFB openly acknowledged — as early as 2001 — that a candidate who lacks sufficient campaign funds could be penalized or even criminalized for complying with IRS or New York State tax law. The act of paying a campaign's tax obligation was recharacterized as an in-kind contribution — and if that payment exceeded CFB's limits, the candidate could be fined or referred for enforcement. This regulatory construction forces underfunded candidates to choose between constitutional compliance and legal exposure, violating both equal protection and First Amendment principles. It also requires campaigns to know what their payroll and other tax obligations are before they have fundraised enough to hire consultants to provide them with this information.

(c)    Advisory Opinion No. 2003-1

In Advisory Opinion No. 2003-1 (February 11, 2003), the Board examined the issue of a candidate's spouse volunteering some of his time providing compliance services to the campaign, while also receiving compensation for other time spent providing compliance services to the campaign.  The result of the spouse's actions would have been significantly reduced expenditures by the candidate's campaign.  The Board rejected the notion that the spouse's activities were purely voluntary, and determined that "once an individual has been compensated for a

service, he or she may no longer be considered a volunteer for that service."  In addition, the Board explained that by paying for only a portion of work performed, the campaign would in reality be receiving services at below-fair-market value, which would result in an in-kind contribution equal to the value of the discount. [4]

*2003 CFB Guidance (from Official Website) — Authorizing Review of Spousal Volunteer Work, Communications, and Activities as Potential Campaign Contributions*

In 2003, the CFB's published guidance states that the Board may audit and assign monetary value to spousal volunteer work, communications, and shared resources — treating such contributions as in-kind donations. This has a chilling effect on candidate families, particularly when spouses possess professional expertise.

**APPENDIX II: VOTER GUIDE ANALYSIS**

Ballotpedia and the Board of Elections both post certified election results for candidates who appear on the ballot or who have been written in. Their candidate rosters and the CFB's slate do not match. For example, in the 2022 U.S. Senate race, the CFB lists the "Candidates on the Ballot" as Charles Schumer and Diane Sare. Where is Joe Pinion's name? He was the Republican candidate who obtained 42.7% of the New York State vote. Plaintiffs submit that the Defendants censored him out of their informational Voter Guide primarily because of his viewpoint, and secondarily because of his race as a Black man. After this litigation commenced, the CFB FOIL Officer, Senior Counsel Mark Griffin, emailed Dr. Devi a certified letter stating that the CFB no longer had a copy of the online General Election Voter Guide for 2022. He stated that the CFB chose not to archive any copies. Plaintiff had saved her own copy before she made the request. For brevity, Plaintiff provides just one Voter Guide comparison here: the 2022 race for U.S. Senate. As stated, there were three candidates on the ballot but only two presented to the NYC voters. The CFB Voter Guide was distributed to approximately 5 million NYC voters, who remained unaware that a Republican was even in the race. No name → no fundraising. (Plaintiffs have also downloaded the Ballotpedia and NYS Board of Elections certified results with the 2022 slate of candidates. Plaintiffs can provide these, should the Defendants raise any factual dispute).



# NYC VOTES

## U.S. Senator

⟷ **Compare the Candidates**

## What Does the U.S. Senate Do?

The U.S. Senate is the upper chamber of the U.S. Congress. Senators draft, debate, and vote on legislation, confirm Presidential appointments such as Supreme Court justices, and conduct oversight of all branches of government.

Learn more about elected offices

### ↗ Find My Poll Site

Visit the BOE website and enter your address to find your polling place

**Find My Poll Site**

## Candidates on the Ballot

See Also:

| Local Offices |
|---|
| Types of Elections |
| How to Vote |



### Diane Sare

LaRouche

**Top 3 Issues**

1. Reinstate Glass-Steagall
2. Nuclear power, not nuclear war

Share or send this page



*Figure 100: Voter Guide 2022 General Election: NYS Senate Candidates*

216. Note that Dr. Devi's campaign platform and profile were censored but her name still remained in the Voter Guide. In the 2022 Voter Guide, the political challengers' names were also deleted. For the 5 million eligible NYC voters, in addition to other members of the public, these candidates did not even exist as an option.

217. Because NYC has so many registered Democrats, only a limited number of races are contested. In 11 contested NYS Assembly races, the Republican was censored out of the Voter Guide. In 5 of the 9 contested NYS Senate races, the Republican was censored out. *Of note, the Asian, Hispanic, and Black GOP candidates were disproportionately targeted by the CFB for deletion.* Plaintiffs have prepared a summary table:

**U.S. Senate General Election (New York):**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 34 | Charles Schumer | **Joe Pinion DELETED** | Diane Sare |

**2022 New York State Senate General Election:**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 34 | Nathalia Fernandez | **Samantha Zherka DELETED** | |
| 32 | Luis Sepulveda | **Antonio Melendez Sr. DELETED** | Dion Powell |
| 31 | Robert Jackson | **Donald Skinner DELETED** | |
| 28 | Liz Kreuger | **Dr. Awadhesh Gupta DELETED** | |
| 26 | Andrew S. Gounardes | **Brian Fox DELETED** | Martha M. Rowen |

| 16 | **John Liu** **DELETED** | Ruben D. Cruz III | |

**2022 New York State Assembly General Election:**

| *District* | *Democrat* | *Republican* | *Other* |
|---|---|---|---|
| 86 | Yudelka Tapia | **Betty Obregan** **DELETED** | |
| 82 | Michael R. Benedetto | **John Greaney** **DELETED** | |
| 74 | Harvey Epstein | **Bryan Cooper** **DELETED** | |
| 69 | Daniel J. O'Donnell | **Cynthia Acevedo** **DELETED** | |
| 68 | Edward Gibbs | **Daby Benjaminé Carreras** **DELETED** | |
| 55 | Latrice Monique Walker | **Berneda Jackson** **DELETED** | Anthony Jones |
| 52 | Jo Anne Simon | **Brett Wynkoop** **DELETED** | |
| 49 | **Peter Abbate, Jr.** **DELETED** | Lester Chang | |
| 45 | Steven Cymbrowitz | **Michael Novakhov** **DELETED** | |

| 44 | Robert C. Carroll | **Brenda Horton**<br>**DELETED** | |
|---|---|---|---|
| 40 | **Ron Kim**<br>**Name but no photo or platform**<br>CFB: "This candidate has not submitted a profile" | **Sharon Liao**<br>**DELETED** | |
| 26 | Edward C. Braunstein | **Robert Speranza**<br>**DELETED** | |

218. Even if these Republicans failed to meet deadlines and even if they simply chose not to submit their candidate profiles at all, that doesn't explain what happened in Assembly District 40, where two Asian-Americans battled each other: *Ron Kim vs. Sharon Liao*. The CFB wrote next to Kim's name "This candidate has not submitted a profile[.]" If so, why is his name included while Liao's is not? If she did not submit a profile either, then theoretically (although still unconstitutionally) both their names should have been included– not his alone. Her name was hidden from the public solely because of her viewpoint. How would the millions of NYC voters know about Sharon Liao in this very close State Assembly race where just a few hundred votes could have changed the outcome?



*Figure 101: Ballotpedia Summary of 2022 Kim vs. Liao NYS Assembly Race*

# NYC VOTES

## State Assembly District 40

⌐ Compare the Candidates

## What Does the State Assembly Do?

The State Assembly is the lower chamber of the State Legislature. Assembly Members write and vote on legislation, approve state spending levels, and uphold or override the Governor's vetoes.

Learn More About Elected Offices

## Candidates on the Ballot



### Find My Poll Site

Visit the BOE website and enter your address to find your polling place

**Find My Poll Site**

See Also:

**Local Offices**

**Types of Elections**

**How to Vote**



*Figure 102: Voter Guide 2022 General Election: State Assembly District 40*

219. Defendants wanted Ron Kim to beat Sharon Liao given his political viewpoint. However, since he was Asian-American, according to their philosophy, he still needed to be censored so he would not go on to later challenge one of their preferred white male incumbents.

220. *No neutral election authority deletes only the challenger in a close race. This is not an error– it is a message.*  Deleting Liao and deleting Dr. Devi from their respective guides had similar effects. The CFB denied them their right to free speech and their supporters and the public's right to listen and to assemble around like-minded candidates to organize a campaign. Educated voters might use the CFB's "Compare the Candidates" and "Add to My Ballot" functions to plan out their voting choices before going to the polls, as they were encouraged to do in countless CFB-placed TV and subway ads. Under the color of law, the CFB misled voters into thinking there were no Republican candidates in these races, so that supporters would stay home and forgo voting.

221. The only entity legislated to provide an accurate roster of the candidates' names is the CFB. A reasonable person would believe the heading "Candidates on the Ballot" is all-inclusive. If so, that person would also assume someone not included in the CFB's Guide asking for money in the form of campaign contributions, must be a con artist. After being excluded from the voter guide, Dr. Devi received hundreds of those accusations from members of the public– to her face, through her family, through her medical practice's receptionists and answering services, and through online trolls.

222. Moreover, a member of the public– without knowing candidates' names–  cannot research those candidates' platforms, contribute to their campaigns, or contact them about fundraising or volunteering. Individual candidates, particularly challengers, cannot reach millions of voters without first having funding and workers, which is why the legislature put the onus for voter education on the CFB, and not on candidates. Without having their names and platforms promulgated to voters, candidates also cannot reach the CFB's threshold requirements for matching funds. This is a self-perpetuating loop.

223. Notably, the CFB censored two Democrats in this 2022 Guide: John Liu and Bill Thompson. In 2014, John Liu sued the CFB for violating his First and Fourteenth Amendment rights, stating the CFB discriminates against Asian-Americans (Liu v. N.Y.C. Campaign Fin. Bd., No. 14-cv-1687 (RJS) (SDNY Mar. 31, 2015). Liu lost in part because there were no similarly situated candidates. He was a "class of one," being the first and only party-endorsed Asian-American nominee on the citywide general election ballot. Upon information and belief, Dr. Devi is the second. After being canceled from the 2022 guide, Liu barely retained his seat in office.

224. Of note, John Liu and Bill Thompson were also prosecuted in OATH Court over illegal signs before Mary Nam. After they lost their respective elections, both received penalties of over $500,000 (See David Seifmah. City upholds decision ordering John Liu to pay $527K for illegal campaign posters. NY Post (July 2, 2012)).

225. Meanwhile, Bill Thompson set in motion a public corruption investigation involving Defendant Schaffer, who now Chairs the CFB. According to PSC-CUNY.org, "The ongoing federal probe at City College led CUNY Board of Trustees Chairperson Bill Thompson to commission an investigation led by [the] State Inspector General... to look into what he called 'waste, fraud and abuse and any unethical or illegal activities.' (Clear the Books, Bill. NY Post (October 3, 2012)). Two top CUNY officials left their posts after the inspector general published an interim report... [The second,] Defendant Schaffer, then-CUNY's general counsel, who was criticized in the report investigating embezzlement of public funds, announced his retirement after the investigation went public. (https://psc-cuny.org/clarion/2017/april/cuny-probe-widens/)

226. Schaffer became President of the Legal Aid Society, but his tenure was brief. Protesters claimed Schaffer was directly responsible for initiating and enforcing discriminatory policies at the City University based on health & disability, and separately, based on race and religion. According to the City's own public records, Schaffer's wife is a registered lobbyist whose non-profit actively lobbied elected officials to change rules regarding the need to disclose lobbying efforts. At the same time her non-profit was

communicating with these elected leaders, Schaffer made matching funds determinations for those same elected leaders. According to public records, Schaffer also personally lobbied the Civilian Complaint Review Board (CCRB) during the 2021-2022 election cycle. Although he did not register himself as a lobbyist or log his activities as he was required to do, the CCRB registered his communications as lobbying efforts.

227. In any case, shortly after Bill Thompson called for further investigation, Defendant Sanitation saddled Bill Thompson and his campaign with over $500,000 in fines and violations related to illegal campaign signs, mirroring Mary Nam's experience.

228. Peter Abbate, Jr. chaired the NYS Committee on Government Employees, an oversight committee. After he was censored from the CFB's Voter Guide, he lost the 2022 race and left office. Discovery is needed as to what projects he was working on before he lost.

229. The Voter Guide for the 2022 U.S. Congressional General Election poses a twist.

**2022 U.S. Congressional General Election:**

| District | Democrat | Republican | Other |
|---|---|---|---|
| 6 | **Grace Meng** **DELETED** | Thomas Zmich | |
| 7 | **Nydia Velazquez** **DELETED** | Juan Pagan | |
| 10 | Daniel Goldman | **Benine Hamdan** **DELETED** | **Steve Speer** **DELETED** |
| 15 | **Ritchie Torres** **DELETED** | Stylo Adonis Sapaskis | |

230. Plaintiffs submit that the Republicans were deleted for their political views. But why were three prominent incumbent Democrats deleted? In 2022, there was a *redistricting* debate. The 2022 Congressional District Map shows that three Democrats had the potential to take voters away from the DSA-endorsed candidate, Alexandria Ocasio-Cortez (AOC). These three Democrats were the three deleted candidates for office: Grace Meng, Nydia Velazquez, and Ritchie Torres. They were campaigning on contested Congressional District borders. Plaintiffs submit that the CFB acted knowingly and deliberately to conceal any information about AOC's opponents from NYC voters, to ensure AOC would capture the full voter turnout. As a side note, at one point, Celia Dosamantes was an aide to Grace Meng, and may have fallen within the Congresswoman's zone of interest.

## APPENDIX III: INTERFERENCE WITH METROPOLIS' OPERATIONS:
### (From Plaintiff's OIG Complaint)

A.  <u>Disruption In the Ability to Order Medications</u>

In 2019, I joined Allergan's Speakers' Bureau on migraine. To be clear, I have never spoken or consulted for Allergan on controlled substances. At the time, I was completely unaware of Allergan's involvement with opiates I was familiar with the company because I had been injecting Botox mostly off-label for over 15 years– *before* ever becoming a speaker or interacting with the company representatives– for patients experiencing spasticity from strokes, spinal cord injuries, traumatic brain injuries, cerebral palsy and other similar neurologic conditions. I have never discussed any of this off-label use of Botox with Allergan or AbbVie. Rather, in my residency and fellowship training at Massachusetts General Hospital, Spaulding Rehabilitation Hospital, Children's Hospital of Boston, and Brigham and Women's Hospital, I saw excellent results and I chose to continue when I joined the VA and treated veterans returning from Iraq and Afghanistan with severe spasticity. Later, when Botox was FDA-approved for chronic migraine, I began using it for that indication as well. I had good outcomes with ubrogepant (Ubrelvy), a CGRP receptor antagonist, and began prescribing it more. Then the company hired me as a speaker on migraine. On May 15, 2020, I was told that AbbVie had acquired Allergan and that my contract would continue. In 2021, my contract was renewed.

### SPEAKER AGREEMENT

THIS SPEAKER AGREEMENT ("Agreement"), effective October 10, 2019 ("Effective Date"), is by and between **Allergan USA, Inc.,** with a place of business located at 5 Giralda Farms, Madison, NJ 07940 ("**Allergan**") and **DEVI NAMPIAPARAMPIL, MD, MS,** located at 111 John Street #2509, New York, NY 10038 ("**Speaker**").

WHEREAS, Allergan is in the business of developing, manufacturing and distributing pharmaceutical, biotechnology, medical device and skincare products and wishes to conduct one or more speaker programs (each a "**Program**") relating to Ubrogepant (the "**Product(s)**") or unbranded material (collectively, with Products, the "**Material(s)**");

On August 8, 2022, I filed the Ex Parte Motion with Justice Shlomo Hagler asking to represent myself pro se in my First and Fourteenth Amendment case. (101118/ 2021). Judge Hagler denied my Motion. It was illegal for me to proceed with an attorney. He

closed the case. I took my Motion and started repackaging it as a Complaint, which I later filed on October 20, 2022.

Around the same time, I started noticing problems with our account. Neither Metropolis nor I could place Botox orders through the Allergan portal or over the phone. My staff spent a significant amount of time trying to correct this issue, but was unsuccessful. I was able to obtain Botox by purchasing from colleagues and by ordering outside of "buy and bill" procedures.

About a year later, we tried to remove the block again. On August 3, 2023, days after HSG had filed the Complaint in the SDNY, I was informed that my account had a "DNS" Do Not Sell (?) "overall block" on it and that was why I could not place any orders.

--------------- Original Message ---------------
From: Akintode, Ayo A [ayo.akintode@allergan.com]
Sent: 8/3/2023 10:39 AM
To: ir-customermaster@allergan.com
Subject: account# 59788413

This account has an DNS overall block and they want to place an order, could this be removed and could them be notified if it is or if there is anything else they need to do

Devi nampiarparampil
Email: devichechi@gmail.com<mailto:devichechi@gmail.com>
[cid:image001.png@01D9C607.7CF65750]

Ayo AKintode
Customer Experience Representative I

None of the representatives could figure out what the "block" was for, but then through my repeated calls to AbbVie/ Allergan Customer Service, I learned that there might be a location issue. A representative told me that the notes about my location did not match the NYC address I was trying to have the medication shipped to.

--------------- Original Message ---------------
From: Arduini, Isabella M [isabella.arduini@allergan.com]
Sent: 8/3/2023 12:43 PM
To: ir-customermaster@allergan.com
Cc: kate.liburd@allergan.com
Subject: Account 0059788413

Hello,

I have account ship to 0059788413 who has an alignment issue on their account with the sold too not being attached to the ship too. I know the account has reached out to credentialing already but wanted to get a status update on this issue/ see if there is anything I can relay to the account on my end.

Thank you! ?

SOLD_TO_0059788413

Ship-To Account ID: 0059788413

DEVI NAMPIAPARAMPIL MD

We went through numerous time-wasting tasks to try to resolve this issue, sending identity verification, licensing, and other paperwork for Metropolis' New York address. Allergan informed me that the information I was sending about NYC did not match their records. Then one representative said that the company's notes stated that I was blocked because of my activity in Ohio. But my ship to/ bill to/ licensure were all in New York. I emailed back that my medical practice was located in New York– *not Ohio.*

Devi Nampiaparampil <devichechi@gmail.com>                    Mon, Aug 14, 2023 at 6:02 PM
To: "Arduini, Isabella M" <Isabella.Arduini@allergan.com>

Hi Isabella,

Thanks for your help! I was able to view that document but not save it properly so I took a screenshot and saved it. I'm attaching everything here. None of the information about my practice has changed at all. I am the owner and the medical director and my contact info is all the same. I have no offices in Ohio-- it's all here in New York.

Devi

My only activity in Ohio had been related to MDL #2804, consolidated and transferred to the Northern District of Ohio Eastern Division, where AbbVie was a Defendant in the opiate litigation. But since I had not disclosed my status as a federal witness, and since I did not associate this web portal "DNS block" with MDL activity, I did not consider a possible link at the time. My staff and I continued to spend time with AbbVie on futile attempts to resolve the block– mostly while we were short-staffed due to COVID and

NYC's lockdowns. I informed AbbVie of the harm to my practice and my patients who relied on the medication.

Devi Nampiaparampil <devichechi@gmail.com>                Thu, Feb 8, 2024 at 9:46 AM
To: "Arduini, Isabella M" <Isabella.Arduini@allergan.com>

Hi Isabella,

Good morning. I'm reaching out about my Botox account. I had wanted to place an order several months ago but there was an issue with my account that we spent several days addressing. You were so helpful! I didn't get to place the order because the patient got tired of waiting and decided to transfer all her care to another provider.

The same thing happened to me months before that.

And now another patient has come to me for treatment and I'm trying to place the order but the screen says there is a problem with my account. There is nothing wrong my medical license, my DEA, etc. I've never been sued or had any professional issues. I haven't even changed my office address in the past 8 years. I know this is not your fault but can you please fix this asap or send us a sample of 200 units of botox asap? The patient is coming in on Tuesday morning. I don't want to lose another patient that is coming in for Botox plus other treatment. It's harmful to the practice and I've done everything Allergan/ Abbvie has asked me to do.

I'm attaching a screenshot of the latest block. I'm blocked on both Botox cosmetic and Botox for chronic migraine.

Thanks.
Devi

*I use Botox Therapeutic, but as a workaround, tried ordering Botox Cosmetic. Neither worked.

On December 12, 2022, days after I filed my Response to the City's Motion to Dismiss Metropolis' and my Libel/ Disparagement of a Commercial Entity case before Judge Ramseur, I received my last payment from AbbVie's Speakers Bureau. Then I was terminated without cause and without notice.

Between mid-October 2022 and mid-February 2025, my office staff, associated independent contractors, and I were put through a series of bureaucratic, time-wasting and ultimately futile tasks to try to order Botox for the patients. No matter what we did to prove my good-standing as a physician, the customer-facing portals always read that Allergan/ AbbVie could not locate our existing account. And AbbVie would not allow us to open a new account.



*Allergan Direct Web Portal: "There is a problem locating your account."*

Allergan denied orders for years and my patients were forced to seek treatment elsewhere—often inappropriately– because I had no way of explaining why I could not obtain the medication they needed– or when the problem would be resolved. To protect the patients, I asked colleagues to order on my behalf, paid for medication out-of-pocket, and hired additional staff to travel to those other medical practices and transport the medications– on dry ice– back to my office. These workarounds eventually became unsustainable. Despite multiple years of inquiries, neither Allergan nor AbbVie provided resolution. I am including one example here:





As above, the names on the orders needed to be for a *different* physician and *different* medical practice. The shipping address also needed to be to a *different* medical practice. However, Allergan did allow the name on the credit card payment to be mine, so I would routinely pay for the medication. I think the whole thing looked very suspicious– but

thankfully, after decades of holding myself to extremely high standards– no medical practices questioned what I was doing shipping Botox elsewhere, even if they may have secretly wondered what was going on.

Since Metropolis could not hire a lawyer or access the courts, I turned to the Better Business Bureau (BBB) for assistance and Abbvie responded to Complaint ID 21271136:

 "... We were able to locate his account... An old case was found indicating there was a block on the account at one point which has been resolved. Currently there is no block on the account and the customer can place orders."

On Monday December 8, 2025 at 3:36pm, I also responded to the Chicago BBB, writing:

"Abbvie's response still does not satisfy my concerns. I am a physician and the owner of a medical practice who was ordering and using Abbvie's products to treat patients with traumatic brain injuries, spinal cord injuries, spinal disorders, migraines, and other refractory pain conditions with Botox. I was not using the medication for cosmetic purposes-- nor was I ordering any controlled substances. Over the past 15 years, I have accumulated a large number of patients with these conditions. To suddenly and arbitrarily be "blocked" from ordering these medications with absolutely no explanation given was unsafe for patients and it harmed my practice. Patients thought that I had done something extremely wrong that I would be "blocked" from prescribing or ordering medications even though I have never been accused of any misconduct whatsoever. This is not a matter that was resolved quickly. I spent *years* contacting Abbvie Customer Service, ultimately referring patients out of my practice, which was very costly and damaging to both the practice and my reputation, and then ultimately asking physician-colleagues to order the medication for me, paying for it using my credit card, and then paying contractors to travel to other practices to pick up the medication. This is not a normal means of ordering medications. Abbvie removed the "block" -- again without explanation-- and says that the issue is now resolved. It's true I can now order their medications but that does not erase the harm caused..."

On December 9, 2025, an individual from Allergan's Division in Texas reached out to me claiming he wanted to resolve the issue. However, during the conversation (on or about December 15, 2025), he denied that there was ever a block on the account, and asked me– if I believed there had been an issue– to compile and send all of my documentation on the matter for his review. He made absolutely no representations he would do anything to ease the burden imposed on Metropolis with or without the documentation..

### B. _Interference In Ability To Prescribe Controlled Substances_

In December 2024, I abruptly lost the ability to electronically prescribe controlled substances — a requirement under NYS law. I spent weeks trying to identify the cause. I have always been in good standing with the DEA and all state and federal medical licensing boards. To my knowledge, no pharmacy has ever reported me for inappropriate prescribing.

I am a Harvard-trained, board-certified physician in four specialties: Physical Medicine & Rehabilitation, Pain Medicine, Sports Medicine, and Hospice & Palliative Medicine. I manage thousands of patients with refractory pain, including those with cancer, spinal cord injuries, HIV-related neuropathy, and other complex conditions. I prescribe controlled substances only when the benefits clearly outweigh the risks. I have never been investigated or sanctioned for prescribing and am frequently invited to speak and teach about responsible prescribing.

New York requires two-factor authentication for all e-prescriptions of controlled substances. The process involves logging into the electronic medical record (EMR), entering a password, and confirming a numeric code sent via an app on a registered smartphone. When my access failed, CureMD (our EMR vendor) and Dr. First (which interfaces with Experian for identity verification) informed me that Experian had flagged me as too suspicious for two-factor authentication by phone. I needed a code– which I could only receive by mail– and only once I had that code, could the entire system reset. Without that, I could not prescribe.

Despite passing every identity-proofing test I was given, no one at any of the companies involved could explain the flag or remove it. I spent over a month trying to resolve the issue, contacting Experian, CureMD, and Dr. First repeatedly — all while still caring for patients with severe pain. This fintech failure had devastating real-world consequences:

- My sickest patients, including those with late-stage cancer, were suddenly unable to receive the prescriptions they depended on.
- I could not ask a colleague to "cover" as I had done with Botox — opioids are too heavily regulated and in 2025, it would have looked very suspicious
- I could not send these patients to the Emergency Room, since Emergency Medicine physicians cannot prescribe 30-day supplies of opioids.
- Many patients lacked the mobility, finances, insurance coverage, or access to go elsewhere. These are medically complex patients and I am in solo practice. If they tried to go between medical practices, that alone could have raised compliance concerns.
- I attempted to coordinate backup care through their other treating physicians– at Memorial Sloan Kettering and NYU Langone, for example– but those physicians explained the patients would have to be admitted to the hospital to manage this level of complexity: cancer, HIV, spinal cord injuries, pulmonary emboli and blood thinners, sleep apnea, etc. all in the context of severe refractory pain.

For weeks, I resorted to writing paper prescriptions, then personally traveling to pharmacies with my phone to prove the authentication issue to skeptical pharmacists. This eliminated all telemedicine options for my most mobility-impaired patients. They had to come in-person to pick up the hard copy prescription. To limit risk and confusion, I consolidated affected patients to a small number of pharmacies where pharmacists had already verified my story. But even though this was a tech failure, not a licensing issue, the result was the same: the entire ecosystem began treating me as suspicious — including pharmacists, colleagues, vendors, and perhaps even some patients. I had all the necessary credentials — a DEA registration, a valid medical license, and decades' long prescribing

history — yet I could not overcome the invisible red flag that prevented my EMR from authenticating my identity.

Of note, the medically vulnerable and disabled patients who were used to mail order prescriptions had to switch to in-person visits to the pharmacy as well. OptumRx Home Delivery and Express Scripts refused to fill paper controlled substance prescriptions– even if there were overwhelming technical difficulties. And the patients– who are disabled– were forced to make in-person visits because others cannot sign on their behalf for receipt of controlled substances. I am including some representative emails to demonstrate how the problem spanned across numerous web platforms– with almost all of them claiming that there was some sort of identity proofing issue on my part.



## Rate your experience with CureMD Support



**Excellent**          **Average**          **Bad**

**Description:**

Hello,

Hope all is well. I am writing about my Cure MD e-prescribing ability. I haven't been able to prescribe controlled substances and first called Cure MD on January 2, 2025 to resolve this. I did the ID.Me verification process and *passed.* Nevertheless, I received a notice that I had to receive a token in the mail and verify my identity that way. I have done that 3 times, passed the identification every time, and still been unable to access the system and e-prescribe. I am very concerned for both my patients and now for my career, as this presents a medical malpractice concern and an interruiption in my business.

I have also noticed I cannot login into Cure MD through google chrome. I have spent a lot of time dealing with both Dr. First and with Experian about all the identity issues and neither one is sure what the issue is. I wanted to make sure this is not a problem with Cure MD, especially since Cure MD is not giving me access to the site unless I use Edge.

# Prescriber token disablement notification Inbox





Summarize this email

D   DO-NOT-REPLY-EP...  Jan 27  ☺  ↩  •••
   to me  ⌄

Dear Dr. NAMPIAPARAMPIL,

Please be advised that a two factor authentication token that was active for your account in the EPCS Gold system has been de-activated, and may no longer be used.





On January 27, 2025, I emailed CureMD Support (Ticket S506904). I also posted publicly, as I could not get Experian to explain the block or remove it. Nor could I navigate the

Experian phone tree to find someone who understood two-factor authentication for controlled substances.



*Excerpt From Tweets to Experian*

I have been prescribing medication since I completed medical school in 2002 but the system was treating me as though I had never been approved to prescribe medications before at all.



*Figure: Excerpt From January 27, 2025 Email*



*Figure: Email to Cure MD EMR Support*

This circular procedural loop continued for weeks– with each tech company pointing at another one– and most of them referencing the DEA, which made no sense since my federal DEA registration and NYS medical license were both intact with no restrictions and no change in status. This wasn't just a technical glitch — it was a compliance failure with real human cost. The system treated me as though I had never been authorized to prescribe at all. My practice and reputation were harmed, my patients suffered, and no one — at any level — took accountability.

I have treated children dying with severe cancer-related pain where the parents stole the children's opioid pain medications for themselves. As a mandatory reporter, I was obligated to report child abuse because of the children's suffering. I have also treated elderly cognitively-impaired patients where their adult children brought them in for pain medication for purported falls, and then stole that medication from them afterwards. I typically alerted case management and social work about potential elder abuse. What is the difference here? The patients are already in severe pain. That is why they have a pain physician. The City first increased the length of the suffering by taking up my time– interfering with my ability to offer appointments– and then some unseen actor prevented the patients from obtaining the medication they need to alleviate their suffering.

### C.  *Implied Requests For Controlled Substances: Denials Followed By Adverse Actions*

Between April 11 and April 16, 2025, shortly after the JPML denied our Motion for Consolidation and Transfer in MDL #3146, an individual contacted Metropolis trying to obtain an appointment. Spontaneously, he volunteered that he was a NYS Supreme Court Judge.



*Automated Telemedicine Transcription; Person Requesting Appointment*

One of the independent contractors who works with Metropolis returned the call and described the encounter. Her note is also time stamped in Metropolis' records.