April 21, 2025

███████████ left a voicemail on 4/11/2025 asking to schedule an appointment with Dr. Devi. I returned the call on 4/13/2025 and he informed me that he would call us back because he was attending to another matter.

The following day, ███████ left another voicemail. When I returned the call, he informed me that he is a New York State Supreme Court Judge. He also disclosed that he is currently using a low-level controlled substance for his pain and that his current pain physician has left the practice. Therefore, he is looking for a new physician to treat his back pain. He told me he was referred by his physical therapist to see Dr. Devi.

During this conversation, I obtained his insurance information. I did not check i-stop because of a technical difficulty. I later informed Dr. Devi of the request.

Dr. Devi expressed concern about a potential conflict of interest, as she currently has a case under review in the New York State Supreme Court. To avoid any appearance of bias or impropriety, she advised against scheduling the appointment and offered to explain to the physical therapist.

I called the Judge back and explained the situation respectfully. The patient stated that he understood and appreciated the transparency.

Anss Annie-Augustine

After I learned of this encounter, I advised Ms. Augustine *not* to verify the insurance information and *not* to check the New York State controlled substance/ prescription drug monitoring "i-stop" registry. I explained that neither I nor Metropolis wanted to establish any type of patient-physician relationship with the Judge. I also checked the caller ID and the NYS Supreme Court roster to verify that this individual actually was a judge. He was. He was never given an appointment and Ms. Augustine documented the events in a contemporaneous time-stamped email to herself. I advised her not to put any documentation in the electronic medical record– so as not to create the appearance of any patient-physician relationship.

I have treated patients who are judges before, so it was not the profession that concerned me — it was the timing and content of the initial phone call that stood out. When new patients call our practice, they typically ask about insurance coverage, appointment

availability, medical conditions treated, or whether specific procedures are offered. They may also mention how they were referred. In general, they do not lead with details about their employment unless directly relevant (e.g., workers' compensation).

In contrast, this caller identified himself as a Judge from the same court where I had three open cases: one before Judge Hagler, another before Judge Ramseur, and a third (less contentious divorce matter) before Judge Pearlman. He also mentioned that he was referred but declined to name his referring provider — a physical therapist — which is unusual in my experience.

More concerning, he raised the topic of controlled substances during this initial outreach with the front desk. In my experience, most patients do not volunteer that information upfront — even those seeking prescriptions — due to fear of being labeled or denied treatment. The story itself also raised concerns. In New York City, where competition among practices is high, patients are rarely "abandoned" — even when a physician leaves a group. Unless the physician's contract specifically allows them to retain their patients, the original practice typically continues treatment. In this case, the disclosure was unsolicited and came early in the conversation, and the explanation for seeking a new pain physician did not align with how these transitions normally occur. and it all occurred in the context of someone likely to be aware of my claims that I was under a selectively enforced Lawyer Ban. That made the whole situation difficult to interpret without the benefit of counsel. As a licensed pain physician, I am required to make . treatment decisions in compliance with both medical and legal standards. If I had taken the Judge on as a patient and declined to prescribe, I could have been viewed as withholding a medically appropriate treatment. If I had prescribed, I could be accused of doing so improperly — particularly if there were any perceived conflict of interest.

Given the nature of the contact, the pending litigation, and the lack of a formal appointment or established patient-physician relationship, I do not believe HIPAA protections attach.

On or about April 21, 2025, Metropolis declined to take the NYS Supreme Court Judge on as a patient or to review the controlled substance situation.

<u>On April 24, 2025,</u> Judge Hagler denied my Motion for Vacatur in NYS Supreme Court Case 101118. As a result, the Lawyer Ban remains in effect. (The Appeal is ongoing in the First Department (Cases #5351-2025, #5331-2025, and #5332-2025)).

<u>On April 29, 2025,</u> Judge Ramseur denied Metropolis' and my Motion for Vacatur in NYS Supreme Court Case 159019/ 2022. As a result, the Lawyer Ban remains in effect. (The Appeal is ongoing in the First Department (Case #4148-2025)).

<u>To date (January 29, 2026),</u> Justice Pearlman has not issued any ruling on my Motion for a *Default* Judgment of Divorce in NYS Supreme Court Case 30068-25, filed in March 2025. As a result, my husband and I remain married even though we do not want to be. We have generally been in agreement on all matters and are following a 50-50 custody arrangement, which was submitted to the court in March 2025. The Court has not approved it. No action has ever been taken by the judiciary in this case, which was opened in January 2025. I remain at risk of losing all custody in this proceeding. (Notably, my husband is a former City employee– also a potential tag-along plaintiff in MDL #3146).

Most importantly for the SBA, even though we are both listed as pro se, third parties have filed a brief for him to obtain full custody of the children *and ownership of Metropolis*. If I lose ownership of this medical practice, the new CEO will likely withdraw Metropolis as a plaintiff in all litigation and the small business will lose any chance at enforcing its rights.

The case is listed as contested. For clarification, I was told by the Clerk that Default cases are often categorized as Contested when the spouse has not submitted an affirmative letter in support of the Divorce action. The third-party lawyers contesting the action tell me that they are representing his interests, but why are they only telling me– and not the courts?

The proximity in timing between my refusal to engage in a controlled-substance-related patient relationship with a sitting judge and the sudden unfavorable procedural outcomes in multiple Supreme Court cases raises serious concerns.



*Timestamped January 26, 2026 → Both parties are still unrepresented/ pro se litigants.*

### D. _Interference With Mail Delivery and Identity Verification_

The problems with identity verification extended beyond digital systems. In the summer of 2025, the U.S. Postal Service (USPS) stopped delivering mail to my home address for approximately six weeks. This disruption interfered with my ability to pay bills, receive insurance and credentialing paperwork, and obtain time-sensitive practice-related notices. To resolve the issue, I initially submitted a change-of-address request from my home address to the same address — an attempt to "restart" delivery. USPS rejected the request because the origin and destination were identical. I then attempted to forward my mail from my home address to my office. However, USPS required identity verification through a two-factor authentication code — which could only be sent by mail to the same address where I was not receiving mail. I then tried to set Informed Delivery so I could determine whether the problem was at our local post office or elsewhere but had the same issue.

**You have successfully requested an invitation code!**

We have received your request for an invitation code to access Informed Delivery features for your mailing address. Your invitation code request is being processed and will be sent via First-Class Mail®. Please return to your Preferences page to enter the invitation code once it has been received.

_USPS Requiring Mail-Based Identity Verification_

This circular loop — requiring me to receive mail in order to fix the fact that I wasn't receiving mail — was never formally explained by USPS. I went to the local post office three times to resolve the issue and try to find the missing mail. No resolution was ever provided. Yet mail delivery resumed around November 2025, after I contacted the USPS OIG, and Informed Delivery began. This was not a minor glitch. At a time when Experian and other entities were already flagging my identity, the inability to receive physical mail compounded operational barriers for my practice, created delays in regulatory correspondence and bill payment, and contributed to the broader pattern of systemic identity disruption undermining Metropolis.

### E. *Interference In Ability to Pay Bills: To Maintain Malpractice Insurance Coverage*

I have been practicing medicine since 2002. I have never been sued for malpractice. Nevertheless, as a physician affiliated with a university medical center, I am legally required to carry both malpractice insurance and "excess" malpractice insurance because I treat a medically high-risk population. During the period in which USPS mail delivery to my home was disrupted, I experienced a near-loss of malpractice insurance coverage due to missed billing notices. My malpractice carrier sent critical correspondence via USPS. Because I could not reliably receive mail or forward it, I was placed at risk of involuntary policy termination despite being in good standing.

To be clear, my insurer has consistently worked with me and has actually gone out of its way to help resolve some of my identity verification issues. However, the fundamental problem was access: I could not receive the physical mail. As a result, I was nearly stripped of malpractice protection through no fault of my own.

Hi Dr. Nampiaparampil ,

The attached correspondence was returned as undeliverable can you please confirm if a change in mailing address is required.  The company did receive your payment on 8/26/2025.

9/8/2025 8:36:55 AM Batch: 9412023





*Excerpts From Email Conversation With Malpractice Carrier*

The mail says it is "unable to forward" to a new address– because I have never moved from my current address. I have been living here for about five-and-a-half years. This was

not a clerical inconvenience. Malpractice insurance is a legal requirement for clinical privileges at nearly every hospital, surgical center, and outpatient facility. Loss of coverage would have rendered me ineligible to practice in most institutional settings, and I would have been personally liable for any and all malpractice claims. I would have been responsible for all legal defense costs. Even a temporary lapse in coverage can trigger downstream consequences, including credentialing delays, license investigations, and third-party contract terminations.

USPS's inability to deliver time-sensitive notices — coupled with the broader identity verification issues I have described — created a direct threat to my licensure, my practice, and my patients' continuity of care. All of these identity issues escalated as my litigation escalated.

F.  ***Heightened Risk of Malpractice and More False Representations in Court***

In our pleadings before Judge Ramseur in 2022, I explained that the patients were at risk. I argued that Metropolis and I could also be sued for malpractice simply because of the reputational harm the City had created with its false negative statements and innuendos about me. *Because the Lawyer Ban prevented me from hiring an attorney* to represent Metropolis, I asked to represent Metropolis myself. The City's attorney enforced the Lawyer Ban and simultaneously argued that I should not be allowed to represent the corporation pro se. She presented a false argument that Metropolis's corporate shield insulated me from medical malpractice. By this false logic, almost all doctors– including those who work for hospitals and nursing homes– are immune from the costs of medical

malpractice suits and claims.

> Plaintiff Metropolis also argues that professional service limited liability companies ("PLLCs") are exempt from CPLR 321(a) because professionals may be personally sued for malpractice claims.[9] Plaintiffs' Aff. p. 30, ¶¶ 3-4; *see* N.Y. Ltd. Liab. Co. Law § 1205. This argument is unavailing. A PLLC, like an LLC, is an entity distinct from its members and a PLLC member's protections include a shield from the PLLC's business debts. *See* 1 N.Y. Prac., New York Limited Liab. Companies and Partnerships § 12:16. As such, PLLCs, like LLCs, are "voluntary associations" that can only appear through counsel. CPLR 321(a); *see Michael Reilly Design, Inc. v. Houraney*, 40 AD3d 592, 592 (2d Dept 2007). New York courts provide very limited exceptions to CPLR 321(a), and a PLLC consisting of non-attorney members is not among the

> ---
>
> [8] Section 1654 provides that that "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." State courts are not included in the definition of "courts of the United States." 28 U.S.C. § 451 (defining "courts of the United States" in Title 28 to include "the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title . . . and any court created by Act of Congress the judges of which are entitled to hold office during good behavior.").
>
> [9] Plaintiffs indicate that Metropolis is a "sole proprietorship," which gives the impression that Metropolis is an unincorporated entity. For the avoidance of doubt, Metropolis is an active PLLC registered under the laws of the state of New York. *See* Complaint at p. 3 ("Metropolis Pain Medicine PLLC, is a professional entity registered in the state of New York."); Perskie Aff, Ex. E.
>
> 12
>
> 12 of 14

FILED: NEW YORK COUNTY CLERK 12/14/2022 05:16 PM    INDEX NO. 159019/2022
NYSCEF DOC. NO. 112    RECEIVED NYSCEF: 12/14/2022

> recognized exceptions. *See Austrian, Lance & Stewart, P.C., v. Hastings Properties, Inc.*, 385 NYS2d 466, 467 (N.Y. Sup. Ct. 1976) (holding that professional corporation of attorneys may appear *pro se* where personal liability attaches, *and* each member of the professional corporation a qualified attorney who could appear before the Court).

*Excerpt From Defendants' Response (to Plaintiffs' Reply) Regarding the Motion to Dismiss*

The Judge accepted this argument. Therefore, I was not allowed to speak to patient harms as I was purportedly insulated from them. Then while enforcing its Lawyer Ban, the City

argued that Metropolis cannot appear without an attorney. The Judge accepted that argument as well.

> **IV.    Plaintiff Metropolis must be dismissed from this action because corporations and voluntary associations must be represented by an attorney.**
>
> CPLR 321(a) provides that corporations and voluntary associations are generally prohibited from appearing in an action without counsel. This requirement has been interpreted to include limited liability companies and other types of legal entities that are "created to shield its members from liability" and "distinct from its members." *See Michael Reilly Design, Inc. v. Houraney*, 40 AD3d 592, 593, 835 NYS2d 640 (2d Dept 2007); *Gioia Equities, Inc. v. One Dev. LLC*, No. 112451/2009, 2011 WL 1235496 (Sur. Ct., New York County 2011). Metropolis is a professional service limited liability company ("PLLC") organized under the laws of New York, which is a type of limited liability company ("LLC") for certain licensed professionals. NY Limit Liab Co § 1207. PLLC members enjoy many of the same legal protections as LLC members. NY Limit Liab Co § 1213. As such, per CPLR 321(a), Metropolis cannot appear in this action *pro se*, and had no authority to file the Complaint. Accordingly, this Court should dismiss Metropolis from this action.

The City Agency argued that as a pro se, I "had no authority to file the Complaint," whereas Judge Ramseur ruled that I did have enough authority for her to dismiss the case against Metropolis with prejudice, but not enough authority to represent the company for more than the Complaint. All of this has rendered Metropolis into a sitting duck for perceived malpractice claims. In this hostile environment– created and maintained by the City– even perceived vulnerabilities can quickly turn into real vulnerabilities. Even though this case is currently in the Appellate Court First Department, Judge Ramos in the SDNY applied res judicata to all constitutional claims that arose before or on the filing date of the libel Complaint before Judge Ramseur. (See SDNY 1:23-cv-06391).

### G. *Interference With Ability to Pay Bills: To Maintain Basic Utilities*

Up through 2025, I kept most of my practice's financial systems paper-based and mail-reliant for a reason: I had repeated problems with two-factor authentication across multiple platforms. I experienced repeated failures of auto-payment systems, even when I had sufficient funds available. Web portals would time out, reject logins, or block access altogether — sometimes flagging routine business activity as suspicious. This was not a personal budgeting issue. At the time, I had a credit score in the 800s, with no history of missed payments and more than sufficient funds in every account.



But I could not get access to those funds — and the systems that normally handled them on my behalf were silently failing. In January 2023, shortly after I became more aggressive in litigation against a City of New York Agency, PayPal abruptly suspended Metropolis' Mastercard access. This effectively disabled our ability to pay vendors — even when I had cash on hand.

The most serious consequence: the medical practice's (internet-based) phone lines were disconnected, cutting off communications with patients, hospitals, radiologists, ER doctors, surgical teams, pharmacies, and health insurers.





*Text Messages in February 2023 Between Dr. Devi and A Metropolis Employee*

This was not a one-time glitch. These credit card suspensions peaked around key deadlines, usually immediately prior to the Court's deadlines in my litigation with the City– creating maximal disruption at the office and the greatest potential harm to patients at

times when I needed to focus. More payments fell through. More auto-transfers failed. More systems reclassified essential practice-related transactions — like rent, phone service, or medical supplies — as high-risk or suspicious, even though they were routine, predictable, and consistent with years of prior activity.

I perform interventional spine procedures on patients with complex medical histories — including cancer, HIV, clotting disorders, and spinal hardware. While I instruct all patients to call 911 for emergencies, many still call the office first, even for signs and symptoms of stroke or spinal cord compression. (Luckily, all the calls we have had so far have been false alarms). But not having a working phone in that setting is not just an inconvenience — it's a direct patient safety hazard.

- ER physicians could not reach me for pain consultations.
- Radiologists could not get through to communicate critical imaging findings.
- Surgeons could not coordinate on shared patients.
- Patients with urgent medical matters could not even leave a message.

Even beyond safety, the reputational damage was serious. Contractors and medical colleagues questioned whether the business was struggling. It became harder to recruit staff– with potential employees wondering if they would be paid or not. If I couldn't even keep the phones on, how would I pay them? The problem wasn't lack of funds, but an inability to access those funds due to payment blocks, failed verifications and halted auto-payments. Even my own employees believed our accounts were past due — not that the payment methods themselves had been disabled behind the scenes.

### H.  *Interference With Commercial Travel and Identity Verification*

Many doctors– including me– travel to medical conferences with their children. They combine work with play. I had to curtail all of that because I never know what will happen. On August 25, 2025, I was prevented from boarding JetBlue Flight #0255 from JFK to Providenciales (Turks and Caicos), despite having checked in online over 10 hours in advance and receiving assigned seats for myself and my two children (29D, 29E, 29F). A JetBlue agent told me I was free to board the plane but I would have to leave my children

behind– I was not authorized to travel with them. My children are ages 4 and 7, and that was simply not feasible. They couldn't just board a later flight. Although my boarding pass was accessible through my Apple Wallet, JetBlue's system would not allow me to download or print boarding passes for my children.

- I attempted printing them from home,
- At the kiosks near the subway exit (with assistance from a JetBlue agent),
- At the main kiosks near the Main Gate entrances (with assistance from a JetBlue agent)
- And finally at the Family Assistance desk — all without success.

At every stage, I was told the children's boarding passes were "unavailable" to me. Despite holding confirmed seats, TSA PreCheck, no checked bags, and arriving on time, we were unable to board. A JetBlue supervisor ultimately had to cancel our flight, rebook us on a new one for the next day, and print our boarding passes herself. She confirmed that the issue was with their system and not user error.

At the time, I attributed the failure to an airline glitch. It now appears this event may represent yet another example of targeted interference through digital flagging or reclassification. My children's boarding passes were associated with my account and travel profile, and would not print. They had to be reissued under a new flight and printed by an individual other than me.

Notably, this was an issue with JetBlue's digital systems– not a government-related security issue. None of us had any problems going through TSA Pre-Check the next day. We had no problems at Customs or Border Patrol, either in Turks and Caicos or upon our return to the U.S. In terms of the divorce, my husband had given me both generalized and specific permission to travel alone with the children, but no one asked me about any of that. All of our passports were fine. I also had copies of the children's birth certificates, if asked. (No one asked).

The missed flight resulted in:

- A full-day delay in travel,

- Lost prepaid lodging and resort fees– and "fun"
- Significant stress and confusion,
- And reputational harm, as it caused others I work with to wonder why I couldn't board a plane with my own children

This incident — like others detailed here — did not involve any misconduct or error on my part. It reflects a pattern in which my ability to function normally in digital systems– *my ability to participate in the modern economy*– is obstructed without explanation, creating cascading professional and personal consequences. This has implications for the corporation.

### I.  <u>Interference With the Practice's Ability to Access Cell Service</u>

While traveling outside of the country– which I frequently do for work– I was unable to access my cell phone. Even though I had paid for roaming cell service, my carrier claimed it could not activate the service through wifi (which is the typical process) and instead, needed me to verify my identity using cell service. I needed the carrier to provide the cell service so I could use the cell service. This presented a serious conundrum in terms of treating the patients.

Our electronic medical record system does not allow access from outside the country. Any foreign attempts at access to patient data will immediately trigger a security cascade that locks down the entire system. So when I travel, I typically ask an employee or a contractor to access  the patient records domestically, and to contact me on my cell to discuss any issues.

We were able to circumvent this problem by arranging specific times to talk at the hotel– using wifi/ What's App, FaceTime, etc.– but we could not find a work-around for everything. First, many health insurer web portals have two-factor authentication that require me to provide the code sent to my cell phone. Because I could not receive the codes, I could not provide them to my medical practice. Second, because of the inconsistent office phone service, I had given my cell phone number out to patients and other contacts. Because I could not receive messages, I could never be sure if someone–

who didn't have an iphone– was trying to reach me. (I could receive iPhone calls and messages on wifi).

In 2025, I traveled to Canada, the United Kingdom, Iceland, the Netherlands, Belgium, Luxembourg, and Turks and Caicos. I was restrained in my ability to practice medicine– not due to a true security risk– but because of an artificial barrier imposed on me for inexplicable reasons. I just kept facing a circular loop of messages.

Optimum Mobile: Welcome to Belgium. In order to talk, text and use data in your current location, you must add a daily or weekly pass

Reply DAYB to add a Daily Travel Pass Group B for $15 or

WEEKB to add a Weekly Travel Pass Group B for $60.

Wed, Aug 13 at 4:38 AM

WEEKB

Optimum Mobile: Your request for data top up on 08/13/2025 04:38:15 was unsuccessful. To try again, please log into your account at My Mobile: https:// mymobile.optimum.com

WEEKB

Optimum Mobile: You are trying to send a message to Germany. You need an International add-on from International - Group B to send this message.

*Inability to Access Text Messaging:*

*I could not logon to the account from wifi;*

*The site demanded I logon using cell service for security*

### *J.   Interference With the Practice's Ability to Maintain Permits*

My practice's radiation permit was set to expire on December 31, 2025. However, for approximately one month, whenever I attempted to access either my account or my practice's account on the NYC Department of Health and Mental Hygiene (DOHMH) website, another recipient of opiate-related litigation funds, no records were available—effectively blocking renewal of the permit. Despite repeated attempts to navigate various DOHMH web portals and renewal processes, I was unable to complete the renewal process. This obstruction is significant for two reasons:

1. If I continued operating in good faith without realizing the permit had not been renewed, I would likely face a surprise inspection in the New Year, resulting in Radiation Safety violations for operating without a permit—a violation manufactured through administrative inaccessibility.

2. If I shut down operations preemptively, patients would likely face delays in care, and the practice would suffer economic harm, reputational damage, and disruption to critical medical services—especially for medically vulnerable patients with limited alternatives.

This is not a coincidence. The timing, historical context, and strategic effect mirrors past conduct in this ongoing litigation in which the City attempted to entrap me in regulatory violations. This appears to be another retaliatory tactic designed to frame the medical practice and me, sabotage our operations, and discredit our constitutional claims.



*Radiation Permit: No Records Found: Timestamped November 27, 2025*



*Various Error Messages Preventing Permit Renewal*





*Various Error Messages Preventing Permit Renewal*

Notably, after I raised this issue in a pleading in Court, entitled "Notice of Spoliation of Evidence and Procedural Harm," we mysteriously received a Radiation Permit in the mail– even though I had never completed the online process.

### *K. Multiple Radiation Safety Audits and Surprise Inspections*

Metropolis has had repeated audits and surprise on-site inspections to investigate whether it follows proper protocols for the safe use of radiation and radioactive materials. Every investigation concluded in Metropolis' favor. (I perform minimally invasive spine procedures using radiologic image guidance.) These inquiries forced the practice to incur significant costs, including expert reviews by physicists, radiation safety consultants, engineers, electricians and in-house building personnel as well as comprehensive radiation surveys of the skyscraper in which it operates. As costly as these demands were, they could not be entirely outsourced. As both the CEO and licensed Radiation Safety Officer of Metropolis, I was personally responsible for: testing every lead garment for integrity; reviewing dosimetry badge reports for all clinical staff; assessing whether operative time could be reduced on a case-by-case basis to minimize radiation exposure; auditing procedure logs and radiation maps; conducting in-house radiation safety trainings; and locating architectural blueprints of the building to determine the thickness of the concrete foundation.

I also served as a de facto liaison and negotiator, tasked with persuading neighboring corporate tenants to grant radiation safety experts unrestricted access to their office suites—since the City required radiation mapping not only within Metropolis, but also in

adjacent, upper, and lower floors due to the risk of radiation penetrating walls, ceilings, and floors.

Whenever these surprise on-site inspections occurred, I was required to immediately halt clinical or administrative functions to personally escort inspectors through the facility and through Metropolis' records. During the first inspection, the staff and I continued treating patients while the inspector was escorted to the procedure suite to work independently. The office manager later informed me that when I checked in on the City inspector, the inspector appeared to be reviewing documents unrelated to radiation safety—but rather, materials belonging to me, housed within Metropolis.

In a past instance, a City inspector violated the City's own mandated COVID-19 safety protocols—such as the 3-day waiting period for negative test results—solely to execute unannounced inspections of Metropolis. The practice treats vulnerable and immunocompromised patients, so this placed both patients and staff at heightened risk of serious infection at the height of COVID-related deaths in NYC. Notably, these on-site inspections occurred immediately prior to key filing dates– deadlines I had to meet.

Due to Metropolis' location adjacent to the 9/11 Memorial and Freedom Tower, the City was able to weaponize reputational harm through insinuation. I was forced to clarify to neighboring corporate tenants that, although I was deeply troubled by certain aspects of the City's behavior, I was not, in fact, building a nuclear bomb in the office.

### L. Interference With Health Insurer Contracts and Hospital Admitting Privileges
On January 3, 2025, the JPML, a seven-member Panel of federal judges from around the country, accepted my mother's and my joint Motion for Consolidation and Transfer regarding civil rights violations by the City. The JPML created the docket "MDL #3146 In Re: Mary and Devi Nampiaparampil."

| Date Filed | # | Docket Text |
|---|---|---|
| 01/03/2025 | 1 | MDL Number 3146 Assigned -- MOTION FOR TRANSFER ACCEPTED FOR FILING re: pldg. ( 1 in Pending No. 1) Associated Cases: Pending No. 1, NYE/1:24-cv-05605, NYS/1:23-cv-06391 (TF) (Entered: 01/03/2025) |

*Excerpt From JPML Docket*

That same afternoon, in spite of my written contract with New York University (NYU), and in spite of my 15 years of service on the faculty, the Chair of my Department told me that I was fired <u>without cause</u> from NYU Grossman School of Medicine, and that he was immediately and unilaterally ending all of Metropolis' insurance contracts with NYU Langone Health, again citing no cause. This change– on January 3, 2025– occurred abruptly in the middle of my faculty appointment, which extended until December 31, 2025, so it was not as though I just fell off.

*Figure: NYU Reappointment Letter*

The termination meant the Chair was abruptly ending my group participation in dozens of contracts with the major medical insurance companies that NYU contracted with including: United Health Care, Aetna, Cigna, Centene, Anthem, Wellpoint, Metroplus, Humana, and their subsidiaries. A Dean later emailed me that the university hospital– which, like my medical practice, receives federal funds– has no appeals process.

After I described the major medical risks that this sudden and surprising change would create for my medically frail patients– especially those who had already stopped blood thinners, obtained pre-auths, undergone procedures with post-op follow-up visits pending, and taken a variety of other steps to embark on medical care with me– the Chair called me back to say I could have 3 months to figure out a plan to transfer the patients to other physicians. Notably, he did not suggest that I recontract with insurers myself, most likely because 3 months is not enough time to look for a lateral or better position at another university healthcare system and it is not enough time to contact major health insurers and negotiate– especially without leverage and without any explanation for the sudden change.

More importantly, major health insurers would be unlikely to take me on unless I had admitting privileges at a hospital, which I would lose along with the faculty appointment. As a respected physician in my field, I am sure I would be able to obtain admitting privileges and health insurance contracts– but not under this extreme time pressure– with the patients at risk. Without health insurance contracts and without admitting privileges, I would lose the *thousands* of patients in my medical practice who have health insurance coverage. If these sick patients could not find another physician to assume care within a reasonable time frame, I was at risk of being reported or sued for patient abandonment. Ironically, even though I did not solicit any donations from them, multiple patients told me they made end-of-the-year donations to NYU *because* I was a doctor there, also putting me at risk for claims of fraud if I suddenly disappeared. Even the logistical burden of informing thousands of people of this unprecedented event seemed overwhelming. Unwilling to accept this course of action, I contacted the Title IX officer to formally opposed the termination. Ultimately, the Chair rescinded it before it was officially processed.



Steven Flanagan, MD
Professor and Chairman
Department of Rehabilitation Medicine

January 7, 2025

Devi Nampiaparampil, MD
250 West 50th Street Apt.27a
New York, NY 10019

Dear Dr. Nampiaparampil,

I am following up on our phone conversation dated January 3, 2025 and your e-mail communication dated January 6, 2025 regarding our discussion pertaining to terminating your faculty appointment. Your communications delineate several contributions to the academic mission of the Department of Rehabilitation Medicine at NYU Grossman School of Medicine, which were not conveyed to me prior to our phone conversation on January 3. Based on this information, I have reconsidered my decision, noting your faculty appointment as Associate Professor on the clinical track and ongoing participation in the University Physician Network will not be terminated at this time.

*Letter From NYU Canceling Termination*

This is an ongoing issue. NYU Grossman School of Medicine has faculty requirements including participation in lectures and Grand Rounds. Since my medical practice is off-site, like many faculty, I have to participate virtually. However, for more than 6 months, I did not receive the web links to participate even though I followed up about this with multiple people. I just started receiving at least one set of Zoom links *this week*. I have also noticed that my emails go through a gatekeeping process and do not immediately reach the intended recipients, which prevents me from volunteering for university events or activities. So this past year, NYU ostensibly invited me to a Leadership seminar, which I attended, for those that want to rise within the institution. It sent me the requirements for promotion, creating the outward impression that I could advance within the system. But for 6 months, it withheld the Zoom links for the mandatory– minimum requirement for faculty–lectures that I was supposed to attend and absolutely could not.

### _M. Interference With Ability to Recruit New Patients and to Hold On to Old Ones_

Even though I remained a member of the University Physician Network (UPN), the physician group contracting arm of NYU Langone Health, and even though I had paid the annual dues to remain a member, NYU Langone Health publicly and **_falsely_** claimed to their collective patient base– on a highly ranked website, that outranked my own– that I did not participate in NYU's insurance contracts– and that I did not accept "insurance" at all– which include Medicare and Medicaid, which I participate in, outside of NYU.



NYU Langone Health
https://nyulangone.org › doctors

## Devi E. Nampiaparampil, MD | NYU Langone Health

Devi E. Nampiaparampil, MD does not accept insurance. Locations and App Pain Medicine, PLLC. 111 John Street, Ste 2509, New York, NY 10038 View I

_False Statement: "Devi E. Nampiaparampil, MD does not accept insurance"_

I informed UPN, which failed to take minimal corrective steps to address the issue of false content being published through erroneous back end data entry. Instead, NYU rerouted me to their general software support number as though this was another inexplicable tech glitch.

**False Statement in NYU Caption About Insurance**
2 messages

**Devi Nampiaparampil** <devichechi@gmail.com>                    Fri, May 23, 2025 at 8:08 AM
To: NYUPNHELPLINE@nyulangone.org

Hello,

Hope all is well. I have been an NYU-UPN physician since 2015/ 2016 and I'm reaching out because of a technical issue in my NYU profile. My practice accepts insurance and the insurances are listed on the NYU Find-A-Doctor website. However, the caption that appears when people search says I do *not* take insurance. Since most patients use insurance, that steers patients away from my practice. They may not click on the link to investigate deeper. I'm attaching a screenshot.

Can you do something to correct that?

Thank you.
Devi

_Notification of Impact and Falsity of Claim_

## N. Burdensome Private Auditing Pertaining to Litigation Before the JPML

Contemporaneous to the JPML filing deadlines, NYU Langone Health implied I had an undisclosed conflict of interest with their work and asked to meet with me to audit all of my "outside activities." At the time, I was unaware of NYU's new multi-billion dollar contract with H+H or the overall local milieu surrounding MDL#2804 and related opiate-related litigation.

RE: Your NYU Langone Health COI Disclosures [NYULH-COI.FID1691]

Nester, Adam <Adam.Nester@nyulangone.org>                                   Tue, Jan 21, 2025 at 10:36 AM
To: "Nampiaparampil, Devi" <Devi.Nampiaparampil@nyulangone.org>, "devichechi@gmail.com" <devichechi@gmail.com>

Dr. Nampiaparampil:

1. I have no knowledge of the grievance you referenced. It is the routine practice of my office (CIMU) to request disclosure from faculty and employees any time outside activities that insect with their role and responsibilities at NYU Langone Health come to the attention of my office. This is so we can account for activities, advise you regarding any intersection with our policies, and discuss any steps that may be necessary to eliminate, manage and mitigate any conflicts that arise.

2. Faculty (including non-compensated faculty) are under an ongoing obligation to disclose all outside activities as they relate to their affiliation and employment at NYU Langone Health, the NYU Grossman School of Medicine and NYU Long Island School of Medicine and ensure their activities comply. Please see the *Faculty Conflict of Commitment* policy, *Business Conflicts of Interest* policy and *Endorsement and Use of NYU Name* policies for more information. These policies are available to you on Ellucid and NYU Langone Health COI policies are available publicly.

*Excerpt From Email From Attorney In the Conflicts of Interest Unit*

## O. Interference With Ability to Obtain COVID Grants Through New York State

Lendistry, the state-contracted COVID relief lender for "Empire State Development," denied Metropolis relief despite receiving *27 forms of identification*, including physician licenses and a personalized letter from the malpractice carrier. Only 2 forms of ID were required under the program. Numerous agents expressed suspicion about whether I was a "real" doctor. These vague suspicions caused long delays and wasted staff time. Metropolis was unable to access the courts due to the Lawyer Ban, so I took to Twitter. I posted a recorded call with Lendistry on social media and tagged physician-donor PACs. The issue was resolved within 24 hours.

**New York Relief Grant Application!**
2 messages

Kelly Kermode <kelly.kermode@lendistry.com>                    Thu, Mar 31, 2022 at 12:44 PM
To: "devichechi@gmail.com" <devichechi@gmail.com>

Dr. Devi Nampiaparampil,

It's come to my attention that you've had an unusually difficult application process. Please accept my apologies and know that I am now personally carrying your application forward.

Next steps are as follows:

We receive your signed closing documents and check them for completion, (24 hours). Then, our funding team will check the ACH details to ensure your ACH transfer is successful (2 days). Finally, your ACH is initiated (2 days).

*Excerpt From Lendistry Email*

### P. Interference With Ability to Obtain COVID Tax Credits Through New York State

In 2025, my practice applied for the New York State COVID Capital Costs Tax Credit Program, which was run through Empire State Development (ESD) and administered by a private contractor called Forward. This program was not a grant; it simply allowed businesses like mine to deduct COVID-related infrastructure costs from state tax liability. It included expired ("perishable") medications, expired disposable medical supplies, and infrastructure upgrades to allow for telemedicine.

My expenses and receipts were *approved* but my tax certificate did not reflect the correct amount of the approval. Per my recall, I received about 1/10 of the tax credits I qualified for and no explanation was provided. When I spoke with Forward's program representative from Washington state, Alexander Morrison, he told me outright that I was a "*fraud*." He offered no justification, no process for appeal, and no opportunity to understand or correct any alleged issue. His tone was aggressive and dismissive.

When I pressed for clarification, Morrison told me that my medical practice– providing essential medical services during a public health emergency– was "low priority" during the pandemic compared to other high-priority projects. He refused to explain how projects were ranked, what criteria were used, or why a ranking list would justify denying

a tax credit program that was not capped by quota and required no new disbursement of funds.

I was also informed that I owed "back taxes," a claim that sent me on a fruitless and time-consuming wild goose chase– calling various government agencies and checking numerous government portals. I did not owe taxes to the IRS or to New York or any other state where I conduct business. Per my recall, I even called other states that I had lived in years over a decade ago– to see if there might be some old issue there, but there was not. The statement that I owed back-taxes somewhere was completely false.

I am including an excerpt from my email before the call:

Hope all is well. I am reaching out for your assistance. I am a physician and the sole owner of a medical private practice that treated over 2500 patients during the pandemic. Most of these patients are minorities, and are either immunocompromised, elderly and/ or disabled. My staff and I kept these patients out of Emergency Rooms at a time when going to one could have been a death sentence for them. However, given the tremendous overhead, and the expenses needed to adapt, my practice sustained unexpected and significant costs.

I applied for a capital tax credit and received an approval from Forward. However, the majority of receipts I submitted-- although approved by the Forward reviewer over email!-- were not approved in the final tax credit offer. I submitted the receipts within 24 hours of the representative's request for them. Nevertheless, I was told via email that the decision was made that way because of a deadline that was unpublished, and which I had no notice of.

I was also instructed via email that I must appeal the decision after I received the approval certificate. I received an approval but no means by which I could appeal. I contacted Forward this morning within a couple hours of receiving an email reminder to accept the tax credit. (I am attaching the email below).

Even though I responded to Forward's reminder email within a couple hours, I was told that I had also missed the deadline for an appeal and that that decision was final. Again, there is no published deadline for appealing and I had no way of knowing that any deadline existed.

I am writing to appeal this decision and to obtain the tax credit that I was initially approved for. I am attaching the relevant emails to this email.

I will also add that this comes on the heels of TWO other costly denials that were made in error, which I have previously received from the Empire State Development Fund. The Empire State Development Fund reversed their denials in both those cases, but only after I spent significant time and effort, and had to put patient care on hold to deal with these issues. I have only applied for one grant and one tax credit-- and I was denied for months in both cases-- and then ultimately approved.

The first denial related to a grant I applied for. At that time, on top of the fact that my business qualified, I should have been ranked high priority as a 100% minority female with 100% ownership of a business that treats almost 100% minority patients, including the poor and disadvantaged. I am attaching an email from Lendistry apologizing for their inappropriate denials on behalf of the NYS Empire Development Fund. I was delayed by almost a year in receiving funds, and as a result, had to take on several high-interest loans to cover expenses in order to treat the patients. I am still paying off that debt today.

The second denial was related to this tax credit (that I have now been approved for-- but for the wrong amount). I was denied the capital tax credit for several months purportedly because I owed back taxes. However, after several months, and after I obtained confirmation from federal, state, and local tax representatives which I provided to Forward, Forward confirmed that I never owed any back taxes. That was an inexplicable error that led to an inappropriate denial.

This denial now is the third inappropriate denial. I have only applied to two programs. I am asking you to review this decision.

I am forwarding my email about this issue and attaching the emails from September 15, 2023 from the Forward representative who told me my receipts were acceptable, and that I would ultimately be approved for the correct amount in the tax credit. I am also attaching the email from Lendistry apologizing for their inappropriate denial. Again, both of those denials turned out to be errors and they were costly for me and my business.

I hope you can review and address this third issue. It appears as though every single time I appropriately apply for grants or tax credits my business qualifies for, there is some type of issue.

*Excerpt From My Email to Empire State Development and the FORWARD*

Paul Matrose from Empire State Development left the entire decision-making up to FORWARD and FORWARD determined that Alexander Morrison was the final decision-maker on the matter. Even before the phone call, Morrison previewed what his response would be in this email to me:

Alexander Morrison <alex.morrison@forwardplatform.com>                        Thu, May 2, 2024 at 7:15 PM
To: Devi Nampiaparampil <devichechi@gmail.com>
Cc: Tim Morones <tim.morones@livestories.com>, Adnan Mahmud <adnan.mahmud@livestories.com>, Alexander Morrison <alex.morrison@forwardplatform.com>

Hello Devi,

Thank you again for contacting me to try and resolve your situation. I have read all of our case files/notes on your application and met with the managers, case reviewers, and assistant program managers for this program.

Currently, adjustments to your tax credit are not allowed.

The NY tax credit appeals process is not a public record, nor are the program metrics available for review. The appeals process is not available for every business nor a guarantee for certain circumstances that a company will receive an appeal. The information shared with you by an Intake specialist, while accurate, is not a guarantee for appeal.

The process businesses follow if appealing a tax credit amount only arises when they reach out to the email listed on the Tax Certificate body email that is provided for inquiries post receipt of a certificate. If a business, after receiving the final amount as dictated by the certificate, wanted to inquire what was and wasn't an allowable expense, an appeal may be opened if it had validity or fell within the program guidance as dictated by NY statute that governed the program.

NY has authorized me to have a phone call with you about your business application for the NY capital cost tax credit, in which I can elaborate on your situation as it stands if you feel you need any further explanation.

Thank you/congratulations again, and I wish you the best moving forward.

Alexander Morrison
Research Program Manager

alex.morrison@forwardplatform.com | (206) 312-1014

*Email Response From Decision-Makers at the FORWARD Platform*

Blocking access to a non-discretionary tax credit, based on non-transparent, shifting standards, and with no fraud finding or due process, significantly undermined my ability to recover from COVID-related losses — and again, increased the financial risk to federal funds tied to my practice's viability. There was no adjudicatory process. I was not given a fraud finding, a hearing, or even an opportunity to respond to any claim. The denial was arbitrary and unsupported. Moreover, tax credits are designed to encourage pandemic-era investment. Punishing physicians who comply with public health guidance (by creating telehealth access, etc.) is antithetical to the program's overall purpose.

### Q. Interference With Other Streams of Income To Pay Back the SBA Loan

The City of New York continues to undermine my credibility across multiple jurisdictions while simultaneously exploiting my medical expertise for its own institutional benefit. Immediately after I filed a Complaint in the Western District of North Carolina (NCWD) where I was denied counsel– under color of law– while giving Oral Argument on a

denial-of-counsel claim before the JPML, I received a request from the City me to be its

expert witness in another case.



*Excerpts From Post-NCWD Emails Between Me and NYC HHC*

If I were to explain the conflict and cite the ongoing litigation, my words could be mischaracterized as unprofessionalism or used against me in unrelated matters. If I remained silent, my silence might later be cited to imply consent or lack of concern. That is the intended effect: ambiguity weaponized to chill constitutionally protected litigation. I am concerned that this interaction—like others involving agencies under City control—was not a good-faith referral, but rather a form of strategic probing or procedural harassment, intended to:

- Portray a conflicted or compromised relationship,
- Divert my time, focus, and legal resources, or
- Create grounds to question my credibility or neutrality as a litigant.

Moreover, were I to accept the referral and perform services, I could be burdened with:
- Onerous documentation requirements,
- Post hoc claims of liability or bias,
- Uncompensated time obligations, or
- Even potential lawsuits for unfavorable outcomes.

## R. Suppression of Medical Research and Education Efforts

The City of New York is interfering not only with legal records, but also with search engine results, social media visibility, and digital metadata—strategically obstructing public access to information about Metropolis' litigation– but as collateral damage– all of the research and education, which I have been involved in over the past three decades: research which has won numerous awards for its groundbreaking nature from the American Medical Association, American Society of Interventional Pain Physicians, American Society of Regional Anesthesia and Pain Medicine, Department of Veterans Affairs, Massachusetts Medical Society, Massachusetts General Hospital, NYU Grossman School of Medicine, and other institutions. My peer-reviewed publications and my lectures are all being suppressed.

On November 13, 2025, a search for "Devi Nampiaparampil" on a major search engine that quantifies search hits produced just **58** results.



*November 13, 2025 Timestamped Search Results: **58** Entries*

On November 14, 2025, just one day later, the same search yielded over **4.78 million** results on the same platform. *How can someone go from just 58 results to over 4,780,000 results in approximately 24 hours?* I believe a ~shadow ban~ was temporarily lifted.



*November 14, 2025 Timestamped Search Results: **4.78 Million** Entries*



*Timestamped Search Results: Activity Seems To Be From Several Years Ago*

Despite this numerical surge, references to my ongoing litigation against the City have vanished. Other digital anomalies followed. On November 18, 2025, my most recent published material appeared to be several years old—even though I continue to publish peer-reviewed articles, report for national news outlets, and produce regular media content. In addition:

- My physician rating profiles fluctuate wildly: sometimes showing thousands of five-star reviews, and at other times showing only dozens, with lower average scores.
- Images of me online often depicted me 6 to 8 months pregnant, though I have only two children, now ages 5 and 7.

This is not random indexing. It is part of a coordinated effort to suppress digital visibility, tarnish credibility, and interfere with press access, particularly around my core claim that the City imposed a Lawyer Ban on me. And while that may be the goal, the result is that– other medical researchers and educators who may rely on my work as a foundation for theirs– are unable to find my work or build on it. That harms the public– not just my medical practice.

Despite these obstacles, my commentary continues to gain international traction, especially on platforms like YouTube, where my videos, most recently on free speech, have generated over 123,000 full views and approximately **1.5 million** impressions, according to my analytics dashboard (accessed December 9, 2025).



*Devi Nampiaparampil YouTube Analytics Board (December 9, 2025)*

Even my credibility as a physician has been actively suppressed. Despite enduring over five years of institutional retaliation, I have continued to be nominated by my peers to the Castle Connolly List of Top Doctors — a distinction that reflects the trust and recognition of fellow physicians across the country. My work has also been featured in numerous national outlets, highlighting the role I have played in elevating medical standards and advocating for underserved patients. But all of this is nearly impossible to find.

My research contributions are also being suppressed. Per my recall, I have approximately 80 publications in peer-reviewed journals. In the past, I used to check the National Institutes of Health/ National Library of Medicine (PubMed) website to update my CV. I spent more time doing the work than cataloguing it. But now the federal website suggests I have no publications.



I was unable to click on "learn why," but when I clicked on my name, I got "Page Not Found."



Meanwhile, if I do a regular internet search of "devi nampiaparampil nih pubmed," I can see that my publications still exist within the federal database– with my name still listed as an author– but they have been disconnected from my name as its own search. The metadata has been erased in a manner that renders my life's work invisible and irretrievable under my name.



*First Page of Results From Search of "nampiaparampil nih pubmed" (Timestamped)*

All of this interferes with my ability to secure research funding and to hold on to my academic position at NYU. In fact, the NYU Langone website provides dead links to patients– and to the rest of the public– reinforcing the impression that I lack any substantial research contributions compared to my peers, who are also on their website. Regardless of the browser, anyone who clicks on "Devi E. Nampiaparampil, MD," scrolls to "Research," and then clicks on "Read all publications," will inevitably obtain this result (regardless of browser or settings):



*My Research Profile on NYU Langone's Website*


### ***S. Collapse of Automated Preauthorization Systems Due to Identity Erasure***

In the digital era, most high-volume medical practices rely on secure, pre-populated web portals to request insurance preauthorizations for procedures, imaging, and testing. Until recently, my practice functioned efficiently within these systems. I am an in-network provider with almost all major commercial insurers. Their online portals, often managed by third parties, were pre-populated with my credentials — including my specialties,

board certifications, Tax ID, and National Provider Identifier (NPI). Patient eligibility determinations and approvals for routine procedures within my specialty were typically processed– and approved– within seconds.

After I initiated my litigation against the City, several systems have been unable to "locate" me in their systems — despite no change in my credentialing or contract status. My NPI and Tax ID no longer match any provider record in their web portals, effectively erasing my clinical profile from their databases. I no longer consistently appear as an in-network provider in their patient-facing provider databases. All of this has resulted in multiple cascading harms:

*Loss of Patients*

At first, based on what the web portals said, we believed I was out-of-network with certain plans (even though I was not) and turned away patients. This directly harmed my practice and denied care to patients with valid insurance. Also, since I have been erased from insurance companies' patient-facing directories, patients are being steered away from my practice and toward my competitors.

*Manual Preauthorization Burden with High Denial Rates*

 We later discovered that authorizations could still be processed by phone — but only if my staff manually provided every element of my identity, including full spelling of my 14-letter last name, credentials, and certifications. Because the system no longer recognizes my NPI or Tax ID, there is a high risk of human error– especially inputting my last name. Moreover, because insurers do not have information about my specialty training, preauth processing times increase, and I am often steered towards peer-to-peer processes.

*Resource Drain and Operational Disruption*

I hired an independent contractor to assist with all of these extra tasks. She now spends the majority of her time on long phone calls with insurers — spelling my last name throughout the day and trying to manually provide data that used to be automatically available. This has tied up phone lines and shifted resources towards repetitive, avoidable

administrative labor. The breakdown of these digital systems — across multiple insurance providers — corresponds with my legal filings against the City, and has impaired my ability to treat the federally protected classes of patients that HHS gave me federal funds to treat.

### T. Increased Surveillance and Burdensome Audits By Third Parties

Ironically– as far as audits go– these major insurers still recognize me as an in-network provider. On October 5, 2023, Judge Edgardo Ramos granted the City's request for a hearing on their Motion to Dismiss my case in the SDNY. The conference was held on October 18, 2023.

The following day– for the first time– UnitedHealth Group (UHG) initiated a series of audits against Metropolis, presumably as surveillance for insurance fraud. At the time, I was unaware that UHG is involved in opioid-related litigation. Per my recall, other health insurers followed suit with the health insurance audits.



As noted at the top of the page, a cascade of 77 separate voicemail/ email contacts about insurance audits on the practice began on October 19, 2023. There were additional calls

that were answered by staff- and did not go to voicemail. This escalated the week before JPML Oral Argument in Charlotte, North Carolina where I gave the Oral Argument on March 27, 2025, with Metropolis receiving calls, faxes and email requests for medical records for audit.

The Affordable Care Act (ACA) requires that insurance companies perform intermittent audits on medical practices and there has been a rise in AI-driven audits recently. However, the increase here appears to have coincided almost exactly with the JPML proceeding whereas, in my past experience, ACA audits typically increase in the 4th quarter to meet year-end deadlines. In the figure below, notice the intermittent requests between August 2024 and January 2025 and then the sudden uptick to weekly audit requests the week of the JPML hearing. These weekly emails have persisted through to today. The frequency of contacts and the burdensome nature of the requests has been disconcerting and time-consuming. The practice frequently responds by answering or by calling back and being put on hold– tying up phone lines.

To be fair, I have not responded to all of UHG's audit requests. I have responded to some. In many cases, Metropolis asked for an extension. In a few cases, I believe we just missed the deadline. I simply do not have time to deal with these audits while defending the patients and the practice from the City on numerous other fronts.

To my knowledge, none of these insurers have taken adverse actions against us because of my lack of response. Although I cannot be certain, I believe this is because we have been flagged in some manner– so we get repeatedly audited– and then when a manual review is triggered (because of my lack of response), the individual realizes there was no reason for this level of auditing in the first place, so our insurance contracts remain intact.



*Increasing Frequency of Insurance Audits; Timing Correlating With Litigation*

### T. Inability to Have Contracts Reviewed or Enforced By The Courts

Metropolis and I must enter into contracts in order to earn income and to pay back the SBA loan. However, we have two problems when it comes to participating in contracts. First, we cannot have contracts reviewed effectively by legal counsel. Pre-MDL #2804, it was my habit– after I signed a contract– not to look at it again unless there was a serious problem with the relationship. Post MDL #2804, I have to be vigilant at all times, but even if I engaged a lawyer, it would be illegal for me to tell the person what specifically I am worried about. If I told the lawyer about the speech suppression and retaliation, and asked that person to respond, it would immediately become a violation. So instead, I just have to wing it with the corporation's contracts– without any legal counsel at all. And if I guess wrong, too bad. Metropolis cannot enforce any rights, or seek redress, because it cannot access the courts anyway. This came to a head when I contracted with the NYS Attorney General to work on a Section 1983 case.



**Office of the New York State**
**Attorney General**

**Letitia James**
**Attorney General**

### MEMORANDUM OF AGREEMENT (Contract)
### Contract Number/Name: C107275/ Metropolis Pain Medicine PLLC
### (Rochester RO)

This AGREEMENT, by and between the New York State Office of the Attorney General, with its principal offices at the State Capitol, Albany, New York 12224 (hereinafter referred to as OAG); and Metropolis Pain Medicine PLLC with the principal office of 111 John Street, Suite 2509, New York, NY, 10038 (hereinafter referred to as CONTRACTOR).

WITNESSETH:

WHEREAS the OAG, in its capacity as enforcer of New York State laws, is in need of expert(s) to

*Excerpt From Office of the NYS Attorney General*

*Section 1983 Expert Witness Contract*

The reports shall be submitted to the following three (3) agencies:

| NYS Office of the State Comptroller | NYS Department of Civil Service | Office of the Attorney General |
|---|---|---|
| Bureau of Contracts | Alfred E. Smith Building | Purchasing Team |
| 110 State Street, 11th Floor | Albany, NY 12239 | State Capitol |
| Albany, NY 12236 | | Albany, NY 12224 |
| Attn: Consulting Reporting | | |

*Excerpt From Office of the NYS Attorney General*



**Office of the New York State Attorney General**

**Letitia James Attorney General**

January 17, 2025

Devi Elizabeth Nampiaparampil, M.D., M.S.
111 John Street, Suite 2509
New York, New York 10038

Thank you very much.

Sincerely

**LETITIA JAMES**
Attorney General of the State of New York
*Attorneys for Served Defendants*

*Letter of Agreement From Letitia James, NYS Attorney General*

In 2025, after I received the green light to proceed from an Assistant Attorney in the Office of the NYS Attorney General's office, I completed approximately $60,000 worth of expert consulting work. After I nearly completed the work, I was sent a *new* contract, which I was told I needed to sign to get paid. I found the entire contract to be unorthodox but could not consult with counsel. I cannot say for certain if there was anything wrong with the contract, but because I could not understand it, and because I was still under the City's Lawyer Ban, I declined to sign the new agreement and forfeited the payment for the work I had already performed. I also had to leave the project entirely because I did not want to be sued for breach of contract or any other issues related to the performance of the work– and not be able to access the courts.

## *U. Attack on Physician Credentials To Cast Doubt*

The City has published **numerous** false and deceptive statements that harmed the practice. As just one example, the City added the honorific title "Dr." to my physician colleague's name in a government publication that it distributed to approximately 5 million people. And it deliberately chose to leave the "Dr." title off my name. People in the community were confused and outraged because they thought I had tricked them– that I had lied about being a doctor and about treating patients during COVID. After all, in one of the most egalitarian cities in the world, why would the government only ascribe the doctor title to a white male physician and deliberately deny it to a brown female– unless she wasn't a doctor at all? (The George Santos misrepresentations were discovered around this time).

## Dr. Jeff Ascherman

## Devi E. Nampiaparampil

In court, CFB General Counsel Bethany Perskie appeared to argue that the First Amendment entitles City employees to use public funds to circulate falsehoods about private citizens—including the suggestion that I may not be a real physician—unless I could affirmatively prove that they knew the truth at the time of publication. Judge Ramseur appeared to accept what Perskie wrote:

> 110 NY3d 526, 529 (citing *McKee v. Cosby*, 874 F.3d 54, 61 (1st Cir. 2017).² **Actual malice** focuses on the defendant's subjective state of mind and requires that the defendant had "knowledge that [the statement] was false or with reckless disregard of whether [the statement] was false or not." *Khan v. New York Times Co.* 269 AD2d 74, 77 (1st Dept 2000). Importantly, regardless of whether

### *V. Injuries Interfering With the Ability to Perform Interventional Pain Procedures*

I received numerous verbal and physical threats in 2021 and 2022– many of these precipitated by false and defamatory statements published by the City and sent out through their official distribution channels. In the midst of all this, a City Agency warned me that I could not spend more than an allotted $6000 on any expenses– including personal or public safety measures. As a result, I found myself in several dangerous situations– pulled into a person's apartment while going door-to-door and locked inside against my will, subjected to simulated gunfire, chased around a parking lot with a car, assaulted when I picked up a microphone to give a talk, and accosted, attacked and molested by one man flanked by two others at a private event. For clarification, these attacks were not precipitated by anything I said. I was almost always assaulted before I ever spoke. I had no defenses because it was illegal for me to spend money on safety measures.

> the Court recognizes that plaintiff has not established the proximate causation element of a negligence cause of action. Plaintiff describes injuries to her such as being attacked by one supporter and menaced by another but conduct by third parties which is extraordinary and unforeseeable severs the causal connection between the CFB's alleged inaccurate advice and plaintiff's injuries.

*Excerpt From Judge Ramseur's Decision and Order*

*Of note, I did not describe the people who attacked me as "supporters."

In the last instance– while trying to defend myself from my attacker– I sustained significant injuries to my cervical spine, right rotator cuff, and right first digit (the thumb). Shortly afterwards, I developed adhesive capsulitis ("frozen shoulder") in the right arm.

Since I am right-handed and perform surgical procedures for Metropolis– as my primary job function– these injuries significantly limited the number and breadth of interventional pain procedures I could perform in the practice. My limited use of my right arm was a catastrophic problem for the medical practice. I still had to pay all the employees– because they were still ready and willing to work– showing up everyday. But because I couldn't perform the procedures, we were not able to actually offer the same services. I had to tell everyone in the practice what happened and we had to change all of our protocols to be able to treat the patients. I taught myself how to do numerous parts of the procedures left-handed. I used foot pedals. And my staff performed the parts of the procedure that did not require licensing, board-certification, and training. But we were still extremely limited for over a year. The staff performed four cortisone injections in my right shoulder that first year– just so I could get some more range of motion.

During the attack, I thought I saw a person filming a video, but I thought that person was with the attackers. I did not file a police report at the time. I told HSG about the attack later because I thought it supported my claim that I was prohibited from spending money and I acted accordingly. HSG heard me but never responded. In the Ramseur case, I uploaded my medical records but the Court redacted them in their entirety– so there was no evidence of injury. The redaction was presumably based on HIPAA, even though there is no HIPAA violation when you release your own medical records. (I had already redacted my social security number, date of birth, medical record number, and those personal identifiers).

After I fired HSG, my friend suggested I FOIL the NYPD about these attacks:

As it pertains to records withheld because they are specifically exempted by state or federal statute [§87(2)(a)], the Court of Appeals has determined that "FOIL's statutory scheme separately makes clear that redacted disclosure cannot be compelled where, as here, an agency has met its burden of demonstrating that records are exempt from disclosure under Public Officers Law §87(2)(a)." Therefore, because the requested records are specifically exempted from disclosure pursuant to Criminal Procedure Law §160.50, this agency is, "not obligated to provide the records even though redaction might remove all details which 'tend to identify the victim,'" *Karlin v. McMahon*, 96 N.Y.2d 842, 729 N.Y.S.2d 435 (2001), *citing Short v. Board of Managers of Nassau County Medical Center*, 57 N.Y.2d 399, 456 N.Y.S. 2d 724 (1982).

Accordingly, **all associated records** related to an arrest which has been sealed under Criminal Procedure Law Section 160.50 are exempted from disclosure; and, absent a notarized authorization from the accused/arrested person, or an unsealing order from the court, any records associated with this incident may not be disclosed.

You may seek judicial review of this determination by commencing an Article 78 proceeding within four months of the date of this decision.

*FOIL Denial Even When Record Can Be Redacted So As Not To Identify Victim*

**Appeal About [OpenRecords] Request FOIL-2024-056-00146 Submitted to New York City Police Department (NYPD)**

FOIL APPEALS <FOILAppeals@nypd.org>                    Wed, Jan 10, 2024 at 9:02 AM
To: Devi Nampiaparampil <devichechi@gmail.com>

There is no exception for the victim.

Respectfully,



Jordan S. Mazur, Esq.
Sergeant
Records Access Appeals Officer
NYPD Legal Bureau
One Police Plaza, New York, NY 10038
FOILAppeals@NYPD.org

*FOIL Denial: "No Exception For the Victim"*

### W. Surveillance-Adjacent Atmosphere

I cannot say much but we are in a strange situation where pharmaceutical representatives and patients connected to those who may have adverse interests are routinely in and out of the office. On January 12, 2025, an independent contractor associated with the practice said to me, "I just *pray* ICE doesn't show up… That's the last thing we need right now." At first I was stunned, then momentarily anxious, and then ultimately confused, at which

point I reminded the contractor that she was a U.S. citizen. She looked puzzled how to respond. And that is when I realized– with me living off the grid– relying on cash from the copay drawer– not credit, unable to board planes with my children, and unable to verify my identity at critical moments– she was concerned I was a migrant-adjacent. Because of the City's frequent and intensive radiation checks on the practice, our corporate neighbors wondered if I was terrorist-adjacent. And others wondered if I was just a plain fugitive from justice– unable to spend money, unable to use cell phones reliably, unable to verify who I was, and "missing" from the internet for the past several years. Surprisingly, we still get new patients. Yet even in New York City, I do not believe this is an attractive look for the medical practice, a business backed by federal funds.